UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | | |
|---|---|---|
| FIRST BANK & TRUST, | § | |
| | § | |
| Plaintiff, | § | |
| v. | § | |
| | § | |
| REAGOR AUTO MALL, LTD. d/b/a | § | |
| REAGOR-DYKES OF LEVELLAND, | § | CAUSE NO. 5:18-cv-00234-C |
| and d/b/a REAGOR-DYKES IMPORTS, | § | |
| FIRSTCAPITAL BANK OF TEXAS, | § | |
| N.A., BART REAGOR, RICK DYKES, | § | |
| SHANE SMITH, SHEILA MILLER, | § | |
| BRAD D. BURGESS, and KENNETH L. | § | |
| BURGESS, | § | |
| | § | |
| Defendants. | § | |

**DEFENDANT FIRSTCAPITAL BANK'S
BRIEF IN SUPPORT OF MOTION TO DISMISS**

SPROUSE SHRADER SMITH PLLC
Joel R. Hogue, State Bar No. 09809720
joel.hogue@sprouselaw.com
John Massouh, State Bar No. 24026866
john.massouh@sprouselaw.com
M. Chase Hales, State Bar No. 24083124
chase.hales@sprouselaw.com
701 S. Taylor, Suite 500 (79101)
P.O. Box 15008
Amarillo, Texas   79105
(806) 468-3300; (806) 373-3454 fax


 /s/ *Joel R. Hogue*
Joel R. Hogue
**ATTORNEYS FOR DEFENDANT,
FIRSTCAPITAL BANK OF TEXAS, N.A.**

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................. 1

II.    ARGUMENT AND AUTHORITIES ................................................................... 5

  A.  Motion to Dismiss Standard ................................................................................ 5

  B.  The Law Regarding the Allocation of Losses Upon the Collapse of a Check Kite ........... 6

    1.  What is a Check Kite? ................................................................................... 6

    2.  How Should a Bank Respond to a Check Kite? ........................................... 7

    3.  What Law Applies? ....................................................................................... 8

      a.    UCC and Federal Regulations Govern Check Clearing Process and Allocation of Losses Caused by a Check Kite. ....................................................................... 8

        1)    UCC Duties ................................................................................ 10

        2)    Regulation CC Duties .............................................................. 11

  C.  FB&T's UCC and Regulatory Claims Fail as a Matter of Law ....................................... 11

    1.  UCC Claim Fails ......................................................................................... 11

      a.    First Capital Met its Midnight Deadlines .............................................. 12

      b.    FB&T is Not Entitled to Restitution under the UCC for Checks Presented by FirstCapital. ........................................................................................................ 13

    2.  FB&T's Regulatory Claim Fails. ................................................................. 15

  D.  Courts Routinely Dismiss Common Law Claims. ............................................................ 19

    1.  The UCC Preempts FB&T's Common Law Claims ................................... 19

    2.  When Courts Analyze Common Law Claims Alternatively, They Still Fail. .............. 20

    2.  Even if Common Law Claims Were Permissible, these Claims Fail. ......................... 22

      a.    Money Had and Received/Unjust Enrichment/Restitution (Count 14) ................. 22

      b.    Conversion (Count 15) ........................................................................... 23

      c.    Conspiracy to Commit Fraud and Aiding and Abetting Fraud (Counts 19 and 20) 23

III.    CONCLUSION .................................................................................................. 25

CERTIFICATE OF SERVICE ..................................................................................... 26

# TABLE OF AUTHORITIES

**Cases**

*½ Price Checks Cashed v. United Auto Ins. Co.*,
  344 S.W. 378 (Tex. 2011)..............................................................................9

*American Airlines Employees Fed. Credit Union v. Martin*,
  29 S.W.3d 86 (Tex. 2000)..............................................................................9

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)...................................................................................5, 6

*Bank One Chicago., N.A. v. Midwest Bank & Trust Co.*,
  516 U.S. 264 (1996)....................................................................................11

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007).......................................................................................5

*Campbell v. City of San Antonio*,
  43 F.3d 973 (5th Cir. 1995) ..........................................................................6

*Citizens National Bank v. First National Bank*,
  347 So.2d 964 (Miss. 1977)...........................................................7, 14, 15, 21

*Commerce Bank v. First Union National Bank*,
  911 A.2d 133 (Pa. Superior Ct. 2006) .......................................................22

*Conley v. Gibson*,
  355 U.S. 41 (1974).........................................................................................5

*Cuvillier v. Taylor*,
  503 F.3d 397 (5th Cir. 2007) ........................................................................6

*Dean v. Commonwealth Bank & Trust Co.*,
  434 S.W.3d 489 (Ky. 2014) ....................................................................19, 20

*Edlund v. Bounds*,
  842 S.W.2d 719 (Tex. App. - Dallas 1992, writ denied) .............................23

*Ennis State Bank v. Heritage Bank*,
  No. 10-02-226-CV, 2004 Tex. App. LEXIS 4355, at *2 (Tex. App. - - Waco, May 12, 2004,
  pet. denied)............................................................................................passim

*First Financial Bank, N.A. v. Citibank, N.A.*,
  No. 1:11-CV-226, 2012 U.S. Dist. LEXIS 104883, at *25-26 (S.D. Ind., July 27, 2012). 4, 16,
  17

*First National Bank v. Colonial Bank*,
  898 F. Supp. 1220 (N.D. Ill. 1995) .................................................7, 11, 21, 22

*Giancarlo v. UBS Fin. Servs. Inc.*,
  725 F. App'x 278 (5th Cir. 2018) ................................................................24

*Gronberg v. York*,
  568 S.W.2d 139 (Tex. Civ. App. - Tyler 1978, writ ref'd n.r.e.) ...............23

*Guerra v. Regions Bank*,
  188 S.W.3d 744 (Tex. App.–Tyler 2006, no pet.) ......................................20

*Midwestern Cattle Mktg. LLC v. Legend Bank, N.A.*,
  No. 4:17-CV-375-A, 2018 U.S. Dist. LEXIS 82291, at *7 (Tex. App. - - Ft. Worth, May 16,
  2018, appeal pending) ...............................................................9, 20, 21, 22

*Mitchell Energy Corp. v. Samson Res. Co.*,
   80 F.3d 976 (5th Cir. 1996) ...................................................................................... 23
*Newsome v. Charter Bank Colonial*,
   940 S.W.2d 157 (Tex. App. - Houston [14 Dist.] 1996, writ denied) ...................................... 23
*Owens v. Comerica Bank*,
   229 S.W.3d 544 (Tex. App.–Dallas 2007, no pet.) .................................................. 20
*Quilling v. Compass Bank*,
   CA No. 3:03-CV-2180-R, 2004 U.S. Dist. LEXIS, 18811, at \*23-24 (September 17, 2004,
   N.D. Tex.) ................................................................................................. 14
*Ritchie v. Rupe*,
   433 S.W.3d 856 (Tex. 2014) ....................................................................... 8
*Southwest Bank v. Information Support Concepts, Inc.*,
   149 S.W.3d 104 (Tex. 2004) ....................................................................... 8
*Taylor Pipeline Constr., Inc. v. Directional Road Boring, Inc.*,
   438 F. Supp. 2d 696 (E.D. Tex. 2006) ............................................................ 23
*Wells Fargo Bank, N.A. v. Citizens Bank of Texas, N.A.*
   181 S.W.3d 790 (Tex. App. - - Waco 2005, pet.denied) ...................................... 9, 21

## Statutes
Fed. R. Civ. 9 ....................................................................................... 24

## Other Authorities
12 C.F.R. §229 ..................................................................................... 9, 11
12 U.S.C. §4001 .................................................................................... 9, 11
12 U.S.C. §4010(f) ................................................................................ 15
A. Brooke Overby, *Check Fraud in the Courts after the Revisions to U.C.C. Articles 3 and 4*, 57
   Ala. L. Rev. 351, 398 (2005) .................................................................. 20
Black's Law Dictionary, 601 (10th ed.) ................................................... 14
Tex. Bus. & Comm. Code, §1.304 ............................................................ 9
Tex. Bus. & Comm. Code, §4.104 ............................................................ 10
Tex. Bus. & Comm. Code, §4.105 ............................................................ 10
Tex. Bus. & Comm. Code, §4.302 ............................................................ 10, 12
Thomas McCurnin and Peter Frandsen, *Grounding Check Kiting with Check 21:  The Civil and
   Criminal Ramifications of Check Kiting in the 21st Century*,
   The Banking Law Journal, at 298-299 ....................................................... 7

The Defendant FirstCapital Bank of Texas, N.A. ("FirstCapital") files this Brief in Support of Motion to Dismiss pertaining to the Amended Complaint of Plaintiff First Bank & Trust ("FB&T"), associated with Reagor Dykes Auto Mall, Ltd. ("RAM").

