UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | | |
|---|---|---|
| FIRST BANK & TRUST, | § | |
| | § | |
| Plaintiff, | § | |
| v. | § | |
| | § | |
| REAGOR AUTO MALL, LTD. d/b/a | § | |
| REAGOR-DYKES OF LEVELLAND, | § | CAUSE NO. 5:18-cv-00234-C |
| and d/b/a REAGOR-DYKES IMPORTS, | § | |
| FIRSTCAPITAL BANK OF TEXAS, | § | |
| N.A., BART REAGOR, RICK DYKES, | § | |
| SHANE SMITH, SHEILA MILLER, | § | |
| BRAD D. BURGESS, and KENNETH L. | § | |
| BURGESS, | § | |
| | § | |
| Defendants. | § | |

## APPENDIX IN SUPPORT OF DEFENDANT FIRSTCAPITAL BANK OF TEXAS, N.A.'S MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT AND BRIEF IN SUPPORT

Defendant FirstCapital Bank of Texas, N.A. submits this appendix in support of its Motion to Dismiss Plaintiff's Second Amended Complaint and brief in support:

| DESCRIPTION | APPENDIX PAGE |
|---|---|
| The Banking Law Journal | 1 - 42 |
| Midwestern Cattle Marketing, LLC vs Legend Bank, N.A. | 43 - 48 |

Respectfully submitted,

SPROUSE SHRADER SMITH PLLC
Joel R. Hogue, State Bar No. 09809720
joel.hogue@sprouselaw.com
John Massouh, State Bar No. 24026866
john.massouh@sprouselaw.com
M. Chase Hales, State Bar No. 24083124
chase.hales@sprouselaw.com
701 S. Taylor, Suite 500 (79101)
P.O. Box 15008
Amarillo, Texas   79105
(806) 468-3300; (806) 373-3454 fax


 /s/ Joel R. Hogue
Joel R. Hogue
**ATTORNEYS FOR DEFENDANT
FIRSTCAPITAL BANK OF TEXAS, N.A.**

## CERTIFICATE OF SERVICE

I hereby certify that on November 13, 2018, I electronically filed the foregoing document with the clerk of court using the electronic filing system. The electronic filing system will send a "Notice of Electronic Filing" to the following attorney(s) of record who have consented in writing to accept this Notice as service of this document by electronic means:

Paul B. Lackey
*paul.lackey@stinson.com*
Michael P. Aigen
*michael.aigen@stinson.com*
Katy L. Hart *katy.hart@stinson.com*
STINSON LEONARD STREET LLP
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219-4259
**ATTORNEYS FOR PLAINTIFF**
**FIRST BANK & TRUST**

Marshall M. Searcy, Jr.
*marshall.searcy@kellyhart.com*
Scott R. Wiehle
*scott.wiehle@kellyhart.com*
Kelly Hart & Hallman, LLP
201 Main Street, Suite 2500
Fort Worth, Texas 76102

John C. Sims
*johnsimslaw@yahoo.com*
PO Box 10236
Lubbock, TX 79408
**ATTORNEYS FOR DEFENDANTS**
**REAGOR-DYKES II, L.L.C.,**
**REAGOR-DYKES AUTO**
**MALL I, L.L.C.**
**AND BART REAGOR**

Tom Kirkendall
*bigtkirk@kir.com*
Law Office of Tom Kirkendall
2 Violetta Ct.
The Woodlands, Texas 77381-4550
**ATTORNEYS FOR DEFENDANT**
**RICK DYKES**

Robert A. Aycock
*aaycock@lubbocklawfirm.com*
Joshua D. Frost
*jfrost@lubbocklawfirm.com*
FIELD, MANNING, STONE,
HAWTHORNE & AYCOCK, P.C.
2112 Indiana Avenue
Lubbock, Texas 79410-1499
**ATTORNEYS FOR DEFENDANT**
**SHANE SMITH**

Robert N. Nebb
*rnebb@carperlaw.com*
LAW OFFICE OF MICHAEL H. CARPER, P.C.
1102 Main Street
Lubbock, Texas 79401
**ATTORNEYS FOR DEFENDANT**
**SHEILA MILLER**

*/s/ Joel R. Hogue*
Joel R. Hogue

1072254_1.docx/4739.363

# GROUNDING CHECK KITING WITH CHECK 21: THE CIVIL AND CRIMINAL RAMIFICATIONS OF CHECK KITING IN THE 21ST CENTURY

THOMAS E. McCURNIN AND PETER A. FRANDSEN

*This article discusses check kiting, steps banks can take to prevent and discover check kiting, and how to collect loss from the customer or insurance bond. It also explores the bankruptcy ramifications of check kiting, how "Check 21" reduces check kiting losses to banks, and the criminal aspects of check kiting.*

Long after the paper check's predicted demise,[1] check kiting is a continuing crime in the United States and has resulted in the loss of billions of dollars to banks.[2] While the new Check 21 Act reduces float and speeds item processing, check kiting has not been eliminated.

This article discusses the definition and history of check kiting. It also discusses what a bank may do to prevent and discover check kiting, and once discovered, how to collect loss from the customer or insurance bond and the defense of the midnight deadline suit by the other bank. This article also discusses the bankruptcy ramifications of check kiting and how "Check 21"

Thomas E. McCurnin is a partner with the law firm of Barton, Klugman & Oetting in Los Angeles, specializing in the representation of financial institutions. Peter A. Frandsen is a Trial Attorney with the Criminal Division, Fraud Section, United States Department of Justice, in Washington, D.C.

None of the views contained herein necessarily represent those of the Department of Justice or any other government agency.



295

Published in the April 2008 issue of The Banking Law Journal.
Copyright ALEXeSOLUTIONS, INC.

reduces check kiting losses to the bank. Finally, this article discusses the criminal aspects of check kiting, including prosecution and defense.

## ORIGIN OF TERM AND HISTORY

The term "check kiting" originated as a financial term relating to drafts, notes or accommodation notes in the late 1700s and was in effect at the time of the French and Indian War.[3] The practice was originally known as "draft kiting" or "free riding" and was essentially a form of a forced loan, by playing the float or collection period for accommodation bills or notes between the accounts at two banks.[4] It was a concern to Congress after the Civil War,[5] and by the early 1920s the practice was so commonplace that some states made check kiting illegal by statute.[6]

In a typical 19th Century kite, a kiter would play the float on a bill or note, exchanging the notes between his or her banks or the bank of a colleague. Unlike today, private notes were negotiated extensively and remained outstanding for long periods of time and would allow customers to draw on these uncollected deposits.[7] The bank would grant immediate credit for a note that might take some time to collect. Meanwhile the kiter would enjoy an inflated bank account.

Modern check kites are highly repetitive and have far more velocity compared to the 19th Century kites, because float times of two weeks have been replaced by float times of two days. While a 19th Century kite may seem quaint today, the concepts behind check kiting and the abuse of float remains unchanged.

## MODERN CHECK KITES

Check kites are not restricted to small or thinly capitalized businesses. The E.F. Hutton check kite is one of the most spectacular in recent times and worthy of study.[8]

In the early 1980s under the guise of a cash management program, Hutton passed thousands of checks from its local banks to its regional banks to artificially increase the amount of float. From its regional banks, Hutton

296

Published in the April 2008 issue of The Banking Law Journal.
Copyright ALEXeSOLUTIONS, INC.

-002-

passed checks to its concentration banks. Finally, the concentration banks issued checks back down to the local banks to start the process over again. Hutton was essentially recycling the same money to increase its bank balances through float, which created investment income for Hutton at the expense of its banks.

In 1985, Hutton pled guilty in district court to 2,000 counts of mail and wire fraud, paid a $2 million fine, paid $750,000 reimbursement to the government for its prosecution costs, and paid restitution to defrauded banks.

In the early 1990s, members of Congress were accused of check kiting.[9] The House of Representatives Bank at the United States Congress permitted a form of kiting where members of Congress were allowed to write checks on their account without sufficient funds being present at the time the check was written. In other words, the House Bank made loans to Congressmen in anticipation of receiving their regular government paychecks. While certainly not the systematic exchange of checks between controlled accounts, the media at the time called the operation a check kite.

Bank kites can be disastrous for a bank, and the losses of kites have caused banks to close or have seriously impacted their cash reserves. Recently, two Ohio banks have fallen victim to check kiting, one of which had to close.[10]

## CHECK 21 AND CHECK KITING

In October 2003, Congress passed legislation which was designed to speed up the check collection process, encourage check truncation, and reduce float time. Known as "Check 21," the act allows banks to electronically process checks, so that they clear in a matter of a few days.[11] Prior to Check 21, banks typically processed paper checks which could take up a week or more to clear between distant banks.

The law allows a bank to truncate checks, by creating a substitute check and to process check information electronically.[12] Check 21 requires banks to accept these substitute checks.

Because Check 21 allows banks to track exchange and endorsement information electronically from the bank of first deposit to final payment at the drawee's bank and tracking the check electronically for faster return of

Published in the April 2008 issue of The Banking Law Journal.
Copyright ALEXeSOLUTIONS, INC.

exception items,[13] it increases the chance that bank can spot fraud and reduces the cost of processing to the banks.[14] However, Check 21 is certainly no panacea for check kiting, as substantial check kiting losses have occurred after its enactment.[15]

## PROVISIONAL CREDIT AND FLOAT

In order to understand check kiting, one must understand how two inherent procedures in banking contribute to check kiting: provisional credit and float time.

Check kiting is only possible because the bank gives the customer immediate credit during the float period, which is common and encouraged by Regulation CC and the UCC.[16] This credit results in a positive ledger balance for the account. Allowing the customer to draw on that provisional



**Check Payment for Goods and Services**

298

Published in the April 2008 issue of The Banking Law Journal.
Copyright ALEXeSOLUTIONS, INC.

-004-

credit before collection is known as negative collected balance or uncollected funds,[17] and is the heart of a check kite. Without uncollected funds, there can be no check kite.

Uncollected funds are very real to the banks. Uncollected funds are recorded on the books of the bank, reported on account statements, and the customer can be charged interest on uncollected funds. For larger commercial customers the extension of provisional credit is negotiated between financial institution and the customer.[18]

A second prerequisite for a check kite is float time, the time it takes between deposit and collection.[19] Banks have always sought ways to reduce float time, beginning with specialized delivery services, clearinghouses, and the use of aircraft to speed collection. In the past 30 years, the Federal Reserve Board enacted the Expedited Funds Availability Act and Regulation CC, which also reduced float time.[20] Now, collection is done directly between banks, by private clearinghouses, and the Federal Reserve System.[21]



**Exchange of Checks to Increase Float**

299

Published in the April 2008 issue of The Banking Law Journal.
Copyright ALEXeSOLUTIONS, INC.

-005-

Check 21 is the latest example of improvements in the payment system, which ultimately results in the separation of check information from its physical medium for more efficient processing.

## THE ELEMENTS OF CHECK KITING

Check kiting has been defined many ways over the years.[22] The United States Supreme Court has defined check kiting by example.[23] Other definitions are legal definitions and not particularly helpful and often combine civil and criminal aspects of the kite.[24]

For purposes of this article, a check kite has the following elements:

1) the exchange of items for collection;

2) between two or more transaction accounts under common control;

3) to create artificial balances of uncollected funds.

It is not the writing of "bad checks," a concept of state commercial law, that makes a check kite and in fact, a well executed kite does not have bad checks until the very end of the kite.

The first element of an exchange of items for collection is the mechanical operation of a kite. It is the exchange of smaller checks between accounts that takes advantage of the float time. Smaller checks invite less scrutiny and give the appearance of a genuine business activity.

When the kiter deposits an uncovered check, he or she must eventually cover it or the item will be returned unpaid, covering the item with another check drawn upon another account under the kiter's control. That check is also covered with yet another check in a day or two. This results in a systematic cycle which never ends.[25]

The kiter must also gain a knowledge of bank operations and will frequently make deposits at the same branch everyday at the same time, and sometimes to the same teller, to meet cutoff times.

The second element of a check kite is the exchange of checks between two or more bank accounts under common control of the kiter. Only bank accounts under control of the kiter are part of a kite, because only the kiter can issue and

300

Published in the April 2008 issue of The Banking Law Journal.
Copyright ALEXeSOLUTIONS, INC.

deposit the checks necessary to accomplish the kite. The type of kiter control varies and may include situations where the kiter has direct signing authority over the bank account, where the accounts are owned by different businesses under the kiter's control, or those accounts owned by colleagues of the kiter.

