**FILED**

**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION**

**March 04, 2019**

KAREN MITCHELL
CLERK, U.S. DISTRICT COURT

| | | |
|---|---|---|
| **FIRST BANK & TRUST,** | § | |
| | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **vs.** | § | **Cause No.5:18-cv-00234-C** |
| | § | |
| **REAGOR AUTO MALL, LTD. d/b/a** | § | |
| **REAGOR-DYKES OF LEVELLAND and** | § | |
| **d/b/a REAGOR-DYKES IMPORTS,** | § | |
| **FIRSTCAPITAL BANK OF TEXAS, N.A.,** | § | |
| **BART REAGOR, RICK DYKES, SHANE** | § | |
| **SMITH, SHEILA MILLER, BRAD D.** | § | |
| **BURGESS, and KENNETH L. BURGESS,** | § | |
| | § | |
| **Defendant.** | § | |

## PLAINTIFF'S THIRD AMENDED COMPLAINT
## AND APPLICATION FOR WRIT OF SEQUESTRATION

Pursuant to Federal Rule of Civil Procedure 15(a)(1)(B), Plaintiff First Bank & Trust ("First Bank") files its Third Amended Complaint and Application for Writ of Sequestration against Defendants Reagor Auto Mall, Ltd. d/b/a Reagor-Dykes of Levelland and d/b/a Reagor-Dykes Imports ("RAM"), FirstCapital Bank of Texas, N.A. ("FirstCapital"), Bart Reagor ("Reagor"), Rick Dykes (Dykes"), Shane Smith ("Smith"), Sheila Miller ("Miller"), Brad D. Burgess ("B. Burgess"), and Kenneth L. Burgess ("K. Burgess") and would respectfully show the Court as follows.

# I.
## NATURE OF THE ACTION

Plaintiff First Bank brings this action to enforce its rights as a secured creditor pursuant to a number of agreements with some of the Defendants.  Certain Defendants have breached their agreements and are in default for, among other things, selling vehicles pledged as collateral to Plaintiff, failing to remit the required payments for those vehicles to First Bank, falsely reporting the sales status and location of the collateral, and overdrawing RAM's checking account at First Bank.  In addition, First Bank seeks to recover the money out of which it was defrauded due to Defendants' involvement in a fraudulent scheme that involved check-kiting.  Accordingly, First Bank seeks to recover monetary damages caused by Defendants as well as possession of the collateral pledged by Defendants, so that it may be sold by the private power of foreclosure sale under the parties' agreements and Article 9 of the Uniform Commercial Code.

# II.
## PARTIES

1.      Plaintiff First Bank & Trust ("First Bank" or "Plaintiff" or "Lender") is a bank chartered under the laws of the State of Texas with its principal place of business located at 9816 Slide Road, Lubbock, Texas 79424.

2.      Defendant Reagor Auto Mall, Ltd. d/b/a Reagor-Dykes of Levelland and d/b/a Reagor-Dykes Imports ("RAM" or "Borrower") is a limited partnership formed under the laws of the State of Texas with its principal place of business located at 1219 19th Street, Lubbock, Texas 79401.  RAM may be served with process via its registered agent in Texas, Reagor Auto Mall I, LLC, at 1215 Avenue J, Lubbock, Texas 79401.

3.      Defendant FirstCapital Bank of Texas, N.A. ("FirstCapital") is a national banking association with its principal place of business located at 310 W. Wall Street, Suite 100, Midland, Texas 79701.  FirstCapital may be served with process via its registered agent in Texas, Kenneth Burgess, Jr, at 1141 Hollis Drive, Abilene, Texas 79605.

4.      Defendant Bart Reagor ("Reagor") is an individual residing in Texas who may be served at 2809 19th Street, Lubbock, Texas 79410, 8504 Oxford Avenue, Lubbock, Texas 79423, or wherever else he may be found.

5.      Defendant Rick Dykes ("Dykes") is an individual residing in Texas who may be served at 4705 21st Street, Lubbock, Texas 79407, 2108 Vicksburg Avenue, Lubbock, Texas 79407, or wherever else he may be found.

6.      Defendant Shane Smith ("Smith") is an individual residing in Texas who may be served at 3804 106th Street, Lubbock, Texas 79243, 5016 County Road 7890, Lubbock, Texas 79424, or wherever else he may be found.

7.      Defendant Sheila Miller ("Miller") is an individual residing in Texas who may be served at 1111 19th Street, Lubbock, Texas 79401, 2810 75th Street, Lubbock, Texas 79423, or wherever else she may be found.

8.      Defendant Brad D. Burgess ("B. Burgess") is an individual residing in Texas who may be served at 3802 111th Street, Lubbock, Texas 79243, 8611 Indiana Avenue, Lubbock, Texas 79413, or wherever else he may be found.

9.      Defendant Kenneth L. Burgess, Jr. ("K. Burgess") is an individual residing in Texas who may be served at 310 W. Wall Street, Suite 100, Midland, Texas 79701, 5501

**PLAINTIFF'S THIRD AMENDED COMPLAINT**
**AND APPLICATION FOR WRIT OF SEQUESTRATION – PAGE 3**

Sherwood Drive, Apt. D104, Midland, Texas 79707, or wherever else he may be found.   B. Burgess and K. Burgess are collectively referred to as the "Burgess Defendants."

### III.
### JURISDICTION AND VENUE

10.     On September 21, 2018, Defendant FirstCapital Bank of Texas, N.A. removed this suit to this Court from the 72nd Judicial District Court of Lubbock County, Texas pursuant to 28 U.S.C. §§ 1441 and 1446 (the "Removal").   The Removal papers allege that this Court has original jurisdiction pursuant to 28 U.S.C. § 1331 because the removal was based upon a claim arising under federal law, making removal proper under 28 U.S.C. § 1441(a).   Specifically, the Removal was based on Plaintiff's claim for violation of 12 C.F.R. § 229.38(a), which grants concurrent jurisdiction to the United States district courts and state courts.   12 U.S.C. § 4010(d). *See* Notice of Removal [Dkt. 1] at ¶¶ 2-3.

### IV.
### FACTUAL ALLEGATIONS

**A.     The RD-Levelland Agreements.**

The Business Loan Agreement and Promissory Note.

11.     On or about September 29, 2017, RAM obtained a loan from Plaintiff for use in renewing an existing floor plan line of credit at its Levelland location, pursuant to the terms of a Business Loan Agreement.   A true and correct copy of the Business Loan Agreement is attached as **Exhibit A** (the "RD-Levelland Business Loan Agreement").   RAM also executed a Promissory Note payable to Plaintiff in the principal amount of $1,000,000.00.   A true and correct copy of the Promissory Note is attached as **Exhibit B** (the "RD-Levelland Promissory Note").

12. The RD-Levelland Promissory Note is payable on demand under the "Payment" provision. If no demand is made, RAM is required to pay the loan in one payment of all outstanding principal plus all accrued unpaid interest on October 1, 2018. In addition, RAM is required to pay regular monthly payments of all accrued unpaid interest due as of each payment date, beginning November 1, 2017, with all subsequent interest payments to be due on the same day of each month after that. *See* RD-Levelland Promissory Note at 1.

13. The RD-Levelland Business Loan Agreement and the RD-Levelland Promissory Note list several events that constitute an event of default, including, but not limited to:

- failure to make any payment when due under the RD-Levelland Promissory Note;

- failure to comply with or to perform any other term, obligation, covenant or condition contained in the RD-Levelland Promissory Note or in any of the related documents;

- failure to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower;

- any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under the RD-Levelland Promissory Note or the related documents is false or misleading in any material respect, either now or at the time made or furnished, or becomes false or misleading at any time thereafter;

- a material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of the RD-Levelland Promissory Note is impaired; or

- Lender in good faith believes itself insecure. *See* RD-Levelland Business Loan Agreement at 3-4; RD-Levelland Promissory Note at 1.

14. Since one or more defaults described herein have occurred, First Bank is entitled to, and did, accelerate and declare due the entire indebtedness, including the unpaid balance, all

**PLAINTIFF'S THIRD AMENDED COMPLAINT**
**AND APPLICATION FOR WRIT OF SEQUESTRATION – PAGE 5**

accrued unpaid interest, and all other amounts, costs and expenses for which RAM is responsible under the RD-Levelland Promissory Note or any other agreements with First Bank pertaining to the loan, immediately, without notice.  *See* RD-Levelland Business Loan Agreement at 4; RD-Levelland Promissory Note at 2.  RAM also agreed to pay First Bank's attorneys' fees, court costs and fees, incurred in collecting on the RD-Levelland Promissory Note.  *See id.*

The Commercial Security Agreement.

15.     In exchange for the financing provided under the Business Loan Agreement and Promissory Note, RAM granted Plaintiff a security interest in its inventory.

16.     On or about September 29, 2017, RAM executed a Commercial Security Agreement.  A true and correct copy of the Commercial Security Agreement is attached as **Exhibit C** (the "RD-Levelland Security Agreement"). Pursuant to the RD-Levelland Security Agreement, RAM granted Plaintiff a security interest in the following collateral:

All inventory, together with the following specifically described property:  all debtor's inventory of property of every description (specifically including by [sic] not limited to) all new and used motor vehicles, which includes but is not limited to automobiles, motorcycles, mobile homes, motor homes, travel trailers, boats, vans, pickups, together with all accessories, attachments, or accessions related to any of the foregoing collateral hereafter acquired and evidenced by mso and/or title, whether held for rental, lease, sale or use, of whatever nature and whosoever located and all debtor's accounts, accounts receivable, notes receivable, checks, drafts, contract rights and general intangibles of every nature evidencing debtor's right to the payment of monies arising from the sale, leasing, or rental of such inventory items and/or from the performance of debtor of services in connection therewith or related thereto all the foregoing whether now owned or hereafter acquired by debtor and the proceeds and products thereof[.]

In addition, the word "Collateral" also includes all of the following, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located:

(A) All accessions, attachments, accessories, tools, parts, supplies, replacements of and addition to any of the collateral described herein, whether added now or later.

(B) All products and produce of any of the property described in this Collateral section.

(C) All accounts, general intangibles, instruments, rents, monies, payments, and all other rights, arising out of a sale, lease, consignment or other disposition of any of the property described in this Collateral section.

(D) All proceeds (including insurance proceeds) from the sale, destruction, loss, or other disposition of any of the property described in this Collateral section, and sums due from a third party who has damages or destroyed the Collateral or from that party's insurer, whether due to judgment, settlement or other process.

(E) All records and data relating to any of the property described in this Collateral section, whether in the form of a writing, photograph, microfilm, microfiche, or electronic media, together with all of Grantor's right, title, and interest in and to all computer software required to utilize, create, maintain, and process any such records or data on electronic media. *See* RD-Levelland Security Agreement at 1.

17.     The RD-Levelland Security Agreement also requires that RAM:

shall not pledge, mortgage, encumber or otherwise permit the Collateral to be subject to any lien, security interest, encumbrance, or charge, other than the security interest provided for in this Agreement, without the prior written consent of Lender.  This includes security interests even if junior in right to the security interests granted under this Agreement.  Unless waived by Lender, all proceeds from any disposition of the Collateral (for whatever reason) shall be held in trust for Lender and shall not be commingled with any other funds; provided however, this requirement shall not constitute consent by Lender to any sale or other disposition.  Upon receipt, Grantor shall immediately deliver any such proceeds to Lender.  RD-Levelland Security Agreement at 1-2.

18.     The RD-Levelland Security Agreement lists several events that constitute an

event of default, including, but not limited to:

- •      failure to make any payment when due on the related indebtedness;

- failure to comply with or to perform any other term, obligation, covenant or condition contained in the RD-Levelland Security Agreement or in any of the related documents;

- failure to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower;

- any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under the RD-Levelland Security Agreement or the related documents is false or misleading in any material respect, either now or at the time made or furnished, or becomes false or misleading at any time thereafter;

- failure of any collateral document to create a valid and perfected security interest or lien at any time and for any reason;

- a material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of the indebtedness is impaired; or

- Lender in good faith believes itself insecure. *See* RD-Levelland Security Agreement at 3.

19.    Since one or more defaults described herein have occurred, First Bank is entitled to, and did, accelerate and declare the entire indebtedness immediately due and payable, without notice of any kind to RAM. First Bank may also require RAM to deliver all or any portion of the collateral and any and all certificates of title and other documents related to the collateral. In addition, First Bank may also enter upon RAM's property to take possession of and remove the collateral. *See* RD-Levelland Security Agreement at 3.

20.    Pursuant to the RD-Levelland Security Agreement, if RAM defaults, First Bank has the "full power to sell, lease, transfer, or otherwise deal with the Collateral or proceeds thereof in Lender's own name or that of Grantor." *Id.* Further, First Bank may collect the

payments, rents, income and revenues from the collateral and obtain a deficiency judgment from RAM. *See id.*

21.     In addition to its common law rights, Plaintiff also reserved "a right of setoff in all Grantor's accounts with Lender (whether checking, savings, or some other account)," including "all accounts Grantor holds with someone else and all accounts Grantor may open in the future." RAM authorized Plaintiff "to charge or setoff all sums owing on the indebtedness against any and all such accounts," and to "administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights[.]" *See* RD-Levelland Security Agreement at 1.

22.     RAM also agreed to pay all of First Bank's costs and expenses, including First Bank's reasonable attorneys' fees and expenses, incurred in connection with enforcing the RD-Levelland Security Agreement. *Id.* at 3-4.

Guaranties of RAM's Indebtedness.

23.     On or about September 29, 2017, Bart Reagor executed and delivered to Plaintiff a continuing Commercial Guaranty, pursuant to which Reagor, as Guarantor:

> [A]bsolutely and unconditionally guarantees full and punctual payment and satisfaction of the indebtedness of Borrower to Lender, and the performance and discharge of all Borrower's obligations under the Note and the Related Documents.  This is a guaranty of payment and performance and not of collection, so Lender can enforce this Guaranty against Guarantor even when Lender has not exhausted Lender's remedies against anyone else obligated to pay the indebtedness or against any collateral securing the indebtedness, this Guaranty or any other guaranty of the indebtedness. Guarantor will make any payments to Lender or its order, on demand, in legal tender of the United States of America, in same-day funds, without set-off or deduction or counterclaim, and will otherwise perform Borrower's obligations under the Note and Related Documents.  Under this Guaranty, Guarantor's liability is unlimited and Guarantor's obligations are continuing.  *See* Commercial Guaranty, a true and correct copy of which is attached as **Exhibit D** (the "RD-Levelland Reagor Commercial Guaranty").

The indebtedness guaranteed by Reagor includes "overdraft indebtedness." *See id* at 1.

24.     Reagor also agreed to pay all of First Bank's costs and expenses, including First Bank's reasonable attorneys' fees and expenses, incurred in connection with enforcing the RD-Levelland Reagor Commercial Guaranty. *See id.* at 2.

25.     On or about September 29, 2017, Rick Dykes executed and delivered to Plaintiff a continuing Commercial Guaranty, pursuant to which Dykes, as Guarantor:

> [A]bsolutely and unconditionally guarantees full and punctual payment and satisfaction of the indebtedness of Borrower to Lender, and the performance and discharge of all Borrower's obligations under the Note and the Related Documents.  This is a guaranty of payment and performance and not of collection, so Lender can enforce this Guaranty against Guarantor even when Lender has not exhausted Lender's remedies against anyone else obligated to pay the indebtedness or against any collateral securing the indebtedness, this Guaranty or any other guaranty of the indebtedness. Guarantor will make any payments to Lender or its order, on demand, in legal tender of the United States of America, in same-day funds, without set-off or deduction or counterclaim, and will otherwise perform Borrower's obligations under the Note and Related Documents.  Under this Guaranty, Guarantor's liability is unlimited and Guarantor's obligations are continuing.  *See* Commercial Guaranty, a true and correct copy of which is attached as **Exhibit E** (the "RD-Levelland Dykes Commercial Guaranty").

The indebtedness guaranteed by Dykes includes "overdraft indebtedness." *See id* at 1.

26.     Dykes also agreed to pay all of First Bank's costs and expenses, including First Bank's reasonable attorneys' fees and expenses, incurred in connection with enforcing the RD-Levelland Dykes Commercial Guaranty. *See id.* at 2.

**B.     The RD-Imports Agreements**

The Business Loan Agreement and Promissory Note.

27.     On or about September 29, 2017, RAM obtained a loan from Plaintiff for use in renewing an existing floor plan line of credit at its Imports location, pursuant to the terms of a

Business Loan Agreement.  A true and correct copy of the Business Loan Agreement is attached as **Exhibit F** (the "RD-Imports Business Loan Agreement").  RAM also executed a Promissory Note payable to Plaintiff in the principal amount of $2,500,000.00.  A true and correct copy of the Promissory Note is attached as **Exhibit G** (the "RD-Imports Promissory Note").

28.     The RD-Imports Promissory Note is payable on demand under the "Payment" provision.  If no demand is made, RAM is required to pay the loan in one payment of all outstanding principal plus all accrued unpaid interest on October 1, 2018.  In addition, RAM is required to pay regular monthly payments of all accrued unpaid interest due as of each payment date, beginning November 1, 2017, with all subsequent interest payments to be due on the same day of each month after that.

29.     The RD-Imports Business Loan Agreement and RD-Imports Promissory Note list several events that constitute an event of default, including, but not limited to:

- failure to make any payment when due under the RD-Imports Promissory Note;

- failure to comply with or to perform any other term, obligation, covenant or condition contained in the RD-Imports Promissory Note or in any of the related documents;

- failure to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower;

- any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under the RD-Imports Promissory Note or the related documents is false or misleading in any material respect, either now or at the time made or furnished, or becomes false or misleading at any time thereafter;

**PLAINTIFF'S THIRD AMENDED COMPLAINT**
**AND APPLICATION FOR WRIT OF SEQUESTRATION – PAGE 11**

- a material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of the RD-Imports Promissory Note is impaired; or

- Lender in good faith believes itself insecure.  *See* RD-Imports Business Loan Agreement at 3-4; RD-Imports Promissory Note at 1.

30.     Since one or more defaults described herein have occurred, First Bank is entitled to, and did, accelerate and declare due the entire indebtedness, including the unpaid balance, all accrued unpaid interest, and all other amounts, costs and expenses for which RAM is responsible under the RD-Imports Promissory Note or any other agreements with First Bank pertaining to the loan, immediately, without notice. *See* RD-Imports Business Loan Agreement at 4; RD-Imports Promissory Note at 2.  RAM also agreed to pay First Bank's attorneys' fees, court costs and fees, incurred in collecting on the RD-Imports Promissory Note.  *See id.*

The Commercial Security Agreement.

31.     In exchange for the financing provided under the Business Loan Agreement and Promissory Note, RAM granted Plaintiff a security interest in its inventory.

32.     On or about September 29, 2017, RAM executed a Commercial Security Agreement.  A true and correct copy of the Commercial Security Agreement is attached as **Exhibit H** (the "RD-Imports Security Agreement").  Pursuant to the RD-Imports Security Agreement, RAM granted Plaintiff a security interest in the following collateral:

All inventory, together with the following specifically described property:  all debtor's inventory of property of every description (specifically including by [sic] not limited to) all new and used motor vehicles, which includes but is not limited to automobiles, motorcycles, mobile homes, motor homes, travel trailers, boats, vans, pickups, together with all accessories, attachments, or accessions related to any of the foregoing collateral hereafter acquired and evidenced by mso and/or title, whether held for rental, lease, sale or use, of whatever nature and whosoever located and all debtor's accounts, accounts receivable, notes receivable, checks,

drafts, contract rights and general intangibles of every nature evidencing debtor's right to the payment of monies arising from the sale, leasing, or rental of such inventory items and/or from the performance of debtor of services in connection therewith or related thereto all the foregoing whether now owned or hereafter acquired by debtor and the proceeds and products thereof[.]

In addition, the word "Collateral" also includes all of the following, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located:

> (A) All accessions, attachments, accessories, tools, parts, supplies, replacements of and addition to any of the collateral described herein, whether added now or later.

> (B) All products and produce of any of the property described in this Collateral section.

> (C) All accounts, general intangibles, instruments, rents, monies, payments, and all other rights, arising out of a sale, lease, consignment or other disposition of any of the property described in this Collateral section.

> (D) All proceeds (including insurance proceeds) from the sale, destruction, loss, or other disposition of any of the property described in this Collateral section, and sums due from a third party who has damages or destroyed the Collateral or from that party's insurer, whether due to judgment, settlement or other process.

> (E) All records and data relating to any of the property described in this Collateral section, whether in the form of a writing, photograph, microfilm, microfiche, or electronic media, together with all of Grantor's right, title, and interest in and to all computer software required to utilize, create, maintain, and process any such records or data on electronic media. *See* RD-Imports Security Agreement at 1.

33.     The RD-Imports Security Agreement also requires that RAM:

shall not pledge, mortgage, encumber or otherwise permit the Collateral to be subject to any lien, security interest, encumbrance, or charge, other than the security interest provided for in this Agreement, without the prior written consent of Lender. This includes security interests even if junior in right to the security interests granted under this Agreement. Unless waived by Lender, all proceeds from any disposition of the Collateral (for whatever reason) shall be held in trust for Lender and shall not be commingled with any other funds; provided however,

this requirement shall not constitute consent by Lender to any sale or other disposition.  Upon receipt, Grantor shall immediately deliver any such proceeds to Lender.  RD-Imports Security Agreement at 1-2.

34.     The RD-Imports Security Agreement lists several events that constitute an event of default, including, but not limited to:

- failure to make any payment when due on the related indebtedness;

- failure to comply with or to perform any other term, obligation, covenant or condition contained in the RD-Imports Security Agreement or in any of the related documents;

- failure to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower;

- any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under the RD-Imports Security Agreement or the related documents is false or misleading in any material respect, either now or at the time made or furnished, or becomes false or misleading at any time thereafter;

- failure of any collateral document to create a valid and perfected security interest or lien at any time and for any reason;

- a material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of the indebtedness is impaired; or

- Lender in good faith believes itself insecure.  *See* RD-Imports Security Agreement at 3.

35.     Since one or more defaults described herein have occurred, First Bank is entitled to, and did, accelerate and declare the entire indebtedness immediately due and payable, without notice of any kind to RAM.  First Bank may also require RAM to deliver all or any portion of the collateral and any and all certificates of title and other documents related to the collateral.  In

**PLAINTIFF'S THIRD AMENDED COMPLAINT**
**AND APPLICATION FOR WRIT OF SEQUESTRATION – PAGE 14**

addition, First Bank may also enter upon RAM's property to take possession of and remove the collateral. *See* RD-Imports Security Agreement at 3.

36.     Pursuant to the RD-Imports Security Agreement, if RAM defaults, First Bank has the "full power to sell, lease, transfer, or otherwise deal with the Collateral or proceeds thereof in Lender's own name or that of Grantor." *Id.* Further, First Bank may collect the payments, rents, income and revenues from the collateral and obtain a deficiency judgment from RAM. *See id.*

37.     In addition to its common law rights, Plaintiff reserved "a right of setoff in all Grantor's accounts with Lender (whether checking, savings, or some other account)," including "all accounts Grantor holds with someone else and all accounts Grantor may open in the future." RAM authorized Plaintiff "to charge or setoff all sums owing on the indebtedness against any and all such accounts," and to "administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights[.]" *See* RD-Imports Security Agreement at 1.

38.     RAM also agreed to pay all of First Bank's costs and expenses, including First Bank's reasonable attorneys' fees and expenses, incurred in connection with enforcing the RD-Imports Security Agreement. *Id.* at 3-4.

Guaranties of RAM's Indebtedness.

39.     On or about September 29, 2017, Bart Reagor executed and delivered to Plaintiff a continuing Commercial Guaranty, pursuant to which Reagor, as Guarantor:

> [A]bsolutely and unconditionally guarantees full and punctual payment and satisfaction of the indebtedness of Borrower to Lender, and the performance and discharge of all Borrower's obligations under the Note and the Related Documents. This is a guaranty of payment and performance and not of collection, so Lender can enforce this Guaranty against Guarantor even when Lender has not exhausted Lender's remedies against anyone else obligated to pay the indebtedness or against any collateral securing the indebtedness, this Guaranty or

any other guaranty of the indebtedness. Guarantor will make any payments to Lender or its order, on demand, in legal tender of the United States of America, in same-day funds, without set-off or deduction or counterclaim, and will otherwise perform Borrower's obligations under the Note and Related Documents.  Under this Guaranty, Guarantor's liability is unlimited and Guarantor's obligations are continuing.  *See* Commercial Guaranty, a true and correct copy of which is attached as **Exhibit I** (the "RD-Imports Reagor Commercial Guaranty").

The indebtedness guaranteed by Reagor includes "overdraft indebtedness." *See id* at 1.

40.     Reagor also agreed to pay all of First Bank's costs and expenses, including First Bank's reasonable attorneys' fees and expenses, incurred in connection with enforcing the RD-Imports Reagor Commercial Guaranty.  *See id.* at 2.

41.     On or about September 29, 2017, Rick Dykes executed and delivered to Plaintiff a continuing Commercial Guaranty, pursuant to which Dykes, as Guarantor:

[A]bsolutely and unconditionally guarantees full and punctual payment and satisfaction of the indebtedness of Borrower to Lender, and the performance and discharge of all Borrower's obligations under the Note and the Related Documents.  This is a guaranty of payment and performance and not of collection, so Lender can enforce this Guaranty against Guarantor even when Lender has not exhausted Lender's remedies against anyone else obligated to pay the indebtedness or against any collateral securing the indebtedness, this Guaranty or any other guaranty of the indebtedness. Guarantor will make any payments to Lender or its order, on demand, in legal tender of the United States of America, in same-day funds, without set-off or deduction or counterclaim, and will otherwise perform Borrower's obligations under the Note and Related Documents.  Under this Guaranty, Guarantor's liability is unlimited and Guarantor's obligations are continuing.  *See* Commercial Guaranty, a true and correct copy of which is attached as **Exhibit J** (the "RD-Imports Dykes Commercial Guaranty").

The indebtedness guaranteed by Dykes includes "overdraft indebtedness." *See id* at 1.

42.     Dykes also agreed to pay all of First Bank's costs and expenses, including First Bank's reasonable attorneys' fees and expenses, incurred in connection with enforcing the RD-Imports Dykes Commercial Guaranty.  *See id.* at 2.

**PLAINTIFF'S THIRD AMENDED COMPLAINT**
**AND APPLICATION FOR WRIT OF SEQUESTRATION – PAGE 16**

C.   **The Defaults.**

43.   In August 2018, First Bank began investigating the status of RAM's inventory at its Levelland and Imports (the "Dealerships") locations.  Though the investigation is ongoing, First Bank has discovered that some of its collateral has been sold, is missing, or has been double pledged.

44.   When a car dealership obtains financing on a vehicle in its inventory, the dealership will pledge that vehicle as collateral to its lender and place the vehicle on its floor plan until that vehicle is sold.  This is known as "floor planning."  On occasion, a dealership may finance a vehicle and pledge it as collateral to two different lenders, thereby illegally double pledging that vehicle as collateral.  This is known as "double-flooring."

45.   Regarding the Levelland location's pledged inventory, First Bank has discovered that of the 40 vehicles on the Levelland floor plan, 21 have been sold, but still floor planned, allowing RAM to continue to obtain financing payments from First Bank while avoiding and/or delaying paying First Bank the amounts owed to it for the sold inventory.  The payoff amount that RAM owes First Bank for these 21 vehicles is $420,025.00.  In addition, 1 vehicle is missing from the floorplan with no explanation as to its location.  For this missing vehicle, RAM owes First Bank $31,750.00.  First Bank's inspection of the Levelland inventory has also revealed 7 instances of RAM "double-flooring" vehicles pledged as collateral to First Bank.

46.   With regard to the pledged inventory at the Imports location, First Bank's inspection has revealed that of the 101 units on the Imports floor plan, 43 have been sold, but still floor planned, allowing RAM to continue to obtain financing payments from First Bank while avoiding and/or delaying paying First Bank the amounts owed to it for the sold inventory.

CORE/3507552.0006/150913717.3

The payoff amount that RAM owes First Bank for these 43 vehicles is $1,084,025.00.   First Bank's inspection also revealed that 6 of the 101 units are inexplicably missing from the floorplan.  For these 6 vehicles, RAM owes First Bank $69,750.00.  Plaintiff has also discovered that 13 units were double-floored.

47.     RAM's false representations regarding the status of the pledged inventory allowed it to avoid and/or delay paying First Bank the amounts it is owed for such inventory.

48.     These acts and omissions show that Defendants have experienced a material adverse change in their respective financial conditions.  Certainly, they give rise to First Bank's good faith belief that it is insecure under its agreements with each of the Defendants.

49.     All of these acts constitute Events of Default and therefore violate the aforementioned agreements with First Bank.

50.     As of September 7, 2018, the estimated total amount outstanding and due to First Bank on the aforementioned contracts is in excess of $3 million.  This debt exceeds the value of the remaining inventory collateral available to First Bank.

51.     First Bank made demand upon RAM, Reagor and Dykes to pay the amounts owing on the promissory notes.  Payment has not been received.

**D.     The RAM Check-Kiting Scheme and Resulting Overdrafts.**

Rick Dykes:  Insider, FirstCapital Board Member and Large Shareholder.

52.     Defendant Dykes is a co-owner of various corporate entities commonly referred to as "Reagor-Dykes Auto Group" ("Reagor-Dykes") with Defendant Reagor. Reagor-Dykes is a well-known regional auto dealership enterprise, of which RAM is an affiliate.

**PLAINTIFF'S THIRD AMENDED COMPLAINT**
**AND APPLICATION FOR WRIT OF SEQUESTRATION – PAGE 18**

53.     Until very recently, Dykes was a member of FirstCapital's Board of Advisors and previously served as a Director on FirstCapital's Board of Directors. Further, upon information and belief, Dykes is a large shareholder in FirstCapital's parent, holding at least 375,000 shares, and personal friend of the Burgesses.   Upon information and belief, Reagor also owns a significant number of shares.

54.     RAM maintained active deposit accounts with First Bank and FirstCapital.

Check Kiting.

55.     Check kiting is a form of check fraud that involves the interplay between the provisional credit given to a customer account by a collecting bank upon deposit of checks by the customer and the "midnight deadline" for subsequent dishonor and return by a payor bank where the same customer also maintains an account against which those checks are drawn when presented for payment by the collecting bank.  When a collecting bank (such as First Bank, here) receives deposit of a check, it increases the available balance in the customer's account by the check amount.  The collecting bank, however, will not receive actual funds on account of the check until the check-clearing process is completed through cash letters with the Federal Reserve and final payment by the payor bank (such as FirstCapital, here). If the account holder withdraws funds credited to the account for a deposited check before the collecting bank receives final payment on that check, the account holder can receive cash on the account of the check, even though the check ultimately has no cash value due to the payor bank's refusal to pay it. Essentially, check kiting allows the account holder to withdraw non-existent funds from an account, such that checks are misused as a form of fraudulently-procured credit, because the customer knows that the checks crossing back and forth between the collecting and payor banks

are not ultimately backed by funds that will finally pay the checks.  Due to its insider role with

RAM, in this case, FirstCapital also had such knowledge.

56.     Check kiters use accounts at two or more banks, intentionally writing worthless

checks from their unfunded account at the payor bank and depositing these worthless checks into

their account at the collecting bank. In the two to three days before the payor bank dishonors and

returns unpaid the deposited check, the collecting bank has increased the provisional balance in

the check kiter's account, allowing the check kiter to withdraw funds on the account into which

the check was deposited. When the collecting bank receives the dishonored and returned check

and charges back the provisional credit previously given to the account when the check was

deposited, there is nothing in the account to fund the chargeback.  An overdraft is created,

leaving the collecting bank only with a claim for refund against a customer which (as here) is

generally insolvent and incapable of paying the refund.  The collecting bank is thus left with a

loss in the amount of the overdraft.

57.     As detailed below, RAM and its former Chief Financial Officer ("CFO"),

Defendant Smith, with the assistance of FirstCapital and the Burgess Defendants, perpetrated a

massive fraud, including selling inventory vehicles out of trust and not paying First Bank for its

loans made against such vehicles, double-pledging vehicle inventory to First Bank which was

also pledged to other lenders, taking trade-ins when selling such collateral inventory and using

the trade-ins as collateral for new First Bank loans but failing to pay off loans already secured by

such trade-ins, and conducting a multi-million dollar check-kiting scheme.

58.     FirstCapital was the primary bank used by RAM and Smith and was both the hub

and a spoke of the check-kiting scheme.  FirstCapital knew in advance of Ford Motor Credit

Company LLC's lawsuit against several Reagor-Dykes affiliates and in advance of the bankruptcies filed by several Reagor-Dykes affiliates that Defendants were perpetuating a check-kiting scheme.  FirstCapital had the largest role in the check-kiting scheme and knew or should have known of the scheme much earlier than it acted to freeze accounts or dishonor checks presented for payment due to the depth of its involvement with RAM and Smith, receiving daily floorplan lists and daily deposits from RAM.  In fact, FirstCapital was so intertwined with RAM that it loaned money to both Reagor and Smith <u>after</u> the Reagor-Dykes' bankruptcy filings. With respect to the check-kiting scheme, FirstCapital and the Burgess Defendants conspired with RAM and Smith to continue the scheme long enough to shift overdraft losses of nearly $1 million from FirstCapital to First Bank.

<u>The RAM Check-Kiting Scheme against First Bank and Resulting Overdrafts</u>.

59.     RAM maintained active deposit accounts with First Bank and FirstCapital.  In connection with opening RAM's account with First Bank, Defendants Reagor, Dykes, Smith, and Miller, Reagor-Dykes' former Controller, executed an Account Agreement, a true and correct copy of which is attached as **Exhibit K**.

60.     Pursuant to the Account Agreement, Defendants Reagor, Dykes, Smith, and Miller agreed to certain Terms and Conditions, a true and correct copy of which is attached as **Exhibit L**.  Subparagraph 3 of the Terms and Conditions provides in relevant part:

> Each of you also agrees to be jointly and severally (individually) liable for any account shortage resulting from charges or overdrafts, whether caused by you or another with access to this account.  This liability is due immediately, and can be deducted directly from the account balance whenever sufficient funds are available.  You have no right to defer payment of this liability, and you are liable regardless of whether you signed the item or benefited from the charge or overdraft.

**PLAINTIFF'S THIRD AMENDED COMPLAINT**
<u>**AND APPLICATION FOR WRIT OF SEQUESTRATION – PAGE 21**</u>

You will be liable for our costs as well as for our reasonable attorneys' fees, to the extent permitted by law, whether incurred as a result of collection or in any other dispute involving your account.  This includes, but is not limited to, disputes between you and another joint owner; you and an authorized signer or similar party; or a third party claiming an interest in your account.  This also includes any action that you or a third party takes regarding the account that causes us, in good faith, to seek the advice of an attorney, whether or not we become involved in the dispute.  All costs and attorneys' fees can be deducted from your account when they are incurred, without notice to you. *See* Terms and Conditions, ¶ (3).

61.    RAM subsequently used the account as part of its fraudulent check-kiting scheme.

RAM had a practice of regularly writing and depositing a high volume of large denomination

checks between its First Bank and FirstCapital accounts.  RAM wrote several multi-thousand

dollar checks from a FirstCapital account, deposited these checks into a First Bank account and

then issued payments from the First Bank account based on provisional credit obtained from

First Bank upon making these deposits to cover obligations or make deposits to its accounts at

another financial institution. Given the size of the RAM business and volume of transactions,

such account activity did not seem irregular.  In doing this, RAM obtained millions of dollars in

fraudulent credit from First Bank during the "float" period while First Bank completed the cash

letter process with the Federal Reserve and waited for FirstCapital to pay the deposited items.

62.    At times when RAM's account at First Bank would become overdrawn, First

Bank would contact RAM's then CFO, Defendant Smith, to determine the issue(s), who would

assure First Bank that RAM was just paying off vehicles and the money to cover the overdrawn

amounts would immediately be deposited.  Upon information and belief, this was just Smith's

cover-up of the ongoing RAM check-kiting scheme and was intended to make sure that First

Bank kept providing provisional credit to RAM.  In fact, just one week before RAM's check-

**PLAINTIFF'S THIRD AMENDED COMPLAINT**
**AND APPLICATION FOR WRIT OF SEQUESTRATION – PAGE 22**

kiting scheme blew up, Smith contacted First Bank to request additional time for RAM to pay off vehicles it had floored with First Bank.

63.      Smith also made misrepresentations about RAM's financial condition.   In the months leading up to the bankruptcy of several Reagor-Dykes entities and affiliates of RAM, Smith continually assured First Bank that the Reagor-Dykes Auto Group was financially sound, and, in fact, growing more profitable every year.

64.      RAM's cycle of deposits and fraudulent float credit survived only as long as RAM maintained the volume and speed of its deposit cycle to keep ahead of the check-clearing process.   However, the bankruptcy filing of several Reagor-Dykes entities and affiliates of RAM broke the cycle and revealed the scheme, and FirstCapital and the Burgess Defendants scrambled to return the items RAM wrote on its FirstCapital account that were deposited on Friday, July 27, 2018, Monday, July 30, 2018, and Tuesday, July 31, 2018.   Upon information and belief, FirstCapital used Dykes' inside information, at the direction of the Burgess Defendants, to unload nearly $1 million in losses and damages to First Bank, thereby knowingly profiting from the scheme.

### FirstCapital and the Burgess Defendants Conspire with RAM and Smith to Pin the Damages on First Bank.

65.      As described above, Dykes held management and ownership roles at both RAM and FirstCapital's parent. RAM used this close relationship with the Burgess Defendants and FirstCapital to prolong and continue its check-kiting scheme against First Bank. Specifically, RAM implemented the scheme through several multi-thousand dollar check deposits at FirstCapital and First Bank.   As detailed below, the Burgess Defendants and FirstCapital

CORE/3507552.0006/150913717.3

exploited their personal and special insider relationship with Dykes to improperly shift the scheme's fraud and resulting injury to First Bank.

66.     Some time on or before Saturday, July 28, 2018, Ford Motor Credit Company, LLC ("Ford"), Reagor-Dykes' largest inventory lender, notified Dykes of its discovery of massive fraud at Reagor-Dykes. Ford terminated Reagor-Dykes' funding, declared default, and threatened immediate legal action, including seizing Reagor-Dykes' assets.

67.     Upon information and belief, on or before Monday, July 30th, Dykes met with Defendant B. Burgess, FirstCapital's CEO, to ask them for financial assistance through loans and warn them of Ford's impending legal action, Reagor-Dykes' severe financial problems, and Reagor-Dykes' planned bankruptcy filing. Upon information and belief, Dykes alerted no other creditors of these facts.

68.     On July 31st, Ford sued nine of the Reagor-Dykes entities, in addition to Bart Reagor and Rick Dykes, in the United States District Court for the Northern District of Texas, Lubbock Division, alleging, among other things, breach of contract and claiming tens of millions of dollars of damages.

69.     The very next day, Wednesday, August 1st, six of the nine Reagor-Dykes entities filed for bankruptcy.  RAM was not one of the Reagor-Dykes entities that filed for bankruptcy. First Bank learned of these bankruptcies through local Lubbock news reports and word of mouth.

70.     The timing of these events and FirstCapital's contemporaneous and highly irregular banking transactions set forth below show that the Burgess Defendants and FirstCapital used the inside information provided by Dykes to improperly shift approximately $1 million in losses to First Bank.

**PLAINTIFF'S THIRD AMENDED COMPLAINT**
**AND APPLICATION FOR WRIT OF SEQUESTRATION – PAGE 24**

FirstCapital and the Burgess Defendants Act on Inside Information.

71.     Prior to Dykes providing the inside information, FirstCapital timely cleared and paid RAM's items deposited with First Bank during normal hours and in a normal volume and never returned items unpaid. On July 31st, however, FirstCapital, acting at the Burgess Defendants' direction, abruptly changed its practice and returned all items presented for payment, regardless of applicable banking deadlines, while simultaneously presenting items deposited with FirstCapital for payment by First Bank.

72.     As explained above, upon information and belief, RAM and Smith used RAM's FirstCapital account to run a number of multi-thousand dollar checks through its First Bank account, thereby creating funds in the FirstCapital account which FirstCapital could then set off to reduce its overdraft balance rather than pay the checks deposited with First Bank and presented to FirstCapital for payment.

73.     Specifically, on Friday, July 27, 2018, First Bank processed numerous RAM deposits and transmitted its outgoing cash letter to the Federal Reserve. On the next business day, Monday, July 30, 2018, the Federal Reserve provided the items to FirstCapital in an incoming cash letter.

74.     On Tuesday, July 31, 2018, FirstCapital <u>should</u> have identified and returned any items from First Bank's July 27th outgoing cash letter that FirstCapital refused to pay by issuing an outgoing return cash letter to the Federal Reserve no later than midnight central standard time. Then, on Wednesday, August 1, 2018, no later than 4 p.m. central standard time, First Bank would have received an incoming return cash letter and large time return notification listing

**PLAINTIFF'S THIRD AMENDED COMPLAINT**
<u>**AND APPLICATION FOR WRIT OF SEQUESTRATION – PAGE 25**</u>

FirstCapital's July 31st outgoing return cash letter items.  FirstCapital, however, completely deviated from this process.

75.     On July 31, 2018, at the same time it was scrambling to dishonor and return checks presented for payment by First Bank, FirstCapital presented for payment to First Bank $487,167.00 worth of checks by RAM.  Unaware of the fraud, First Bank timely paid the $487,167.00 to FirstCapital.

76.     On August 1, 2018, at approximately 10:15 a.m. central time, six Reagor-Dykes entities (not including RAM) filed bankruptcy.

77.     On August 1, 2018, at 8:52 p.m., after the 4:00 p.m. deadline, First Bank received notice of FirstCapital's dishonor and return of 24 RAM checks[1] totaling $1,190,916.00, stamping on the checks as the reason for dishonor: "uncollected funds."  Because the return was submitted after business hours, First Bank did not learn of the returned items until the next morning, August 2nd.  Upon information and belief, FirstCapital had already set off the balance of funds in RAM's account there, so the truthful or additional reason for return of the checks to First Bank was that there were "insufficient funds" in the account for payment.  First Capital knew there would <u>never</u> be collected funds because it was offsetting all funds received into the account to minimize the overdraft loss at FirstCapital.  Prior to FirstCapital's return of these 24 items, FirstCapital had never returned a single RAM item to First Bank for nonpayment.  Of those 24 items, 12 of them (totaling $602,280.00) were untimely under the UCC and Federal Reserve

---

[1] FirstCapital's August 1, 2018 return cash letter contained 12 returned items from First Bank's July 27, 2018 cash letter and 12 returned items from First Bank's July 30, 2018 cash letter.

**PLAINTIFF'S THIRD AMENDED COMPLAINT**
<u>**AND APPLICATION FOR WRIT OF SEQUESTRATION – PAGE 26**</u>

guidelines, as they were the return of items presented in First Bank's July 27th outgoing cash letter (which FirstCapital should have returned by August 1 by 4 p.m.).

78.     Then, on August 3, 2018, First Bank received notice of FirstCapital's return and nonpayment of 10 of RAM's items totaling $502,908.00 from First Bank's July 31, 2018 outgoing cash letter, under the return reason of "uncollected funds."  Upon information and belief, FirstCapital had already set off the balance of funds in RAM's account there, so the truthful or additional reason for return of the checks to First Bank was that there were "insufficient funds" in the account for payment.  FirstCapital submitted such a large volume of returns in its (late) August 1st and August 3rd outgoing return cash letters for several reasons.

79.     First, FirstCapital's late August 1st cash letter included 12 returned items from First Bank's July 27, 2018 outgoing cash letter, totaling $602,280.00 in returns. Having missed the July 31, 2018 return deadline for July 27, 2018 dated items, these 12 items were late under the Federal Reserve guidelines.  Upon information and belief, this required FirstCapital to engage in the labor-intensive investigation, processing and manual entry of all such late returns. To have processed and submitted all these late returns after business hours on August 1st indicates that FirstCapital used the manual return process in an effort to unload the return losses onto First Bank.

80.     Second, FirstCapital's submission of the voluminous July 27th late returns on the evening of August 1st also indicates that FirstCapital initially approved these July 27th items for payment, but reversed course following Brad Burgess's meeting with Dykes, trying, but failing, to timely return these items by the July 31, 2018 Federal Reserve cutoff.

**PLAINTIFF'S THIRD AMENDED COMPLAINT**
**AND APPLICATION FOR WRIT OF SEQUESTRATION – PAGE 27**

81.     Third, out of all of RAM's banking institutions, including, upon information and belief, FirstCapital, IBC Bank of Oklahoma, Vista Bank, AIM Bank and First Bank, only FirstCapital attempted to charge back July 27, 2018 RAM items.

FirstCapital Misleads Its Shareholders

82.     On September 28, 2018, a letter from Defendant K. Burgess to the shareholders of First Bancshares of Texas, Inc. "to give [them] an update on this situation, given the fact that FirstCapital Bank (Bank) is involved in two . . . lawsuits" resulting from the bankruptcy of one of its "longtime customers in Lubbock" was posted on FirstCapital's website.[2]

83.     The letter reads in relevant part:

[A]s a result of the financial condition of a group of related companies that are customers of our Bank, a lawsuit was filed on July 31, 2018 by Ford Motor Credit Company against those companies and their individual owners.  On the next day, August 1, 2018, six of those companies filed for Chapter 11 Bankruptcy protection.  Immediately following these filings, our Bank took internal steps to protect our Bank, our customers and our shareholders from what we had determined was a possible check-kiting scheme that had apparently been orchestrated by someone internally associated with those companies.  Despite our efforts, various banks, including ours, sustained losses in the process.

. . .

I want to assure you that neither the Bank, Brad, nor I took any actions outside of the law in the efforts that were taken to protect the Bank.

84.     Defendant K. Burgess would like the shareholders and the public to believe that it was only after the Reagor-Dykes' bankruptcy filings that FirstCapital and the Burgess Defendants "determined [there] was a possible check kiting scheme," when, upon information

---

[2]  A true and correct copy of this letter may be found at https://www.fcbtexas.com/wp-content/uploads/2018/09/Shareholder-Letter_092818.pdf.

CORE/3507552.0006/150913717.3

and belief, FirstCapital and the Burgess Defendants already knew of and were facilitating the check-kiting scheme.  It was only when FirstCapital and the Burgess Defendants learned that discovery of the check-kiting scheme by <u>others</u> (particularly those banks it targeted) was imminent (from Brad Burgess's meeting with Defendant Dykes), that they decided to dishonor RAM checks by falsely representing the reason for their return.

<u>First Bank is Damaged by Approximately $1 Million.</u>

85.     FirstCapital and the Burgess Defendants' actions in conspiring with RAM and Smith, directly, knowingly, and intentionally damaged First Bank. As officers, directors, and owners of a financial institution, they understood well the check-clearing and dishonor and return processes and how to exploit their timing to ensure First Bank absorbed the damages for the RAM check-kiting collapse. FirstCapital also knew that a collecting bank would not conclude that a check would ultimately not be paid by a payor bank such as FirstCapital if the check was returned because of "uncollected funds" because a resubmission of the check for payment could be successful after the subject funds were collected in the meantime.  FirstCapital knew that if it truthfully disclosed that the reason for dishonor was "insufficient funds" following its set off of the balance in the account or because it knew of the fraudulent nature of RAM's deposits, the collecting bank would know to then dishonor and return checks deposited with the collecting bank.  In essence, the Burgess Defendants and FirstCapital took advantage of the check-clearing process to unload nearly $1 million in damages onto First Bank.

86.     Specifically, by simultaneously accelerating the mass returns and dishonor of checks presented by First Bank for payment by FirstCapital (including the manual late returns of RAM items to First Bank after the deadline on August 1st) while presenting for payment checks

drawn on RAM's account at First Bank, the Burgess Defendants and FirstCapital acted on Dykes' inside information to accelerate and exploit First Bank's exposure to the RAM scheme, while intentionally depriving First Bank of any opportunity to avoid accepting RAM's deposits from FirstCapital.

87.     In addition, FirstCapital's use of the "uncollected funds" reason (meaning a frozen account) as opposed to the "NSF" reason (meaning an unfrozen account that lacks sufficient funds) indicates that FirstCapital froze or set off RAM's bank accounts, even though RAM was not a part to the Reagor-Dykes bankruptcy filing, when, upon information and belief, these accounts otherwise held available funds to pay items on First Bank's July 27th, 30th and 31st outbound cash letters. Instead of paying First Bank as it should have, FirstCapital applied the balance in the account to the overdraft at FirstCapital, in furtherance of the RAM check-kiting scheme.

88.     In total, FirstCapital and the Burgess Defendants' actions damaged First Bank by actively funneling nearly $1 million in RAM returns and losses onto First Bank, allowing them to improperly profit from their insider relationship with Dykes.  After all lawful offsets and credits, RAM's account remains overdrawn by $993,115.83.

<u>FirstCapital Wrongfully Fails to Account for Proceeds from the Sale of Collateral Subject to First Bank's Security Interest.</u>

89.     As described above, First Bank held a security interest in RAM's inventory of vehicles.

**PLAINTIFF'S THIRD AMENDED COMPLAINT**
<u>**AND APPLICATION FOR WRIT OF SEQUESTRATION – PAGE 30**</u>

90.     After investigation, it appears that in or around July 2018, RAM sold over 60 vehicles in which First Bank held a security interest out of trust, resulting in proceeds of approximately $1.4 million.

91.     Pursuant to both the security agreements and TEX. BUS. & COM. CODE § 9.315, First Bank also held a security interest in the proceeds from the sale of those vehicles.

92.     RAM failed to account for and pay over the proceeds from those sales to First Bank.  On information and belief, RAM's operating account was maintained at FirstCapital.  As such, on information and belief, RAM deposited the bulk of those proceeds into its operating account and/or other accounts held at FirstCapital.

93.     FirstCapital has failed to transfer any of those proceeds from those sales to First Bank.

**V.**
**CLAIMS FOR RELIEF**

**A.     Count 1: Breach of the RD-Levelland Business Loan Agreement (against RAM).**

94.     Plaintiff repeats and realleges the preceding paragraphs as if fully set forth herein.

95.     As set forth in greater detail above, Plaintiff and RAM entered into the RD-Levelland Business Loan Agreement, which is a valid and enforceable contract.

96.     Plaintiff, as the Lender under the RD-Levelland Business Loan Agreement, is the proper party to sue for breach of contract.

97.     Plaintiff has performed, tendered performance of, or was excused from performing its contractual obligations.

98.   Defendant RAM has materially breached the RD-Levelland Business Loan Agreement by, among other things:

   a.   failing to pay installments when due;

   b.   failing to remit payments to First Bank when vehicles are sold;

   c.   pledging collateral and allowing it to become subject to other liens, security interests, encumbrances or charges other than the security interest provided for in the aforementioned agreements, without First Bank's prior written consent;

   d.   making false representations and warranties regarding the status of collateral pledged as security;

   e.   removing collateral from its existing location without First Bank's prior written consent;

   f.   failing to pay when due all liens upon the collateral;

   g.   failing to hold in trust for First Bank all proceeds from the disposition of any collateral;

   h.   experiencing a material adverse change in their respective financial conditions (or First Bank believes the prospect of payment or performance of the indebtedness is impaired); and

   i.   causing First Bank to in good faith believe itself insecure.

99.   These breaches proximately caused First Bank to sustain damages, and pursuant to the agreement, First Bank is owed approximately $967,000.

100.   First Bank made demand for payment of this amount and no payment was made by RAM.

**B.   <u>Count 2: Breach of the RD-Levelland Promissory Note (against RAM).</u>**

101.   Plaintiff repeats and realleges the preceding paragraphs as if fully set forth herein.

**PLAINTIFF'S THIRD AMENDED COMPLAINT**
**AND APPLICATION FOR WRIT OF SEQUESTRATION – PAGE 32**

102.     As set forth in greater detail above, RAM executed the RD-Levelland Promissory Note, which is a valid and enforceable contract.

103.     Plaintiff, as the Lender under the RD-Levelland Promissory Note, is the proper party to sue for breach of contract.

104.     Plaintiff has performed, tendered performance of, or was excused from performing its contractual obligations.

105.     Defendant RAM has materially breached the RD-Levelland Promissory Note by, among other things:

    a.     failing to pay installments when due;

    b.     failing to remit payments to First Bank when vehicles are sold;

    c.     pledging collateral and allowing it to become subject to other liens, security interests, encumbrances or charges other than the security interest provided for in the aforementioned agreements, without First Bank's prior written consent;

    d.     making false representations and warranties regarding the status of collateral pledged as security;

    e.     removing collateral from its existing location without First Bank's prior written consent;

    f.     failing to pay when due all liens upon the collateral;

    g.     failing to hold in trust for First Bank all proceeds from the disposition of any collateral;

    h.     experiencing a material adverse change in their respective financial conditions (or First Bank believes the prospect of payment or performance of the indebtedness is impaired); and

    i.     causing First Bank to in good faith believe itself insecure.

106.    These breaches proximately caused First Bank to sustain damages, and pursuant to the agreement, First Bank is owed approximately $967,000.

107.    First Bank made demand for payment of this amount and no payment was made by RAM.

**C.    Count 3: Breach of the RD-Levelland Security Agreement (against RAM).**

108.    Plaintiff repeats and realleges the preceding paragraphs as if fully set forth herein.

109.    As set forth in greater detail above, RAM executed the RD-Levelland Security Agreement, which is a valid and enforceable contract.

110.    Plaintiff, as the Lender under the RD-Levelland Security Agreement, is the proper party to sue for breach of contract.

111.    Plaintiff has performed, tendered performance of, or was excused from performing its contractual obligations.

112.    Defendant RAM has materially breached the RD-Levelland Security Agreement by, among other things:

    a.    failing to pay installments when due;

    b.    failing to remit payments to First Bank when vehicles are sold;

    c.    pledging collateral and allowing it to become subject to other liens, security interests, encumbrances or charges other than the security interest provided for in the aforementioned agreements, without First Bank's prior written consent;

    d.    making false representations and warranties regarding the status of collateral pledged as security;

    e.    removing collateral from its existing location without First Bank's prior written consent;

f.      failing to pay when due all liens upon the collateral;

g.      failing to hold in trust for First Bank all proceeds from the disposition of any collateral;

h.      experiencing a material adverse change in their respective financial conditions (or First Bank believes the prospect of payment or performance of the indebtedness is impaired); and

i.      causing First Bank to in good faith believe itself insecure.

113.    These breaches proximately caused First Bank to sustain damages, and pursuant to the agreement, First Bank is owed approximately $967,000.

114.    First Bank made demand for payment of the amounts owing and no payment was made by RAM.

**D.    <u>Count 4: Breach of RD-Levelland Reagor Commercial Guaranty (against Reagor).</u>**

115.    Plaintiff repeats and realleges the preceding paragraphs as if fully set forth herein.

116.    As set forth in greater detail above, Defendant Reagor executed the RD-Levelland Reagor Commercial Guaranty, which is a valid and enforceable contract.

117.    Plaintiff, as the Lender under the RD-Levelland Reagor Commercial Guaranty, is the proper party to sue for breach of contract.

118.    Plaintiff has performed, tendered performance of, or was excused from performing its contractual obligations.

119.    First Bank made demand for payment of the amounts owing and no payment was made by Reagor.

120.    Reagor has materially breached the RD-Levelland Reagor Commercial Guaranty by failing to perform his obligations thereunder, specifically by not paying the outstanding

amounts due to Plaintiff from RAM on the RD-Levelland Agreements and by not paying the overdraft indebtedness described in Section VI.D, above.

121.    These breaches proximately caused First Bank to sustain damages, and pursuant to the agreements, First Bank is owed in excess of $967,000 on the RD-Levelland Agreements and nearly $1 million in overdraft indebtedness.

122.    As a result, Reagor is liable to First Bank for breach of the RD-Levelland Reagor Commercial Guaranty in the amount of the indebtedness under the RD-Levelland Agreements, plus interest, costs and fees incurred in connection with First Bank's efforts to collect the indebtedness thereunder, in addition to the nearly $1 million in overdraft indebtedness.

**E.     Count 5: Breach of RD-Levelland Dykes Commercial Guaranty (against Dykes).**

123.    Plaintiff repeats and realleges the preceding paragraphs as if fully set forth herein.

124.    As set forth in greater detail above, Defendant Dykes executed the RD-Levelland Dykes Commercial Guaranty, which is a valid and enforceable contract.

125.    Plaintiff, as the Lender under the RD-Levelland Dykes Commercial Guaranty, is the proper party to sue for breach of contract.

126.    Plaintiff has performed, tendered performance of, or was excused from performing its contractual obligations.

127.    First Bank made demand for payment of the amounts owing and no payment was made by Dykes.

128.    Dykes has materially breached the RD-Levelland Dykes Commercial Guaranty by failing to perform his obligations thereunder, specifically by not paying the outstanding amounts

CORE/3507552.0006/150913717.3

due to Plaintiff from RAM on the RD-Levelland Agreements and by not paying the overdraft indebtedness described in Section VI.D, above.

129.    These breaches proximately caused First Bank to sustain damages, and pursuant to the agreements, First Bank is owed in excess of $967,000 on the RD-Levelland Agreements and nearly $1 million in overdraft indebtedness.

130.    As a result, Dykes is liable to First Bank for breach of the RD-Levelland Dykes Commercial Guaranty in the amount of the indebtedness under the RD-Levelland Agreements, plus interest, costs and fees incurred in connection with First Bank's efforts to collect the indebtedness thereunder, in addition to the nearly $1 million in overdraft indebtedness.

**F.    Count 6: Breach of the RD-Imports Business Loan Agreement (against RAM).**

131.    Plaintiff repeats and realleges the preceding paragraphs as if fully set forth herein.

132.    As set forth in greater detail above, Plaintiff and RAM entered into the RD-Imports Business Loan Agreement, which is a valid and enforceable contract.

133.    Plaintiff, as the Lender under the RD-Imports Business Loan Agreement, is the proper party to sue for breach of contract.

134.    Plaintiff has performed, tendered performance of, or was excused from performing its contractual obligations.

135.    Defendant RAM has materially breached the RD-Imports Business Loan Agreement by, among other things:

      a.    failing to pay installments when due;

      b.    failing to remit payments to First Bank when vehicles are sold;

    c.      pledging collateral and allowing it to become subject to other liens, security interests, encumbrances or charges other than the security interest provided for in the aforementioned agreements, without First Bank's prior written consent;

    d.      making false representations and warranties regarding the status of collateral pledged as security;

    e.      removing collateral from its existing location without First Bank's prior written consent;

    f.      failing to pay when due all liens upon the collateral;

    g.      failing to hold in trust for First Bank all proceeds from the disposition of any collateral;

    h.      experiencing a material adverse change in their respective financial conditions (or First Bank believes the prospect of payment or performance of the indebtedness is impaired); and

    i.      causing First Bank to in good faith believe itself insecure.

136.    These breaches proximately caused First Bank to sustain damages, and pursuant to the agreement, First Bank is owed approximately $2.1 million.

137.    First Bank made demand for payment of the amounts owing and no payment was made by RAM.

**G.    Count 7: Breach of the RD-Imports Promissory Note (against RAM).**

138.    Plaintiff repeats and realleges the preceding paragraphs as if fully set forth herein.

139.    As set forth in greater detail above, RAM executed the RD-Imports Promissory Note, which is a valid and enforceable contract.

140.    Plaintiff, as the Lender under the RD-Imports Promissory Note, is the proper party to sue for breach of contract.

141.    Plaintiff has performed, tendered performance of, or was excused from performing its contractual obligations.

142.    Defendant RAM has materially breached the RD-Imports Promissory Note by, among other things:

    a.     failing to pay installments when due;

    b.     failing to remit payments to First Bank when vehicles are sold;

    c.     pledging collateral and allowing it to become subject to other liens, security interests, encumbrances or charges other than the security interest provided for in the aforementioned agreements, without First Bank's prior written consent;

    d.     making false representations and warranties regarding the status of collateral pledged as security;

    e.     removing collateral from its existing location without First Bank's prior written consent;

    f.     failing to pay when due all liens upon the collateral;

    g.     failing to hold in trust for First Bank all proceeds from the disposition of any collateral;

    h.     experiencing a material adverse change in their respective financial conditions (or First Bank believes the prospect of payment or performance of the indebtedness is impaired); and

    i.     causing First Bank to in good faith believe itself insecure.

143.    These breaches proximately caused First Bank to sustain damages, and pursuant to the agreement, First Bank is owed approximately $2.1 million.

144.    First Bank made demand for payment of the amounts owing and no payment was made by RAM.

**PLAINTIFF'S THIRD AMENDED COMPLAINT**
**AND APPLICATION FOR WRIT OF SEQUESTRATION – PAGE 39**

**H.** **Count 8: Breach of the RD-Imports Security Agreement (against RAM).**

145.    Plaintiff repeats and realleges the preceding paragraphs as if fully set forth herein.

146.    As set forth in greater detail above, RAM executed the RD-Imports Security Agreement, which is a valid and enforceable contract.

147.    Plaintiff, as the Lender under the RD-Imports Security Agreement, is the proper party to sue for breach of contract.

148.    Plaintiff has performed, tendered performance of, or was excused from performing its contractual obligations.

149.    Defendant RAM has materially breached the RD-Imports Security Agreement by, among other things:

     a.    failing to pay installments when due;

     b.    failing to remit payments to First Bank when vehicles are sold;

     c.    pledging collateral and allowing it to become subject to other liens, security interests, encumbrances or charges other than the security interest provided for in the aforementioned agreements, without First Bank's prior written consent;

     d.    making false representations and warranties regarding the status of collateral pledged as security;

     e.    removing collateral from its existing location without First Bank's prior written consent;

     f.    failing to pay when due all liens upon the collateral;

     g.    failing to hold in trust for First Bank all proceeds from the disposition of any collateral;

     h.    experiencing a material adverse change in their respective financial conditions (or First Bank believes the prospect of payment or performance of the indebtedness is impaired); and

CORE/3507552.0006/150913717.3

      i.     causing First Bank to in good faith believe itself insecure.

150.    These breaches proximately caused First Bank to sustain damages, and pursuant to the agreement, First Bank is owed approximately $2.1 million.

151.    First Bank made demand for payment of the amounts owing and no payment was made by RAM.

**I.**    **Count 9: Breach of RD-Imports Reagor Commercial Guaranty (against Reagor).**

152.    Plaintiff repeats and realleges the preceding paragraphs as if fully set forth herein.

153.    As set forth in greater detail above, Defendant Reagor executed the RD-Imports Reagor Commercial Guaranty, which is a valid and enforceable contract.

154.    Plaintiff, as the Lender under the RD-Imports Reagor Commercial Guaranty, is the proper party to sue for breach of contract.

155.    Plaintiff has performed, tendered performance of, or was excused from performing its contractual obligations.

156.    First Bank made demand for payment of the amounts owing and no payment was made by Reagor.

157.    Reagor has materially breached the RD-Imports Reagor Commercial Guaranty by failing to perform his obligations thereunder, specifically by not paying the outstanding amounts due to Plaintiff from RAM on the RD-Imports Agreements and by not paying the overdraft indebtedness described in Section VI.D, above.

158.    These breaches proximately caused First Bank to sustain damages, and pursuant to the agreements, First Bank is owed approximately $2.1 million on the RD-Imports Agreements and approximately $1 million in overdraft indebtedness.

159.    As a result, Reagor is liable to First Bank for breach of the RD-Imports Reagor Commercial Guaranty in the amount of the indebtedness under the RD-Imports Agreements, plus interest, costs and fees incurred in connection with First Bank's efforts to collect the indebtedness thereunder, in addition to the nearly $1 million in overdraft indebtedness.

## J.    Count 10: Breach of RD-Imports Dykes Commercial Guaranty (against Dykes).

160.    Plaintiff repeats and realleges the preceding paragraphs as if fully set forth herein.

161.    As set forth in greater detail above, Defendant Dykes executed the RD-Imports Dykes Commercial Guaranty, which is a valid and enforceable contract.

162.    Plaintiff, as the Lender under the RD-Imports Dykes Commercial Guaranty, is the proper party to sue for breach of contract.

163.    Plaintiff has performed, tendered performance of, or was excused from performing its contractual obligations.

164.    First Bank made demand for payment of the amounts owing and no payment was made by Dykes.

165.    Dykes has materially breached the RD-Imports Dykes Commercial Guaranty by failing to perform his obligations thereunder, specifically by not paying the outstanding amounts due to Plaintiff from RAM on the RD-Imports Agreements and by not paying the overdraft indebtedness described in Section VI.D, above.

166.    These breaches proximately caused First Bank to sustain damages, and pursuant to the agreements, First Bank is owed approximately $2.1 million on the RD-Imports Agreements and nearly $1 million in overdraft indebtedness.

**PLAINTIFF'S THIRD AMENDED COMPLAINT**
**AND APPLICATION FOR WRIT OF SEQUESTRATION – PAGE 42**

167.    As a result, Dykes is liable to First Bank for breach of the RD-Imports Dykes Commercial Guaranty in the amount of the indebtedness under the RD-Imports Agreements, plus interest, costs and fees incurred in connection with First Bank's efforts to collect the indebtedness thereunder, in addition to the approximately $1 million in overdraft indebtedness.

**K.   Count 11: Application for a Writ of Sequestration against RAM.**

168.    Plaintiff repeats and realleges the preceding paragraphs as if fully set forth herein.

169.    RAM continues to hold and possess collateral pledged to First Bank, which is subject to First Bank's security interest, including, but not limited to, their new and used vehicle inventory, including all attachments, accession, and accessories.

170.    The vehicles that remain in RAM's inventory, and which are subject to First Bank's security interests, are sorted by dealership and listed on the attached **Exhibit M**.  The vehicles are believed to be located at (1) Reagor-Dykes of Levelland, 2379 East Highway 114, Levelland, Texas, 79336, in Hockley County, and (2) Reagor-Dykes Imports, 1301 19th Street, Lubbock, Texas 79401, in Lubbock County.

171.    The value of the collateral is believed to be $1,563,000.00.  However, vehicles depreciate every day such that the collateral is diminishing in value while it is being held by RAM.

172.    This is a case in which the legislature has specifically authorized the issuance of a writ of sequestration and in which the grounds specified by the legislature for the issuance of the writ exist, as follows:  Plaintiff sues for the enforcement of a security interest in personal property and a reasonable conclusion may be drawn that there is immediate danger that RAM will remove the property out of the limits of the county during the pendency of the suit.

**PLAINTIFF'S THIRD AMENDED COMPLAINT**
**AND APPLICATION FOR WRIT OF SEQUESTRATION – PAGE 43**

173.    The collateral has not been taken for any tax, assessment or fine levied by virtue of any law of this State against the property of First Bank, or against it individually, nor seized under any lawful process or against the goods and chattels of First Bank subject to such lawful process, nor held by virtue of any order of replevin against First Bank.

174.    Due to the defaults by RAM, its continued possession of the collateral would be wrongful.   As a result of their default, First Bank is entitled to immediate possession of the collateral pursuant to the security agreements with First Bank and pursuant to TEX. CIV. PRAC. & REM. CODE § 62.001(1).   Sequestration is permitted under FED. R. CIV. P. 64(a)-(b).

175.    Because RAM has breached its agreements with First Bank and because it has moved vehicles without paying First Bank, there is an immediate danger that RAM will continue to do so.   There is also an immediate danger it will conceal, dispose of, ill-treat, waste or destroy the collateral.   Accordingly, First Bank is entitled to immediate possession of the collateral.   *See id.*   It would require a breach of the peace for Plaintiff to obtain possession of the collateral. Accordingly, Plaintiff seeks a writ of sequestration in order for it to peacefully obtain its legal right to possession of the collateral so that it may sell the vehicles pursuant to the aforementioned agreements and Article 9 of the UCC.

176.    Plaintiff requests that the court schedule a hearing ex parte to consider the legal propriety of issuance of the writ.

177.    Plaintiff requests that after the hearing, the court issue a written order granting this application in which it specifically finds the statutory grounds that exist for issuance of the writ; makes specific findings of facts to support the statutory grounds found to exist; describes

and specifies the value of the property to be sequestered; and specifies the amount of bond required of Plaintiff.

178.    Plaintiff requests that it be allowed to segregate funds into a separate account, in lieu of posting a bond, pending further order of the Court.  Plaintiff requests that the Court set an amount to be segregated that will adequately compensate RAM in the event Plaintiff fails to prosecute this suit to effect, and pay all damages and costs which may be adjudged against him for wrongfully suing out the writ of sequestration, including the elements of damages stated in TEX. CIV. PRAC. & REM. CODE §§ 62.044 and 62.045.

179.    Plaintiff requests that the order specify that the amount of the bond required of RAM to replevy be $1,563,000.00, which is an amount equal to the value of the property sequestered and the estimated costs of court.

180.    Because of the express provisions of TEX. CIV. PRAC. & REM. CODE § 62.021, plaintiff requests that the writ be issued by a judge and not by a clerk.

181.    Please display on the face of the writ, in ten-point type and in a manner calculated to advise a reasonably attentive person of its contents, the following:

> YOU HAVE A RIGHT TO REGAIN POSSESSION OF THE PROPERTY BY FILING A REPLEVY BOND. YOU HAVE A RIGHT TO SEEK TO REGAIN POSSESSION OF THE PROPERTY BY FILING WITH THE COURT A MOTION TO DISSOLVE THIS WRIT.

182.    Plaintiff requests that this court issue a writ of sequestration, returnable to this court, on the basis of the specific facts stated in this application and affidavit on oath, and that the described property be taken into the possession of the proper officer.

**PLAINTIFF'S THIRD AMENDED COMPLAINT**
**AND APPLICATION FOR WRIT OF SEQUESTRATION – PAGE 45**

183.    The Affidavit of First Bank representative Jared Townsend in support of First Bank's Application for a Writ of Sequestration is made on personal knowledge of the truth and correctness of the facts stated in this application and in the affidavit, and it attached as **Exhibit N** (the "Townsend Affidavit").

**L.    Count 12: Recovery of Overdraft/Refund under UCC § 4.214 (against RAM).**

184.    Plaintiff repeats and realleges the preceding paragraphs as if fully set forth herein.

185.    As set forth above, RAM presented several items for deposit to First Bank, upon which First Bank provided RAM credit totaling $993,115.83.   This amount remains unpaid by RAM.

186.    Pursuant to UCC § 4.214, Plaintiff, having provided provisional credit to RAM for items that later failed by reason of dishonor, is entitled to a refund from RAM.   *See* UCC § 4.214.

187.    Accordingly, and pursuant to UCC § 4.214, Plaintiff seeks to recover from RAM the $993,115.83 that it has failed to pay.

**M.    Count 13: Fraud (against Defendants RAM and Smith).**

188.    Plaintiff repeats and realleges the preceding paragraphs as if fully set forth herein.

189.    As set forth above, in perpetrating the RAM check-kiting scheme, RAM, though its then-CFO, Defendant Smith, made misrepresentations regarding the business and its use of funds overdrawn in its First Bank account.   Specifically, Smith represented that checks written, which caused RAM's account to be overdrawn, were used to pay off vehicles RAM had floored with First Bank, when in reality, those checks, upon information and belief, were part of RAM's

check-kiting scheme.   Smith also misrepresented that the Reagor-Dykes Auto Group was financially sound and profitable.

190.    These misrepresentations were material and false.

191.    When Smith made these misrepresentations, he knew they were false, or made the misrepresentations recklessly, as a positive assertion, and without knowledge of their truth.

192.    Smith made the representations with the intent that First Bank act on them by providing RAM access to funds it did not actually have in its First Bank account.

193.    First Bank relied on RAM's misrepresentations by continuing to provide RAM access to funds.

194.    First Bank's reliance on these misrepresentations caused it damages of at least $993,115.83.

**N.    Count 14: Money Had and Received/ Unjust Enrichment/Restitution (against RAM and FirstCapital).**

195.    Plaintiff repeats and realleges the preceding paragraphs as if fully set forth herein.

196.    RAM and FirstCapital hold money payable to First Bank.

197.    As set forth above, RAM and FirstCapital knowingly facilitated a check-kiting scheme so long as they believed it would go undetected.  Then FirstCapital waited to pick a day to freeze RAM's account at a time to minimize its losses and maximize First Bank's losses and dishonored checks presented for payment with a false reason for dishonor so that First Bank would continue to extend provisional credit to RAM as long as possible and thereby pay any checks presented by FirstCapital for payment, causing First Bank to suffer $993,115.83 in damages. This money belongs to First Bank in equity and good conscience.

**PLAINTIFF'S THIRD AMENDED COMPLAINT**
**AND APPLICATION FOR WRIT OF SEQUESTRATION – PAGE 47**

198.     RAM and FirstCapital unjustly enriched themselves at First Bank's expense as a result of fraud and undue advantage. Therefore, First Bank asserts a claim against this money, which in equity and good conscience, belongs to First Bank.

**O.     Count 15: Statutory Liability under the Expedited Funds Availability Act and Federal Reserve Regulation CC (against FirstCapital).**

199.     Plaintiff repeats and realleges the preceding paragraphs as if fully set forth herein.

200.     The Expedited Funds Availability Act authorizes the Federal Reserve to impose or allocate among banks the risks of loss and liability in connection with any aspect of the check payment system.  In cases of bad faith, damages suffered by a bank as a proximate consequence of any act or omission by another bank giving rise to a loss or liability may be imposed.  12 U.S.C. 4010(f).  The Federal Reserve has implemented this authority by enactment of Regulation CC ("Reg CC").  12 CFR Part 229.

201.     Pursuant to Reg CC, at 12 C.F.R. § 229.38(a), "[a] bank shall exercise ordinary care and act in good faith in complying with the requirements of this subpart.  A bank that fails to exercise ordinary care or act in good faith under the subpart may be liable to the depositary bank[.]"  Thus, FirstCapital had a duty to exercise ordinary care and act in good faith in the check-clearing process with First Bank.

202.     As set forth in greater detail above, FirstCapital failed to exercise ordinary care and failed to act in good faith when it simultaneously dishonored and returned checks presented to it by First Bank for payment, while at the same time presented checks to First Bank for payment, when it knew that, due to the fraudulent check-kiting scheme, there would never be sufficient funds in RAM's First Bank account to cover any RAM checks.  Upon information and

**PLAINTIFF'S THIRD AMENDED COMPLAINT**
**AND APPLICATION FOR WRIT OF SEQUESTRATION – PAGE 48**

belief, FirstCapital knew of, facilitated and participated in the RAM check-kiting scheme before it learned from Dykes that the scheme would soon fail and froze RAM's account to protect itself from the losses caused by the scheme.  FirstCapital also failed to exercise ordinary care and failed to act in good faith by erroneously stating the reason for the check returns.  FirstCapital thus violated Reg CC, causing First Bank damages of nearly $1 million.

**P.**      **Count 16: Liability under TEX. BUS. & COM. CODE ("UCC") (against FirstCapital).**

203.    Plaintiff repeats and realleges the preceding paragraphs as if fully set forth herein.

204.    Pursuant to UCC § 4.215(a)(3), the aforementioned items were "finally paid," and FirstCapital is therefore liable to First Bank because, as set forth in greater detail above, FirstCapital "made a provisional settlement for the item[s] and failed to revoke the settlement in the time and manner permitted by statute, clearing-house rule, or agreement."   UCC § 4.215(a)(3).

205.    In addition, pursuant to UCC § 3.418, First Bank should be awarded recovery of the payments it made to FirstCapital, because First Bank is entitled to restitution under Texas law.  *See* UCC § 3.418(b).  FirstCapital's simultaneous dishonor of items presented for payment by First Bank, late return of RAM checks, not freezing the account as soon as it suspected the kiting scheme, and erroneously stating the reason of the returns, establishes that FirstCapital did not present the RAM items for payment in good faith.  *See* UCC § 3.418(c). Moreover, FirstCapital is liable for the amount of the checks presented in First Bank's letters of July 27, 30, and 31, because FirstCapital failed to exercise ordinary care and to act in good faith in processing those items as more particularly set forth above.  Because of FirstCapital's lack of good faith and erroneously-stated reason for the returns, First Bank, operating on the

CORE/3507552.0006/150913717.3

presumption that FirstCapital was making honest representations regarding the reason for dishonor, mistakenly accepted RAM checks presented for payment. Accordingly, First Bank is entitled to restitution to restore the amounts taken from it due to FirstCapital's fraud and taking undue advantage of First Bank.

206.    Similarly, FirstCapital is liable for the $487,167.00 in checks it presented to First Bank for payment on July 31, because FirstCapital failed to exercise ordinary care and to act in good faith in presenting those items when FirstCapital knew that it was simultaneously dishonoring and returning checks to First Bank without complying with the regulatory obligation to accurately and fully disclose the reason for such return and dishonor as more particularly set forth above. Again, because of FirstCapital's lack of good faith in its simultaneous dishonor of items presented for payment by First Bank, late return of RAM checks, not freezing the account as soon as it suspected the kiting scheme, and erroneously stating the reason of the returns, First Bank, operating on the presumption that FirstCapital was making honest representations regarding the reason for dishonor, mistakenly paid these RAM checks.

207.    Relief under UCC § 3.418 is not precluded by subsection (c), because the foregoing facts establish that FirstCapital did not act in good faith. Moreover, FirstCapital's unlawful and wrongful acts in perpetuating the fraudulent check-kiting scheme, rather than shutting it down as soon as it suspected it, created a duty of disclosure to First Bank.

**Q.    Count 17: Breach of Account Agreement (against Reagor, Dykes, Smith, and Miller).**

208.    Plaintiff repeats and realleges the preceding paragraphs as if fully set forth herein.

**PLAINTIFF'S THIRD AMENDED COMPLAINT
AND APPLICATION FOR WRIT OF SEQUESTRATION – PAGE 50**

209.    As set forth in greater detail above, Reagor, Dykes, Smith, and Miller executed an Account Agreement, which is a valid and enforceable contract.

210.    Plaintiff, as the bank that opened RAM's checking account, is the proper party to sue for breach of contract.

211.    Plaintiff has performed, tendered performance of, or was excused from performing its contractual obligations.

212.    Defendants Reagor, Dykes, Smith, and Miller have materially breached the Account Agreement by failing to pay Plaintiff for the account's overdraft of $993,115.83.

213.    Defendants' breaches proximately caused First Bank to sustain damages, and pursuant to the Account Agreement, First Bank is owed $993,115.83.

**R.    Count 18: Conspiracy to Commit Fraud (against RAM, Smith, FirstCapital and the Burgess Defendants).**

214.    Plaintiff repeats and realleges the preceding paragraphs as if fully set forth herein.

215.    Each of these Defendants entered into an agreement among themselves and had a meeting of the minds to commit an unlawful act or a lawful act in an unlawful manner to accomplish the check-kiting scheme, which resulted in damages to Plaintiff of at least $993,115.83.

216.    As set forth above, in perpetrating the check-kiting scheme, RAM, through Smith, made material and false representations regarding the business and its use of overdrawn funds in its First Bank account.  Specifically, Smith represented that checks written, which caused RAM's account to be overdrawn, were used to pay off vehicles RAM had floored with First Bank, when in reality, those checks, upon information and belief, were part of RAM's check-kiting scheme.

**PLAINTIFF'S THIRD AMENDED COMPLAINT**
**AND APPLICATION FOR WRIT OF SEQUESTRATION – PAGE 51**

Smith also misrepresented that the Reagor-Dykes Auto Group was financially sound and profitable.

217.    Smith knew that these representations were false when he made them, or he made them recklessly, as a positive assertion without knowledge of their truth.  He made them with the intent that First Bank act on them by providing RAM access to funds it did not actually have in its First Bank account.

218.    First Bank relied on RAM's misrepresentations by continuing to provide RAM access to funds, which caused it damages of at least $993,115.83.

219.    Then, each of these defendants agreed to take advantage of the inside information provided by Dykes as part of the fraudulent scheme to ensure First Bank continued to provide provisional credit to RAM.  As set forth above, upon information and belief, Defendants knew of and helped facilitate the check-kiting scheme until learning that it would likely be discovered. Only then did FirstCapital and the Burgess Defendants pick a day to freeze or set off RAM's funds and returned all checks First Bank presented to FirstCapital for payment and simultaneously sent checks drawn on RAM's First Bank account for payment by First Bank, even though they knew the funds at First Bank that would pay those checks would never be sufficient because FirstCapital froze or set off RAM's funds. In other words, Defendants facilitated the check-kiting scheme until they knew it would be discovered by others, did not freeze the account when they first suspected the check kiting, but waited to freeze the account at a time that would minimize their losses and maximize First Bank's losses, thereby defrauding Plaintiff out of at least $993,115.83.

220.     Defendants also had a meeting of the minds on another object or course of action, which was to induce First Bank to provide RAM access to funds through its First Bank account, knowing that FirstCapital would not honor the items subsequently presented for payment by First Bank against the balance established by First Bank's payment in good faith of checks presented by FirstCapital.

221.     As a proximate result of Defendants' common scheme and the acts done in furtherance of it, *i.e.*, by facilitating rather than stopping the scheme as long as Defendants felt no one would discover it, First Bank was injured resulting in damages of at least $993,115.83.

S.     **Count 19: Aiding and Abetting Fraud (against RAM, Smith, FirstCapital and the Burgess Defendants).**

222.     Plaintiff repeats and realleges the preceding paragraphs as if fully set forth herein.

223.     Specifically, each of these defendants agreed to take advantage of the inside information provided by Dykes to aid and abet the fraudulent scheme with the intention that First Bank would continue to provide provisional credit to RAM.   As set forth above, upon information and belief, Defendants knew of and helped facilitate the RAM check-kiting scheme before ultimately putting a stop to it.   Once Defendants suspected the scheme would be discovered, FirstCapital and the Burgess Defendants waited to freeze the account until a time that would minimize their losses and maximize First Bank's losses, and returned all checks First Bank presented to FirstCapital for payment and simultaneously sent checks drawn on RAM's First Bank account for payment by First Bank, even though they knew the funds at First Bank that would pay those checks would never be sufficient because FirstCapital froze or set off

RAM's funds. Defendants facilitated the check-kiting scheme until they knew it would be discovered by others, thereby defrauding Plaintiff out of at least $993,115.83.

224.    Each of these defendants aided and abetted the check-kiting scheme, giving substantial assistance in defrauding Plaintiff, and their actions were a substantial factor in causing the fraud on Plaintiff.

225.    As a proximate result of FirstCapital and the Burgess Defendants' acts, First Bank was injured resulting in damages of at least $993,115.83.

**T.    Count 20: Conversion (against FirstCapital).**

226.    Plaintiff repeats and realleges the preceding paragraphs as if fully set forth herein.

227.    Plaintiff held a security interest in the vehicles being sold by RAM.  Plaintiff therefore held a security interest in the proceeds from the sale of those vehicles.

228.    RAM sold dozens of vehicles in which Plaintiff held a security interest.  Those sales were out of trust and RAM failed and refused to pay the proceeds of those sales to Plaintiff.

229.    On information and belief, the proceeds from those sales were deposited into accounts held at FirstCapital.  As such, FirstCapital has unlawfully and without Plaintiff's authorization assumed and exercised dominion and control over the property to the exclusion of, or inconsistent with, Plaintiff's ownership rights.

230.    Despite Plaintiff's security interest in the proceeds from those sales, and Plaintiff's demand for the return of such proceeds, FirstCapital has not paid those proceeds to Plaintiff.

231.    As a proximate result of FirstCapital's acts, Plaintiff has suffered potential damages of approximately $1,400,000.00.

**U.**    **Count 21: Money Had and Received (against FirstCapital).**

232.    Plaintiff repeats and realleges the preceding paragraphs as if fully set forth herein.

233.    Plaintiff held a security interest in the vehicles being sold by RAM.  Plaintiff therefore held a security interest in the proceeds from the sale of those vehicles.

234.    RAM sold dozens of vehicles in which Plaintiff held a security interest.  Those sales were out of trust and RAM failed and refused to pay the proceeds of those sales to Plaintiff.

235.    On information and belief, the proceeds from those sales were deposited into accounts held at FirstCapital.

236.    Plaintiff held a security interest in the proceeds from those sales.  However, FirstCapital has not paid those proceeds to Plaintiff.  This money belongs to Plaintiff in equity and good conscience.

237.    As a proximate result of FirstCapital's acts, Plaintiff has suffered potential damages of approximately $1,400,000.00.

**V.**    **Count 22: Marshaling (against FirstCapital).**

238.    Plaintiff repeats and realleges the preceding paragraphs as if fully set forth herein.

239.    In the alternative, to the extent that a Court determines that FirstCapital held a security interest in the proceeds of the vehicles sold out of trust by RAM and deposited into account(s) at FirstCapital, and FirstCapital's security interest was senior to Plaintiff's security interest, FirstCapital may not satisfy its debts against those proceeds.

240.    Plaintiff and FirstCapital were both secured creditors with claims against a common debtor, RAM.

**PLAINTIFF'S THIRD AMENDED COMPLAINT**
**AND APPLICATION FOR WRIT OF SEQUESTRATION – PAGE 55**

241.    To the extent that FirstCapital was a senior secured creditor, it also had a security interest in other collateral sources beyond the inventory vehicles.

242.    Plaintiff did not hold a security interest in those other sources of collateral.

243.    Accordingly, FirstCapital should be prohibited from marshaling its claims against RAM and should proceed against its other sources of collateral, releasing the proceeds from the sales of the inventory vehicles to Plaintiff.

244.    Neither FirstCapital nor any third parties would be unduly prejudiced by marshaling.

## VI.
## EXEMPLARY DAMAGES

245.    Plaintiff's damages resulted from RAM, Smith, FirstCapital, and the Burgess Defendants' participation in fraud, which entitles Plaintiff to exemplary damages under TEXAS CIVIL PRACTICE AND REMEDIES CODE § 41.003(a).

## VII.
## ATTORNEYS' FEES AND COSTS

246.    Pursuant to Chapter 38 of the TEX. CIV. PRAC. & REM. CODE, the Business Loan Agreements, the Promissory Notes, the Commercial Security Agreements, the Commercial Guaranties, and the Account Agreement, Plaintiff is entitled to recover its reasonable and necessary attorneys' fees and costs.

## VIII.
## CONDITIONS PRECEDENT

247.    All conditions precedent necessary to the relief sought herein have occurred or have been performed.

**PLAINTIFF'S THIRD AMENDED COMPLAINT**
**AND APPLICATION FOR WRIT OF SEQUESTRATION – PAGE 56**

# IX.
# PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Plaintiff respectfully prays that:

1.    Defendants be cited to appear and answer;

2.    The Court set Plaintiff's Application for Writ of Sequestration for hearing on the nearest available date and time;

3.    A writ of sequestration be issued for the collateral identified in the Townsend Affidavit and incorporated by reference herein;

4.    Plaintiff be granted possession of collateral identified in the Townsend Affidavit and incorporated by reference herein;

5.    Plaintiff be granted judgment against Defendants for damages in an amount to be determined by the trier of fact;

6.    Exemplary damages to be proven at trial on all issues available;

7.    Attorneys' fees and costs;

8.    Pre- and post-judgment interest at the highest rate allowed by law; and

9.    Such other and further relief to which Plaintiff may show itself entitled.

Respectfully submitted,


**STINSON LEONARD STREET LLP**

By: */s/ Paul B. Lackey*
Paul B. Lackey
State Bar. No. 00791061
paul.lackey@stinson.com
Michael P. Aigen
State Bar No. 24012196
michael.aigen@stinson.com
Matthew R. Miller
State Bar No. 24013165
matt.miller@stinson.com

3102 Oak Lawn Avenue, Suite 777

**PLAINTIFF'S THIRD AMENDED COMPLAINT**
**AND APPLICATION FOR WRIT OF SEQUESTRATION – PAGE 57**

Dallas, Texas 75219-4259
Telephone: (214) 560-2201
Telecopier: (214) 560-2203

**ATTORNEYS FOR PLAINTIFF FIRST
BANK & TRUST**

## <u>CERTIFICATE OF SERVICE</u>

I certify that on March 1, 2019, a true and correct copy of the foregoing document was served on all counsel of record via the Court's electronic filing system.

*/s/ Matthew R. Miller*
Matthew R. Miller

# EXHIBIT A

*000000001009B18697%0070%09292017%00000000RAA2564*

## BUSINESS LOAN AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $1,000,000.00 | 09-29-2017 | 10-01-2018 | 1009B18697 | 4A / 45 | RAA2564 | JET | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "****" has been omitted due to text length limitations.

**Borrower:**  Reagor Auto Mall, Ltd., dba Reagor-Dykes of
Levelland (TIN: 20-0275022)
1215 Ave. J
Lubbock, TX 79401

**Lender:**  First Bank & Trust
First Bank & Trust- South
7808 Indiana Ave
Lubbock, TX 79423
(806) 776-0800

THIS BUSINESS LOAN AGREEMENT dated September 29, 2017, is made and executed between Reagor Auto Mall, Ltd., dba Reagor-Dykes of Levelland ("Borrower") and First Bank & Trust ("Lender") on the following terms and conditions. Borrower has received prior commercial loans from Lender or has applied to Lender for a commercial loan or loans or other financial accommodations, including those which may be described on any exhibit or schedule attached to this Agreement. Borrower understands and agrees that: (A) in granting, renewing, or extending any Loan, Lender is relying upon Borrower's representations, warranties, and agreements as set forth in this Agreement; (B) the granting, renewing, or extending of any Loan by Lender at all times shall be subject to Lender's sole judgment and discretion; and (C) all such Loans shall be and remain subject to the terms and conditions of this Agreement.

**TERM.** This Agreement shall be effective as of September 29, 2017, and shall continue in full force and effect until such time as all of Borrower's Loans in favor of Lender have been paid in full, including principal, interest, costs, expenses, attorneys' fees, and other fees and charges, or until October 1, 2018.

**CONDITIONS PRECEDENT TO EACH ADVANCE.** Lender's obligation to make the initial Advance and each subsequent Advance under this Agreement shall be subject to the fulfillment to Lender's satisfaction of all of the conditions set forth in this Agreement and in the Related Documents.

**Loan Documents.** Borrower shall provide to Lender the following documents for the Loan: (1) the Note; (2) Security Agreements granting to Lender security interests in the Collateral; (3) financing statements and all other documents perfecting Lender's Security interests; (4) evidence of insurance as required below; (5) guaranties; (6) together with all such Related Documents as Lender may require for the Loan; all in form and substance satisfactory to Lender and Lender's counsel.

**Borrower's Authorization.** Borrower shall have provided in form and substance satisfactory to Lender properly certified resolutions, duly authorizing the execution and delivery of this Agreement, the Note and the Related Documents. In addition, Borrower shall have provided such other resolutions, authorizations, documents and instruments as Lender or its counsel, may require.

**Payment of Fees and Expenses.** Borrower shall have paid to Lender all fees, charges, and other expenses which are then due and payable as specified in this Agreement or any Related Document.

**Representations and Warranties.** The representations and warranties set forth in this Agreement, in the Related Documents, and in any document or certificate delivered to Lender under this Agreement are true and correct.

**No Event of Default.** There shall not exist at the time of any Advance a condition which would constitute an Event of Default under this Agreement or under any Related Document.

**REPRESENTATIONS AND WARRANTIES.** Borrower represents and warrants to Lender, as of the date of this Agreement, as of the date of each disbursement of loan proceeds, as of the date of any renewal, extension or modification of any Loan, and at all times any Indebtedness exists:

**Organization.** Borrower is a limited partnership which is, and at all times shall be, duly organized, validly existing, and in good standing under and by virtue of the laws of the State of Texas. Borrower is duly authorized to transact business in all other states in which Borrower is doing business, having obtained all necessary filings, governmental licenses and approvals for each state in which Borrower is doing business. Specifically, Borrower is, and at all times shall be, duly qualified as a foreign limited partnership in all states in which the failure to so qualify would have a material adverse effect on its business or financial condition. Borrower has the full power and authority to own its properties and to transact the business in which it is presently engaged or presently proposes to engage. Borrower maintains an office at 1215 Ave. J, Lubbock, TX 79401. Unless Borrower has designated otherwise in writing, the principal office is the office at which Borrower keeps its books and records including its records concerning the Collateral. Borrower will notify Lender prior to any change in the location of Borrower's principal office address or any change in Borrower's name. Borrower shall do all things necessary to preserve and to keep in full force and effect its existence, rights and privileges, and shall comply with all regulations, rules, ordinances, statutes, orders and decrees of any governmental or quasi-governmental authority or court applicable to Borrower and Borrower's business activities.

**Assumed Business Names.** Borrower has filed or recorded all documents or filings required by law relating to all assumed business names used by Borrower. Excluding the name of Borrower, the following is a complete list of all assumed business names under which Borrower does business: None.

**Authorization.** Borrower's execution, delivery, and performance of this Agreement and all the Related Documents have been duly authorized by all necessary action by Borrower and do not conflict with, result in a violation of, or constitute a default under (1) any provision of (a) Borrower's articles or agreements of partnership, or (b) any agreement or other instrument binding upon Borrower or (2) any law, governmental regulation, court decree, or order applicable to Borrower or to Borrower's properties.

**Financial Information.** Each of Borrower's financial statements supplied to Lender truly and completely disclosed Borrower's financial condition as of the date of the statement, and there has been no material adverse change in Borrower's financial condition subsequent to the date of the most recent financial statement supplied to Lender. Borrower has no material contingent obligations except as disclosed in such financial statements.

**Legal Effect.** This Agreement constitutes, and any instrument or agreement Borrower is required to give under this Agreement when delivered will constitute legal, valid, and binding obligations of Borrower enforceable against Borrower in accordance with their respective terms.

**Properties.** Except as contemplated by this Agreement or as previously disclosed in Borrower's financial statements or in writing to Lender and as accepted by Lender, and except for property tax liens for taxes not presently due and payable, Borrower owns and has good title to all of Borrower's properties free and clear of all Security Interests, and has not executed any security documents or financing statements relating to such properties. All of Borrower's properties are titled in Borrower's legal name, and Borrower has not used any other name or filed under any other name for the last five (5) years.

**Hazardous Substances.** Except as disclosed to and acknowledged by Lender in writing, Borrower represents and warrants that: (1) During the period of Borrower's ownership of the Collateral, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance by any person on, under, about or from any of the Collateral. (2) Borrower has no knowledge of, or reason to believe that there has been (a) any breach or violation of any Environmental Laws; (b) any use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance on, under, about or from the Collateral by any prior owners or occupants of any of the Collateral; or (c) any actual or threatened litigation or claims of any kind by any person relating to such matters. (3) Neither Borrower nor any tenant, contractor, agent or other authorized user of any of the Collateral shall use, generate, manufacture, store, treat, dispose of or release any Hazardous Substance on, under, about or from any of the Collateral; and any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations, and ordinances, including without limitation all Environmental Laws. Borrower authorizes Lender and its agents to enter upon the Collateral to make such inspections and tests as Lender may deem appropriate to determine compliance of the Collateral with this section of the Agreement. Any inspections or tests made by Lender shall be at Borrower's expense and for Lender's purposes only and shall not be construed to create any responsibility or liability on the part of Lender to Borrower or to any other person. The representations and warranties contained herein are based on Borrower's due diligence in investigating the Collateral for hazardous waste and Hazardous Substances. Borrower hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Borrower becomes liable for cleanup or other costs under any such laws, and (2) agrees to indemnify, defend, and hold harmless Lender against any and all claims, losses, liabilities, damages, penalties, and expenses which Lender may directly or indirectly sustain or suffer resulting from a breach of this section of the Agreement or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release of a hazardous waste or substance on the Collateral. The provisions of this section of the Agreement,

## BUSINESS LOAN AGREEMENT
### (Continued)

Loan No: 1009818597                                                          Page 2

including the obligation to indemnify and defend, shall survive the payment of the Indebtedness and the termination, expiration or satisfaction of this Agreement and shall not be affected by Lender's acquisition of any interest in any of the Collateral, whether by foreclosure or otherwise.

**Litigation and Claims.**  No litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Borrower is pending or threatened, and no other event has occurred which may materially adversely affect Borrower's financial condition or properties, other than litigation, claims, or other events, if any, that have been disclosed to and acknowledged by Lender in writing.

**Taxes.**  To the best of Borrower's knowledge, all of Borrower's tax returns and reports that are or were required to be filed, have been filed, and all taxes, assessments and other governmental charges have been paid in full, except those presently being or to be contested by Borrower in good faith in the ordinary course of business and for which adequate reserves have been provided.

**Lien Priority.**  Unless otherwise previously disclosed to Lender in writing, Borrower has not entered into or granted any Security Agreements, or permitted the filing or attachment of any Security Interests on or affecting any of the Collateral directly or indirectly securing repayment of Borrower's Loan and Note, that would be prior or that may in any way be superior to Lender's Security Interests and rights in and to such Collateral.

**Binding Effect.**  This Agreement, the Note, all Security Agreements (if any), and all Related Documents are binding upon the signers thereof, as well as upon their successors, representatives and assigns, and are legally enforceable in accordance with their respective terms.

**AFFIRMATIVE COVENANTS.**  Borrower covenants and agrees with Lender that, so long as this Agreement remains in effect, Borrower will:

**Notices of Claims and Litigation.**  Promptly inform Lender in writing of (1) all material adverse changes in Borrower's financial condition, and (2) all existing and all threatened litigation, claims, investigations, administrative proceedings or similar actions affecting Borrower or any Guarantor which could materially affect the financial condition of Borrower or the financial condition of any Guarantor.

**Financial Records.**  Maintain its books and records in accordance with GAAP, applied on a consistent basis, and permit Lender to examine and audit Borrower's books and records at all reasonable times.

**Financial Statements.**  Furnish Lender with the following:

**Interim Statements.**  As soon as available, but in no event later than thirty (30) days after the end of each fiscal quarter, Borrower's balance sheet and profit and loss statement for the period ended, prepared by Borrower in form satisfactory to Lender.

**Tax Returns.**  As soon as available after the applicable filing date for the tax reporting period ended, Borrower's Federal and other governmental tax returns, prepared by a tax professional satisfactory to Lender.

**Additional Requirements.**
**Annual Statements.**  As soon as available or by September 30th of each fiscal year, Borrower's balance sheet and income statement for the year ended, audited by a certified public accountant satisfactory to lender.

**Inventory Listing.**  As soon as available after the end of each fiscal month, company prepared in form satisfactory to Lender

**Guarantor(s)** agrees to furnish Lender with the following:

**Annual Statements.**  As soon as available after the end of each fiscal year, Guarantor's balance sheet and income statement for the year ended, prepared by Guarantor in form satisfactory to Lender

**Tax Returns.**  As soon as available after the applicable filing date for the tax reporting period ended, Federal and other governmental tax returns, prepared by a tax professional satisfactory to Lender .

All financial reports required to be provided under this Agreement shall be prepared in accordance with GAAP, applied on a consistent basis, and certified by Borrower as being true and correct.

**Additional Information.**  Furnish such additional information and statements, as Lender may request from time to time.

**Additional Requirements.**
**Minimum Annual DSCR: 1.00X** after distribution debt service coverage ratio required for the companies on a consolidated basis measured quarterly.  Failure to meet requirement will result in all related debt increasing to a rate of FB&T base + 3 00%.  The DSCR will be calculated as:
Earnings before interest, depreciation, and amortization (EBIDA):
- Partner draws from equity
+ Partner contributions to equity
= Cash flow to service debt
Divided by annual debt service
= Debt Service Coverage Ratio

**Maximum Current Ratio:** Current ratio required at or above 1.00:1 including re-categorization of owner receivable to long-term assets.

**Curtailments:** 10% due at 90 days; 10% due every 30 days thereafter until paid in full

**Flooring Fee: $25 fee per floored item**

**Monthly Inspections:** Monthly inspections of all units.

**Insurance.**  Maintain fire and other risk insurance, public liability insurance, and such other insurance as Lender may require with respect to Borrower's properties and operations, in form, amounts, and coverages reasonably acceptable to Lender and by insurance companies authorized to transact business in Texas.  BORROWER MAY FURNISH THE INSURANCE REQUIRED BY THIS AGREEMENT WHETHER THROUGH EXISTING POLICIES OWNED OR CONTROLLED BY BORROWER OR THROUGH EQUIVALENT COVERAGE FROM ANY INSURANCE COMPANY AUTHORIZED TO TRANSACT BUSINESS IN TEXAS.  Borrower, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least thirty (30) days prior written notice to Lender.  Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Borrower or any other person.  In connection with all policies covering assets in which Lender holds or is offered a security interest for the Loans, Borrower will provide Lender with such lender's loss payable or other endorsements as Lender may require.

**Insurance Reports.**  Furnish to Lender, upon request of Lender, reports on each existing insurance policy showing such information as Lender may reasonably request, including without limitation the following:  (1) the name of the insurer;  (2) the risks insured;  (3) the amount of the policy;  (4) the properties insured;  (5) the then current property values on the basis of which insurance has been obtained, and the manner of determining those values; and  (6) the expiration date of the policy.  In addition, upon request of Lender (however not more often than annually), Borrower will have an independent appraiser satisfactory to Lender determine, as applicable, the actual cash value or replacement cost of any Collateral.  The cost of such appraisal shall be paid by Borrower.

**Guaranties.**  Prior to disbursement of any Loan proceeds, furnish executed guaranties of the Loans in favor of Lender, executed by the guarantors named below, on Lender's forms, and in the amounts and under the conditions set forth in those guaranties.

| Names of Guarantors | Amounts |
| --- | --- |
| Bart Reagor | Unlimited |
| Rick Dykes | Unlimited |

**Other Agreements.**  Comply with all terms and conditions of all other agreements, whether now or hereafter existing, between Borrower and any other party and notify Lender immediately in writing of any default in connection with any other such agreements.

**Loan Proceeds.**  Use all Loan proceeds solely for Borrower's business operations, unless specifically consented to the contrary by Lender in writing.

**Taxes, Charges and Liens.**  Pay and discharge when due all of its Indebtedness and obligations, including without limitation all assessments, taxes, governmental charges, levies and liens, of every kind and nature, imposed upon Borrower or its properties, income, or profits, prior to the date on which penalties would attach, and all lawful claims that, if unpaid, might become a lien or charge upon any of Borrower's properties, income, or profits.  Provided however, Borrower will not be required to pay and discharge any such assessment, tax, charge, levy, lien or claim so long as  (1) the legality of the same shall be contested in good faith by appropriate proceedings, and  (2) Borrower shall have established on Borrower's books adequate reserves with respect to such contested assessment, tax, charge, levy, lien, or claim in accordance with GAAP.

# BUSINESS LOAN AGREEMENT
## (Continued)

**Performance.** Perform and comply, in a timely manner, with all terms, conditions, and provisions set forth in this Agreement, in the Related Documents, and in all other instruments and agreements between Borrower and Lender. Borrower shall notify Lender immediately in writing of any default in connection with any agreement.

**Operations.** Maintain executive and management personnel with substantially the same qualifications and experience as the present executive and management personnel; provide written notice to Lender of any change in executive and management personnel; conduct its business affairs in a reasonable and prudent manner.

**Environmental Studies.** Promptly conduct and complete, at Borrower's expense, all such investigations, studies, samplings and testings as may be requested by Lender or any governmental authority relative to any substance, or any waste or by-product of any substance defined as toxic or a hazardous substance under applicable federal, state, or local law, rule, regulation, order or directive, at or affecting any property or any facility owned, leased or used by Borrower.

**Compliance with Governmental Requirements.** Comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the conduct of Borrower's properties, businesses and operations, and to the use or occupancy of the Collateral, including without limitation, the Americans With Disabilities Act. Borrower may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Borrower has notified Lender in writing prior to doing so and so long as, in Lender's sole opinion, Lender's interests in the Collateral are not jeopardized. Lender may require Borrower to post adequate security or a surety bond, reasonably satisfactory to Lender, to protect Lender's interest.

**Inspection.** Permit employees or agents of Lender at any reasonable time to inspect any and all Collateral for the Loan or Loans and Borrower's other properties and to examine or audit Borrower's books, accounts, and records and to make copies and memoranda of Borrower's books, accounts, and records. If Borrower now or at any time hereafter maintains any records (including without limitation computer generated records and computer software programs for the generation of such records) in the possession of a third party, Borrower, upon request of Lender, shall notify such party to permit Lender free access to such records at all reasonable times and to provide Lender with copies of any records it may request, all at Borrower's expense.

**Compliance Certificates.** Unless waived in writing by Lender, provide Lender at least annually, with a certificate executed by Borrower's chief financial officer, or other officer or person acceptable to Lender, certifying that the representations and warranties set forth in this Agreement are true and correct as of the date of the certificate and further certifying that, as of the date of the certificate, no Event of Default exists under this Agreement.

**Environmental Compliance and Reports.** Borrower shall comply in all respects with any and all Environmental Laws; not cause or permit to exist, as a result of an intentional or unintentional action or omission on Borrower's part or on the part of any third party, on property owned and/or occupied by Borrower, any environmental activity where damage may result to the environment, unless such environmental activity is pursuant to and in compliance with the conditions of a permit issued by the appropriate federal, state or local governmental authorities; shall furnish to Lender promptly and in any event within thirty (30) days after receipt thereof a copy of any notice, summons, lien, citation, directive, letter or other communication from any governmental agency or instrumentality concerning any intentional or unintentional action or omission on Borrower's part in connection with any environmental activity whether or not there is damage to the environment and/or other natural resources.

**Additional Assurances.** Make, execute and deliver to Lender such promissory notes, mortgages, deeds of trust, security agreements, assignments, financing statements, instruments, documents and other agreements as Lender or its attorneys may reasonably request to evidence and secure the Loans and to perfect all Security Interests.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Borrower fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Borrower's failure to discharge or pay when due any amounts Borrower is required to discharge or pay under this Agreement or any Related Documents, Lender on Borrower's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on any Collateral and paying all costs for insuring, maintaining and preserving any Collateral. All such expenditures paid by Lender for such purposes will then bear interest at the Note rate from the date paid by Lender to the date of repayment by Borrower. To the extent permitted by applicable law, all such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity.

**NEGATIVE COVENANTS.** Borrower covenants and agrees with Lender that while this Agreement is in effect, Borrower shall not, without the prior written consent of Lender:

**Indebtedness and Liens.** (1) Except for trade debt incurred in the normal course of business and indebtedness to Lender contemplated by this Agreement, create, incur or assume indebtedness for borrowed money, including capital leases, (2) sell, transfer, mortgage, assign, pledge, lease, grant a security interest in, or encumber any of Borrower's assets (except as allowed as Permitted Liens), or (3) sell with recourse any of Borrower's accounts, except to Lender.

**Continuity of Operations.** (1) Engage in any business activities substantially different than those in which Borrower is presently engaged, (2) cease operations, liquidate, merge, transfer, acquire or consolidate with any other entity, change its name, dissolve or transfer or sell Collateral out of the ordinary course of business, or (3) make any distribution with respect to any capital account, whether by reduction of capital or otherwise.

**Loans, Acquisitions and Guaranties.** (1) Loan, invest in or advance money or assets to any other person, enterprise or entity, (2) purchase, create or acquire any interest in any other enterprise or entity, or (3) incur any obligation as surety or guarantor other than in the ordinary course of business.

**Agreements.** Enter into any agreement containing any provisions which would be violated or breached by the performance of Borrower's obligations under this Agreement or in connection herewith.

**CESSATION OF ADVANCES.** If Lender has made any commitment to make any Loan to Borrower, whether under this Agreement or under any other agreement, Lender shall have no obligation to make Loan Advances or to disburse Loan proceeds if: (A) Borrower or any Guarantor is in default under the terms of this Agreement or any of the Related Documents or any other agreement that Borrower or any Guarantor has with Lender; (B) Borrower or any Guarantor dies, becomes incompetent or becomes insolvent, files a petition in bankruptcy or similar proceedings, or is adjudged a bankrupt; (C) there occurs a material adverse change in Borrower's financial condition, in the financial condition of any Guarantor, or in the value of any Collateral securing any Loan; or (D) any Guarantor seeks, claims or otherwise attempts to limit, modify or revoke such Guarantor's guaranty of the Loan or any other loan with Lender; or (E) Lender in good faith deems itself insecure, even though no Event of Default shall have occurred.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the Indebtedness against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

**DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement:

**Payment Default.** Borrower fails to make any payment when due under the Loan.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Death or Insolvency.** The dissolution or termination of Borrower's existence as a going business or the death of any partner, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Defective Collateralization.** This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the Loan.

**BUSINESS LOAN AGREEMENT**
**(Continued)**

Loan No: 1009818597

Page 4

This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Events Affecting General Partner of Borrower.** Any of the preceding events occurs with respect to any general partner of Borrower or any general partner dies or becomes incompetent.

**Change in Ownership.** The resignation or expulsion of any general partner with an ownership interest of twenty-five percent (25%) or more in Borrower.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of the Loan is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**Right to Cure.** If any default, other than a default on Indebtedness, is curable and if Borrower or Grantor, as the case may be, has not been given a notice of a similar default within the preceding twelve (12) months, it may be cured if Borrower or Grantor, as the case may be, after Lender sends written notice to Borrower or Grantor, as the case may be, demanding cure of such default: (1) cure the default within thirty (30) days; or (2) if the cure requires more than thirty (30) days, immediately initiate steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continue and complete all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**EFFECT OF AN EVENT OF DEFAULT.** If any Event of Default shall occur, except where otherwise provided in this Agreement or the Related Documents, all commitments and obligations of Lender under this Agreement or the Related Documents or any other agreement immediately will terminate (including any obligation to make further Loan Advances or disbursements), and, at Lender's option, all Indebtedness immediately will become due and payable, all without notice of any kind to Borrower, except that in the case of an Event of Default of the type described in the "Insolvency" subsection above, such acceleration shall be automatic and not optional. In addition, Lender shall have all the rights and remedies provided in the Related Documents or available at law, in equity, or otherwise. Except as may be prohibited by applicable law, all of Lender's rights and remedies shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Borrower or of any Grantor shall not affect Lender's right to declare a default and to exercise its rights and remedies.

**ORIGINAL DOCUMENT.** "The parties whose signatures appear below agree that a photographic, photostatic, facsimile, copy or similar reproduction of this document shall be valid as the original.".

**CANCELLATION PROVISION.** "Notwithstanding anything to the contrary contained in this Loan Agreement or the Related Documents this Loan may be cancelled at any time and for any reason in the sole discretion of Lender and Lender shall have no obligation to make any additional Advances thereafter. Lender shall so notify Borrower of Lender's decision to cancel the loan, which notification shall be immediately effective or effective at the time stated therein if another effective time is stated in the notice. All Advances made prior to the cancellation of the Loan shall remain payable pursuant to the terms of the Loan Agreement and the Related Documents.".

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement:

**Amendments.** This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.** Borrower agrees to pay upon demand all of Lender's costs and expenses, including Lender's reasonable attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement. Lender may hire or pay someone else to help enforce this Agreement, and Borrower shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's reasonable attorneys' fees and legal expenses whether or not there is a lawsuit, including Lender's reasonable attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Borrower also shall pay all court costs and such additional fees as may be directed by the court.

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Consent to Loan Participation.** Borrower agrees and consents to Lender's sale or transfer, whether now or later, of one or more participation interests in the Loan to one or more purchasers, whether related or unrelated to Lender. Lender may provide, without any limitation whatsoever, to any one or more purchasers, or potential purchasers, any information or knowledge Lender may have about Borrower or about any other matter relating to the Loan, and Borrower hereby waives any rights to privacy Borrower may have with respect to such matters. Borrower additionally waives any and all notices of sale of participation interests, as well as all notices of any repurchase of such participation interests. Borrower also agrees that the purchasers of any such participation interests will be considered as the absolute owners of such interests in the Loan and will have all the rights granted under the participation agreement or agreements governing the sale of such participation interests. Borrower further waives all rights of offset or counterclaim that it may have now or later against Lender or against any purchaser of such a participation interest and unconditionally agrees that either Lender or such purchaser may enforce Borrower's obligation under the Loan irrespective of the failure or insolvency of any holder of any interest in the Loan. Borrower further agrees that the purchaser of any such participation interests may enforce its interests irrespective of any personal claims or defenses that Borrower may have against Lender.

**Governing Law.** This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Texas without regard to its conflicts of law provisions. This Agreement has been accepted by Lender in the State of Texas.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Borrower, or between Lender and any Grantor, shall constitute a waiver of any of Lender's rights or of any of Borrower's or any Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Notices.** Any notice required to be given under this Agreement shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Agreement. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Borrower agrees to keep Lender informed at all times of Borrower's current address. Unless otherwise provided or required by law, if there is more than one Borrower, any notice given by Lender to any Borrower is deemed to be notice given to all Borrowers.

**Payment of Interest and Fees.** Notwithstanding any other provision of this Agreement or any provision of any Related Document, Borrower does not agree or intend to pay, and Lender does not agree or intend to charge, collect, take, reserve or receive (collectively referred to herein as "charge or collect"), any amount in the nature of interest or in the nature of a fee for the Loan which would in any way or event (including interest, prepayment, or acceleration) cause Lender to contract for, charge or collect more for the Loan than the maximum Lender would be permitted to charge or collect by any applicable federal or Texas state law. Any such excess interest or unauthorized fee shall, instead of anything stated to the contrary, be applied first to reduce the unpaid principal balance of the Loan, and when the principal has been paid in full, be refunded to Borrower.

**Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

**Subsidiaries and Affiliates of Borrower.** To the extent the context of any provisions of this Agreement makes it appropriate, including

**BUSINESS LOAN AGREEMENT**
**(Continued)**

without limitation any representation, warranty or covenant, the word "Borrower" as used in this Agreement shall include all of Borrower's subsidiaries and affiliates. Notwithstanding the foregoing however, under no circumstances shall this Agreement be construed to require Lender to make any Loan or other financial accommodation to any of Borrower's subsidiaries or affiliates.

**Successors and Assigns.** All covenants and agreements by or on behalf of Borrower contained in this Agreement or any Related Documents shall bind Borrower's successors and assigns and shall inure to the benefit of Lender and its successors and assigns. Borrower shall not, however, have the right to assign Borrower's rights under this Agreement or any interest therein, without the prior written consent of Lender.

**Survival of Representations and Warranties.** Borrower understands and agrees that in extending Loan Advances, Lender is relying on all representations, warranties, and covenants made by Borrower in this Agreement or in any certificate or other instrument delivered by Borrower to Lender under this Agreement or the Related Documents. Borrower further agrees that regardless of any investigation made by Lender, all such representations, warranties and covenants will survive the extension of Loan Advances and delivery to Lender of the Related Documents, shall be continuing in nature, shall be deemed made and redated by Borrower at the time each Loan Advance is made, and shall remain in full force and effect until such time as Borrower's Indebtedness shall be paid in full, or until this Agreement shall be terminated in the manner provided above, whichever is the last to occur.

**Time is of the Essence.** Time is of the essence in the performance of this Agreement.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code. Accounting words and terms not otherwise defined in this Agreement shall have the meanings assigned to them in accordance with generally accepted accounting principles as in effect on the date of this Agreement:

**Advance.** The word "Advance" means a disbursement of Loan funds made, or to be made, to Borrower or on Borrower's behalf on a line of credit or multiple advance basis under the terms and conditions of this Agreement.

**Agreement.** The word "Agreement" means this Business Loan Agreement, as this Business Loan Agreement may be amended or modified from time to time, together with all exhibits and schedules attached to this Business Loan Agreement from time to time.

**Borrower.** The word "Borrower" means Reagor Auto Mall, Ltd., dba Reagor-Dykes of Levelland and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Collateral.** The word "Collateral" means all property and assets granted as collateral security for a Loan, whether real or personal property, whether granted directly or indirectly, whether granted now or in the future, and whether granted in the form of a security interest, mortgage, collateral mortgage, deed of trust, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien, charge, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever, whether created by law, contract, or otherwise.

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Agreement in the default section of this Agreement.

**GAAP.** The word "GAAP" means generally accepted accounting principles.

**Grantor.** The word "Grantor" means each and all of the persons or entities granting a Security Interest in any Collateral for the Loan, including without limitation all Borrowers granting such a Security Interest.

**Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Loan.

**Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Indebtedness.** The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Borrower is responsible under this Agreement or under any of the Related Documents.

**Lender.** The word "Lender" means First Bank & Trust, its successors and assigns.

**Loan.** The word "Loan" means any and all loans and financial accommodations from Lender to Borrower whether now or hereafter existing, and however evidenced, including without limitation those loans and financial accommodations described herein or described on any exhibit or schedule attached to this Agreement from time to time.

**Note.** The word "Note" means the Note dated September 29, 2017 and executed by Reagor Auto Mall, Ltd., dba Reagor-Dykes of Levelland in the principal amount of $1,000,000.00, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the note or credit agreement.

**Permitted Liens.** The words "Permitted Liens" mean (1) liens and security interests securing Indebtedness owed by Borrower to Lender; (2) liens for taxes, assessments, or similar charges either not yet due or being contested in good faith; (3) liens of materialmen, mechanics, warehousemen, or carriers, or other like liens arising in the ordinary course of business and securing obligations which are not yet delinquent; (4) purchase money liens or purchase money security interests upon or in any property acquired or held by Borrower in the ordinary course of business to secure indebtedness outstanding on the date of this Agreement or permitted to be incurred under the paragraph of this Agreement titled "Indebtedness and Liens"; (5) liens and security interests which, as of the date of this Agreement, have been disclosed to and approved by the Lender in writing; and (6) those liens and security interests which in the aggregate constitute an immaterial and insignificant monetary amount with respect to the net value of Borrower's assets.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Loan.

**Security Agreement.** The words "Security Agreement" mean and include without limitation any agreements, promises, covenants, arrangements, understandings or other agreements, whether created by law, contract, or otherwise, evidencing, governing, representing, or creating a Security Interest.

**Security Interest.** The words "Security Interest" mean, without limitation, any and all types of collateral security, present and future, whether in the form of a lien, charge, encumbrance, mortgage, deed of trust, security deed, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever whether created by law, contract, or otherwise.

**BUSINESS LOAN AGREEMENT**
**(Continued)**

Loan No: 1009818597                                                                                 Page 6

BORROWER ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS BUSINESS LOAN AGREEMENT AND BORROWER AGREES TO ITS TERMS. THIS BUSINESS LOAN AGREEMENT IS DATED SEPTEMBER 29, 2017.

BORROWER:

REAGOR AUTO MALL, LTD., DBA REAGOR-DYKES OF LEVELLAND

REAGOR AUTO MALL I, L.L.C., General Partner of Reagor Auto Mall, Ltd., dba Reagor-Dykes of Levelland

By: _____          By: _____
    Bart Reagor, Manager of Reagor Auto Mall I, L.L.C.        Rick Dykes, Manager of Reagor Auto Mall I, L.L.C.

LENDER:

FIRST BANK & TRUST

By: _____
    Jared Edward Townsend, Senior Vice President

LaserPro, Ver. 17.3.6.010  Copr. D+H USA Corporation 1997, 2017.  All Rights Reserved.  TX  Z:\CFI\LPL\C40.FC  TR-40250  PR-4

# EXHIBIT B

*000000001009818597%0955%09292017%00000000RAA2564*

# PROMISSORY NOTE

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|-----------|-----------|----------|---------|-------------|---------|---------|----------|
| $1,000,000.00 | 09-29-2017 | 10-01-2018 | 1009818597 | 4A / 46 | RAA2564 | JET | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "****" has been omitted due to text length limitations.

| Borrower: | Reagor Auto Mall, Ltd., dba Reagor-Dykes of | Lender: | First Bank & Trust |
| | Levelland (TIN: 20-0275022) | | First Bank & Trust- South |
| | 1215 Ave. J | | 7806 Indiana Ave |
| | Lubbock, TX 79401 | | Lubbock, TX 79423 |
| | | | (806) 776-0900 |

**Principal Amount: $1,000,000.00**                    **Date of Note: September 29, 2017**

**PROMISE TO PAY.** Reagor Auto Mall, Ltd., dba Reagor-Dykes of Levelland ("Borrower") promises to pay to First Bank & Trust ("Lender"), or order, in lawful money of the United States of America, the principal amount of One Million & 00/100 Dollars ($1,000,000.00) or so much as may be outstanding, together with interest on the unpaid outstanding principal balance of each advance. Interest shall be calculated from the date of each advance until repayment of each advance or maturity, whichever occurs first.

**CHOICE OF USURY CEILING AND INTEREST RATE.** The interest rate on this Note has been implemented under the "Weekly Ceiling" as referred to in Sections 303.002 and 303.003 of the Texas Finance Code.

**PAYMENT.** Borrower will pay this loan in full immediately upon Lender's demand. If no demand is made, Borrower will pay this loan in one payment of all outstanding principal plus all accrued unpaid interest on October 1, 2018. In addition, Borrower will pay regular monthly payments of all accrued interest due as of each payment date, beginning November 1, 2017, with all subsequent interest payments to be due on the same day of each month after that. Unless otherwise agreed or required by applicable law, payments will be applied first to any accrued unpaid interest; then to principal; then to any unpaid collection costs; and then to any late charges. Borrower will pay Lender at Lender's address shown above or at such other place as Lender may designate in writing. Notwithstanding any other provision of this Note, Lender will not charge interest on any undisbursed loan proceeds. No scheduled payment, whether of principal or interest or both, will be due unless sufficient loan funds have been disbursed by the scheduled payment date to justify the payment.

**VARIABLE INTEREST RATE.** The interest rate on this Note is subject to change from time to time based on changes in an index which is the First Bank & Trust Base Rate (the "Index"). The Index is not necessarily the lowest rate charged by Lender on its loans and is set by Lender in its sole discretion. If the Index becomes unavailable during the term of this loan, Lender may designate a substitute index after notifying Borrower. Lender will tell Borrower the current index rate upon Borrower's request. The interest rate change will not occur more often than each day. Borrower understands that Lender may make loans based on other rates as well. The Index currently is 5.750% per annum. Interest prior to maturity on the unpaid principal balance of this Note will be calculated as described in the "INTEREST CALCULATION METHOD" paragraph using a rate equal to the Index, adjusted if necessary for any minimum and maximum rate limitations described below, resulting in an initial rate of 6.125% per annum based on a year of 360 days. NOTICE: Under no circumstances will the interest rate on this Note be less than 6.125% per annum or more than (except for any higher default rate or Post Maturity Rate shown below) the lesser of 18.000% per annum or the maximum rate allowed by applicable law. For purposes of this Note, the "maximum rate allowed by applicable law" means the greater of (A) the maximum rate of interest permitted under federal or other law applicable to the indebtedness evidenced by this Note, or (B) the "Weekly Ceiling" as referred to in Sections 303.002 and 303.003 of the Texas Finance Code.

**INTEREST CALCULATION METHOD.** Interest on this Note is computed on a 365/360 basis; that is, by applying the ratio of the interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding, unless such calculation would result in a usurious rate, in which case interest shall be calculated on a per diem basis of a year of 365 or 366 days, as the case may be. All interest payable under this Note is computed using this method.

**PREPAYMENT.** Borrower agrees that all loan fees and other prepaid finance charges are earned fully as of the date of the loan and will not be subject to refund upon early payment (whether voluntary or as a result of default), except as otherwise required by law. Except for the foregoing, Borrower may pay without penalty all or a portion of the amount owed earlier than it is due. Prepayment in full shall consist of payment of the remaining unpaid principal balance together with all accrued and unpaid interest and all other amounts, costs and expenses for which Borrower is responsible under this Note or any other agreement with Lender pertaining to this loan, and in no event will Borrower ever be required to pay any unearned interest. Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments of accrued unpaid interest. Rather, early payments will reduce the principal balance due. Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language. If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Note, and Borrower will remain obligated to pay any further amount owed to Lender. All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to: First Bank & Trust, 9816 Slide Road Lubbock, TX 79424.

**LATE CHARGE.** If a payment is 10 days or more late, Borrower will be charged 5.000% of the regularly scheduled payment.

**POST MATURITY RATE.** The Post Maturity Rate on this Note is the lesser of (A) the maximum rate allowed by law or (B) 18.000% per annum based on a year of 360 days. Borrower will pay interest on all sums due after final maturity, whether by acceleration or otherwise, at that rate

**DEFAULT.** Each of the following shall constitute an event of default ("Event of Default") under this Note:

  **Payment Default.** Borrower fails to make any payment when due under this Note.

  **Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Note or in any of the related documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

  **False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Note or the related documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

  **Death or Insolvency.** The dissolution or termination of Borrower's existence as a going business or the death of any partner, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

  **Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

  **Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any guaranty of the indebtedness evidenced by this Note.

  **Events Affecting General Partner of Borrower.** Any of the preceding events occurs with respect to any general partner of Borrower or any general partner dies or becomes incompetent.

  **Change in Ownership.** The resignation or expulsion of any general partner with an ownership interest of twenty-five percent (25%) or more in Borrower.

  **Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of this Note is impaired.

  **Insecurity.** Lender in good faith believes itself insecure.

## PROMISSORY NOTE
### (Continued)

Loan No: 1009818597                                                                                          Page 2

---

Cure Provisions. If any default, other than a default in payment, is curable and if Borrower has not been given a notice of a breach of the same provision of this Note within the preceding twelve (12) months, it may be cured if Borrower, after Lender sends written notice to Borrower demanding cure of such default: (1) cures the default within thirty (30) days; or (2) if the cure requires more than thirty (30) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

LENDER'S RIGHTS. Upon default, Lender may declare the entire indebtedness, including the unpaid principal balance under this Note, all accrued unpaid interest, and all other amounts, costs and expenses for which Borrower is responsible under this Note or any other agreement with Lender pertaining to this loan, immediately due, without notice, and then Borrower will pay that amount.

ATTORNEYS' FEES; EXPENSES. Lender may hire an attorney to help collect this Note if Borrower does not pay, and Borrower will pay Lender's reasonable attorneys' fees. Borrower also will pay Lender all other amounts Lender actually incurs as court costs, lawful fees for filing, recording, releasing to any public office any instrument securing this Note; the reasonable cost actually expended for repossessing, storing, preparing for sale, and selling any security; and fees for noting a lien on or transferring a certificate of title to any motor vehicle offered as security for this Note, or premiums or identifiable charges received in connection with the sale of authorized insurance.

GOVERNING LAW. This Note will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Texas without regard to its conflicts of law provisions. This Note has been accepted by Lender in the State of Texas.

DISHONORED CHECK CHARGE. Borrower will pay a processing fee of $30.00 if any check given by Borrower to Lender as a payment on this loan is dishonored.

RIGHT OF SETOFF. To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the indebtedness against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

COLLATERAL. Borrower acknowledges this Note is secured by a Commercial Security Agreement from Reagor Auto Mall, Ltd., dba Reagor-Dykes of Levelland to First Bank & Trust, dated September 29, 2017, secured by All Inventory, together with the following specifically described property: all debtor's inventory of property of every description (specifically including by not limited to) all new and used motor vehicles, which includes but is not limited to automobiles, motorcycles, mobile homes, motor homes, travel trailers, boats, vans, pickups, together with all accessories, attachments, or accessions related to any of the foregoing collateral hereafter acquired and evidenced by mso and/or title, whether held for rental, lease, sale or use, of whatever nature and whosoever located and all debtor's accounts, accounts receivable, notes receivable, checks, drafts, contract rights and general intangibles of every nature evidencing debtor's right to the payment of monies arising from the sale, leasing, or rental of such inventory items and/or from the performance of debtor of services in connection therewith or related thereto all the foregoing whether now owned or hereafter acquired by debtor and the proceeds and products thereof.

LINE OF CREDIT. This Note evidences a revolving line of credit. Advances under this Note, as well as directions for payment from Borrower's accounts, may be requested orally or in writing by Borrower or by an authorized person. Lender may, but need not, require that all oral requests be confirmed in writing. Borrower agrees to be liable for all sums either: (A) advanced in accordance with the instructions of an authorized person or (B) credited to any of Borrower's accounts with Lender. The unpaid principal balance owing on this Note at any time may be evidenced by endorsements on this Note or by Lender's internal records, including daily computer print-outs. This revolving line of credit shall not be subject to Ch. 346 of the Texas Finance Code.

ORIGINAL DOCUMENT. "The parties whose signatures appear below agree that a photographic, photostatic, facsimile, electronic, copy or similar reproduction of this document shall be valid as the original.".

CHOICE OF VENUE. If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the Courts of Lubbock County, Texas. The parties agree that Lubbock County, Texas is the sole and exclusive venue for any lawsuit arising out of this transaction.

CANCELLATION PROVISION. "Notwithstanding any language to the contrary contained herein, the loan represented by this Note may be cancelled at any time and for any reason in the sole discretion of Lender and Lender shall have no obligation to make any additional advances thereafter. Lender shall so notify Borrower of Lender's decision to cancel this loan, which notification shall be immediately effective or effective at the time stated therein if another effective time is stated in the notice. All principal advanced prior to the cancellation of this loan shall continue to accrue interest and shall remain payable pursuant to the terms of this Note.".

RENEWAL AND EXTENSION. This Note is given in renewal and extension and not in novation of the following described indebtedness: a Promissory Note #1009818597 from Reagor Auto Mall, Ltd., dba Reagor-Dykes of Levelland to First Bank & Trust, dated August 23, 2016, in the original commitment amount of $1,000,000.00, with a current principal balance of $997,000.00.

SUCCESSOR INTERESTS. The terms of this Note shall be binding upon Borrower, and upon Borrower's heirs, personal representatives, successors and assigns, and shall inure to the benefit of Lender and its successors and assigns.

GENERAL PROVISIONS. This Note is payable on demand. The inclusion of specific default provisions or rights of Lender shall not preclude Lender's right to declare payment of this Note on its demand. If any part of this Note cannot be enforced, this fact will not affect the rest of the Note. Borrower does not agree or intend to pay, and Lender does not agree or intend to contract for, charge, collect, take, reserve or receive (collectively referred to herein as "charge or collect"), any amount in the nature of interest or in the nature of a fee for this loan, which would in any way or event (including demand, prepayment, or acceleration) cause Lender to charge or collect more for this loan than the maximum Lender would be permitted to charge or collect by federal law or the law of the State of Texas (as applicable). Any such excess interest or unauthorized fee shall, instead of anything stated to the contrary, be applied first to reduce the principal balance of this loan, and when the principal has been paid in full, be refunded to Borrower. The right to accelerate maturity of sums due under this Note does not include the right to accelerate any interest which has not otherwise accrued on the date of such acceleration, and Lender does not intend to charge or collect any unearned interest in the event of acceleration. All sums paid or agreed to be paid to Lender for the use, forbearance or detention of sums due hereunder shall, to the extent permitted by applicable law, be amortized, prorated, allocated and spread throughout the full term of the loan evidenced by this Note until payment in full so that the rate or amount of interest on account of the loan advanced hereby does not exceed the applicable usury ceiling. Lender may delay or forgo enforcing any of its rights or remedies under this Note without losing them. Borrower and any other person who signs, guarantees or endorses this Note, to the extent allowed by law, waive presentment, demand for payment, notice of dishonor, notice of intent to accelerate the maturity of this Note, and notice of acceleration of the maturity of this Note. Upon any change in the terms of this Note, and unless otherwise expressly stated in writing, no party who signs this Note, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability. All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan or release any party, partner, or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral without the consent of or notice to anyone. All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made. The obligations under this Note are joint and several.

PRIOR TO SIGNING THIS NOTE, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE, INCLUDING THE VARIABLE INTEREST RATE PROVISIONS. BORROWER AGREES TO THE TERMS OF THE NOTE.

BORROWER ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS PROMISSORY NOTE.

BORROWER:

REAGOR AUTO MALL, LTD., DBA REAGOR-DYKES OF LEVELLAND

REAGOR AUTO MALL I, L.L.C., General Partner of Reagor Auto Mall, Ltd., dba Reagor-Dykes of Levelland

By: _____                    By: _____
Bart Reagor, Manager of Reagor Auto Mall I, L.L.C.        Rick Dykes, Manager of Reagor Auto Mall I, L.L.C.

# EXHIBIT C

## COMMERCIAL SECURITY AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $1,000,000.00 | 09-29-2017 | 10-01-2018 | 1009818597 | 4A / 45 | RAA2564 | JET | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "****" has been omitted due to text length limitations.

**Grantor:** Reagor Auto Mall, Ltd., dba Reagor-Dykes of
Levelland (TIN: 20-0275022)
1215 Ave. J
Lubbock, TX 79401

**Lender:** First Bank & Trust
First Bank & Trust- South
7806 Indiana Ave
Lubbock, TX 79423
(806) 776-0800

---

**THIS COMMERCIAL SECURITY AGREEMENT** dated September 29, 2017, is made and executed between Reagor Auto Mall, Ltd., dba Reagor-Dykes of Levelland ("Grantor") and First Bank & Trust ("Lender").

**GRANT OF SECURITY INTEREST.** For valuable consideration, Grantor grants to Lender a security interest in the Collateral to secure the Indebtedness and agrees that Lender shall have the rights stated in this Agreement with respect to the Collateral, in addition to all other rights which Lender may have by law.

**COLLATERAL DESCRIPTION.** The word "Collateral" as used in this Agreement means the following described property, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located, in which Grantor is giving a security interest for the payment of the Indebtedness and performance of all other obligations under the Note and this Agreement:

All Inventory, together with the following specifically described property: all debtor's Inventory of every description (specifically including by not limited to) all new and used motor vehicles, which includes but is not limited to automobiles, motorcycles, mobile homes, motor homes, travel trailers, boats, vans, pickups, together with all accessories, attachments, or accessions related to any of the foregoing collateral hereafer acquired and evidenced by mso and/or title, whether held for rental, lease, sale or use, of whatever nature and whosoever located and all debtor's accounts, accounts receivable, notes receivable, checks, drafts, contract rights and general intangibles of every nature evidencing debtor's right to the payment of monies arising from the sale, leasing, or rental of such Inventory Items and/or from the performance of debtor of services in connection therewith or related thereto all the foregoing whether now owned or hereafter acquired by debtor and the proceeds and products thereof

In addition, the word "Collateral" also includes all the following, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located:

(A) All accessions, attachments, accessories, tools, parts, supplies, replacements of and additions to any of the collateral described herein, whether added now or later.

(B) All products and produce of any of the property described in this Collateral section.

(C) All accounts, general intangibles, instruments, rents, monies, payments, and all other rights, arising out of a sale, lease, consignment or other disposition of any of the property described in this Collateral section.

(D) All proceeds (including insurance proceeds) from the sale, destruction, loss, or other disposition of any of the property described in this Collateral section, and sums due from a third party who has damaged or destroyed the Collateral or from that party's insurer, whether due to judgment, settlement or other process.

(E) All records and data relating to any of the property described in this Collateral section, whether in the form of a writing, photograph, microfilm, microfiche, or electronic media, together with all of Grantor's right, title, and interest in and to all computer software required to utilize, create, maintain, and process any such records or data on electronic media.

**CROSS-COLLATERALIZATION.** In addition to the Note, this Agreement secures all obligations, debts and liabilities, plus interest thereon, of Grantor to Lender, or any one or more of them, as well as all claims by Lender against Grantor or any one or more of them, whether now existing or hereafter arising, whether related or unrelated to the purpose of the Note, whether voluntary or otherwise, whether due or not due, direct or indirect, determined or undetermined, absolute or contingent, liquidated or unliquidated, whether Grantor may be liable individually or jointly with others, whether obligated as guarantor, surety, accommodation party or otherwise. However, this Agreement shall not secure, and the "Indebtedness" shall not include, any obligations arising under Subchapters E and F of Chapter 342 of the Texas Finance Code, as amended.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Grantor's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Grantor holds jointly with someone else and all accounts Grantor may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Grantor authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the Indebtedness against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

**GRANTOR'S REPRESENTATIONS AND WARRANTIES WITH RESPECT TO THE COLLATERAL.** With respect to the Collateral, Grantor represents and promises to Lender that:

Perfection of Security Interest. Grantor agrees to take whatever actions are requested by Lender to perfect and continue Lender's security interest in the Collateral. Upon request of Lender, Grantor will deliver to Lender any and all of the documents evidencing or constituting the Collateral, and Grantor will note Lender's interest upon any and all chattel paper and instruments if not delivered to Lender for possession by Lender. This is a continuing Security Agreement and will continue in effect even though all or any part of the Indebtedness is paid in full and even though for a period of time Grantor may not be indebted to Lender.

Notices to Lender. Grantor will promptly notify Lender in writing at Lender's address shown above (or such other addresses as Lender may designate from time to time) prior to any (1) change in Grantor's name; (2) change in Grantor's assumed business name(s); (3) change in the partners of the partnership, including the addition of new partners or the departure of current partners from the partnership Grantor; (4) change in the authorized signer(s); (5) change in Grantor's principal office address; (6) change in Grantor's state of organization; (7) conversion of Grantor to a new or different type of business entity; or (8) change in any other aspect of Grantor that directly or indirectly relates to any agreements between Grantor and Lender. No change in Grantor's name, state or organization, or principal office address will take effect until after Lender has received notice.

No Violation. The execution and delivery of this Agreement will not violate any law or agreement governing Grantor or to which Grantor is a party, and its partnership agreement does not prohibit any term or condition of this Agreement.

Enforceability of Collateral. To the extent the Collateral consists of accounts, chattel paper, or general intangibles, as defined by the Uniform Commercial Code, the Collateral is enforceable in accordance with its terms, is genuine, and fully complies with all applicable laws and regulations concerning form, content and manner of preparation and execution, and, all persons appearing to be obligated on the Collateral have authority and capacity to contract and are in fact obligated as they appear to be on the Collateral. There shall be no setoffs or counterclaims against any of the Collateral, and no agreement shall have been made under which any deductions or discounts may be claimed concerning the Collateral except those disclosed to Lender in writing.

Location of the Collateral. Except in the ordinary course of Grantor's business, Grantor agrees to keep the Collateral at Grantor's address shown above or at such other locations as are acceptable to Lender. Upon Lender's request, Grantor will deliver to Lender in form satisfactory to Lender a schedule of real properties and Collateral locations relating to Grantor's operations, including without limitation the following: (1) all real property Grantor owns or is purchasing; (2) all real property Grantor is renting or leasing; (3) all storage facilities Grantor owns, rents, leases, or uses; and (4) all other properties where Collateral is or may be located.

Removal of the Collateral. Except in the ordinary course of Grantor's business, including the sales of Inventory, Grantor shall not remove the Collateral from its existing location without Lender's prior written consent. To the extent that the Collateral consists of vehicles, or other titled property, Grantor shall not take or permit any action which would require application for certificates of title for the vehicles outside the State of Texas, without Lender's prior written consent. Grantor shall, whenever requested, advise Lender of the exact location of the Collateral.

Transactions Involving Collateral. Except for Inventory sold or accounts collected in the ordinary course of Grantor's business, or as otherwise provided for in this Agreement, Grantor shall not sell, offer to sell, or otherwise transfer or dispose of the Collateral. While Grantor is not in default under this Agreement, Grantor may sell Inventory, but only in the ordinary course of its business and only to buyers who qualify as a buyer in the ordinary course of business. A sale in the ordinary course of Grantor's business does not include a transfer in partial or total satisfaction of a debt or any bulk sale. Grantor shall not pledge, mortgage, encumber or otherwise permit the Collateral to be subject to any lien, security interest, encumbrance, or charge, other than the security interest provided for in this Agreement, without

## COMMERCIAL SECURITY AGREEMENT
Loan No: 1009818597                    (Continued)                                    Page 2

the prior written consent of Lender. This includes security interests even if junior in right to the security interests granted under this Agreement. Unless waived by Lender, all proceeds from any disposition of the Collateral (for whatever reason) shall be held in trust for Lender and shall not be commingled with any other funds; provided however, this requirement shall not constitute consent by Lender to any sale or other disposition. Upon receipt, Grantor shall immediately deliver any such proceeds to Lender.

Title. Grantor represents and warrants to Lender that Grantor holds good and marketable title to the Collateral, free and clear of all liens and encumbrances except for the lien of this Agreement. No financing statement covering any of the Collateral is on file in any public office other than those which reflect the security interest created by this Agreement or to which Lender has specifically consented. Grantor shall defend Lender's rights in the Collateral against the claims and demands of all other persons.

Repairs and Maintenance. Grantor agrees to keep and maintain, and to cause others to keep and maintain, the Collateral in good order, repair and condition at all times while this Agreement remains in effect. Grantor further agrees to pay when due all claims for work done on, or services rendered or material furnished in connection with the Collateral so that no lien or encumbrance may ever attach to or be filed against the Collateral.

Inspection of Collateral. Lender and Lender's designated representatives and agents shall have the right at all reasonable times to examine and inspect the Collateral wherever located.

Taxes, Assessments and Liens. Grantor will pay when due all taxes, assessments and liens upon the Collateral, its use or operation, upon this Agreement, upon any promissory note or notes evidencing the Indebtedness, or upon any of the other Related Documents. Grantor may withhold any such payment or may elect to contest any lien if Grantor is in good faith conducting an appropriate proceeding to contest the obligation to pay and so long as Lender's interest in the Collateral is not jeopardized in Lender's sole opinion. In any contest Grantor shall defend itself and Lender and shall satisfy any final adverse judgment before enforcement against the Collateral. Grantor shall name Lender as an additional obligee under any surety bond furnished in the contest proceedings. Grantor further agrees to furnish Lender with evidence that such taxes, assessments, and governmental and other charges have been paid in full and in a timely manner. Grantor may withhold any such payment or may elect to contest any lien if Grantor is in good faith conducting an appropriate proceeding to contest the obligation to pay and so long as Lender's interest in the Collateral is not jeopardized.

Compliance with Governmental Requirements. Grantor shall comply promptly with all laws, ordinances, rules and regulations of all governmental authorities, now or hereafter in effect, applicable to the ownership, production, disposition, or use of the Collateral, including all laws or regulations relating to the undue erosion of highly-erodible land or relating to the conversion of wetlands for the production of an agricultural product or commodity. Grantor may contest in good faith any such law, ordinance or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Lender's interest in the Collateral, in Lender's opinion, is not jeopardized.

Hazardous Substances. Grantor represents and warrants that the Collateral never has been, and never will be so long as this Agreement remains a lien on the Collateral, used in violation of any Environmental Laws or for the generation, manufacture, storage, transportation, treatment, disposal, release or threatened release of any Hazardous Substance. The representations and warranties contained herein are based on Grantor's due diligence in investigating the Collateral for Hazardous Substances. Grantor hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Grantor becomes liable for cleanup or other costs under any Environmental Laws, and (2) agrees to indemnify, defend, and hold harmless Lender against any and all claims and losses resulting from a breach of this provision of this Agreement. This obligation to indemnify and defend shall survive the payment of the Indebtedness and the satisfaction of this Agreement.

Maintenance of Casualty Insurance. Grantor shall procure and maintain all risks insurance, including without limitation fire, theft and liability coverage together with such other insurance as Lender may require with respect to the Collateral, in form, amounts, coverages and basis reasonably acceptable to Lender. Grantor, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least thirty (30) days' prior written notice to Lender and not including any disclaimer of the insurer's liability for failure to give such a notice. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Grantor or any other person. In connection with all policies covering assets in which Lender holds or is offered a security interest, Grantor will provide Lender with such loss payable or other endorsements as Lender may require. If Grantor at any time fails to obtain or maintain any insurance as required under this Agreement, Lender may (but shall not be obligated to) obtain such insurance as Lender deems appropriate, including if Lender so chooses "single interest insurance," which will cover only Lender's interest in the Collateral.

Application of Insurance Proceeds. Grantor shall promptly notify Lender of any loss or damage to the Collateral, whether or not such casualty or loss is covered by insurance. Lender may make proof of loss if Grantor fails to do so within fifteen (15) days of the casualty. All proceeds of any insurance on the Collateral, including accrued proceeds thereon, shall be held by Lender as part of the Collateral. If Lender consents to repair or replacement of the damaged or destroyed Collateral, Lender shall, upon satisfactory proof of expenditure, pay or reimburse Grantor from the proceeds for the reasonable cost of repair or restoration. If Lender does not consent to repair or replacement of the Collateral, Lender shall retain a sufficient amount of the proceeds to pay all of the Indebtedness, and shall pay the balance to Grantor. Any proceeds which have not been disbursed within six (6) months after their receipt and which Grantor has not committed to the repair or restoration of the Collateral shall be used to prepay the Indebtedness.

Insurance Reserves. Lender may require Grantor to maintain with Lender reserves for payment of insurance premiums, which reserves shall be created by monthly payments from Grantor of a sum estimated by Lender to be sufficient to produce, at least fifteen (15) days before the premium due date, amounts at least equal to the insurance premiums to be paid. If fifteen (15) days before payment is due, the reserve funds are insufficient, Grantor shall upon demand pay any deficiency to Lender. The reserve funds shall be held by Lender as a general deposit and shall constitute a non-interest-bearing account which Lender may satisfy by payment of the insurance premiums required to be paid by Grantor as they become due. Lender does not hold the reserve funds in trust for Grantor, and Lender is not the agent of Grantor for payment of the insurance premiums required to be paid by Grantor. The responsibility for the payment of premiums shall remain Grantor's sole responsibility.

Insurance Reports. Grantor, upon request of Lender, shall furnish to Lender reports on each existing policy of insurance showing such information as Lender may reasonably request including the following: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the property insured; (5) the then current value on the basis of which insurance has been obtained and the manner of determining that value; and (6) the expiration date of the policy. In addition, Grantor shall upon request by Lender (however not more often than annually) have an independent appraiser satisfactory to Lender determine, as applicable, the cash value or replacement cost of the Collateral.

Financing Statements. Grantor authorizes Lender to file a UCC financing statement, or alternatively, a copy of this Agreement to perfect Lender's security interest. At Lender's request, Grantor additionally agrees to sign all other documents that are necessary to perfect, protect, and continue Lender's security interest in the Property. Grantor will pay all filing fees, title transfer fees, and other fees and costs involved unless prohibited by law or unless Lender is required by law to pay such fees and costs. Grantor irrevocably appoints Lender to execute documents necessary to transfer title if there is a default. Grantor may file a copy of this Agreement as a financing statement. Grantor will promptly notify Lender of any change to Grantor's name or the name of any individual Grantor, any individual who is a partner for a Grantor, and any individual who is a trustee or settlor or trustor for a Grantor under this Agreement. Grantor will also promptly notify Lender of any change to the name that appears on the most recently issued, unexpired driver's license or state-issued identification card, any expiration of the most recently issued driver's license or state-issued identification card for Grantor or any individual for whom Grantor is required to provide notice regarding name changes.

GRANTOR'S RIGHT TO POSSESSION. Until default, Grantor may have possession of the tangible personal property and beneficial use of all the Collateral and may use it in any lawful manner not inconsistent with this Agreement or the Related Documents, provided that Grantor's right to possession and beneficial use shall not apply to any Collateral where possession of the Collateral by Lender is required by law to perfect Lender's security interest in such Collateral. If Lender at any time has possession of any Collateral, whether before or after an Event of Default, Lender shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral if Lender takes such action for that purpose as Grantor shall request or as Lender, in Lender's sole discretion, shall deem appropriate under the circumstances, but failure to honor any request by Grantor shall not of itself be deemed to be a failure to exercise reasonable care. Lender shall not be required to take any steps necessary to preserve any rights in the Collateral against prior parties, nor to protect, preserve or maintain any security interest given to secure the Indebtedness.

LENDER'S EXPENDITURES. If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Grantor fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Grantor's failure to discharge or pay when due any amounts Grantor is required to discharge or pay under this Agreement or any Related Documents, Lender on Grantor's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on the Collateral and paying all costs for insuring, maintaining and preserving the Collateral. All such expenditures paid by Lender for such purposes will then bear interest at the Note rate from the date paid by Lender to the date of repayment by Grantor. To the extent permitted by applicable law, all such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be

## COMMERCIAL SECURITY AGREEMENT
### (Continued)

| Loan No: 1009818597 | | Page 3 |

apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity. The Agreement also will secure payment of these amounts. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon Default.

**DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement:

**Payment Default.** Grantor fails to make any payment when due under the Indebtedness.

**Other Defaults.** Grantor fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Grantor.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Grantor or on Grantor's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Defective Collateralization.** This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Insolvency.** The dissolution or termination of Grantor's existence as a going business or the death of any partner, the insolvency of Grantor, the appointment of a receiver for any part of Grantor's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Grantor.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Grantor or by any governmental agency against any collateral securing the Indebtedness. This includes a garnishment of any of Grantor's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Grantor as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Grantor gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or Guarantor dies or becomes incompetent or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Adverse Change.** A material adverse change occurs in Grantor's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**Cure Provisions.** If any default, other than a default in payment, is curable and if Grantor has not been given a notice of a breach of the same provision of this Agreement within the preceding twelve (12) months, it may be cured if Grantor, after Lender sends written notice to Grantor demanding cure of such default: (1) cures the default within thirty (30) days; or (2) if the cure requires more than thirty (30) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**RIGHTS AND REMEDIES ON DEFAULT.** If an Event of Default occurs under this Agreement, at any time thereafter, Lender shall have all the rights of a secured party under the Texas Uniform Commercial Code. In addition and without limitation, Lender may exercise any one or more of the following rights and remedies:

**Accelerate Indebtedness.** Lender may declare the entire Indebtedness immediately due and payable, without notice of any kind to Grantor.

**Assemble Collateral.** Lender may require Grantor to deliver to Lender all or any portion of the Collateral and any and all certificates of title and other documents relating to the Collateral. Lender may require Grantor to assemble the Collateral and make it available to Lender at a place to be designated by Lender. Lender also shall have full power to enter, provided Lender does so without a breach of the peace or a trespass, upon the property of Grantor to take possession of and remove the Collateral. If the Collateral contains other goods not covered by this Agreement at the time of repossession, Grantor agrees Lender may take such other goods, provided that Lender makes reasonable efforts to return them to Grantor after repossession.

**Sell the Collateral.** Lender shall have full power to sell, lease, transfer, or otherwise deal with the Collateral or proceeds thereof in Lender's own name or that of Grantor. Lender may sell the Collateral at public auction or private sale. Unless the Collateral threatens to decline speedily in value or is of a type customarily sold on a recognized market, Lender will give Grantor, and other persons as required by law, reasonable notice of the time and place of any public sale, or the time after which any private sale or any other disposition of the Collateral is to be made. However, no notice need be provided to any person who, after Event of Default occurs, enters into and authenticates an agreement waiving that person's right to notification of sale. The requirements of reasonable notice shall be met if such notice is given at least ten (10) days before the time of the sale or disposition. All expenses relating to the disposition of the Collateral, including without limitation the expenses of retaking, holding, insuring, preparing for sale and selling the Collateral, shall become a part of the Indebtedness secured by this Agreement and shall be payable on demand, with interest at the Note rate from date of expenditure until repaid.

**Appoint Receiver.** Lender shall have the right to have a receiver appointed to take possession of all or any part of the Collateral, with the power to protect and preserve the Collateral, to operate the Collateral preceding foreclosure or sale, and to collect the rents from the Collateral and apply the proceeds, over and above the cost of the receivership, against the Indebtedness. The receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Collateral exceeds the Indebtedness by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver.

**Collect Revenues, Apply Accounts.** Lender, either itself or through a receiver, may collect the payments, rents, income, and revenues from the Collateral. Lender may at any time in Lender's discretion transfer any Collateral into Lender's own name or that of Lender's nominee and receive the payments, rents, income, and revenues therefrom and hold the same as security for the Indebtedness or apply it to payment of the Indebtedness in such order of preference as Lender may determine. Insofar as the Collateral consists of accounts, general intangibles, insurance policies, instruments, chattel paper, choses in action, or similar property, Lender may demand, collect, receipt for, settle, compromise, adjust, sue for, foreclose, or realize on the Collateral as Lender may determine, whether or not Indebtedness or Collateral is then due. For these purposes, Lender may, on behalf of and in the name of Grantor, receive, open and dispose of mail addressed to Grantor; change any address to which mail and payments are to be sent; and endorse notes, checks, drafts, money orders, documents of title, instruments and items pertaining to payment, shipment, or storage of any Collateral. To facilitate collection, Lender may notify account debtors and obligors on any Collateral to make payments directly to Lender.

**Obtain Deficiency.** If Lender chooses to sell any or all of the Collateral, Lender may obtain a judgment against Grantor for any deficiency remaining on the Indebtedness due to Lender after application of all amounts received from the exercise of the rights provided in this Agreement. Grantor shall be liable for a deficiency even if the transaction described in this subsection is a sale of accounts or chattel paper.

**Other Rights and Remedies.** Lender shall have all the rights and remedies of a secured creditor under the provisions of the Uniform Commercial Code, as may be amended from time to time. In addition, Lender shall have and may exercise any or all other rights and remedies it may have available at law, in equity, or otherwise.

**Election of Remedies.** Except as may be prohibited by applicable law, all of Lender's rights and remedies, whether evidenced by this Agreement, the Related Documents, or by any other writing, shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Grantor under this Agreement, after Grantor's failure to perform, shall not affect Lender's right to declare a default and exercise its remedies.

**ORIGINAL DOCUMENT.** "The parties whose signatures appear below agree that a photographic, photostatic, facsimile, electronic, copy or similar reproduction of this document shall be valid as the original.".

**CHOICE OF VENUE.** If there is a lawsuit, Grantor agrees upon Lender's request to submit to the jurisdiction of the Courts of Lubbock County, Texas. The parties agree that Lubbock County, Texas is the sole and exclusive venue for any lawsuit arising out of this transaction.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement:

**Amendments.** This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.** Grantor agrees to pay upon demand all of Lender's costs and expenses, including Lender's reasonable attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement. Lender may hire or pay

## COMMERCIAL SECURITY AGREEMENT
### (Continued)

Loan No: 1009818597                                                            Page 4

---

someone else to help enforce this Agreement, and Grantor shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's reasonable attorneys' fees and legal expenses whether or not there is a lawsuit, including Lender's reasonable attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Grantor also shall pay all court costs and such additional fees as may be directed by the court.

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Governing Law.** This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Texas without regard to its conflicts of law provisions. This Agreement has been accepted by Lender in the State of Texas.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Grantor, shall constitute a waiver of any of Lender's rights or of any of Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Notices.** Any notice required to be given under this Agreement shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Agreement. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Grantor agrees to keep Lender informed at all times of Grantor's current address. Unless otherwise provided or required by law, if there is more than one Grantor, any notice given by Lender to any Grantor is deemed to be notice given to all Grantors.

**Power of Attorney.** Grantor hereby appoints Lender as Grantor's irrevocable attorney-in-fact for the purpose of executing any documents necessary to perfect, amend, or to continue the security interest granted in this Agreement or to demand termination of filings of other secured parties. Lender may at any time, and without further authorization from Grantor, file a carbon, photographic or other reproduction of any financing statement or of this Agreement for use as a financing statement. Grantor will reimburse Lender for all expenses for the perfection and the continuation of the perfection of Lender's security interest in the Collateral.

**Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

**Successors and Assigns.** Subject to any limitations stated in this Agreement on transfer of Grantor's interest, this Agreement shall be binding upon and inure to the benefit of the parties, their successors and assigns. If ownership of the Collateral becomes vested in a person other than Grantor, Lender, without notice to Grantor, may deal with Grantor's successors with reference to this Agreement and the Indebtedness by way of forbearance or extension without releasing Grantor from the obligations of this Agreement or liability under the Indebtedness.

**Survival of Representations and Warranties.** All representations, warranties, and agreements made by Grantor in this Agreement shall survive the execution and delivery of this Agreement, shall be continuing in nature, and shall remain in full force and effect until such time as Grantor's Indebtedness shall be paid in full.

**Time is of the Essence.** Time is of the essence in the performance of this Agreement.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Agreement.** The word "Agreement" means this Commercial Security Agreement, as this Commercial Security Agreement may be amended or modified from time to time, together with all exhibits and schedules attached to this Commercial Security Agreement from time to time.

**Borrower.** The word "Borrower" means Reagor Auto Mall, Ltd., dba Reagor-Dykes of Levelland and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Collateral.** The word "Collateral" means all of Grantor's right, title and interest in and to all the Collateral as described in the Collateral Description section of this Agreement.

**Default.** The word "Default" means the Default set forth in this Agreement in the section titled "Default."

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Agreement in the default section of this Agreement.

**Grantor.** The word "Grantor" means Reagor Auto Mall, Ltd., dba Reagor-Dykes of Levelland.

**Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Indebtedness.

**Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Indebtedness.** The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Grantor is responsible under this Agreement or under any of the Related Documents. Specifically, without limitation, Indebtedness includes all amounts that may be indirectly secured by the Cross-Collateralization provision of this Agreement.

**Lender.** The word "Lender" means First Bank & Trust, its successors and assigns.

**Note.** The word "Note" means the Note dated September 29, 2017 and executed by Reagor Auto Mall, Ltd., dba Reagor-Dykes of Levelland in the principal amount of $1,000,000.00, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the note or credit agreement.

**Property.** The word "Property" means all of Grantor's right, title and interest in and to all the Property as described in the "Collateral Description" section of this Agreement.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

GRANTOR HAS READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS COMMERCIAL SECURITY AGREEMENT AND AGREES TO ITS TERMS. THIS AGREEMENT IS DATED SEPTEMBER 29, 2017.

## COMMERCIAL SECURITY AGREEMENT
### (Continued)

GRANTOR:

REAGOR AUTO MALL, LTD., DBA REAGOR-DYKES OF LEVELLAND

REAGOR AUTO MALL I, L.L.C., General Partner of Reagor Auto Mall, Ltd., dba Reagor-Dykes of Levelland

By: _____          By: _____
   Bart Reagor, Manager of Reagor Auto Mall I, L.L.C.          Rick Dykes, Manager of Reagor Auto Mall I, L.L.C.

LaserPro, Ver. 17.2.0.010  Copr. D+H USA Corporation 1997, 2017.  All Rights Reserved.  - TX  J:\CFI\L\L\LPL\PL8\D\F\\CFI\LPL\L40.FC  TR-40382  PR-6

# EXHIBIT D

*00000001009818597%0220%09292017%00000000RAA2564*

## COMMERCIAL GUARANTY

| Borrower: | Reagor Auto Mall, Ltd., dba Reagor-Dykes of Levelland (TIN: 20-0275022) 1215 Ave. J Lubbock, TX 79401 | Lender: | First Bank & Trust First Bank & Trust- South 7806 Indiana Ave Lubbock, TX 79423 (806) 776-0800 |
| --- | --- | --- | --- |
| Guarantor: | Bart Reagor (SSN: 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) 8504 Oxford Ave Lubbock, TX 79423 | | |

**CONTINUING GUARANTEE OF PAYMENT AND PERFORMANCE.** For good and valuable consideration, Guarantor absolutely and unconditionally guarantees full and punctual payment and satisfaction of the Indebtedness of Borrower to Lender, and the performance and discharge of all Borrower's obligations under the Note and the Related Documents. This is a guaranty of payment and performance and not of collection, so Lender can enforce this Guaranty against Guarantor even when Lender has not exhausted Lender's remedies against anyone else obligated to pay the Indebtedness or against any collateral securing the Indebtedness, this Guaranty or any other guaranty of the Indebtedness. Guarantor will make any payments to Lender or its order, on demand, in legal tender of the United States of America, in same-day funds, without set-off or deduction or counterclaim, and will otherwise perform Borrower's obligations under the Note and Related Documents. Under this Guaranty, Guarantor's liability is unlimited and Guarantor's obligations are continuing.

**INDEBTEDNESS.** The word "Indebtedness" as used in this Guaranty means all of the principal amount outstanding from time to time and at any one or more times, accrued unpaid interest thereon and all collection costs and legal expenses related thereto permitted by law, Lender's reasonable attorneys' fees, arising from any and all debts, liabilities and obligations of every nature or form, now existing or hereafter arising or acquired, that Borrower individually or collectively or interchangeably with others, owes or will owe Lender. "Indebtedness" includes, without limitation, loans, advances, debts, overdraft indebtedness, credit card indebtedness, lease obligations, liabilities and obligations under any interest rate protection agreements or foreign currency exchange agreements or commodity price protection agreements, other obligations, and liabilities of Borrower, and any present or future judgments against Borrower, future advances, loans or transactions that renew, extend, modify, refinance, consolidate or substitute these debts, liabilities and obligations whether: voluntarily or involuntarily incurred; due or to become due by their terms or acceleration; absolute or contingent; liquidated or unliquidated; determined or undetermined; direct or indirect; primary or secondary in nature, or arising from a guaranty or surety; secured or unsecured; joint or several or joint and several; evidenced by a negotiable or non-negotiable instrument or writing; originated by Lender or another or others; barred or unenforceable against Borrower for any reason whatsoever; for any transactions that may be voidable for any reason (such as infancy, insanity, ultra vires or otherwise); and originated then reduced or extinguished and then afterwards increased or reinstated.

If Lender presently holds one or more guaranties, or hereafter receives additional guaranties from Guarantor, Lender's rights under all guaranties shall be cumulative. This Guaranty shall not (unless specifically provided below to the contrary) affect or invalidate any such other guaranties. Guarantor's liability will be Guarantor's aggregate liability under the terms of this Guaranty and any such other unterminated guaranties.

**CONTINUING GUARANTY.** THIS IS A "CONTINUING GUARANTY" UNDER WHICH GUARANTOR AGREES TO GUARANTEE THE FULL AND PUNCTUAL PAYMENT, PERFORMANCE AND SATISFACTION OF THE INDEBTEDNESS OF BORROWER TO LENDER, NOW EXISTING OR HEREAFTER ARISING OR ACQUIRED, ON AN OPEN AND CONTINUING BASIS. ACCORDINGLY, ANY PAYMENTS MADE ON THE INDEBTEDNESS WILL NOT DISCHARGE OR DIMINISH GUARANTOR'S OBLIGATIONS AND LIABILITY UNDER THIS GUARANTY FOR ANY REMAINING AND SUCCEEDING INDEBTEDNESS EVEN WHEN ALL OR PART OF THE OUTSTANDING INDEBTEDNESS MAY BE A ZERO BALANCE FROM TIME TO TIME.

**DURATION OF GUARANTY.** This Guaranty will take effect when received by Lender without the necessity of any acceptance by Lender, or any notice to Guarantor or to Borrower, and will continue in full force until all the Indebtedness incurred or contracted before receipt by Lender of any notice of revocation shall have been fully and finally paid and satisfied and all of Guarantor's other obligations under this Guaranty shall have been performed in full. If Guarantor elects to revoke this Guaranty, Guarantor may only do so in writing. Guarantor's written notice of revocation must be mailed to Lender, by certified mail, at Lender's address listed above or such other place as Lender may designate in writing. Written revocation of this Guaranty will apply only to new indebtedness created after actual receipt by Lender of Guarantor's written revocation and Lender's written acknowledgment of receipt. For this purpose and without limitation, the term "new indebtedness" does not include the Indebtedness which at the time of notice of revocation is contingent, unliquidated, undetermined or not due and which later becomes absolute, liquidated, determined or due. For this purpose and without limitation, "new indebtedness" does not include all or part of the Indebtedness that is: incurred by Borrower prior to revocation; incurred under a commitment that became binding before revocation; any renewals, extensions, substitutions, and modifications of the indebtedness. This Guaranty shall bind Guarantor's estate as to the indebtedness created both before and after Guarantor's death or incapacity, regardless of Lender's actual notice of Guarantor's death. Subject to the foregoing, Guarantor's executor or administrator or other legal representative may terminate this Guaranty in the same manner in which Guarantor might have terminated it and with the same effect. Release of any other guarantor or termination of any other guaranty of the Indebtedness shall not affect the liability of Guarantor under this Guaranty. A revocation Lender receives from any one or more Guarantors shall not affect the liability of any remaining Guarantors under this Guaranty. It is anticipated that fluctuations may occur in the aggregate amount of the Indebtedness covered by this Guaranty, and Guarantor specifically acknowledges and agrees that reductions in the amount of the Indebtedness, even to zero dollars ($0.00), shall not constitute a termination of this Guaranty. This Guaranty is binding upon Guarantor and Guarantor's heirs, successors and assigns so long as any of the Indebtedness remains unpaid and even though the Indebtedness may from time to time be zero dollars ($0.00).

**GUARANTOR'S AUTHORIZATION TO LENDER.** Guarantor authorizes Lender, either before or after any revocation hereof, without notice or demand and without lessening or otherwise affecting Guarantor's liability under this Guaranty, from time to time: (A) prior to revocation as set forth above, to make one or more additional secured or unsecured loans to Borrower, to lease equipment or other goods to Borrower, or otherwise to extend additional credit to Borrower; (B) to alter, compromise, renew, extend, accelerate, or otherwise change one or more times the time for payment or other terms of the Indebtedness or any part of the Indebtedness, including increases and decreases of the rate of interest on the Indebtedness; extensions may be repeated and may be for longer than the original loan term; (C) to take and hold security for the payment of this Guaranty or the Indebtedness, and exchange, enforce, waive, subordinate, fail or decide not to perfect, and release any such security, with or without the substitution of new collateral; (D) to release, substitute, agree not to sue, or deal with any one or more of Borrower's sureties, endorsers, or other guarantors on any terms or in any manner Lender may choose; (E) to determine how, when and what application of payments and credits shall be made on the Indebtedness; (F) to apply such security and direct the order or manner of sale thereof, including without limitation, any nonjudicial sale permitted by the terms of the controlling security agreement or deed of trust, as Lender in its discretion may determine; (G) to sell, transfer, assign or grant participations in all or any part of the Indebtedness; and (H) to assign or transfer this Guaranty in whole or in part.

**GUARANTOR'S REPRESENTATIONS AND WARRANTIES.** Guarantor represents and warrants to Lender that (A) no representations or agreements of any kind have been made to Guarantor which would limit or qualify in any way the terms of this Guaranty; (B) this Guaranty is executed at Borrower's request and not at the request of Lender; (C) Guarantor has full power, right and authority to enter into this Guaranty; (D) the provisions of this Guaranty do not conflict with or result in a default under any agreement or other instrument binding upon Guarantor and do not result in a violation of any law, regulation, court decree or order applicable to Guarantor; (E) Guarantor has not and will not, without the prior written consent of Lender, sell, lease, assign, encumber, hypothecate, transfer, or otherwise dispose of all or substantially all of Guarantor's assets, or any interest therein; (F) upon Lender's request, Guarantor will provide to Lender financial and credit information in form acceptable to Lender, and all such financial information which currently has been, and all future financial information which will be provided to Lender is and will be true and correct in all material respects and fairly present Guarantor's financial condition as of the dates the financial information is provided; (G) no material adverse change has occurred in Guarantor's financial condition since the date of the most recent financial statements provided to Lender and no event has occurred which may materially adversely affect Guarantor's financial condition; (H) no litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Guarantor is pending or threatened; (I) Lender has made no representation to Guarantor as to the creditworthiness of Borrower; and (J) Guarantor has established adequate means of obtaining from Borrower on a continuing basis information regarding Borrower's financial condition. Guarantor agrees to keep adequately informed from such means of any facts, events, or circumstances which might in any way affect Guarantor's risks under this Guaranty, and Guarantor further agrees that, absent a request for information, Lender shall have no obligation to disclose to Guarantor any information or documents acquired by Lender in the course of its relationship with Borrower.

**GUARANTOR'S WAIVERS.** Except as prohibited by applicable law, Guarantor waives any right to require Lender (A) to continue lending money or to extend other credit to Borrower; (B) to make any presentment, protest, demand, or notice of any kind, including notice of any nonpayment of the Indebtedness or of any nonpayment related to any collateral, or notice of any action or nonaction on the part of Borrower, Lender, any surety, endorser, or other guarantor in connection with the Indebtedness or in connection with the creation of new or additional

## COMMERCIAL GUARANTY
### (Continued)

| | | |
|---|---|---|
| Loan No: 1009818597 | | Page 2 |

loans or obligations; (C) to resort for payment or to proceed directly or at once against any person, including Borrower or any other guarantor; (D) to proceed directly against or exhaust any collateral held by Lender from Borrower, any other guarantor, or any other person; (E) to give notice of the terms, time, and place of any public or private sale of personal property security held by Lender from Borrower or to comply with any other applicable provisions of the Uniform Commercial Code; (F) to pursue any other remedy within Lender's power; or (G) to commit any act or omission of any kind, or at any time, with respect to any matter whatsoever.

Guarantor waives all rights of Guarantor under Chapter 43 of the Texas Civil Practice and Remedies Code. Guarantor also waives any and all rights or defenses based on suretyship or impairment of collateral including, but not limited to, any rights or defenses arising by reason of (A) any "one action" or "anti-deficiency" law or any other law which may prevent Lender from bringing any action, including a claim for deficiency, against Guarantor, before or after Lender's commencement or completion of any foreclosure action, either judicially or by exercise of a power of sale; (B) any election of remedies by Lender which destroys or otherwise adversely affects Guarantor's subrogation rights or Guarantor's rights to proceed against Borrower for reimbursement, including without limitation, any loss of rights Guarantor may suffer by reason of any law limiting, qualifying, or discharging the Indebtedness; (C) any disability or other defense of Borrower, of any other guarantor, or of any other person, or by reason of the cessation of Borrower's liability from any cause whatsoever, other than payment in full in legal tender, of the Indebtedness; (D) any right to claim discharge of the Indebtedness on the basis of unjustified impairment of any collateral for the Indebtedness; (E) any statute of limitations, if at any time any action or suit brought by Lender against Guarantor is commenced, there is outstanding Indebtedness which is not barred by any applicable statute of limitations; or (F) any defenses given to guarantors at law or in equity other than actual payment and performance of the Indebtedness. If payment is made by Borrower, whether voluntarily or otherwise, or by any third party, on the Indebtedness and thereafter Lender is forced to remit the amount of that payment to Borrower's trustee in bankruptcy or to any similar person under any federal or state bankruptcy law or law for the relief of debtors, the Indebtedness shall be considered unpaid for the purpose of the enforcement of this Guaranty.

Guarantor further waives and agrees not to assert or claim at any time any deductions to the amount guaranteed under this Guaranty for any claim of setoff, counterclaim, counter demand, recoupment or similar right, whether such claim, demand or right may be asserted by the Borrower, the Guarantor, or both.

**GUARANTOR'S UNDERSTANDING WITH RESPECT TO WAIVERS.** Guarantor warrants and agrees that each of the waivers set forth above is made with Guarantor's full knowledge of its significance and consequences and that, under the circumstances, the waivers are reasonable and not contrary to public policy or law. If any such waiver is determined to be contrary to any applicable law or public policy, such waiver shall be effective only to the extent permitted by law or public policy.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Guarantor's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Guarantor holds jointly with someone else and all accounts Guarantor may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Guarantor authorizes Lender, to the extent permitted by applicable law, to hold these funds if there is a default, and Lender may apply the funds in these accounts to pay what Guarantor owes under the terms of this Guaranty.

**SUBORDINATION OF BORROWER'S DEBTS TO GUARANTOR.** Guarantor agrees that the Indebtedness, whether now existing or hereafter created, shall be superior to any claim that Guarantor may now have or hereafter acquire against Borrower, whether or not Borrower becomes insolvent. Guarantor hereby expressly subordinates any claim Guarantor may have against Borrower, upon any account whatsoever, to any claim that Lender may now or hereafter have against Borrower. In the event of insolvency and consequent liquidation of the assets of Borrower, through bankruptcy, by an assignment for the benefit of creditors, by voluntary liquidation, or otherwise, the assets of Borrower applicable to the payment of the claims of both Lender and Guarantor shall be paid to Lender and shall be first applied by Lender to the Indebtedness. Guarantor does hereby assign to Lender all claims which it may have or acquire against Borrower or against any assignee or trustee in bankruptcy of Borrower; provided however, that such assignment shall be effective only for the purpose of assuring to Lender full payment in legal tender of the Indebtedness. If Lender so requests, any notes or credit agreements now or hereafter evidencing any debts or obligations of Borrower to Guarantor shall be marked with a legend that the same are subject to this Guaranty and shall be delivered to Lender. Guarantor agrees, and Lender is hereby authorized, in the name of Guarantor, from time to time to file financing statements and continuation statements and to execute documents and to take such other actions as Lender deems necessary or appropriate to perfect, preserve and enforce its rights under this Guaranty.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Guaranty.

**Amendments.** This Guaranty, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Guaranty. No alteration of or amendment to this Guaranty shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.** Guarantor agrees to pay upon demand all of Lender's costs and expenses, including Lender's reasonable attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Guaranty. Lender may hire or pay someone else to help enforce this Guaranty, and Guarantor shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's reasonable attorneys' fees and legal expenses whether or not there is a lawsuit, including Lender's reasonable attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Guarantor also shall pay all court costs and such additional fees as may be directed by the court.

**Caption Headings.** Caption headings in this Guaranty are for convenience purposes only and are not to be used to interpret or define the provisions of this Guaranty.

**Governing Law. This Guaranty will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Texas without regard to its conflicts of law provisions.**

**Integration.** Guarantor further agrees that Guarantor has read and fully understands the terms of this Guaranty; Guarantor has had the opportunity to be advised by Guarantor's attorney with respect to this Guaranty; the Guaranty fully reflects Guarantor's intentions and parol evidence is not required to interpret the terms of this Guaranty. Guarantor hereby indemnifies and holds Lender harmless from all losses, claims, damages, and costs (including Lender's attorneys' fees) suffered or incurred by Lender as a result of any breach by Guarantor of the warranties, representations and agreements of this paragraph.

**Interpretation.** In all cases where there is more than one Borrower or Guarantor, then all words used in this Guaranty in the singular shall be deemed to have been used in the plural where the context and construction so require; and where there is more than one Borrower named in this Guaranty or when this Guaranty is executed by more than one Guarantor, the words "Borrower" and "Guarantor" respectively shall mean all and any one or more of them. The words "Guarantor," "Borrower," and "Lender" include the heirs, successors, assigns, and transferees of each of them. If a court finds that any provision of this Guaranty is not valid or should not be enforced, that fact by itself will not mean that the rest of this Guaranty will not be valid or enforced. Therefore, a court will enforce the rest of the provisions of this Guaranty even if a provision of this Guaranty may be found to be invalid or unenforceable. If any one or more of Borrower or Guarantor are corporations, partnerships, limited liability companies, or similar entities, it is not necessary for Lender to inquire into the powers of Borrower or Guarantor or of the officers, directors, partners, managers, or other agents acting or purporting to act on their behalf, and any indebtedness made or created in reliance upon the professed exercise of such powers shall be guaranteed under this Guaranty.

**Notices.** Any notice required to be given under this Guaranty shall be given in writing, and, except for revocation notices by Guarantor, shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Guaranty. All revocation notices by Guarantor shall be in writing and shall be effective upon delivery to Lender as provided in the section of this Guaranty entitled "DURATION OF GUARANTY." Any party may change its address for notices under this Guaranty by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Guarantor agrees to keep Lender informed at all times of Guarantor's current address. Unless otherwise provided or required by law, if there is more than one Guarantor, any notice given by Lender to any Guarantor is deemed to be notice given to all Guarantors.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Guaranty unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Guaranty shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Guaranty. No prior waiver by Lender, nor any course of dealing between Lender and Guarantor, shall constitute a waiver of any of Lender's rights or of any of Guarantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Guaranty, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Successors and Assigns.** Subject to any limitations stated in this Guaranty on transfer of Guarantor's interest, this Guaranty shall be binding upon and inure to the benefit of the parties, their successors and assigns.

## COMMERCIAL GUARANTY
### (Continued)

**Waive Jury.** Lender and Guarantor hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by either Lender or Guarantor against the other.

**Original Document.** "The parties whose signatures appear below agree that a photographic, photostatic, facsimile, electronic, copy or similar reproduction of this document shall be valid as the original.".

**Choice of Venue.** If there is a lawsuit, Guarantor agrees upon Lender's request to submit to the jurisdiction of the Courts of Lubbock County, Texas  The parties agree that Lubbock County, Texas is the sole and exclusive venue for any lawsuit arising out of this Guaranty.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Guaranty. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Guaranty shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Borrower.** The word "Borrower" means Reagor Auto Mall, Ltd., dba Reagor-Dykes of Levelland and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Guarantor.** The word "Guarantor" means everyone signing this Guaranty, including without limitation Bart Reagor, and in each case, any signer's successors and assigns.

**Guaranty.** The word "Guaranty" means this guaranty from Guarantor to Lender.

**Indebtedness.** The word "Indebtedness" means Borrower's indebtedness to Lender as more particularly described in this Guaranty.

**Lender.** The word "Lender" means First Bank & Trust, its successors and assigns.

**Note.** The word "Note" means and includes without limitation all of Borrower's promissory notes and/or credit agreements evidencing Borrower's loan obligations in favor of Lender, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of and substitutions for promissory notes or credit agreements.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

**EACH UNDERSIGNED GUARANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS GUARANTY AND AGREES TO ITS TERMS. IN ADDITION, EACH GUARANTOR UNDERSTANDS THAT THIS GUARANTY IS EFFECTIVE UPON GUARANTOR'S EXECUTION AND DELIVERY OF THIS GUARANTY TO LENDER AND THAT THE GUARANTY WILL CONTINUE UNTIL TERMINATED IN THE MANNER SET FORTH IN THE SECTION TITLED "DURATION OF GUARANTY". NO FORMAL ACCEPTANCE BY LENDER IS NECESSARY TO MAKE THIS GUARANTY EFFECTIVE. THIS GUARANTY IS DATED SEPTEMBER 29, 2017.**

**GUARANTOR:**

X _____
Bart Reagor

---

## INDIVIDUAL ACKNOWLEDGMENT

STATE OF __Texas__ }
                    } SS
COUNTY OF __Lubbock__ }

This instrument was acknowledged before me on __September 29__, 20 __17__ by Bart Reagor.

LYNETTE BONHAM
Notary Public, State of Texas
Comm Expires 05-22-2019
Notary ID 125582733

_____
Notary Public, State of Texas

LaserPro, Ver 17.3.0.019 Copr. D+H USA Corporation 1997, 2017. All Rights Reserved.  TX  J:\BACKLAND\CLASE\PP\QUERY\PAGE\C  TR-40282  PR-4

# EXHIBIT E

*0000000001009818597%0220%09292017%00000000RAA2564*

# COMMERCIAL GUARANTY

**Borrower:** Reagor Auto Mall, Ltd., dba Reagor-Dykes of  
Levelland (TIN: 20-0275022)  
1215 Ave. J  
Lubbock, TX 79401

**Lender:** First Bank & Trust  
First Bank & Trust- South  
7606 Indiana Ave  
Lubbock, TX 79423  
(806) 776-0800

**Guarantor:** Rick Dykes (SSN: 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)  
4705 21st Street  
Lubbock, TX 79407

**CONTINUING GUARANTEE OF PAYMENT AND PERFORMANCE.** For good and valuable consideration, Guarantor absolutely and unconditionally guarantees full and punctual payment and satisfaction of the Indebtedness of Borrower to Lender, and the performance and discharge of all Borrower's obligations under the Note and the Related Documents. This is a guaranty of payment and performance and not of collection, so Lender can enforce this Guaranty against Guarantor even when Lender has not exhausted Lender's remedies against anyone else obligated to pay the Indebtedness or against any collateral securing the Indebtedness, this Guaranty or any other guaranty of the Indebtedness. Guarantor will make any payments to Lender or its order, on demand, in legal tender of the United States of America, in same-day funds, without set-off or deduction or counterclaim, and will otherwise perform Borrower's obligations under the Note and Related Documents. Under this Guaranty, Guarantor's liability is unlimited and Guarantor's obligations are continuing.

**INDEBTEDNESS.** The word "Indebtedness" as used in this Guaranty means all of the principal amount outstanding from time to time and at any one or more times, accrued unpaid interest thereon and all collection costs and legal expense related thereto permitted by law, Lender's reasonable attorneys' fees, arising from any and all debts, liabilities and obligations of every nature or form, now existing or hereafter arising or acquired, that Borrower individually or collectively or interchangeably with others, owes or will owe Lender, "Indebtedness" includes, without limitation, loans, advances, debts, overdraft indebtedness, credit card indebtedness, lease obligations, liabilities and obligations under any interest rate protection agreements or foreign currency exchange agreements or commodity price protection agreements, other obligations, and liabilities of Borrower, and any present or future judgments against Borrower, future advances, loans or transactions that renew, extend, modify, refinance, consolidate or substitute these debts, liabilities and obligations whether: voluntarily or involuntarily incurred; due or to become due by their terms or acceleration; absolute or contingent; liquidated or unliquidated; determined or undetermined; direct or indirect; primary or secondary in nature or arising from a guaranty or surety; secured or unsecured; joint or several or joint and several; evidenced by a negotiable or non-negotiable instrument or writing; originated by Lender or another or others; barred or unenforceable against Borrower for any reason whatsoever; for any transactions that may be voidable for any reason (such as infancy, insanity, ultra vires or otherwise); and originated then reduced or extinguished and then afterwards increased or reinstated.

If Lender presently holds one or more guaranties, or hereafter receives additional guaranties from Guarantor, Lender's rights under all guaranties shall be cumulative. This Guaranty shall not (unless specifically provided below to the contrary) affect or invalidate any such other guaranties. Guarantor's liability will be Guarantor's aggregate liability under the terms of this Guaranty and any such other unterminated guaranties.

**CONTINUING GUARANTY.** THIS IS A "CONTINUING GUARANTY" UNDER WHICH GUARANTOR AGREES TO GUARANTEE THE FULL AND PUNCTUAL PAYMENT, PERFORMANCE AND SATISFACTION OF THE INDEBTEDNESS OF BORROWER TO LENDER, NOW EXISTING OR HEREAFTER ARISING OR ACQUIRED, ON AN OPEN AND CONTINUING BASIS. ACCORDINGLY, ANY PAYMENTS MADE ON THE INDEBTEDNESS WILL NOT DISCHARGE OR DIMINISH GUARANTOR'S OBLIGATIONS AND LIABILITY UNDER THIS GUARANTY FOR ANY REMAINING AND SUCCEEDING INDEBTEDNESS EVEN WHEN ALL OR PART OF THE OUTSTANDING INDEBTEDNESS MAY BE A ZERO BALANCE FROM TIME TO TIME.

**DURATION OF GUARANTY.** This Guaranty will take effect when received by Lender without the necessity of any acceptance by Lender, or any notice to Guarantor or to Borrower, and will continue in full force until all the Indebtedness incurred or contracted before receipt by Lender of any notice of revocation shall have been fully and finally paid and satisfied and all of Guarantor's other obligations under this Guaranty shall have been performed in full. If Guarantor elects to revoke this Guaranty, Guarantor may only do so in writing. Guarantor's written notice of revocation must be mailed to Lender, by certified mail, at Lender's address listed above or such other place as Lender may designate in writing. Written revocation of this Guaranty will apply only to new Indebtedness created after actual receipt by Lender of Guarantor's written revocation and Lender's written acknowledgment of receipt. For this purpose and without limitation, the term "new Indebtedness" does not include the Indebtedness which at the time of notice of revocation is contingent, unliquidated, undetermined or not due and which later becomes absolute, liquidated, determined or due. For this purpose and without limitation, "new Indebtedness" does not include all or part of the Indebtedness that is: incurred by Borrower prior to revocation; incurred under a commitment that became binding before revocation; any renewals, extensions, substitutions, and modifications of the Indebtedness. This Guaranty shall bind Guarantor's estate as to the Indebtedness created both before and after Guarantor's death or incapacity, regardless of Lender's actual notice of Guarantor's death. Subject to the foregoing, Guarantor's executor or administrator or other legal representative may terminate this Guaranty in the same manner in which Guarantor might have terminated it and with the same effect. Release of any other guarantor or termination of any other guaranty of the Indebtedness shall not affect the liability of Guarantor under this Guaranty. A revocation Lender receives from any one or more Guarantors shall not affect the liability of any remaining Guarantors under this Guaranty. It is anticipated that fluctuations may occur in the aggregate amount of the Indebtedness covered by this Guaranty, and Guarantor specifically acknowledges and agrees that reductions in the amount of the Indebtedness, even to zero dollars ($0.00), shall not constitute a termination of this Guaranty. This Guaranty is binding upon Guarantor and Guarantor's heirs, successors and assigns so long as any of the Indebtedness remains unpaid and even though the Indebtedness may from time to time be zero dollars ($0.00).

**GUARANTOR'S AUTHORIZATION TO LENDER.** Guarantor authorizes Lender, either before or after any revocation hereof, without notice or demand and without lessening or otherwise affecting Guarantor's liability under this Guaranty, from time to time: (A) prior to revocation as set forth above, to make one or more additional secured or unsecured loans to Borrower, to lease equipment or other goods to Borrower, or otherwise to extend additional credit to Borrower; (B) to alter, compromise, renew, extend, accelerate, or otherwise change one or more times the time for payment or other terms of the Indebtedness or any part of the Indebtedness, including increases and decreases of the rate of interest on the Indebtedness; extensions may be repeated and may be for longer than the original loan term; (C) to take and hold security for the payment of this Guaranty or the Indebtedness, and exchange, enforce, waive, subordinate, fail or decide not to perfect, and release any such security, with or without the substitution of new collateral; (D) to release, substitute, agree not to sue, or deal with any one or more of Borrower's sureties, endorsers, or other guarantors on any terms or in any manner Lender may choose; (E) to determine how, when and what application of payments and credits shall be made on the Indebtedness; (F) to apply such security and direct the order or manner of sale thereof, including without limitation, any nonjudicial sale permitted by the terms of the controlling security agreement or deed of trust, as Lender in its discretion may determine; (G) to sell, transfer, assign or grant participations in all or any part of the Indebtedness; and (H) to assign or transfer this Guaranty in whole or in part.

**GUARANTOR'S REPRESENTATIONS AND WARRANTIES.** Guarantor represents and warrants to Lender that (A) no representations or agreements of any kind have been made to Guarantor which would limit or qualify in any way the terms of this Guaranty; (B) this Guaranty is executed at Borrower's request and not at the request of Lender; (C) Guarantor has full power, right and authority to enter into this Guaranty; (D) the provisions of this Guaranty do not conflict with or result in a default under any agreement or other instrument binding upon Guarantor and do not result in a violation of any law, regulation, court decree or order applicable to Guarantor; (E) Guarantor has not and will not, without the prior written consent of Lender, sell, lease, assign, encumber, hypothecate, transfer, or otherwise dispose of all or substantially all of Guarantor's assets, or any interest therein, (F) upon Lender's request, Guarantor will provide to Lender financial and credit information in form acceptable to Lender, and all such financial information which currently has been, and all future financial information which will be provided to Lender is and will be true and correct in all material respects and fairly present Guarantor's financial condition as of the dates the financial information is provided; (G) no material adverse change has occurred in Guarantor's financial condition since the date of the most recent financial statements provided to Lender and no event has occurred which may materially adversely affect Guarantor's financial condition; (H) no litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Guarantor is pending or threatened; (I) Lender has made no representation to Guarantor as to the creditworthiness of Borrower; and (J) Guarantor has established adequate means of obtaining from Borrower on a continuing basis information regarding Borrower's financial condition. Guarantor agrees to keep adequately informed from such means of any facts, events, or circumstances which might in any way affect Guarantor's risks under this Guaranty, and Guarantor further agrees that, absent a request for information, Lender shall have no obligation to disclose to Guarantor any information or documents acquired by Lender in the course of its relationship with Borrower.

**GUARANTOR'S WAIVERS.** Except as prohibited by applicable law, Guarantor waives any right to require Lender (A) to continue lending money or to extend other credit to Borrower; (B) to make any presentment, protest, demand, or notice of any kind, including notice of any nonpayment of the Indebtedness or of any nonpayment related to any collateral, or notice of any action or nonaction on the part of Borrower, Lender, any surety, endorser, or other guarantor in connection with the Indebtedness or in connection with the creation of new or additional

# COMMERCIAL GUARANTY
## (Continued)

Loan No: 1009818597          Page 2

loans or obligations; (C) to resort for payment or to proceed directly or at once against any person, including Borrower or any other guarantor; (D) to proceed directly against or exhaust any collateral held by Lender from Borrower, any other guarantor, or any other person; (E) to give notice of the terms, time, and place of any public or private sale of personal property security held by Lender from Borrower or to comply with any other applicable provisions of the Uniform Commercial Code; (F) to pursue any other remedy within Lender's power; or (G) to commit any act or omission of any kind, or at any time, with respect to any matter whatsoever.

Guarantor waives all rights of Guarantor under Chapter 43 of the Texas Civil Practice and Remedies Code. Guarantor also waives any and all rights or defenses based on suretyship or impairment of collateral including, but not limited to, any rights or defenses arising by reason of (A) any "one action" or "anti-deficiency" law or any other law which may prevent Lender from bringing any action, including a claim for deficiency, against Guarantor, before or after Lender's commencement or completion of any foreclosure action, either judicially or by exercise of a power of sale; (B) any election of remedies by Lender which destroys or otherwise adversely affects Guarantor's subrogation rights or Guarantor's rights to proceed against Borrower for reimbursement, including without limitation, any loss of rights Guarantor may suffer by reason of any law limiting, qualifying, or discharging the Indebtedness; (C) any disability or other defense of Borrower, of any other guarantor, or of any other person, or by reason of the cessation of Borrower's liability from any cause whatsoever, other than payment in full in legal tender, of the Indebtedness; (D) any right to claim discharge of the Indebtedness on the basis of unjustified impairment of any collateral for the Indebtedness; (E) any statute of limitations, if at any time any action or suit brought by Lender against Guarantor is commenced, there is outstanding Indebtedness which is not barred by any applicable statute of limitations; or (F) any defenses given to guarantors at law or in equity other than actual payment and performance of the Indebtedness. If payment is made by Borrower, whether voluntarily or otherwise, or by any third party, on the Indebtedness and thereafter Lender is forced to remit the amount of that payment to Borrower's trustee in bankruptcy or to any similar person under any federal or state bankruptcy law or law for the relief of debtors, the Indebtedness shall be considered unpaid for the purpose of the enforcement of this Guaranty.

Guarantor further waives and agrees not to assert or claim at any time any deductions to the amount guaranteed under this Guaranty for any claim of setoff, counterclaim, counter demand, recoupment or similar right, whether such claim, demand or right may be asserted by the Borrower, the Guarantor, or both.

**GUARANTOR'S UNDERSTANDING WITH RESPECT TO WAIVERS.** Guarantor warrants and agrees that each of the waivers set forth above is made with Guarantor's full knowledge of its significance and consequences and that, under the circumstances, the waivers are reasonable and not contrary to public policy or law. If any such waiver is determined to be contrary to any applicable law or public policy, such waiver shall be effective only to the extent permitted by law or public policy.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Guarantor's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Guarantor holds jointly with someone else and all accounts Guarantor may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Guarantor authorizes Lender, to the extent permitted by applicable law, to hold these funds if there is a default, and Lender may apply the funds in these accounts to pay what Guarantor owes under the terms of this Guaranty.

**SUBORDINATION OF BORROWER'S DEBTS TO GUARANTOR.** Guarantor agrees that the Indebtedness, whether now existing or hereafter created, shall be superior to any claim that Guarantor may now have or hereafter acquire against Borrower, whether or not Borrower becomes insolvent. Guarantor hereby expressly subordinates any claim Guarantor may have against Borrower, upon any account whatsoever, to any claim that Lender may now or hereafter have against Borrower. In the event of insolvency and consequent liquidation of the assets of Borrower, through bankruptcy, by an assignment for the benefit of creditors, by voluntary liquidation, or otherwise, the assets of Borrower applicable to the payment of the claims of both Lender and Guarantor shall be paid to Lender and shall be first applied by Lender to the Indebtedness. Guarantor does hereby assign to Lender all claims which it may have or acquire against Borrower or against any assignee or trustee in bankruptcy of Borrower; provided however, that such assignment shall be effective only for the purpose of assuring to Lender full payment in legal tender of the Indebtedness. If Lender so requests, any notes or credit agreements now or hereafter evidencing any debts or obligations of Borrower to Guarantor shall be marked with a legend that the same are subject to this Guaranty and shall be delivered to Lender. Guarantor agrees, and Lender is hereby authorized, in the name of Guarantor, from time to time to file financing statements and continuation statements and to execute documents and to take such other actions as Lender deems necessary or appropriate to perfect, preserve and enforce its rights under this Guaranty.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Guaranty:

**Amendments.** This Guaranty, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Guaranty. No alteration of or amendment to this Guaranty shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.** Guarantor agrees to pay upon demand all of Lender's costs and expenses, including Lender's reasonable attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Guaranty. Lender may hire or pay someone else to help enforce this Guaranty, and Guarantor shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's reasonable attorneys' fees and legal expenses whether or not there is a lawsuit, including Lender's reasonable attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Guarantor also shall pay all court costs and such additional fees as may be directed by the court.

**Caption Headings.** Caption headings in this Guaranty are for convenience purposes only and are not to be used to interpret or define the provisions of this Guaranty.

**Governing Law.** This Guaranty will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Texas without regard to its conflicts of law provisions.

**Integration.** Guarantor further agrees that Guarantor has read and fully understands the terms of this Guaranty; Guarantor has had the opportunity to be advised by Guarantor's attorney with respect to this Guaranty; the Guaranty fully reflects Guarantor's intentions and parol evidence is not required to interpret the terms of this Guaranty. Guarantor hereby indemnifies and holds Lender harmless from all losses, claims, damages, and costs (including Lender's attorneys' fees) suffered or incurred by Lender as a result of any breach by Guarantor of the warranties, representations and agreements of this paragraph.

**Interpretation.** In all cases where there is more than one Borrower or Guarantor, then all words used in this Guaranty in the singular shall be deemed to have been used in the plural where the context and construction so require; and where there is more than one Borrower named in this Guaranty or when this Guaranty is executed by more than one Guarantor, the words "Borrower" and "Guarantor" respectively shall mean all and any one or more of them. The words "Guarantor," "Borrower," and "Lender" include the heirs, successors, assigns, and transferees of each of them. If a court finds that any provision of this Guaranty is not valid or should not be enforced, that fact by itself will not mean that the rest of this Guaranty will not be valid or enforced. Therefore, a court will enforce the rest of the provisions of this Guaranty even if a provision of this Guaranty may be found to be invalid or unenforceable. If any one or more of Borrower or Guarantor are corporations, partnerships, limited liability companies, or similar entities, it is not necessary for Lender to inquire into the powers of Borrower or Guarantor or of the officers, directors, partners, managers, or other agents acting or purporting to act on their behalf, and any Indebtedness made or created in reliance upon the professed exercise of such powers shall be guaranteed under this Guaranty.

**Notices.** Any notice required to be given under this Guaranty shall be given in writing, and, except for revocation notices by Guarantor, shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Guaranty. All revocation notices by Guarantor shall be in writing and shall be effective upon delivery to Lender as provided in the section of this Guaranty entitled "DURATION OF GUARANTY." Any party may change its address for notices under this Guaranty by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Guarantor agrees to keep Lender informed at all times of Guarantor's current address. Unless otherwise provided or required by law, if there is more than one Guarantor, any notice given by Lender to any Guarantor is deemed to be notice given to all Guarantors.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Guaranty unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Guaranty shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Guaranty. No prior waiver by Lender, nor any course of dealing between Lender and Guarantor, shall constitute a waiver of any of Lender's rights or of any of Guarantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Guaranty, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Successors and Assigns.** Subject to any limitations stated in this Guaranty on transfer of Guarantor's interest, this Guaranty shall be binding upon and inure to the benefit of the parties, their successors and assigns.

**COMMERCIAL GUARANTY**
**(Continued)**

| Loan No: 1009818597 | | Page 3 |

---

**Waive Jury.** Lender and Guarantor hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by either Lender or Guarantor against the other.

**Original Document.** "The parties whose signatures appear below agree that a photographic, photostatic, facsimile, electronic, copy or similar reproduction of this document shall be valid as the original.".

**Choice of Venue.** If there is a lawsuit, Guarantor agrees upon Lender's request to submit to the jurisdiction of the Courts of Lubbock County, Texas. The parties agree that Lubbock County, Texas is the sole and exclusive venue for any lawsuit arising out of this Guaranty.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Guaranty. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Guaranty shall have the meanings attributed to such terms in the Uniform Commercial Code.

**Borrower.** The word "Borrower" means Reagor Auto Mall, Ltd., dba Reagor-Dykes of Levelland and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Guarantor.** The word "Guarantor" means everyone signing this Guaranty, including without limitation Rick Dykes, and in each case, any signer's successors and assigns.

**Guaranty.** The word "Guaranty" means this guaranty from Guarantor to Lender.

**Indebtedness.** The word "Indebtedness" means Borrower's Indebtedness to Lender as more particularly described in this Guaranty.

**Lender.** The word "Lender" means First Bank & Trust, its successors and assigns.

**Note.** The word "Note" means and includes without limitation all of Borrower's promissory notes and/or credit agreements evidencing Borrower's loan obligations in favor of Lender, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of and substitutions for promissory notes or credit agreements.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

**EACH UNDERSIGNED GUARANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS GUARANTY AND AGREES TO ITS TERMS. IN ADDITION, EACH GUARANTOR UNDERSTANDS THAT THIS GUARANTY IS EFFECTIVE UPON GUARANTOR'S EXECUTION AND DELIVERY OF THIS GUARANTY TO LENDER AND THAT THE GUARANTY WILL CONTINUE UNTIL TERMINATED IN THE MANNER SET FORTH IN THE SECTION TITLED "DURATION OF GUARANTY". NO FORMAL ACCEPTANCE BY LENDER IS NECESSARY TO MAKE THIS GUARANTY EFFECTIVE. THIS GUARANTY IS DATED SEPTEMBER 29, 2017.**

**GUARANTOR:**

X _____
**Rick Dykes**

---

## INDIVIDUAL ACKNOWLEDGMENT

STATE OF _Texas_ )
                    ) SS
COUNTY OF _Lubbock_ )

This instrument was acknowledged before me on _September 29_, 20_17_ by Rick Dykes.

LYNETTE BONHAM
Notary Public, State of Texas
Comm. Expires 05-22-2019
Notary ID 125582733

_____
Notary Public, State of Texas

LaserPro, Ver. 17.3.0.019 Copr. D+H USA Corporation 1997, 2017. All Rights Reserved. - TX  J:\CFI\LPL\LASERPRO\CFI\LPL\E35.FC  TR-42380  PR-4

# EXHIBIT F

*00000000400982298B/0070%09292017%00000000RAA2504*

## BUSINESS LOAN AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|-----------|-----------|----------|---------|-------------|---------|---------|----------|
| $2,500,000.00 | 09-29-2017 | 10-01-2018 | 4009822988 | 4A / 45 | RAA2564 | JET | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "****" has been omitted due to text length limitations.

**Borrower:** Reagor Auto Mall, Ltd. dba Reagor-Dykes Imports
(TIN: 20-0276022)
1215 Ave J
Lubbock, TX 79401

**Lender:** First Bank & Trust
First Bank Centre
9816 Slide Road
Lubbock, TX 79424
(806) 788-0800

THIS BUSINESS LOAN AGREEMENT dated September 29, 2017, is made and executed between Reagor Auto Mall, Ltd. dba Reagor-Dykes Imports ("Borrower") and First Bank & Trust ("Lender") on the following terms and conditions. Borrower has received prior commercial loans from Lender or has applied to Lender for a commercial loan or loans or other financial accommodations, including those which may be described on any exhibit or schedule attached to this Agreement. Borrower understands and agrees that: (A) in granting, renewing, or extending any Loan, Lender is relying upon Borrower's representations, warranties, and agreements as set forth in this Agreement; (B) the granting, renewing, or extending of any Loan by Lender at all times shall be subject to Lender's sole judgment and discretion; and (C) all such Loans shall be and remain subject to the terms and conditions of this Agreement.

**TERM.** This Agreement shall be effective as of September 29, 2017, and shall continue in full force and effect until such time as all of Borrower's Loans in favor of Lender have been paid in full, including principal, interest, costs, expenses, attorneys' fees, and other fees and charges, or until October 1, 2018.

**CONDITIONS PRECEDENT TO EACH ADVANCE.** Lender's obligation to make the initial Advance and each subsequent Advance under this Agreement shall be subject to the fulfillment to Lender's satisfaction of all of the conditions set forth in this Agreement and in the Related Documents.

**Loan Documents.** Borrower shall provide to Lender the following documents for the Loan: (1) the Note; (2) Security Agreements granting to Lender security interests in the Collateral; (3) financing statements and all other documents perfecting Lender's Security Interests; (4) evidence of insurance as required below; (5) guaranties; (6) together with all such Related Documents as Lender may require for the Loan; all in form and substance satisfactory to Lender and Lender's counsel.

**Borrower's Authorization.** Borrower shall have provided in form and substance satisfactory to Lender properly certified resolutions, duly authorizing the execution and delivery of this Agreement, the Note and the Related Documents. In addition, Borrower shall have provided such other resolutions, authorizations, documents and instruments as Lender or its counsel, may require.

**Payment of Fees and Expenses.** Borrower shall have paid to Lender all fees, charges, and other expenses which are then due and payable as specified in this Agreement or any Related Document.

**Representations and Warranties.** The representations and warranties set forth in this Agreement, in the Related Documents, and in any document or certificate delivered to Lender under this Agreement are true and correct.

**No Event of Default.** There shall not exist at the time of any Advance a condition which would constitute an Event of Default under this Agreement or under any Related Document.

**REPRESENTATIONS AND WARRANTIES.** Borrower represents and warrants to Lender, as of the date of this Agreement, as of the date of each disbursement of loan proceeds, as of the date of any renewal, extension or modification of any Loan, and at all times any Indebtedness exists:

**Organization.** Borrower is a limited partnership which is, and at all times shall be, duly organized, validly existing, and in good standing under and by virtue of the laws of the State of Texas. Borrower is duly authorized to transact business in all other states in which Borrower is doing business, having obtained all necessary filings, governmental licenses and approvals for each state in which Borrower is doing business. Specifically, Borrower is, and at all times shall be, duly qualified as a foreign limited partnership in all states in which the failure to so qualify would have a material adverse effect on its business or financial condition. Borrower has the full power and authority to own its properties and to transact the business in which it is properly engaged or presently proposes to engage. Borrower maintains an office at 1215 Ave J, Lubbock, TX 79401. Unless Borrower has designated otherwise in writing, the principal office is the office at which Borrower keeps its books and records including its records concerning the Collateral. Borrower will notify Lender prior to any change in the location of Borrower's principal office address or any change in Borrower's name. Borrower shall do all things necessary to preserve and to keep in full force and effect its existence, rights and privileges, and shall comply with all regulations, rules, ordinances, statutes, orders and decrees of any governmental or quasi-governmental authority or court applicable to Borrower and Borrower's business activities.

**Assumed Business Names.** Borrower has filed or recorded all documents or filings required by law relating to all assumed business names used by Borrower. Excluding the name of Borrower, the following is a complete list of all assumed business names under which Borrower does business: None.

**Authorization.** Borrower's execution, delivery, and performance of this Agreement and all the Related Documents have been duly authorized by all necessary action by Borrower and do not conflict with, result in a violation of, or constitute a default under (1) any provision of (a) Borrower's articles or agreements of partnership, or (b) any agreement or other instrument binding upon Borrower or (2) any law, governmental regulation, court decree, or order applicable to Borrower or to Borrower's properties.

**Financial Information.** Each of Borrower's financial statements supplied to Lender truly and completely disclosed Borrower's financial condition as of the date of the statement, and there has been no material adverse change in Borrower's financial condition subsequent to the date of the most recent financial statement supplied to Lender. Borrower has no material contingent obligations except as disclosed in such financial statement.

**Legal Effect.** This Agreement constitutes, and any instrument or agreement Borrower is required to give under this Agreement when delivered will constitute legal, valid, and binding obligations of Borrower enforceable against Borrower in accordance with their respective terms.

**Properties.** Except as contemplated by this Agreement or as previously disclosed in Borrower's financial statements or in writing to Lender and as accepted by Lender, and except for property tax liens for taxes not presently due and payable, Borrower owns and has good title to all of Borrower's properties free and clear of all Security Interests, and has not executed any security documents or financing statements relating to such properties. All of Borrower's properties are titled in Borrower's legal name, and Borrower has not used or filed a financing statement under any other name for at least the last five (5) years.

**Hazardous Substances.** Except as disclosed to and acknowledged by Lender in writing, Borrower represents and warrants that: (1) During the period of Borrower's ownership of the Collateral, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance by any person on, under, about or from any of the Collateral. (2) Borrower has no knowledge of, or reason to believe that there has been (a) any breach or violation of any Environmental Laws; (b) any use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance on, under, about or from the Collateral by any prior owners or occupants of any of the Collateral; or (c) any actual or threatened litigation or claims of any kind by any person relating to such matters. (3) Neither Borrower nor any tenant, contractor, agent or other authorized user of any of the Collateral shall use, generate, manufacture, store, treat, dispose of or release any Hazardous Substance on, under, about or from any of the Collateral; and any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations, and ordinances, including without limitation all Environmental Laws. Borrower authorizes Lender and its agents to enter upon the Collateral to make such inspections and tests as Lender may deem appropriate to determine compliance of the Collateral with this section of the Agreement. Any inspections or tests made by Lender shall be at Borrower's expense and for Lender's purposes only and shall not be construed to create any responsibility or liability on the part of Lender to Borrower or to any other person. The representations and warranties contained herein are based on Borrower's due diligence in investigating the Collateral for hazardous waste and Hazardous Substances. Borrower hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Borrower becomes liable for cleanup or other costs under any such laws, and (2) agrees to indemnify, defend, and hold harmless Lender against any and all claims, losses, liabilities, damages, penalties, and expenses which Lender may directly or indirectly sustain or suffer resulting from a breach of this section of the Agreement or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release of a hazardous waste or substance on the Collateral. The provisions of this section of the Agreement,

## BUSINESS LOAN AGREEMENT
### (Continued)

Loan No: 4009822988                                                                                           Page 2

including the obligation to indemnify and defend, shall survive the payment of the Indebtedness and the termination, expiration or satisfaction of this Agreement and shall not be affected by Lender's acquisition of any interest in any of the Collateral, whether by foreclosure or otherwise.

**Litigation and Claims.** No litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Borrower is pending or threatened, and no other event has occurred which may materially adversely affect Borrower's financial condition or properties, other than litigation, claims, or other events, if any, that have been disclosed to and acknowledged by Lender in writing.

**Taxes.** To the best of Borrower's knowledge, all of Borrower's tax returns and reports that are or were required to be filed, have been filed, and all taxes, assessments and other governmental charges have been paid in full, except those presently being or to be contested by Borrower in good faith in the ordinary course of business and for which adequate reserves have been provided.

**Lien Priority.** Unless otherwise previously disclosed to Lender in writing, Borrower has not entered into or granted any Security Agreements, or permitted the filing or attachment of any Security Interests on or affecting any of the Collateral directly or indirectly securing repayment of Borrower's Loan and Note, that would be prior or that may in any way be superior to Lender's Security Interests and rights in and to such Collateral.

**Binding Effect.** This Agreement, the Note, all Security Agreements (if any), and all Related Documents are binding upon the signers thereof, as well as upon their successors, representatives and assigns, and are legally enforceable in accordance with their respective terms.

**AFFIRMATIVE COVENANTS.** Borrower covenants and agrees with Lender that, so long as this Agreement remains in effect, Borrower will:

**Notices of Claims and Litigation.** Promptly inform Lender in writing of (1) all material adverse changes in Borrower's financial condition, and (2) all existing and all threatened litigation, claims, investigations, administrative proceedings or similar actions affecting Borrower or any Guarantor which could materially affect the financial condition of Borrower or the financial condition of any Guarantor.

**Financial Records.** Maintain its books and records in accordance with GAAP, applied on a consistent basis, and permit Lender to examine and audit Borrower's books and records at all reasonable times.

**Financial Statements.** Furnish Lender with the following:

  **Interim Statements.** As soon as available, but in no event later than thirty (30) days after the end of each fiscal quarter, Borrower's balance sheet and profit and loss statement for the period ended, prepared by Borrower in form satisfactory to Lender.

  **Tax Returns.** As soon as available after the applicable filing date for the tax reporting period ended, Borrower's Federal and other governmental tax returns, prepared by a tax professional satisfactory to Lender.

  **Additional Requirements.**
  **Annual Statements.** As soon as available or by September 30th of each fiscal year, Borrower's balance sheet and income statement for the year ended, audited by a certified public accountant satisfactory to Lender

  **Inventory Listing.** As soon as available after the end of each fiscal month, company prepared in form satisfactory to Lender

**Guarantor(s) agrees to furnish Lender with the following:**

  **Annual Statements.** As soon as available after the end of each fiscal year, Guarantor's balance sheet and income statement for the year ended, prepared by Guarantor in form satisfactory to Lender

  **Tax Returns.** As soon as available after the applicable filing date for the tax reporting period ended, Federal and other governmental tax returns, prepared by a tax professional satisfactory to Lender .

All financial reports required to be provided under this Agreement shall be prepared in accordance with GAAP, applied on a consistent basis, and certified by Borrower as being true and correct.

**Additional Information.** Furnish such additional information and statements, as Lender may request from time to time.

**Additional Requirements.**
Minimum Annual DSCR: 1.00X after-distribution debt service coverage ratio required for the companies on a consolidated basis measured quarterly. Failure to meet this requirement will result in all related debt increasing to a rate of F&T Base + 3.00%.

The DSCR will be calculated as:
Earnings before interest, depreciation, and amortization (EBIDA):
-Partner draws from equity
+Partner contributions to equity
= Cash flow to service debt
Divided by annual debt service
= Debt Service Coverage Ratio

**Maximum Current Ratio:** Current ration required at or above 1.00:1 including re-categorization of owner receivables to long-term assets

**Curtailments:** 10% due at 90 days; 10% due every 30 days thereafter until paid in full

**Flooring Fee:** $25.00 fee per floored item

**Monthly Inspection:** Monthly inspections of all units.

**Insurance.** Maintain fire and other risk insurance, public liability insurance, and such other insurance as Lender may require with respect to Borrower's properties and operations, in form, amounts, and coverage reasonably acceptable to Lender and by insurance companies authorized to transact business in Texas. BORROWER MAY FURNISH THE INSURANCE REQUIRED BY THIS AGREEMENT WHETHER THROUGH EXISTING POLICIES OWNED OR CONTROLLED BY BORROWER OR THROUGH EQUIVALENT COVERAGE FROM ANY INSURANCE COMPANY AUTHORIZED TO TRANSACT BUSINESS IN TEXAS. Borrower, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least thirty (30) days prior written notice to Lender. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Borrower or any other person. In connection with all policies covering assets in which Lender holds or is offered a security interest for the Loans, Borrower will provide Lender with such lender's loss payable or other endorsements as Lender may require.

**Insurance Reports.** Furnish to Lender, upon request of Lender, reports on each existing insurance policy showing such information as Lender may reasonably request, including without limitation the following: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the properties insured; (5) the then current property value on the basis of which insurance has been obtained, and the manner of determining those values; and (6) the expiration date of the policy. In addition, upon request of Lender (however not more often than annually), Borrower will have an independent appraiser satisfactory to Lender determine, as applicable, the actual cash value or replacement cost of any Collateral. The cost of such appraisal shall be paid by Borrower.

**Guaranties.** Prior to disbursement of any Loan proceeds, furnish executed guaranties of the Loans in favor of Lender, executed by the guarantors named below, on Lender's forms, and in the amounts and under the conditions set forth in those guaranties.

| Names of Guarantors | Amounts |
|---|---|
| Bart Reagor | Unlimited |
| Rick Dykes | Unlimited |

**Other Agreements.** Comply with all terms and conditions of all other agreements, whether now or hereafter existing, between Borrower and any other party and notify Lender immediately in writing of any default in connection with any other such agreements.

**Loan Proceeds.** Use all Loan proceeds solely for Borrower's business operations, unless specifically consented to the contrary by Lender in writing.

**Taxes, Charges and Liens.** Pay and discharge when due all of its Indebtedness and obligations, including without limitation all assessments, taxes, governmental charges, levies and liens, of every kind and nature, imposed upon Borrower or its properties, income, or profits, prior to the date on which penalties would attach, and all lawful claims that, if unpaid, might become a lien or charge upon any of Borrower's properties, income, or profits. Provided however, Borrower will not be required to pay and discharge any such assessment, tax, charge, levy, lien or claim so long as (1) the legality of the same shall be contested in good faith by appropriate proceedings, and (2) Borrower shall have established on Borrower's books adequate reserves with respect to such contested assessment, tax, charge, levy, lien, or claim in accordance with GAAP.

## BUSINESS LOAN AGREEMENT
### (Continued)

| Loan No: 4009822988 | | Page 3 |

**Performance.** Perform and comply, in a timely manner, with all terms, conditions, and provisions set forth in this Agreement, in the Related Documents, and in all other instruments and agreements between Borrower and Lender. Borrower shall notify Lender immediately in writing of any default in connection with any agreement.

**Operations.** Maintain executive and management personnel with substantially the same qualifications and experience as the present executive and management personnel; provide written notice to Lender of any change in executive and management personnel; conduct its business affairs in a reasonable and prudent manner.

**Environmental Studies.** Promptly conduct and complete, at Borrower's expense, all such investigations, studies, samplings and testings as may be requested by Lender or any governmental authority relative to any substance, or any waste or by-product of any substance defined as toxic or a hazardous substance under applicable federal, state, or local law, rule, regulation, order or directive, at or affecting any property or any facility owned, leased or used by Borrower.

**Compliance with Governmental Requirements.** Comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the conduct of Borrower's properties, businesses and operations, and to the use or occupancy of the Collateral, including without limitation, the Americans With Disabilities Act. Borrower may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Borrower has notified Lender in writing prior to doing so and so long as, in Lender's sole opinion, Lender's interests in the Collateral are not jeopardized. Lender may require Borrower to post adequate security or a surety bond, reasonably satisfactory to Lender, to protect Lender's interest.

**Inspection.** Permit employees or agents of Lender at any reasonable time to inspect any and all Collateral for the Loan or Loans and Borrower's other properties and to examine or audit Borrower's books, accounts, and records and to make copies and memoranda of Borrower's books, accounts, and records. If Borrower now or at any time hereafter maintains any records (including without limitation computer generated records and computer software programs for the generation of such records) in the possession of a third party, Borrower, upon request of Lender, shall notify such party to permit Lender free access to such records at all reasonable times and to provide Lender with copies of any records it may request, all at Borrower's expense.

**Compliance Certificates.** Unless waived in writing by Lender, provide Lender at least annually, with a certificate executed by Borrower's chief financial officer, or other officer or person acceptable to Lender, certifying that the representations and warranties set forth in this Agreement are true and correct as of the date of the certificate and further certifying that, as of the date of the certificate, no Event of Default exists under this Agreement.

**Environmental Compliance and Reports.** Borrower shall comply in all respects with any and all Environmental Laws; not cause or permit to exist, as a result of an intentional or unintentional action or omission on Borrower's part or on the part of any third party, on property owned and/or occupied by Borrower, any environmental activity where damage may result to the environment, unless such environmental activity is pursuant to and in compliance with the conditions of a permit issued by the appropriate federal, state or local governmental authorities; shall furnish to Lender promptly and in any event within thirty (30) days after receipt thereof a copy of any notice, summons, lien, citation, directive, letter or other communication from any governmental agency or instrumentality concerning any intentional or unintentional action or omission on Borrower's part in connection with any environmental activity whether or not there is damage to the environment and/or other natural resources.

**Additional Assurances.** Make, execute and deliver to Lender such promissory notes, mortgages, deeds of trust, security agreements, assignments, financing statements, instruments, documents and other agreements as Lender or its attorneys may reasonably request to evidence and secure the Loans and to perfect all Security Interests.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Borrower fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Borrower's failure to discharge or pay when due any amounts Borrower is required to discharge or pay under this Agreement or any Related Documents, Lender on Borrower's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on any Collateral and paying all costs for insuring, maintaining and preserving any Collateral. All such expenditures paid by Lender for such purposes will then bear interest at the Note rate from the date paid by Lender to the date of repayment by Borrower. To the extent permitted by applicable law, all such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity.

**NEGATIVE COVENANTS.** Borrower covenants and agrees with Lender that while this Agreement is in effect, Borrower shall not, without the prior written consent of Lender:

**Indebtedness and Liens.** (1) Except for trade debt incurred in the normal course of business and indebtedness to Lender contemplated by this Agreement, create, incur or assume indebtedness for borrowed money, including capital leases, (2) sell, transfer, mortgage, assign, pledge, lease, grant a security interest in, or encumber any of Borrower's assets (except as allowed as Permitted Liens), or (3) sell with recourse any of Borrower's accounts, except to Lender.

**Continuity of Operations.** (1) Engage in any business activities substantially different than those in which Borrower is presently engaged, (2) cease operations, liquidate, merge, transfer, acquire or consolidate with any other entity, change its name, dissolve or transfer or sell Collateral out of the ordinary course of business, or (3) make any distribution with respect to any capital account, whether by reduction of capital or otherwise.

**Loans, Acquisitions and Guaranties.** (1) Loan, invest in or advance money or assets to any other person, enterprise or entity, (2) purchase, create or acquire any interest in any other enterprise or entity, or (3) incur any obligation as surety or guarantor other than in the ordinary course of business.

**Agreements.** Enter into any agreement containing any provisions which would be violated or breached by the performance of Borrower's obligations under this Agreement or in connection herewith.

**CESSATION OF ADVANCES.** If Lender has made any commitment to make any Loan to Borrower, whether under this Agreement or under any other agreement, Lender shall have no obligation to make Loan Advances or to disburse Loan proceeds if: (A) Borrower or any Guarantor is in default under the terms of this Agreement or any of the Related Documents or any other agreement that Borrower or any Guarantor has with Lender; (B) Borrower or any Guarantor dies, becomes incompetent or becomes insolvent, files a petition in bankruptcy or similar proceedings, or is adjudged a bankrupt; (C) there occurs a material adverse change in Borrower's financial condition, in the financial condition of any Guarantor, or in the value of any Collateral securing any Loan; or (D) any Guarantor seeks, claims or otherwise attempts to limit, modify or revoke such Guarantor's guaranty of the Loan or any other loan with Lender; or (E) Lender in good faith deems itself insecure, even though no Event of Default shall have occurred.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the Indebtedness against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

**DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement:

**Payment Default.** Borrower fails to make any payment when due under the Loan.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Death or Insolvency.** The dissolution or termination of Borrower's existence as a going business or the death of any partner, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Defective Collateralization.** This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the Loan.

## BUSINESS LOAN AGREEMENT
### (Continued)

Loan No: 4009822988                                                                 Page 4

---

This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Events Affecting General Partner of Borrower.** Any of the preceding events occurs with respect to any general partner of Borrower or any general partner dies or becomes incompetent.

**Change In Ownership.** The resignation or expulsion of any general partner with an ownership interest of twenty-five percent (25%) or more in Borrower.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of the Loan is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**Right to Cure.** If any default, other than a default on Indebtedness, is curable and if Borrower or Grantor, as the case may be, has not been given a notice of a similar default within the preceding twelve (12) months, it may be cured if Borrower or Grantor, as the case may be, after Lender sends written notice to Borrower or Grantor, as the case may be, demanding cure of such default: (1) cure the default within thirty (30) days; or (2) if the cure requires more than thirty (30) days, immediately initiate steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continue and complete all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**EFFECT OF AN EVENT OF DEFAULT.** If any Event of Default shall occur, except where otherwise provided in this Agreement or the Related Documents, all commitments and obligations of Lender under this Agreement or the Related Documents or any other agreement immediately will terminate (including any obligation to make further Loan Advances or disbursements), and, at Lender's option, all Indebtedness immediately will become due and payable, all without notice of any kind to Borrower, except that in the case of an Event of Default of the type described in the "Insolvency" subsection above, such acceleration shall be automatic and not optional. In addition, Lender shall have all the rights and remedies provided in the Related Documents or available at law, in equity, or otherwise. Except as may be prohibited by applicable law, all of Lender's rights and remedies shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Borrower or of any Grantor shall not affect Lender's right to declare a default and to exercise its rights and remedies.

**ORIGINAL DOCUMENT.** "The parties whose signatures appear below agree that a photographic, photostatic, facsimile, electronic, copy or similar reproduction of this document shall be valid as the original.".

**CANCELLATION PROVISION.** "Notwithstanding anything to the contrary contained in this Loan Agreement or the Related Documents this Loan may be cancelled at any time and for any reason in the sole discretion of Lender and Lender shall have no obligation to make any additional Advances thereafter. Lender shall so notify Borrower at Lender's decision to cancel the loan, which notification shall be immediately effective or effective at the time stated therein if another effective time is stated in the notice. All Advances made prior to the cancellation of the Loan shall remain payable pursuant to the terms of the Loan Agreement and the Related Documents.".

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement:

**Amendments.** This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.** Borrower agrees to pay upon demand all of Lender's costs and expenses, including Lender's reasonable attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement. Lender may hire or pay someone else to help enforce this Agreement, and Borrower shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's reasonable attorneys' fees and legal expenses whether or not there is a lawsuit, including Lender's reasonable attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Borrower also shall pay all court costs and such additional fees as may be directed by the court.

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Consent to Loan Participation.** Borrower agrees and consents to Lender's sale or transfer, whether now or later, of one or more participation interests in the Loan to one or more purchasers, whether related or unrelated to Lender. Lender may provide, without any limitation whatsoever, to any one or more purchasers, or potential purchasers, any information or knowledge Lender may have about Borrower or about any other matter relating to the Loan, and Borrower hereby waives any rights to privacy Borrower may have with respect to such matters. Borrower additionally waives any and all notices of sale of participation interests, as well as all notices of any repurchase of such participation interests. Borrower also agrees that the purchasers of any such participation interests will be considered as the absolute owners of such interests in the Loan and will have all the rights granted under the participation agreement or agreements governing the sale of such participation interests. Borrower further waives all rights of offset or counterclaim that it may have now or later against Lender or against any purchaser of such a participation interest and unconditionally agrees that either Lender or such purchaser may enforce Borrower's obligation under the Loan irrespective of the failure or insolvency of any holder of any interest in the Loan. Borrower further agrees that the purchaser of any such participation interests may enforce its interests irrespective of any personal claims or defenses that Borrower may have against Lender.

**Governing Law.** This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Texas without regard to its conflicts of law provisions. This Agreement has been accepted by Lender in the State of Texas.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Borrower, or between Lender and any Grantor, shall constitute a waiver of any of Lender's rights or of any of Borrower's or any Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Notices.** Any notice required to be given under this Agreement shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Agreement. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Borrower agrees to keep Lender informed at all times of Borrower's current address. Unless otherwise provided or required by law, if there is more than one Borrower, any notice given by Lender to any Borrower is deemed to be notice given to all Borrowers.

**Payment of Interest and Fees.** Notwithstanding any other provision of this Agreement or any provision of any Related Document, Borrower does not agree or intend to pay, and Lender does not agree or intend to charge, collect, take, reserve or receive (collectively referred to herein as "charge or collect"), any amount in the nature of interest or in the nature of a fee for the Loan which would in any way or event (including demand, prepayment, or acceleration) cause Lender to contract for, charge or collect more for the Loan than the maximum Lender would be permitted to charge or collect by any applicable federal or Texas state law. Any such excess interest or unauthorized fee will, instead of anything stated to the contrary, be applied first to reduce the unpaid principal balance of the Loan, and when the principal has been paid in full, be refunded to Borrower.

**Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

**Subsidiaries and Affiliates of Borrower.** To the extent the context of any provisions of this Agreement makes it appropriate, including

## BUSINESS LOAN AGREEMENT
(Continued)

| Loan No: 4009822988 | | Page 5 |

---

without limitation any representation, warranty or covenant, the word "Borrower" as used in this Agreement shall include all of Borrower's subsidiaries and affiliates.   Notwithstanding the foregoing however, under no circumstances shall this Agreement be construed to require Lender to make any Loan or other financial accommodation to any of Borrower's subsidiaries or affiliates.

**Successors and Assigns.**   All covenants and agreements by or on behalf of Borrower contained in this Agreement or any Related Documents shall bind Borrower's successors and assigns and shall inure to the benefit of Lender and its successors and assigns.   Borrower shall not, however, have the right to assign Borrower's rights under this Agreement or any interest therein, without the prior written consent of Lender.

**Survival of Representations and Warranties.**   Borrower understands and agrees that in extending Loan Advances, Lender is relying on all representations, warranties, and covenants made by Borrower in this Agreement or in any certificate or other instrument delivered by Borrower to Lender under this Agreement or the Related Documents.   Borrower further agrees that regardless of any investigation made by Lender, all such representations, warranties and covenants will survive the extension of Loan Advances and delivery to Lender of the Related Documents, shall be continuing in nature, shall be deemed made and redated by Borrower at the time each Loan Advance is made, and shall remain in full force and effect until such time as Borrower's Indebtedness shall be paid in full, or until this Agreement shall be terminated in the manner provided above, whichever is the last to occur.

**Time is of the Essence.**   Time is of the essence in the performance of this Agreement.

**DEFINITIONS.**   The following capitalized words and terms shall have the following meanings when used in this Agreement.   Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America.   Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require.   Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code.   Accounting words and terms not otherwise defined in this Agreement shall have the meanings assigned to them in accordance with generally accepted accounting principles as in effect on the date of this Agreement:

**Advance.**   The word "Advance" means a disbursement of Loan funds made, or to be made, to Borrower or on Borrower's behalf on a line of credit or multiple advance basis under the terms and conditions of this Agreement.

**Agreement.**   The word "Agreement" means this Business Loan Agreement, as this Business Loan Agreement may be amended or modified from time to time, together with all exhibits and schedules attached to this Business Loan Agreement from time to time.

**Borrower.**   The word "Borrower" means Reagor Auto Mall, Ltd. dba Reagor-Dykes Imports and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Collateral.**   The word "Collateral" means all property and assets granted as collateral security for a Loan, whether real or personal property, whether granted directly or indirectly, whether granted now or in the future, and whether granted in the form of a security interest, mortgage, collateral mortgage, deed of trust, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien, charge, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever, whether created by law, contract, or otherwise.

**Environmental Laws.**   The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.**   The words "Event of Default" mean any of the events of default set forth in this Agreement in the default section of this Agreement.

**GAAP.**   The word "GAAP" means generally accepted accounting principles.

**Grantor.**   The word "Grantor" means each and all of the persons or entities granting a Security Interest in any Collateral for the Loan, including without limitation all Borrowers granting such a Security Interest.

**Guarantor.**   The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Loan.

**Guaranty.**   The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.**   The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled.   The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws.   The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Indebtedness.**   The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Borrower is responsible under this Agreement or under any of the Related Documents.

**Lender.**   The word "Lender" means First Bank & Trust, its successors and assigns.

**Loan.**   The word "Loan" means any and all loans and financial accommodations from Lender to Borrower whether now or hereafter existing, and however evidenced, including without limitation those loans and financial accommodations described herein or described on any exhibit or schedule attached to this Agreement from time to time.

**Note.**   The word "Note" means the Note dated September 29, 2017 and executed by Reagor Auto Mall, Ltd. dba Reagor-Dykes Imports in the principal amount of $2,500,000.00, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the note or credit agreement.

**Permitted Liens.**   The words "Permitted Liens" mean  (1)  liens and security interests securing Indebtedness owed by Borrower to Lender;  (2)  liens for taxes, assessments, or similar charges either not yet due or being contested in good faith;  (3)  liens of materialmen, mechanics, warehousemen, or carriers, or other like liens arising in the ordinary course of business and securing obligations which are not yet delinquent;  (4)  purchase money liens or purchase money security interests upon or in any property acquired or held by Borrower in the ordinary course of business to secure indebtedness outstanding on the date of this Agreement or permitted to be incurred under the paragraph of this Agreement titled "Indebtedness and Liens";  (5)  liens and security interests which, as of the date of this Agreement, have been disclosed to and approved by the Lender in writing; and  (6)  those liens and security interests which in the aggregate constitute an immaterial and insignificant monetary amount with respect to the net value of Borrower's assets.

**Related Documents.**   The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Loan.

**Security Agreement.**   The words "Security Agreement" mean and include without limitation any agreements, promises, covenants, arrangements, understandings or other agreements, whether created by law, contract, or otherwise, evidencing, governing, representing, or creating a Security Interest.

**Security Interest.**   The words "Security Interest" mean, without limitation, any and all types of collateral security, present and future, whether in the form of a lien, charge, encumbrance, mortgage, deed of trust, security deed, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever whether created by law, contract, or otherwise.

**BUSINESS LOAN AGREEMENT**
**(Continued)**

Loan No: 400982298B

Page 6

BORROWER ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS BUSINESS LOAN AGREEMENT AND BORROWER AGREES TO ITS TERMS. THIS BUSINESS LOAN AGREEMENT IS DATED SEPTEMBER 29, 2017.

BORROWER:

REAGOR AUTO MALL, LTD. DBA REAGOR-DYKES IMPORTS

REAGOR AUTO MALL I, L.L.C., General Partner of Reagor Auto Mall, Ltd. dba Reagor-Dykes Imports

By: _____
Bart Reagor, Manager of Reagor Auto Mall I, L.L.C.

By: _____
Rick Dykes, Manager of Reagor Auto Mall I, L.L.C.

LENDER:

FIRST BANK & TRUST

By: _____
Jared Edward Townsend, Senior Vice President

LaserPro, Ver. 17.3.0.010  Copr. D.+ H USA Corporation 1997, 2017.  All Rights Reserved.  TX  J:\HARLAND\LASERPRO\CFI\LPL\C40.FC  TR 40211  PR-4

# EXHIBIT G

*00000000400982298B%0955%09292017%00000000NAA2564*

# PROMISSORY NOTE

| Principal | Loan Date | Maturity | Loan No. | Cell / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $2,500,000.00 | 09-29-2017 | 10-01-2018 | 4009822988 | 4A / 46 | RAA2564 | JET | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing " * * * * " has been omitted due to text length limitations.

Borrower:  Reagor Auto Mall, Ltd. dba Reagor-Dykes Imports
(TIN: 20-0275022)
1215 Ave J
Lubbock, TX 79401

Lender:  First Bank & Trust
First Bank Centre
9816 Slide Road
Lubbock, TX 79424
(806) 788-0800

---

Principal Amount: $2,500,000.00                                                Date of Note: September 29, 2017

PROMISE TO PAY.  Reagor Auto Mall, Ltd. dba Reagor-Dykes Imports ("Borrower") promises to pay to First Bank & Trust ("Lender"), or order, in lawful money of the United States of America, the principal amount of Two Million Five Hundred Thousand & 00/100 Dollars ($2,500,000.00) or so much as may be outstanding, together with interest on the unpaid outstanding principal balance of each advance. Interest shall be calculated from the date of each advance until repayment of each advance or maturity, whichever occurs first.

CHOICE OF USURY CEILING AND INTEREST RATE.  The interest rate on this Note has been implemented under the "Weekly Ceiling" as referred to in Sections 303.002 and 303 003 of the Texas Finance Code.

PAYMENT.  Borrower will pay this loan in full immediately upon Lender's demand.  If no demand is made, Borrower will pay this loan in one payment of all outstanding principal plus all accrued unpaid interest on October 1, 2018.  In addition, Borrower will pay regular monthly payments of all accrued unpaid interest due as of each payment date, beginning November 1, 2017, with all subsequent interest payments to be due on the same day of each month after that.  Unless otherwise agreed or required by applicable law, payments will be applied first to any accrued unpaid interest; then to principal; then to any unpaid collection costs; and then to any late charges.  Borrower will pay Lender at Lender's address shown above or at such other place as Lender may designate in writing.  Notwithstanding any other provision of this Note, Lender will not charge interest on any undisbursed loan proceeds.  No scheduled payment, whether of principal or interest or both, will be due unless sufficient loan funds have been disbursed by the scheduled payment date to justify the payment.

VARIABLE INTEREST RATE.  The interest rate on this Note is subject to change from changes in an index which is set by the First Bank & Trust Base Rate  (the "Index").  The Index is not necessarily the lowest rate charged by Lender on its loans and is set by Lender in its sole discretion.  If the Index becomes unavailable during the term of this loan, Lender may designate a substitute index after notifying Borrower.  Lender will tell Borrower the current index rate upon Borrower's request.  The interest rate change will not occur more often than each day.  Borrower understands that Lender may make loans based on other rates as well.  The Index currently is 5.750% per annum.  Interest prior to maturity on the unpaid principal balance of this Note will be calculated as described in the "INTEREST CALCULATION METHOD" paragraph using a rate equal to the Index, adjusted if necessary for any minimum and maximum rate limitations described below, resulting in an initial rate of 8.125% per annum based on a year of 360 days.  NOTE:  Under no circumstances will the interest rate on this Note be less than 6 125% per annum or more than (except for any higher default rate or Post Maturity Rate shown below) the lesser of 18.000% per annum or the maximum rate allowed by applicable law.  For purposes of this Note, the "maximum rate allowed by applicable law" means the greater of (A)  the maximum rate of interest permitted under applicable law or the indebtedness evidenced by this Note, or  (B)  the "Weekly Ceiling" as referred to in Sections 303.002 and 303.003 of the Texas Finance Code.

INTEREST CALCULATION METHOD.  Interest on this Note is computed on a 365/360 basis; that is, by applying the ratio of the interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding, unless such calculation would result in a usurious rate, in which case interest shall be calculated on a per diem basis of a year of 365 or 366 days, as the case may be.  All interest payable under this Note is computed using this method.

PREPAYMENT.  Borrower agrees that all loan fees and other prepaid finance charges are earned fully as of the date of the loan and will not be subject to refund upon early payment (whether voluntary or as a result of default), except as otherwise required by law.   Except for the foregoing, Borrower may pay without penalty all or a portion of the amount owed earlier than it is due.  Prepayment in full shall consist of payment of the remaining unpaid principal balance together with all accrued and unpaid interest and all other amounts, costs and expenses for which Borrower is responsible under this Note or any other agreement with Lender pertaining to this loan, and in no event will Borrower ever be required to pay any unearned interest.  Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments of accrued unpaid interest.  Rather, early payments will reduce the principal balance due.  Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language.  If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Note, and Borrower will remain obligated to pay any further amount owed to Lender.  All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to: First Bank & Trust, 9816 Slide Road Lubbock, TX  79424.

LATE CHARGE.  If a payment is 10 days or more late, Borrower will be charged 5.000% of the regularly scheduled payment.

POST MATURITY RATE.  The Post Maturity Rate on this Note is the lesser of  (A)  the maximum rate allowed by law or  (B)  18 000% per annum based on a year of 360 days.  Borrower will pay interest on all sums due after final maturity, whether by acceleration or otherwise, at that rate.

DEFAULT.  Each of the following shall constitute an event of default ("Event of Default") under this Note:

Payment Default.  Borrower fails to make any payment when due under this Note.

Other Defaults.  Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Note or in any of the related documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

False Statements.  Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Note or the related documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

Death or Insolvency.  The dissolution or termination of Borrower's existence as a going business or the death of any partner, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower

Creditor or Forfeiture Proceedings.  Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender.  However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

Events Affecting Guarantor.  Any of the preceding events occurs with respect to any Guarantor of any of the indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any guaranty of the indebtedness evidenced by this Note.

Events Affecting General Partner of Borrower.  Any of the preceding events occurs with respect to any general partner of Borrower or any general partner dies or becomes incompetent.

Change in Ownership.  The resignation or expulsion of any general partner with an ownership interest of twenty-five percent (25%) or more in Borrower.

Adverse Change.  A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of this Note is impaired.

Insecurity.  Lender in good faith believes itself insecure.

## PROMISSORY NOTE
(Continued)

Loan No: 4009822988                                                                                           Page 2

Cure Provisions. If any default, other than a default in payment, is curable and if Borrower has not been given a notice of a breach of the same provision of this Note within the preceding twelve (12) months, it may be cured if Borrower, after Lender sends written notice to Borrower demanding cure of such default: (1) cures the default within thirty (30) days; or (2) if the cure requires more than thirty (30) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

LENDER'S RIGHTS. Upon default, Lender may declare the entire indebtedness, including the unpaid principal balance under this Note, all accrued unpaid interest, and all other amounts, costs and expenses for which Borrower is responsible under this Note or any other agreement with Lender pertaining to this loan, immediately due, without notice, and then Borrower will pay that amount.

ATTORNEYS' FEES; EXPENSES. Lender may hire an attorney to help collect this Note if Borrower does not pay, and Borrower will pay Lender's reasonable attorneys' fees. Borrower also will pay Lender all other amounts Lender actually incurs as court costs, lawful fees for filing, recording, releasing to any public office any instrument securing this Note; the reasonable cost actually expended for repossessing, storing, preparing for sale, and selling any security; and fees for making a lien on or transferring a certificate of title to any motor vehicle offered as security for this Note, or premiums or identifiable charges received in connection with the sale of authorized insurance.

GOVERNING LAW. This Note will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Texas without regard to its conflicts of law provisions. This Note has been accepted by Lender in the State of Texas.

DISHONORED CHECK CHARGE. Borrower will pay a processing fee of $30.00 if any check given by Borrower to Lender as a payment on this loan is dishonored.

RIGHT OF SETOFF. To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the indebtedness against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

COLLATERAL. Borrower acknowledges this Note is secured by a Commercial Security Agreement dated September 29, 2017, secured by All inventory, together with the following specifically described property: all debtor's inventory of property of every description (specifically including by not limited to) all motor vehicles, which includes but is not limited to automobiles, motorcycles, mobile homes, motor homes, travel trailers, boats, vans, pickups, together with all accessories, attachments, or accessions related to any of the foregoing collateral hereafter acquired and attached to any and/or title, whether held for rental, lease, sale or use, of whatever nature and wheresoever located and all debtor's accounts, accounts receivable, notes receivable, checks, drafts, contract rights and general intangibles of every nature evidencing debtor's right to the payment of monies arising from the sale, leasing, or rental of such inventory items and/or from the performance of debtor of services in connection therewith or related thereto all the foregoing whether now owned or hereafter acquired by debtor and the proceeds and products thereof.

LINE OF CREDIT. This Note evidences a revolving line of credit. Advances under this Note, as well as directions for payment from Borrower's accounts, may be requested orally or in writing by Borrower or by an authorized person. Lender may, but need not, require that all oral requests be confirmed in writing. Borrower agrees to be liable for all sums either: (A) advanced in accordance with the instructions of an authorized person or (B) credited to any of Borrower's accounts with Lender. The unpaid principal balance owing on this Note at any time may be evidenced by endorsements on this Note or by Lender's internal records, including daily computer print-outs. This revolving line of credit shall not be subject to Ch. 346 of the Texas Finance Code.

ORIGINAL DOCUMENT. "The parties whose signatures appear below agree that a photographic, photostatic, facsimile, electronic, copy or similar reproduction of this document shall be valid as the original.".

CHOICE OF VENUE. If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the Courts of Lubbock County, Texas. The parties agree that Lubbock County, Texas is the sole and exclusive venue for any lawsuit arising out of this transaction.

CANCELLATION PROVISION. "Notwithstanding any language to the contrary contained herein, the loan represented by this Note may be cancelled at any time and for any reason in the sole discretion of Lender and Lender shall have no obligation to make any additional advances thereafter. Lender shall so notify Borrower of Lender's decision to cancel this loan, which notification shall be immediately effective or effective at the time stated therein if another effective time is stated in the notice. All principal advanced prior to the cancellation of this loan shall continue to accrue interest and shall remain payable pursuant to the terms of this Note ".

RENEWAL AND EXTENSION. This Note is given in renewal and extension and not in novation of the following described indebtedness: a Promissory Note #4009822988 from Reagor Auto Mall, Ltd. dba Reagor-Dykes Imports to First Bank & Trust, dated August 23, 2016, in the original commitment amount of $2,500,000.00, with a current principal balance of $2,494,475.00.

SUCCESSOR INTERESTS. The terms of this Note shall be binding upon Borrower, and upon Borrower's heirs, personal representatives, successors and assigns, and shall inure to the benefit of Lender and its successors and assigns.

GENERAL PROVISIONS. This Note is payable on demand. The inclusion of specific default provisions or rights of Lender shall not preclude Lender's right to declare payment of this Note on its demand. If any part of this Note cannot be enforced, this fact will not affect the rest of the Note. Borrower does not agree or intend to pay, and Lender does not agree or intend to contract for, charge, collect, take, reserve or receive (collectively referred to herein as "charge or collect"), any amount in the nature of interest or in the nature of a fee for this loan, which would in any way or event (including demand, prepayment, or acceleration) cause Lender to charge or collect more for this loan than the maximum Lender would be permitted to charge or collect by federal law or the law of the State of Texas (as applicable). Any such excess interest or unauthorized fee shall, instead of anything stated to the contrary, be applied first to reduce the principal balance of this loan, and when the principal has been paid in full, be refunded to Borrower. The right to accelerate maturity of sums due under this Note does not include the right to accelerate any interest which has not otherwise accrued on the date of such acceleration, and Lender does not intend to charge or collect any unearned interest in the event of acceleration. All sums paid or agreed to be paid to Lender for the use, forbearance or detention of sums due hereunder shall, to the extent permitted by applicable law, be amortized, prorated, allocated and spread throughout the full term of the loan evidenced by this Note until payment in full so that the rate or amount of interest on account of the loan evidenced hereby does not exceed the applicable usury ceiling. Lender may delay or forgo enforcing any of its rights or remedies under this Note without losing them. Borrower and any other person who signs, guarantees or endorses this Note, to the extent allowed by law, waive presentment, demand for payment, notice of dishonor, notice of intent to accelerate the maturity of this Note, and notice of acceleration of the maturity of this Note. Upon any change in the terms of this Note, and unless otherwise expressly stated in writing, no party who signs this Note, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability. All parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan or release any party, partner, or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral without the consent of or notice to anyone. All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made. The obligations under this Note are joint and several.

PRIOR TO SIGNING THIS NOTE, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE, INCLUDING THE VARIABLE INTEREST RATE PROVISIONS. BORROWER AGREES TO THE TERMS OF THE NOTE.

BORROWER ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS PROMISSORY NOTE.

BORROWER:

REAGOR AUTO MALL, LTD. DBA REAGOR-DYKES IMPORTS

REAGOR AUTO MALL I, L.L.C., General Partner of Reagor Auto Mall, Ltd. dba Reagor-Dykes Imports

By: _____          By: _____
Bert Reagor, Manager of Reagor Auto Mall I, L.L.C.          Rick Dykes, Manager of Reagor Auto Mall I, L.L.C.

# EXHIBIT H

## COMMERCIAL SECURITY AGREEMENT

| Principal $2,500,000.00 | Loan Date 09-29-2017 | Maturity 10-01-2018 | Loan No 4009822988 | Call / Coll 4A / 45 | Account RAA2564 | Officer JET | Initials |
|---|---|---|---|---|---|---|---|

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "****" has been omitted due to text length limitations.

**Grantor:** Reagor Auto Mall, Ltd., dba Reagor-Dykes Imports
(TIN: 20-0275022)
1215 Ave J
Lubbock, TX 79401

**Lender:** First Bank & Trust
First Bank Centre
9816 Slide Road
Lubbock, TX 79424
(806) 788-0800

THIS COMMERCIAL SECURITY AGREEMENT dated September 29, 2017, is made and executed between Reagor Auto Mall, Ltd., dba Reagor-Dykes Imports ("Grantor") and First Bank & Trust ("Lender").

**GRANT OF SECURITY INTEREST.** For valuable consideration, Grantor grants to Lender a security interest in the Collateral to secure the Indebtedness and agrees that Lender shall have the rights stated in this Agreement with respect to the Collateral, in addition to all other rights which Lender may have by law.

**COLLATERAL DESCRIPTION.** The word "Collateral" as used in this Agreement means the following described property, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located, in which Grantor is giving to Lender a security interest for the payment of the Indebtedness and performance of all other obligations under the Note and this Agreement:

All Inventory, together with the following specifically described property: all debtor's inventory of property of every description (specifically including by not limited to) all new and used motor vehicles, which includes but is not limited to automobiles, motorcycles, mobile homes, motor homes, travel trailers, boats, vans, pickups, together with all accessories, attachments, or accessions related to any of the foregoing collateral hereafter acquired and evidenced by new and/or title, whether held for rental, lease, sale or use, of whatever nature and whosoever located and all debtor's accounts, accounts receivable, notes receivable, checks, drafts, contract rights and general intangibles of every nature evidencing debtor's right to the payment of monies arising from the sale, leasing, or rental of such inventory items and/or from the performance of debtor of services in connection therewith or related thereto all the foregoing whether now owned or hereafter acquired by debtor and the proceeds and products thereof

In addition, the word "Collateral" also includes all the following, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located:

(A) All accessions, attachments, accessories, tools, parts, supplies, replacements of and additions to any of the collateral described herein, whether added now or later.

(B) All products and produce of any of the property described in this Collateral section.

(C) All accounts, general intangibles, instruments, rents, monies, payments, and all other rights, arising out of a sale, lease, consignment or other disposition of any of the property described in this Collateral section.

(D) All proceeds (including insurance proceeds) from the sale, destruction, loss, or other disposition of any of the property described in this Collateral section, and sums due from a third party who has damaged or destroyed the Collateral or from that party's insurer, whether due to judgment, settlement or other process.

(E) All records and data relating to any of the property described in this Collateral section, whether in the form of a writing, photograph, microfilm, microfiche, or electronic media, together with all of Grantor's right, title, and interest in and to all computer software required to utilize, create, maintain, and process any such records or data on electronic media.

**CROSS-COLLATERALIZATION.** In addition to the Note, this Agreement secures all obligations, debts and liabilities, plus interest thereon, of Grantor to Lender, or any one or more of them, as well as all claims by Lender against Grantor or any one or more of them, whether now existing or hereafter arising, whether related or unrelated to the purpose of the Note, whether voluntary or otherwise, whether due or not due, direct or indirect, determined or undetermined, absolute or contingent, liquidated or unliquidated, whether Grantor may be liable individually or jointly with others, whether obligated as guarantor, surety, accommodation party or otherwise. However, this Agreement shall not secure, and the "Indebtedness" shall not include, any obligations arising under Subchapters E and F of Chapter 342 of the Texas Finance Code, as amended.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Grantor's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Grantor holds jointly with someone else and all accounts Grantor may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Grantor authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the Indebtedness against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

**GRANTOR'S REPRESENTATIONS AND WARRANTIES WITH RESPECT TO THE COLLATERAL.** With respect to the Collateral, Grantor represents and promises to Lender that:

**Perfection of Security Interest.** Grantor agrees to take whatever actions are requested by Lender to perfect and continue Lender's security interest in the Collateral. Upon request of Lender, Grantor will deliver to Lender any and all of the documents evidencing or constituting the Collateral, and Grantor will note Lender's interest upon any and all chattel paper and instruments if not delivered to Lender for possession by Lender. This is a continuing Security Agreement and will continue in effect even though all or any part of the Indebtedness is paid in full and even though for a period of time Grantor may not be indebted to Lender.

**Notices to Lender.** Grantor will promptly notify Lender in writing at Lender's address shown above (or such other addresses as Lender may designate from time to time) prior to any (1) change in Grantor's name; (2) change in Grantor's assumed business name(s); (3) change in the partners or the partnership, including the addition of new partners or the departure of current partners from the partnership Grantor; (4) change in the authorized signer(s); (5) change in Grantor's principal office address; (6) change in Grantor's state of organization; (7) conversion of Grantor to a new or different type of business entity; or (8) change in any other aspect of Grantor that directly or indirectly relates to any agreements between Grantor and Lender. No change in Grantor's name, state or organization, or principal office address will take effect until after Lender has received notice.

**No Violation.** The execution and delivery of this Agreement will not violate any law or agreement governing Grantor or to which Grantor is a party, and its partnership agreement does not prohibit any term or condition of this Agreement.

**Enforceability of Collateral.** To the extent the Collateral consists of accounts, chattel paper, or general intangibles, as defined by the Uniform Commercial Code, the Collateral is enforceable in accordance with its terms, is genuine, and fully complies with all applicable laws and regulations concerning form, content and manner of preparation and execution, and all persons appearing to be obligated on the Collateral have authority and capacity to contract and are in fact obligated as they appear to be on the Collateral. There shall be no setoffs or counterclaims against any of the Collateral, and no agreement shall have been made under which any deductions or discounts may be claimed concerning the Collateral except those disclosed to Lender in writing.

**Location of the Collateral.** Except in the ordinary course of Grantor's business, Grantor agrees to keep the Collateral at Grantor's address shown above or at such other locations as are acceptable to Lender. Upon Lender's request, Grantor will deliver to Lender in form satisfactory to Lender a schedule of real properties and Collateral locations relating to Grantor's operations, including without limitation the following: (1) all real property Grantor owns or is purchasing; (2) all real property Grantor is renting or leasing; (3) all storage facilities Grantor owns, rents, leases, or uses; and (4) all other properties where Collateral is or may be located.

**Removal of the Collateral.** Except in the ordinary course of Grantor's business, including the sales of Inventory, Grantor shall not remove the Collateral from its existing location without Lender's prior written consent. To the extent that the Collateral consists of vehicles, or other titled property, Grantor shall not take or permit any action which would require application for certificates of title for the vehicles outside the State of Texas, without Lender's prior written consent. Grantor shall, whenever requested, advise Lender of the exact location of the Collateral.

**Transactions Involving Collateral.** Except for Inventory sold or accounts collected in the ordinary course of Grantor's business, or as otherwise provided for in this Agreement, Grantor shall not sell, offer to sell, or otherwise transfer or dispose of the Collateral. While Grantor is not in default under this Agreement, Grantor may sell Inventory, but only in the ordinary course of its business and only to buyers who qualify as a buyer in the ordinary course of business. A sale in the ordinary course of Grantor's business does not include a transfer in partial or total satisfaction of a debt or any bulk sale. Grantor shall not pledge, mortgage, encumber or otherwise permit the Collateral to be subject to any lien, security interest, encumbrance, or charge, other than the security interest provided for in this Agreement, without

## COMMERCIAL SECURITY AGREEMENT
### (Continued)

the prior written consent of Lender. This includes security interests even if junior in right to the security interests granted under this Agreement. Unless waived by Lender, all proceeds from any disposition of the Collateral (for whatever reason) shall be held in trust for Lender and shall not be commingled with any other funds; provided however, this requirement shall not constitute consent by Lender to any sale or other disposition. Upon receipt, Grantor shall immediately deliver any such proceeds to Lender.

**Title.** Grantor represents and warrants to Lender that Grantor holds good and marketable title to the Collateral, free and clear of all liens and encumbrances except for the lien of this Agreement. No financing statement covering any of the Collateral is on file in any public office other than those which reflect the security interest created by this Agreement or to which Lender has specifically consented. Grantor shall defend Lender's rights in the Collateral against the claims and demands of all other persons.

**Repairs and Maintenance.** Grantor agrees to keep and maintain, and to cause others to keep and maintain, the Collateral in good order, repair and condition at all times while this Agreement remains in effect. Grantor further agrees to pay when due all claims for work done on, or services rendered or material furnished in connection with the Collateral so that no lien or encumbrance may ever attach to or be filed against the Collateral.

**Inspection of Collateral.** Lender and Lender's designated representatives and agents shall have the right at all reasonable times to examine and inspect the Collateral wherever located.

**Taxes, Assessments and Liens.** Grantor will pay when due all taxes, assessments and liens upon the Collateral, its use or operation, upon this Agreement, upon any promissory note or notes evidencing the Indebtedness, or upon any of the other Related Documents. Grantor may withhold any such payment or may elect to contest any lien if Grantor is in good faith conducting an appropriate proceeding to contest the obligation to pay and so long as Lender's interest in the Collateral is not jeopardized in Lender's sole opinion. In any contest Grantor shall defend itself and Lender and shall satisfy any final adverse judgment before enforcement against the Collateral. Grantor shall name Lender as an additional obligee under any surety bond furnished in the contest proceedings. Grantor further agrees to furnish Lender with evidence that such taxes, assessments, and governmental and other charges have been paid in full and in a timely manner. Grantor may withhold any such payment or may elect to contest any lien if Grantor is in good faith conducting an appropriate proceeding to contest the obligation to pay and so long as Lender's interest in the Collateral is not jeopardized.

**Compliance with Governmental Requirements.** Grantor shall comply promptly with all laws, ordinances, rules and regulations of all governmental authorities, now or hereafter in effect, applicable to the ownership, production, disposition, or use of the Collateral, including all laws or regulations relating to the undue erosion of highly-erodible land or relating to the conversion of wetlands for the production of an agricultural product or commodity. Grantor may contest in good faith any such law, ordinance or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Lender's interest in the Collateral, in Lender's opinion, is not jeopardized.

**Hazardous Substances.** Grantor represents and warrants that the Collateral never has been, and never will be so long as this Agreement remains a lien on the Collateral, used in violation of any Environmental Laws or for the generation, manufacture, storage, transportation, treatment, disposal, release or threatened release of any Hazardous Substance. The representations and warranties contained herein are based on Grantor's due diligence in investigating the Collateral for Hazardous Substances. Grantor hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Grantor becomes liable for cleanup or other costs under any Environmental Laws, and (2) agrees to indemnify, defend, and hold harmless Lender against any and all claims and losses resulting from a breach of this provision of this Agreement. This obligation to indemnify and defend shall survive the payment of the Indebtedness and the satisfaction of this Agreement.

**Maintenance of Casualty Insurance.** Grantor shall procure and maintain all risks insurance, including without limitation fire, theft and liability coverage together with such other insurance as Lender may require with respect to the Collateral, in form, amounts, coverages and basis reasonably acceptable to Lender. Grantor, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least thirty (30) days' prior written notice to Lender and not including any disclaimer of the insurer's liability for failure to give such a notice. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Grantor or any other person. In connection with all policies covering assets in which Lender holds or is offered a security interest, Grantor will provide Lender with such loss payable or other endorsements as Lender may require. If Grantor at any time fails to obtain or maintain any insurance as required under this Agreement, Lender may (but shall not be obligated to) obtain such insurance as Lender deems appropriate, including if Lender so chooses "single interest insurance," which will cover only Lender's interest in the Collateral.

**Application of Insurance Proceeds.** Grantor shall promptly notify Lender of any loss or damage to the Collateral, whether or not such casualty or loss is covered by insurance. Lender may make proof of loss if Grantor fails to do so within fifteen (15) days of the casualty. All proceeds of any insurance on the Collateral, including accrued proceeds thereon, shall be held by Lender as part of the Collateral. If Lender consents to repair or replacement of the damaged or destroyed Collateral, Lender shall, upon satisfactory proof of expenditure, pay or reimburse Grantor from the proceeds for the reasonable cost of repair or restoration. If Lender does not consent to repair or replacement of the Collateral, Lender shall retain a sufficient amount of the proceeds to pay all of the Indebtedness, and shall pay the balance to Grantor. Any proceeds which have not been disbursed within six (6) months after their receipt and which Grantor has not committed to the repair or restoration of the Collateral shall be used to prepay the Indebtedness.

**Insurance Reserves.** Lender may require Grantor to maintain with Lender reserves for payment of insurance premiums, which reserves shall be created by monthly payments from Grantor of a sum estimated by Lender to be sufficient to produce, at least fifteen (15) days before the premium due date, amounts at least equal to the insurance premiums to be paid. If fifteen (15) days before payment is due, the reserve funds are insufficient, Grantor shall upon demand pay any deficiency to Lender. The reserve funds shall be held by Lender as a general deposit and shall constitute a non-interest-bearing account which Lender may satisfy by payment of the insurance premiums required to be paid by Grantor as they become due. Lender does not hold the reserve funds in trust for Grantor, and Lender is not the agent of Grantor for payment of the insurance premiums required to be paid by Grantor. The responsibility for the payment of premiums shall remain Grantor's sole responsibility.

**Insurance Reports.** Grantor, upon request of Lender, shall furnish to Lender reports on each existing policy of insurance showing such information as Lender may reasonably request including the following: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the property insured; (5) the then current value on the basis of which insurance has been obtained and the manner of determining that value; and (6) the expiration date of the policy. In addition, Grantor shall upon request by Lender (however not more often than annually) have an independent appraiser satisfactory to Lender determine, as applicable, the cash value or replacement cost of the Collateral.

**Financing Statements.** Grantor authorizes Lender to file a UCC financing statement, or alternatively, a copy of this Agreement to perfect Lender's security interest. At Lender's request, Grantor additionally agrees to sign all other documents that are necessary to perfect, protect, and continue Lender's security interest in the Property. Grantor will pay all filing fees, title transfer fees, and other fees and costs involved unless prohibited by law or unless Lender is required by law to pay such fees and costs. Grantor irrevocably appoints Lender to execute documents necessary to transfer title if there is a default. Lender may file a copy of this Agreement as a financing statement. Grantor will promptly notify Lender of any change to Grantor's name or the name of any individual Grantor, any individual who is a partner for a Grantor, and any individual who is a trustee or settlor or trustor for a Grantor under this Agreement. Grantor will also promptly notify Lender of any change to the name that appears on the most recently issued, unexpired driver's license or state-issued identification card, any expiration of the most recently issued driver's license or state-issued identification card for Grantor or any individual for whom Grantor is required to provide notice regarding name changes.

**GRANTOR'S RIGHT TO POSSESSION.** Until default, Grantor may have possession of the tangible personal property and beneficial use of all the Collateral and may use it in any lawful manner not inconsistent with this Agreement or the Related Documents, provided that Grantor's right to possession and beneficial use shall not apply to any Collateral where possession of the Collateral by Lender is required by law to perfect Lender's security interest in such Collateral. If Lender at any time has possession of any Collateral, whether before or after an Event of Default, Lender shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral if Lender takes such action for that purpose as Grantor shall request or as Lender, in Lender's sole discretion, shall deem appropriate under the circumstances, but failure to honor any request by Grantor shall not of itself be deemed to be a failure to exercise reasonable care. Lender shall not be required to take any steps necessary to preserve any rights in the Collateral against prior parties, nor to protect, preserve or maintain any security interest given to secure the Indebtedness.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Grantor fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Grantor's failure to discharge or pay when due any amounts Grantor is required to discharge or pay under this Agreement or any Related Documents, Lender on Grantor's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on the Collateral and paying all costs for insuring, maintaining and preserving the Collateral. All such expenditures paid by Lender for such purposes will then bear interest at the Note rate from the date incurred by Lender to the date of repayment by Grantor. To the extent permitted by applicable law, all such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be

## COMMERCIAL SECURITY AGREEMENT
### (Continued)

apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity. The Agreement also will secure payment of these amounts. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon Default.

DEFAULT. Each of the following shall constitute an Event of Default under this Agreement:

Payment Default. Grantor fails to make any payment when due under the Indebtedness.

Other Defaults. Grantor fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Grantor.

False Statements. Any warranty, representation or statement made or furnished to Lender by Grantor or on Grantor's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

Defective Collateralization. This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

Insolvency. The dissolution or termination of Grantor's existence as a going business or the death of any partner, the insolvency of Grantor, the appointment of a receiver for any part of Grantor's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Grantor.

Creditor or Forfeiture Proceedings. Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Grantor or by any governmental agency against any collateral securing the Indebtedness. This includes a garnishment of any of Grantor's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Grantor as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Grantor gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

Events Affecting Guarantor. Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or Guarantor dies or becomes incompetent or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

. Adverse Change. A material adverse change occurs in Grantor's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired.

Insecurity. Lender in good faith believes itself insecure.

Cure Provisions. If any default, other than a default in payment, is curable and if Grantor has not been given a notice of a breach of the same provision of this Agreement within the preceding twelve (12) months, it may be cured if Grantor, after Lender sends written notice to Grantor demanding cure of such default: (1) cures the default within thirty (30) days; or (2) if the cure requires more than thirty (30) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

RIGHTS AND REMEDIES ON DEFAULT. If an Event of Default occurs under this Agreement, at any time thereafter, Lender shall have all the rights of a secured party under the Texas Uniform Commercial Code. In addition and without limitation, Lender may exercise any one or more of the following rights and remedies:

Accelerate Indebtedness. Lender may declare the entire Indebtedness immediately due and payable, without notice of any kind to Grantor.

Assemble Collateral. Lender may require Grantor to deliver to Lender all or any portion of the Collateral and any and all certificates of title and other documents relating to the Collateral. Lender may require Grantor to assemble the Collateral and make it available to Lender at a place to be designated by Lender. Lender also shall have full power to enter, provided Lender does so without a breach of the peace or a trespass, upon the property of Grantor to take possession of and remove the Collateral. If the Collateral contains other goods not covered by this Agreement at the time of repossession, Grantor agrees Lender may take such other goods, provided that Lender makes reasonable efforts to return them to Grantor after repossession.

Sell the Collateral. Lender shall have full power to sell, lease, transfer, or otherwise deal with the Collateral or proceeds thereof in Lender's own name or that of Grantor. Lender may sell the Collateral at public auction or private sale. Unless the Collateral threatens to decline speedily in value or is of a type customarily sold on a recognized market, Lender will give Grantor, and other persons as required by law, reasonable notice of the time and place of any public sale, or the time after which any private sale or any other disposition of the Collateral is to be made. However, no notice need be provided to any person who, after Event of Default occurs, enters into and authenticates an agreement waiving that person's right to notification of sale. The requirements of reasonable notice shall be met if such notice is given at least ten (10) days before the time of the sale or disposition. All expenses relating to the disposition of the Collateral, including without limitation the expenses of retaking, holding, insuring, preparing for sale and selling the Collateral, shall become a part of the Indebtedness secured by this Agreement and shall be payable on demand, with interest at the Note rate from date of expenditure until repaid.

Appoint Receiver. Lender shall have the right to have a receiver appointed to take possession of all or any part of the Collateral, with the power to protect and preserve the Collateral, to operate the Collateral preceding foreclosure or sale, and to collect the rents from the Collateral and apply the proceeds, over and above the cost of the receivership, against the Indebtedness. The receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Collateral exceeds the Indebtedness by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver.

Collect Revenues, Apply Accounts. Lender, either itself or through a receiver, may collect the payments, rents, income, and revenues from the Collateral. Lender may at any time in Lender's discretion transfer any Collateral into Lender's own name or that of Lender's nominee and receive the payments, rents, income, and revenues therefrom and hold the same as security for the Indebtedness or apply it to payment of the Indebtedness in such order of preference as Lender may determine. Insofar as the Collateral consists of accounts, general intangibles, insurance policies, instruments, chattel paper, choses in action, or similar property, Lender may demand, collect, receipt for, settle, compromise, adjust, sue for, foreclose, or realize on the Collateral as Lender may determine, whether or not Indebtedness or Collateral is then due. For those purposes, Lender may, on behalf of and in the name of Grantor, receive, open and dispose of mail addressed to Grantor; change any address to which mail and payments are to be sent; and endorse notes, checks, drafts, money orders, documents of title, instruments and items pertaining to payment, shipment, or storage of any Collateral. To facilitate collection, Lender may notify account debtors and obligors on any Collateral to make payments directly to Lender.

Obtain Deficiency. If Lender chooses to sell any or all of the Collateral, Lender may obtain a judgment against Grantor for any deficiency remaining on the Indebtedness due to Lender after application of all amounts received from the exercise of the rights provided in this Agreement. Grantor shall be liable for a deficiency even if the transaction described in this subsection is a sale of accounts or chattel paper.

Other Rights and Remedies. Lender shall have all the rights and remedies of a secured creditor under the provisions of the Uniform Commercial Code, as may be amended from time to time. In addition, Lender shall have and may exercise any or all other rights and remedies it may have available at law, in equity, or otherwise.

Election of Remedies. Except as may be prohibited by applicable law, all of Lender's rights and remedies, whether evidenced by this Agreement, the Related Documents, or by any other writing, shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Grantor under this Agreement, after Grantor's failure to perform, shall not affect Lender's right to declare a default and exercise its remedies.

ORIGINAL DOCUMENT. "The parties whose signatures appear below agree that a photographic, photostatic, facsimile, electronic, copy or similar reproduction of this document shall be valid as the original.".

CHOICE OF VENUE. If there is a lawsuit, Grantor agrees upon Lender's request to submit to the jurisdiction of the Courts of Lubbock County, Texas. The parties agree that Lubbock County, Texas is the sole and exclusive venue for any lawsuit arising out of this transaction. .

MISCELLANEOUS PROVISIONS. The following miscellaneous provisions are a part of this Agreement:

Amendments. This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

Attorneys' Fees; Expenses. Grantor agrees to pay upon demand all of Lender's costs and expenses, including Lender's reasonable attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement. Lender may hire or pay

**COMMERCIAL SECURITY AGREEMENT**
**(Continued)**

Loan No: 4009822988                                                                                          Page 4

someone else to help enforce this Agreement, and Grantor shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's reasonable attorneys' fees and legal expenses whether or not there is a lawsuit, including Lender's reasonable attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Grantor also shall pay all court costs and such additional fees as may be directed by the court.

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Governing Law.** This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Texas without regard to its conflicts of law provisions. This Agreement has been accepted by Lender in the State of Texas.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Grantor, shall constitute a waiver of any of Lender's rights or of any of Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Notices.** Any notice required to be given under this Agreement shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Agreement. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Grantor agrees to keep Lender informed at all times of Grantor's current address. Unless otherwise provided or required by law, if there is more than one Grantor, any notice given by Lender to any Grantor is deemed to be notice given to all Grantors.

**Power of Attorney.** Grantor hereby appoints Lender as Grantor's irrevocable attorney-in-fact for the purpose of executing any documents necessary to perfect, amend, or to continue the security interest granted in this Agreement or to demand termination of filings of other secured parties. Lender may at any time, and without further authorization from Grantor, file a carbon, photographic or other reproduction of any financing statement or of this Agreement for use as a financing statement. Grantor will reimburse Lender for all expenses for the perfection and the continuation of the perfection of Lender's security interest in the Collateral.

**Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

**Successors and Assigns.** Subject to any limitations stated in this Agreement on transfer of Grantor's interest, this Agreement shall be binding upon and inure to the benefit of the parties, their successors and assigns. If ownership of the Collateral becomes vested in a person other than Grantor, Lender, without notice to Grantor, may deal with Grantor's successors with reference to this Agreement and the Indebtedness by way of forbearance or extension without releasing Grantor from the obligations of this Agreement or liability under the Indebtedness.

**Survival of Representations and Warranties.** All representations, warranties, and agreements made by Grantor in this Agreement shall survive the execution and delivery of this Agreement, shall be continuing in nature, and shall remain in full force and effect until such time as Grantor's Indebtedness shall be paid in full.

**Time is of the Essence.** Time is of the essence in the performance of this Agreement.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code:

    **Agreement.** The word "Agreement" means this Commercial Security Agreement, as this Commercial Security Agreement may be amended or modified from time to time, together with all exhibits and schedules attached to this Commercial Security Agreement from time to time.

    **Borrower.** The word "Borrower" means Reagor Auto Mall, Ltd. dba Reagor-Dykes Imports and includes all co-signers and co-makers signing the Note and all their successors and assigns.

    **Collateral.** The word "Collateral" means all of Grantor's right, title and interest in and to all the Collateral as described in the Collateral Description section of this Agreement.

    **Default.** The word "Default" means the Default set forth in this Agreement in the section titled "Default".

    **Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

    **Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Agreement in the default section of this Agreement.

    **Grantor.** The word "Grantor" means Reagor Auto Mall, Ltd. dba Reagor-Dykes Imports.

    **Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Indebtedness.

    **Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

    **Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

    **Indebtedness.** The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Grantor is responsible under this Agreement or under any of the Related Documents. Specifically, without limitation, Indebtedness includes all amounts that may be indirectly secured by the Cross-Collateralization provision of this Agreement.

    **Lender.** The word "Lender" means First Bank & Trust, its successors and assigns.

    **Note.** The word "Note" means the Note dated September 29, 2017 and executed by Reagor Auto Mall, Ltd. dba Reagor-Dykes Imports in the principal amount of $2,500,000.00, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the note or credit agreement.

    **Property.** The word "Property" means all of Grantor's right, title and interest in and to all the Property as described in the "Collateral Description" section of this Agreement.

    **Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

**GRANTOR HAS READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS COMMERCIAL SECURITY AGREEMENT AND AGREES TO ITS TERMS. THIS AGREEMENT IS DATED SEPTEMBER 29, 2017.**

## COMMERCIAL SECURITY AGREEMENT
### (Continued)

GRANTOR:

REAGOR AUTO MALL, LTD. DBA REAGOR-DYKES IMPORTS

REAGOR AUTO MALL I, L.L.C., General Partner of Reagor Auto Mall, Ltd. dba Reagor-Dykes Imports

By: _____            By: _____
  Bart Reagor, Manager of Reagor Auto Mall I, L.L.C.       Rick Dykes, Manager of Reagor Auto Mall I, L.L.C.

LaserPro, Ver. 17.2.0.010 Copr. Harland Financial Solutions, Inc. 1997, 2017. All Rights Reserved. - TX  J:\HARLAND\CFI\LPL\E40.FC  TR-49271  PR-4

# EXHIBIT I

*0000000004009822988%0220%0923#2017%0000000RAA2564*

## COMMERCIAL GUARANTY

| Borrower: | Reagor Auto Mall, Ltd. dba Reagor-Dykes Imports (TIN: 20-0275022) 1215 Ave J Lubbock, TX 79401 | Lender: | First Bank & Trust First Bank Centre 9816 Slide Road Lubbock, TX 79424 (806) 788-0800 |
|---|---|---|---|
| Guarantor: | Bart Reagor (SSN: 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) 8504 Oxford Ave Lubbock, TX 79423 | | |

**CONTINUING GUARANTEE OF PAYMENT AND PERFORMANCE.** For good and valuable consideration, Guarantor absolutely and unconditionally guarantees full and punctual payment and satisfaction of the Indebtedness of Borrower to Lender, and the performance and discharge of all Borrower's obligations under the Note and the Related Documents. This is a guaranty of payment and performance and not of collection, so Lender can enforce this Guaranty against Guarantor even when Lender has not exhausted Lender's remedies against anyone else obligated to pay the Indebtedness or against any collateral securing the Indebtedness, this Guaranty or any other guaranty of the Indebtedness. Guarantor will make any payments to Lender or its order, on demand, in legal tender of the United States of America, in same-day funds, without set-off or deduction or counterclaim, and will otherwise perform Borrower's obligations under the Note and Related Documents. Under this Guaranty, Guarantor's liability is unlimited and Guarantor's obligations are continuing.

**INDEBTEDNESS.** The word "Indebtedness" as used in this Guaranty means all of the principal amount outstanding from time to time and at any one or more times, accrued unpaid interest thereon and all collection costs and legal expenses related thereto permitted by law, Lender's reasonable attorneys' fees, arising from any and all debts, liabilities and obligations of every nature or form, now existing or hereafter arising or acquired, that Borrower individually or collectively or interchangeably with others, owes or will owe Lender. "Indebtedness" includes, without limitation, loans, advances, debts, overdraft indebtedness, credit card indebtedness, lease obligations, liabilities and obligations under any interest rate protection agreements or foreign currency exchange agreements or commodity price protection agreements, other obligations, and liabilities of Borrower, and any present or future judgments against Borrower, future advances, loans or transactions that renew, extend, modify, refinance, consolidate or substitute these debts, liabilities and obligations whether: voluntarily or involuntarily incurred; due or to become due by their terms or acceleration; absolute or contingent; liquidated or unliquidated; determined or undetermined; direct or indirect; primary or secondary in nature or arising from a guaranty or surety; secured or unsecured; joint or several or joint and several; evidenced by a negotiable or non-negotiable instrument or writing; originated by Lender or another or others; barred or unenforceable against Borrower for any reason whatsoever; for any transactions that may be voidable for any reason (such as infancy, insanity, ultra vires or otherwise); and originated then reduced or extinguished and then afterwards increased or reinstated.

If Lender presently holds one or more guaranties, or hereafter receives additional guaranties from Guarantor, Lender's rights under all guaranties shall be cumulative. This Guaranty shall not (unless specifically provided below to the contrary) affect or invalidate any such other guaranties. Guarantor's liability will be Guarantor's aggregate liability under the terms of this Guaranty and any such other unterminated guaranties.

**CONTINUING GUARANTY. THIS IS A "CONTINUING GUARANTY" UNDER WHICH GUARANTOR AGREES TO GUARANTEE THE FULL AND PUNCTUAL PAYMENT, PERFORMANCE AND SATISFACTION OF THE INDEBTEDNESS OF BORROWER TO LENDER, NOW EXISTING OR HEREAFTER ARISING OR ACQUIRED, ON AN OPEN AND CONTINUING BASIS. ACCORDINGLY, ANY PAYMENTS MADE ON THE INDEBTEDNESS WILL NOT DISCHARGE OR DIMINISH GUARANTOR'S OBLIGATIONS AND LIABILITY UNDER THIS GUARANTY FOR ANY REMAINING AND SUCCEEDING INDEBTEDNESS EVEN WHEN ALL OR PART OF THE OUTSTANDING INDEBTEDNESS MAY BE A ZERO BALANCE FROM TIME TO TIME.**

**DURATION OF GUARANTY.** This Guaranty will take effect when received by Lender without the necessity of any acceptance by Lender, or any notice to Guarantor or to Borrower, and will continue in full force until all the Indebtedness incurred or contracted before receipt by Lender of any notice of revocation shall have been fully and finally paid and satisfied and all of Guarantor's other obligations under this Guaranty shall have been performed in full. If Guarantor elects to revoke this Guaranty, Guarantor may only do so in writing. Guarantor's written notice of revocation must be mailed to Lender, by certified mail, at Lender's address listed above or such other place as Lender may designate in writing. Written revocation of this Guaranty will apply only to new Indebtedness created after actual receipt by Lender of Guarantor's written revocation and Lender's written acknowledgment of receipt. For this purpose and without limitation, the term "new Indebtedness" does not include the Indebtedness which at the time of notice of revocation is contingent, unliquidated, undetermined or not due and which later becomes absolute, liquidated, determined or due. For this purpose and without limitation, "new Indebtedness" does not include all or part of the Indebtedness that is: incurred by Borrower prior to revocation; incurred under a commitment that became binding before revocation; any renewals, extensions, substitutions, and modifications of the Indebtedness. This Guaranty shall bind Guarantor's estate as to the Indebtedness created both before and after Guarantor's death or incapacity, regardless of Lender's actual notice of Guarantor's death. Subject to the foregoing, Guarantor's executor or administrator or other legal representative may terminate this Guaranty in the same manner in which Guarantor might have terminated it and with the same effect. Release of any other guarantor or termination of any other guaranty of the Indebtedness shall not affect the liability of Guarantor under this Guaranty. A revocation Lender receives from any one or more Guarantors shall not affect the liability of any remaining Guarantors under this Guaranty. It is anticipated that fluctuations may occur in the aggregate amount of the Indebtedness covered by this Guaranty, and Guarantor specifically acknowledges and agrees that reductions in the amount of the Indebtedness, even to zero dollars ($0.00), shall not constitute a termination of this Guaranty. This Guaranty is binding upon Guarantor and Guarantor's heirs, successors and assigns so long as any of the Indebtedness remains unpaid and even though the Indebtedness may from time to time be zero dollars ($0.00).

**GUARANTOR'S AUTHORIZATION TO LENDER.** Guarantor authorizes Lender, either before or after any revocation hereof, without notice or demand and without lessening or otherwise affecting Guarantor's liability under this Guaranty, from time to time: (A)  prior to revocation as set forth above, to make one or more additional secured or unsecured loans to Borrower, to lease equipment or other goods to Borrower, or otherwise to extend additional credit to Borrower; (B) to alter, compromise, renew, extend, accelerate, or otherwise change one or more times the time for payment or other terms of the Indebtedness or any part of the Indebtedness, including increases and decreases of the rate of interest on the Indebtedness; extensions may be repeated and may be for longer than the original loan term; (C) to take and hold security for the payment of this Guaranty or the Indebtedness, and exchange, enforce, waive, subordinate, fail or decide not to perfect, and release any such security, with or without the substitution of new collateral; (D) to release, substitute, agree not to sue, or deal with any one or more of Borrower's sureties, endorsers, or other guarantors on any terms or in any manner Lender may choose; (E) to determine how, when and what application of payments and credits shall be made on the Indebtedness; (F) to apply such security and direct the order or manner of sale thereof, including without limitation, any nonjudicial sale permitted by the terms of the controlling security agreement or deed of trust, as Lender in its discretion may determine; (G) to sell, transfer, assign or grant participations in all or any part of the Indebtedness; and (H) to assign or transfer this Guaranty in whole or in part.

**GUARANTOR'S REPRESENTATIONS AND WARRANTIES.** Guarantor represents and warrants to Lender that  (A)  no representations or agreements of any kind have been made to Guarantor which would limit or qualify in any way the terms of this Guaranty; (B)  this Guaranty is executed at Borrower's request and not at the request of Lender; (C)  Guarantor has full power, right and authority to enter into this Guaranty; (D)  the provisions of this Guaranty do not conflict with or result in a default under any agreement or other instrument binding upon Guarantor and do not result in a violation of any law, regulation, court decree or order applicable to Guarantor; (E)  Guarantor has not and will not, without the prior written consent of Lender, sell, lease, assign, encumber, hypothecate, transfer, or otherwise dispose of all or substantially all of Guarantor's assets, or any interest therein; (F)  upon Lender's request, Guarantor will provide to Lender financial and credit information in form acceptable to Lender, and all such financial information which currently has been, and all future financial information which will be provided to Lender is and will be true and correct in all material respects and fairly present Guarantor's financial condition as of the dates the financial information is provided; (G)  no material adverse change has occurred in Guarantor's financial condition since the date of the most recent financial statements provided to Lender and no event has occurred which may materially adversely affect Guarantor's financial condition; (H)  no litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Guarantor is pending or threatened; (I)  Lender has made no representation to Guarantor as to the creditworthiness of Borrower; and (J)  Guarantor has established adequate means of obtaining from Borrower on a continuing basis information regarding Borrower's financial condition. Guarantor agrees to keep adequately informed from such means of any facts, events, or circumstances which might in any way affect Guarantor's risks under this Guaranty, and Guarantor further agrees that, absent a request for information, Lender shall have no obligation to disclose to Guarantor any information or documents acquired by Lender in the course of its relationship with Borrower.

**GUARANTOR'S WAIVERS.** Except as prohibited by applicable law, Guarantor waives any right to require Lender  (A)  to continue lending money or to extend other credit to Borrower; (B)  to make any presentment, protest, demand, or notice of any kind, including notice of any nonpayment of the Indebtedness or of any nonpayment related to any collateral, or notice of any action or nonaction on the part of Borrower, Lender, any surety, endorser, or other guarantor in connection with the Indebtedness or in connection with the creation of new or additional

**COMMERCIAL GUARANTY**
(Continued)

Loan No: 4009822988                                                                                     Page 2

loans or obligations; (C) to resort for payment or to proceed directly or at once against any person, including Borrower or any other guarantor; (D) to proceed directly against or exhaust any collateral held by Lender from Borrower, any other guarantor, or any other person; (E) to give notice of the terms, time, and place of any public or private sale of personal property security held by Lender from Borrower or to comply with any other applicable provisions of the Uniform Commercial Code; (F) to pursue any other remedy within Lender's power; or (G) to commit any act or omission of any kind, or at any time, with respect to any matter whatsoever.

Guarantor waives all rights of Guarantor under Chapter 43 of the Texas Civil Practice and Remedies Code. Guarantor also waives any and all rights or defenses based on suretyship or impairment of collateral including, but not limited to, any rights or defenses arising by reason of (A) any "one action" or "anti-deficiency" law or any other law which may prevent Lender from bringing any action, including a claim for deficiency, against Guarantor, before or after Lender's commencement or completion of any foreclosure action, either judicially or by exercise of a power of sale; (B) any election of remedies by Lender which destroys or otherwise adversely affects Guarantor's subrogation rights or Guarantor's rights to proceed against Borrower for reimbursement, including without limitation, any loss of rights Guarantor may suffer by reason of any law limiting, qualifying, or discharging the Indebtedness; (C) any disability or other defense of Borrower, of any other guarantor, or of any other person, or by reason of the cessation of Borrower's liability from any cause whatsoever, other than payment in full in legal tender, of the Indebtedness; (D) any right to claim discharge of the Indebtedness on the basis of unjustified impairment of any collateral for the Indebtedness; (E) any statute of limitations, if at any time any action or suit brought by Lender against Guarantor is commenced, there is outstanding Indebtedness which is not barred by any applicable statute of limitations; or (F) any defenses given to guarantors at law or in equity other than actual payment and performance of the Indebtedness. If payment is made by Borrower, whether voluntarily or otherwise, or by any third party, on the Indebtedness and thereafter Lender is forced to remit the amount of that payment to Borrower's trustee in bankruptcy or to any similar person under any federal or state bankruptcy law or law for the relief of debtors, the Indebtedness shall be considered unpaid for the purpose of the enforcement of this Guaranty.

Guarantor further waives and agrees not to assert or claim at any time any deductions to the amount guaranteed under this Guaranty for any claim of setoff, counterclaim, counter demand, recoupment or similar right, whether such claim, demand or right may be asserted by the Borrower, the Guarantor, or both.

**GUARANTOR'S UNDERSTANDING WITH RESPECT TO WAIVERS.** Guarantor warrants and agrees that each of the waivers set forth above is made with Guarantor's full knowledge of its significance and consequences and that, under the circumstances, the waivers are reasonable and not contrary to public policy or law. If any such waiver is determined to be contrary to any applicable law or public policy, such waiver shall be effective only to the extent permitted by law or public policy.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Guarantor's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Guarantor holds jointly with someone else and all accounts Guarantor may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Guarantor authorizes Lender, to the extent permitted by applicable law, to hold these funds if there is a default, and Lender may apply the funds in these accounts to pay what Guarantor owes under the terms of this Guaranty.

**SUBORDINATION OF BORROWER'S DEBTS TO GUARANTOR.** Guarantor agrees that the Indebtedness, whether now existing or hereafter created, shall be superior to any claim that Guarantor may now have or hereafter acquire against Borrower, whether or not Borrower becomes insolvent. Guarantor hereby expressly subordinates any claim Guarantor may have against Borrower, upon any account whatsoever, to any claim that Lender may now or hereafter have against Borrower. In the event of insolvency and consequent liquidation of the assets of Borrower, through bankruptcy, by an assignment for the benefit of creditors, by voluntary liquidation, or otherwise, the assets of Borrower applicable to the payment of the claims of both Lender and Guarantor shall be paid to Lender and shall be first applied by Lender to the Indebtedness. Guarantor does hereby assign to Lender all claims which it may have or acquire against Borrower or against any assignee or trustee in bankruptcy of Borrower; provided however, that such assignment shall be effective only for the purpose of assuring to Lender full payment in legal tender of the Indebtedness. If Lender so requests, any notes or credit agreements now or hereafter evidencing any debts or obligations of Borrower to Guarantor shall be marked with a legend that the same are subject to this Guaranty and shall be delivered to Lender. Guarantor agrees, and Lender is hereby authorized, in the name of Guarantor, from time to time to file financing statements and continuation statements and to execute documents and to take such other actions as Lender deems necessary or appropriate to perfect, preserve and enforce its rights under this Guaranty.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Guaranty:

**Amendments.** This Guaranty, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Guaranty. No alteration of or amendment to this Guaranty shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.** Guarantor agrees to pay upon demand all of Lender's costs and expenses, including Lender's reasonable attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Guaranty. Lender may hire or pay someone else to help enforce this Guaranty, and Guarantor shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's reasonable attorneys' fees and legal expenses whether or not there is a lawsuit, including Lender's reasonable attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Guarantor also shall pay all court costs and such additional fees as may be directed by the court.

**Caption Headings.** Caption headings in this Guaranty are for convenience purposes only and are not to be used to interpret or define the provisions of this Guaranty.

**Governing Law.** This Guaranty will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Texas without regard to its conflicts of law provisions.

**Integration.** Guarantor further agrees that Guarantor has read and fully understands the terms of this Guaranty; Guarantor has had the opportunity to be advised by Guarantor's attorney with respect to this Guaranty; the Guaranty fully reflects Guarantor's intentions and parol evidence is not required to interpret the terms of this Guaranty. Guarantor hereby indemnifies and holds Lender harmless from all losses, claims, damages, and costs (including Lender's attorneys' fees) suffered or incurred by Lender as a result of any breach by Guarantor of the warranties, representations and agreements of this paragraph.

**Interpretation.** In all cases where there is more than one Borrower or Guarantor, then all words used in this Guaranty in the singular shall be deemed to have been used in the plural where the context and construction so require; and where there is more than one Borrower named in this Guaranty or when this Guaranty is executed by more than one Guarantor, the words "Borrower" and "Guarantor" respectively shall mean all and any one or more of them. The words "Guarantor," "Borrower," and "Lender" include the heirs, successors, assigns, and transferees of each of them. If a court finds that any provision of this Guaranty is not valid or should not be enforced, that fact by itself will not mean that the rest of this Guaranty will not be valid or enforced. Therefore, a court will enforce the rest of the provisions of this Guaranty even if a provision of this Guaranty may be found to be invalid or unenforceable. If any one or more of Borrower or Guarantor are corporations, partnerships, limited liability companies, or similar entities, it is not necessary for Lender to inquire into the powers of Borrower or Guarantor or of the officers, directors, partners, managers, or other agents acting or purporting to act on their behalf, and any indebtedness made or created in reliance upon the professed exercise of such powers shall be guaranteed under this Guaranty.

**Notices.** Any notice required to be given under this Guaranty shall be given in writing, and, except for revocation notices by Guarantor, shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Guaranty. All revocation notices by Guarantor shall be in writing and shall be effective upon delivery to Lender as provided in the section of this Guaranty entitled "DURATION OF GUARANTY." Any party may change its address for notices under this Guaranty by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Guarantor agrees to keep Lender informed at all times of Guarantor's current address. Unless otherwise provided or required by law, if there is more than one Guarantor, any notice given by Lender to any Guarantor is deemed to be notice given to all Guarantors.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Guaranty unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Guaranty shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Guaranty. No prior waiver by Lender, nor any course of dealing between Lender and Guarantor, shall constitute a waiver of any of Guarantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Guaranty, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Successors and Assigns.** Subject to any limitations stated in this Guaranty on transfer of Guarantor's interest, this Guaranty shall be binding upon and inure to the benefit of the parties, their successors and assigns.

## COMMERCIAL GUARANTY
### (Continued)

Loan No: 4009822988

Page 3

**Waive Jury.** Lender and Guarantor hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by either Lender or Guarantor against the other.

**Original Document.** "The parties whose signatures appear below agree that a photographic, photostatic, facsimile, electronic, copy or similar reproduction of this document shall be valid as the original.".

**Choice of Venue.** If there is a lawsuit, Guarantor agrees upon Lender's request to submit to the jurisdiction of the Courts of Lubbock County, Texas. The parties agree that Lubbock County, Texas is the sole and exclusive venue for any lawsuit arising out of this Guaranty.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Guaranty. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Guaranty shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Borrower.** The word "Borrower" means Reagor Auto Mall, Ltd. dba Reagor-Dykes Imports and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Guarantor.** The word "Guarantor" means everyone signing this Guaranty, including without limitation Bart Reagor, and in each case, any signer's successors and assigns.

**Guaranty.** The word "Guaranty" means this guaranty from Guarantor to Lender.

**Indebtedness.** The word "Indebtedness" means Borrower's indebtedness to Lender as more particularly described in this Guaranty.

**Lender.** The word "Lender" means First Bank & Trust, its successors and assigns.

**Note.** The word "Note" means and includes without limitation all of Borrower's promissory notes and/or credit agreements evidencing Borrower's loan obligations in favor of Lender, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of and substitutions for promissory notes or credit agreements.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

**EACH UNDERSIGNED GUARANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS GUARANTY AND AGREES TO ITS TERMS. IN ADDITION, EACH GUARANTOR UNDERSTANDS THAT THIS GUARANTY IS EFFECTIVE UPON GUARANTOR'S EXECUTION AND DELIVERY OF THIS GUARANTY TO LENDER AND THAT THE GUARANTY WILL CONTINUE UNTIL TERMINATED IN THE MANNER SET FORTH IN THE SECTION TITLED "DURATION OF GUARANTY". NO FORMAL ACCEPTANCE BY LENDER IS NECESSARY TO MAKE THIS GUARANTY EFFECTIVE. THIS GUARANTY IS DATED SEPTEMBER 29, 2017.**

**GUARANTOR:**

X _____
Bart Reagor

---

## INDIVIDUAL ACKNOWLEDGMENT

STATE OF _Texas_ )
                  ) SS
COUNTY OF _Lubbock_ )

This instrument was acknowledged before me on _September 29_, 20_17_ by Bart Reagor.

LYNETTE BONHAM
Notary Public, State of Texas
Comm. Expires 05-22-2019
Notary ID 125682733

_____
Notary Public, State of Texas

# EXHIBIT J

*000000000400982298B%0220%09292017%00000000RAA2564*

## COMMERCIAL GUARANTY

| Borrower: | Reagor Auto Mall, Ltd. dba Reagor-Dykes Imports (TIN: 20-0275022) 1215 Ave J Lubbock, TX 79401 | Lender: | First Bank & Trust First Bank Centre 9816 Slide Road Lubbock, TX 79424 (806) 788-0800 |
|---|---|---|---|
| Guarantor: | Rick Dykes (SSN: 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) 4705 21st Street Lubbock, TX 79407 | | |

**CONTINUING GUARANTEE OF PAYMENT AND PERFORMANCE.** For good and valuable consideration, Guarantor absolutely and unconditionally guarantees full and punctual payment and satisfaction of the Indebtedness of Borrower to Lender, and the performance and discharge of all Borrower's obligations under the Note and the Related Documents. This is a guaranty of payment and performance and not of collection, so Lender can enforce this Guaranty against Guarantor even when Lender has not exhausted Lender's remedies against anyone else obligated to pay the Indebtedness or against any collateral securing the Indebtedness, this Guaranty or any other guaranty of the Indebtedness. Guarantor will make any payments to Lender or its order, on demand, in legal tender of the United States of America, in same-day funds, without set-off or deduction or counterclaim, and will otherwise perform Borrower's obligations under the Note and Related Documents. Under this Guaranty, Guarantor's liability is unlimited and Guarantor's obligations are continuing.

**INDEBTEDNESS.** The word "Indebtedness" as used in this Guaranty means all of the principal amount outstanding from time to time and at any one or more times, accrued unpaid interest thereon and all collection costs and legal expenses related thereto permitted by law, Lender's reasonable attorneys' fees, arising from any and all debts, liabilities and obligations of every nature or form, now existing or hereafter arising or acquired, that Borrower individually or collectively or interchangeably with others, owes or will owe Lender. "Indebtedness" includes, without limitation, loans, advances, debts, overdraft indebtedness, credit card indebtedness, lease obligations, liabilities and obligations under any interest rate protection agreements or foreign currency exchange agreements or commodity price protection agreements, other obligations, and liabilities of Borrower, and any present or future judgments against Borrower, future advances, loans or transactions that renew, extend, modify, refinance, consolidate or substitute these debts, liabilities and obligations whether: voluntarily or involuntarily incurred; due or to become due by their terms or acceleration; absolute or contingent; liquidated or unliquidated; determined or undetermined; direct or indirect; primary or secondary in nature or arising from a guaranty or surety; secured or unsecured; joint or several or joint and several; evidenced by a negotiable or non-negotiable instrument or writing; originated by Lender or another or others; barred or unenforceable against Borrower for any reason whatsoever; for any transactions that may be voidable for any reason (such as infancy, insanity, ultra vires or otherwise); and originated then reduced or extinguished and then afterwards increased or reinstated.

If Lender presently holds one or more guaranties, or hereafter receives additional guaranties from Guarantor, Lender's rights under all guaranties shall be cumulative. This Guaranty shall not (unless specifically provided below to the contrary) affect or invalidate any such other guaranties. Guarantor's liability will be Guarantor's aggregate liability under the terms of this Guaranty and any such other unterminated guaranties.

**CONTINUING GUARANTY. THIS IS A "CONTINUING GUARANTY" UNDER WHICH GUARANTOR AGREES TO GUARANTEE THE FULL AND PUNCTUAL PAYMENT, PERFORMANCE AND SATISFACTION OF THE INDEBTEDNESS OF BORROWER TO LENDER, NOW EXISTING OR HEREAFTER ARISING OR ACQUIRED, ON AN OPEN AND CONTINUING BASIS. ACCORDINGLY, ANY PAYMENTS MADE ON THE INDEBTEDNESS WILL NOT DISCHARGE OR DIMINISH GUARANTOR'S OBLIGATIONS AND LIABILITY UNDER THIS GUARANTY FOR ANY REMAINING AND SUCCEEDING INDEBTEDNESS EVEN WHEN ALL OR PART OF THE OUTSTANDING INDEBTEDNESS MAY BE A ZERO BALANCE FROM TIME TO TIME.**

**DURATION OF GUARANTY.** This Guaranty will take effect when received by Lender without the necessity of any acceptance by Lender, or any notice to Guarantor or to Borrower, and will continue in full force until all the Indebtedness incurred or contracted before receipt by Lender of any notice of revocation shall have been fully and finally paid and satisfied and all of Guarantor's other obligations under this Guaranty shall have been performed in full. If Guarantor elects to revoke this Guaranty, Guarantor may only do so in writing. Guarantor's written notice of revocation must be mailed to Lender, by certified mail, at Lender's address listed above or such other place as Lender may designate in writing. Written revocation of this Guaranty will apply only to new Indebtedness created after actual receipt by Lender of Guarantor's written revocation and Lender's written acknowledgment of receipt. For this purpose and without limitation, the term "new Indebtedness" does not include the Indebtedness which at the time of notice of revocation is contingent, unliquidated, undetermined or not due and which later becomes absolute, liquidated, determined or due. For this purpose and without limitation, "new Indebtedness" does not include all or part of the Indebtedness that is: incurred by Borrower prior to revocation; incurred under a commitment that became binding before revocation; any renewals, extensions, substitutions, and modifications of the Indebtedness. This Guaranty shall bind Guarantor's estate as to the Indebtedness created both before and after Guarantor's death or incapacity, regardless of Lender's actual notice of Guarantor's death. Subject to the foregoing, Guarantor's executor or administrator or other legal representative may terminate this Guaranty in the same manner in which Guarantor might have terminated it and with the same effect. Release of any other guarantor or termination of any other guaranty of the Indebtedness shall not affect the liability of Guarantor under this Guaranty. A revocation under this section will not apply as to any one or more Guarantors shall not affect the liability of any remaining Guarantors under this Guaranty. It is anticipated that fluctuations may occur in the aggregate amount of the Indebtedness covered by this Guaranty, and Guarantor specifically acknowledges and agrees that reductions in the amount of the Indebtedness, even to zero dollars ($0.00), shall not constitute a termination of this Guaranty. This Guaranty is binding upon Guarantor and Guarantor's heirs, successors and assigns so long as any of the Indebtedness remains unpaid and even though the Indebtedness may from time to time be zero dollars ($0.00).

**GUARANTOR'S AUTHORIZATION TO LENDER.** Guarantor authorizes Lender, either before or after any revocation hereof, without notice or demand and without lessening or otherwise affecting Guarantor's liability under this Guaranty, from time to time: (A) prior to revocation as set forth above, to make one or more additional secured or unsecured loans to Borrower, to lease equipment or other goods to Borrower, or otherwise to extend additional credit to Borrower; (B) to alter, compromise, renew, extend, accelerate, or otherwise change one or more times the time for payment or other terms of the Indebtedness or any part of the Indebtedness, including increases and decreases of the rate of interest on the Indebtedness; extensions may be repeated and may be for longer than the original loan term; (C) to take and hold security for the payment of this Guaranty or the Indebtedness, and exchange, enforce, waive, subordinate, fail or decide not to perfect, and release any such security, with or without the substitution of new collateral; (D) to release, substitute, agree not to sue, or deal with any one or more of Borrower's sureties, endorsers, or other guarantors on any terms or in any manner Lender may choose; (E) to determine how, when and what application of payments and credits shall be made on the Indebtedness; (F) to apply such security and direct the order or manner of sale thereof, including without limitation, any nonjudicial sale permitted by the terms of the controlling security agreement or deed of trust, as Lender in its discretion may determine; (G) to sell, transfer, assign or grant participations in all or any part of the Indebtedness; and (H) to assign or transfer this Guaranty in whole or in part.

**GUARANTOR'S REPRESENTATIONS AND WARRANTIES.** Guarantor represents and warrants to Lender that: (A) no representations or agreements of any kind have been made to Guarantor which would limit or qualify in any way the terms of this Guaranty; (B) this Guaranty is executed at Borrower's request and not at the request of Lender; (C) Guarantor has full power, right and authority to enter into this Guaranty; (D) the provisions of this Guaranty do not conflict with or result in a default under any agreement or other instrument binding upon Guarantor and do not result in a violation of any law, regulation, court decree or order applicable to Guarantor; (E) Guarantor has not and will not, without the prior written consent of Lender, sell, lease, assign, encumber, hypothecate, transfer, or otherwise dispose of all or substantially all of Guarantor's assets, or any interest therein; (F) upon Lender's request, Guarantor will provide to Lender financial and credit information in form acceptable to Lender, and at such financial information which currently has been, and all future financial information which will be provided to Lender is and will be true and correct in all material respects and fairly present Guarantor's financial condition as of the dates the financial information is provided; (G) no material adverse change has occurred in Guarantor's financial condition since the date of the most recent financial statements provided to Lender and no event has occurred which may materially adversely affect Guarantor's financial condition; (H) no litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Guarantor is pending or threatened; (I) Lender has made no representation to Guarantor as to the creditworthiness of Borrower; and (J) Guarantor has established adequate means of obtaining from Borrower on a continuing basis information regarding Borrower's financial condition. Guarantor agrees to keep adequately informed from such means of any facts, events, or circumstances which might in any way affect Guarantor's risks under this Guaranty, and Guarantor further agrees that, absent a request for information, Lender shall have no obligation to disclose to Guarantor any information or documents acquired by Lender in the course of its relationship with Borrower.

**GUARANTOR'S WAIVERS.** Except as prohibited by applicable law, Guarantor waives any right to require Lender (A) to continue lending money or to extend other credit to Borrower; (B) to make any presentment, protest, demand, or notice of any kind, including notice of any nonpayment of the Indebtedness or of any nonpayment related to any collateral, or notice of any action or nonaction on the part of Borrower, Lender, any surety, endorser, or other guarantor in connection with the Indebtedness or in connection with the creation of new or additional

## COMMERCIAL GUARANTY
### (Continued)

| Loan No: 4009822988 | | Page 2 |
|---|---|---|

loans or obligations; (C) to resort for payment or to proceed directly or at once against any person, including Borrower or any other guarantor; (D) to proceed directly against or exhaust any collateral held by Lender from Borrower, any other guarantor, or any other person; (E) to give notice of the terms, time, and place of any public or private sale of personal property security held by Lender from Borrower or to comply with any other applicable provisions of the Uniform Commercial Code; (F) to pursue any other remedy within Lender's power; or (G) to commit any act or omission of any kind, or at any time, with respect to any matter whatsoever.

Guarantor waives all rights of Guarantor under Chapter 43 of the Texas Civil Practice and Remedies Code. Guarantor also waives any and all rights or defenses based on suretyship or impairment of collateral including, but not limited to, any rights or defenses arising by reason of (A) any "one action" or "anti-deficiency" law or any other law which may prevent Lender from bringing any action, including a claim for deficiency, against Guarantor, before or after Lender's commencement or completion of any foreclosure action, either judicially or by exercise of a power of sale; (B) any election of remedies by Lender which destroys or otherwise adversely affects Guarantor's subrogation rights or Guarantor's rights to proceed against Borrower for reimbursement, including without limitation, any loss of rights Guarantor may suffer by reason of any law limiting, qualifying, or discharging the Indebtedness; (C) any disability or other defense of Borrower, of any other guarantor, or of any other person, or by reason of the cessation of Borrower's liability from any cause whatsoever, other than payment in full in legal tender, of the Indebtedness; (D) any right to claim discharge of the Indebtedness on the basis of unjustified impairment of any collateral for the Indebtedness; (E) any statute of limitations, if at any time any action or suit brought by Lender against Guarantor is commenced, there is outstanding Indebtedness which is not barred by any applicable statute of limitations; or (F) any defenses given to guarantors at law or in equity other than actual payment and performance of the Indebtedness. If payment is made by Borrower, whether voluntarily or otherwise, or by any third party, on the Indebtedness and thereafter Lender is forced to remit the amount of that payment to Borrower's trustee in bankruptcy or to any similar person under any federal or state bankruptcy law or law for the relief of debtors, the Indebtedness shall be considered unpaid for the purpose of the enforcement of this Guaranty.

Guarantor further waives and agrees not to assert or claim at any time any deductions to the amount guaranteed under this Guaranty for any claim of setoff, counterclaim, counter demand, recoupment or similar right, whether such claim, demand or right may be asserted by the Borrower, the Guarantor, or both.

**GUARANTOR'S UNDERSTANDING WITH RESPECT TO WAIVERS.** Guarantor warrants and agrees that each of the waivers set forth above is made with Guarantor's full knowledge of its significance and consequences and that, under the circumstances, the waivers are reasonable and not contrary to public policy or law. If any such waiver is determined to be contrary to any applicable law or public policy, such waiver shall be effective only to the extent permitted by law or public policy.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Guarantor's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Guarantor holds jointly with someone else and all accounts Guarantor may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Guarantor authorizes Lender, to the extent permitted by applicable law, to hold these funds if there is a default, and Lender may apply the funds in these accounts to pay what Guarantor owes under the terms of this Guaranty.

**SUBORDINATION OF BORROWER'S DEBTS TO GUARANTOR.** Guarantor agrees that the Indebtedness, whether now existing or hereafter created, shall be superior to any claim that Guarantor may now have or hereafter acquire against Borrower, whether or not Borrower becomes insolvent. Guarantor hereby expressly subordinates any claim Guarantor may have against Borrower, upon any account whatsoever, to any claim that Lender may now or hereafter have against Borrower. In the event of insolvency and consequent liquidation of the assets of Borrower, through bankruptcy, by an assignment for the benefit of creditors, by voluntary liquidation, or otherwise, the assets of Borrower applicable to the payment of the claims of both Lender and Guarantor shall be paid to Lender and shall be first applied by Lender to the Indebtedness. Guarantor does hereby assign to Lender all claims which it may have or acquire against Borrower or against any assignee or trustee in bankruptcy of Borrower; provided however, that such assignment shall be effective only for the purpose of assuring to Lender full payment in legal tender of the Indebtedness. If Lender so requests, any notes or credit agreements now or hereafter evidencing any debts or obligations of Borrower to Guarantor shall be marked with a legend that the same are subject to this Guaranty and shall be delivered to Lender. Guarantor agrees, and Lender is hereby authorized, in the name of Guarantor, from time to time to file financing statements and continuation statements and to execute documents and to take such other actions as Lender deems necessary or appropriate to perfect, preserve and enforce its rights under this Guaranty.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Guaranty:

**Amendments.** This Guaranty, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Guaranty. No alteration of or amendment to this Guaranty shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.** Guarantor agrees to pay upon demand all of Lender's costs and expenses, including Lender's reasonable attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Guaranty. Lender may hire or pay someone else to help enforce this Guaranty, and Guarantor shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's reasonable attorneys' fees and legal expenses whether or not there is a lawsuit, including Lender's reasonable attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Guarantor also shall pay all court costs and such additional fees as may be directed by the court.

**Caption Headings.** Caption headings in this Guaranty are for convenience purposes only and are not to be used to interpret or define the provisions of this Guaranty.

**Governing Law.** This Guaranty will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Texas without regard to its conflicts of law provisions.

**Integration.** Guarantor further agrees that Guarantor has read and fully understands the terms of this Guaranty; Guarantor has had the opportunity to be advised by Guarantor's attorney with respect to this Guaranty; the Guaranty fully reflects Guarantor's intentions and parol evidence is not required to interpret the terms of this Guaranty. Guarantor hereby indemnifies and holds Lender harmless from all losses, claims, damages, and costs (including Lender's attorneys' fees) suffered or incurred by Lender as a result of any breach by Guarantor of the warranties, representations and agreements of this paragraph.

**Interpretation.** In all cases where there is more than one Borrower or Guarantor, then all words used in this Guaranty in the singular shall be deemed to have been used in the plural where the context and construction so require; and where there is more than one Borrower named in this Guaranty or when this Guaranty is executed by more than one Guarantor, the words "Borrower" and "Guarantor" respectively shall mean all and any one or more of them. The words "Guarantor," "Borrower," and "Lender" include the heirs, successors, assigns, and transferees of each of them. If a court finds that any provision of this Guaranty is not valid or should not be enforced, that fact by itself will not mean that the rest of this Guaranty will not be valid or enforced. Therefore, a court will enforce the rest of the provisions of this Guaranty even if a provision of this Guaranty may be found to be invalid or unenforceable. If any one or more of Borrower or Guarantor are corporations, partnerships, limited liability companies, or similar entities, it is not necessary for Lender to inquire into the powers of Borrower or Guarantor or of the officers, directors, partners, managers, or other agents acting or purporting to act on their behalf, and any indebtedness made or created in reliance upon the professed exercise of such powers shall be guaranteed under this Guaranty.

**Notices.** Any notice required to be given under this Guaranty shall be given in writing, and, except for revocation notices by Guarantor, shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Guaranty. All revocation notices by Guarantor shall be in writing and shall be effective upon delivery to Lender as provided in the section of this Guaranty entitled "DURATION OF GUARANTY." Any party may change its address for notices under this Guaranty by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Guarantor agrees to keep Lender informed at all times of Guarantor's current address. Unless otherwise provided or required by law, if there is more than one Guarantor, any notice given by Lender to any Guarantor is deemed to be notice given to all Guarantors.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Guaranty unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Guaranty shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Guaranty. No prior waiver by Lender, nor any course of dealing between Lender and Guarantor, shall constitute a waiver of any of Lender's rights or of any of Guarantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Guaranty, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Successors and Assigns.** Subject to any limitations stated in this Guaranty on transfer of Guarantor's interest, this Guaranty shall be binding upon and inure to the benefit of the parties, their successors and assigns.

**COMMERCIAL GUARANTY**
**(Continued)**

Loan No: 4009822988                                                                 Page 3

Waive Jury. Lender and Guarantor hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by either Lender or Guarantor against the other.

Original Document. "The parties whose signatures appear below agree that a photographic, photostatic, facsimile, electronic, copy or similar reproduction of this document shall be valid as the original.".

Choice of Venue. If there is a lawsuit, Guarantor agrees upon Lender's request to submit to the jurisdiction of the Courts of Lubbock County, Texas. The parties agree that Lubbock County, Texas is the sole and exclusive venue for any lawsuit arising out of this Guaranty.

DEFINITIONS. The following capitalized words and terms shall have the following meanings when used in this Guaranty. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Guaranty shall have the meanings attributed to such terms in the Uniform Commercial Code:

Borrower. The word "Borrower" means Reagor Auto Mall, Ltd, dba Reagor-Dykes Imports and includes all co-signers and co-makers signing the Note and all their successors and assigns.

Guarantor. The word "Guarantor" means everyone signing this Guaranty, including without limitation Rick Dykes, and in each case, any signer's successors and assigns.

Guaranty. The word "Guaranty" means this guaranty from Guarantor to Lender.

Indebtedness. The word "Indebtedness" means Borrower's indebtedness to Lender as more particularly described in this Guaranty.

Lender. The word "Lender" means First Bank & Trust, its successors and assigns.

Note. The word "Note" means and includes without limitation all of Borrower's promissory notes and/or credit agreements evidencing Borrower's loan obligations in favor of Lender, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of and substitutions for promissory notes or credit agreements.

Related Documents. The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

EACH UNDERSIGNED GUARANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS GUARANTY AND AGREES TO ITS TERMS. IN ADDITION, EACH GUARANTOR UNDERSTANDS THAT THIS GUARANTY IS EFFECTIVE UPON GUARANTOR'S EXECUTION AND DELIVERY OF THIS GUARANTY TO LENDER AND THAT THE GUARANTY WILL CONTINUE UNTIL TERMINATED IN THE MANNER SET FORTH IN THE SECTION TITLED "DURATION OF GUARANTY", NO FORMAL ACCEPTANCE BY LENDER IS NECESSARY TO MAKE THIS GUARANTY EFFECTIVE. THIS GUARANTY IS DATED SEPTEMBER 29, 2017.

GUARANTOR:

X _____
Rick Dykes

---

**INDIVIDUAL ACKNOWLEDGMENT**

STATE OF ___Texas_____ )
                                  ) SS
COUNTY OF ___Lubbock_____ )

This instrument was acknowledged before me on ___September 29___, 20_17_ by Rick Dykes.

LYNETTE BONHAM
Notary Public, State of Texas
Comm Expires 05-22-2019
Notary ID 125582733

_____
Notary Public, State of Texas

# EXHIBIT K

**Account Agreement**            Date: _05/17/13_

| Institution Name & Address | Internal Use Totally Free Bus Ck | 4016015978 |
|---|---|---|
| First Bank & Trust Company | Account Title & Address | |
| First Bank & Trust Centre | Reagor Auto Mall, Ltd | |
| 9816 Slide Road | 1211 19th St | |
| Lubbock, TX 79424 | Lubbock TX 79401 | |
| (806) 788-0800 | | |

**Ownership of Account**

The specified ownership will remain the same for all accounts.

**IMPORTANT ACCOUNT OPENING INFORMATION:** Federal law requires us to obtain sufficient information to verify your identity. You may be asked several questions and to provide one or more forms of identification to fulfill this requirement. In some instances we may use outside sources to confirm the information. The information you provide is protected by our privacy policy and federal law.

Enter Non-Individual Owner Information on page 2. There is additional Owner/Signer Information space on page 2.

*(For consumer accounts, select and initial.):*
Uniform Single-Party or Multiple-Party Account Selection Form Notice: The type of account you select may determine how property passes at your death. Your Will may not control the disposition of funds held in some of the following accounts:

☐ Single-Party Account with Payable-On-Death

☐ (POD) Designation

☐ Single-Party Account without POD Designation

☐ Multiple-Party Account with Right of Survivorship

☐ Multiple-Party Account with Right of Survivorship and POD

☐ Multiple-Party Account without Right of Survivorship

☐ Convenience Account

☐ Trust Account *(name beneficiaries below)*

☐

| Owner/Signer Information 1 | |
|---|---|
| Name | BART REAGOR |
| Relationship | SIGNER |
| Address | 8504 OXFORD AVE |
| | LUBBOCK TX 79423 |
| Mailing Address (if different) | |
| Home Phone | (806) 790-4593 |
| Work Phone | |
| Mobile Phone | |
| E-Mail | |
| Birth Date | 02/01/66 |
| SSN/TIN | 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 |
| Gov't Issued Photo ID (Type, Number, State, Issue Date, Exp. Date) | Drivers License        DL 10626650        02/01/ 18 |
| Other ID (Description, Details) | |
| Employer | |
| Previous Financial Inst. | |

☐ Corporation - For Profit      ☐ Corporation - Nonprofit

☒ Partnership      ☐ Sole Proprietorship

☐ Limited Liability Company

☐ Trust–Separate Agreement Dated:_____

☐

**Beneficiary Name(s), Address(es), and SSN(s)**

*(Check appropriate ownership above.)*

| Owner/Signer Information 2 | |
|---|---|
| Name | RICK DYKES |
| Relationship | SIGNER |
| Address | 4705 21ST ST |
| | LUBBOCK TX 79407 |
| Mailing Address (if different) | |
| Home Phone | (806) 773-4382 |
| Work Phone | |
| Mobile Phone | |
| E-Mail | |
| Birth Date | 01/12/60 |
| SSN/TIN | 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 |
| Gov't Issued Photo ID (Type, Number, State, Issue Date, Exp. Date) | Drivers License 10611178 TX        01/12/ 18 |
| Other ID (Description, Details) | |
| Employer | |
| Previous Financial Inst. | |

☐ If checked, this is a temporary account agreement.

**Signature(s)**

The undersigned authorize the financial institution to investigate credit and employment history and obtain reports from consumer reporting agency(ies) on them as individuals. Except as otherwise provided by law or other documents, each of the undersigned is authorized to make withdrawals from the account(s), provided the required number of signature(s) indicated above is satisfied. The undersigned personally and as, or on behalf of, the account owner(s) agree to the terms of, and acknowledge receipt of copy(ies) of, this document and the following:

☒ Terms and Conditions      ☒ Privacy

☒ Electronic Fund Transfers      ☒ Truth in Savings

☒ Substitute Checks      ☒ Funds Availability

☒ Common Features      ☒ New Account Opening Proce

Number of signatures required for withdrawal: ___1___

See Other Signer Information for Convenience Signer designation(s).

1 [ X _BART REAGOR_                              ]

2 [ X _RICK DYKES_                    ] 4 [ X _____ ]

3 [ X _Shane Andrew Smith_                       ]

SHEILA E MILLER

KO 7/2/13

## Owner/Signer Information 3

| | |
|---|---|
| Name | Shane Andrew Smith |
| Relationship | SIGNER |
| Address | 3804 106th St<br>Lubbock TX 79423 |
| Mailing Address (if different) | |
| Home Phone | (806) 368-3531 |
| Work Phone | (806) 687-7771 |
| Mobile Phone | |
| E-Mail | SMITH-SHANE@SBCGLOBAL.NET |
| Birth Date | 07/20/73 |
| SSN/TIN | 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 |
| Gov't Issued Photo ID (Type, Number, State, Issue Date, Exp. Date) | Drivers License        DL<br>08915839<br>TX        07/20/14 |
| Other ID (Description, Details) | |
| Employer | Reagor Dykes Auto Group |
| Previous Financial Inst. | |

## Owner/Signer Information 4

| | |
|---|---|
| Name | SHEILA E MILLER |
| Relationship | SIGNER |
| Address | 1111 19TH ST<br>LUBBOCK TX 79401 |
| Mailing Address (if different) | |
| Home Phone | (806) 687-7771 |
| Work Phone | (806) 687-7771 |
| Mobile Phone | |
| E-Mail | SMILLER@REAGORAUTOMALL.COM |
| Birth Date | 11/11/66 |
| SSN/TIN | 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 |
| Gov't Issued Photo ID (Type, Number, State, Issue Date, Exp. Date) | Drivers License        DL<br>11492950<br>TX        11/11/18 |
| Other ID (Description, Details) | |
| Employer | REAGOR AUTO MALL LTD |
| Previous Financial Inst. | |

## Backup Withholding Certifications

(If not a "U.S. Person," certify foreign status separately.)

TIN: 20-0275022

☒ Taxpayer I.D. Number (TIN) - The number shown above is my correct taxpayer identification number.

☒ Backup Withholding - I am not subject to backup withholding either because I have not been notified that I am subject to backup withholding as a result of a failure to report all interest or dividends, or the Internal Revenue Service has notified me that I am no longer subject to backup withholding.

☐ Exempt Recipients - I am an exempt recipient under the Internal Revenue Service Regulations.

I certify under penalties of perjury the statements checked in this section and that I am a U.S. person (including a U.S. resident alien).

X _____ (Date)

## Non-Individual Owner Information

| | |
|---|---|
| Name | Reagor Auto Mall, Ltd |
| EIN | 20-0275022 |
| Phone | 806-687-7771 |
| Mobile Phone | |
| E-Mail | |
| Type of Entity | |
| State/Country & Date of Organization | |
| Nature of Business | |
| Address | 1211 19th St<br>Lubbock TX 79401 |
| Mailing Address (if different) | |
| Authorization/ Resolution Date | |
| Previous Financial Inst. | |

| Account Description | Account # | Initial Deposit/Source | |
|---|---|---|---|
| Checking | 4016015978 | $ _____<br>☐ Cash ☐ Check<br>☐ _____ | |
| | | $ _____<br>☐ Cash ☐ Check | |
| | | $ _____<br>☐ Cash ☐ Check | |

## Services Requested

☐ ATM    ☐ Debit/Check Cards (No. Requested: _____)
☐ _____        ☐ _____
☐ _____        ☐ _____

## Other Terms/Information

All overdraft amounts and overdraft fees and/or insufficient funds charges may, at Bank's discretion, be added to the balance of any promissory note, of whatever type, that exists by and between Bank and the Owner(s) and/or Customer or any entity directly or indirectly owned or controlled by Owner(s) and/or Customer, in whatever capacity.

**SIGNATURE ADDENDUM**   4016015978

**Date of Document:** 05/17/13
                       Revised Date: 05/23/13

**Additional Parties' Type:** _____

**Names and Addresses of Parties:**
DIANA H URIAS
1111 19TH ST
LUBBOCK TX 79401

**Signatures.** By signing under seal, I agree to the terms contained in the named document. The undersigned also acknowledge receipt of a copy of this named document.

Reagor Auto Mall, Ltd
Entity Name                                          Entity Name

_____ (Seal)             _____ (Seal)
Signature                           Date             Signature                           Date
DIANA H URIAS

_____ (Seal)             _____ (Seal)
Signature                           Date             Signature                           Date

_____ (Seal)             _____ (Seal)
Signature                           Date             Signature                           Date

_____ (Seal)             _____ (Seal)
Signature                           Date             Signature                           Date


Entity Name                                          Entity Name

_____ (Seal)             _____ (Seal)
Signature                           Date             Signature                           Date

_____ (Seal)             _____ (Seal)
Signature                           Date             Signature                           Date

_____ (Seal)             _____ (Seal)
Signature                           Date             Signature                           Date

_____ (Seal)             _____ (Seal)
Signature                           Date             Signature                           Date

## PARTNERSHIP RESOLUTION OF AUTHORITY

First Bank & Trust Company
9816 Slide Road
Lubbock, TX 79424

By: Reagor Auto Mall, Ltd
1211 19th St
Lubbock TX 79401

Referred to in this document as "Financial Institution"

Referred to in this document as "Partnership"

The above partnership consists of the following partners (or if a limited partnership, the following general partners):

*Bart Reagor*
*Kirk Dykes*

The above-named parties represent that they constitute all of the partners of the Partnership designated above, or if a limited Partnership, constitute all of the general partners of the partnership designated above. These individuals are referred to in this document as "Partners."

Federal I.D. Number   20-0275022   for   Reagor Auto Mall, Ltd   Date   05/23/13
(EIN if one has been obtained or SSN if no EIN has been obtained)   (Trade Name of Partnership if EIN provided or Name of Partner supplying SSN)

AGENTS Any Agent listed below, subject to any written limitations, is authorized to exercise the powers granted as indicated below:

| Name and Title or Position | Signature | Facsimile Signature (if used) |
|---|---|---|
| A. BART REAGOR-SIGNER | X | X |
| B. RICK DYKES-SIGNER | X | X |
| C. SHANE SMITH-SIGNER | X | X |
| D. SHEILA MILLER-SIGNER | X | X |
| E. DIANA URIAS-SIGNER | X | X |
| F. | X | X |

POWERS GRANTED (Attach one or more Agents to each power by placing the letter corresponding to their name in the area before each power. Following each power indicate the number of Agent signatures required to exercise the power.)

| Indicate A, B, C, D, E, and/or F | | Description of Power | Indicate number of signatures required |
|---|---|---|---|
| A, B, C, D, E | (1) | Exercise all of the powers listed in this resolution. | 1 |
| | (2) | Open any deposit or share account(s) in the name of the Partnership. | |
| | (3) | Endorse checks and orders for the payment of money or otherwise withdraw or transfer funds on deposit with this Financial Institution. | |
| | (4) | Borrow money on behalf and in the name of the Partnership, sign, execute and deliver promissory notes or other evidences of indebtedness. | |
| | (5) | Endorse, assign, transfer, mortgage or pledge bills receivable, warehouse receipts, bills of lading, stocks, bonds, real estate or other property now owned or hereafter owned or acquired by the Partnership as security for sums borrowed, and to discount the same, unconditionally guarantee payment of all bills received, negotiated or discounted and to waive demand, presentment, protest, notice of protest and notice of non-payment. | |
| | (6) | Enter into a written lease for the purpose of renting, maintaining, accessing and terminating a Safe Deposit Box in this Financial Institution. | |
| | (7) | Other _____ | |

LIMITATIONS ON POWERS The following are the Partnership's express limitations on the powers granted under this resolution.

EFFECT ON PREVIOUS RESOLUTIONS This resolution supersedes resolution dated _____ . If not completed, all resolutions remain in effect

CERTIFICATION OF AUTHORITY I further certify that the Partnership has, and at the time of adoption of this resolution had, full power and lawful authority to adopt the resolutions on page 2 and to confer the powers granted above to the person named who have full power and lawful authority to exercise the same.

Signatures: (Type name of each Partner below each signature line.)

X _____   X _____   X _____

X _____   X _____   X _____

Partnership Authorization
VMP® Bankers Systems™
Wolters Kluwer Financial Services ©1985, 2009

PR-1 9/11/200
VMPC101 (0909
Page 1 of

The Partners to the Partnership resolve, warrant and agree as follows:

(1) The Financial Institution is designated as a depository for the funds of the Partnership and to provide other financial accommodations indicated in this resolution.

(2) This resolution shall continue to have effect until express written notice of its rescission or modification has been received and recorded by the Financial Institution. Any and all prior resolutions adopted by the Partners and certified to the Financial Institution as governing the operation of this partnership's account(s), are in full force and effect, until the Financial Institution receives and acknowledges an express written notice of its revocation, modification or replacement. Any revocation, modification or replacement of a resolution must be accompanied by documentation, satisfactory to the Financial Institution, establishing the authority for the changes.

(3) The signature of an Agent on this resolution is conclusive evidence of their authority to act on behalf of the Partnership. Any Agent, so long as they act in a representative capacity as an Agent of the Partnership, is authorized to make any and all other contracts, agreements, stipulations and orders which they may deem advisable for the effective exercise of the powers indicated on page one, from time to time with the Financial Institution, subject to any restrictions on this resolution or otherwise agreed to in writing.

(4) All transactions, if any, with respect to any deposits, withdrawals, rediscounts and borrowings by or on behalf of the Partnership with the Financial Institution prior to the adoption of this resolution are hereby ratified, approved and confirmed.

(5) The Partners agree to the terms and conditions of any account agreement, properly opened by any Agent of the Partnership. The Partners authorize the Financial Institution, at any time, to charge the Partnership for all checks, drafts, or other orders, for the payment of money, that are drawn on the Financial Institution, so long as they contain the required number of signatures for this purpose.

(6) The Partners acknowledge and agree that the Financial Institution may furnish at its discretion automated access devices to Agents of the Partnership to facilitate those powers authorized by this resolution or other resolutions in effect at the time of issuance. The term "automated access device" includes, but is not limited to, credit cards, automated teller machines (ATM), and debit cards.

(7) The Partners acknowledge and agree that the Financial Institution may rely on alternative signature and verification codes issued to or obtained from the Agent named on this resolution. The term "alternative signature and verification codes" includes, but is not limited to, facsimile signatures on file with the Financial Institution, personal identification numbers (PIN), and digital signatures. If a facsimile signature specimen has been provided on this resolution, (or that are filed separately by the Partnership with the Financial Institution from time to time) the Financial Institution is authorized to treat the facsimile signature as the signature of the Agent(s) regardless of by whom or by what means the facsimile signature may have been affixed so long as it resembles the facsimile signature specimen on file. The Partners authorize each Agent to have custody of the Partnership's private key used to create a digital signature and to request issuance of a certificate listing the corresponding public key. The Financial Institution shall have no responsibility or liability for unauthorized use of alternative signature and verification codes unless otherwise agreed in writing.

(8) If any other parties become interested in the partnership as co-partners, the partnership relationship is altered in any way or if the business should become incorporated, the Partners shall promptly notify the Financial Institution.

(9) By signing this resolution, Partners represent that they have provided the Financial Institution with true and complete copies of the partnership agreement, if any, as amended to the date of this resolution.

Pennsylvania. The designation of an Agent does not create a power of attorney; therefore, Agents are not subject to the provisions of 20 Pa.C.S.A. Section 5601 et seq. (Chapter 56; Decedents, Estates and Fiduciaries Code) unless the agency was created by a separate power of attorney. Any provision that assigns Financial Institution rights to act on behalf of any person or entity is not subject to the provisions of 20 Pa.C.S.A. Section 5601 et seq. (Chapter 56; Decedents, Estates and Fiduciaries Code).

---

**FOR FINANCIAL INSTITUTION USE ONLY**

Acknowledged and received on _____ (date) by _____ (initials)  ☐ This resolution is superseded by resolution dated _____

Comments:

Partnership Authorization
VMP® Bankers Systems™
Wolters Kluwer Financial Services ©1985, 2009

PR-1 9/11/2009
VMPC161 (0909)
Page 2 of 2

# EXHIBIT L

# Terms and Conditions of Your Account

**Contents:**

(1) Important Information about Procedures for Opening a New Account
(2) Agreement
(3) Liability
(4) Deposits
(5) Withdrawals
    *Generally*
    *Postdated Checks*
    *Checks and Withdrawal Rules*
    *A Temporary Debit Authorization Hold Affects Your Account Balance*
    *Overdrafts*
    *Multiple Signatures, Electronic Check Conversion, and Similar Transactions*
    *Notice of Withdrawal*
(6) Uniform Single-Party or Multiple-Party Account Selection Form Notice
    *Single-Party Account Without "P.O.D." (Payable on Death) Designation*
    *Single-Party Account With "P.O.D." (Payable on Death) Designation*
    *Multiple-Party Account Without Right of Survivorship*
    *Multiple-Party Account With Right of Survivorship*
    *Multiple-Party Account with Right of Survivorship and "P.O.D." (Payable on Death) Designation*
    *Convenience Account*
    *Trust Account*
(7) Business, Organization, and Association Accounts
(8) Stop Payments
(9) Telephone Transfers
(10) Amendments and Termination
(11) Notices
(12) Statements
    *Your Duty to Report Unauthorized Signatures, Alterations, and Forgeries*
    *Your Duty to Report Other Errors*
    *Errors Relating to Electronic Fund Transfers or Substitute Checks*
(13) Direct Deposits
(14) Temporary Account Agreement
(15) Setoff
(16) Check Processing
(17) Check Cashing
(18) Truncation, Substitute Checks, and Other Check Images
(19) Remotely Created Checks
(20) Unlawful Internet Gambling Notice
(21) ACH and Wire Transfers
(22) Facsimile Signatures
(23) Restrictive Legends or Indorsements
(24) Account Transfer
(25) Indorsements
(26) Death or Incompetence
(27) Fiduciary Accounts
(28) Credit Verification
(29) Legal Actions Affecting Your Account
(30) Security
(31) Telephonic Instructions
(32) Monitoring and Recording Telephone Calls and Consent to Receive Communications
(33) Claim of Loss
(34) Early Withdrawal Penalties
(35) Address or Name Changes
(36) Resolving Account Disputes
(37) Waiver of Notices
(38) Additional Terms

**(1) Important Information about Procedures for Opening a New Account.** To help the government fight the funding of terrorism and money laundering activities, federal law requires all financial institutions to obtain, verify, and record information that identifies each person who opens an account.

What this means for you: When you open an account, we will ask for your name, address, date of birth, and other information that will allow us to identify you. We may also ask to see your driver's license or other identifying documents.

**(2) Agreement.** This document, along with any other documents we give you pertaining to your account(s), is a contract that establishes rules which control your account(s) with us. Please read this carefully and retain it for future reference. If you sign the signature card or open or continue to use the account, you agree to these rules. You will receive a separate schedule of rates, qualifying balances, and fees if they are not included in this document. If you have any questions, please call us.

This agreement is subject to applicable federal laws, the laws of the state of Texas and other applicable rules such as the operating letters of the Federal Reserve Banks and payment processing system rules (except to the extent that this agreement can and does vary such rules or laws). The body of state and federal law that governs our relationship with you, however, is too large and complex to be reproduced here. The purpose of this document is to:

1. summarize some laws that apply to common transactions;
2. establish rules to cover transactions or events which the law does not regulate;

3. establish rules for certain transactions or events which the law regulates but permits variation by agreement; and

4. give you disclosures of some of our policies to which you may be entitled or in which you may be interested.

If any provision of this document is found to be unenforceable according to its terms, all remaining provisions will continue in full force and effect. We may permit some variations from our standard agreement, but we must agree to any variation in writing either on the signature card for your account or in some other document. Nothing in this document is intended to vary our duty to act in good faith and with ordinary care when required by law.

As used in this document the words "we," "our," and "us" mean the financial institution and the words "you" and "your" mean the account holder(s) and anyone else with the authority to deposit, withdraw, or exercise control over the funds in the account. However, this agreement does not intend, and the terms "you" and "your" should not be interpreted, to expand an individual's responsibility for an organization's liability. If this account is owned by a corporation, partnership or other organization, individual liability is determined by the laws generally applicable to that type of organization. The headings in this document are for convenience or reference only and will not govern the interpretation of the provisions. Unless it would be inconsistent to do so, words and phrases used in this document should be construed so the singular includes the plural and the plural includes the singular.

"Party" means a person who, by the terms of an account, has a present right, subject to request, to payment from the account other than as a beneficiary or agent.

**(3) Liability.** You agree, for yourself (and the person or entity you represent if you sign as a representative of another) to the terms of this account and the schedule of charges. You authorize us to deduct these charges, without notice to you, directly from the account balance as accrued. You will pay any additional reasonable charges for services you request which are not covered by this agreement.

Each of you also agrees to be jointly and severally (individually) liable for any account shortage resulting from charges or overdrafts, whether caused by you or another with access to this account. This liability is due immediately, and can be deducted directly from the account balance whenever sufficient funds are available. You have no right to defer payment of this liability, and you are liable regardless of whether you signed the item or benefited from the charge or overdraft.

You will be liable for our costs as well as for our reasonable attorneys' fees, to the extent permitted by law, whether incurred as a result of collection or in any other dispute involving your account. This includes, but is not limited to, disputes between you and another joint owner; you and an authorized signer or similar party; or a third party claiming

an interest in your account. This also includes any action that you or a third party takes regarding the account that causes us, in good faith, to seek the advice of an attorney, whether or not we become involved in the dispute. All costs and attorneys' fees can be deducted from your account when they are incurred, without notice to you.

**(4) Deposits.** We will give only provisional credit until collection is final for any items, other than cash, we accept for deposit (including items drawn "on us"). Before settlement of any item becomes final, we act only as your agent, regardless of the form of indorsement or lack of indorsement on the item and even though we provide you provisional credit for the item. We may reverse any provisional credit for items that are lost, stolen, or returned. Unless prohibited by law, we also reserve the right to charge back to your account the amount of any item deposited to your account or cashed for you which was initially paid by the payor bank and which is later returned to us due to an allegedly forged, unauthorized or missing indorsement, claim of alteration, encoding error or other problem which in our judgment justifies reversal of credit. You authorize us to attempt to collect previously returned items without giving you notice, and in attempting to collect we may permit the payor bank to hold an item beyond the midnight deadline. Actual credit for deposits of, or payable in, foreign currency will be at the exchange rate in effect on final collection in U.S. dollars. We are not responsible for transactions by mail or outside depository until we actually record them. We will treat and record all transactions received after our "daily cutoff time" on a business day we are open, or received on a day we are not open for business, as if initiated on the next business day that we are open. At our option, we may take an item for collection rather than for deposit. If we accept a third-party check for deposit, we may require any third-party indorsers to verify or guarantee their indorsements, or indorse in our presence.

**(5) Withdrawals.**

**Generally.** Unless clearly indicated otherwise on the account records, any of you, acting alone, who signs to open the account or has authority to make withdrawals may withdraw or transfer all or any part of the account balance at any time. Each of you (until we receive written notice to the contrary) authorizes each other person who signs or has authority to make withdrawals to indorse any item payable to you or your order for deposit to this account or any other transaction with us.

**Postdated Checks.** A postdated check is one which bears a date later than the date on which the check is written. We may properly pay and charge your account for a postdated check even though payment was made before the date of the check, unless we have received written notice of the postdating in time to have a reasonable opportunity to act. Because we process checks mechanically, your notice will not be effective and we will not be liable for failing to honor your notice unless it

precisely identifies the number, date, amount and payee of the item.

**Checks and Withdrawal Rules.** If you do not purchase your check blanks from us, you must be certain that we approve the check blanks you purchase. We may refuse any withdrawal or transfer request which you attempt on forms not approved by us or by any method we do not specifically permit. We may refuse any withdrawal or transfer request which is greater in number than the frequency permitted, or which is for an amount greater or less than any withdrawal limitations. We will use the date the transaction is completed by us (as opposed to the date you initiate it) to apply the frequency limitations. In addition, we may place limitations on the account until your identity is verified.

Even if we honor a nonconforming request, we are not required to do so later. If you violate the stated transaction limitations (if any), in our discretion we may close your account or reclassify it as a transaction account. If we reclassify your account, your account will be subject to the fees and earnings rules of the new account classification.

If we are presented with an item drawn against your account that would be a "substitute check," as defined by law, but for an error or defect in the item introduced in the substitute check creation process, you agree that we may pay such item.

See the funds availability policy disclosure for information about when you can withdraw funds you deposit. For those accounts to which our funds availability policy disclosure does not apply, you can ask us when you make a deposit when those funds will be available for withdrawal. An item may be returned after the funds from the deposit of that item are made available for withdrawal. In that case, we will reverse the credit of the item. We may determine the amount of available funds in your account for the purpose of deciding whether to return an item for insufficient funds at any time between the time we receive the item and when we return the item or send a notice in lieu of return. We need only make one determination, but if we choose to make a subsequent determination, the account balance at the subsequent time will determine whether there are insufficient available funds.

**A Temporary Debit Authorization Hold Affects Your Account Balance.** On debit card purchases, merchants may request a temporary hold on your account for a specified sum of money, which may be more than the actual amount of your purchase. When this happens, our processing system cannot determine that the amount of the hold exceeds the actual amount of your purchase. This temporary hold, and the amount charged to your account, will eventually be adjusted to the actual amount of your purchase, but it may be up to three days before the adjustment is made. Until the adjustment is made, the amount of funds in your account available for other

transactions will be reduced by the amount of the temporary hold. If another transaction is presented for payment in an amount greater than the funds left after the deduction of the temporary hold amount, that transaction will be a nonsufficient funds (NSF) transaction if we do not pay it or an overdraft transaction if we do pay it. You will be charged an NSF or overdraft fee according to our NSF or overdraft fee policy. You will be charged the fee even if you would have had sufficient funds in your account if the amount of the hold had been equal to the amount of your purchase.

Here is an example of how this can occur - assume for this example the following: (1) you have opted-in to our overdraft services for the payment of overdrafts on ATM and everyday debit card transactions, (2) we pay the overdraft, and (3) our overdraft fee is $35 per overdraft, but we do not charge the overdraft fee if the transaction overdraws the account by less than $10.

You have $120 in your account. You swipe your card at the card reader on a gasoline pump. Since it is unclear what the final bill will be, the gas station's processing system immediately requests a hold on your account in a specified amount, for example, $80. Our processing system authorizes a temporary hold on your account in the amount of $80, and the gas station's processing system authorizes you to begin pumping gas. You fill your tank and the amount of gasoline you purchased is only $50. Our processing system shows that you have $40 in your account available for other transactions ($120 - $80 = $40) even though you would have $70 in your account available for other transactions if the amount of the temporary hold was equal to the amount of your purchase ($120 - $50 = $70). Later, another transaction you have authorized is presented for payment from your account in the amount of $60 (this could be a check you have written, another debit card transaction, an ACH debit or any other kind of payment request). This other transaction is presented before the amount of the temporary hold is adjusted to the amount of your purchase (remember, it may take up to three days for the adjustment to be made). Because the amount of this other transaction is greater than the amount our processing system shows is available in your account, our payment of this transaction will result in an overdraft transaction. Because the transaction overdraws your account by $20, your account will be assessed the overdraft fee of $35 according to our overdraft fee policy. You will be charged this $35 fee according to our policy even though you would have had enough money in your account to cover the $60 transaction if your account had only been debited the amount of your purchase rather than the amount of the temporary hold or if the temporary hold had already been adjusted to the actual amount of your purchase.

**Overdrafts.** You understand that we may, at our discretion, honor withdrawal requests that overdraw your account. However, the fact that we may honor withdrawal requests that overdraw the account balance

does not obligate us to do so later. So you can NOT rely on us to pay overdrafts on your account regardless of how frequently or under what circumstances we have paid overdrafts on your account in the past. We can change our practice of paying overdrafts on your account without notice to you. You can ask us if we have other account services that might be available to you where we commit to paying overdrafts under certain circumstances, such as an overdraft protection line-of-credit or a plan to sweep funds from another account you have with us. You agree that we may charge fees for overdrafts. For consumer accounts, we will not charge fees for overdrafts caused by ATM withdrawals or one-time debit card transactions if you have not opted-in to that service. We may use subsequent deposits, including direct deposits of social security or other government benefits, to cover such overdrafts and overdraft fees.

**Multiple Signatures, Electronic Check Conversion, and Similar Transactions.** An electronic check conversion transaction is a transaction where a check or similar item is converted into an electronic fund transfer as defined in the Electronic Fund Transfers regulation. In these types of transactions the check or similar item is either removed from circulation (truncated) or given back to you. As a result, we have no opportunity to review the check to examine the signatures on the item. You agree that, as to these or any items as to which we have no opportunity to examine the signatures, you waive any requirement of multiple signatures.

**Notice of Withdrawal.** We reserve the right to require not less than 7 days' notice in writing before each withdrawal from an interest-bearing account other than a time deposit or demand deposit, or from any other savings account as defined by Regulation D. (The law requires us to reserve this right, but it is not our general policy to use it.) Withdrawals from a time account prior to maturity or prior to any notice period may be restricted and may be subject to penalty. See your notice of penalty for early withdrawal.

**(6) Uniform Single-Party or Multiple-Party Account Selection Form Notice.** The type of account you select may determine how property passes on your death. Your will may not control the disposition of funds held in some of the following accounts. You may choose to designate one or more convenience signers on an account, even if the account is not a convenience account. A designated convenience signer may make transactions on your behalf during your lifetime, but does not own the account during your lifetime. The designated convenience signer owns the account on your death only if the convenience signer is also designated as a P.O.D. payee or trust account beneficiary.

**Single-Party Account Without "P.O.D." (Payable on Death) Designation.** The party to the account owns the account. On the death of the party, ownership of the account passes as a part of the party's estate under the party's will or by intestacy.

**Single-Party Account With "P.O.D." (Payable on Death) Designation.** The party to the account owns the account. On the death of the party, ownership of the account passes to the P.O.D. beneficiaries of the account. The account is not a part of the party's estate.

**Multiple-Party Account Without Right of Survivorship.** The parties to the account own the account in proportion to the parties' net contributions to the account. The financial institution may pay any sum in the account to a party at any time. On the death of a party, the party's ownership of the account passes as a part of the party's estate under the party's will or by intestacy.

**Multiple-Party Account With Right of Survivorship.** The parties to the account own the account in proportion to the parties' net contributions to the account. The financial institution may pay any sum in the account to a party at any time. On the death of a party, the party's ownership of the account passes to the surviving parties.

**Multiple-Party Account With Right of Survivorship and "P.O.D." (Payable on Death) Designation.** The parties to the account own the account in proportion to the parties' net contributions to the account. The financial institution may pay any sum in the account to a party at any time. On the death of the last surviving party, the ownership of the account passes to the P.O.D. beneficiaries.

**Convenience Account.** The parties to the account own the account. One or more convenience signers to the account may make account transactions for a party. A convenience signer does not own the account. On the death of the last surviving party, ownership of the account passes as a part of the last surviving party's estate under the last surviving party's will or by intestacy. The financial institution may pay funds in the account to a convenience signer before the financial institution receives notice of the death of the last surviving party. The payment to a convenience signer does not affect the parties' ownership of the account.

**Trust Account.** The parties named as trustees to the account own the account in proportion to the parties' net contributions to the account. A trustee may withdraw funds from the account. A beneficiary may not withdraw funds from the account before all trustees are deceased. On the death of the last surviving trustee, the ownership of the account passes to the beneficiary. The trust account is not a part of a trustee's estate and does not pass under the trustee's will or by intestacy, unless the trustee survives all of the beneficiaries and all other trustees.

**(7) Business, Organization, and Association Accounts.** Earnings in the form of interest, dividends, or credits will be paid only on collected funds, unless otherwise provided by law or our policy. You represent that you have the authority to open and conduct business on this account on behalf of the entity. We may require the

governing body of the entity opening the account to give us a separate authorization telling us who is authorized to act on its behalf. We will honor the authorization until we actually receive written notice of a change from the governing body of the entity.

**(8) Stop Payments.** Unless otherwise provided, the rules in this section cover stopping payment of items such as checks and drafts. Rules for stopping payment of other types of transfers of funds, such as consumer electronic fund transfers, may be established by law or our policy. If we have not disclosed these rules to you elsewhere, you may ask us about those rules.

We may accept an order to stop payment on any item from any one of you. You must make any stop-payment order in the manner required by law; it must be made in a dated, authenticated record that describes the item with certainty. (Generally, a "record" is information that is stored in such a way that it can be retrieved and can be heard or read and understood - you can ask us what type of stop payment records you can give us). We must receive it in time to give us a reasonable opportunity to act on it before our stop-payment cutoff time. Because stop-payment orders are handled by computers, to be effective, your stop-payment order must precisely identify the number, date, and amount of the item, and the payee.

You may stop payment on any item drawn on your account whether you sign the item or not. Your stop-payment order is effective for six months. Your order will lapse after that time if you do not renew the order in writing before the end of the six-month period. We are not obligated to notify you when a stop-payment order expires. A release of the stop-payment request may be made only by the person who initiated the stop-payment order.

If you stop payment on an item and we incur any damages or expenses because of the stop payment, you agree to indemnify us for those damages or expenses, including attorneys' fees. You assign to us all rights against the payee or any other holder of the item. You agree to cooperate with us in any legal actions that we may take against such persons. You should be aware that anyone holding the item may be entitled to enforce payment against you despite the stop-payment order.

Our stop-payment cutoff time is one hour after the opening of the next banking day after the banking day on which we receive the item. Additional limitations on our obligation to stop payment are provided by law (e.g., we paid the item in cash or we certified the item).

**(9) Telephone Transfers.** A telephone transfer of funds from this account to another account with us, if otherwise arranged for or permitted, may be made by the same persons and under the same conditions generally applicable to withdrawals made in writing. Unless a different limitation is disclosed in writing, we restrict the number of transfers from a savings account to another account or to third parties, to a maximum of six per month (less the number of

"preauthorized transfers" during the month). Other account transfer restrictions may be described elsewhere.

**(10) Amendments and Termination.** We may change any term of this agreement. Rules governing changes in interest rates are provided separately in the Truth-in-Savings disclosure or in another document. For other changes, we will give you reasonable notice in writing or by any other method permitted by law. We may also close this account at any time upon reasonable notice to you and tender of the account balance personally or by mail. Items presented for payment after the account is closed may be dishonored. When you close your account, you are responsible for leaving enough money in the account to cover any outstanding items to be paid from the account. Reasonable notice depends on the circumstances, and in some cases such as when we cannot verify your identity or we suspect fraud, it might be reasonable for us to give you notice after the change or account closure becomes effective. For instance, if we suspect fraudulent activity with respect to your account, we might immediately freeze or close your account and then give you notice. If we have notified you of a change in any term of your account and you continue to have your account after the effective date of the change, you have agreed to the new term(s).

**(11) Notices.** Any written notice you give us is effective when we actually receive it, and it must be given to us according to the specific delivery instructions provided elsewhere, if any. We must receive it in time to have a reasonable opportunity to act on it. If the notice is regarding a check or other item, you must give us sufficient information to be able to identify the check or item, including the precise check or item number, amount, date and payee. Written notice we give you is effective when it is deposited in the United States Mail with proper postage and addressed to your mailing address we have on file. Notice to any of you is notice to all of you.

**(12) Statements.**

**Your Duty to Report Unauthorized Signatures, Alterations, and Forgeries.** You must examine your statement of account with "reasonable promptness." If you discover (or reasonably should have discovered) any unauthorized signatures or alterations, you must promptly notify us of the relevant facts. As between you and us, if you fail to do either of these duties, you will have to either share the loss with us, or bear the loss entirely yourself (depending on whether we used ordinary care and, if not, whether we contributed to the loss). The loss could be not only with respect to items on the statement but other items with unauthorized signatures or alterations by the same wrongdoer.

You agree that the time you have to examine your statement and report to us will depend on the circumstances, but will not, in any circumstance, exceed a total of 30 days from when the statement is first sent or made available to you.

You further agree that if you fail to report any unauthorized signatures, alterations or forgeries in your account within 60 days of when we first send or make the statement available, you cannot assert a claim against us on any items in that statement, and as between you and us the loss will be entirely yours. The 60-day limitation is without regard to whether we used ordinary care. The limitation in this paragraph is in addition to that contained in the first paragraph of this section.

**Your Duty to Report Other Errors.** In addition to your duty to review your statements for unauthorized signatures, alterations and forgeries, you agree to examine your statement with reasonable promptness for any other error - such as an encoding error. In addition, if you receive or we make available either your items or images of your items, you must examine them for any unauthorized or missing indorsements or any other problems. You agree that the time you have to examine your statement and items and report to us will depend on the circumstances. However, this time period shall not exceed 60 days. Failure to examine your statement and items and report any errors to us within 60 days of when we first send or make the statement available precludes you from asserting a claim against us for any errors on items identified in that statement and as between you and us the loss will be entirely yours.

**Errors Relating to Electronic Fund Transfers or Substitute Checks** *(For consumer accounts only)*. For information on errors relating to electronic fund transfers (e.g., computer, debit card or ATM transactions) refer to your Electronic Fund Transfers disclosure and the sections on consumer liability and error resolution. For information on errors relating to a substitute check you received, refer to your disclosure entitled Substitute Checks and Your Rights.

**(13) Direct Deposits.** If we are required for any reason to reimburse the federal government for all or any portion of a benefit payment that was directly deposited into your account, you authorize us to deduct the amount of our liability to the federal government from the account or from any other account you have with us, without prior notice and at any time, except as prohibited by law. We may also use any other legal remedy to recover the amount of our liability.

**(14) Temporary Account Agreement.** If the account documentation indicates that this is a temporary account agreement, each person who signs to open the account or has authority to make withdrawals (except as indicated to the contrary) may transact business on this account. However, we may at some time in the future restrict or prohibit further use of this account if you fail to comply with the requirements we have imposed within a reasonable time.

**(15) Setoff.** We may (without prior notice and when permitted by law) set off the funds in this account against any due and payable debt any of you owe us now or in the future. If this account is owned by one or more of you as individuals, we may set off any funds in the account against a due and payable debt a partnership owes us now or in the future, to the extent of your liability as a partner for the partnership debt. If your debt arises from a promissory note, then the amount of the due and payable debt will be the full amount we have demanded, as entitled under the terms of the note, and this amount may include any portion of the balance for which we have properly accelerated the due date.

This right of setoff does not apply to this account if prohibited by law. For example, the right of setoff does not apply to this account if: (a) it is an Individual Retirement Account or similar tax-deferred account, or (b) the debt is created by a consumer credit transaction under a credit card plan (but this does not affect our rights under any consensual security interest), or (c) the debtor's right of withdrawal only arises in a representative capacity, or (d) the debt is created by a home equity loan, or (e) setoff is prohibited by the Military Lending Act or its implementing regulations. We will not be liable for the dishonor of any check when the dishonor occurs because we set off a debt against this account. You agree to hold us harmless from any claim arising as a result of our exercise of our right of setoff.

**(16) Check Processing.** We process items mechanically by relying solely on the information encoded in magnetic ink along the bottom of the items. This means that we do not individually examine all of your items to determine if the item is properly completed, signed and indorsed or to determine if it contains any information other than what is encoded in magnetic ink. You agree that we have exercised ordinary care if our automated processing is consistent with general banking practice, even though we do not inspect each item. Because we do not inspect each item, if you write a check to multiple payees, we can properly pay the check regardless of the number of indorsements unless you notify us in writing that the check requires multiple indorsements. We must receive the notice in time for us to have a reasonable opportunity to act on it, and you must tell us the precise date of the check, amount, check number and payee. We are not responsible for any unauthorized signature or alteration that would not be identified by a reasonable inspection of the item. Using an automated process helps us keep costs down for you and all account holders.

**(17) Check Cashing.** We may charge a fee for anyone that does not have an account with us who is cashing a check, draft or other instrument written on your account. We may also require reasonable identification to cash such a check, draft or other instrument. We can decide what identification is reasonable under the circumstances and such identification may be documentary or physical and may include collecting a thumbprint or fingerprint.

**(18) Truncation, Substitute Checks, and Other Check Images.** If you truncate an original check and create a substitute check, or other paper or electronic image of the

original check, you warrant that no one will be asked to make payment on the original check, a substitute check or any other electronic or paper image, if the payment obligation relating to the original check has already been paid. You also warrant that any substitute check you create conforms to the legal requirements and generally accepted specifications for substitute checks. You agree to retain the original check in conformance with our internal policy for retaining original checks. You agree to indemnify us for any loss we may incur as a result of any truncated check transaction you initiate. We can refuse to accept substitute checks that have not previously been warranted by a bank or other financial institution in conformance with the Check 21 Act. Unless specifically stated in a separate agreement between you and us, we do not have to accept any other electronic or paper image of an original check.

**(19) Remotely Created Checks.** Like any standard check or draft, a remotely created check (sometimes called a telecheck, preauthorized draft or demand draft) is a check or draft that can be used to withdraw money from an account. Unlike a typical check or draft, however, a remotely created check is not issued by the paying bank and does not contain the signature of the account owner (or a signature purported to be the signature of the account owner). In place of a signature, the check usually has a statement that the owner authorized the check or has the owner's name typed or printed on the signature line.

You warrant and agree to the following for every remotely created check we receive from you for deposit or collection: (1) you have received express and verifiable authorization to create the check in the amount and to the payee that appears on the check; (2) you will maintain proof of the authorization for at least 2 years from the date of the authorization, and supply us the proof if we ask; and (3) if a check is returned you owe us the amount of the check, regardless of when the check is returned. We may take funds from your account to pay the amount you owe us, and if there are insufficient funds in your account, you still owe us the remaining balance.

**(20) Unlawful Internet Gambling Notice.** Restricted transactions as defined in Federal Reserve Regulation GG are prohibited from being processed through this account or relationship. Restricted transactions generally include, but are not limited to, those in which credit, electronic fund transfers, checks, or drafts are knowingly accepted by gambling businesses in connection with the participation by others in unlawful Internet gambling.

**(21) ACH and Wire Transfers.** This agreement is subject to Article 4A of the Uniform Commercial Code - Fund Transfers as adopted in the state in which you have your account with us. If you originate a fund transfer and you identify by name and number a beneficiary financial institution, an intermediary financial institution or a beneficiary, we and every receiving or beneficiary financial institution may rely on the identifying number to make payment. We may rely on the number even if it identifies a

financial institution, person or account other than the one named. You agree to be bound by automated clearing house association rules. These rules provide, among other things, that payments made to you, or originated by you, are provisional until final settlement is made through a Federal Reserve Bank or payment is otherwise made as provided in Article 4A-403(a) of the Uniform Commercial Code. If we do not receive such payment, we are entitled to a refund from you in the amount credited to your account and the party originating such payment will not be considered to have paid the amount so credited. Credit entries may be made by ACH. If we receive a payment order to credit an account you have with us by wire or ACH, we are not required to give you any notice of the payment order or credit.

**(22) Facsimile Signatures.** Unless you make advance arrangements with us, we have no obligation to honor facsimile signatures on your checks or other orders. If we do agree to honor items containing facsimile signatures, you authorize us, at any time, to charge you for all checks, drafts, or other orders, for the payment of money, that are drawn on us. You give us this authority regardless of by whom or by what means the facsimile signature(s) may have been affixed so long as they resemble the facsimile signature specimen filed with us, and contain the required number of signatures for this purpose. You must notify us at once if you suspect that your facsimile signature is being or has been misused.

**(23) Restrictive Legends or Indorsements.** The automated processing of the large volume of checks we receive prevents us from inspecting or looking for restrictive legends, restrictive indorsements or other special instructions on every check. Examples of restrictive legends placed on checks are "must be presented within 90 days" or "not valid for more than $1,000.00." The payee's signature accompanied by the words "for deposit only" is an example of a restrictive indorsement. For this reason, we are not required to honor any restrictive legend or indorsement or other special instruction placed on checks you write unless we have agreed in writing to the restriction or instruction. Unless we have agreed in writing, we are not responsible for any losses, claims, damages, or expenses that result from your placement of these restrictions or instructions on your checks.

**(24) Account Transfer.** This account may not be transferred or assigned without our prior written consent.

**(25) Indorsements.** We may accept for deposit any item payable to you or your order, even if they are not indorsed by you. We may give cash back to any one of you. We may supply any missing indorsement(s) for any item we accept for deposit or collection, and you warrant that all indorsements are genuine.

To ensure that your check or share draft is processed without delay, you must indorse it (sign it on the back) in a specific area. Your entire indorsement (whether a signature

or a stamp) along with any other indorsement information (e.g., additional indorsements, ID information, driver's license number, etc.) must fall within 1 1/2" of the "trailing edge" of a check. Indorsements must be made in blue or black ink, so that they are readable by automated check processing equipment.

As you look at the front of a check, the "trailing edge" is the left edge. When you flip the check over, be sure to keep all indorsement information within 1 1/2" of that edge.



It is important that you confine the indorsement information to this area since the remaining blank space will be used by others in the processing of the check to place additional needed indorsements and information. You agree that you will indemnify, defend, and hold us harmless for any loss, liability, damage or expense that occurs because your indorsement, another indorsement, or information you have printed on the back of the check obscures our indorsement. These indorsement guidelines apply to both personal and business checks.

**(26) Death or Incompetence.** You agree to notify us promptly if any person with a right to withdraw funds from your account(s) dies or is adjudicated (determined by the appropriate official) incompetent. We may continue to honor your checks, items, and instructions until: (a) we know of your death or adjudication of incompetence, and (b) we have had a reasonable opportunity to act on that knowledge. You agree that we may pay or certify checks drawn on or before the date of death or adjudication of incompetence for up to ten (10) days after your death or adjudication of incompetence unless ordered to stop payment by someone claiming an interest in the account.

**(27) Fiduciary Accounts.** Accounts may be opened by a person acting in a fiduciary capacity. A fiduciary is someone

who is appointed to act on behalf of and for the benefit of another. We are not responsible for the actions of a fiduciary, including the misuse of funds. This account may be opened and maintained by a person or persons named as a trustee under a written trust agreement, or as executors, administrators, or conservators under court orders. You understand that by merely opening such an account, we are not acting in the capacity of a trustee in connection with the trust nor do we undertake any obligation to monitor or enforce the terms of the trust or letters.

**(28) Credit Verification.** You agree that we may verify credit and employment history by any necessary means, including preparation of a credit report by a credit reporting agency.

**(29) Legal Actions Affecting Your Account.** If we are served with a subpoena, restraining order, writ of attachment or execution, levy, garnishment, search warrant, or similar order relating to your account (termed "legal action" in this section), we will comply with that legal action. Or, in our discretion, we may freeze the assets in the account and not allow any payments out of the account until a final court determination regarding the legal action. We may do these things even if the legal action involves less than all of you. In these cases, we will not have any liability to you if there are insufficient funds to pay your items because we have withdrawn funds from your account or in any way restricted access to your funds in accordance with the legal action. Any fees or expenses we incur in responding to any legal action (including, without limitation, attorneys' fees and our internal expenses) may be charged against your account. The list of fees applicable to your account(s) provided elsewhere may specify additional fees that we may charge for certain legal actions.

**(30) Security.** It is your responsibility to protect the account numbers and electronic access devices (e.g., an ATM card) we provide you for your account(s). Do not discuss, compare, or share information about your account number(s) with anyone unless you are willing to give them full use of your money. An account number can be used by thieves to issue an electronic debit or to encode your number on a false demand draft which looks like and functions like an authorized check. If you furnish your access device and grant actual authority to make transfers to another person (a family member or coworker, for example) who then exceeds that authority, you are liable for the transfers unless we have been notified that transfers by that person are no longer authorized. Your account number can also be used to electronically remove money from your account, and payment can be made from your account even though you did not contact us directly and order the payment. You must also take precaution in safeguarding your blank checks. Notify us at once if you believe your checks have been lost or stolen. As between you and us, if you are negligent in safeguarding your checks, you must bear the loss entirely yourself or share the loss with us (we may have to share

some of the loss if we failed to use ordinary care and if we substantially contributed to the loss).

Except for consumer electronic funds transfers subject to Regulation E, you agree that if we offer you services appropriate for your account to help identify and limit fraud or other unauthorized transactions against your account, such as positive pay or commercially reasonable security procedures, and you reject those services, you will be responsible for any fraudulent or unauthorized transactions which could have been prevented by the services we offered, unless we acted in bad faith or to the extent our negligence contributed to the loss. If we offered you a commercially reasonable security procedure which you reject, you agree that you are responsible for any payment order, whether authorized or not, that we accept in compliance with an alternative security procedure that you have selected.

**(31) Telephonic Instructions.** Unless required by law or we have agreed otherwise in writing, we are not required to act upon instructions you give us via facsimile transmission or leave by voice mail or on a telephone answering machine.

**(32) Monitoring and Recording Telephone Calls and Consent to Receive Communications.** We may monitor or record phone calls for security reasons, to maintain a record and to ensure that you receive courteous and efficient service. You consent in advance to any such recording. We need not remind you of our recording before each phone conversation.

To provide you with the best possible service in our ongoing business relationship for your account we may need to contact you about your account from time to time by telephone, text messaging or email. However, we must first obtain your consent to contact you about your account because we must comply with the consumer protection provisions in the federal Telephone Consumer Protection Act of 1991 (TCPA), CAN-SPAM Act and their related federal regulations and orders issued by the Federal Communications Commission (FCC).

- ◆ Your consent is limited to this account, and as authorized by applicable law and regulations.
- ◆ Your consent does not authorize us to contact you for telemarketing purposes (unless you otherwise agreed elsewhere).

With the above understandings, you authorize us to contact you regarding this account throughout its existence using any telephone numbers or email addresses that you have previously provided to us or that you may subsequently provide to us.

This consent is regardless of whether the number we use to contact you is assigned to a landline, a paging service, a cellular wireless service, a specialized mobile radio service, other radio common carrier service or any other service for which you may be charged for the call. You further

authorize us to contact you through the use of voice, voice mail and text messaging, including the use of pre-recorded or artificial voice messages and an automated dialing device.

If necessary, you may change or remove any of the telephone numbers or email addresses at any time using any reasonable means to notify us.

**(33) Claim of Loss.** If you claim a credit or refund because of a forgery, alteration, or any other unauthorized withdrawal, you agree to cooperate with us in the investigation of the loss, including giving us an affidavit containing whatever reasonable information we require concerning your account, the transaction, and the circumstances surrounding the loss. You will notify law enforcement authorities of any criminal act related to the claim of lost, missing, or stolen checks or unauthorized withdrawals. We will have a reasonable period of time to investigate the facts and circumstances surrounding any claim of loss. Unless we have acted in bad faith, we will not be liable for special or consequential damages, including loss of profits or opportunity, or for attorneys' fees incurred by you. You agree that you will not waive any rights you have to recover your loss against anyone who is obligated to repay, insure, or otherwise reimburse you for your loss. You will pursue your rights or, at our option, assign them to us so that we may pursue them. Our liability will be reduced by the amount you recover or are entitled to recover from these other sources.

**(34) Early Withdrawal Penalties** *(and involuntary withdrawals).* We may impose early withdrawal penalties on a withdrawal from a time account even if you don't initiate the withdrawal. For instance, the early withdrawal penalty may be imposed if the withdrawal is caused by our setoff against funds in the account or as a result of an attachment or other legal process. We may close your account and impose the early withdrawal penalty on the entire account balance in the event of a partial early withdrawal. See your notice of penalty for early withdrawals for additional information.

**(35) Address or Name Changes.** You are responsible for notifying us of any change in your address or your name. Unless we agree otherwise, change of address or name must be made in writing by at least one of the account holders. Informing us of your address or name change on a check reorder form is not sufficient. We will attempt to communicate with you only by use of the most recent address you have provided to us. If provided elsewhere, we may impose a service fee if we attempt to locate you.

**(36) Resolving Account Disputes.** We may place an administrative hold on the funds in your account (refuse payment or withdrawal of the funds) if it becomes subject to a claim adverse to (1) your own interest; (2) others claiming an interest as survivors or beneficiaries of your account; or (3) a claim arising by operation of law. The hold may be placed for such period of time as we believe reasonably

necessary to allow a legal proceeding to determine the merits of the claim or until we receive evidence satisfactory to us that the dispute has been resolved. We will not be liable for any items that are dishonored as a consequence of placing a hold on funds in your account for these reasons.

**(37) Waiver of Notices.** To the extent permitted by law, you waive any notice of non-payment, dishonor or protest regarding any items credited to or charged against your account. For example, if you deposit a check and it is returned unpaid or we receive a notice of nonpayment, we do not have to notify you unless required by federal Regulation CC or other law.

**(38) Additional Terms.**

Terms and Conditions-TX
Bankers Systems™ VMP®
Wolters Kluwer Financial Services © 2016

# EXHIBIT M

## Vehicles Located in Lubbock County

| Description | Last 8 of VIN | Value |
|---|---|---|
| 2013 Lexus RX 350 | DC090040 | $ 17,100.00 |
| 2015 Nissan Rogue | FC830059 | $ 15,500.00 |
| 2015 Honda Accord | FA190286 | $ 17,000.00 |
| 2018 Kia Forte | JE170347 | $ 13,500.00 |
| 2018 Toyota 4Runner | J5491075 | $ 33,750.00 |
| 2018 Toyota Corolla | JC031095 | $ 15,750.00 |
| 2015 Lexus 350 | FA001178 | $ 24,300.00 |
| 2014 Toyota Sequoia | ES051207 | $ 24,000.00 |
| 2017 Subaru Forester | HH431207 | $ 22,850.00 |
| 2018 Kia Forte | JE171304 | $ 13,750.00 |
| 2018 Toyota Corolla | JJ561533 | $ 14,000.00 |
| 2016 Mercedes GLC | GF041726 | $ 30,025.00 |
| 2017 Nissan Murano | HN131843 | $ 19,250.00 |
| 2018 Nissan Murano | JN121877 | $ 28,000.00 |
| 2017 Nissan Pathfinder | HC662240 | $ 19,950.00 |
| 2017 Nissan Murano | HN102263 | $ 19,750.00 |
| 2010 VW Passat | AE142451 | $ 5,500.00 |
| 2015 Nissan Murano | FN232730 | $ 24,575.00 |
| 2017 Nissan Versa | HL812790 | $ 10,500.00 |
| 2017 Kia Soul | H7412875 | $ 13,250.00 |
| 2017 Hyundai Accent | HU172887 | $ 10,000.00 |
| 2016 Lexus ES 350 | GU032921 | $ 21,250.00 |
| 2017 Toyota Camry | HU763024 | $ 19,025.00 |
| 2016 BMW 5 Series | GG253191 | $ 37,250.00 |
| 2016 BMW 6 Series | GGT83326 | $ 41,000.00 |
| 2017 Lexus LL | H5173482 | $ 52,000.00 |
| 2010 Land Rover | AA254020 | $ 16,750.00 |
| 2016 Merc Benz | GB214072 | $ 37,500.00 |
| 2018 Kia Forte | JE174291 | $ 13,450.00 |
| 2018 Nissan Altima | JC114308 | $ 18,250.00 |
| 2016 Hyundai Elantra | GU604413 | $ 7,975.00 |
| 2013 Toyota Tundra | DX295156 | $ 28,750.00 |
| 2017 Nissan Titan | HN545492 | $ 32,000.00 |
| 2015 Volvo XC60 | F2586263 | $ 16,000.00 |
| 2016 Nissan Maxima | GC906292 | $ 21,750.00 |
| 2014 Toyota 4Runner | E5186403 | $ 26,000.00 |
| 2018 Mazda CX 9 | J0216641 | $ 30,000.00 |
| 2018 Kia Forte | JE206676 | $ 13,500.00 |
| 2015 Honda CR-V | FH556980 | $ 22,500.00 |
| 2018 Hyundai Santa Fe | JH077002 | $ 18,000.00 |
| 2014 Nissan Altima | EN227772 | $ 13,500.00 |
| 2017 Nissan Versa | HK408079 | $ 10,500.00 |
| 2013 Jaguar XF | D8S88635 | $ 3,900.00 |
| 2017 Nissan Maxima | HC449963 | $ 22,000.00 |
| 2018 Toyota 4Runner | J5169974 | $ 32,000.00 |
| 2012 Infiniti QX 56 | XC9018987 | $ 14,000.00 |
| 2018 Toyota 4Runner | J555839 | $ 48,900.00 |
| 2016 Land Rover | GA549061 | $ 49,500.00 |
| 2016 Hyundai Elantra | GH758999 | $ 9,900.00 |
| **Total Value** | | **$ 1,069,450.00** |

## Vehicles Located in Hockley County

| Description | Last 8 of VIN | Value |
|---|---|---|
| 2015 Ford F350 | 431340006 | $ 44,250.00 |
| 2011 Chevy Traverse | BJ360152 | $ 6,000.00 |
| 2017 Volvo XC60 | H2011582 | $ 24,950.00 |
| 2017 Ford Edge | HBB31863 | $ 23,000.00 |
| 2016 Cadillac Escalade | GR182212 | $ 13,400.00 |
| 2016 Ford F150 | GKE72318 | $ 24,200.00 |
| 2015 Honda Pilot | FB012803 | $ 18,575.00 |
| 2017 Ford Escape | HUA63004 | $ 20,000.00 |
| 2015 Toyota Tundra | FX433239 | $ 34,000.00 |
| 2016 Chevy Silverado | GF113904 | $ 47,500.00 |
| 2014 Ford F150 | EKF04969 | $ 29,000.00 |
| 2014 Ford F250 | EEA96875 | $ 37,425.00 |
| 2015 GMC Acadia | FJ237782 | $ 23,500.00 |
| 2016 Toyota Tundra | GX518888 | $ 37,500.00 |
| 2015 Ford F350 | FEC79071 | $ 49,500.00 |
| 2015 Ford Explorer | FGA19464 | $ 22,000.00 |
| 2015 GMC Yukon | FR129493 | $ 39,000.00 |
| Total Value | | $493,800.00 |

# EXHIBIT N

CAUSE NO. _____

| | | |
|---|---|---|
| **FIRST BANK & TRUST,** | § | **IN THE DISTRICT COURT** |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | |
| | § | |
| **REAGOR AUTO MALL, LTD. d/b/a** | § | |
| **REAGOR-DYKES OF LEVELLAND** | § | |
| **and d/b/a REAGOR-DYKES** | § | **____JUDICIAL DISTRICT** |
| **IMPORTS, FIRSTCAPITAL BANK** | § | |
| **OF TEXAS, N.A., BART REAGOR,** | § | |
| **RICK DYKES, SHANE SMITH,** | § | |
| **SHEILA MILLER, BRAD D.** | § | |
| **BURGESS, and KENNETH L.** | § | |
| **BURGESS,** | § | |
| | § | |
| **Defendants.** | § | **LUBBOCK COUNTY, TEXAS** |

## AFFIDAVIT OF JARED TOWNSEND

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF LUBBOCK | § |

1.    My name is Jared Townsend. I am over the age of 21, and am fully competent and authorized to execute this Affidavit in support of Plaintiff's Original Petition and Application for a Writ of Sequestration.

2.    I am a Senior Vice President of First Bank & Trust ("First Bank").

3.    I have personal knowledge of all facts set forth in this affidavit and in First Bank's Original Petition and Application for Writ of Sequestration (the "Petition"), based on my review of First Bank's books and records and my dealings with Reagor Auto Mall Ltd. d/b/a Reagor-Dykes of Levelland and d/b/a Reagor-Dykes Imports ("RAM"). Thus, the matters stated herein are true and correct and within my personal knowledge.

4.    I have reviewed the Petition and hereby verify that the factual allegations contained in the Petition are true and correct.

**AFFIDAVIT OF JARED TOWNSEND – PAGE 1**

5.      All capitalized terms in this Affidavit have the same meaning as in the Petition, unless otherwise defined herein.

6.      First Bank requests a Writ of Sequestration (the "Writ") in order to protect its interests as the holder of security interests in collateral pledged to it by, and currently in the possession of, RAM.

7.      First Bank seeks the Writ because RAM has sold vehicles in which First Bank has a security interest without remitting the contractually-required payments to First Bank.  RAM has made misrepresentations to First Bank regarding the status of the inventory RAM pledged to First Bank and is otherwise in default under its agreements with First Bank.  RAM has failed to cure its defaults and has not voluntarily surrendered the collateral in its possession subject to First Bank's security interests.

8.      This has compelled First Bank to seek the Writ to recover its collateral and to protect its rights as a secured creditor.

9.      All of the documents attached to the Petition are true and correct copies of First Bank's business records.

**The RD-Levelland Agreements**

10.      On or about September 29, 2017, RAM obtained a loan from First Bank for use in renewing an existing floor plan line of credit at its Levelland location, pursuant to the terms of a Business Loan Agreement.  A true and correct copy of the Business Loan Agreement is attached to the Petition as **Exhibit A** (the "RD-Levelland Business Loan Agreement").

11.      On or about September 29, 2017, RAM executed a Promissory Note payable to First Bank in the principal amount of $1,000,000.00.  A true and correct copy of the Promissory Note is attached to the Petition as **Exhibit B** (the "RD-Levelland Promissory Note").

**AFFIDAVIT OF JARED TOWNSEND – PAGE 2**

12.     On or about September 29, 2017, RAM executed a Commercial Security Agreement.  A true and correct copy of the Commercial Security Agreement is attached to the Petition as **Exhibit C** (the "RD-Levelland Security Agreement").

13.     On or about September 29, 2017, Bart Reagor executed and delivered to First Bank a continuing Commercial Guaranty.  A true and correct copy of the Commercial Guaranty is attached to the Petition as **Exhibit D** (the "RD-Levelland Reagor Commercial Guaranty").

14.     On or about September 29, 2017, Rick Dykes executed and delivered to First Bank a continuing Commercial Guaranty.  A true and correct copy of the Commercial Guaranty is attached to the Petition as **Exhibit E** (the "RD-Levelland Dykes Commercial Guaranty").

## The RD-Imports Agreements

15.     On or about September 29, 2017, RAM obtained a loan from First Bank for use in renewing an existing floor plan line of credit at its Imports location, pursuant to the terms of a Business Loan Agreement.  A true and correct copy of the Business Loan Agreement is attached to the Petition as **Exhibit F** (the "RD-Imports Business Loan Agreement").

16.     On or about September 29, 2017, RAM executed a Promissory Note payable to First Bank in the principal amount of $2,500,000.00.  A true and correct copy of the Promissory Note is attached to the Petition as **Exhibit G** (the "RD-Imports Promissory Note").

17.     On or about September 29, 2017, RAM executed a Commercial Security Agreement.  A true and correct copy of the Commercial Security Agreement is attached to the Petition as **Exhibit H** (the "RD-Imports Security Agreement").

18.     On or about September 29, 2017, Bart Reagor executed and delivered to First Bank a continuing Commercial Guaranty.  A true and correct copy of the Commercial Guaranty is attached to the Petition as **Exhibit I** (the "RD-Imports Reagor Commercial Guaranty").

19.     On or about September 29, 2017, Rick Dykes executed and delivered to First Bank a continuing Commercial Guaranty.  A true and correct copy of the Commercial Guaranty is attached to the Petition as **Exhibit J** (the "RD-Imports Dykes Commercial Guaranty").

## RAM's Defaults

20.     In August 2018, I, on behalf of First Bank, began investigating the status of RAM's inventory at its Levelland and Imports (the "Dealerships") locations in an effort to monitor vehicle sales information and to identify whether RAM was falsely reporting sales data and inventory status.  Though the investigation is ongoing, I have discovered that some of First Bank's collateral has been sold, is missing, or has been double pledged.

21.     My analysis included a review of monthly floor plan inspections for the Dealerships and an inspection I personally conducted of the inventory present at each Dealership in August 2018.  Based on my analysis, I discovered that there were numerous vehicles sold out of trust, others that were simply missing from the floor plan, and others that were double-floored.

22.     For example, regarding the Levelland location's pledged inventory, I discovered that of the 40 vehicles on the Levelland floor plan, 21 have been sold, but still floor planned, allowing RAM to continue to obtain financing payments from First Bank while avoiding and/or delaying paying First Bank the amounts owed to it for the sold inventory.  The payoff amount that RAM owes First Bank for these 21 vehicles is $420,025.00.  In addition, 1 vehicle is missing from the floorplan with no explanation as to its location.  For this missing vehicle, RAM owes First Bank $31,750.00.  My inspection of the Levelland inventory has also revealed 7 instances of RAM "double-flooring" vehicles pledged as collateral to First Bank.  In other words, RAM applied for financing from First Bank and from Ford Motor Credit on these 7 vehicles, thereby obtaining double financing on them.

23.    With regard to the pledged inventory at the Imports location, my inspection revealed that of the 101 units on the Imports floor plan, 43 have been sold, but still floor planned, allowing RAM to continue to obtain financing payments from First Bank while avoiding and/or delaying paying First Bank the amounts owed to it for the sold inventory. The payoff amount that RAM owes First Bank for these 43 vehicles is $1,084,025.00. My inspection also revealed that 6 of the 101 units are inexplicably missing from the floorplan. For these 6 vehicles, RAM owes First Bank $69,750.00. I also discovered that 13 units were double-floored.

24.    RAM's false representations regarding the status of the pledged inventory allowed it to avoid and/or delay paying First Bank the amounts it is owed for such inventory.

25.    These misrepresentations show that RAM has experienced a material adverse change in its financial condition, giving rise to First Bank's good faith belief that it is insecure under its agreements with RAM.

26.    In addition, RAM maintained an active deposit account at First Bank. At times when the account would become overdrawn, I would contact RAM's then CFO, Shane Smith, who assured me that RAM was simply paying off vehicles and the money to cover the overdrawn amounts would immediately be deposited. This proved to be false, as RAM has now overdrawn its First Bank account by over $1.5 million.

27.    Though First Bank's analysis is ongoing, the information I have reviewed and analyzed indicates that the problems identified above are pervasive and are ongoing.

28.    As of September 7, 2018, after applying all credits and offsets, the estimated amount First Bank believes to be owed by RAM on the RD-Levelland Agreements and the RD-Imports Agreements is $3,057,045.47 (approximately $966,825 on the Levelland floor plan and approximately $2,090,220.47 on the Imports floor plan).

**AFFIDAVIT OF JARED TOWNSEND – PAGE 5**

29.     As of the filing of First Bank's Petition, the collateral has not been surrendered, nor has RAM or either of its guarantors paid the amounts due.

## Conclusion

30.     Based upon the foregoing and the allegations contained in First Bank's Petition, First Bank has instituted this suit and applied for the sequestration of its collateral and recovery of any resulting deficiency after First Bank's collateral is liquidated.

31.     I am not aware of any defense to First Bank's claims.

32.     RAM's indebtedness and First Bank's right to immediate possession of its collateral is demonstrated by the evidence attached to the Petition and to this Affidavit.

33.     RAM's continued possession of the collateral is irreparably harming First Bank, as the value of the collateral is depreciating, and even disappearing.  In addition, RAM's failure to make payments to First Bank when vehicles are sold and its false representations regarding the status of the vehicles gives rise to First Bank's good faith belief that, absent court intervention, RAM will continue to conceal, dispose of, ill-treat, waste or destroy the collateral, resulting in substantial losses to First Bank.

34.     Accordingly, First Bank requests that this Court issue the requested Writ.  Further, First Bank requests that the Court grant such other and further relief as the Court deems necessary to protect First Bank's interests.

35.     A list of the vehicles pledged as collateral to First Bank pursuant to the aforementioned agreements, and which are believed to still be in RAM's possession, is attached to the Petition as **Exhibit M**.  A copy is also attached to this Affidavit.

36.     First Bank is willing to post a reasonable undertaking deemed necessary by this Court, or segregate funds into a separate account, in lieu of posting a bond, pending further order of the Court.

37.     No prior application for this relief has been made.

DATED: September 13, 2018

_____
Jared Townsend

Sworn to and subscribed before me by Jared Townsend on September 13th, 2018.

_____
Notary Public in and for the State of Texas

JOHNNIE FIELD
Notary Public, State of Texas
Comm. Expires 03-10-2019
Notary ID 4157165

**AFFIDAVIT OF JARED TOWNSEND – PAGE 7**

## Vehicles Located in Lubbock County

| Description | Last 8 of VIN | Value |
|---|---|---|
| 2013 Lexus RX 350 | DC090040 | $ 17,100.00 |
| 2015 Nissan Rogue | FC830059 | $ 15,500.00 |
| 2015 Honda Accord | FA190286 | $ 17,000.00 |
| 2018 Kia Forte | JE170347 | $ 13,500.00 |
| 2018 Toyota 4Runner | J5491075 | $ 33,750.00 |
| 2018 Toyota Corolla | JC031095 | $ 15,750.00 |
| 2015 Lexus 350 | FA001178 | $ 24,300.00 |
| 2014 Toyota Sequoia | ES051207 | $ 24,000.00 |
| 2017 Subaru Forester | HH431207 | $ 22,860.00 |
| 2018 Kia Forte | JE171304 | $ 13,750.00 |
| 2018 Toyota Corolla | JJ561533 | $ 14,000.00 |
| 2016 Mercedes GLC | GF041726 | $ 30,025.00 |
| 2017 Nissan Murano | HN131843 | $ 19,250.00 |
| 2018 Nissan Murano | JN121877 | $ 28,000.00 |
| 2017 Nissan Pathfinder | HC662240 | $ 19,950.00 |
| 2017 Nissan Murano | HN102263 | $ 19,750.00 |
| 2010 VW Passat | AE142451 | $ 5,500.00 |
| 2015 Nissan Murano | FN232730 | $ 24,575.00 |
| 2017 Nissan Versa | HL812790 | $ 10,500.00 |
| 2017 Kia Soul | H7412875 | $ 13,250.00 |
| 2017 Hyundai Accent | HU172887 | $ 10,000.00 |
| 2016 Lexus ES 350 | GU032921 | $ 21,250.00 |
| 2017 Toyota Camry | HU763024 | $ 19,025.00 |
| 2016 BMW 5 Series | GG253191 | $ 37,250.00 |
| 2016 BMW 6 Series | GGT83326 | $ 41,000.00 |
| 2017 Lexus LL | H5173482 | $ 52,000.00 |
| 2010 Land Rover | AA254020 | $ 16,750.00 |
| 2016 Merc Benz | GB214072 | $ 37,500.00 |
| 2018 Kia Forte | JE174291 | $ 13,450.00 |
| 2018 Nissan Altima | JC114308 | $ 18,250.00 |
| 2016 Hyundai Elantra | GU604413 | $ 7,975.00 |
| 2013 Toyota Tundra | DX295156 | $ 28,750.00 |
| 2017 Nissan Titan | HN545492 | $ 32,000.00 |
| 2015 Volvo XC60 | F2586263 | $ 16,000.00 |
| 2016 Nissan Maxima | GC906292 | $ 21,750.00 |
| 2014 Toyota 4Runner | E5186403 | $ 26,000.00 |
| 2018 Mazda CX 9 | J0216641 | $ 30,000.00 |
| 2018 Kia Forte | JE206676 | $ 13,500.00 |
| 2015 Honda CR-V | FH556980 | $ 22,500.00 |
| 2018 Hyundai Santa Fe | JH077002 | $ 18,000.00 |
| 2014 Nissan Altima | EN227772 | $ 13,500.00 |
| 2017 Nissan Versa | HK408079 | $ 10,500.00 |
| 2013 Jaguar XF | D8S88635 | $ 3,900.00 |
| 2017 Nissan Maxima | HC449963 | $ 22,000.00 |
| 2018 Toyota 4Runner | J5169974 | $ 32,000.00 |
| 2012 Infiniti QX 56 | XC9018987 | $ 14,000.00 |
| 2018 Toyota 4Runner | J555839 | $ 48,900.00 |
| 2016 Land Rover | GA549061 | $ 49,500.00 |
| 2016 Hyundai Elantra | GH758999 | $ 9,900.00 |
| Total Value | | $ 1,069,450.00 |

## Vehicles Located in Hockley County

| Description | Last 8 of VIN | Value |
|---|---|---|
| 2015 Ford F350 | 431340006 | $ 44,250.00 |
| 2011 Chevy Traverse | BJ360152 | $ 6,000.00 |
| 2017 Volvo XC60 | H2011582 | $ 24,950.00 |
| 2017 Ford Edge | HBB31863 | $ 23,000.00 |
| 2016 Cadillac Escalade | GR182212 | $ 13,400.00 |
| 2016 Ford F150 | GKE72318 | $ 24,200.00 |
| 2015 Honda Pilot | FB012803 | $ 18,575.00 |
| 2017 Ford Escape | HUA63004 | $ 20,000.00 |
| 2015 Toyota Tundra | FX433239 | $ 34,000.00 |
| 2016 Chevy Silverado | GF113904 | $ 47,500.00 |
| 2014 Ford F150 | EKF04969 | $ 29,000.00 |
| 2014 Ford F250 | EEA96875 | $ 37,425.00 |
| 2015 GMC Acadia | FJ237782 | $ 23,500.00 |
| 2016 Toyota Tundra | GX518888 | $ 37,500.00 |
| 2015 Ford F350 | FEC79071 | $ 49,500.00 |
| 2015 Ford Explorer | FGA19464 | $ 22,000.00 |
| 2015 GMC Yukon | FR129493 | $ 39,000.00 |
| Total Value | | $493,800.00 |