## I.      INTRODUCTION

1.      There are two questions to answer in this case:  First, did FirstCapital meet its "midnight deadline" to return $1,091,544 in dishonored RAM checks to FB&T? Yes it did, so FB&T's claims against FirstCapital relating to those checks fail. Second, switching roles, did FB&T meet its midnight deadline to return $487,167 in dishonored RAM checks to FirstCapital? It did not, so FB&T's claims against FirstCapital relating to those checks also fail.  In short, the entirety of FB&T's lawsuit against FirstCapital should be dismissed for failure to state a claim.

2.      To provide context, FirstCapital and FB&T are competing banks and both are victims of a check kiting scheme perpetrated by RAM. Once a check kite becomes apparent, the universally-recognized prudent step for banks to take is to freeze accounts and return checks to the presenting banks. That brings the kite to an end and the law provides a mechanism for allocating the losses among the banks caught up in the kite.

3.      FB&T brings six claims against FirstCapital seeking over $1.5 million pertaining to RAM's check kite. The two claims tied to the Uniform Commercial Code ("UCC") and a related federal regulation fail as a matter of law because FirstCapital satisfied the limited duties it owed to FB&T imposed by the UCC and the regulation. The other four common law tort and contract-based claims fail, as well, because the field of law relating to the clearance of checks and allocation of losses in a check kite has been pre-empted by the UCC and federal law.

4.      In this case, FB&T refers to four batches of checks, three FB&T submitted for payment and one FirstCapital submitted for payment. The first batch totaled $602,280 and was

presented to FirstCapital for payment on July 30th. FirstCapital's return deadline was July 31st, a deadline that FirstCapital concedes it missed. However, there is a process through the Federal Reserve system for FB&T to reverse the credits FirstCapital received for those checks. FB&T recognizes this as it does not seek recovery for these checks. Thus, notwithstanding all of the sound and fury in FB&T's Amended Complaint about FirstCapital having a "special insider relationship" with Rick Dykes and "scrambling to dishonor and return checks" on July 31st, it is all irrelevant. This is because FirstCapital could not and did not meet the midnight deadline on July 31st. FirstCapital recognizes this and does not dispute that the UCC loss allocation process assures FB&T that it will recoup these funds totaling $602,280.  These allegations drawn from FB&T's Amended Complaint are set forth below:

| Batch | Amount FB&T Seeks to Recover | July 27 (Fri) | July 30 (Mon) | July 31 (Tues) | August 1 (Wed) |
|-------|------------------------------|----------------|----------------|-----------------|-----------------|
| 1 | $0 | FB&T sends outgoing cash letter to Federal Reserve containing $602,280 in RAM checks drawn on FirstCapital accounts.[1] | FirstCapital receives presentment of FB&T's RAM checks by incoming Federal Reserve Cash letter[2] | FirstCapital midnight deadline to return and dishonor FB&T RAM checks to Federal Reserve[3] | FirstCapital returned checks to Federal Reserve, but *missed* July 31st midnight deadline.[4] |

5.       Instead, what this case is about are three remaining batches of checks, two that FB&T presented to FirstCapital, and one that FirstCapital presented to FB&T. FB&T presented (or "pitched" to use a baseball metaphor) RAM checks by its outgoing July 30th cash letter to the Federal Reserve and the presentment was received (or "caught") by FirstCapital from the Federal Reserve on July 31st totaling $588,636.   Another batch of RAM checks was presented (or pitched) by FB&T by its outgoing July 31st cash letter to the Federal Reserve and the

---

[1] *See* Amended Complaint, ¶¶72, 76, 199.
[2] *See id*.  FB&T's July 27th outgoing cash letter would necessarily have been received by FirstCapital on July 30th.
[3] *See* Amended Complaint, ¶78, 199.
[4] *See* Amended Complaint, ¶¶76, 78, 199.

presentment was received (or caught) by FirstCapital from the Federal Reserve on August 1st totaling $502,908.  First Capital, as the catcher, *met* the return midnight deadlines to the Federal Reserve on August 1st and August 2nd, respectively.  These allegations drawn from FB&T's Amended Complaint are set forth below:

| Batch | Amount FB&T Seeks to Recover | July 30 (Mon.) | July 31 (Tues.) | Aug. 1 (Wed.) | Aug. 2 (Thurs.) |
|---|---|---|---|---|---|
| 2 | $588,636 | FB&T sends outgoing cash letter to Federal Reserve containing $588,636 in RAM checks drawn on FirstCapital accounts.[5] | FirstCapital receives presentment of FB&T's RAM checks by incoming Federal Reserve Cash letter.[6] | FirstCapital *met* midnight deadline to return and dishonor FB&T RAM checks to Federal Reserve.[7] | |
| 3 | $502,908 | | FB&T sends outgoing cash letter to Federal Reserve containing $502,908 in RAM checks drawn on FirstCapital accounts.[8] | FirstCapital receives presentment of FB&T's RAM checks by incoming Federal Reserve Cash letter.[9] | FirstCapital *met* midnight deadline to return and dishonor FB&T RAM checks to Federal Reserve.[10] |

6.      Switching roles as pitcher and catcher, FB&T also seeks to recover for $487,167 in RAM checks drawn on FB&T accounts that were deposited into FirstCapital accounts and presented (or pitched) for payment by FirstCapital's outgoing July 30th cash letter to the Federal Reserve and received (or caught) by FB&T from the Federal Reserve on July 31st.  FB&T, as catcher of those checks, *missed* the August 1st midnight deadline to return and dishonor the checks.  These allegations drawn from FB&T's Amended Complaint are set forth below:

---

[5] *See* Amended Complaint, ¶¶76, 199.
[6] *See id.*  FB&T's July 30th outgoing cash letter would necessarily have been received by FirstCapital on July 31st.
[7] *See id.*  FirstCapital's midnight deadline would necessarily have been August 1st and FB&T does not allege that FirstCapital missed the midnight deadline.
[8] See Amended Complaint, ¶¶77.
[9] *See id.*  FirstCapital would necessarily have received FB&T's outgoing cash letter on August 1st.
[10] *See id.*  FB&T alleges it received notice of dishonor by FirstCapital on August 3rd meaning that FirstCapital timely returned the checks by its midnight deadline on August 2nd.

| Batch | Amount FB&T Seeks to Recover | July 30 (Mon.) | July 31 (Tues.) | August 1 (Wed.) |
|-------|------------------------------|----------------|-----------------|-----------------|
| 4 | $487,167 | FirstCapital sends outgoing cash letter to Federal Reserve containing $487,167 in RAM checks drawn on FB&T accounts.[11] | FB&T receives presentment of FirstCapital's RAM checks by incoming Federal Reserve Cash letter.[12] | FB&T *missed* midnight deadline to return and dishonor First Capital RAM checks to Federal Reserve.[13] |

7.      Thus, for the checks at issue in this case, FirstCapital *met* its midnight deadlines for checks totaling $1,091,544, and FB&T *missed* its midnight deadline for checks totaling $487,167.   As a matter of law under the UCC and related federal regulations, FirstCapital satisfied its duty, as well as any obligations of ordinary care and good faith that go along with that duty, so that there is no legal basis for the claims and damages exceeding $1.5 million[14] asserted here by FB&T.