The kiter will usually deposit checks at two banks at least, often located in different processing jurisdictions which increases float time. Kiters may also damage the checks so the processing time is delayed.

The third element of a check kite is the intent to create artificial balances on uncollected funds. The kited checks create an increase in the uncollected funds balance above regular business activity. Indeed, the kiter's deposits and the associated fee income from uncollected funds often make the kiter a prized customer. The bank's computer system may automatically grant immediate credit on the kiters deposits based on the kiters large and frequent deposit activity.

Sometimes bank employees unwittingly aid the kite by holding deposits in a desk while processing the deposit so the kiter can still draw on the account but doesn't have to cover the deposits. On the other end of the kite, helpful employees at the second bank might hold checks drawn against the account to give the kiter more time to cover an overdraft.

It is important to distinguish between a true kite and writing checks with insufficient funds. The customer may have innocent intentions and be short of cash. Often called the "supermarket kite," the customer has a reasonable expectation of receiving funds from another source to cover the check; the kiter covers his or her own check with his or her own check. The supermarket kite is a one time event; the kiter continues the kite with increasing deposits until it reaches the kiter's desired amount, and the kiter makes his or her final withdrawal, skips or files bankruptcy.[26]

All kites come to an end at some point, leaving a string of banks holding the empty bag of uncollected funds, and litigation between the various financial institutions which were involved. If the kiter is truly unlucky, he or she may be prosecuted for the crime of bank fraud.[27]

## KITE WARNING SIGNS

Many lists of check kiting red flags have been published over the years.[28] The following core characteristics of the customer identify patterns, from the

301

Published in the April 2008 issue of The Banking Law Journal.
Copyright ALEXeSOLUTIONS, INC.

-007-

bank's point of view, that may be an indication of check kiting:

- Constant drawing on uncollected funds
- Repetitive transaction patterns
- Frequent requests for account information
- Debits and credits being consistently equal
- Low beginning and ending book balances
- Low book balances in relation to deposit activity
- Eccentric deposit activity
- Extremely high percentage of kiter-to-kiter checks
- Use of banks not rationally connected with the customer's legitimate business or outside the area
- Multiple accounts under common control
- A volume of account activity unsupported by the customer's business activity

One of the main problems for the bank is that it does not know that a substantial majority of the deposits are kiter-to-kiter checks, so it must rely on other elements. Of all the above elements, drawing on uncollected funds is the most significant. Without this temporary loan in the form of uncollected funds, there can be no check kite.

Modern automated item processing accounting systems gather information that can be used to quickly detect some of elements of check kiting. Many banks have a specific Check Kite Exception Report which incorporates some of the above elements.[29]

Even with full knowledge of a Check Kite Exception Reports, bankers may turn a blind eye to the kite, because the kiter is supposedly a valued customer who is generating fee income for the bank. In addition, employees of banks may discover the kite and conceal it so they are not fired. Finally, once discovered, senior management may intentionally let the kite continue to pull the plug on the kite at a specific time, hoping to improve the banks credit position with guaranties, or force the loss onto another bank.

302

Published in the April 2008 issue of The Banking Law Journal.
Copyright ALEXeSOLUTIONS, INC.

# PREVENTING THE CHECK KITE

Prompt discovery of the check kite improves the odds that the bank will be made whole.[30] It is no coincidence that the banks that are made whole are generally the first banks to discover the kite.[31] Every bank's operation manual is filled with procedures to reduce fraud and catch check kiters.[32] Unfortunately, when a check kite is successful it is generally the case that the bank's policies were ignored. The following general guidelines for bank policies may be useful to prevent a check kite:

## Personnel

The employees of the bank are its greatest resource and its greatest risk. The bank's policies are meaningless unless the employees follow basic bank rules. Employees should be trained to recognize a check kite, encouraged to read the internal reports to spot the kite, and the tellers and customer service managers should alert corporate security to investigate potential kites.

## Limits on Drawing on Uncollected Funds

No kite can proceed without immediate credit on check deposits. But because uncollected funds are a necessary evil of banking, the focus should then be developing bank policies to determine under what circumstances to allow immediate credit on check deposits.

Some banks treat the drawing of uncollected funds as an extension of credit, and a loan officer with specific credit authority makes those decisions. In other banks, the granting of immediate credit is a function of the operations department. Banks often assess service charges on uncollected funds.[33] Ironically, it is this fee income that earns bank employees awards and may prevent discovery of the kite.

As a form of internal control, accounts with high uncollected funds fees should be reviewed on a regular basis for kiting. Often, these are legitimate customers which might need a credit line. This presents the bank with a marketing opportunity. Bankers must be made aware that the fee income on uncollected funds will be vastly out weighed by the cost of a collapsed check

303

kite, and that a formal credit line will result in more and safer revenue to the bank.

## Uncollected Funds Disclosure

The amount of uncollected funds, drawn by the customer, should be disclosed on the account statement to make the potential kite easier to spot by the bank. This will also come into play for any subsequent criminal prosecution, as explained later in this article.

## Financial Ratio Analysis

All banks have sophisticated software programs capable of producing a variety of reports of account activity. A Kite Suspect Report can be useful here, provided the correct parameters are selected to identify accounts drawing on uncollected funds over some appropriate level.[34] Using the natural monthly cycle of account statements will smooth out short term events and can make changes over time more apparent. Some ratios are given below.

The ratio of Average Collected Balance divided by Average Book Balance (provided the denominator is a positive number) for a given period of time is a measure of the speed and direction of activity in an account. A positive number indicates that the customer on average that period is not drawing on uncollected funds. A negative number indicates the customer on average that period is drawing on uncollected funds.

The ratio of the Average Book Balance for a given period of time divided by the Total Deposits for the same period of time indicates how quickly deposits stay in the account. This ratio shows how much of the deposits remain in the account. The lower the ratio, the faster deposited funds are withdrawn from the account, and is indicative of a check kite.

The ratio of Ending Book Balance divided by the Total Deposits for that monthly statement cycle indicates how much of the month's total deposits remain in the account ending balance for the end of that period. The lower the ratio the more the funds are removed from the account, and is also indicative of a check kite.

The ratio of Beginning Account Balance to Ending Account Balance is a

304

measure of turnover in the account. A ratio of one-to-one shows that all the activity in the account for the period of time has left the account where it started at the beginning. A consistent ratio of one is also indicative of check kiting, except for sweep accounts. The more varied the ratio, the less likely the account is part of a kite.

The ratio of the number and/or the dollar amount of checks drawn on an account, divided by the number and dollar amount of checks deposit into the account from another account under common control of the account holder is a measure of exchange of checks. The larger the ratio number produced means a higher percentage of checks are being exchanged between accounts under common control. A ratio of one means that all the checks deposited are from an account under common control and is a likely sign of check kiting.

The bank may try to determine whether the deposits are kiter to kiter checks, but there is no known software that can track other banks' account numbers to determine whether the depository account is controlled by the customer, and the process must be done by hand.

Digital analysis searches for abnormal repetitive patterns in data can also be used.[35]  Auditors could use digital analysis to detect kiting schemes by looking for a high incidence of similar check dollar amounts within an account or being exchanged with other accounts.

Finally, while many bankers tout the advantage of a positive pay system (a system whereby the customer submits a computer file of the issued checks, the check numbers, the payee, and the amount to the bank to stop counterfeit checks upon receipt by the drawee bank) to combat check kiting,[36] this system is worthless because counterfeit and altered checks are never used in a kite.

## Contract Language

The account agreement, no matter what terms it may contain, will do nothing to stop a kiter, nor assist the bank in identifying the kiter, once it is in process. The only reason to consider adding language to an account agreement, with respect to kiting, would only be to assist the bank in a subsequent civil action against the kiter, assuming the kiter has not skipped and has assets

305

Published in the April 2008 issue of The Banking Law Journal.
Copyright ALEXeSOLUTIONS, INC.

— two very big assumptions.

In any event, should the bank lawyer want to go down this path, there are four main areas in which the account agreement can be modified; including supplying language which would allow the bank to close the account for any reason; deeming the activity fraudulent so that the bank may pursue the kiter in bankruptcy; cementing the statutory security interest in uncollected funds to prevent a trustee from asserting claims against the bank; and to provide language which would entitle the bank to obtain a pre-judgment writ of attachment in those states which allow this remedy.

## CHECK KITING AND THE MIDNIGHT DEADLINE

Once a customer presents a check for deposit, it ultimately ends up at the drawee bank where the check is presented for payment. Subject to some exceptions under Regulation CC, the drawee bank must either pay or return a check by midnight of the second banking day following presentment.[37]

A drawee bank which discovers a kite must immediately start returning checks to the collecting bank.[38] There is simply no time to lose and delay may mean losing the right to return the checks to the collecting bank.[39]

While the basic law of the midnight deadline is contained in the Uniform Commercial Code, Regulation CC supplements the law and provides for several extensions of the deadline.[40] Regulation CC has a one day extension provision, if the items are delivered before the next business day. This would entail the drawee bank sending the returned items by courier to the collecting bank.[41] Two courts have upheld this exception.[42] If the return is made after business hours and the collecting bank is closed, the return may be made to the Federal Reserve, which is technically open 24 hours a day.[43] Examples of how the midnight deadline affects a bank's liability under a check kite follow.

In one case, a banker discovered the kite on the last day to return checks and personally drove to the Federal Reserve, getting the checks there a few minutes before 4:00 p.m. The banker's personal effort and the return were both deemed satisfactory.[44]

A depository bank which mis-coded the check but otherwise made a timely return, was not sanctioned for a late return. The bank elected to con-

306

vert the check to a Qualified Return Check,[45] and returned the check in time under both the Uniform Commercial Code and Regulation CC, but in its haste, mis-coded the item. The drawee bank argued that the mis-coding of the item converted an otherwise timely return to strict liability, a position rejected by the court.[46]

Therefore, the bank that first discovers the kite will generally come out ahead, because it will be able to return more checks.[47] The bank with an overdraft will generally be stuck with that overdraft unless it can establish that another bank failed to return items within its midnight deadline.[48]

A Minnesota case took a different approach, and rather than analyzing the returns using a calendar, submitted the issue of a drawee bank's good faith to the jury. In that case, a drawee bank became aware of the kite and worked with the kiter for another 7 days, resulting in an overdraft of $370,000. Under the theory that the bank knew or should have known about the kite, it disallowed an otherwise timely return to a collecting bank, because the bank did not operate in good faith. Although this case is interesting reading, the issue should have been decided using a calendar rather than a jury's view point of "good faith."

The bottom line to any kite is as soon as it is discovered, the drawee bank needs to start returning checks as fast as possible, and if necessary, utilize the one-day extension under Regulation CC. Any delay may make recourse of those worthless checks impossible to achieve.

## POST-DISCOVERY OF THE KITE: THE BANK'S FIRST STEPS

After the kite has been discovered, the first thing the bank must do is freeze the account and return all checks drawn on the account. The bank may get lucky and be able to collect on deposits and timely return most of the checks drawn on the account within its midnight deadline.

If the bank fails to immediately freeze the account and tries to maneuver the loss by keeping the kite open, it may ultimately lose the entire overdraft and be responsible for another bank's loss as well.[49]

Closing an account of a customer that is suspected of being part of a check kite can be tricky. A wrong decision to dishonor checks or close the

307

account can cause the bank to be accused of breach of contract, wrongful dishonor, and lender liability. It is a business decision not to be made lightly in either direction.

The first thing that needs to be done is to immediately determine the cash position of the various accounts, some of which will be negative. Then a determination must be made which checks have been presented that must be returned that day in order to qualify for a timely return under the Uniform Commercial Code or the Regulation CC extension. Of course, those checks must go back to the various banks or clearinghouses that day. There may be other checks which can be returned in the next few days, and a single officer should be in charge of the account and all checks presented to the bank for payment that need to be routed to a single decision maker. As explained later in this article, the bank will want to interview the kiter and conduct its own investigation as well.

Most states allow the bank a banker's lien to setoff against property in its possession by contract,[50] Uniform Commercial Code,[51] and the common law bankers lien.[52]

The bank may want to consider obtaining guaranties by the customer and the spouse,[53] going into court, to obtain injunctions[54] or attachments[55] on the customer's bank accounts located at other institutions, the customer's real estate, or other tangible assets. A quick writ of attachment will defeat a bankruptcy filed within 90 days after levy[56] and will prevent the kiter from dissipating assets. Other banks may have the same idea, and a prompt attachment will also defeat their later filed lien.