8.      To divert attention from the bright lines established in the UCC for the return and dishonor of checks, FB&T chooses instead to distort the facts and use sinister-sounding words to try to make its case based on alleged misconduct of FirstCapital occurring over 24 hours before the first midnight deadline on August 1st.   Allegations such as these led one court to label the bank's argument as "specious" where the case was so clearly determined under the UCC and regulatory framework.[15]   FB&T cannot cite to any law that says FirstCapital could not move to protect its own interest once it learned "of Ford's impending legal action, Reagor-Dykes' severe financial problems, and Reagor-Dykes' planned bankruptcy filing" as alleged by FB&T.[16]

---

[11] *See* Amended Complaint, ¶¶74.  Checks presented to FB&T on July 31st were necessarily sent out in FirstCapital's outgoing cash letter on July 30th.

[12] *See id.*

[13] *See id.*  By FB&T's own admission, it paid the RAM checks and it therefore did not meet the deadline on August 1st to return and dishonor checks.

[14] *See* Amended Complaint, ¶¶63, 69, 81, 84, 188, 193, 197, 208, 214, 218.

[15] *First Financial Bank, N.A. v. Citibank, N.A.*, No. 1:11-CV-226, 2012 U.S. Dist. LEXIS 104883, at *25-26 (S.D. Ind., July 27, 2012).

[16] Amended Complaint, ¶66.

9.      A host of cases and other authorities emphasize the need for quick action under these circumstances and they recognize that freezing accounts, returning checks, and accepting deposits are the prudent things for banks to do to protect their own interests, even if it means competing banks will suffer losses.  Regarding a collapsed check kite and the need for quick action, one court said it this way, "As in the game of musical chairs, [the last bank] was left without a chair."[17]   For those checks totaling $602,280 for which FirstCapital *missed* the midnight deadline, FirstCapital will be left without a chair.  For those checks totaling $1,091,544 for which FirstCapital *met* the midnight deadline, FB&T will be left without a chair.  For those checks totaling $487,167 for which FB&T *missed* the midnight deadline, FB&T will be left without a chair.  This case is that simple and all of FB&T's claims should be dismissed for failure to state a claim.

## II.      ARGUMENT AND AUTHORITIES

### A.      Motion to Dismiss Standard

10.      Federal Rule 12(b)(6) allows dismissal if a plaintiff fails "to state a claim upon which relief can be granted." To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must demonstrate that the complaint provides fair notice of plaintiff's claims.[18]   The facts alleged must sufficiently show a plausible claim for relief.[19]

11.      Although "the pleading standard Rule 8 announces does not require 'detailed factual allegations,'" "it demands more than 'labels and conclusions.'"[20]   "The complaint must contain either direct allegations on every material point necessary to sustain a recovery . . . or contain allegations from which an inference fairly may be drawn under the relevant legal

---

[17] *Ennis State Bank v. Heritage Bank*, No. 10-02-226-CV, 2004 Tex. App. LEXIS 4355, at *2 (Tex. App. - - Waco, May 12, 2004, pet. denied).
[18] *Conley v. Gibson*, 355 U.S. 41, 47 (1974).
[19] *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 569 (2007).
[20] *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555).

theory."[21]   Additionally, while courts are required to take all factual allegations found in a complaint as true for purposes of a motion to dismiss, a court is "not bound to accept as true a legal conclusion couched as a factual allegation."[22]

12.     Accordingly, a court considering a 12(b)(6) motion to dismiss must, first, determine which facts in the complaint deserve the assumption of truth by identifying the non-conclusory factual allegations in the complaint, and second, drawing all inferences in favor of the plaintiff, must decide whether the non-conclusory allegations plausibly give rise to an entitlement of relief.[23]   "'[W]hen the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court.'"[24]

13.     Further, Federal Rule 9(b) requires that fraud-based claims "state with particularity the circumstances constituting fraud."

**B.     The Law Regarding the Allocation of Losses Upon the Collapse of a Check Kite.**

14.     The allocation of losses suffered by banks that find themselves victimized by a mutual customer's check kiting scheme is governed the UCC and related federal regulations.  To understand the situation, some background information is helpful.

**1.     What is a Check Kite?**

15.     One court described a check kite this way:

Check kiting is possible because of a combination of two rules found in Article 4 of the Uniform Commercial Code.  Under §4.208(1), a depository bank may allow a customer to draw on uncollected funds, that is, checks that have been deposited but not yet paid.  Second, under §§4-301 and 4-302, a payor bank must either pay or dishonor a check drawn on it by midnight of the second banking day following

---

[21] *Campbell v. City of San Antonio*, 43 F.3d 973, 975 (5th Cir. 1995) (quoting 3 C. Wright & A. Miller, Fed. Prac. & Proc.: Civil 2d § 1216 at 156-59).

[22] *Iqbal*, 566 U.S. at 678-79 (noting that Rule 8 "does not unlock the doors for discovery for a plaintiff armed with nothing more than conclusions").

[23] *See Iqbal*, 566 U.S. at 679.

[24] *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (quoting *Twombly*, 550 U.S. at 558).

presentment.  Thus when a kite is operating, the depository bank allows the kiter to draw on uncollected funds based on a deposit of a check.  The depository bank presents that check to the payor bank, which must decide whether to pay or return the check before the midnight deadline.  The check may appear to be covered by uncollected funds at the payor bank, and so the payor bank may decide to pay the check by allowing the midnight deadline to pass.

A kite crashes when one of the banks dishonors checks drawn on it and returns them to the other banks involved in the kite.  Usually, such a dishonor occurs when one bank suspects a kite.  However, an individual bank may have trouble detecting a check kiting scheme.  Until one has devoted a substantial amount of time examining not only one's own account, but accounts at other banks, it may be impossible to know whether the customer is engaged in a legitimate movement of funds or illegitimate kiting.  But each bank is usually able to monitor only its own account, and there is no certain test that distinguishes one who writes many checks on low balances from a check kiter. [25]

16.     FB&T's practice of allowing RAM to access uncollected funds - - that is, giving RAM immediate access to funds before its deposited checks had been collected - - is what exposed FB&T to the risk of RAM's check kite.  "Without uncollected funds, there can be no check kite."[26]  Banks can protect themselves from check kites in a number of ways.  The bank can require the customer to pledge collateral to secure uncollected funds, or the bank can simply place a hold on uncollected funds until the funds are collected.[27]  In the end, it was FB&T, and no one else, that made the choice to expose itself to the risks associated with uncollected funds.

### 2.     How Should a Bank Respond to a Check Kite?

17.     When a check kite is suspected, quick decisions and actions must be taken.  As one commentator said, "A drawee bank [i.e. payor bank] which discovers a kite must immediately start returning checks to the collecting bank.  There simply is no time to lose and

---

[25] *First National Bank v. Colonial Bank*, 898 F. Supp. 1220, 1222-23 (N.D. Ill. 1995) (citations omitted).

[26] McCurnin and Frandsen, Grounding Check Kiting with Check 21:  The Civil and Criminal Ramifications of Check Kiting in the 21st Century, THE BANKING LAW JOURNAL, at 298-299 (A copy of this  journal article is contained in the separately-filed Appendix at Exhibit A, beginning at 001. Cited pages are at 004 - 005).