The bank will probably have a stack of checks (or Check 21 images) which have been returned unpaid by the other banks in the kite, some of which will be timely returned under the midnight deadline and others which have been untimely returned. The bank needs to compile a list of these checks, the date presented to the other bank, and the date returned. The issue of whether the other banks made a timely return under the midnight deadline should be a careful decision made with a calendar in one hand and Regulation CC in the other.

308

Published in the April 2008 issue of The Banking Law Journal.
Copyright ALEXeSOLUTIONS, INC.

## LONG RANGE LITIGATION STRATEGY

Regardless of the type of legal action pursued, counsel for the bank should have a thorough understanding of the facts, and should garner bank witnesses who can competently testify to the mechanics of the check kiting scheme.[57]

In most states, the principals of a corporation, who commit check kiting through their corporations, can be held personally liable.[58] Therefore, the corporate shell cannot be used to insulate the principals from personal liability. Of course, the use of guaranties to secure the underlying account balance and potential overdraft are encouraged and are enforceable.[59]

The kiter may argue that his or her bookkeeper was really the kiter and he or she had no knowledge of, nor benefit from, the kite. If that is truly the case, there is some authority that simply because a person's name is on the account, the principal is not liable for the kite, and the principal may absolve himself by claiming ignorance of the kite.[60]

In situations where the kiter is uncollectible and imprisonment is likely, the bank may want to forgo any civil action against the kiter and simply rely upon the federal courts to impose restitution, which assumes that the kite is large enough to prosecute. In such a case, that may not be an unreasonable decision, because restitution orders are generally mandatory for federal prosecutions and they can be enforced as a judgment.[61]

## INVESTIGATING AND DOCUMENTING THE CHECK KITE

Once the kite is discovered and the checks returned, the bank's investigation of the kite will directly affect its ability to recover the overdraft and will assist the prosecutor in the criminal case.

The most urgent information to gather is witnesses to the kite. Paper reports may be generated later, but witnesses may lose their memory or skip town. Therefore, the bank investigator needs to consider some of the following steps:

- *Bank Employees.* The investigator should interview bank employees as to the representations the kiter may have made to them. The representations the kiter made to the bank as to his or her business, the source of

309

Published in the April 2008 issue of The Banking Law Journal.
Copyright ALEXeSOLUTIONS, INC.

deposits, his or her business volume, and representations made to con-
tinue to kite are very important for a criminal prosecution. A memoran-
dum of interview should be prepared by the interviewer or the employ-
ee should sign a detailed statement. As set forth later in this article, this
is one of the more crucial parts of a kite prosecution and the success of
the prosecution may depend, in large measure, on the quality of the post
kite interviews with bank employees.

- *The Kiter.* Bank security should also interview the kiter and a memo-
  randum of the interview should be made. Any interview, no matter how
  informal, is better than none. These interviews may cement a subse-
  quent criminal prosecution.[62]

- *The Kiter's Employees.* Bank security should also interview the kiter's
  employees and bookkeepers as well as any nominee account holder at
  any of the banks involved with the kite.

- *Drive by the Kiter's Business.* The bank investigator should drive by the
  place of business of the kiter and take photographs. An interview of
  adjacent businesses can be probative to show a lack of business activity
  on the part of the kiter.

- *Other Banks.* Contacting the other banks where the kiter was using can be
  touchy because of privacy and inter-bank liability issues.[63] Improper dis-
  closure of customer information to another bank investigator could impose
  liability to the bank,[64] subject to some narrowly defined exceptions.[65]

The bank investigator should also obtain full documentation of the kite,
as well as utilizing the bank's report generating capability to condense the
information. Many a kite case has been jeopardized by the bank losing criti-
cal information in the years between the kite and the actual trial.

The bank investigator should obtain the following documents and
reports:

- *Account Statements.* The bank should compile account statements to
  obtain a summary of the size and scope of the check kite. Although the
  kiter may claim ignorance of the uncollected funds, that claim can be

310

Published in the April 2008 issue of The Banking Law Journal.
Copyright ALEXeSOLUTIONS, INC.

defeated with the evidence of the account statements which shows uncollected funds.

- *Payee Information.* It is difficult to determine if the kiter was issuing kiter-to-kiter checks without examining the payee on the checks. If this information is captured electronically with Check 21 capability, the bank investigator can obtain this information without printing all checks.

- *The Checks.* There is probably no way to get around producing all the checks involved in the kite. Check 21's use of substitute checks ought not present an evidentiary problem, because, with proper authentication, substitute checks are admissible.[66] In addition, if the checks were electronically endorsed, additional evidence may be needed to prove the existence of endorsements that are not on the check.[67]

- *Signature Cards and Account Agreements.* The bank investigator should obtain the original signature card, applicable bank disclosure agreements, overdraft notices, and correspondence to and from the kiter. These types of documents are often lost or destroyed years later when the matter finally goes to trial.

- *Loan Records.* The bank investigator should also obtain any loan files for the kiter. Loan files, particularly financial statements and tax returns, should reveal information about the kiter's true business.

- *Account Statement Spread Sheets.* In order to present the matter to a federal prosecutor, the information from the last six months of the kiter must be spread. That information should include beginning and ending balances; total deposits and credits and withdrawals and deductions; average book balances; and average collected balances; and number of items processed. Spreading this information by month will demonstrate the amount, nature, and volume of activity over a period of time.

- *Payee Spread Sheet.* In order to prove kiter-to-kiter checks, the bank investigator should prepare a list of the payees over the last six months of the kite. This spread sheet will demonstrate that the payees are persons and entities controlled by the kiter. The percentage of checks that are kiter-to-kiter will be the vast majority of checks and often in excess of ninety percent.

311

- *Unpaid Checks Report.* The bank investigator should prepare a list of the last unpaid or NSF checks which will probably be from the last two or three days of the kite. These last unpaid checks represent the net cumulative amount over the life of the kite.

- *Flow Chart.* In order to understand how the kite worked, the bank investigator should prepare a report which should classify, by major category, all the inflows and flows of funds through the account. The categories include beginning and ending balances, maker to maker checks for each payee, and non maker to maker checks.

By condensing and organizing this large amount of information into a few spread sheets, the investigator will make it easier for trial lawyers to prove the fraud.[68]

## DISCLOSING THE KITE TO OTHER BANKS

Whether or not a bank which discovers a kite should notify other financial institutions is a touchy question. The debate started in the late 1970s when some courts ruled that a bank could not return deposit items while trying to collect their own in a kite.[69] At about the same time, some experts opined that the loss of the banks should be equitably apportioned between them.[70]

However, the majority rule is that if each bank in a kiting situation is merely trying to protect itself, it has no duty to advise the other bank of its suspicions and the discovering bank can act to protect itself — even if this has the effect of shifting the entire loss to the other bank.[71] Some examples of banks properly acting to protect their own interests follow.

In one case, a drawee bank became aware of kite after it became stuck with large NSF checks and asked the customer out of bank. The customer obtained an investor to sign a note to cover overdraft. The bank made no disclosure to the investor, and it was held that the bank had no duty of disclosure.[72]

In another case, a bank discovered a kite, and was aware of another bank's potential losses because of deposits to the first bank, but quietly closed

312

Copyright ALEXeSOLUTIONS, INC.

down the account without disclosure. The second bank sued claiming a common law duty to disclose, but the court held there was no such duty.[73]

Another bank became aware of the kite and took the textbook action — it froze the account, and continued to collect deposits. The second bank was unaware of the criminal activity of its customer honored checks to the first bank. The court held that the first bank's activities were legal and prudent.[74] This is probably the best strategy the bank has at its disposal.

The case books are replete with banks acting to protect their own best interests, without informing anyone of the kite until after the midnight deadline, and save and except a few peculiar decisions, no court has imposed a duty to disclose.[75]

The limited decisions which impose such duties are generally factually specific, and focus on unreasonable activity by the bank after the check kite is discovered, such as delaying returning checks,[76] keeping the kite open while the customer secures cashiers checks,[77] or keeping the kite open while negotiating with another financial institution to pay off the overdraft.[78]

## BANKRUPTCY ISSUES: PREFERENCE ACTIONS AGAINST BANK

Many check kites end up in bankruptcy because the kiter wants to discharge the obligations to the banks. In bankruptcy, the trustee may pursue payments received by the depository bank in the form of checks deposited into the debtor's account, as preferential payments. The theory is that the payments made by the now bankrupt check kiter were payments on an antecedent debt (to cover an overdraft) and were made within 90 days of the bankruptcy filing.[79] Thus, the trustee will sue the depository bank to recover the checks the bank received as preferential payments. This is an issue that has been heavily litigated in recent years.

Almost every bankruptcy court that has faced the issue have ruled in favor of the bank and against the trustee, because the depository bank has a security interest in the check for which a provisional credit was granted by the bank.[80] No security agreement is necessary, and no filing is required to perfect the interest and it has priority over other types of security interest, even interests perfected by filing.[81] There have been no reported decisions

313

against banks involving check kites in recent years which refused to recognize the bank's security interest,[82] save and except one odd Florida decision particular to specific facts.[83]

## BANKRUPTCY ISSUES:  IS A CHECK KITE NON-DISCHARGEABLE?

There have been two grounds for holding the kite non-dischargeable, actual fraud[84] or conversion.[85] Most courts have embraced the actual fraud exception as opposed to the conversion exception.

Some courts, analyzing the discharge from a fraud basis, require some type of representation to the banks as to the check itself.[86] A contract provision in the account agreement that every deposited check is based on good funds would solve this issue in states that require this level of proof.

Other states hold that the mere issuance of the check is a representation,[87] or imply an oral or written representation by the check kiter.[88]

Other courts view the check kite as conversion, and likewise differ on the level of proof.[89] In one case, the kiter claimed he was drunk and therefore lacked the mental state to deny him discharge, and surprisingly, the court agreed.[90] If the kiter pleads guilty to check kiting, a simple guilty plea to check kiting is not *res judicata* as to the damages the bank suffered, and the bank must nevertheless prove its damages.[91] A strong statement of the facts in the indictment, plea agreement, or civil settlement document should establish the kite and the damages.  If a federal criminal restitution order is obtained by the government, the victim may enforce that as a judgment,[92] but this judgment is not per se dischargeable.[93]

There is another split of authority on vicarious liability for check kiting and non-dischargeability claims.  One U.S. Court of Appeals has held that the actions of a partner can be imputed to the other partner for fraud and non-dischargeability purposes, if the partner benefited from the fraud.[94] California takes a different view, holding that the creditor must establish that debtor participated in fraud in order to find debt non-dischargeable.[95] This issue may be addressed by the account agreement, by having each principal sign the account agreement.

When faced with a check kite, under either the fraud or conversion

314

Published in the April 2008 issue of The Banking Law Journal.
Copyright ALEXeSOLUTIONS, INC.

analysis, the bank must act quickly.   Once a Chapter 11 Plan is filed, an adversary action against a check kiter is barred.[96]

While the courts are split as to whether a state court judgment for a species of fraud for the check kite constitutes *res judicata* or collateral estoppel in bankruptcy, there seems little downside in pursuing state court remedies in the face of a possible bankruptcy.[97]

Arbitration presents a special problem because most banks have mandatory arbitration and arbitrators make no findings of fact, and therefore there can be no collateral estoppel of those facts for the check kite dischargeability litigation.[98]  However, many courts have bent over backwards to find that the arbitration award constitutes issue preclusion where the debtor was obviously guilty of fraud.[99]  In California, a confirmed arbitration will have the same force and effect of a judgment with findings on all issues arbitrated.[100] Some states agree with California that the bankruptcy court can merely look at the issues arbitrated and infer findings positive to the winner.[101]  The federal courts are more inclined to honor arbitrations in bankruptcy court, simply because of the Federal Arbitration Act.[102]

## INSURANCE COVERAGE FOR LOSSES FROM CHECK KITING

Losses from bank loans are inherent to banking and are not subject to insurance underwriting for that risk, under the so-called "loan exclusion." Historically, insurers did not provide insurance for check kiting fraud. Check kiting losses were typically viewed as a "credit risk."   When a bank presented a claim for a check kiting loss, the insurer typically asserted that the loss was excluded by this loan exclusion.[103]

Losses from check kiting cannot be predicted, because they are based on a credit decision by the teller or an operations officer.  Therefore, insurers argued that insurance should not be available for loan losses, check kiting, or a bank automated approval system, all of which were excluded by the loan loss exclusion of the Financial Institution Bond.