[27] 12 C.F.R. §229.13. *See also*, *Citizens National Bank v. First National Bank*, 347 So.2d 964, 967 (Miss. 1977) (depository bank had the right to refuse to credit customer's account until checks cleared).

delay may mean losing the right to return the checks to the collecting bank."[28]   Further, "After the kite has been discovered, the first thing the bank must do is freeze the account and return all checks drawn on the account."[29]   Also, to not act quickly would be a potential breach of fiduciary duties owed by FirstCapital officers to the institution they serve:  FirstCapital.[30]

18.     Should a bank that discovers a kite contact other banks?  As one commentator says, "Contacting the other banks where the kiter was using can be touchy because of privacy and inter-bank liability issues.  Improper disclosure of customer information to another bank investigator could impose liability to the bank . . ."[31]

### 3.     What Law Applies?

#### a.     UCC and Federal Regulations Govern Check Clearing Process and Allocation of Losses Caused by a Check Kite.

19.     The duties owed by banks in the check collection process and the allocation of losses arising from a check kite are governed by the UCC and it provides a comprehensive scheme for the check handling process that provides the basis for any duties among the banks involved in the check clearing process.  Common law and other non-UCC claims are barred.[32]

20.     The UCC is a codification of rules "carefully integrated and intended as a uniform codification of permanent character covering an entire 'field' of law.'"[33]  "The UCC contains a comprehensive and carefully considered allocation of responsibility in banking relationships."[34] Article 3 of the UCC "establishes a comprehensive scheme governing the procedures, liabilities,

---

[28] McCurnin and Frandsen, *Grounding Check Kiting with Check 21:  The Civil and Criminal Ramifications of Check Kiting in the 21st Century*, THE BANKING LAW JOURNAL, at 306 (Appendix at Exhibit A, at 012).
[29] *Id*. at 307 (Appendix at Exhibit A, at 013).
[30] *Ritchie v. Rupe*, 433 S.W.3d 856, 868-69 (Tex. 2014) (corporate officers and directors owe the corporation fiduciary duties of obedience, loyalty, and due care).
[31] McCurnin and Frandsen, *Grounding Check Kiting with Check 21:  The Civil and Criminal Ramifications of Check Kiting in the 21st Century*, THE BANKING LAW JOURNAL, at 310 (Appendix at Exhibit A, at 016).
[32] *See* discussion of preemption of other claims at ¶¶55-59, *infra*.
[33] *Southwest Bank v. Information Support Concepts, Inc.,* 149 S.W.3d 104, 109 (Tex. 2004) (quoting Texas Business & Commerce Code, §1.104, comment 1).
[34] *Id*. at 107.

and remedies pertaining to negotiable instruments, including checks."[35]  Article 4 of the UCC "establishes the rights and duties between banks and their customers regarding deposits and collections."[36]

21.     The check clearing process is also affected by Regulation CC of the Board of Governors Federal Reserve System[37] promulgated under the authority granted by Congress under the Expedited Funds Availability Act ("EFFA").[38]

22.     The duties of banks in the check clearing process are precisely defined and very limited in recognition of the fact that competing banks do not owe broader common law duties to each other.[39]   The UCC provides that, "Every contract or duty within this title imposes an obligation of good faith in its performance or enforcement."[40]   Regulation CC requires that, "A bank shall exercise ordinary care and act in good faith in complying with the requirements *of this subpart*."[41]

23.     But the obligations to exercise ordinary care and act in good faith do not exist independent of a duty.[42]   So what are the duties the UCC and Regulation CC impose on banks relative to one another in the check clearing process arising from a mutual customer's check kiting scheme?

---

[35] *½ Price Checks Cashed v. United Auto Ins. Co.*, 344 S.W. 378, 380 (Tex. 2011).
[36] *American Airlines Employees Fed. Credit Union v. Martin*, 29 S.W.3d 86, 91 (Tex. 2000).
[37] 12 C.F.R. §229
[38] 12 U.S.C. §4001, *et seq.*
[39] *See* discussion of common law duties between competing banks at ¶60, *infra*.
[40] Tex. Bus. & Comm. Code, §1.304.
[41] 12 C.F.R. §229.38(a) (emphasis added).
[42] *See generally, Midwestern Cattle Mktg. LLC v. Legend Bank, N.A.,* No. 4:17-CV-375-A, 2018 U.S. Dist. LEXIS 82291, at *7-9 (Tex. App. - - Ft. Worth, May 16, 2018, appeal pending); *Wells Fargo Bank, N.A. v. Citizens Bank of Texas, N.A.* 181 S.W.3d 790, 804 (Tex. App. - - Waco 2005, pet.denied); *Ennis State Bank v. Heritage Bank*, No. 10-02-226-CV, Tex. App. LEXIS 4355, at *2-5 (Tex. App. - - Waco, May 12, 2004, pet. denied).

### 1) UCC Duties

24.     UCC duties depend on the role a bank has in the check clearing process.  The relevant roles under Article 4 here are "payor bank", which is defined as the "drawee of a draft",[43] and "drawee" is defined as "a person ordered in a draft to make payment."[44]  Under Article 4, a "depository bank" is the "first bank to take an item."[45]  Accordingly, the roles of FirstCapital and FB&T regarding the checks at issue are as follows:

| Batch | Total Amount | Payor Bank | Depository Bank |
|-------|-------------|------------|-----------------|
| 2 & 3 | $1,091,544 | FirstCapital | FB&T |
| 4 | $487,167 | FB&T | FirstCapital |

25.     The payor bank is required to pay or dishonor by the applicable midnight deadline.[46]  "Midnight deadline" is defined "with respect to a bank [as] midnight on its next banking day following the banking day on which it receives the relevant item or notice or from which time for taking action commences to run, whichever is later."  That is, checks presented for payment to the payor bank on banking day 1 are required to be paid or dishonored by midnight of banking day 2.[47]

26.     A payor bank is *accountable* for the amount of the check presented to it for payment if it does not pay or return the item or send notice of dishonor until after its midnight deadline."[48]  The UCC duty imposed on FirstCapital and FB&T in their payor bank roles is one

---

[43] Tex. Bus. & Comm. Code, §4.105(3).
[44] Tex. Bus. & Comm. Code, §4.104(a)(8.
[45] Tex. Bus. & Comm. Code, §4.105(2).
[46] Tex. Bus. & Comm. Code, §4.302(a)(1).
[47] "Banking day" is defined as "the part of a day on which a bank is open to the public for carrying on substantially all of its banking functions." Tex. Bus. & Comm. Code §4.104(a)(3).
[48] Tex. Bus. & Comm. Code, §4.302(a)(1) (emphasis added).

of strict liability,[49] so any obligation of ordinary care or good faith is irrelevant.   Either FirstCapital and FB&T met their UCC midnight deadlines or they didn't.

### 2)  Regulation CC Duties

27.     Layered on top of the UCC framework is the federal EFFA[50] and Regulation CC[51] promulgated pursuant to the EFFA.  Regulation CC[52] sets forth the standard of care for complying with the federal regulation requiring that, "A bank shall exercise ordinary care and act in good faith in complying with the requirements *of this subpart*."[53]

28.     Regulation CC contains rules to expedite the collection and return of checks by banks.[54]  Regulation CC is further broken down into subparts.  Subpart C[55] covers, among other things, the manner in which the payor bank must return checks to the depositary bank, notification of nonpayment by the paying bank, presentment of checks, and the liability of banks for failure to comply with Subpart C.[56]

## C.    FB&T's UCC and Regulatory Claims Fail as a Matter of Law.

29.     FB&T brings Count 17 premised on the UCC and Count 16 premised on the EFFA and related Subpart C.  While based on the correct body of law, the claims fail as a matter of law under FB&T's allegations.