Because the courts were not always receptive to the loan loss exclusion, insurers amended the exclusion to make it clear that kiting losses were not covered by the bond.[104]  The exclusion was based on the fact that the kite was

315

funded off site by checks, not in the form of cash.[105] However, if the kiter was physically at the bank and withdrew the funds in cash, there would be coverage.[106]

In the 1980s, the insurers decided that they simply did not want to insure for check kiting losses, whether inside or outside the bank, and deleted the on premises exception to the exclusion. After the 1986 changes, there was no coverage for check kiting losses unless the loss involved employee dishonesty.

In the early 1990s, insurers replaced the bankers blanket bond with the current format called a Form 24 Financial Institution Bond, and many offered a rider called a Check Fraud Endorsement,[107] which offered coverage for losses resulting from a "Check Kiting Fraud" (a defined term).[108] However, as a condition precedent to coverage, the bank must stop payment on all outstanding checks and must also return all checks drawn on uncollected funds. Of course, there are separate limits and deductibles for the check kiting coverage.

The coverage is fairly complete, but not without some holes for the insurer to wiggle around, including an exclusion for uncollected funds resulting from the extension of credit on uncollected funds. Because check kites always occur as a result of uncollected funds, it would seem that this extension would bar most check kite claims.[109] But some coverage is better than none, as a bank in Baltimore recently learned, recovering about 30 cents on the dollar from its insurer on a multi-million dollar check kite in 2007.[110]

## REPORTING THE CHECK KITE TO LAW ENFORCEMENT

Banks are required by law to make referrals of suspicious activities, called a Suspicious Activity Report ("SAR") to law enforcement when the bank suspects violation of federal law, money laundering, or a violation of the Bank Secrecy Act.[111] There is a specific part of the form for check kiting.[112] Banks should recognize that the effective prosecution and conviction of the suspect directly depends, in large measure, on the quality of data reported in the SAR. The FBI can not prosecute a crime of which it wasn't made aware. There is no liability for filing an accurate SAR and the bank is insulated from liability to the kiter.[113] The safe harbor applies to SARs filed within the

316

required reporting thresholds, as well as to SARs filed voluntarily on any activity below the threshold.[114]

The SARs themselves are usually exempt from discovery in civil litigation.[115]  Sometimes disclosure is ordered by state or federal courts in connection with litigation.[116]  Reports of the Inspector General in response to a SAR, which address the failure of the bank to detect check kiting, are not admissible at trial.[117]

The bank may be reluctant to reveal to law enforcement all the facts of the case for two reasons.  First the disclosure of negligence on the part of the bank may inhibit recovery of funds.  Second, there is a false perception that financial privacy laws may subject a financial institution to civil liability for disclosure of customer information.[118, 119]

After the SAR is received, a federal investigative agency, generally the Federal Bureau of Investigation, conducts an investigation of the fraud.  These investigations can become quite lengthy because of the complicated nature of bank fraud, perceived difficulties of completing the investigation, the reluctance of persons and institutions to becoming involved, and ultimately the "sex appeal" of the case to the jury.

## CRIMINAL PROSECUTION

### Federal Prosecution

The criminal investigation of check kiting cases is seemingly difficult for three reasons, generally dealing with the complicated nature of the case and its inherent lack of sex appeal.

First, a large check kite can generate thousands of documents especially cancelled checks and account statements.  It is challenging for the prosecutor to get his or her arms around the kite to understand the whole process and understand it sufficiently to explain it to the judge and jury.

Second, the nature of the crime is built on very short timing differences between payment and collection of checks (the float) created by the payment process giving the appearance of only a technical criminal violation.

Third, because the banks processed all the checks, intuitively, one could argue that the bank must have been aware of the kite.  Indeed, the bank may

317

have charged the kiter fees on the uncollected funds.  Worse, a responsible officer of the bank may have intentionally, but unwittingly, permitted the kiter to draw on uncollected funds.

Prior to 1984, federal criminal prosecution of check kiting was limited to using the mail and wire fraud statutes.[120]  The theory of using the mail fraud statute was two-fold — the mailing of checks between banks to clear, or mailing of account statements to the customer.[121]  Sometimes such mailings did not support a conviction.[122]  Other times, the bank false statement statute was used on the theory that the kited checks deposited at a financial institution were false.[123]

This practice was almost completely overturned in 1982 by the landmark case of *Williams v. United States*,[124] a case which reversed a check kiting conviction of a bank president.  In that case, the Supreme Court held that a check, with nothing more, is a future promise to pay money, and therefore, is not necessarily a false statement at the time it is presented to a bank for collection.  The Court also held that the existing statutory framework did not encompass check kiting and reversed the conviction of the bank president.  This case seriously inhibited prosecutions of check kiting other crimes by non-insiders involving checks.[125]

In response to *Williams v. United States*, Congress passed a completely new general bank fraud statue in 1984.[126]  The bank fraud statute is directly modeled on the time-tested mail and wire fraud statutes.  The bank fraud statute has generally superceded all statutes for prosecution of check kiting and many other bank fraud cases by outside and insiders as well.

This "bank fraud" statute applies to all manner of financial institutions and not just banks.[127]  This statute is popular among federal prosecutors because it is an encompassing continuing offense statute which allows speaking indictment, so the indictment can recite the broad themes and specific events of the scheme to defraud the bank.  Further, the statute is better written and easier to understand than the older criminal banking statutes.

There are actually two separate offenses contained in the bank fraud statute in common with the mail and wire fraud statutes:  a) a scheme to defraud that does not require that the defendant submit a false representation to the bank or b) the submission of false statements to the bank to get money or property from the bank.  The elements of the bank fraud statute require

318

that the government prove that the defendant: a) knowingly executes, or attempts to execute; b) with the intent defraud; c) a scheme to defraud, or submits a false statement to a financial institution to get money or property; and d) a defined financial institution.[128]

Taking the elements of bank fraud a case for check kiting may be assembled as follows:

1) The exchange of items for collection between two or more accounts under common control to create artificial balances of uncollected funds is the scheme to defraud element.

2) Taking the uncollected funds for one's own use and benefit without bank's knowing permission is the intent element.

3) The scheme to defraud is directed at an insured depositary institution is the federal jurisdiction element.

Each element of the crime must be stated in the indictment.[129]

There can only be one execution per each scheme to defraud.[130]  Each check kited, whether covered or not, can be a separate offense and form the basis of one count.[131]  Usually, the last returned checks of the kite are the only checks charged as acts of execution of the kite.  Because they are often the only bad checks, it is attractive to charge them.  They also represent the amount of funds that the check kiter has drawn out of the kite over the life of the kite including interest and fees paid back to the financial institution. At first glance, it might be tempting to charge each check of the kite as a kited check.  This strategy is wrong because a check is not a false statement and because the kiter makes good all the checks drawn on uncollected funds until the very end.[132]  The checks are technically good, and are covered by other corresponding deposits.[133]

The false statements of the defendant, oral or written, come from something other than the checks and that is why these false representations must be documented to the fullest extent possible.  These will be some of the most important facts of the case and worth far more than all the laws involved. Because the kiter may not take the witness stand, the prosecution's success will be greatly enhanced if it can introduce evidence as to conversations the

319

Published in the April 2008 issue of The Banking Law Journal.
Copyright ALEXeSOLUTIONS, INC.

kiter had with the bank before, during and after the kite, about the kiter's business, his or her need for immediate credit and promises made post discovery about the reasons for the overdraft.[134] These false statements can be additionally charged as bank fraud and should be generically described in the indictment, not be charged as separate counts, but part of the substantive bank fraud count.[135] The false statements by the kiter need not precede the deposit of the lost fraudulent checks, and some of the more damning statements are those excuses made by the kiter once the overdraft has come to light.[136]

Success of the kite is not an element of the crime nor a defense if the scheme fails,[137] and the prosecutor need not prove personal gain.[138] Moreover, loss is not an element of the crime and the defendant's repayment of the kited checks to the ban k after discovery of the kite is not a defense.[139] Intent to repay the kited checks is not a defense to bank fraud, embezzlement, or mail fraud.[140]

The instructions to the jury should not contain a definition of check kiting because it is not a crime, and it is unnecessary and adds complexity to the case.[141] If the prosecutor wants to prove a check kite, he or she establishes this through expert witness testimony.[142]

After conviction of a federal crime, the defendant is sentenced. Under the bank fraud statutes, the kiter may be fined not more than $1,000,000 or imprisoned not more than 30 years, or both, plus restitution, for each count of conviction. Under the Federal Sentencing Guidelines, the actual sentence would be in the vast majority of cases much less, although since 2005, the Sentencing Guidelines are advisory only.[143]

Historically, federal judges have sentenced defendants in fraud cases based upon the extent and sophistication of the scheme to defraud, the abuse of a position of trust, and the amount of monetary loss to the victims. These concepts are embodied in the Federal Sentencing Guidelines.[144]

There is a seeming contradiction in the sentencing of check frauds in the Sentencing Guidelines. The gross receipts of the kite are generally not viewed as the appropriate loss to the bank. If only a few checks are used, the amount of loss for sentencing is the face value of the checks without regard to recovery by the financial institution victims.[145] If many checks are used in the check kite, the net total loss to the victim financial institutions is used for

320

sentencing and not the face value of all the checks deposited (which can be extraordinarily high in an extended kite). The net total loss in a check kite is represented by all the last checks deposited and not collected by the financial institutions (the bounced checks). In some sense, this is the face value of only the bad checks used in the fraud and is consistent with sentencing of some check frauds. It is inconsistent in a large scheme because it gives credit to the perpetrator for the checks drawn on uncollected funds over the life of the check kite that are covered by the check kiter.

Criminal restitution is separate from the amount of loss for sentencing and is based on the net total monetary loss to the bank with regard to any recoveries made by the bank. In a federal criminal case restitution is usually mandatory.[146] The bank should contact the probation and pre-trial services office of the district in which the conviction takes place and provide information to that office for the benefit of the district court. As a victim of the fraud, the bank may also address the district court directly.[147]

## State Prosecution

Most state prosecutions for check kiting are made pursuant to state bad check laws. A check kite could be prosecuted under state law for the last returned unpaid checks of a kite. Very few state criminal statutes specifically mention the term check kiting.[148] State fraud or theft statutes could also probably be used as well.[149]

# DEFENSES TO A CHARGE OF CHECK KITING

A legal defense to check kiting, or any other charge, is the failure of proof of an element of the crime. As no element is more important than any other, the failure of any one element is a complete defense and results in the dismissal of the charge.

In defending a charge of fraud offense the element of intent is most often at issue because it is more difficult to prove than others; and subject to the greatest controversy. While intent is a difficult question to answer, the answer is by no means mystical or mysterious. Intent to defraud must be proved by the facts of the case.[150]

321

The prosecution of a check kite is much different than prosecution of violent crimes where there is a clear victim.  For example, in prosecuting a murder, there is little question of some type of criminal intent and the biggest issue may be identity of the perpetrator.  Conversely, in a prosecution of a check kite, there is little question as to the identity of perpetrator, but substantial question as to the intent.

Attacking the element of intent in a check kite is often made with emotional, factual, and equitable arguments. These arguments have at least some facial appeal to the uncritical jury.

One appealing argument is to incorporate elements of entrapment defense against the victim bank.  In this argument, the defendant does not deny the central elements of using the immediate credit and float to increase the uncollected funds, but the defendant claims that he had no intent of harming the bank, not a particularly sympathetic victim.

This defense may be successful where the prosecution has not developed its case to show intent, e.g., the kiter was not shown to have said one thing to the bank and done another.  In addition, the prosecutor may have failed to lay the documentary background of the kite, showing the complexity of the check exchanges to refute the simple argument that the kiter intended to pay a few discreet checks.

There have been many defenses asserted in check kiting cases.[151]  The kiter can argue that the activity is simply that of passing a bad check, and does not rise to the level of check kiting or bank fraud.[152]  Simply causing overdrafts at a bank, without more, is not enough to support a conviction.[153]

The kiter can argue that the checks covering the kite reduce the offense, either in trial or at sentencing.[154]  In other words, the kiter is trying to take credit for the deposits he or she makes that are associated with the kite.  In some cases the bank charges interest on the uncollected funds, allowing the defendant to argue the kite was a loan.  Of course, the interest is funded by increasing the amount of float, which the financial institution deducts a portion for interest.