### 1.      UCC Claim Fails

---

[49] *Ennis State Bank v. Heritage Bank*, No. 10-02-226-CV, Tex. App. LEXIS 4355, at *6-7 (Tex. App. - - Waco, May 12, 2004,  pet. denied) ("Accountable means that the payor bank is strictly liable for the amount of the check.") (emphasis added).  *See also, First National Bank v. Colonial Bank*, 898 F. Supp. 1220, 1226 (N.D. Ill. 1995) ("The operative word in this section is 'accountable.'  Courts interpreting this section have nearly unanimously concluded that §4.302 imposes strict liability on a payor bank for failing to adhere to the midnight deadline, and make the measure of damages the face amount of the check.").
[50] 12 U.S.C. §4001, *et seq.*
[51] 12 C.F.R., Part 229, Subpart C.
[52] 12 C.F.R. §229.38(a).
[53] 12 C.F.R. §229.38(a) (emphasis added).  *See also, Bank One Chicago., N.A. v. Midwest Bank & Trust Co.*, 516 U.S. 264, 268 (1996) (stating that ordinary care and good faith compliance obligations relate to Subpart C).
[54] 12 C.F.R. §229.1(b)(3).
[55] 12 C.F.R. §229.30-43.
[56] 12 C.F.R. §229.1(b)(3).

### a.   First Capital Met its Midnight Deadlines

30.     Again, the UCC requires a payor bank to return and give notice of dishonor of checks presented for payment by midnight of the following day, or the payor bank becomes "accountable for the amount of the check presented to it for payment. . ."[57] This is the only duty pertaining to the return and dishonor of checks that FirstCapital owed to FB&T under the UCC pertaining to batches 2 and 3 and it is a duty of strict liability.[58]

31.     FB&T concedes, as it must, that FirstCapital met its midnight deadlines to dishonor and return batch 2, as reflected in the timeline below: [59]

| Batch | July 30 (Mon) | July 31 (Tues) | Aug. 1 (Wed) |
|-------|---------------|----------------|--------------|
| 2 | FB&T sends outgoing cash letter to Federal Reserve containing $588,636 in RAM checks drawn on FirstCapital accounts. | FirstCapital receives presentment of FB&T's RAM checks by incoming Federal Reserve Cash letter | FirstCapital *met* midnight deadline to return and dishonor FB&T RAM checks to Federal Reserve. |

32.     Thus, FB&T's own allegations demonstrate that FirstCapital met the midnight deadline to return $588,636 in RAM checks.

33.     Similarly, FB&T does not allege or contest the fact that RAM checks presented by FB&T to FirstCapital for payment on August 1st totaling $502,908 (batch 3) were timely dishonored and returned by FirstCapital by midnight on August 2nd.[60] Here is the sequence of events associated with these checks:[61]

| Batch | July 31 (Tues.) | August 1 (Wed.) | August 2 (Thurs.) |
|-------|-----------------|-----------------|-------------------|
| 3 | FB&T sends outgoing cash letter to Federal Reserve containing $502,908 in RAM checks drawn on FirstCapital accounts. | FirstCapital receives presentment of FB&T's RAM checks by incoming Federal Reserve Cash letter. | FirstCapital *met* midnight deadline to return and dishonor FB&T RAM checks to Federal Reserve. |

---

[57] Tex. Bus. & Comm. Code, §4.302(a)(1).
[58] *See supra* at ¶26.
[59] *See* chart in ¶5 above for pin citations to allegations in Amended Complaint.
[60] See Amended Complaint, ¶77 (not alleging untimely dishonor).
[61] *See* chart in ¶5 above for pin citations to allegations in Amended Complaint.

34.     Thus, FB&T's own allegations demonstrate that FirstCapital met the midnight deadline to return $502,908 in RAM checks.

> ### b.     FB&T is Not Entitled to Restitution under the UCC for Checks Presented by FirstCapital.

35.     Despite FirstCapital's timely returns, FB&T says it "should be awarded recovery of the payments it made to FirstCapital, because First Bank is entitled to restitution [under UCC §3.418 for] FirstCapital's simultaneous dishonor of items presented for payment by First Bank, late return of RAM checks, and erroneously stating the reason of the returns . . ."[62]

36.     Section 3.418 (b) and (c), upon which FB&T relies, reads as follows:

(b)  Except as provided in Subsection (c), if an instrument has been paid or accepted by mistake and the case is not covered by Subsection (a), the person paying or accepting may, to the extent permitted by the law governing mistake and restitution:

> (1) recover the payment from the person to whom or for whose benefit payment was made; or
> (2) in the case of acceptance, revoke the acceptance.

(c)  The remedies provided by Subsection (a) or (b) may not be asserted against a person who took the instrument in good faith and for value or who in good faith changed position in reliance on the payment or acceptance…

37.     By its own terms, section 3.418 only applies to mistaken payments.  There was no mistake here.  FB&T made a calculated business decision to extend RAM credit for uncollected funds and its remedy is against RAM.  If RAM can't or won't pay, FB&T has no one to blame but itself for a risk that FB&T willingly accepted.

---

[62] Amended Complaint, ¶201.

38.     Further, this restitutionary remedy only applies to "drawees".[63]  A drawee bank is also referred to as the payor bank.[64]  Therefore, FB&T's restitution claim, if any, can only relate to batch 4 where FB&T was the payor/drawee bank.  These checks are summarized as follows:[65]

| Batch | July 30 (Mon.) | July 31 (Tues.) | August 1 (Wed.) |
|---|---|---|---|
| 4 | FirstCapital sends outgoing cash letter to Federal Reserve containing $487,167 in RAM checks drawn on FB&T accounts. | FB&T receives presentment of FirstCapital's RAM checks by incoming Federal Reserve Cash letter. | FB&T *missed* midnight deadline to return and dishonor First Capital RAM checks to Federal Reserve. |

39.     Accepting FB&T's contentions for the sake of argument, it complains about what it asserts was the dishonor of its presentment of $1,091,544 (batches 1 and 2) in RAM checks to FirstCapital, and FirstCapital's simultaneous presentment of $487,167 (batch 4) in RAM checks to FB&T.

40.     This type of argument was debunked in an often cited case:  *Citizens National Bank v. First National Bank*, 347 So. 2d 964 (Miss. 1977).   In that case, First National discovered a check kite by its customer, but the bank did not immediately notify Citizens National, a competing bank that also had accounts belonging to the kiter.  Instead, First National began returning checks drawn on the kiter's accounts at First National.  It also continued to accept deposits from the kiter drawn on accounts at Citizens National.