One defense has been to say the last deposited checks were post-dated and therefore not part of a fraud.[155]  Such a defense is not legally correct and does not reflect modern item processing. The bank is free to honor a post-dated check, regardless of the date on the check.[156]  A worthless check post-

Published in the April 2008 issue of The Banking Law Journal.
Copyright ALEXeSOLUTIONS, INC.

dated, in and of itself, does not preclude a conviction under a bad check statute for issuing such a check under state law.[157] Further, a check is a future promise to pay, and a future promise alone cannot be made a false statement for criminal law purposes.[158]

The fact that the bank acquiesced to the request for immediate credit, makes check kiting a species of victim assisted fraud. This can be a real psychological barrier because the jury may view the victim bank as getting its own just reward. It also does not help matters that the bank is generally viewed as a large, impersonal entity. The prosecution should point out that negligence, indeed monumental stupidity, of the victim is not a legal defense in a criminal case.[159] Disclosure to a bank officer does not exculpate defendant.[160] Complicity on the part of an institution officer is no defense.[161] However, lack of intent may be shown if the bank knowingly considered the drawing of uncollected funds by the customer as a loan to the customer, which is generally not the case.[162] However, if the argument is made, the prosecution must respond that the extension of credit ought not be obtained by trickery. However, because the above equitable defenses can have such an enormous jury appeal, they are continuously employed.

## CONCLUSION

Check kiting is at least 300 years old, and the kiter's success relies on two inherent attributes of banking — the granting of immediate credit on deposit items and the float time in processing checks.

While Check 21 will cut float time, and may thus reduce a bank's check kiting losses, it is certainly not a cure-all. Banks need to remain vigilant to discover check kites. When a kite is discovered, the bank must act quickly to freeze the account, return all checks, and commence a thorough investigation of the kite. The bank also needs to consider lawsuits, injunctions, and attachments to seize funds. The trend of the law has reversed itself, and statutes now protect the banks against check kites, claims of non-disclosure, and bankruptcy preferences. Criminal prosecutions are now easier and bring stiff sentences. While the banking waters are now safer, the bank's vigilance and velocity will be the ultimate kite killers.

323

Published in the April 2008 issue of The Banking Law Journal.
Copyright ALEXeSOLUTIONS, INC.

-029-

## NOTES

[1] In the 1970s, the Federal Reserve Bank and industry pundits predicted that paper checks would be soon be replaced by electronic funds transfers in a "check-less" society. More than 68 billion checks are written each year in the U.S. Federal Reserve System, *Federal Reserve Payments Study* (2004).

[2] While the FBI estimated check kiting losses at $8.1 billion dollars since 2000, no precise estimate can be made. FBI Press Release September 17, 2004. In 2007, a single kite in Ohio caused a loss to National City Bank of over $2.8 million dollars. US Federal News November 15, 2007, 2007 WLNR 23298689; FBI Press Release November 15, 2007. Carrollton Bank in Maryland lost over $5 million in a check cashing kite in 2006. Baltimore Business Journal 7/30/07.

[3] In the French and Indian War of 1754-1766, England's commander in chief, General Jeffrey Amherst was so short on operating funds in the final campaign of 1759 against the French that he kited checks to the Colonial Paymaster. Fred Anderson, Crucible of War at 321 (Alfred A. Knopf, 2001).

[4] *Webster's Dictionary* (1864).

[5] Cong. Globe, 29 June 1866, at 3482; Cong. Globe, 3 April 1872, at 2128.

[6] *State v. Levy*, 18 S.E.2d 355, 356 (N.C. 1942); P.H.V., *Construction of Criminal Statute Against Use of Worthless Check*, 95 A.L.R. 486 (1935) (annotation mostly in the context of bad checks not checks that are covered during the course of the kite).

[7] Spahr, *The Clearing and Collection of Checks* (1926). The book gives an example of a check deposited at a bank drawn on another bank four miles away. The check was negotiated through 5 different banks for 14 days in transit and traveled 4,500 miles.

[8] *Pearce v. E.F. Hutton Group*, 653 F. Supp. 810 (D. D.C. 1987); E.F. Hutton Mail and Wire Fraud Case, *Hearings before the Subcommittee on Crime of the Committee of the Judiciary*, 99th Cong., 1st Sess., (1986); Donnelly, *Cash Management: Where Do You Draw the Line?*, Institutional Investor 68 (September 1985) (discussion of Hutton kite).

[9] *Inquiry Into the Operation of the Bank of the Sergeant-at-Arms*, H.R. Rep. No. 452, 102d Cong., 2d Sess. 1992, at 13, 1992 WL 54509 (March 10, 1992); Boehner, *Bounced Checks and Congress*, 12 St. Louis U. Pub. L. Rev. 5 (1993).

[10] Oakwood Deposit Bank lost $285 million dollars in a 2000 check kite and was forced to close. *United States v. Myers*, Docket No. 3:03-cr-00773-DAK (N.D. Ohio); *FDIC v. Flagship Auto Center*, 2006 WL 2711788 (N.D. Ohio 2006). More recently, another Ohio Bank, National City Bank lost $2.8 million dollars in a 2007 check kite and its fate remains uncertain at press time. FBI Press Release November 15, 2007; US Federal News November 15, 2007, 2007 WLNR 23298689.

324

[11]  Check Clearing for the 21st Century Act of 2003, Pub. L. No. 108-100, 117 Stat. 1177, codified at 12 U.S.C. §§ 5001 *et seq.*; Weber, *Check Please? The Check 21 Act and Its Impact on Check Fraud Claims*, 40 Tort Trial & Ins. Prac. L.J. 941 (2005) (recovering on bad checks); Overby, *Check Fraud in the Courts After the Revisions To U.C.C. Articles 3 and 4*, 57 Ala. L. Rev. 351 (2005) (recovering on bad checks); Electronic Check Clearing House Organization (ECCHO), *Check 21 Implementation* (2004).

[12]  Truncate means to omit the paper check and to send a substitute check, information relating to the original check, or an electronic image of the original check.  12 U.S.C. § 5002(18).

[13]  12 U.S.C. § 5007 and 12 C.F.R. § 229.55.

[14]  The Federal Reserve Banks will process the items electronically and return either an electronic file or substitute checks to the bank of first deposit.  *See* FedReturn Services at www.frbservices.org.

[15]  In 2007, a single kite in Ohio caused over $2.8 million dollars in losses to National City Bank.  US Federal News, November 15, 2007, 2007 WLNR 23298689; FBI Press Release November 15, 2007.

[16]  Barkley Clark, *The Law of Bank Deposits, Collections and Credit Cards* § 9.04 at 9-15 (2001); Board of Governors of the Federal Reserve, *Report to Congress on Funds Availability Schedules and Fraud* (October 1996).

[17]  For example the immediate credit of a $1,000 check on day one results in a positive ledger of $1,000 for each day the deposit remains untouched, but the collected balance is zero.

[18]  Friedman, American Bankers Association, *Deposit Operations* (3d ed. 1992).

[19]  Swords, *Managing Float in the Banking Industry* (2d Ed. 1991)(float in moderation is good); Mitko, ed., Bank Administration Institute, *An Analysis of Float in the Commercial Banking Industry* (1987).

[20]  Title VI of the Competitive Equality Banking Act of 1987 was the Expedited Funds Availability Act.  12 U.S.C. § 4009.  *See* Comment, *Regulation CC and Expedited Funds Availability*, J. Of Corp. Law 785 (Spring 1989).

[21]  Federal Reserve Board, *Operating Circular 3: Collection of Cash Items and Returned Checks*, available at http://www.frbservices.org/OperatingCirculars/index.html;   Federal Financial Institutions Examination Council, Information Technology Examination Handbook Series, *Operations*, Appendix C, Item processing.  Available at www.ffiec.gov.

[22]  A legal definition sometimes used is: "the illegal practice of writing a check against a bank account with insufficient funds to cover the check in the hope that the funds from a previously deposited check will reach the account before the bank debits the amount of the check.  Blacks Law Dictionary p. 231 (7th Ed. 1999);

325

Barkley Clark, *The Law of Bank Deposits, Collections, and Credit Cards*, §9.01 at 9-1 (2001);   *United States v. Frydenlund*, 990 F.2d 822 (5th Cir. 1993)(a scheme designed to separate the bank from its money by tricking it into inflating account balances and honoring checks drawn against accounts with insufficient funds).

[23] *Williams v. United States*, 458 U.S. 279, 281 fn.2 (1982).

[24] *Bank of America v. Hubert*, 101 P.3d 409, 412 (Wash. 2004); *Wells Fargo Bank v. Citizens Bank*, 181 S.W.3d 790, 793 (Tex. App. 2005).

[25] *First Texas Savings Ass'n v. Reliance Ins.*, 950 F.2d 1171, 1173, n.1 (5th Cir. 1992); *Calcasieu Marine Nat'l Bank v. American Employer's Ins.*, 533 F.2d 290, 294, n. 3 (5th Cir. 1976).

[26] *Williams v. United States*, 458 U.S. 279, 281 fn. 2 (1982).

[27] Fraud is a consensual crime because it takes two participants who are more or less willing to enter in some transaction for a gain later. The unwitting partner that is taken is the victim of the other, the perpetrator. While there is nothing forced about the appropriation of funds in a scheme to defraud, the scheme may be set up to "force" the bank to give immediate credit to the kiter. *United States v. Shepherd*, 511 F.2d 119, 121 (5th Cir. 1975).

[28] The FDIC's red flags list includes high volume low balance accounts which may be frequently overdrawn, large balance accounts with little or no apparent justification. Federal Deposit Insurance Corporation, *Risk Management Manual of Examination Policies*, Section 8.1 — Bank Secrecy Act (April 2005).

[29] Office of Thrift Supervision, *Examination Handbook*, Section 340-Internal Control (February 2002) (Reports designating customers which draw upon uncollected could indicate a kite, but most of the account holders identified on the report are not involved in check kiting).

[30] The Office of the Comptroller of the Currency issued an advisory on check kiting which discussed some steps a financial institution could do to strengthen its defenses.   OCC, *Advisory Letter* 96-6 (August 6, 1996), reprinted American Community Bankers, Federal Guide and Supervisory Service, ¶36,414 (June 2003).

[31] Clark, *The Law of Bank Deposits, Collections and Credit Cards* § 9.04 at 9-15 (2001).

[32] Seglin, Bank Administration Institute, *Bank Administration Manual* (1988). This book has some useful internal control guidelines for preventing fraud.

[33] Annot., *Bank's Liability for...Excessive Service Charges*, 73 A.L.R.4th 1028 (1989).

[34] *United States v. Abboud*, 438 F.3d 554 (6th Cir. 2006) (criminal conviction was supported by Check Kiting Analysis Software).

[35] Nigrini, *Digital analysis using Benford's Law* (2001).

[36] FFIEC, Examination Handbook, *Retail Payment Systems* at 38 (March 2004).   It is probable that the FFIEC comment does not envision the elaborate check kiting

326

schemes described in this article.

[37] U.C.C. §§ 4-301 and 4-302.

[38] U.C.C. § 4-302.

[39] *Schwegmann Bank and Trust v. Bank of Louisiana*, 595 So. 2d 1185, 1187 (La. Ct. App. 1992); *Town & Country State Bank v. First State Bank*, 358 N.W.2d 387 (Minn. 1984).

[40] 12 C.F.R. § 229.30.

[41] 12 C.F.R. § 229.30(c).

[42] *First National Bank v. Standard Bank and Trust*, 172 F.3d 472 (7th Cir. 1999); *Wells Fargo Bank v. Citizens Bank*, 181 S.W.3d 790, 808 (Tex. App. 2005).

[43] *Oak Brook Bank v. Northern Trust*, 256 F.3d 638 (7th Cir. 2001).

[44] *Oak Brook Bank v. Northern Trust*, 256 F.3d 638 (7th Cir. 2001); Pitcher, *Bank's Failure to Detect Fraud*, 13 Am. Jur. P.O.F.2d § 347 (2006).

[45] A QRC is issued under Regulation CC, and the bank attaches a strip of paper encoded with magnetic ink, permitting the check to be processed through an automated system. 12 C.F.R. § 229.30(a).

[46] *NBT Bank v. First Nat. Community Bank*, 393 F.3d 404 (3d Cir. 2004).

[47] Clark, *The Law of Bank Deposits, Collections, and Credit Cards*, § 9.01 at 9-1 (2002).

[48] *Oak Brook Bank v. Northern Trust*, 256 F.3d 638 (7th Cir. 2001); *First National Bank v. Standard Bank and Trust*, 172 F.3d 472 (7th Cir. 1999).