41.     The *Citizens National* court found no duty and no liability saying the following:

These two banks were competitors in the banking field and ordinarily banks deal with each other at arm's length.  The bill does not allege any circumstances or facts that tend to show that a confidential or fiduciary relationship existed between these two banks, neither does it show that there is any requirement in the banking field that one bank notify another of its discovery of a customer kiting checks.  In the absence of a fiduciary or confidential relationship, or some other

---

[63] *Quilling v. Compass Bank,* CA No. 3:03-CV-2180-R, 2004 U.S. Dist. LEXIS, 18811, at *23-24 (September 17, 2004, N.D. Tex.).
[64] BLACK'S LAW DICTIONARY, 601 (10th ed.) ("The drawee is usu. a bank that is directed to pay a sum of money on an instrument.  UCC §105(3).- Also termed *payor; payor bank*.")
[65] *See* chart in ¶6 above for pin citations to allegations in Amended Complaint.

legal duty, First National Bank had no duty to inform Citizens National Bank that Duran was kiting checks. *That being true, we are of the opinion that First National Bank had the legal right to continue to accept for deposit checks drawn by Duran on accounts at Citizens National Bank and present those checks for payment. At the same time, First National Bank had the legal right to refuse to pay checks drawn by Duran on accounts in First National Bank and deposited in Citizens National Bank.*[66]

42.     But FB&T's factual allegations, even if legally relevant, are wrong on their face. FB&T alleges that FirstCapital returned and dishonored RAM checks drawn on RAM's accounts at FirstCapital totaling $1,091,549 (batch 1 and 2) on August 1st and August 2nd.  Yet, FirstCapital's cash letter containing $487,167 (batch 4) in checks drawn on RAM accounts at FB&T had already gone out on July 30th.  **Since these events occurred two days apart, FB&T's allegation that FirstCapital simultaneously dishonored FB&T's RAM checks while FirstCapital presented RAM checks to FB&T for payment is patently false!**

**2.     FB&T's Regulatory Claim Fails.**

43.     FB&T asserts Count 16 based on 12 U.S.C. §4010(f) of the EFFA and 12 C.F.R. §229.38(a) of Regulation CC.   Sections 4007 and 4010 (f) of the EFFA make the point that the UCC, as well as the EFFA and applicable federal regulations, govern the risk of loss and liability "in connection with any aspect of the payment system, including the receipt, payment, collection, or clearing of checks, and any related function of the payment system with respect to checks."[67]

44.     Section 229.38(a) of Regulation CC, which is contained in Subpart C of that regulation, provides that, "A bank shall exercise ordinary care and act in good faith in complying with the requirements *of this subpart*." (emphasis added). In other words, there must be a duty recognized in Subpart C before a bank is obligated to exercise ordinary care or act in good faith.

---

[66] *Citizens National,* 347 So. 2d at 967 (emphasis added).
[67] 12 U.S.C. §4010(f).

45.     In *First Financial Bank, N.A. v. Citibank, N.A.*, No. 1:11-CV-226-WTL-DML, 2012 U.S. Dist. LEXIS 104883 (S.D. Ind. 2012), the court made clear that arguments associated with failure to comply with an obligation of ordinary care must be tied to recognized duties under Subpart C.   In that case, the arguments focused on the failure to return checks expeditiously, failure to provide timely notice of dishonor, and breach of warranty for failure to meet the midnight deadline, all of which tied to specific provisions of Subpart C.[68]

46.     The depository bank in *First Financial* made one argument not tied to Subpart C based on allegations that the payor bank failed to investigate an earlier suspicious check, and that if it had done so the losses suffered by the depository bank could have been reduced.   The *First Financial* court had this to say about that:

> This argument is specious.   As the Court has noted several times, Citibank's liability under 12 C.F.R. §229.38(b) is for the failure to exercise ordinary care in complying with the requirements of Regulation CC.   First Financial points to no provision of Regulation CC that requires Citibank to conduct investigations into suspicious items.[69]

47.     In an effort to avoid the conclusion reached in the *First Financial* case, FB&T argues in Count 16 that FirstCapital "failed to exercise ordinary care and failed to act in good faith by erroneously stating the reason for the check returns."[70]   In this regard, FB&T alleges that FirstCapital listed the reason for nonpayment as "uncollected funds."[71]   FB&T argues, in conclusory fashion, that "the truthful or additional reason for return of the checks to First Bank was that there were "insufficient funds" in the account for payment."[72]

48.     Section 229.31(c)(2)(i)(E) requires that, to the extent available, the paying bank must include the "reason for nonpayment."   FB&T does not quibble with the fact that check

---

[68] *See id*, at *8-23 (emphasis added).
[69] Id. at *25.
[70] Amended Complaint, ¶197.
[71] *Id*. at ¶76.
[72] *Id*.

kiting involves uncollected funds,[73] but FB&T assumes, on information and belief, that "FirstCapital had already set off the balance of funds in RAM's account there, so the truthful or additional reason for return of the checks to First Bank was that there were 'insufficient funds' in the account for payment."[74]

49.      But the purpose for stating a reason for dishonor is not for the benefit of the depositary bank, it is for the benefit of the customer so it can determine whether it has the basis for a wrongful dishonor claim against its payor bank.[75]

50.      Indulging FB&T's argument again, FB&T says that if FB&T had learned on August 2nd that FirstCapital dishonored batch 1 and batch 2 because of "insufficient funds" as the reason for dishonoring these 24 RAM checks, FB&T would have been able "to then dishonor and return checks deposited with the collecting bank." This refers to the  checks totaling $487,167 (batch 4) in RAM checks sent by FirstCapital on July 30th to the Federal Reserve and presented (batch 4) to FB&T on July 31st and which FB&T had to dishonor by midnight on August 1st.[76]

51.      FB&T admits it did not see FirstCapital's August 1st return of RAM checks totaling $1,190,916 (batch 1 and 2) until August 2nd, by which time FB&T's midnight deadline on the $487,167 (batch 4) checks had already passed the day before.[77] **Hence, the reason for dishonor could not have impacted what FB&T did or did not do relating to the batch 4 checks since it had already made its decision on batch 4 before it knew of FirstCapital's reason for the dishonor of batches 1 and 2.**

---

[73] *See generally, id.* at ¶¶55-56.
[74] *Id.* at ¶76.
[75] *See* Tex. Bus. & Comm Code, §4.402.
[76] *Id.* at ¶81.
[77] *See* charts in ¶¶ 4, 5 and 6 for pin citations in Amended Complaint.

52.     Pressing further, FB&T says that a "a collecting bank would not conclude that a check would ultimately not be paid by a payor bank such as FirstCapital if the check was returned because of 'uncollected funds' because a resubmission of the check for payment could be successful after the subject funds were collected in the meantime."[78] **Of course, the same can be said for a check returned for insufficient funds.**

53.     Further, it is disingenuous to argue that FB&T would have been jolted into action upon receipt of $1,190,916 in dishonored checks for "insufficient funds," but not for "uncollected funds." The court need not accept FB&T's self-serving conclusion when it is obvious that the number and amount of the returned checks, regardless of the stated reason, gave FB&T notice of serious questions about the checks contained in batch 1 and 2.

54.     To the extent FB&T seeks to link its August 2nd or 3rd notice of "reason for dishonor" issue to checks for which FirstCapital *met* its midnight deadline (batch 2 and 3), there was no course of action that FB&T could have taken differently because those checks went out days earlier in FB&T's cash letters on July 30th and July 31st, as reflected below:

| Batch | July 30 (Mon.) | July 31 (Tues.) | Aug. 1 (Wed.) | Aug. 2 (Thurs.) |
|-------|----------------|-----------------|---------------|-----------------|
| 2 | FB&T sends outgoing cash letter to Federal Reserve containing $588,636 in RAM checks drawn on FirstCapital accounts. | FirstCapital receives presentment of FB&T's RAM checks by incoming Federal Reserve Cash letter. | FirstCapital *met* midnight deadline to return and dishonor FB&T RAM checks to Federal Reserve. | |
| 3 | | FB&T sends outgoing cash letter to Federal Reserve containing $502,908 in RAM checks drawn on FirstCapital accounts. | FirstCapital receives presentment of FB&T's RAM checks by incoming Federal Reserve Cash letter. | FirstCapital *met* midnight deadline to return and dishonor FB&T RAM checks to Federal Reserve. |

---

[78] *Id.*

**D.      Courts Routinely Dismiss Common Law Claims.**

**1.      The UCC Preempts FB&T's Common Law Claims**

55.      FB&T also asserts four common law claims against FirstCapital, but because the UCC and Subpart C pre-empt the field of law in the check clearing process and the allocation of losses arising from a check kite, the Court should dismiss all of FB&T's common law claims.