[49] *Schwegmann Bank and Trust v. Bank of Louisiana*, 595 So. 2d 1185, 1187 (La. Ct. App. 1992) (one bank tried to keep the kite open and was stuck with their own overdraft and could not return the NSF checks due to the midnight deadline). *See* Tinney, *Construction and Effect of UCC § 4–301 and 4–302 Making Payor Bank Accountable*, 22 A.L.R.4th 10 (1983).

[50] Most bank account agreements allow the bank to set off returned items. The language is on the signature card or associated documents signed or given to the customer at the time of opening.

[51] U.C.C. § 4-302(b).

[52] *Pioneer Commercial Funding Corp. v. American Financial Mortg. Corp.*, 855 A.2d 818, 820 (Penn. 2004); *Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16, 18 (1995); *Peoples Nat'l Bank v. Coleman*, 9 S.E.2d 333 (Va. 1940); *Thompson Kissel v. National Bankers Life Ins.*, 436 S.W.2d 80, 82 (Ky. 1968); Eclavea, *Special Bank Deposits as Subject of Attachment*, 8 A.L.R.4th 998 (1981); Spivey, *Status of Bank's Right of Setoff*, 68 A.L.R.3d 192 (1976).

[53] *Bohac v. Walsh*, 233 S.W.3d 858 (Mo. App. 2007) (bank could threaten criminal prosecution of husband to induce wife to sign guaranty).

[54] *New v. Texas Commerce Bank*, 971 S.W.2d 711 (Texas Ct. App. 1998), *reversed on*

327

*other grounds*, 3 S.W.3d 515 (Tex. 1999). *See also Drew Development v. Hibernia Nat. Bank*, 442 So.2d 1229, 1230 (La. Ct. App. 1983); *Silverman v. Christian*, 198 A. 832, 834 (N.J. Chan. 1938).

[55] Many states allow pre-judgment attachments of real and personal property. The New York statute includes recovery by a victim of a crime. N.Y. Civ. P. L. & R. § 6201. *See United Northern Mortgage Bankers, Ltd. v. Bellettieri*, 16 Misc.3d 1118A, 2007 WL 2241578(NY Sup. Ct. 2007) (Writ of Attachment in check kiting scheme); *Madisonville State Bank, N.A. v. Citizens Bank of Texas, N.A.*, 184 S.W.3d 835 (Tex. App. 2006) (bank could obtain garnishment against funds on deposit at another bank involved in the kite);  Illinois has a similar statute. Ill. Rev. Stat. ch. 735, ¶ 5/4101. California's attachment statute allows an attachment in any liquidated commercial claim founded on contact. Cal. Code Civ. Proc. § 483.010. In Idaho attachment is allowed for overdrafts, and presumably check kites. *Valley Bank v. Dalton*, 714 P.2d 56 (Idaho 1986).

[56] 11 U.S.C. § 547.

[57] Consider using expert testimony to establish that check kiting has occurred. *United States v. Winkle*, 477 F.3d 407 (6th 2007) (expert testimony admissible to establish fact of check kiting).

[58] *National Bank of Commerce v. Hughes-Walsh*, 246 So. 2d 872 (La. App. 1971)(president held personally liable for  kiting scheme); *In re Turner*, 32 B.R. 244 (Bankr. D. Mass. 1983) (corporate officer held liable on a knew or should have known basis); *see also Southeastern Financial Corp. v. Smith*, 397 F. Supp. 649 (D. Ala. 1975), rv'd, 542 F.2d 278 (5th Cir. 1976)(officer held personally liable); Perovich, *Personal Liability of Officers…on Corporate Checks*, 47 A.L.R.3d 1250 (1973).

[59] *MidAm Bank v. Dolin*, 2005 WL 1532622 (Ohio App. 2005); *Bohac v. Walsh*, 233 S.W.3d 858 (Mo. App. 2007) (bank could threaten criminal prosecution of husband to induce wife to sign guaranty).

[60] *Bank of America v. Hubert*, 101 P.3d 409, 413 (Wash. 2004).

[61] 18 U.S.C. §§ 3663A ad 3664. A restitution order may be enforced by the United States as if it were a fine, in accordance with Title 18, subchapter C of Chapter 2727 and subchapter B of Chapter 229, and Title 18, U.S.C. § 3664(m).

[62] *United States v. Munoz-Franco*, 487 F.3d 25 (1st Cir. 2007) (court admitted bank officers interview with kiter as evidence of intent); *United States v. Abboud*, 438 F.3d 554 (6th Cir. 2006) (criminal conviction was supported by bank officer's interview with kiter).

[63] The Right To Financial Privacy Act of 1978 governs bank's disclosure information to the government. 12 U.S.C. §§ 3401 *et seq.* Cordero, *Construction and Application of Right to Financial Privacy Act*, 112 A.L.R. Fed. 295 (1993).  The Gramm Leach

328

Copyright ALEXeSOLUTIONS, INC.

-034-

Bliley Act of 2005 governs disclosure to the government and private persons. 15 U.S.C. §§ 6801 *et seq.*; Link, Validity, *Construction, and Application of Information Privacy Provisions of Gramm Leach Bliley Act*, 5 A.L.R. Fed. 2d 497 (2005).

[64] Neeley, *Third Party Information Sharing Beyond GLB*, 55 Consumer Fin. L.Q. Rep. 39 (2001).

[65] 15 U.S.C. § 6802(e)(3)(B)(fraud) and 15 U.S.C. §§ 6802 (5) and (8) (other laws and law enforcement).

[66] Rule 803(6) of the Federal Rules of Evidence (hearsay exception to business records); *Crawford v. Washington*, 541 U.S. 36, 56 (2004).

[67] 12 U.S.C. § 5003(c) and 12 C.F.R. Part 229, Appendix D — Indorsement, Reconverting Bank Identification, and Truncating Bank Identification Standards.

[68] *See* Rule 1006 of the Federal Rules of Evidence for the requirements of trial-admissible summaries of voluminous evidence.

[69] *Community Bank v. United States Nat'l Bank of Oregon*, 555 P.2d 435 (Or. 1976); *Cumis Ins. Soc'y. v. Windsor Bank & Trust*, 736 F. Supp. 1226 (D. Conn. 1990) (no duty except where special relationship).

[70] Reilly, *What Goes Up Must Come Down: Check Kiting, the UCC and the Trustee's Avoiding Powers*, 77 Am. Bankr. L.J. 333 (2003); Lucie, *Check Kiting: The Inadequacy of the Uniform Commercial Code*, 1986 Duke L.J. 728 (1986).

[71] *Alta Vista State Bank v. Kobliska*, 897 F.2d 930, 934 (8th Cir. 1990); *Mid Cal Nat. Bank v. Federal Reserve Bank of San Francisco*, 590 F.2d 761 (9th Cir. 1979); *Citizens Nat'l Bank v. First Nat'l Bank*, 347 So. 2d 964, 967-68 (Miss. 1977); *Community Bank v. United States Nat'l Bank of Oregon*, 555 P.2d 435 (Or. 1976); Fischler, *No Duty To Disclose Customer's Check Kiting Activities to Other Banks*, Nat'l. L.J., page B7 (February 24, 1997); Strickland, *Shifting the Loss: Claims in Defenses in Check Kite Litigation*, 117 Banking L.J. 487 (November-December 2000).

[72] *Smith v. American National Bank*, 982 F.2d 936 (6th Cir. 1992).

[73] *Mid-Cal National Bank v. Federal Reserve Bank of San Francisco*, 590 F.2d 761, 763 (9th Cir. 1979).

[74] *Frost National Bank v. Midwest Autohaus*, 241 F.3d 862 (7th Cir. 2001).

[75] *Chicago Title Insurance v. Superior Court*, 174 Cal. App.3d 1142 (1985) (no implied duty by the bank to inform another bank of kite); *Frost National Bank v. Midwest Autohaus*, 241 F.3d 862 (7th Cir. 2001) (bank does not have a duty to disclose kite); *Brooks v. Bank of Boulder*, 891 F. Supp. 1469 (D. Colo. 1995) (no duty to disclose check kite to kiter's investors); *Wells Fargo Bank v. Citizens Bank of Texas*, 181 S.W.3d 790, 801 (Tex. App. 2005) (no duty to disclose kite); *Hillside Check Cashing Corp. v. Mymar Export*, 2005 WL 1388850 (N.Y. Sup. 2005) (absent special relationship, no duty to disclose kite); Annot., *Existence of Fiduciary Relationship...to Impose Special Duty of Disclosure*, 70 A.L.R.3d 1344 (1976); *Bohac v. Walsh*, 233

329

S.W.3d 858 (Mo. App. 2007) (no duty to disclose to wife that husband was kiting checks).

[76] *Merrill Lynch Pierce Fenner & Smith v. First National Bank*, 774 F.2d 909 (8th Cir. 1985) (bank which delayed returning the checks, contrary to prior policy, until it had secured deposits to cover overdrafts, was liable to third party).

[77] *Farmer's & Merchants State Bank v. Western Bank*, 841 F.2d 1433 (9th Cir. 1988) (depository bank had knowledge of check kite and held it open pending deposit of cashiers checks to cover overdraft).

[78] *Barnett Bank of West Florida v. Hooper*, 498 So.2d 923 (Fla. 1986) (Bank had knowledge of check kite and arranged with depositor to have third party cover overdraft).

[79] 11 U.S.C. § 547.  Averch, *Check-Kiting:  Preference Recovery from Participating Lenders*, 7 J. of Bankr. Law and Practice 613 (September/October 1998).

[80] U.C.C. § 4-210.

[81] U.C.C. § 9-203(c).

[82] Thorne, *Lien on Me:  Bank's Security Interest in Checking Accounts and Check-Kiting Schemes*, 21 American Bankr. Inst. J. 14 (October 2002); *In re Cannon*, 237 F.3d 716 (6th Cir. 2001)(bank had security interest in future checks); *Pereira v. Summit Bank*, 44 U.C.C. Rep. Serv.2d 193 (S.D.N.Y. 2001) (same); *see also In re Frigitemp Corp.* 34 B.R. 1000 (Bankr. S.D.N.Y. 1983), *aff'd* 753 F.2d 230 (2d Cir. 1985); *Laws v. United Missouri Bank*, 98 F.3d 1047 (8th Cir. 1996); *In re Consolidated Pioneer Mortgage Entities*, 211 B.R. 704 (S.D. Cal. 1997) *aff'd in part*, 166 F.3d 342 (9th Cir. 1999); *In the Matter of Summit Financial Services*, 240 B.R. 105, 119 (Bankr. N.D. Ga. 1999) (bank was secured and therefore there was no preferential transfer).

[83] *In re Sophisticated Communications, Inc.*, 369 B.R. 689 (Bankr. S.D. Fla. 2007) There, the court made a distinction between uncollected funds overdrafts and ledger balance overdrafts, with deposits made to cure ledger balance overdrafts held as being preferential.  A ledger balance overdraft occurred because the bank allowed the kiter to draw against the account for cashiers checks without sufficient funds in the account.  This decision should be held to its facts.

[84] Bankruptcy Code § 523(a)(2).

[85] Bankruptcy Code § 523(a)(6).

[86] *In re Roberts*, 82 B.R. 179, 181 (Bankr. D. Mass. 1987) (no representation, therefore debt was dischargeable).

[87] *In re Vitanovich*, 259 B.R. 873, 876 (6th Cir. 2001) (check kiting debt is non-dischargeable under the "actual fraud" definition of § 523(a)(2)).  *But see Williams v. United States.*

[88] *In re Fitzgerald*, 109 B.R. 893 (Bankr. N.D. Ind. 1989) (kiter obtained a vehicle

330

based on the bad check).

[89] *In re Miller*, 310 B.R. 185, 202 (Bankr. C.D. Cal. 2004); *In re Singleton*, 37 B.R. 787 (Bankr. D. Nev. 1984).

[90] *In re Lauricella*, 105 B.R. 536 (9th Cir. 1989).

[91] *In re Cooper*, 125 B.R. 777, 780 (Bankr. N.D. Ill. 1991). Neither reliance on false representations or loss is an element of any of the criminal bank fraud statute.

[92] *See* 18 U.S.C. §§ 3663A and 3664. A restitution order may be enforced by the United States as if it were a fine, in accordance with Title 18, subchapter C of Chapter 227 and subchapter B of Chapter 229, and Title 18, U.S.C. § 3664(m).

[93] Bankruptcy Code, §523.

[94] *In re M.M. Winkler*, 239 F.3d 746 (5th Cir. 2001).