56.      In *Dean v. Commonwealth Bank & Trust Co*., 434 S.W.3d 489 (Ky. 2014), the Kentucky Supreme Court undertook an in-depth analysis of the interplay between the UCC and the common law in the context of a check kite.  The court cited the following Official Comment to the UCC which recognizes that the common law can supplement the UCC, but it cannot be used to supplant the UCC or its purposes and policies:

> [T]he Uniform Commercial Code is the primary source of commercial law rules in areas that it governs, and its rules represent choices made by its drafters and the enacting legislatures about the appropriate policies to be furthered in the transactions it covers.  Therefore, while principles of common law and equity may supplement provisions of the Uniform Commercial Code, they may not be used to supplant its provisions, or the purposes and policies those provisions reflect, unless a specific provision of the Uniform Commercial Code provides otherwise.  In the absence of such a provision, the Uniform Commercial Code preempts principles of common law and equity that are inconsistent with either its provisions or its purposes and policies.[79]

57.      Consistent with this Official Comment, the court noted that "there is a strong policy in favor of treating the UCC as occupying the field and displacing common-law causes of action."[80]  The UCC is to be "liberally administered" which "has led many commentators to conclude that the UCC, as a comprehensive code of law . . . should be read broadly to preempt common-law and other non-code causes of action."[81]  "The prevailing view now is that when the

---

[79] *Id.* at 506 (quoting Uniform Commercial Code §1-103 Official Cmt. 2 (2002))
[80] *Dean*, 434 S.W. 3d at 505.
[81] *Id.*

UCC provides a comprehensive remedy for the parties to a transaction, common-law and other non-Code claims and remedies should be barred."[82]

58.     The court concluded "that with respect to the transactions at issue, the UCC provides a comprehensive remedy, or scheme of remedies.  The list of scenarios directly covered by Articles 3 and 4 is long, and includes . . . [allocation of] losses among banks dealing with checks that are returned . . . (midnight deadline) [and] the bank's liability to its customer for wrongful dishonor."[83]  Further, the court said that Articles 3 and 4 of the UCC were intended to provide a "comprehensive allocation scheme for check fraud losses."[84]

59.     Because of the preemptive nature of the UCC, a court need not analyze common law claims, unless the claims can truly be said to fall into a gap where the UCC's comprehensive scheme does not apply.  None of FB&T's claims fall into any of those gaps.

## 2.     When Courts Analyze Common Law Claims Alternatively, They Still Fail.

60.     Any analysis of common law claims has to begin with an understanding that a bank owes no common law duty to someone who is not a customer and with whom the bank does not have a relationship.[85]  Further, a bank does not owe a common law duty to detect and

---

[82] *Id.* at 506.

[83] *Id*. at 507 (citations omitted).

[84] *Id.* (quoting A. Brooke Overby, *Check Fraud in the Courts after the Revisions to U.C.C. Articles 3 and 4*, 57 ALA. L. REV. 351, 398 (2005).

[85] *See, e.g., Owens v. Comerica Bank*, 229 S.W.3d 544, 547 (Tex. App.–Dallas 2007, no pet.) ("To maintain a negligence cause of action, a plaintiff must establish a duty owed to it by the defendant . . . Generally a bank owes no duty to someone who is not a customer and with whom the bank does not have a relationship"); *Guerra v. Regions Bank*, 188 S.W.3d 744, 747 (Tex. App.–Tyler 2006, no pet.) (holding that because the plaintiff was not a customer of the bank and had no other relationship with the bank, the bank owed no duty to the plaintiff as a matter of law); *Ennis State Bank v. Heritage Bank*, No. 10-02-226-CV, Tex. App. LEXIS 4355, at *2-3 (Tex. App. - - Waco, May 12, 2004,  pet. denied), at *2-3 (no duty between banks and no duty to discover check kite);  *Midwestern Cattle Mktg. v. Legend Bank, N.A.,* No. 4:17-CV-375-A, 2018 U.S. Dist. LEXIS 82291, at *8 (Tex. App. - - Ft. Worth, May 16, 2018, appeal pending) (bank owes no duty someone who is not a customer and with whom the bank does not have a relationship).

stop a check-kiting scheme to someone who is not a customer and with whom it otherwise does not have a special relationship.[86]

61.     Even where courts indulge the plaintiff and analyze common law claims in the check clearing/check kiting context, they find the claims ineffective.   For example in, *Midwestern Cattle Mktg., LLC v. Legend Bank, N.A.*, No. 4:17-CV-375-A, 2018 U.S. Dist. LEXIS 82291 (Tex. App. - - Ft. Worth, May 16, 2018) the court confirmed the absence of a duty between competing banks to detect and stop a check-kiting scheme.[87]  The court also recognized that this is "in keeping with Texas's recognition that the UCC has the objective of promoting certainty and predictability in commercial transactions . . . Recognizing a UCC duty owed to one outside the UCC scheme would be contrary to the UCC's goals."[88]   Even though it was unnecessary, the court analyzed the common law claims and granted summary judgment against the depositary bank's claims under the UCC, as well as all of the common law claims.[89]  *See also Citizens National Bank v. First National Bank*, 347 So. 2d 964 (Miss. 1977) (court found no duty running between competing banks outside of the UCC, so the court dismissed the bank's claims for conversion, restitution, and constructive trust).

62.     Similarly, in *First National Bank v. Colonial Bank*, 898 F. Supp. 1220 (N.D. Ill. 1995), First National suspected its customer was engaged in check kiting, so it immediately closed accounts and began returning checks presented by Colonial Bank for payment on the

---

[86] *See e.g., Ennis State Bank,* 2004 LEXIS 4355, at *5 (rejecting claims that the UCC supports an independent action for breach of good faith and that there is some other independent general duty of care to stop a check-kiting scheme); *Wells Fargo Bank, N.A. v. Citizens Bank of Texas, N.A.*, 181 S.W.3d 790, 804 (Tex. App.–Waco 2005, pet denied) (§ 1.203 (now § 1.304) does not provide an independent cause of action to detect and stop a check-kiting scheme or any other duty of care to a non-customer absent a special or confidential relationship); *Midwestern Cattle* 2018 U.S. Dist. LEXIS 82291, at *7 (" [A] bank does not owe a duty to detect and stop a check-kiting scheme to someone who is not a customer of the bank or does not otherwise have a special relationship").
[87] *Midwestern Cattle*, 2018 U.S. Dist. LEXIS 82291, at *7
[88] *Id.* at *8.
[89] *Id*. at *7-15.  The court did not initially dismiss a fraudulent transfer claim, but did so by separate order.  See Appendix, Exhibit B, at 043.

mutual customer's account.  Colonial Bank contended that First National breached its duty of good faith, but the court noted that "a bank has no good faith obligation to disclose a suspected kite or to refrain from attempting to shift the kite loss."[90]  Further, the court rejected arguments that First National was unjustly enriched.[91]

### 2.      Even if Common Law Claims Were Permissible, these Claims Fail.

#### a.      Money Had and Received/Unjust Enrichment/Restitution (Count 14)

63.      FB&T asserts a claim for money had and received/unjust enrichment/restitution by arguing that "RAM and FirstCapital knowingly facilitated a check-kiting scheme, causing First Bank to suffer $1,595,395.83 in damages."  According to FB&T this "money belongs to First Bank in equity and good conscience."[92]

64.      The UCC recognizes a restitutionary remedy as already discussed.[93]  Because FB&T cannot prevail under that UCC provision, its restitution-like claims should be dismissed.