[95] *In re Tobin*, 258 B.R. 199, 205 (9th Cir. 2001).

[96] *In re McAfee*, 120 B.R. 76 (Bankr. N.D. Tex. 1990).

[97] *Matter of Halpern*, 50 B.R. 260, 263 (Bankr. N.D. Ga. 1985) (state court findings of a check kiting scheme were entitled to collateral estoppel effect, and debt was not dischargeable).

[98] *In re Hanna*, 163 B.R. 918, 924 (Bankr. E.D. N.Y. 1994) (Arbitration award for securities fraud but because lack factual findings, no preclusive effect).

[99] *In re Cantrell*, 329 F.3d 1119, 1123 (9th Cir. 2003) (State court implicitly decided that debtor breachedhis or herfiduciary duties to the corporation and that specific findings were unnecessary).

[100] *Heenan v. Sobati*, 96 Cal. App. 4th 995, 1001 (2002) ("The arbitrator's decision (even if erroneous) is intended to function as the end, not the beginning, of the dispute").

[101] *Moncharsh v. Heily & Blase*, 10 Cal. Rptr.2d 183 (Cal. 1992); *Gordon v. G.R.O.U.P.*, 49 Cal. App. 4th 998, 1010 (1996) (arbitrator's implied findings binding on parties); *Greenblatt v. Drexel Burnham Lambert*, 763 F. 2d 1352, 1361 (11th Cir. 1985); *In re Beckemeyer*, 222 B.R. 318, 321 (Bankr. W.D. Tenn. 1998); Phelps, *Pre–emption by Federal Arbitration Act…Restricting Formation or Enforcement of Arbitration Agreements*, 108 A.L.R. Fed. 179 (1992).

[102] *Fallick v. Kehr*, 369 F.2d 899, 905 (22 Cir. 1966).

[103] Kleiman Lawrence Baskind Fitzgerald, LLP, *Coverage for Check Kiting Fraud*, (2001); Knox, *The Loan and Uncollected Funds Exclusion*, ABA National Institute on Financial Institution Bonds (1989).

[104] *Calcasieu Marine Nat'l Bank v. American Employers Ins*, 533 F.2d 290 (5th Cir. 1976); E.W.H., *Act or Default of Officer*, 98 A.L.R. 1264 (1935).

[105] *Bradley Bank v. Hartford Accident & Indemnity*, 557 F. Supp. 243 (W.D. Wis. 1983), *aff'd*, 737 F.2d 657 (7th Cir. 1984).

[106] *See* Knox, *The Loan and Uncollected Funds Exclusion*, ABA National Institute on

331

Financial Institution Bonds (1989).

[107] A sample form can be obtained from most insurers web sites.  *See* for example www.chubb.com.

[108] Check kiting is a loss from checks which are not paid due to "Check Kiting Fraud" involving the "constant, systematic, back and forth deposits" between two or more accounts utilizing checks of "approximately the same amount" to create the appearance of valid funds in the accounts, "drawn against uncollected funds".

[109] *Mitsui Mfrs. Bank v. Federal Ins.*, 795 F.2d 827 (9th Cir. 1986); *Bay Area Bank v. Fidelity and Deposit of Maryland*, 629 F. Supp. 693 (N.D. Cal. 1986); *Security Nat. Bank v. Continental Ins*, 586 F. Supp. 139 (D.C. Kan. 1982).

[110] Baltimore County Savings Bank recovered over $3.3 million dollars on its banker's bond to compensate it for its losses in a check kiting scheme involving a check cashing customer.  However, the loss totaled $10 million dollars.  American Banker, March 12, 2007.

[111] 12 C.F.R. § 21.11.

[112] Part II, Question 23(d), Suspicious Activity Report by Depository Institution. FinCEN provides no definition of check kiting.

[113] *S.E.C. v. O'Brien*, 467 U.S. 735, 741-45 (1984); *Waye v. Commonwealth Bank*, 846 F. Supp. 321 (M.D. Penn. 1994) (Bank alerted federal authorities of possible check kite, and was not liable to customer; no claim under RFPA); *Right to Financial Privacy*, C.J.S. Banks and Banking § 268.

[114] 31 U.S.C. § 5318(g)(3) and 31 C.F.R. § 103.100; *Stoutt v. Banco Popular*, 320 F.3d 26 (1st Cir. 2003) (no liability for reporting check kite to law enforcement); *Coronado v. BankAtlantic Bancorp*, 951 F. Supp. 1025, 1026 (S.D. Fla. 1997), *aff'd*, 222 F.3d 1315 (11th Cir. 2000) (no liability for reporting suspicious activity to law enforcement); *Medical Supply Chain v. Neoforma*, 419 F. Supp.2d 1316, 1330 (D. Kan. 2006) (no private cause of action exists to enforce USA Patriot Act).

[115] *Cotton v. PrivateBank and Trust*, 235 F. Supp.2d 809, 814 (N.D. Ill. 2002); *Lee v. Bankers Trust*, 166 F.3d 540, 544 (2d Cir. 1999); *Whitney Nat'l Bank v. Karam*, 306 F. Supp. 2d 678, 682 (S.D. Tex. 2004).

[116] An unreported decision, ordering release of a SAR under the Freedom of Information Act, was vacated as moot.  *See, Dupre v. Federal Bureau of Investigation*, 2002 WL 1042073 (E.D. La. 2002), vacated, No. 02 30714 (5th Cir. 2003). Another case drew much attention because ordered release, but was later remanded for a very narrow point of law.  *BizCapital Business v. Comptroller of the Currency*, 406 F. Supp.2d 688 (E.D. La. 2005) *rv'd* 467 F.3d 871 (5th Cir. 2006).

[117] *United States v. Winkle*, 477 F.3d 407 (6th Cir. 2007).

[118] The Bank Secrecy Act contains a safe harbor provision.  31 U.S.C. §§ 5318(g)(3) and 5318(h).  *Whitney Nat'l Bank v. Karam*, 306 F. Supp.2d 678 (S.D. Tex. 2004);

332

*Lopez v. First Union National Bank,* 931 F. Supp. 860, 864 (S.D. Fla. 1996) (bank had blanket immunity from civil liability); *Coronado v. BankAtlantic Bancorp,* 951 F. Supp. 1025, 1026 (S.D. Fla. 1997), *aff'd,* 222 F.3d 1315 (11th Cir. 2000); *Lee v. Bankers Trust,* 166 F.3d 540, 544 (2d Cir. 1999) (no requirement of good faith or probable cause). FinCEN, *Interagency Advisory — Federal Court Reaffirms Protections For Financial Institutions Filing Suspicious Activity Reports* (May 24, 2004). *See also* OCC, *Safe Harbor When Filing Suspicious Activity Reports Advisory Letter 98-4,* reprinted at Volume 5, *Fed. Banking L. Rep.* (CCH) ¶ 51 991, at page 58,198 (March 30, 1998); Raymond, *Bank's Liability for Disclosing Financial Information,* 81 A.L.R.4th 377 (1990).

[119] 12 U.S.C. § 3403(d).

[120] 18 U.S.C. § 1341 and 18 U.S.C. § 1343.

[121] *United States v. Freitag,* 768 F.2d 240, 242 (8th Cir. 1985); *United States v. Pick,* 724 F.2d 297, 300-01 (2d Cir. 1983); *United States v. Bosby,* 675 F.2d 1174, 1183 (11th Cir. 1982); *Ohrynowicz v. United States,* 542 F.2d 715, 718 (7th Cir. 1976) (mailings of preprinted checks, monthly statements of account and canceled checks sufficient); *United States v. Johnston,* 547 F.2d 282, 284 (5th Cir. 1977) (mailings between banks in kite sufficient); *United States v. Rafsky,* 803 F.2d 105, 106 (3d Cir. 1986) (wires by defendant between banks in kite sufficient to support wire fraud conviction).

[122] *United States v. Frankel,* 721 F.2d 917, 918 (3d Cir. 1983); *United States v. Britzman,* 547 F.2d 380, 382-84 (7th Cir. 1977) (mailings by bank not sufficient).

[123] A indictment charging only false statements is generally the weaker case and runs the risk of having a court exclude amounts gained by the defendant or lost by the financial institution is not part of the evidence.

[124] *Williams v. United States,* 458 U.S. 279 (1982); Levendusky, *Validity, Construction, and Application of 18 U.S.C.A.* § 1014, 16 A.L.R. Fed. 825 (1973).

[125] A "bare check kite" is a scheme to defraud without without the defendant making any false pretenses, representations, or promises, can be prosecuted under the first tranche of the mail, wire and bank fraud statutes. *United States v. Burnett,* 10 F.3d 74 (2d Cir. 1993); *United States v. Doherty,* 969 F.2d 425, 428 (7th Cir. 1992); *United States v. Schwartz,* 899 F.2d 243, 246 (3d Cir. 1990).

[126] 18 U.S.C. § 1344. *United States v. Bonnett,* 877 F.2d 1450, 1454-55 (10th Cir. 1989) (history of statute).

[127] If not otherwise specified in the Title 18 statute, a general definition of financial institutions is provided. 18 U.S.C. § 20. It only applies to the jurisdictional element for federal criminal prosecutions of the criminal code.

[128] Fraud Section, Criminal Division, U.S. Department of Justice, *Financial Institution Fraud* (1994) (official publication); Kiessig, Karpf, Linkins, *Financial*

333

BANKING LAW JOURNAL

*Institutions Fraud*, 43 Am. Crim. L. Rev. 527 (2006); Wagner, *What Constitutes a Violation of the Bank Fraud Statute*, 99 A.L.R. Fed. 888 (1990); Villa, *Banking Crimes* (2007) (best book on subject and contains reprints of official publications).
[129] O'Malley, *Federal Jury Practice and Instructions*, Ch. 47 (5th Ed. 2000) (circuit by circuit description of the elements of mail, wire and bank fraud).
[130] *United States v. Lilly*, 983 F.2d 300, 305 (1st Cir. 1992); *United States v. Lemons*, 941 F.2d 309 (5th Cir. 1991) (the first case to clarify the point). Bank fraud parallels mail fraud in that there can only be one mailing per each execution of the scheme (although multiple executions are allowed by the language of the statute).
[131] *United States v. King*, 200 F.3d 1207, 1213 (9th Cir. 1999); *United States v. Poliak*, 823 F.2d 371, 372 (9th Cir. 1987) (each check of a check kiting scheme can be a separate count, but does not have to be separately charged). The point raises the issue of how an indictment can charge multiple related but separate counts of bank fraud for a single check kite that is properly described in the indictment as a single scheme.
[132] *Williams v. United States*, 458 U.S. 279 (1982)(check itself not a false statement for federal criminal law).
[133] A reasonable expectation of payment from another person that was to be deposited into the bank upon which the check was drawn constitutes a defense, where intent is an element of the offense. *People v. Becker*, 30 P. 2d 562 (Cal. App. 1934)(intent to defraud). *See* discussion of supermarket kite above. Intent is a question of fact to be found by the trier of fact.
[134] *United States v. Swearingen*, 858 F.2d 1555, 1557 (11th Cir. 1988).
[135] *United States v. Chacko*, 169 F.3d 140 (2d Cir. 1999).
[136] *United States v. Samarah*, 77 Fed. Appx. 969 (9th Cir. 2003).
[137] *United States v. Briggs*, 965 F.2d 10, 12 (5th Cir. 1992); *United States v. Frank Najjor*, 255 F.3d 979 (9th Cir. 2001); *United States v. Oplinger*, 150 F.3d 1061, 1065 (9th Cir. 1998).
[138] *United States v. Williams*, 728 F.2d 1402 (11th Cir. 1984).
[139] *United States v. Foshee*, 578 F.2d 629, 631 (5th Cir. 1978) (mail fraud charged); *United States v. Broxmeyer*, 192 F.2d 230 (2d Cir. 1951); *Rakes v. United States*, 163 F.2d 771 (4th Cir. 1948).
[140] *United States v. Ross*, 206 F.3d 896, 899 (9th Cir. 2000).
[141] *United States v. Montgomery*, 980 F.2d 388 (6th Cir. 1992).
[142] *United States v. Winkle*, 477 F.3d 407 (6th Cir. 2007) (expert testimony admissible to establish fact of check kiting).
[143] *United States v. Booker*, 543 U.S. 220 (2005).
[144] Haines, Federal Sentencing Guidelines Handbook (2006). Most bank fraud cases will involve the same sentencing determination categories. U.S.S.G. §

334

2B1.1(a)(1)(base offense); § 2B1.1(b)(1)(amount of loss); § 2B1.1(b)(13)(financial institution victim); § 3B1.3 (abuse of a position of trust — such as bank officer); and § 3E1.1 (acceptance of responsibility — for pleading guilty).