65.      Given the comprehensive nature of the UCC, few cases address restitutionary claims and remedies in this context.  One such case is *Commerce Bank v. First Union National Bank*, 911 A.2d 133 (Pa. Superior Ct. 2006) where two banks were affected by a check kite.  The losing bank complained that the other bank knew or should have known of the check kiting scheme and should have stopped the kite before the losing bank ever opened an account with the kiter.  The court pointed out that the party that was unjustly enriched was neither of the banks, but the customer.  As the court said, "If anyone possessed funds unjustly, it is presumably [the customer]."[94]

---

[90] *Colonial Bank,* at 1230.
[91] *Id*. at 1228.
[92] Amended Complaint, ¶¶187-189.
[93] *See* discussion *supra* at ¶¶35 through 42.
[94] *Id.* at 143-44.  *See also, Midwestern Cattle,* 2018 U.S. Dist. LEXIS, at*11-12 (court denied money had and received claim in connection with a check kiting scheme while noting that ownership of check proceeds is an

66. The same is true in this case. It is neither FirstCapital nor FB&T that is being unjustly enriched, it is RAM that was unjustly enriched because it had the benefit of other people's money as a result of the check kiting scheme.

### b. Conversion (Count 15)

67. An action for conversion of money exists only when the money is "(1) delivered for safekeeping; (2) intended to be kept segregated; (3) substantially in the form in which it is received or in an intact fund; and (4) not the subject of a title claim by the keeper."[95] Money can be the subject of a conversion claim only if it can be identified as a specific chattel, and a claim will not lie "where an indebtedness can be discharged by a payment of money generally."[96] Thus, when an indebtedness can be discharged by payment of money, a conversion action is inappropriate.[97]

68. FB&T merely recites the basic the elements of conversion without any factual allegations to support the legal conclusions.[98] Moreover, FB&T has not alleged the necessary elements specific to a claim for conversion of money.[99] For example, FB&T did not allege that FB&T provided money to FirstCapital for safekeeping and intended it to be kept segregated in an intact fund.[100] Moreover, FB&T did not identify specific monies in dispute.[101] As such, FB&T has failed to state a claim for conversion of money.

### c. Conspiracy to Commit Fraud and Aiding and Abetting Fraud (Counts 19 and 20)

---

essential element so that any claim to ownership of proceeds of check would be the depositor, not the depositary bank).

[95] *Newsome v. Charter Bank Colonial*, 940 S.W.2d 157, 161 (Tex. App. - Houston [14 Dist.] 1996, writ denied); see also *Taylor Pipeline Constr., Inc. v. Directional Road Boring, Inc*., 438 F. Supp. 2d 696, 707 (E.D. Tex. 2006) (quoting *Mitchell Energy Corp. v. Samson Res. Co*., 80 F.3d 976, 984 (5th Cir. 1996)).

[96] *Mitchell Energy Corp. v. Samson Res. Co., 80 F.3d 976, 984 (5th Cir. 1996).*

[97] *Id. See Edlund v. Bounds*, 842 S.W.2d 719, 727 (Tex. App. - Dallas 1992, writ denied); *Gronberg v. York*, 568 S.W.2d 139, 144-45 (Tex. Civ. App. - Tyler 1978, writ ref'd n.r.e.).

[98] Amended Complaint, ¶¶191-193.

[99] *Id.*

[100] *See generally, id.*

[101] *See generally, id.*

69.     FB&T alleges that FirstCapital conspired and aided and abetted RAM in a fraudulent scheme to ensure that FB&T would continue to provide provisional credit to RAM, presumably knowing from insider information received from RAM that FB&T's provisional credits would never be paid.[102]

70.     "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."[103]   At a minimum, a plaintiff must plead "the who, what, when, and where" of the alleged fraud to satisfy Rule 9(b).[104]

71.     The only allegation made with particularity by FB&T regarding supposed insider information upon which its fraud-based claims are based is one made on information and belief that, "on or before Tuesday, July 31st, Dykes met with Defendant B. Burgess, FirstCapital's CEO, and Defendant K. Burgess, FirstCapital's Chairman to ask them for financial assistance through loans and warn them of Ford's impending legal action, Reagor-Dykes' severe financial problems, and Reagor-Dykes' planned bankruptcy filing."[105]

72.     The allegations that follow reflect nothing other than lawful, prudent actions taken by FirstCapital officers to discharge their fiduciary duties to protect the interests of FirstCapital.[106]   Contrary to the allegations of FB&T, FirstCapital did nothing to "ensure First Bank continued to provide provisional credit to RAM."   The decision to provide provisional credit was a decision made exclusively by FB&T without any assertion or contention that FirstCapital did or said anything to induce or encourage FB&T to do either before, on or after July 31st.   In fact, FirstCapital brought the check kite to a close, once and for all, by closing RAM accounts and returning checks.   At that point, the UCC system for allocating the inevitable

---

[102] Amended Complaint, ¶¶212, 216.
[103] FED. R. CIV. 9(b).
[104] *Giancarlo v. UBS Fin. Servs. Inc.*, 725 F. App'x 278, 282 (5th Cir. 2018).
[105] Amended Complaint, ¶66.
[106] *See* generally, Amended Complaint, ¶¶67-80.

losses built into the check kiting scheme kicked in and resulted in the cessation of the extension of any further provisional credits by all banks caught up in the scheme.

## III.  CONCLUSION

73.     The provisions of the UCC and applicable regulations determine the outcome of this case.  The claims asserted by FB&T relate to two batches of checks dishonored and returned by FirstCapital **before** its midnight deadline, and one batch of checks that FB&T dishonored and returned **after** its midnight deadline.   Nothing in the law requires FirstCapital to look out for the best interests of FB&T; in fact, the law compels FirstCapital to look out for its best interests. Therefore, the Court should dismiss all claims asserted by FB&T, including their claims for punitive damages and attorney's fees.

Respectfully submitted,

SPROUSE SHRADER SMITH PLLC
Joel R. Hogue, State Bar No. 09809720
joel.hogue@sprouselaw.com
John Massouh, State Bar No. 24026866
john.massouh@sprouselaw.com
M. Chase Hales, State Bar No. 24083124
chase.hales@sprouselaw.com
701 S. Taylor, Suite 500 (79101)
P.O. Box 15008
Amarillo, Texas   79105
(806) 468-3300; (806) 373-3454 fax


 */s/ Joel R. Hogue*
Joel R. Hogue

**ATTORNEYS FOR DEFENDANT
FIRSTCAPITAL BANK OF TEXAS, N.A.**

## CERTIFICATE OF SERVICE

I hereby certify that on October 11, 2018, I electronically filed the foregoing document with the clerk of court using the electronic filing system.  The electronic filing system will send a "Notice of Electronic Filing" to the following attorney(s) of record who have consented in writing to accept this Notice as service of this document by electronic means:

Paul B. Lackey                          *paul.lackey@stinson.com*
Michael P. Aigen                        *michael.aigen@stinson.com*
Katy L. Hart                            *katy.hart@stinson.com*
STINSON LEONARD STREET LLP
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219-4259
**ATTORNEYS FOR PLAINTIFF**
**FIRST BANK & TRUST**

Robert A. Aycock                        *aaycock@lubbocklawfirm.com*
Joshua D. Frost                         *jfrost@lubbocklawfirm.com*
FIELD, MANNING, STONE,
   HAWTHORNE & AYCOCK, P.C.
2112 Indiana Avenue
Lubbock, Texas 79410-1499
**ATTORNEYS FOR DEFENDANT**
**SHANE SMITH**

Robert N. Nebb                          *rnebb@carperlaw.com*
LAW OFFICE OF MICHAEL H. CARPER, P.C.
1102 Main Street
Lubbock, Texas 79401
**ATTORNEYS FOR DEFENDANT**
**SHEILA MILLER**

                              */s/ Joel R. Hogue*
                              Joel R. Hogue