[145] *United States v. Kushner*, 305 F.3d 194, 197-98 (3d Cir. 2002); *United States v. Geevers*, 226 F.3d 186 (3d Cir. 2000) (face value of bad checks can be used for intended loss); *United States v. Kipta*, 212 F.3d 1049, 1052 (7th Cir. 2000) (intended loss is the sum of all of the phony checks defendant deposited in victim bank rather than the amount deducted); *United States v. Burridge*, 191 F.3d 1297, 1303-04 (10th Cir. 1999).

[146] 18 U.S.C. §§ 3663A and 3664; U.S.S.G. § 5E.

[147] 18 U.S.C. § 3771.

[148] There is no specific federal check kite criminal statute for none is needed. California infers the offense. California Penal Code § 476a. Rhode Island makes specific reference to check kiting. Rhode Island Code § 19-9-27. There are no reported cases for the Rhode Island statute.

[149] *State v. Copeland*, 2007 WL 4099507 (Ohio App. 2007).

[150] *Benchwick v. United States*, 297 F.2d 333, fn. 5 (9th Cir. 1961); *Dow v. United States*, 82 F. 904, 908 (8th Cir. 1897); *United States v. Giordano*, 489 F.2d 327, 330 (2d Cir. 1973).

[151] Some of the defenses include the following: the bank knew; the bank allowed me to float checks until I got financially healthy; all the seasonal businesses like mine do the same thing every year; the bank charged interest on the uncollected balances, so it's just a loan; it was a cash management program; my [partner][spouse][office manager] did it, not me; I was helping the bank officer cover loans; that's not my signature on the checks; the deposits and withdrawals were equal; it was a wash; call me a sloppy businessman, but I am not a crook; and I tried to pay it back.

[152] *Williams v. United States*, 458 U.S. 279 (1982). *See also United States v. Hamilton*, 499 F.3d 734 (7th Cir. 2007) (holding that an innocent intention to repay the kited funds is not a defense).

[153] *United States v. Haddock*, 961 F.2d 933 (10th Cir. 1992); *United States v. Boedker*, 389 F. Supp. 360 (M.D. Pa. 1974).

[154] *United States v. Swanson*, 87 Fed. Appx. 112 (10th Cir. 2004).

[155] The maker of a check may not escape liability by merely dating it far enough ahead so as to give him an opportunity to realize some expectation, more or less well founded, of obtaining money to meet it on presentation. *State v. Johnson*, 226 P. 758 (Kan. 1924); Dougherty, *Extent of Bank's Liability for Paying Postdated Check*, 31 A.L.R.4th 329 (1984).

[156] U.C.C. § 4-401(c).

[157] *People v. Poyet*, 492 P.2d 1150 (Cal. 1972); Perovich, *Application of "Bad Check"*

335

Published in the April 2008 issue of The Banking Law Journal.
Copyright ALEXeSOLUTIONS, INC.

BANKING LAW JOURNAL

*Statute With Respect to Postdated Checks*, 52 A.L.R.3d 464 (1973).

[158] Thus comporting with *Williams v. United States*, 458 U.S. 279 (1982).

[159] *Tucker v. United States*, 224 F. 833, 836 (6th Cir. 1915) (A fraud that would not have deceived one of ordinary intelligence does not relieve the wrongdoer of liability for using the mails to carry out the deception); *Deaver v. United States*, 155 F.2d 740, 745 (D.C. Cir. 1946) (The monumental credulity of the victim is no shield for the accused); *O'Hara v. United States*, 129 F. 551, 555 (6th Cir. 1904) (Schemes to defraud depend for success not on what men can do, but upon what they may be made to believe, and the credulity of mankind remains yet unmeasured); *United States v. Ciccone*, 219 F.3d 1078, 1083 (9th Cir. 2000); *United States v. Kreimer*, 609 F.2d 126, 132 (5th Cir. 1980); *Blachly v. United States*, 380 F.2d 665, 672 n. 13 (5th Cir. 1967).

[160] *United States v. Ripinsky*, 109 F.3d 1436, 1440 (9th Cir. 1997); *United States v. Aubin*, 87 F.3d 141 (5th Cir. 1996); *United States v. Molinaro*, 11 F.3d 853, 857 (9th Cir. 1993).

[161] *United States v. Wilcox*, 919 F.2d 109, 111 (9th Cir. 1990).

[162] *United States v. Matsinger*, 191 F.2d 1014 (3d Cir. 1951).

336



IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
**FILED**

JUN  5 2018

CLERK, U.S. DISTRICT COURT
By_____
Deputy

MIDWESTERN CATTLE MARKETING, §
LLC, §
§
Plaintiff, §
§
VS. § NO. 4:17-CV-375-A
§
LEGEND BANK, N.A., §
§
Defendant. §

<u>SUPPLEMENT TO MAY 16, 2018 MEMORANDUM OPINION AND ORDER</u>

Upon further consideration of the May 16, 2018 memorandum opinion and order, Doc.[1] 42, and the summary judgment record, and in light of the discussion at the pretrial conference held June 4, 2018, the court is signing this supplement to May 16, 2018 memorandum opinion and order to clarify, supplement, and make final the court's summary judgment rulings in this action.

As plaintiff has admitted and the record makes clear, there was no fraudulent transfer as defined by the Texas Uniform Fraudulent Conveyance Act, Tex. Bus. & Com. Code § 24, ("TUFTA"), inasmuch as the transfers the subject of plaintiff's TUFTA claim were not of property of the alleged debtors. That is, the Lyons (alleged "debtors" under TUFTA) did not transfer their own property[2]; rather, any transfer was of property of plaintiff. <u>See</u>

---

[1]The "Doc. __" reference is to the number of the item on the docket in this action.

[2]<u>See, e.g.</u>, Doc. 51 at 3 ("funds [transferred] never belonged to the Lyons").


EXHIBIT
**B**

-043-

Bank of America, N.A. v. Fulcrum Enters., LLC, 20 F. Supp. 3d 594, 599 (S.D. Tex. 2014)(quoting Nobles v. Marcus, 533 S.W.2d 923, 925 (Tex. 1976)("A fraudulent transfer is a transfer by a debtor with the intent to hinder, delay, or defraud his creditors by placing the debtor's property beyond the creditor's reach."). Accordingly, TUFTA does not apply and defendant is entitled to judgment as a matter of law on Count One of plaintiff's first amended complaint.

Whether TUFTA applied in the first place was not explicitly considered in the court's May 16 memorandum opinion and order, because defendant focused its motion for summary judgment on its affirmative defense of right to setoff.[3] Doc. 28 at 33-36. Defendant maintained that TUFTA did not apply because the property at issue, funds deposited, was subject to a valid lien. In that regard, the court pointed out that Texas courts recognize an equitable exception to the right to setoff. And, under that exception, even if defendant had no notice of the character of the funds, it could still be liable to the extent it applied the funds to its depositor's debt. Doc. 42 at 12. Thus, it appeared that the issue to be tried was whether the equitable exception to

---

[3]Although defendant did say that "there was no 'transfer of assets' of a debtor," it did not make any further argument in this regard. Doc. 28 at 34. The court regrets that it did not consider the viability of the TUFTA claim at that point, as summary judgment would have been rendered for defendant on all grounds and the action would not have proceeded any further in this court.

setoff applies as to the funds defendant took from the Legend

account to satisfy the Lyons' debts to it. (The setoff funds

being the $67,891 applied to pay off vehicle loans, $275,000

applied to pay a line of credit between June 16-29, 2015, and

$72,500 applied to pay a line of credit on or around August 3,

2015.)

For the reasons discussed in the proposed joint pretrial

order under the statement of defendant's claims, Doc. 51 at 29-

39, it may be that the equitable exception to setoff no longer

applies or that there may be other reasons that it would not

apply in this case. Those are legal issues that do not need to be

determined, however, since there is no need for a trial as all of

plaintiff's claims have been addressed.

The court finally notes that the discussion at the pretrial

conference of whether plaintiff had pleaded constructive trust

may inspire plaintiff to argue that its position relative to the

$4,386,650.22 "fraudulent transfer" is still viable. It occurs to

the court that plaintiff, realizing it had not pleaded

sufficiently, massaged its summary judgment response as well as

the statement of its claims in the proposed pretrial order to

make it appear that constructive trust was part of its fraudulent

transfer cause of action. However, constructive trust does not

fit the TUFTA rubric, which requires that the debtor transfer his

3

-045-

own property to defraud his creditor. Tex. Bus. & Com. Code
§ 24.005.

Though plaintiff listed "constructive trust" in its prayer
as a type of relief it sought, Doc. 23 at 31, it did not assert
as a count of its amended complaint that it was entitled to
imposition of a constructive trust. See, e.g., Doc. 23 at 22,
Count Two: Money Had and Received & Count Three: Unjust
Enrichment. And, as the court explained at the pretrial
conference, it does not allow the pretrial order to amend the
claims asserted by the parties. Nevertheless, because of the
confusion created by the discussion of constructive trust, the
court is explaining why such relief would not in any event be
appropriate here.

A constructive trust is an equitable, court-created remedy
designed to prevent unjust enrichment. KCM Fin. LLC v. Bradshaw,
457 S.W.3d 70, 87 (Tex. 2015). It is not a vehicle for collecting
assets as a form of damages. Id. at 88. A constructive trust can
only attach to some identifiable property that can be traced back
to original property acquired by fraud. Haber Oil Co. v.
Swinehart (In re Haber Oil Co.), 12 F.3d 426, 437 (5th Cir.
1994)(citing Rosenberg v. Collins, 624 F.2d 659, 663 (5th Cir.
1980)). Further, "when a party resorts to equity to obtain relief
not available legally, his actions are measured by equitable

4

standards and he may not invoke the strict letter of the law to deny equity to another who has been harmed, at least in part, by the original party's action." <u>Meadows v. Bierschwale</u>, 516 S.W.2d 125, 132 (Tex. 1974).

Here, plaintiff cannot deny that its own actions played a role in the outcome. Plaintiff gave Tony Lyon its checkbook and a signature stamp despite knowing that Tony was a convicted felon. And, plaintiff wrote and deposited checks on the Legend account to its own account. <u>See, e.g.</u>, Doc. 23 ¶¶ 17. Arguably, plaintiff had access to information that would have brought the scheme to light just as it alleges that defendant had or should have had such information.

More importantly, plaintiff does not identify a particular <u>res</u> that it contends should constitute the constructive trust. There simply is no specific, identifiable property upon which a constructive trust can be imposed. <u>Rosenberg</u>, 624 F.2d at 663. "Definitive, designated property, wrongfully withheld from another, is the very heart and soul of the constructive trust theory." <u>KMC Fin. LLC</u>, 457 S.W.3d at 88 (quoting <u>Wheeler v. Blacklands Prod. Credit Ass'n</u>, 627 S.W.2d 846, 851 (Tex. App.-- Fort Worth 1982, no writ)). Plaintiff admits that the Legend account contained deposits from a number of sources. <u>See, e.g.</u>, Doc. 51 ¶¶ 33-34; Doc. 35 at 39 (alleging that "<u>some</u> of the funds

5

in the Legend account did not legitimately belong to the Lyons").
Defendant setoff the Legend account to pay debts owed to it by
the Lyons and there has been no tracing of those funds. And, at
this point, proceeds of the Legend account have been paid to
plaintiff pursuant to its garnishment action. There is no way to
show that any specific money is the same property that was stolen
from plaintiff. See In re Hayward, 480 S.W.3d 48, 52 (Tex. App.--
Fort Worth 2015)(orig. proceeding).

In sum, this is not the type of case where a constructive
trust is appropriate. In addition, it occurs to the court that it
would not be just or equitable to allow plaintiff to recover from
defendant what it was unable to recover from its own bank. See
Doc. 29 at 710-18. As the Nebraska court noted, it is a critical
fact that plaintiff gave both checks and a signature stamp to the
Lyons, who were clearly authorized to produce and sign checks on
plaintiff's account. Id. at 713-14, 716.

The court ORDERS that defendant's motion for summary
judgment be, and is hereby, granted in its entirety; that
plaintiff take nothing on the claims asserted in its amended
complaint; and, that such claim be, and are hereby, dismissed.

SIGNED June 5, 2018.

JOHN McBRYDE
United States District Judge

6