# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### LUBBOCK DIVISION

| | | |
|---|---|---|
| **FIRST BANK & TRUST,** | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| **vs.** | § | |
| | § | **Cause No.5:18-cv-00234-C** |
| **REAGOR AUTO MALL, LTD. d/b/a** | § | |
| **REAGOR-DYKES OF LEVELLAND  and** | § | |
| **d/b/a REAGOR-DYKES IMPORTS,** | § | |
| **FIRSTCAPITAL BANK OF TEXAS, N.A.,** | § | |
| **BART REAGOR, RICK DYKES, SHANE** | § | |
| **SMITH, SHEILA MILLER, BRAD D.** | § | |
| **BURGESS, and KENNETH L. BURGESS,** | § | |
| | § | |
| *Defendant*. | § | |

## APPENDIX TO PLAINTIFF'S BRIEF IN SUPPORT
## OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT
## AGAINST DEFENDANTS REAGOR AND DYKES

Plaintiff First Bank & Trust files this Appendix to its Motion for Partial Summary Judgment against Defendants Bart Reagor and Rick Dykes.

| Exhibit | Appendix Pages | Exhibit Description |
|---|---|---|
| A | 0005-0012 | Affidavit of Jared Townsend |
| A-1 | 0014-0019 | Business Loan Agreement (Levelland) |
| A-2 | 0021-0022 | Promissory Note (Levelland) |
| A-3 | 0024-0026 | Reagor Commercial Guaranty (Levelland) |
| A-4 | 0028-0030 | Dykes Commercial Guaranty (Levelland) |
| A-5 | 0032-0037 | Business Loan Agreement (RD-Imports) |
| A-6 | 0039-0040 | Promissory Note (RD-Imports) |
| A-7 | 0042-0044 | Reagor Commercial Guaranty (RD-Imports) |
| A-8 | 0046-0048 | Dykes Commercial Guaranty (RD-Imports) |
| A-9 | 0050 | Floor Plan Balance Statement (Levelland) |
| A-10 | 0052 | Floor Plan Balance Statement (RD-Imports) |
| A-11 | 0054 | Account Statement |
| A-12 | 0056-0115 | First Bank Challenges |

APP 0001

| A-13 | 0117-0152 | Payment Demand - First Bank to Reagor |
| A-14 | 0154-0189 | Payment Demand – First Bank to Dykes |
| B | 0191-0193 | Affidavit of Matthew Miller |
| B-1 | 0195-0205 | Answer of Defendant Rick Dykes to First Bank & Trust's First Set of Requests for Admission |
| B-2 | 0207-0224 | Defendant Bart Reagor's Responses to Plaintiff First Bank & Trust's First Set of Requests for Admissions |
| B-3 | 0226-0294 | Oral and Videotaped Deposition of Tim Connor (August 13, 2018) |
| B-4 | 0296-0344 | Oral and Videotaped Deposition of Rick Dykes (August 13, 2018) |
| B-5 | 0346-0361 | Answers of Defendant Rick Dykes to First Bank & Trust's First Set of Interrogatories |
| B-6 | 0363-0379 | Defendant Bart Reagor's Responses and Objections to Plaintiff First Bank & Trust's First Set of Interrogatories |

DATED:  August 30, 2019

Respectfully submitted,

STINSON, L.L.P.

/s/ Paul B. Lackey

Paul B. Lackey
State Bar. No. 00791061
paul.lackey@stinson.com
Michael P. Aigen
State Bar No. 24012196
michael.aigen@stinson.com
Matthew R. Miller
State Bar No. 24013165
matt.miller@stinson.com
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219-4259
Telephone: (214) 560-2201
Telecopier: (214) 560-2203

**ATTORNEYS FOR PLAINTIFF**
**FIRST BANK & TRUST**

APP 0002

## <u>CERTIFICATE OF SERVICE</u>

I certify that a true and correct copy of the foregoing document was served on all parties

or counsel of record via the Court's electronic filing system.

*/s/ Paul B. Lackey*
Paul B. Lackey

APP 0003

CORE/3507552.0006/154441129.1

# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF TEXAS
### LUBBOCK DIVISION

| | | |
|---|---|---|
| **FIRST BANK & TRUST,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| **vs.** | § | |
| | § | **Cause No.5:18-cv-00234-C** |
| **REAGOR AUTO MALL, LTD. d/b/a** | § | |
| **REAGOR-DYKES OF LEVELLAND  and** | § | |
| **d/b/a REAGOR-DYKES IMPORTS,** | § | |
| **FIRSTCAPITAL BANK OF TEXAS, N.A.,** | § | |
| **BART REAGOR, RICK DYKES, SHANE** | § | |
| **SMITH, SHEILA MILLER, BRAD D.** | § | |
| **BURGESS, and KENNETH L. BURGESS,** | § | |
| | § | |
| *Defendant.* | § | |

## AFFIDAVIT OF JARED TOWNSEND

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF LUBBOCK | § |

1.     My name is Jared Townsend. I am over the age of 21, and am fully competent and authorized to execute this Affidavit in support of Plaintiff's Motion for Summary Judgment.

2.     I am a Senior Vice President of First Bank & Trust ("First Bank"). My duties at First Bank include serving as a commercial loan officer, and in connection with those duties I was assigned manage the relationship between First Bank and Reagor Auto Mall Ltd. d/b/a Reagor-Dykes of Levelland and d/b/a Reagor-Dykes Imports ("RAM"). I have personal knowledge of all facts set forth in this affidavit, based on my review of First Bank's books and records and my dealings with RAM. Thus, the matters stated herein are true and correct and within my personal knowledge.

3.      On or about September 29, 2017, RAM entered into a Business Loan Agreement (the "RD-Levelland Business Loan Agreement") with First Bank to obtain a loan for use in renewing RAM's existing floor plan line of credit at its Levelland location.  A true and correct copy of the RD-Levelland Business Loan Agreement is attached as Ex. A-1.

4.      On or about September 29, 2017, RAM and First Bank entered into a Promissory Note (the "RD-Levelland Promissory Note") payable to First Bank in the principal amount of $1,000,000.00.  A true and correct copy of the RD-Levelland Promissory Note is attached as Ex. A-2.

5.      On or about September 29, 2017, Defendant Bart Reagor ("Reagor") executed and delivered to First Bank a continuing Commercial Guaranty (the "RD-Levelland Reagor Commercial Guaranty").  A true and correct copy of the RD-Levelland Reagor Commercial Guaranty is attached as Ex. A-3.

6.      On or about September 29, 2017, Defendant Rick Dykes ("Dykes") executed and delivered to Plaintiff a continuing Commercial Guaranty (the "RD-Levelland Dykes Commercial Guaranty").  A true and correct cop of the RD-Levelland Dykes Commercial Guaranty is attached as Ex. A-4.

7.      On or about September 29, 2017, RAM entered into a Business Loan Agreement (the "RD-Imports Business Loan Agreement") with First Bank to obtain a loan for use in renewing RAM's existing floor plan line of credit at its Imports location.  A true and correct copy of the RD-Imports Business Loan Agreement is attached as Ex. A-5.

8.      On or about September 29, 2017, RAM and First Bank entered into a Promissory Note (the "RD-Imports Promissory Note") payable to First Bank in the principal amount of

$2,500,000.00. A true and correct copy of the RD-Imports Promissory Note is attached as Ex. A-6.

9.     On or about September 29, 2017, Reagor executed and delivered to First Bank a continuing Commercial Guaranty (the "RD-Imports Reagor Commercial Guaranty"). A true and correct copy of the RD-Imports Commercial Guaranty is attached as Ex. A-7.

10.     On or about September 29, 2017, Dykes executed and delivered to First Bank a continuing Commercial Guaranty (the "RD-Imports Dykes Commercial Guaranty"). A true and correct copy of the RD-Imports Dykes Commercial Guaranty is attached as Ex. A-8.

11.     RAM failed to make all payments under the RD-Levelland Promissory Note and the RD-Imports Promissory Note when due. As of August 15, 2019, $1,034,521.05[1] remains due and outstanding on the RD-Levelland Promissory Note. A true and correct copy of the floor plan balance statement for RAM's Levelland location as of November 2, 2018, is attached as Ex. A-9. As of August 15, 2019, $2,237,534.74[2] remains due and outstanding on the RD-Imports Promissory Note. A true and correct copy of the floor plan balance statement for RAM's Imports location as of November 2, 2018, is attached as Ex. A-10. Despite demand that they do so, Reagor and Dykes have failed to make any payments of those amounts to First Bank.

12.     At the request of RAM, First Bank opened and maintained a bank account for the benefit of RAM (the "RAM-First Bank Account"). The RAM-First Bank Account remained open up to and including August 2018.

---

[1] This amount includes a principal amount of $966,825.00, plus late fees of $514.37, interest at the rate of 6.125% per annum through November 2, 2018 of $20,486.12, and daily interest at the rate of 6.125% per annum of $164.494531 per day through August 15, 2019.

[2] This amount includes a principal amount of $2,090,220.47, plus late fees of $1,201.50, interest at the rate of 6.125% per annum through November 2, 2019 of $45,249.09, and daily interest at the rate of 6.125% per annum of $355.627788 per day through August 15, 2019.

13.    Well after the close of business hours on August 1, 2018, Plaintiff received notice of the dishonor and return of 24 checks deposited in the RAM-First Bank Account totaling $1,190,916.00. Those check numbers, and their amounts, were as follows:

| Check Number | Amount | Check Number | Amount |
|---|---|---|---|
| 191010 | $37,601.00 | 191230 | $38,750.00 |
| 191005 | $38,123.00 | 191231 | $39,125.00 |
| 191011 | $39,862.00 | 191232 | $40,217.00 |
| 191004 | $39,997.00 | 191235 | $43,044.00 |
| 191003 | $43,444.00 | 191238 | $44,227.00 |
| 191002 | $48,246.00 | 191237 | $45,668.00 |
| 191002 | $53,027.00 | 191338 | $50,992.00 |
| 190444 | $57,246.00 | 191331 | $51,456.00 |
| 190998 | $59,064.00 | 191328 | $53,998.00 |
| 190446 | $59,517.00 | 191325 | $58,064.00 |
| 190448 | $62,391.00 | 191335 | $60,097.00 |
| 190449 | $63,762.00 | 191334 | $62,998.00 |

14.    Then, on August 3, 2018, First Bank received notice of the return and nonpayment of 10 more checks deposited in the RAM-First Bank Account totaling $502,908.00. Those check numbers, and their amounts, were as follows:

| Check Number | Amount | Check Number | Amount |
|---|---|---|---|
| 191374 | $36,332.00 | 191372 | $37,097.00 |

| 191234 | $42,027.00 | 191337 | $49,077.00 |
|--------|-----------|--------|-----------|
| 191370 | $53,201.00 | 191326 | $53,972.00 |
| 191336 | $54,025.00 | 191329 | $57,024.00 |
| 191330 | $59,964.00 | 191375 | $60,189.00 |

15.     Checks written on the RAM-First Bank Account and dishonored resulted in the RAM-First Bank Account being overdrawn by $1,595,395.83. A true and correct copy of the account statement indicating that the RAM-First Bank Account is overdrawn by $1,595,395.83, other than my handwritten notes on that account statement, is attached as Ex. A-11.

16.     First Bank challenged several checks that were not returned on a timely basis by other banks through the Federal Reserve. A true and correct copy of the challenges filed by First Bank with Federal Reserve report is attached as Ex. A-12. Thereafter, the Federal Reserve credited First Bank $602,280 in connection with late returns of checks written on the RAM-First Bank Account. After crediting those amounts, and after all lawful offsets and credit, the RAM-First Bank Account remains overdrawn by $993,115.83.

17.     First Bank made demand on all Defendants for payment of the checks that were dishonored. A true and correct copy of the letter from First Bank to Reagor demanding payment is attached as Ex. A-13. A true and correct copy of the letter from First Bank to Dykes demanding payment is attached as Ex. A-14.

18.     Despite demand, RAM, Reagor, and Dykes have not made payment of the amount of the $993,115.83 account shortage.

19.     On or about August 1, 2018, several Reagor-Dykes automobile dealerships filed for bankruptcy protection after Ford Motor Credit Co., which provided financing for the

acquisition of vehicles for the Reagor-Dykes dealerships, discovered what Ford Motor Credit Co. claims was one of the largest floor-plan-financing frauds in the history of the United States and declared that those Reagor-Dykes dealerships were in violation of their contracts with Ford Motor Credit Co.  On information and belief, Ford Motor Credit then filed suit against several Reagor-Dykes dealerships requesting hundreds of millions of dollars in damages against those Reagor-Dykes dealerships, as well as Reagor, and Dykes.

20.     In August 2018, I, on behalf of First Bank, began investigating the status of RAM's inventory at its Levelland and Imports locations (the "Dealerships") in an effort to monitor vehicle sales information and to identify whether RAM was falsely reporting sales data and inventory status.  Through this investigation, I have discovered that some of First Bank's collateral has been sold, is missing, or has been double pledged.

21.     My analysis included a review of monthly floor plan inspections for the Dealerships and an inspection I personally conducted of the inventory present at each Dealership in August 2018.  Based on my analysis, I discovered there were numerous vehicles sold out of trust, others that were simply missing from the floor plan, and others that were double floored.

22.     For example, regarding the Levelland location's pledged inventory, I discovered that of the 40 vehicles on the Levelland floor plan, 21 had been sold, but were still floor planned, allowing RAM to continue to obtain financing payments from the First Bank while avoiding and/or delaying paying First Bank the amounts owed to it for the sold inventory.  The payoff amount that RAM owes First Bank for these 21 vehicles is $420,025.00.  In addition, 1 vehicle is missing from the floorplan with no explanation as to its location.  For this missing vehicle, RAM owes First Bank $31,750.00.  My inspection of the Levelland inventory has also revealed 7 instances of RAM "double flooring" vehicles pledged as collateral to First Bank.  In other words, RAM applied for

financing from First Bank and from Ford Motor Credit on those 7 vehicles, thereby obtaining double financing on them.

23.     With regard to the pledged inventory at the Imports location, my inspection revealed that of the 101 units on the Imports floor plan, 43 had been sold, but were still floor planned, allowing RAM to continue to obtain financing payments from First Bank while avoiding and/or delaying paying First Bank the amounts owed to it for the sold inventory. The payoff amount that RAM owes First Bank for those 43 vehicles is $1,084,025.00. My inspection also revealed that 6 of the 101 units are inexplicably missing from the floor plan. For those 6 vehicles, RAM owes First Bank $69,750.00. I also discovered that 13 vehicles were double floored, thereby allowing RAM to obtain double financing on those vehicles.

24.     RAM's false representations regarding the status of the pledged inventory allowed it to avoid and/or delay paying First Bank the amounts it is owed for such inventory. These misrepresentations show that RAM has experienced a material adverse change in its financial condition, giving rise to First Bank's good faith belief that it is insecure under its agreements with RAM.

25.     On or about November 2, 2018, RAM filed for bankruptcy in the Northern District of Texas.

26.     As a result of these and other events and occurrences, the prospect of payment or performance under the RD-Levelland Business Loan Agreement, RD-Levelland Promissory Note, RD-Imports Business Loan Agreement, and RD-Imports Promissory Note is impaired, and First Bank in good faith believes itself insecure.

27.     Despite demand, RAM, Reagor, and Dykes have not made payment of the amounts owed under the RD-Levelland Business Loan Agreement, RD-Levelland Promissory Note, RD-

Levelland Reagor Commercial Guaranty, and RD-Levelland Dykes Commercial Guaranty, nor under the RD-Imports Business Loan Agreement, RD-Imports Promissory Note, RD-Imports Reagor Commercial Guaranty, and RD-Imports Dykes Commercial Guaranty.

28.     I have reviewed each of the exhibits attached to this Affidavit. Each of Exhibits A-1 through A-14 are true and correct records that (1) were made at or near the time of the dates of execution reflected on those records; (2) are kept in the usual course of First Bank's regularly conducted business; and (3) the making and keeping of such records is a regular practice of First Bank in the course of its regularly conducted business.

29.     As a result of Defendants' failure to pay the amounts owed under the RD-Levelland Business Loan Agreement, RD-Levelland Promissory Note, RD-Levelland Reagor Commercial Guaranty, and RD-Levelland Dykes Commercial Guaranty, the RD-Imports Business Loan Agreement, RD-Imports Promissory Note, RD-Imports Reagor Commercial Guaranty, and RD-Imports Dykes Commercial Guaranty, First Bank has been required to retain attorneys' to prosecute the claims asserted in this lawsuit and the RAM bankruptcy, and to incur attorneys' fees and costs in connection with prosecuting its claims.

Further the affiant sayeth not.

DATED: August 26, 2019

By:_____
Jared Townsend

Sworn to and subscribed before me by Jared Townsend on August 26, 2019.

HANNAH BAIRD
Notary Public, State of Texas
Comm. Expires 09-13-2022
Notary ID 131722698

_____
Notary Public in and for the State of Texas

**AFFIDAVIT OF JARED TOWNSEND – Page 8**
CORE/3507552.0006/154153170.8

APP 0012

# EXHIBIT A-1

APP 0013

*0000000010098186970070409292017%00000000RAA2564*

## BUSINESS LOAN AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $1,000,000.00 | 09-29-2017 | 10-01-2018 | 1009818697 | 4A / 4B | RAA2564 | JET | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "****" has been omitted due to text length limitations.

Borrower: **Reagor Auto Mall, Ltd., dba Reagor-Dykes of Levelland (TIN: 20-0275022)**
1215 Ave. J
Lubbock, TX 79401

Lender: **First Bank & Trust**
First Bank & Trust- South
7808 Indiana Ave
Lubbock, TX 79423
(806) 776-0800

THIS BUSINESS LOAN AGREEMENT dated September 29, 2017, is made and executed between Reagor Auto Mall, Ltd., dba Reagor-Dykes of Levelland ("Borrower") and First Bank & Trust ("Lender") on the following terms and conditions. Borrower has received prior commercial loans from Lender or has applied to Lender for a commercial loan or loans or other financial accommodations, including those which may be described on any exhibit or schedule attached to this Agreement. Borrower understands and agrees that: (A) in granting, renewing, or extending any Loan, Lender is relying upon Borrower's representations, warranties, and agreements as set forth in this Agreement; (B) the granting, renewing, or extending of any Loan by Lender at all times shall be subject to Lender's sole judgment and discretion; and (C) all such Loans shall be and remain subject to the terms and conditions of this Agreement.

**TERM.** This Agreement shall be effective as of September 29, 2017, and shall continue in full force and effect until such time as all of Borrower's Loans in favor of Lender have been paid in full, including principal, interest, costs, expenses, attorneys' fees, and other fees and charges, or until October 1, 2018.

**CONDITIONS PRECEDENT TO EACH ADVANCE.** Lender's obligation to make the initial Advance and each subsequent Advance under this Agreement shall be subject to the fulfillment to Lender's satisfaction of all of the conditions set forth in this Agreement and in the Related Documents.

**Loan Documents.** Borrower shall provide to Lender the following documents for the Loan: (1) the Note; (2) Security Agreements granting to Lender security interests in the Collateral; (3) financing statements and all other documents perfecting Lender's Security Interests; (4) evidence of insurance as required below; (5) guaranties; (6) together with all such Related Documents as Lender may require for the Loan; all in form and substance satisfactory to Lender and Lender's counsel.

**Borrower's Authorization.** Borrower shall have provided in form and substance satisfactory to Lender properly certified resolutions, duly authorizing the execution and delivery of this Agreement, the Note and the Related Documents. In addition, Borrower shall have provided such other resolutions, authorizations, documents and instruments as Lender or its counsel, may require.

**Payment of Fees and Expenses.** Borrower shall have paid to Lender all fees, charges, and other expenses which are then due and payable as specified in this Agreement or any Related Document.

**Representations and Warranties.** The representations and warranties set forth in this Agreement, in the Related Documents, and in any document or certificate delivered to Lender under this Agreement are true and correct.

**No Event of Default.** There shall not exist at the time of any Advance a condition which would constitute an Event of Default under this Agreement or under any Related Document.

**REPRESENTATIONS AND WARRANTIES.** Borrower represents and warrants to Lender, as of the date of this Agreement, as of the date of each disbursement of loan proceeds, as of the date of any renewal, extension or modification of any Loan, and at all times during indebtedness exists:

**Organization.** Borrower is a limited partnership which is, and at all times shall be, duly organized, validly existing, and in good standing under and by virtue of the laws of the State of Texas. Borrower is duly authorized to transact business in all other states in which Borrower is doing business, having obtained all necessary filings, governmental licenses and approvals for each state in which Borrower is doing business. Specifically, Borrower is, and at all times shall be, duly qualified as a foreign limited partnership in all states in which the failure to so qualify would have a material adverse effect on its business or financial condition. Borrower has the full power and authority to own its properties and to transact the business in which it is presently engaged or presently proposes to engage. Borrower maintains an office at 1215 Ave. J, Lubbock, TX 79401. Unless Borrower has designated otherwise in writing, the principal office is the office at which Borrower keeps its books and records including its records concerning the Collateral. Borrower will notify Lender prior to any change in the location of Borrower's principal office address or any change in Borrower's name. Borrower shall do all things necessary to preserve and to keep in full force and effect its existence, rights and privileges, and shall comply with all regulations, rules, ordinances, statutes, orders and decrees of any governmental or quasi-governmental authority or court applicable to Borrower and Borrower's business activities.

**Assumed Business Names.** Borrower has filed or recorded all documents or filings required by law relating to all assumed business names used by Borrower. Excluding the name of Borrower, the following is a complete list of all assumed business names under which Borrower does business: None.

**Authorization.** Borrower's execution, delivery, and performance of this Agreement and all the Related Documents have been duly authorized by all necessary action by Borrower and do not conflict with, result in a violation of, or constitute a default under (1) any provision of (a) Borrower's articles or agreements of partnership, or (b) any agreement or other instrument binding upon Borrower or (2) any law, governmental regulation, court decree, or order applicable to Borrower or to Borrower's properties.

**Financial Information.** Each of Borrower's financial statements supplied to Lender truly and completely disclosed Borrower's financial condition as of the date of the statement, and there has been no material adverse change in Borrower's financial condition subsequent to the date of the most recent financial statement supplied to Lender. Borrower has no material contingent obligations except as disclosed in such financial statements.

**Legal Effect.** This Agreement constitutes, and any instrument or agreement Borrower is required to give under this Agreement when delivered will constitute legal, valid, and binding obligations of Borrower enforceable against Borrower in accordance with their respective terms.

**Properties.** Except as contemplated by this Agreement or as previously disclosed in Borrower's financial statements or in writing to Lender and as accepted by Lender, and except for property tax liens for taxes not presently due and payable, Borrower owns and has good title to all of Borrower's properties free and clear of all Security Interests, and has not executed any security documents or financing statements relating to such properties. All of Borrower's properties are titled in Borrower's legal name, and Borrower has not used or filed a financing statement under any other name for at least the last five (5) years.

**Hazardous Substances.** Except as disclosed to and acknowledged by Lender in writing, Borrower represents and warrants that: (1) During the period of Borrower's ownership of the Collateral, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance by any person on, under, about or from any of the Collateral. (2) Borrower has no knowledge of, or reason to believe that there has been (a) any breach or violation of any Environmental Laws; (b) any use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance on, under, about or from the Collateral by any prior owners or occupants of any of the Collateral; or (c) any actual or threatened litigation or claims of any kind by any person relating to such matters. (3) Neither Borrower nor any tenant, contractor, agent or other authorized user of any of the Collateral shall use, generate, manufacture, store, treat, dispose of or release any Hazardous Substance on, under, about or from any of the Collateral; and any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations, and ordinances, including without limitation all Environmental Laws. Borrower authorizes Lender and its agents to enter upon the Collateral to make such inspections and tests as Lender may deem appropriate to determine compliance of the Collateral with this section of the Agreement. Any inspections or tests made by Lender shall be at Borrower's expense and for Lender's purposes only and shall not be construed to create any responsibility or liability on the part of Lender to Borrower or to any other person. The representations and warranties contained herein are based on Borrower's due diligence in investigating the Collateral for hazardous waste and Hazardous Substances. Borrower hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Borrower becomes liable for cleanup or other costs under any such laws, and (2) agrees to indemnify, defend, and hold harmless Lender against any and all claims, losses, liabilities, damages, penalties, and expenses which Lender may directly or indirectly sustain or suffer resulting from a breach of this section of the Agreement or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release of a hazardous waste or substance on the Collateral. The provisions of this section of the Agreement,

APP 0014

## BUSINESS LOAN AGREEMENT

**Loan No: 1009818597**                    **(Continued)**                    **Page 2**

including the obligation to indemnify and defend, shall survive the payment of the Indebtedness and the termination, expiration or satisfaction of this Agreement and shall not be affected by Lender's acquisition of any interest in any of the Collateral, whether by foreclosure or otherwise.

Litigation and Claims. No litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Borrower is pending or threatened, and no other event has occurred which may materially adversely affect Borrower's financial condition or properties, other than litigation, claims, or other events, if any, that have been disclosed to and acknowledged by Lender in writing.

Taxes. To the best of Borrower's knowledge, all of Borrower's tax returns and reports that are or were required to be filed, have been filed, and all taxes, assessments and other governmental charges have been paid in full, except those presently being or to be contested by Borrower in good faith in the ordinary course of business and for which adequate reserves have been provided.

Lien Priority. Unless otherwise previously disclosed to Lender in writing, Borrower has not entered into or granted any Security Agreements, or permitted the filing or attachment of any Security Interests on or affecting any of the Collateral directly or indirectly securing repayment of Borrower's Loan and Note, that would be prior or that may in any way be superior to Lender's Security Interests and rights in and to such Collateral.

Binding Effect. This Agreement, the Note, all Security Agreements (if any), and all Related Documents are binding upon the signers thereof, as well as upon their successors, representatives and assigns, and are legally enforceable in accordance with their respective terms.

**AFFIRMATIVE COVENANTS.** Borrower covenants and agrees with Lender that, so long as this Agreement remains in effect, Borrower will:

Notices of Claims and Litigation. Promptly inform Lender in writing of (1) all material adverse changes in Borrower's financial condition, and (2) all existing and all threatened litigation, claims, investigations, administrative proceedings or similar actions affecting Borrower or any Guarantor which could materially affect the financial condition of Borrower or the financial condition of any Guarantor.

Financial Records. Maintain its books and records in accordance with GAAP, applied on a consistent basis, and permit Lender to examine and audit Borrower's books and records at all reasonable times.

Financial Statements. Furnish Lender with the following:

Interim Statements. As soon as available, but in no event later than thirty (30) days after the end of each fiscal quarter, Borrower's balance sheet and profit and loss statement for the period ended, prepared by Borrower in form satisfactory to Lender.

Tax Returns. As soon as available after the applicable filing date for the tax reporting period ended, Borrower's Federal and other governmental tax returns, prepared by a tax professional satisfactory to Lender.

Additional Requirements.
Annual Statements. As soon as available or by September 30th of each fiscal year, Borrower's balance sheet and income statement for the year ended, audited by a certified public accountant satisfactory to lender.

Inventory Listing. As soon as available after the end of each fiscal month, company prepared in form satisfactory to Lender

Guarantor(s) agrees to furnish Lender with the following:

Annual Statements. As soon as available after the end of each fiscal year, Guarantor's balance sheet and income statement for the year ended, prepared by Guarantor in form satisfactory to Lender

Tax Returns. As soon as available after the applicable filing date for the tax reporting period ended, Federal and other governmental tax returns, prepared by a tax professional satisfactory to Lender .

All financial reports required to be provided under this Agreement shall be prepared in accordance with GAAP, applied on a consistent basis, and certified by Borrower as being true and correct.

Additional Information. Furnish such additional information and statements, as Lender may request from time to time.

Additional Requirements.
Minimum Annual DSCR: 1.00X after distribution debt service coverage ratio required for the companies on a consolidated basis measured quarterly. Failure to meet requirement will result in all related debt increasing to a rate of FB&T base + 3.00%. The DSCR will be calculated as:
Earnings before interest, depreciation, and amortization (EBIDA):
- Partner draws from equity
+ Partner contributions to equity
= Cash flow to service debt
Divided by annual debt service
= Debt Service Coverage Ratio

Maximum Current Ratio: Current ratio required at or above 1.00:1 including re-categorization of owner receivable to long-term assets.

Curtailments: 10% due at 90 days; 10% due every 30 days thereafter until paid in full

Flooring Fee: $25 fee per floored item

Monthly Inspections: Monthly inspections of all units.

Insurance. Maintain fire and other risk insurance, public liability insurance, and such other insurance as Lender may require with respect to Borrower's properties and operations, in form, amounts, and coverages reasonably acceptable to Lender and by insurance companies authorized to transact business in Texas. BORROWER MAY FURNISH THE INSURANCE REQUIRED BY THIS AGREEMENT WHETHER THROUGH EXISTING POLICIES OWNED OR CONTROLLED BY BORROWER OR THROUGH EQUIVALENT COVERAGE FROM ANY INSURANCE COMPANY AUTHORIZED TO TRANSACT BUSINESS IN TEXAS. Borrower, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least thirty (30) days prior written notice to Lender. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Borrower or any other person. In connection with all policies covering assets in which Lender holds or is offered a security interest for the Loans, Borrower will provide Lender with such lender's loss payable or other endorsements as Lender may require.

Insurance Reports. Furnish to Lender, upon request of Lender, reports on each existing insurance policy showing such information as Lender may reasonably request, including without limitation the following: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the properties insured; (5) the then current property values on the basis of which insurance has been obtained, and the manner of determining those values; and (6) the expiration date of the policy. In addition, upon request of Lender (however not more often than annually), Borrower will have an independent appraiser satisfactory to Lender determine, as applicable, the actual cash value or replacement cost of any Collateral. The cost of such appraisal shall be paid by Borrower.

Guaranties. Prior to disbursement of any Loan proceeds, furnish executed guaranties of the Loans in favor of Lender, executed by the guarantors named below, on Lender's forms, and in the amounts and under the conditions set forth in those guaranties.

| Names of Guarantors | Amounts |
|---|---|
| Bart Reagor | Unlimited |
| Rick Dykes | Unlimited |

Other Agreements. Comply with all terms and conditions of all other agreements, whether now or hereafter existing, between Borrower and any other party and notify Lender immediately in writing of any default in connection with any other such agreements.

Loan Proceeds. Use all Loan proceeds solely for Borrower's business operations, unless specifically consented to the contrary by Lender in writing.

Taxes, Charges and Liens. Pay and discharge when due all of its Indebtedness and obligations, including without limitation all assessments, taxes, governmental charges, levies and liens, of every kind and nature, imposed upon Borrower or its properties, income, or profits, prior to the date on which penalties would attach, and all lawful claims that, if unpaid, might become a lien or charge upon any of Borrower's properties, income, or profits. Provided however, Borrower will not be required to pay and discharge any such assessment, tax, charge, levy, lien or claim so long as (1) the legality of the same shall be contested in good faith by appropriate proceedings, and (2) Borrower shall have established on Borrower's books adequate reserves with respect to such contested assessment, tax, charge, levy, lien, or claim in accordance with GAAP.

**BUSINESS LOAN AGREEMENT**
**(Continued)**

Loan No: 1009818597                                                                 Page 3

**Performance.** Perform and comply, in a timely manner, with all terms, conditions, and provisions set forth in this Agreement, in the Related Documents, and in all other instruments and agreements between Borrower and Lender. Borrower shall notify Lender immediately in writing of any default in connection with any agreement.

**Operations.** Maintain executive and management personnel with substantially the same qualifications and experience as the present executive and management personnel; provide written notice to Lender of any change in executive and management personnel; conduct its business affairs in a reasonable and prudent manner.

**Environmental Studies.** Promptly conduct and complete, at Borrower's expense, all such investigations, studies, samplings and testings as may be requested by Lender or any governmental authority relative to any substance, or any waste or by-product of any substance defined as toxic or a hazardous substance under applicable federal, state, or local law, rule, regulation, order or directive, at or affecting any property or any facility owned, leased or used by Borrower.

**Compliance with Governmental Requirements.** Comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the conduct of Borrower's properties, businesses and operations, and to the use or occupancy of the Collateral, including without limitation, the Americans With Disabilities Act. Borrower may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Borrower has notified Lender in writing prior to doing so and so long as, in Lender's sole opinion, Lender's interests in the Collateral are not jeopardized. Lender may require Borrower to post adequate security or a surety bond, reasonably satisfactory to Lender, to protect Lender's interest.

**Inspection.** Permit employees or agents of Lender at any reasonable time to inspect any and all Collateral for the Loan or Loans and Borrower's other properties and to examine or audit Borrower's books, accounts, and records and to make copies and memoranda of Borrower's books, accounts, and records. If Borrower now or at any time hereafter maintains any records (including without limitation computer generated records and computer software programs for the generation of such records) in the possession of a third party, Borrower, upon request of Lender, shall notify such party to permit Lender free access to such records at all reasonable times and to provide Lender with copies of any records it may request, all at Borrower's expense.

**Compliance Certificates.** Unless waived in writing by Lender, provide Lender at least annually, with a certificate executed by Borrower's chief financial officer, or other officer or person acceptable to Lender, certifying that the representations and warranties set forth in this Agreement are true and correct as of the date of the certificate and further certifying that, as of the date of the certificate, no Event of Default exists under this Agreement.

**Environmental Compliance and Reports.** Borrower shall comply in all respects with any and all Environmental Laws; not cause or permit to exist, as a result of an intentional or unintentional action or omission on Borrower's part or on the part of any third party, on property owned and/or occupied by Borrower, any environmental activity where damage may result to the environment, unless such environmental activity is pursuant to and in compliance with the conditions of a permit issued by the appropriate federal, state or local governmental authorities; shall furnish to Lender promptly and in any event within thirty (30) days after receipt thereof a copy of any notice, summons, lien, citation, directive, letter or other communication from any governmental agency or instrumentality concerning any intentional or unintentional action or omission on Borrower's part in connection with any environmental activity whether or not there is damage to the environment and/or other natural resources.

**Additional Assurances.** Make, execute and deliver to Lender such promissory notes, mortgages, deeds of trust, security agreements, assignments, financing statements, instruments, documents and other agreements as Lender or its attorneys may reasonably request to evidence and secure the Loans and to perfect all Security Interests.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Borrower fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Borrower's failure to discharge or pay when due any amounts Borrower is required to discharge or pay under this Agreement or any Related Documents, Lender on Borrower's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on any Collateral and paying all costs for insuring, maintaining and preserving any Collateral. All such expenditures paid by Lender for such purposes will then bear interest at the Note rate from the date paid by Lender to the date of repayment by Borrower. To the extent permitted by applicable law, all such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity.

**NEGATIVE COVENANTS.** Borrower covenants and agrees with Lender that while this Agreement is in effect, Borrower shall not, without the prior written consent of Lender:

**Indebtedness and Liens.** (1) Except for trade debt incurred in the normal course of business and Indebtedness to Lender contemplated by this Agreement, create, incur or assume Indebtedness for borrowed money, including capital leases, (2) sell, transfer, mortgage, assign, pledge, lease, grant a security interest in, or encumber any of Borrower's assets (except as allowed as Permitted Liens), or (3) sell with recourse any of Borrower's accounts, except to Lender.

**Continuity of Operations.** (1) Engage in any business activities substantially different than those in which Borrower is presently engaged, (2) cease operations, liquidate, merge, transfer, acquire or consolidate with any other entity, change its name, dissolve or transfer or sell Collateral out of the ordinary course of business, or (3) make any distribution with respect to any capital account, whether by reduction of capital or otherwise.

**Loans, Acquisitions and Guaranties.** (1) Loan, invest in or advance money or assets to any other person, enterprise or entity, (2) purchase, create or acquire any interest in any other enterprise or entity, or (3) incur any obligation as surety or guarantor other than in the ordinary course of business.

**Agreements.** Enter into any agreement containing any provisions which would be violated or breached by the performance of Borrower's obligations under this Agreement or in connection herewith.

**CESSATION OF ADVANCES.** If Lender has made any commitment to make any Loan to Borrower, whether under this Agreement or under any other agreement, Lender shall have no obligation to make Loan Advances or to disburse Loan proceeds if: (A) Borrower or any Guarantor is in default under the terms of this Agreement or any of the Related Documents or any other agreement that Borrower or any Guarantor has with Lender; (B) Borrower or any Guarantor dies, becomes incompetent or becomes insolvent, files a petition in bankruptcy or similar proceedings, or is adjudged a bankrupt; (C) there occurs a material adverse change in Borrower's financial condition, in the financial condition of any Guarantor, or in the value of any Collateral securing any Loan; or (D) any Guarantor seeks, claims or otherwise attempts to limit, modify or revoke such Guarantor's guaranty of the Loan or any other loan with Lender; or (E) Lender in good faith deems itself insecure, even though no Event of Default shall have occurred.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the Indebtedness against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

**DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement:

**Payment Default.** Borrower fails to make any payment when due under the Loan.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Death or Insolvency.** The dissolution or termination of Borrower's existence as a going business or the death of any partner, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Defective Collateralization.** This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the Loan.

APP 0016

## BUSINESS LOAN AGREEMENT
### (Continued)

Loan No: 1009818597                                                                 Page 4

This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Events Affecting General Partner of Borrower.** Any of the preceding events occurs with respect to any general partner of Borrower or any general partner dies or becomes incompetent.

**Change in Ownership.** The resignation or expulsion of any general partner with an ownership interest of twenty-five percent (25%) or more in Borrower.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of the Loan is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**Right to Cure.** If any default, other than a default on Indebtedness, is curable and if Borrower or Grantor, as the case may be, has not been given a notice of a similar default within the preceding twelve (12) months, it may be cured if Borrower or Grantor, as the case may be, after Lender sends written notice to Borrower or Grantor, as the case may be, demanding cure of such default: (1) cure the default within thirty (30) days; or (2) if the cure requires more than thirty (30) days, immediately initiate steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continue and complete all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**EFFECT OF AN EVENT OF DEFAULT.** If any Event of Default shall occur, except where otherwise provided in this Agreement or the Related Documents, all commitments and obligations of Lender under this Agreement or the Related Documents or any other agreement immediately will terminate (including any obligation to make further Loan Advances or disbursements), and, at Lender's option, all indebtedness immediately will become due and payable, all without notice of any kind to Borrower, except that in the case of an Event of Default of the type described in the "Insolvency" subsection above, such acceleration shall be automatic and not optional. In addition, Lender shall have all the rights and remedies provided in the Related Documents or available at law, in equity, or otherwise. Except as may be prohibited by applicable law, all of Lender's rights and remedies shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Borrower or of any Grantor shall not affect Lender's right to declare a default and to exercise its rights and remedies.

**ORIGINAL DOCUMENT.** "The parties whose signatures appear below agree that a photographic, photostatic, facsimile, copy or similar reproduction of this document shall be valid as the original.".

**CANCELLATION PROVISION.** "Notwithstanding anything to the contrary contained in this Loan Agreement or the Related Documents this Loan may be cancelled at any time and for any reason in the sole discretion of Lender and Lender shall have no obligation to make any additional Advances thereafter. Lender shall so notify Borrower at Lender's decision to cancel the loan, which notification shall be immediately effective or effective at the time stated therein if another effective time is stated in the notice. All Advances made prior to the cancellation of the Loan shall remain payable pursuant to the terms of the Loan Agreement and the Related Documents.".

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement:

**Amendments.** This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.** Borrower agrees to pay upon demand all of Lender's costs and expenses, including Lender's reasonable attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement. Lender may hire or pay someone else to help enforce this Agreement, and Borrower shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's reasonable attorneys' fees and legal expenses whether or not there is a lawsuit, including Lender's reasonable attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Borrower also shall pay all court costs and such additional fees as may be directed by the court.

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Consent to Loan Participation.** Borrower agrees and consents to Lender's sale or transfer, whether now or later, of one or more participation interests in the Loan to one or more purchasers, whether related or unrelated to Lender. Lender may provide, without any limitation whatsoever, to any one or more purchasers, or potential purchasers, any information or knowledge Lender may have about Borrower or about any other matter relating to the Loan, and Borrower hereby waives any rights to privacy Borrower may have with respect to such matters. Borrower additionally waives any and all notices of sale of participation interests, as well as all notices of any repurchase of such participation interests. Borrower also agrees that the purchasers of any such participation interests will be considered as the absolute owners of such interests in the Loan and will have all the rights granted under the participation agreement or agreements governing the sale of such participation interests. Borrower further waives all rights of offset or counterclaim that it may have now or later against Lender or against any purchaser of such a participation interest and unconditionally agrees that either Lender or such purchaser may enforce Borrower's obligation under the Loan irrespective of the failure or insolvency of any holder of any interest in the Loan. Borrower further agrees that the purchaser of any such participation interests may enforce its interests irrespective of any personal claims or defenses that Borrower may have against Lender.

**Governing Law.** This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Texas without regard to its conflicts of law provisions. This Agreement has been accepted by Lender in the State of Texas.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Borrower, or between Lender and any Grantor, shall constitute a waiver of any of Lender's rights or of any of Borrower's or any Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Notices.** Any notice required to be given under this Agreement shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Agreement. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Borrower agrees to keep Lender informed at all times of Borrower's current address. Unless otherwise provided or required by law, if there is more than one Borrower, any notice given by Lender to any Borrower is deemed to be notice given to all Borrowers.

**Payment of Interest and Fees.** Notwithstanding any other provision of this Agreement or any provision of any Related Document, Borrower does not agree or intend to pay, and Lender does not agree or intend, to charge, collect, take, reserve or receive (collectively referred to herein as "charge or collect"), any amount in the nature of interest or in the nature of a fee for the Loan which would in any way or event (including demand, prepayment, or acceleration) cause Lender to contract for, charge or collect more for the Loan than the maximum Lender would be permitted to charge or collect by any applicable federal or Texas state law. Any such excess interest or unauthorized fee will, instead of anything stated to the contrary, be applied first to reduce the unpaid principal balance of the Loan, and when the principal has been paid in full, be refunded to Borrower.

**Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

**Subsidiaries and Affiliates of Borrower.** To the extent the context or any provisions of this Agreement makes it appropriate, including

APP 0017

**BUSINESS LOAN AGREEMENT**
**(Continued)**

Loan No: 1009818597                                                                                          Page 5

without limitation any representation, warranty or covenant, the word "Borrower" as used in this Agreement shall include all of Borrower's subsidiaries and affiliates. Notwithstanding the foregoing however, under no circumstances shall this Agreement be construed to require Lender to make any Loan or other financial accommodation to any of Borrower's subsidiaries or affiliates.

Successors and Assigns. All covenants and agreements by or on behalf of Borrower contained in this Agreement or any Related Documents shall bind Borrower's successors and assigns and shall inure to the benefit of Lender and its successors and assigns. Borrower shall not, however, have the right to assign Borrower's rights under this Agreement or any interest therein, without the prior written consent of Lender.

Survival of Representations and Warranties. Borrower understands and agrees that in extending Loan Advances, Lender is relying on all representations, warranties, and covenants made by Borrower in this Agreement or in any certificate or other instrument delivered by Borrower to Lender under this Agreement or the Related Documents. Borrower further agrees that regardless of any investigation made by Lender, all such representations, warranties and covenants will survive the extension of Loan Advances and delivery to Lender of the Related Documents, shall be continuing in nature, shall be deemed made and redated by Borrower at the time each Loan Advance is made, and shall remain in full force and effect until such time as Borrower's Indebtedness shall be paid in full, or until this Agreement shall be terminated in the manner provided above, whichever is the last to occur.

Time is of the Essence. Time is of the essence in the performance of this Agreement.

DEFINITIONS. The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code. Accounting words and terms not otherwise defined in this Agreement shall have the meanings assigned to them in accordance with generally accepted accounting principles as in effect on the date of this Agreement:

Advance. The word "Advance" means a disbursement of Loan funds made, or to be made, to Borrower or on Borrower's behalf on a line of credit or multiple advance basis under the terms and conditions of this Agreement.

Agreement. The word "Agreement" means this Business Loan Agreement, as this Business Loan Agreement may be amended or modified from time to time, together with all exhibits and schedules attached to this Business Loan Agreement from time to time.

Borrower. The word "Borrower" means Reagor Auto Mall, Ltd., dba Reagor-Dykes of Levelland and includes all co-signers and co-makers signing the Note and all their successors and assigns.

Collateral. The word "Collateral" means all property and assets granted as collateral security for a Loan, whether real or personal property, whether granted directly or indirectly, whether granted now or in the future, and whether granted in the form of a security interest, mortgage, collateral mortgage, deed of trust, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien, charge, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever, whether created by law, contract, or otherwise.

Environmental Laws. The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

Event of Default. The words "Event of Default" mean any of the events of default set forth in this Agreement in the default section of this Agreement.

GAAP. The word "GAAP" means generally accepted accounting principles.

Grantor. The word "Grantor" means each and all of the persons or entities granting a Security Interest in any Collateral for the Loan, including without limitation all Borrowers granting such a Security Interest.

Guarantor. The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Loan.

Guaranty. The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

Hazardous Substances. The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

Indebtedness. The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Borrower is responsible under this Agreement or under any of the Related Documents.

Lender. The word "Lender" means First Bank & Trust, its successors and assigns.

Loan. The word "Loan" means any and all loans and financial accommodations from Lender to Borrower whether now or hereafter existing, and however evidenced, including without limitation those loans and financial accommodations described herein or described on any exhibit or schedule attached to this Agreement from time to time.

Note. The word "Note" means the Note executed by Reagor Auto Mall, Ltd., dba Reagor-Dykes of Levelland in the principal amount of $1,000,000.00, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the note or credit agreement.

Permitted Liens. The words "Permitted Liens" mean (1) liens and security interests securing Indebtedness owed by Borrower to Lender; (2) liens for taxes, assessments, or similar charges either not yet due or being contested in good faith; (3) liens of materialmen, mechanics, warehousemen, or carriers, or other like liens arising in the ordinary course of business and securing obligations which are not yet delinquent; (4) purchase money liens or purchase money security interests upon or in any property acquired or held by Borrower in the ordinary course of business to secure indebtedness outstanding on the date of this Agreement or permitted to be incurred under the paragraph of this Agreement titled "Indebtedness and Liens"; (5) liens and security interests which, as of the date of this Agreement, have been disclosed to and approved by the Lender in writing; and (6) those liens and security interests in which in the aggregate constitute an immaterial and insignificant monetary amount with respect to the net value of Borrower's assets.

Related Documents. The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Loan.

Security Agreement. The words "Security Agreement" mean and include without limitation any agreements, promises, covenants, arrangements, understandings or other agreements, whether created by law, contract, or otherwise, evidencing, governing, representing, or creating a Security Interest.

Security Interest. The words "Security Interest" mean, without limitation, any and all types of collateral security, present and future, whether in the form of a lien, charge, encumbrance, mortgage, deed of trust, security deed, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever whether created by law, contract, or otherwise.

**BUSINESS LOAN AGREEMENT**
**(Continued)**

Loan No: 1009818597                                                                                                           Page 6

BORROWER ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS BUSINESS LOAN AGREEMENT AND BORROWER AGREES TO ITS TERMS. THIS BUSINESS LOAN AGREEMENT IS DATED SEPTEMBER 29, 2017.

BORROWER:

REAGOR AUTO MALL, LTD., DBA REAGOR-DYKES OF LEVELLAND

REAGOR AUTO MALL I, L.L.C., General Partner of Reagor Auto Mall, Ltd., dba Reagor-Dykes of Levelland

By: _____          By: _____
Bart Reagor, Manager of Reagor Auto Mall I, L.L.C.          Rick Dykes, Manager of Reagor Auto Mall I, L.L.C.

LENDER:

FIRST BANK & TRUST

By: _____
Jared Edward Townsend, Senior Vice President

APP 0019

# EXHIBIT A-2

APP 0020



*000000001000818597%0955%09292017%00000000RAA2564*

# PROMISSORY NOTE

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $1,000,000.00 | 09-29-2017 | 10-01-2018 | 1000818597 | 4A / 46 | RAA2564 | JET | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "****" has been omitted due to text length limitations.

**Borrower:**  Reagor Auto Mall, Ltd., dba Reagor-Dykes of
Levelland (TIN: 20-0275022)
1215 Ave. J
Lubbock, TX 79401

**Lender:**  First Bank & Trust
First Bank & Trust- South
7806 Indiana Ave
Lubbock, TX 79423
(806) 776-0900

---

**Principal Amount:  $1,000,000.00**                    **Date of Note:  September 29, 2017**

**PROMISE TO PAY.** Reagor Auto Mall, Ltd., dba Reagor-Dykes of Levelland ("Borrower") promises to pay to First Bank & Trust ("Lender"), or order, in lawful money of the United States of America, the principal amount of One Million & 00/100 Dollars ($1,000,000.00) or so much as may be outstanding, together with interest on the unpaid outstanding principal balance of each advance. Interest shall be calculated from the date of each advance until repayment of each advance or maturity, whichever occurs first.

**CHOICE OF USURY CEILING AND INTEREST RATE.** The interest rate on this Note has been implemented under the "Weekly Ceiling" as referred to in Sections 303.002 and 303.003 of the Texas Finance Code.

**PAYMENT.** Borrower will pay this loan in full immediately upon Lender's demand. If no demand is made, Borrower will pay this loan in one payment of all outstanding principal plus all accrued unpaid interest on October 1, 2018. In addition, Borrower will pay regular monthly payments of all accrued interest due as of each payment date, beginning November 1, 2017, with all subsequent interest payments to be due on the same day of each month after that. Unless otherwise agreed or required by applicable law, payments will be applied first to any accrued unpaid interest; then to principal; then to any unpaid collection costs; and then to any late charges. Borrower will pay Lender at Lender's address shown above or at such other place as Lender may designate in writing. Notwithstanding any other provision of this Note, Lender will not charge interest on any undisbursed loan proceeds. No scheduled payment, whether of principal or interest or both, will be due unless sufficient loan funds have been disbursed by the scheduled payment date to justify the payment.

**VARIABLE INTEREST RATE.** The interest rate on this Note is subject to change from time to time based on changes in an index which is the First Bank & Trust Base Rate (the "Index"). The Index is not necessarily the lowest rate charged by Lender on its loans and is set by Lender in its sole discretion. If the Index becomes unavailable during the term of this loan, Lender may designate a substitute index after notifying Borrower. Lender will tell Borrower the current index rate upon Borrower's request. The interest rate change will not occur more often than each day. Borrower understands that Lender may make loans based on other rates as well. The Index currently is 5.750% per annum. Interest prior to maturity on the unpaid principal balance of this Note will be calculated as described in the "INTEREST CALCULATION METHOD" paragraph using a rate equal to the Index, adjusted if necessary for any minimum and maximum rate limitations described below, resulting in an initial rate of 6.125% per annum based on a year of 360 days. NOTICE: Under no circumstances will the interest rate on this Note be less than 6.125% per annum or more than (except for any higher default rate or Post Maturity Rate shown below) the lesser of 18.000% per annum or the maximum rate allowed by applicable law. For purposes of this Note, the "maximum rate allowed by applicable law" means the greater of (A) the maximum rate of interest permitted under federal or other law applicable to the indebtedness evidenced by this Note, or (B) the "Weekly Ceiling" as referred to in Sections 303.002 and 303.003 of the Texas Finance Code.

**INTEREST CALCULATION METHOD.** Interest on this Note is computed on a 365/360 basis; that is, by applying the ratio of the interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding, unless such calculation would result in a usurious rate, in which case interest shall be calculated on a per diem basis of a year of 365 or 366 days, as the case may be. All interest payable under this Note is computed using this method.

**PREPAYMENT.** Borrower agrees that all loan fees and other prepaid finance charges are earned fully as of the date of the loan and will not be subject to refund upon early payment (whether voluntary or as a result of default), except as otherwise required by law. Except for the foregoing, Borrower may pay without penalty all or a portion of the amount owed earlier than it is due. Prepayment in full shall consist of payment of the remaining unpaid principal balance together with all accrued and unpaid interest and all other amounts, costs and expenses for which Borrower is responsible under this Note or any other agreement with Lender pertaining to this loan, and in no event will Borrower ever be required to pay any unearned interest. Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments of accrued unpaid interest. Rather, early payments will reduce the principal balance due. Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language. If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Note, and Borrower will remain obligated to pay any further amount owed to Lender. All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to: First Bank & Trust, 9816 Slide Road Lubbock, TX 79424.

**LATE CHARGE.** If a payment is 10 days or more late, Borrower will be charged 5.000% of the regularly scheduled payment.

**POST MATURITY RATE.** The Post Maturity Rate on this Note is the lesser of (A) the maximum rate allowed by law or (B) 18.000% per annum based on a year of 360 days. Borrower will pay interest on all sums due after final maturity, whether by acceleration or otherwise, at that rate

**DEFAULT.** Each of the following shall constitute an event of default ("Event of Default") under this Note:

**Payment Default.**  Borrower fails to make any payment when due under this Note.

**Other Defaults.**  Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Note or in any of the related documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**False Statements.**  Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Note or the related documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Death or Insolvency.**  The dissolution or termination of Borrower's existence as a going business or the death of any partner, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Creditor or Forfeiture Proceedings.**  Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.**  Any of the preceding events occurs with respect to any Guarantor of any of the indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any guaranty of the indebtedness evidenced by this Note.

**Events Affecting General Partner of Borrower.**  Any of the preceding events occurs with respect to any general partner of Borrower or any general partner dies or becomes incompetent.

**Change in Ownership.**  The resignation or expulsion of any general partner with an ownership interest of twenty-five percent (25%) or more in Borrower.

**Adverse Change.**  A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of this Note is impaired.

**Insecurity.**  Lender in good faith believes itself insecure.

APP 0021

# PROMISSORY NOTE
## (Continued)

Loan No: 1009818597

Page 2

Cure Provisions. If any default, other than a default in payment, is curable and if Borrower has not been given a notice of a breach of the same provision of this Note within the preceding twelve (12) months, it may be cured if Borrower, after Lender sends written notice to Borrower demanding cure of such default: (1) cures the default within thirty (30) days; or (2) if the cure requires more than thirty (30) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

LENDER'S RIGHTS. Upon default, Lender may declare the entire indebtedness, including the unpaid principal balance under this Note, all accrued unpaid interest, and all other amounts, costs and expenses for which Borrower is responsible under this Note or any other agreement with Lender pertaining to this loan, immediately due, without notice, and then Borrower will pay that amount.

ATTORNEYS' FEES; EXPENSES. Lender may hire an attorney to help collect this Note if Borrower does not pay, and Borrower will pay Lender's reasonable attorneys' fees. Borrower also will pay Lender all other amounts Lender actually incurs as court costs, lawful fees for filing, recording, releasing to any public office any instrument securing this Note; the reasonable cost actually expended for repossessing, storing, preparing for sale, and selling any security; and fees for noting a lien on or transferring a certificate of title to any motor vehicle offered as security for this Note, or premiums or identifiable charges received in connection with the sale of authorized insurance.

GOVERNING LAW. This Note will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Texas without regard to its conflicts of law provisions. This Note has been accepted by Lender in the State of Texas.

DISHONORED CHECK CHARGE. Borrower will pay a processing fee of $30.00 if any check given by Borrower to Lender as a payment on this loan is dishonored.

RIGHT OF SETOFF. To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the indebtedness against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

COLLATERAL. Borrower acknowledges this Note is secured by a Commercial Security Agreement from Reagor Auto Mall, Ltd., dba Reagor-Dykes of Levelland to First Bank & Trust, dated September 29, 2017, secured by All inventory, together with the following specifically described property: all debtor's inventory of property of every description (specifically including by not limited to) all new and used motor vehicles, which includes but is not limited to automobiles, motorcycles, mobile homes, motor homes, travel trailers, boats, vans, pickups, together with all accessories, attachments, or accessions related to any of the foregoing collateral hereafter acquired and evidenced by mso and/or title, whether held for rental, lease, sale or use, of whatever nature and whosoever located and all debtor's accounts, accounts receivable, notes receivable, checks, drafts, contract rights and general intangibles of every nature evidencing debtor's right to the payment of monies arising from the sale, leasing, or rental of such inventory items and/or from the performance of debtor of services in connection therewith or related thereto all the foregoing whether now owned or hereafter acquired by debtor and the proceeds and products thereof.

LINE OF CREDIT. This Note evidences a revolving line of credit. Advances under this Note, as well as directions for payment from Borrower's accounts, may be requested orally or in writing by Borrower or by an authorized person. Lender may, but need not, require that all oral requests be confirmed in writing. Borrower agrees to be liable for all sums either: (A) advanced in accordance with the instructions of an authorized person or (B) credited to any of Borrower's accounts with Lender. The unpaid principal balance owing on this Note at any time may be evidenced by endorsements on this Note or by Lender's internal records, including daily computer print-outs. This revolving line of credit shall not be subject to Ch. 346 of the Texas Finance Code.

ORIGINAL DOCUMENT. "The parties whose signatures appear below agree that a photographic, photostatic, facsimile, electronic, copy or similar reproduction of this document shall be valid as the original.".

CHOICE OF VENUE. If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the Courts of Lubbock County, Texas. The parties agree that Lubbock County, Texas is the sole and exclusive venue for any lawsuit arising out of this transaction.

CANCELLATION PROVISION. "Notwithstanding any language to the contrary contained herein, the loan represented by this Note may be cancelled at any time and for any reason in the sole discretion of Lender and Lender shall have no obligation to make any additional advances thereafter. Lender shall so notify Borrower of Lender's decision to cancel this loan. Upon which notification shall be immediately effective or effective at the time stated therein if another effective time is stated in the notice. All principal advanced prior to the cancellation of this loan shall continue to accrue interest and shall remain payable pursuant to the terms of this Note.".

RENEWAL AND EXTENSION. This Note is given in renewal and extension and not in novation of the following described indebtedness: a Promissory Note #1009818597 from Reagor Auto Mall, Ltd., dba Reagor-Dykes of Levelland to First Bank & Trust, dated August 23, 2016, in the original commitment amount of $1,000,000.00, with a current principal balance of $997,000.00.

SUCCESSOR INTERESTS. The terms of this Note shall be binding upon Borrower, and upon Borrower's heirs, personal representatives, successors and assigns, and shall inure to the benefit of Lender and its successors and assigns.

GENERAL PROVISIONS. This Note is payable on demand. The inclusion of specific default provisions or rights of Lender shall not preclude Lender's right to declare payment of this Note on its demand. If any part of this Note cannot be enforced, this fact will not affect the rest of the Note. Borrower does not agree or intend to pay, and Lender does not agree or intend to contract for, charge, collect, take, reserve or receive (collectively referred to herein as "charge or collect"), any amount in the nature of interest or in the nature of a fee for this loan, which would in any way or event (including demand, prepayment, or acceleration) cause Lender to charge or collect more for this loan than the maximum Lender would be permitted to charge or collect by federal law or the law of the State of Texas (as applicable). Any such excess interest or unauthorized fee shall, instead of anything stated to the contrary, be applied first to reduce the principal balance of this loan, and when the principal has been paid in full, be refunded to Borrower. The right to accelerate maturity of sums due under this Note does not include the right to accelerate any interest which has not otherwise accrued on the date of such acceleration, and Lender does not intend to charge or collect any unearned interest in the event of acceleration. All sums paid or agreed to be paid to Lender for the use, forbearance or detention of sums due hereunder shall, to the extent permitted by applicable law, be amortized, prorated, allocated and spread throughout the full term of the loan evidenced by this Note until payment in full so that the rate or amount of interest on account of the loan evidenced hereby does not exceed the applicable usury ceiling. Lender may delay or forgo enforcing any of its rights or remedies under this Note without losing them. Borrower and any other person who signs, guarantees or endorses this Note, to the extent allowed by law, waive presentment, demand for payment, notice of dishonor, notice of intent to accelerate the maturity of this Note, and notice of acceleration of the maturity of this Note. Upon any change in the terms of this Note, and unless otherwise expressly stated in writing, no party who signs this Note, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability. All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan or release any party, partner, or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral without the consent of or notice to anyone. All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made. The obligations under this Note are joint and several.

PRIOR TO SIGNING THIS NOTE, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE, INCLUDING THE VARIABLE INTEREST RATE PROVISIONS. BORROWER AGREES TO THE TERMS OF THE NOTE.

BORROWER ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS PROMISSORY NOTE.

BORROWER:

REAGOR AUTO MALL, LTD., DBA REAGOR-DYKES OF LEVELLAND

REAGOR AUTO MALL I, L.L.C., General Partner of Reagor Auto Mall, Ltd., dba Reagor-Dykes of Levelland

By: _____                    By: _____
Bart Reagor, Manager of Reagor Auto Mall I, L.L.C.        Rick Dykes, Manager of Reagor Auto Mall I, L.L.C.

LaserPro, Ver. 17.3.0.015 Copr. D+H USA Corporation 1997, 2017. All Rights Reserved.   TX-J:\HALLANDALE\CFALVIDES\C TR-40330 PR-5

# EXHIBIT A-3

APP 0023

*00000001000981897%0220%09292017%00000000RAA2564*

## COMMERCIAL GUARANTY

| Borrower: | Reagor Auto Mall, Ltd., dba Reagor-Dykes of Levelland (TIN: 20-0275022) 1215 Ave. J Lubbock, TX 79401 | Lender: | First Bank & Trust First Bank & Trust- South 7806 Indiana Ave Lubbock, TX 79423 (806) 776-0800 |
|---|---|---|---|
| Guarantor: | Bart Reagor (SSN: 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) 6504 Oxford Ave Lubbock, TX 79423 | | |

**CONTINUING GUARANTEE OF PAYMENT AND PERFORMANCE.** For good and valuable consideration, Guarantor absolutely and unconditionally guarantees full and punctual payment and satisfaction of the Indebtedness of Borrower to Lender, and the performance and discharge of all Borrower's obligations under the Note and the Related Documents. This is a guaranty of payment and performance and not of collection, so Lender can enforce this Guaranty against Guarantor even when Lender has not exhausted Lender's remedies against anyone else obligated to pay the Indebtedness or against any collateral securing the Indebtedness, this Guaranty or any other guaranty of the Indebtedness. Guarantor will make any payments to Lender or its order, on demand, in legal tender of the United States of America, in same-day funds, without set-off or deduction or counterclaim, and will otherwise perform Borrower's obligations under the Note and Related Documents. Under this Guaranty, Guarantor's liability is unlimited and Guarantor's obligations are continuing.

**INDEBTEDNESS.** The word "Indebtedness" as used in this Guaranty means all of the principal amount outstanding from time to time and at any one or more times, accrued unpaid interest thereon and all collection costs and legal expenses related thereto permitted by law, Lender's reasonable attorneys' fees, arising from any and all debts, liabilities and obligations of every nature or form, now existing or hereafter arising or acquired, that Borrower individually or collectively or interchangeably with others, owes or will owe Lender. "Indebtedness" includes, without limitation, loans, advances, debts, overdraft indebtedness, credit card indebtedness, lease obligations, liabilities and obligations under any interest rate protection agreements or foreign currency exchange agreements or commodity price protection agreements, other obligations, and liabilities of Borrower, and any present or future judgments against Borrower, future advances, loans or transactions that renew, extend, modify, refinance, consolidate or substitute these debts, liabilities and obligations whether: voluntarily or involuntarily incurred; due or to become due by their terms or acceleration; absolute or contingent; liquidated or unliquidated; determined or undetermined; direct or indirect; primary or secondary in nature or arising from a guaranty or surety; secured or unsecured; joint or several or joint and several; evidenced by a negotiable or non-negotiable instrument or writing; originated by Lender or another or others; barred or unenforceable against Borrower for any reason whatsoever; for any transactions that may be voidable for any reason (such as infancy, insanity, ultra vires or otherwise); and originated then reduced or extinguished and then afterwards increased or reinstated.

If Lender presently holds one or more guaranties, or hereafter receives additional guaranties from Guarantor, Lender's rights under all guaranties shall be cumulative. This Guaranty shall not (unless specifically provided below to the contrary) affect or invalidate any such other guaranties. Guarantor's liability will be Guarantor's aggregate liability under the terms of this Guaranty and any such other unterminated guaranties.

**CONTINUING GUARANTY. THIS IS A "CONTINUING GUARANTY" UNDER WHICH GUARANTOR AGREES TO GUARANTEE THE FULL AND PUNCTUAL PAYMENT, PERFORMANCE AND SATISFACTION OF THE INDEBTEDNESS OF BORROWER TO LENDER, NOW EXISTING OR HEREAFTER ARISING OR ACQUIRED, ON AN OPEN AND CONTINUING BASIS. ACCORDINGLY, ANY PAYMENTS MADE ON THE INDEBTEDNESS WILL NOT DISCHARGE OR DIMINISH GUARANTOR'S OBLIGATIONS AND LIABILITY UNDER THIS GUARANTY FOR ANY REMAINING AND SUCCEEDING INDEBTEDNESS EVEN WHEN ALL OR PART OF THE OUTSTANDING INDEBTEDNESS MAY BE A ZERO BALANCE FROM TIME TO TIME.**

**DURATION OF GUARANTY.** This Guaranty will take effect when received by Lender without the necessity of any acceptance by Lender, or any notice to Guarantor or to Borrower, and will continue in full force until all the Indebtedness incurred or contracted before receipt by Lender of any notice of revocation shall have been fully and finally paid and satisfied and all of Guarantor's other obligations under this Guaranty shall have been performed in full. If Guarantor elects to revoke this Guaranty, Guarantor may only do so in writing. Guarantor's written notice of revocation must be mailed to Lender, by certified mail, at Lender's address listed above or such other place as Lender may designate in writing. Written revocation of this Guaranty will apply only to new Indebtedness created after actual receipt by Lender of Guarantor's written revocation and Lender's written acknowledgment of receipt. For this purpose and without limitation, the term "new Indebtedness" does not include the Indebtedness which at the time of notice of revocation is contingent, unliquidated, undetermined or not due and which later becomes absolute, liquidated, determined or due. For this purpose and without limitation, "new Indebtedness" does not include all or part of the Indebtedness that is: incurred by Borrower prior to revocation; incurred under a commitment that became binding before revocation; any renewals, extensions, substitutions, and modifications of the Indebtedness. This Guaranty shall bind Guarantor's estate as to the Indebtedness created both before and after Guarantor's death or incapacity, regardless of Lender's actual notice of Guarantor's death. Subject to the foregoing, Guarantor's executor or administrator or other legal representative may terminate this Guaranty in the same manner in which Guarantor might have terminated it and with the same effect. Release of any other guarantor or termination of any other guaranty of the Indebtedness shall not affect the liability of Guarantor under this Guaranty. A revocation Lender receives from any one or more Guarantors shall not affect the liability of any remaining Guarantors under this Guaranty. It is anticipated that fluctuations may occur in the aggregate amount of the Indebtedness covered by this Guaranty, and Guarantor specifically acknowledges and agrees that reductions in the amount of the Indebtedness, even to zero dollars ($0.00), shall not constitute a termination of this Guaranty. This Guaranty is binding upon Guarantor and Guarantor's heirs, successors and assigns so long as any of the Indebtedness remains unpaid and even though the Indebtedness may from time to time be zero dollars ($0.00).

**GUARANTOR'S AUTHORIZATION TO LENDER.** Guarantor authorizes Lender, either before or after any revocation hereof, without notice or demand and without lessening or otherwise affecting Guarantor's liability under this Guaranty, from time to time: (A) prior to revocation as set forth above, to make one or more additional secured or unsecured loans to Borrower, to lease equipment or other goods to Borrower, or otherwise to extend additional credit to Borrower; (B) to alter, compromise, renew, extend, accelerate, or otherwise change one or more times the time for payment or other terms of the Indebtedness or any part of the Indebtedness, including increases and decreases of the rate of interest on the Indebtedness; extensions may be repeated and may be for longer than the original loan term; (C) to take and hold security for the payment of this Guaranty or the Indebtedness, and exchange, enforce, waive, subordinate, fail or decide not to perfect, and release any such security, with or without the substitution of new collateral; (D) to release, substitute, agree not to sue, or deal with any one or more of Borrower's sureties, endorsers, or other guarantors on any terms or in any manner Lender may choose; (E) to determine how, when and what application of payments and credits shall be made on the Indebtedness; (F) to apply such security and direct the order or manner of sale thereof, including without limitation, any nonjudicial sale permitted by the terms of the controlling security agreement or deed of trust, as Lender in its discretion may determine; (G) to sell, transfer, assign or grant participations in all or any part of the Indebtedness; and (H) to assign or transfer this Guaranty in whole or in part.

**GUARANTOR'S REPRESENTATIONS AND WARRANTIES.** Guarantor represents and warrants to Lender that: (A) no representations or agreements of any kind have been made to Guarantor which would limit or qualify in any way the terms of this Guaranty; (B) this Guaranty is executed at Borrower's request and not at the request of Lender; (C) Guarantor has full power, right and authority to enter into this Guaranty; (D) the provisions of this Guaranty do not conflict with or result in a default under any agreement or other instrument binding upon Guarantor and do not result in a violation of any law, regulation, court decree or order applicable to Guarantor; (E) Guarantor has not and will not, without the prior written consent of Lender, sell, lease, assign, encumber, hypothecate, transfer, or otherwise dispose of all or substantially all of Guarantor's assets, or any interest therein; (F) upon Lender's request, Guarantor will provide to Lender financial and credit information in form acceptable to Lender, and all such financial information which currently has been, and all future financial information which will be provided to Lender is and will be true and correct in all material respects and fairly presents Guarantor's financial condition as of the dates the financial information is provided; (G) no material adverse change has occurred in Guarantor's financial condition since the date of the most recent financial statements provided to Lender and no event has occurred which may materially adversely affect Guarantor's financial condition; (H) no litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Guarantor is pending or threatened; (I) Lender has made no representation to Guarantor as to the creditworthiness of Borrower; and (J) Guarantor has established adequate means of obtaining from Borrower on a continuing basis information regarding Borrower's financial condition. Guarantor agrees to keep adequately informed from such means of any facts, events, or circumstances which might in any way affect Guarantor's risks under this Guaranty, and Guarantor further agrees that, absent a request for information, Lender shall have no obligation to disclose to Guarantor any information or documents acquired by Lender in the course of its relationship with Borrower.

**GUARANTOR'S WAIVERS.** Except as prohibited by applicable law, Guarantor waives any right to require Lender (A) to continue lending money or to extend other credit to Borrower; (B) to make any presentment, protest, demand, or notice of any kind, including notice of any nonpayment of the Indebtedness or of any nonpayment related to any collateral, or notice of any action or nonaction on the part of Borrower, Lender, any surety, endorser, or other guarantor in connection with the Indebtedness or in connection with the creation of new or additional

## COMMERCIAL GUARANTY
### (Continued)

loans or obligations;  (C)  to resort for payment or to proceed directly or at once against any person, including Borrower or any other guarantor; (D) to proceed directly against or exhaust any collateral held by Lender from Borrower, any other guarantor, or any other person;  (E) to give notice of the terms, time, and place of any public or private sale of personal property security held by Lender from Borrower or to comply with any other applicable provisions of the Uniform Commercial Code;  (F)  to pursue any other remedy within Lender's power; or  (G)  to commit any act or omission of any kind, or at any time, with respect to any matter whatsoever.

Guarantor waives all rights of Guarantor under Chapter 43 of the Texas Civil Practice and Remedies Code.  Guarantor also waives any and all rights or defenses based on suretyship or impairment of collateral including, but not limited to, any rights or defenses arising by reason of  (A) any "one action" or "anti-deficiency" law or any other law which may prevent Lender from bringing any action, including a claim for deficiency, against Guarantor, before or after Lender's commencement or completion of any foreclosure action, either judicially or by exercise of a power of sale;  (B)  any election of remedies by Lender which destroys or otherwise adversely affects Guarantor's subrogation rights or Guarantor's rights to proceed against Borrower for reimbursement, including without limitation, any loss of rights Guarantor may suffer by reason of any law limiting, qualifying, or discharging the Indebtedness;  (C)  any disability or other defense of Borrower, of any other guarantor, or of any other person, or by reason of the cessation of Borrower's liability from any cause whatsoever, other than payment in full in legal tender, of the Indebtedness;  (D)  any right to claim discharge of the Indebtedness on the basis of unjustified impairment of any collateral for the Indebtedness; (E)  any statute of limitations, if at any time any action or suit brought by Lender against Guarantor is commenced, there is outstanding Indebtedness which is not barred by any applicable statute of limitations; or  (F)  any defenses given to guarantors at law or in equity other than actual payment and performance of the Indebtedness.  If payment is made by Borrower, whether voluntarily or otherwise, or by any third party, on the Indebtedness and thereafter Lender is forced to remit the amount of that payment to Borrower's trustee in bankruptcy or to any similar person under any federal or state bankruptcy law or law for the relief of debtors, the Indebtedness shall be considered unpaid for the purpose of the enforcement of this Guaranty.

Guarantor further waives and agrees not to assert or claim at any time any deductions to the amount guaranteed under this Guaranty for any claim of setoff, counterclaim, counter demand, recoupment or similar right, whether such claim, demand or right may be asserted by the Borrower, the Guarantor, or both.

**GUARANTOR'S UNDERSTANDING WITH RESPECT TO WAIVERS.**  Guarantor warrants and agrees that each of the waivers set forth above is made with Guarantor's full knowledge of its significance and consequences and that, under the circumstances, the waivers are reasonable and not contrary to public policy or law.  If any such waiver is determined to be contrary to any applicable law or public policy, such waiver shall be effective only to the extent permitted by law or public policy.

**RIGHT OF SETOFF.**  To the extent permitted by applicable law, Lender reserves a right of setoff in all Guarantor's accounts with Lender (whether checking, savings, or some other account).  This includes all accounts Guarantor holds jointly with someone else and all accounts Guarantor may open in the future.  However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law.  Guarantor authorizes Lender, to the extent permitted by applicable law, to hold these funds if there is a default, and Lender may apply the funds in these accounts to pay what Guarantor owes under the terms of this Guaranty.

**SUBORDINATION OF BORROWER'S DEBTS TO GUARANTOR.**  Guarantor agrees that the Indebtedness, whether now existing or hereafter created, shall be superior to any claim that Guarantor may now have or hereafter acquire against Borrower, whether or not Borrower becomes insolvent.  Guarantor hereby expressly subordinates any claim Guarantor may have against Borrower, upon any account whatsoever, to any claim that Lender may now or hereafter have against Borrower.  In the event of insolvency and consequent liquidation of the assets of Borrower, through bankruptcy, by an assignment for the benefit of creditors, by voluntary liquidation, or otherwise, the assets of Borrower applicable to the payment of the claims of both Lender and Guarantor shall be paid to Lender and shall be first applied by Lender to the Indebtedness. Guarantor does hereby assign to Lender all claims which it may have or acquire against Borrower or against any assignee or trustee in bankruptcy of Borrower; provided however, that such assignment shall be effective only for the purpose of assuring to Lender full payment in legal tender of the Indebtedness.  If Lender so requests, any notes or credit agreements now or hereafter evidencing any debts or obligations of Borrower to Guarantor shall be marked with a legend that the same are subject to this Guaranty and shall be delivered to Lender.  Guarantor agrees, and Lender is hereby authorized, in the name of Guarantor, from time to time to file financing statements and continuation statements and to execute documents and to take such other actions as Lender deems necessary or appropriate to perfect, preserve and enforce its rights under this Guaranty.

**MISCELLANEOUS PROVISIONS.**  The following miscellaneous provisions are a part of this Guaranty:

**Amendments.**  This Guaranty, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Guaranty.  No alteration of or amendment to this Guaranty shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.**  Guarantor agrees to pay upon demand all of Lender's costs and expenses, including Lender's reasonable attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Guaranty.  Lender may hire or pay someone else to help enforce this Guaranty, and Guarantor shall pay the costs and expenses of such enforcement.  Costs and expenses include Lender's reasonable attorneys' fees and legal expenses whether or not there is a lawsuit, including Lender's reasonable attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services.  Guarantor also shall pay all court costs and such additional fees as may be directed by the court.

**Caption Headings.**  Caption headings in this Guaranty are for convenience purposes only and are not to be used to interpret or define the provisions of this Guaranty.

**Governing Law.**  This Guaranty will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Texas without regard to its conflicts of laws provisions.

**Integration.**  Guarantor further agrees that Guarantor has read and fully understands the terms of this Guaranty; Guarantor has had the opportunity to be advised by Guarantor's attorney with respect to this Guaranty; the Guaranty fully reflects Guarantor's intentions and parol evidence is not required to interpret the terms of this Guaranty.  Guarantor hereby indemnifies and holds Lender harmless from all losses, claims, damages, and costs (including Lender's attorneys' fees) suffered or incurred by Lender as a result of any breach by Guarantor of the warranties, representations and agreements of this paragraph.

**Interpretation.**  In all cases where there is more than one Borrower or Guarantor, then all words used in this Guaranty in the singular shall be deemed to have been used in the plural where the context and construction so require; and where there is more than one Borrower named in this Guaranty or when this Guaranty is executed by more than one Guarantor, the words "Borrower" and "Guarantor" respectively shall mean all and any one or more of them.  The words "Guarantor," "Borrower," and "Lender" include the heirs, successors, assigns, and transferees of each of them.  If a court finds that any provision of this Guaranty is not valid or should not be enforced, that fact by itself will not mean that the rest of this Guaranty will not be valid or enforced.  Therefore, a court will enforce the rest of the provisions of this Guaranty even if a provision of this Guaranty may be found to be invalid or unenforceable.  If any one or more of Borrower or Guarantor are corporations, partnerships, limited liability companies, or similar entities, it is not necessary for Lender to inquire into the powers of Borrower or Guarantor or of the officers, directors, partners, managers, or other agents acting or purporting to act on their behalf, and any Indebtedness made or created in reliance upon the professed exercise of such powers shall be guaranteed under this Guaranty.

**Notices.**  Any notice required to be given under this Guaranty shall be given in writing, and, except for revocation notices by Guarantor, shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Guaranty.  All revocation notices by Guarantor shall be in writing and shall be effective upon delivery to Lender as provided in the section of this Guaranty entitled "DURATION OF GUARANTY."  Any party may change its address for notices under this Guaranty by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address.  For notice purposes, Guarantor agrees to keep Lender informed at all times of Guarantor's current address.  Unless otherwise provided or required by law, if there is more than one Guarantor, any notice given by Lender to any Guarantor is deemed to be notice given to all Guarantors.

**No Waiver by Lender.**  Lender shall not be deemed to have waived any rights under this Guaranty unless such waiver is given in writing and signed by Lender.  No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right.  A waiver by Lender of a provision of this Guaranty shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Guaranty.  No prior waiver by Lender, nor any course of dealing between Lender and Guarantor, shall constitute a waiver of any of Lender's rights or of any of Guarantor's obligations as to any future transactions.  Whenever the consent of Lender is required under this Guaranty, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Successors and Assigns.**  Subject to any limitations stated in this Guaranty on transfer of Guarantor's interest, this Guaranty shall be binding upon and inure to the benefit of the parties, their successors and assigns.

## COMMERCIAL GUARANTY
### (Continued)

| Loan No: 1009818597 | | Page 3 |

**Waive Jury.** Lender and Guarantor hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by either Lender or Guarantor against the other.

**Original Document.** "The parties whose signatures appear below agree that a photographic, photostatic, facsimile, electronic, copy or similar reproduction of this document shall be valid as the original.".

**Choice of Venue.** If there is a lawsuit, Guarantor agrees upon Lender's request to submit to the jurisdiction of the Courts of Lubbock County, Texas  The parties agree that Lubbock County, Texas is the sole and exclusive venue for any lawsuit arising out of this Guaranty.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Guaranty.  Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America.  Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require.  Words and terms not otherwise defined in this Guaranty shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Borrower.**  The word "Borrower" means Reagor Auto Mall, Ltd., dba Reagor-Dykes of Levelland and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Guarantor.**  The word "Guarantor" means everyone signing this Guaranty, including without limitation Bart Reagor, and in each case, any signer's successors and assigns.

**Guaranty.**  The word "Guaranty" means this guaranty from Guarantor to Lender.

**Indebtedness.**  The word "Indebtedness" means Borrower's indebtedness to Lender as more particularly described in this Guaranty.

**Lender.**  The word "Lender" means First Bank & Trust, its successors and assigns.

**Note.**  The word "Note" means and includes without limitation all of Borrower's promissory notes and/or credit agreements evidencing Borrower's loan obligations in favor of Lender, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of and substitutions for promissory notes or credit agreements.

**Related Documents.**  The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

**EACH UNDERSIGNED GUARANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS GUARANTY AND AGREES TO ITS TERMS.  IN ADDITION, EACH GUARANTOR UNDERSTANDS THAT THIS GUARANTY IS EFFECTIVE UPON GUARANTOR'S EXECUTION AND DELIVERY OF THIS GUARANTY TO LENDER AND THAT THE GUARANTY WILL CONTINUE UNTIL TERMINATED IN THE MANNER SET FORTH IN THE SECTION TITLED "DURATION OF GUARANTY".  NO FORMAL ACCEPTANCE BY LENDER IS NECESSARY TO MAKE THIS GUARANTY EFFECTIVE.  THIS GUARANTY IS DATED SEPTEMBER 29, 2017.**

**GUARANTOR:**

X _____
Bart Reagor

---

## INDIVIDUAL ACKNOWLEDGMENT

STATE OF _Texas_ )
) SS
COUNTY OF _Lubbock_ )

This instrument was acknowledged before me on _September 29_, 20_17_ by Bart Reagor.

LYNETTE BONHAM
Notary Public, State of Texas
Comm Expires 05-22-2019
Notary ID 125582733

_____
Notary Public, State of Texas

# EXHIBIT A-4

APP 0027

‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖

*0000000010098185970%0220%09292017%00000000RAA2564*

## COMMERCIAL GUARANTY

| Borrower: | Reagor Auto Mall, Ltd., dba Reagor-Dykes of<br>Levelland (TIN: 20-0275022)<br>1215 Ave. J<br>Lubbock, TX 79401 | Lender: | First Bank & Trust<br>First Bank & Trust- South<br>7806 Indiana Ave.<br>Lubbock, TX 79423<br>(806) 776-0600 |
| :--- | :--- | :--- | :--- |
| Guarantor: | Rick Dykes (SSN:  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)<br>4705 21st Street<br>Lubbock, TX 79407 | | |

**CONTINUING GUARANTEE OF PAYMENT AND PERFORMANCE. For good and valuable consideration, Guarantor absolutely and unconditionally guarantees full and punctual payment and satisfaction of the Indebtedness of Borrower to Lender, and the performance and discharge of all Borrower's obligations under the Note and the Related Documents. This is a guaranty of payment and performance and not of collection, so Lender can enforce this Guaranty against Guarantor even when Lender has not exhausted Lender's remedies against anyone else obligated to pay the Indebtedness or against any collateral securing the Indebtedness, this Guaranty or any other guaranty of the Indebtedness. Guarantor will make any payments to Lender or its order, on demand, in legal tender of the United States of America, in same-day funds, without set-off or deduction or counterclaim, and will otherwise perform Borrower's obligations under the Note and Related Documents. Under this Guaranty, Guarantor's liability is unlimited and Guarantor's obligations are continuing.**

**INDEBTEDNESS.** The word "Indebtedness" as used in this Guaranty means all of the principal amount outstanding from time to time and at any one or more times, accrued unpaid interest thereon and all collection costs and legal expenses related thereto permitted by law, Lender's reasonable attorneys' fees, arising from any and all debts, liabilities and obligations of every nature or form, now existing or hereafter arising or acquired, that Borrower individually or collectively or interchangeably with others, owes or will owe Lender. "Indebtedness" includes, without limitation, loans, advances, debts, overdraft indebtedness, credit card indebtedness, lease obligations, liabilities and obligations under any interest rate protection agreements or foreign currency exchange agreements or commodity price protection agreements, other obligations, and liabilities of Borrower, and any present or future judgments against Borrower, future advances, loans or transactions that renew, extend, modify, refinance, consolidate or substitute these debts, liabilities and obligations whether: voluntarily or involuntarily incurred; due or to become due by their terms or acceleration; absolute or contingent; liquidated or unliquidated; determined or undetermined; direct or indirect; primary or secondary; in nature or arising from a guaranty or surety; secured or unsecured; joint or several or joint and several; evidenced by a negotiable or non-negotiable instrument or writing; originated by Lender or another or others; barred or unenforceable against Borrower for any reason whatsoever; for any transactions that may be voidable for any reason (such as infancy, insanity, ultra vires or otherwise); and originated then reduced or extinguished and then afterwards increased or reinstated.

If Lender presently holds one or more guaranties, or hereafter receives additional guaranties from Guarantor, Lender's rights under all guaranties shall be cumulative. This Guaranty shall not (unless specifically provided below to the contrary) affect or invalidate any such other guaranties. Guarantor's liability will be Guarantor's aggregate liability under the terms of this Guaranty and any such other undetermined guaranties.

**CONTINUING GUARANTY. THIS IS A "CONTINUING GUARANTY" UNDER WHICH GUARANTOR AGREES TO GUARANTEE THE FULL AND PUNCTUAL PAYMENT, PERFORMANCE AND SATISFACTION OF THE INDEBTEDNESS OF BORROWER TO LENDER, NOW EXISTING OR HEREAFTER ARISING OR ACQUIRED, ON AN OPEN AND CONTINUING BASIS. ACCORDINGLY, ANY PAYMENTS MADE ON THE INDEBTEDNESS WILL NOT DISCHARGE OR DIMINISH GUARANTOR'S OBLIGATIONS AND LIABILITY UNDER THIS GUARANTY FOR ANY REMAINING AND SUCCEEDING INDEBTEDNESS EVEN WHEN ALL OR PART OF THE OUTSTANDING INDEBTEDNESS MAY BE A ZERO BALANCE FROM TIME TO TIME.**

**DURATION OF GUARANTY.** This Guaranty will take effect when received by Lender without the necessity of any acceptance by Lender, or any notice to Guarantor or to Borrower, and will continue in full force until all the Indebtedness incurred or contracted before receipt by Lender of any notice of revocation shall have been fully and finally paid and satisfied and all of Guarantor's other obligations under this Guaranty shall have been performed in full. If Guarantor elects to revoke this Guaranty, Guarantor may only do so in writing. Guarantor's written notice of revocation must be mailed to Lender, by certified mail, at Lender's address listed above or such other place as Lender may designate in writing. Written revocation of this Guaranty will apply only to new Indebtedness created after actual receipt by Lender of Guarantor's written revocation and Lender's written acknowledgment of receipt. For this purpose and without limitation, the term "new Indebtedness" does not include the Indebtedness which at the time of notice of revocation is contingent, unliquidated, undetermined or not due and which later becomes absolute, liquidated, determined or due. For this purpose and without limitation, "new Indebtedness" does not include all or part of the Indebtedness that is: incurred by Borrower prior to revocation; incurred under a commitment that became binding before revocation; any renewals, extensions, substitutions, and modifications of the Indebtedness. This Guaranty shall bind Guarantor's estate as to the Indebtedness created both before and after Guarantor's death or incapacity, regardless of Lender's actual notice of Guarantor's death. Subject to the foregoing, Guarantor's executor or administrator or other legal representative may terminate this Guaranty in the same manner in which Guarantor might have terminated it and with the same effect. Release of any other guarantor or termination of any other guaranty of the Indebtedness shall not affect the liability of Guarantor under this Guaranty. A revocation Lender receives from any one or more Guarantors shall not affect the liability of any remaining Guarantors under this Guaranty. It is anticipated that fluctuations may occur in the aggregate amount of the Indebtedness covered by this Guaranty, and Guarantor specifically acknowledges and agrees that reductions in the amount of the Indebtedness, even to zero dollars ($0.00), shall not constitute a termination of this Guaranty. This Guaranty is binding upon Guarantor and Guarantor's heirs, successors and assigns so long as any of the Indebtedness remains unpaid and even though the Indebtedness may from time to time be zero dollars ($0.00).

**GUARANTOR'S AUTHORIZATION TO LENDER.** Guarantor authorizes Lender, either before or after any revocation hereof, without notice or demand and without lessening or otherwise affecting Guarantor's liability under this Guaranty, from time to time: (A)  prior to revocation as set forth above, to make one or more additional secured or unsecured loans to Borrower, to lease equipment or other goods to Borrower, or otherwise to extend additional credit to Borrower; (B) to alter, compromise, renew, extend, accelerate, or otherwise change one or more times the time for payment or other terms of the Indebtedness or any part of the Indebtedness, including increases and decreases of the rate of interest on the Indebtedness; extensions may be repeated and may be for longer than the original loan term; (C) to take and hold security for the payment of this Guaranty or the Indebtedness, and exchange, enforce, waive, subordinate, fail or decide not to perfect, and release any such security, with or without the substitution of new collateral; (D) to release, substitute, agree not to sue, or deal with any one or more of Borrower's sureties, endorsers, or other guarantors on any terms or in any manner Lender may choose; (E) to determine how, when and what application of payments and credits shall be made on the Indebtedness; (F) to apply such security and direct the order or manner of sale thereof, including without limitation, any nonjudicial sale permitted by the terms of the controlling security agreement or deed of trust, as Lender in its discretion may determine; (G) to sell, transfer, assign or grant participations in all or any part of the Indebtedness; and (H) to assign or transfer this Guaranty in whole or in part.

**GUARANTOR'S REPRESENTATIONS AND WARRANTIES.** Guarantor represents and warrants to Lender that (A)  no representations or agreements of any kind have been made to Guarantor which would limit or qualify in any way the terms of this Guaranty; (B) this Guaranty is executed at Borrower's request and not at the request of Lender; (C) Guarantor has full power, right and authority to enter into this Guaranty; (D) the provisions of this Guaranty do not conflict with or result in a default under any agreement or other instrument binding upon Guarantor and do not result in a violation of any law, regulation, court decree or order applicable to Guarantor; (E) Guarantor has not and will not, without the prior written consent of Lender, sell, lease, assign, encumber, hypothecate, transfer, or otherwise dispose of all or substantially all of Guarantor's assets, or any interest therein. (F) upon Lender's request, Guarantor will provide to Lender financial and credit information in form acceptable to Lender, and all such financial information which currently has been, and all future financial information which will be provided to Lender is and will be true and correct in all material respects and fairly present Guarantor's financial condition as of the dates the financial information is provided; (G)  no material adverse change has occurred in Guarantor's financial condition since the date of the most recent financial statements provided to Lender and no event has occurred which may materially adversely affect Guarantor's financial condition; (H) no litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Guarantor is pending or threatened; (I) Lender has made no representation to Guarantor as to the creditworthiness of Borrower; and (J) Guarantor has established adequate means of obtaining from Borrower on a continuing basis information regarding Borrower's financial condition. Guarantor agrees to keep adequately informed from such means of any facts, events, or circumstances which might in any way affect Guarantor's risks under this Guaranty, and Guarantor further agrees that, absent a request for information, Lender shall have no obligation to disclose to Guarantor  any information or documents acquired by Lender in the course of its relationship with Borrower.

**GUARANTOR'S WAIVERS.** Except as prohibited by applicable law, Guarantor waives any right to require Lender  (A)  to continue lending money or to extend other credit to Borrower; (B)  to make any presentment, protest, demand, or notice of any kind, including notice of any nonpayment of the Indebtedness or of any nonpayment related to any collateral, or notice of any action or nonaction on the part of Borrower, Lender, any surety, endorser, or other guarantor in connection with the Indebtedness or in connection with the creation of new or additional

APP 0028

## COMMERCIAL GUARANTY
### (Continued)

Loan No: 1009818597                                                                 Page 2

loans or obligations; (C) to resort for payment or to proceed directly or at once against any person, including Borrower or any other guarantor; (D) to proceed directly against or exhaust any collateral held by Lender from Borrower, any other guarantor, or any other person; (E) to give notice of the terms, time, and place of any public or private sale of personal property security held by Lender from Borrower or to comply with any other applicable provisions of the Uniform Commercial Code; (F) to pursue any other remedy within Lender's power; or (G) to commit any act or omission of any kind, or at any time, with respect to any matter whatsoever.

Guarantor waives all rights of Guarantor under Chapter 43 of the Texas Civil Practice and Remedies Code. Guarantor also waives any and all rights or defenses based on suretyship or impairment of collateral including, but not limited to, any rights or defenses arising by reason of (A) any "one action" or "anti-deficiency" law or any other law which may prevent Lender from bringing any action, including a claim for deficiency, against Guarantor, before or after Lender's commencement or completion of any foreclosure action, either judicially or by exercise of a power of sale; (B) any election of remedies by Lender which destroys or otherwise adversely affects Guarantor's subrogation rights or Guarantor's rights to proceed against Borrower for reimbursement, including without limitation, any loss of rights Guarantor may suffer by reason of any law limiting, qualifying, or discharging the Indebtedness; (C) any disability or other defense of Borrower, of any other guarantor, or of any other person, or by reason of the cessation of Borrower's liability from any cause whatsoever, other than payment in full in legal tender, of the Indebtedness; (D) any right to claim discharge of the Indebtedness on the basis of unjustified impairment of any collateral for the Indebtedness; (E) any statute of limitations, if at any time any action or suit brought by Lender against Guarantor is commenced, there is outstanding Indebtedness which is not barred by any applicable statute of limitations; or (F) any defenses given to guarantors at law or in equity other than actual payment and performance of the Indebtedness. If payment is made by Borrower, whether voluntarily or otherwise, or by any third party, on the Indebtedness and thereafter Lender is forced to remit the amount of that payment to Borrower's trustee in bankruptcy or to any similar person under any federal or state bankruptcy law for the relief of debtors, the Indebtedness shall be considered unpaid for the purpose of the enforcement of this Guaranty.

Guarantor further waives and agrees not to assert or claim at any time any deductions to the amount guaranteed under this Guaranty for any claim of setoff, counterclaim, counter demand, recoupment or similar right, whether such claim, demand or right may be asserted by the Borrower, the Guarantor, or both.

**GUARANTOR'S UNDERSTANDING WITH RESPECT TO WAIVERS.** Guarantor warrants and agrees that each of the waivers set forth above is made with Guarantor's full knowledge of its significance and consequences and that, under the circumstances, the waivers are reasonable and not contrary to public policy or law. If any such waiver is determined to be contrary to any applicable law or public policy, such waiver shall be effective only to the extent permitted by law or public policy.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Guarantor's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Guarantor holds jointly with someone else and all accounts Guarantor may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Guarantor authorizes Lender, to the extent permitted by applicable law, to hold these funds if there is a default, and Lender may apply the funds in these accounts to pay what Guarantor owes under the terms of this Guaranty.

**SUBORDINATION OF BORROWER'S DEBTS TO GUARANTOR.** Guarantor agrees that the Indebtedness, whether now existing or hereafter created, shall be superior to any claim that Guarantor may now have or hereafter acquire against Borrower, whether or not Borrower becomes insolvent. Guarantor hereby expressly subordinates any claim Guarantor may have against Borrower, upon any account whatsoever, to any claim that Lender may now or hereafter have against Borrower. In the event of insolvency and consequent liquidation of the assets of Borrower, through bankruptcy, by an assignment for the benefit of creditors, by voluntary liquidation, or otherwise, the assets of Borrower applicable to the payment of the claims of both Lender and Guarantor shall be paid to Lender and shall be first applied by Lender to the Indebtedness. Guarantor does hereby assign to Lender all claims which it may have or acquire against Borrower or against any assignee or trustee in bankruptcy of Borrower; provided however, that such assignment shall be effective only for the purpose of assuring to Lender full payment in legal tender of the Indebtedness. If Lender so requests, any notes or credit agreements now or hereafter evidencing any debts or obligations of Borrower to Guarantor shall be marked with a legend that the same are subject to this Guaranty and shall be delivered to Lender. Guarantor agrees, and Lender is hereby authorized, in the name of Guarantor, from time to time to file financing statements and continuation statements and to execute documents and to take such other actions as Lender deems necessary or appropriate to perfect, preserve and enforce its rights under this Guaranty.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Guaranty:

**Amendments.** This Guaranty, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Guaranty. No alteration of or amendment to this Guaranty shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.** Guarantor agrees to pay upon demand all of Lender's costs and expenses, including Lender's reasonable attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Guaranty. Lender may hire or pay someone else to help enforce this Guaranty, and Guarantor shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's reasonable attorneys' fees and legal expenses whether or not there is a lawsuit, including Lender's reasonable attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Guarantor also shall pay all court costs and such additional fees as may be directed by the court.

**Caption Headings.** Caption headings in this Guaranty are for convenience purposes only and are not to be used to interpret or define the provisions of this Guaranty.

**Governing Law.** This Guaranty will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Texas without regard to its conflicts of law provisions.

**Integration.** Guarantor further agrees that Guarantor has read and fully understands the terms of this Guaranty; Guarantor has had the opportunity to be advised by Guarantor's attorney with respect to this Guaranty; the Guaranty fully reflects Guarantor's intentions and parol evidence is not required to interpret the terms of this Guaranty. Guarantor hereby indemnifies and holds Lender harmless from all losses, claims, damages, and costs (including Lender's attorneys' fees) suffered or incurred by Lender as a result of any breach by Guarantor of the warranties, representations and agreements of this paragraph.

**Interpretation.** In all cases where there is more than one Borrower or Guarantor, then all words used in this Guaranty in the singular shall be deemed to have been used in the plural where the context and construction so require; and where there is more than one Borrower named in this Guaranty or when this Guaranty is executed by more than one Guarantor, the words "Borrower" and "Guarantor" respectively shall mean all and any one or more of them. The words "Guarantor," "Borrower," and "Lender" include the heirs, successors, assigns, and transferees of each of them. If a court finds that any provision of this Guaranty is not valid or should not be enforced, that fact by itself will not mean that the rest of this Guaranty will not be valid or enforced. Therefore, a court will enforce the rest of the provisions of this Guaranty even if a provision of this Guaranty may be found to be invalid or unenforceable. If any one or more of Borrower or Guarantor are corporations, partnerships, limited liability companies, or similar entities, it is not necessary for Lender to inquire into the powers of Borrower or Guarantor or of the officers, directors, partners, managers, or other agents acting or purporting to act on their behalf, and any indebtedness made or created in reliance upon the professed exercise of such powers shall be guaranteed under this Guaranty.

**Notices.** Any notice required to be given under this Guaranty shall be given in writing, and, except for revocation notices by Guarantor, shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Guaranty. All revocation notices by Guarantor shall be in writing and shall be effective upon delivery to Lender as provided in the section of this Guaranty entitled "DURATION OF GUARANTY." Any party may change its address for notices under this Guaranty by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Guarantor agrees to keep Lender informed at all times of Guarantor's current address. Unless otherwise provided or required by law, if there is more than one Guarantor, any notice given by Lender to any Guarantor is deemed to be notice given to all Guarantors.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Guaranty unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Guaranty shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Guaranty. No prior waiver by Lender, nor any course of dealing between Lender and Guarantor, shall constitute a waiver of any of Lender's rights or of any of Guarantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Guaranty, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Successors and Assigns.** Subject to any limitations stated in this Guaranty on transfer of Guarantor's interest, this Guaranty shall be binding upon and inure to the benefit of the parties, their successors and assigns.

APP 0029

**COMMERCIAL GUARANTY**
**(Continued)**

| Loan No: 1009818597 | | Page 3 |

---

Waive Jury. Lender and Guarantor hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by either Lender or Guarantor against the other.

Original Document. "The parties whose signatures appear below agree that a photographic, photostatic, facsimile, electronic, copy or similar reproduction of this document shall be valid as the original.".

Choice of Venue. If there is a lawsuit, Guarantor agrees upon Lender's request to submit to the jurisdiction of the Courts of Lubbock County, Texas. The parties agree that Lubbock County, Texas is the sole and exclusive venue for any lawsuit arising out of this Guaranty.

DEFINITIONS. The following capitalized words and terms shall have the following meanings when used in this Guaranty. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Guaranty shall have the meanings attributed to such terms in the Uniform Commercial Code:

Borrower. The word "Borrower" means Reagor Auto Mall, Ltd., dba Reagor-Dykes of Levelland and includes all co-signers and co-makers signing the Note and all their successors and assigns.

Guarantor. The word "Guarantor" means everyone signing this Guaranty, including without limitation Rick Dykes, and in each case, any signer's successors and assigns.

Guaranty. The word "Guaranty" means this guaranty from Guarantor to Lender.

Indebtedness. The word "Indebtedness" means Borrower's indebtedness to Lender as more particularly described in this Guaranty.

Lender. The word "Lender" means First Bank & Trust, its successors and assigns.

Note. The word "Note" means and includes without limitation all of Borrower's promissory notes and/or credit agreements evidencing Borrower's loan obligations in favor of Lender, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of and substitutions for promissory notes or credit agreements.

Related Documents. The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

EACH UNDERSIGNED GUARANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS GUARANTY AND AGREES TO ITS TERMS. IN ADDITION, EACH GUARANTOR UNDERSTANDS THAT THIS GUARANTY IS EFFECTIVE UPON GUARANTOR'S EXECUTION AND DELIVERY OF THIS GUARANTY TO LENDER AND THAT THE GUARANTY WILL CONTINUE UNTIL TERMINATED IN THE MANNER SET FORTH IN THE SECTION TITLED "DURATION OF GUARANTY". NO FORMAL ACCEPTANCE BY LENDER IS NECESSARY TO MAKE THIS GUARANTY EFFECTIVE. THIS GUARANTY IS DATED SEPTEMBER 29, 2017.

GUARANTOR:

X _____
Rick Dykes

---

## INDIVIDUAL ACKNOWLEDGMENT

STATE OF _Texas_ )
                 ) SS
COUNTY OF _Lubbock_ )

This instrument was acknowledged before me on _September 29_, 20_17_ by Rick Dykes.

LYNETTE BONHAM
Notary Public, State of Texas
Comm. Expires 05-22-2019
Notary ID 125582733

_____
Notary Public, State of Texas

LaserPro, Ver. 17.3.0019  Copr. D + H USA Corporation 1997, 2017. All Rights Reserved. - TX  J:\LPL\KANDACE\MOM\CFI\LPL\E5.FC  TR-42382  PR-6

# EXHIBIT A-5

APP 0031

*0000000400982298B%0070%09292017%00C00000RAA2504*

## BUSINESS LOAN AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|-----------|-----------|----------|---------|-------------|---------|---------|----------|
| $2,500,000.00 | 09-29-2017 | 10-01-2018 | 4009822988 | 4A / 45 | RAA2564 | JET | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "****" has been omitted due to text length limitations.

**Borrower:**  Reagor Auto Mall, Ltd. dba Reagor-Dykes Imports
(TIN: 20-0275022)
1215 Ave J
Lubbock, TX 79401

**Lender:**  First Bank & Trust
First Bank Centre
9816 Slide Road
Lubbock, TX 78424
(806) 788-0800

---

THIS BUSINESS LOAN AGREEMENT dated September 29, 2017, is made and executed between Reagor Auto Mall, Ltd. dba Reagor-Dykes Imports ("Borrower") and First Bank & Trust ("Lender") on the following terms and conditions. Borrower has received prior commercial loans from Lender or has applied to Lender for a commercial loan or loans or other financial accommodations, including those which may be described on any exhibit or schedule attached to this Agreement. Borrower understands and agrees that: (A) in granting, renewing, or extending any Loan, Lender is relying upon Borrower's representations, warranties, and agreements as set forth in this Agreement; (B) the granting, renewing, or extending of any Loan by Lender at all times shall be subject to Lender's sole judgment and discretion; and (C) all such Loans shall be and remain subject to the terms and conditions of this Agreement.

**TERM.** This Agreement shall be effective as of September 29, 2017, and shall continue in full force and effect until such time as all of Borrower's Loans in favor of Lender have been paid in full, including principal, interest, costs, expenses, attorneys' fees, and other fees and charges, or until October 1, 2018.

**CONDITIONS PRECEDENT TO EACH ADVANCE.** Lender's obligation to make the initial Advance and each subsequent Advance under this Agreement shall be subject to the fulfillment to Lender's satisfaction of all of the conditions set forth in this Agreement and in the Related Documents.

**Loan Documents.** Borrower shall provide to Lender the following documents for the Loan: (1) the Note; (2) Security Agreements granting to Lender security interests in the Collateral; (3) financing statements and all other documents perfecting Lender's Security Interests; (4) evidence of insurance as required below; (5) guaranties; (6) together with all such Related Documents as Lender may require for the Loan; all in form and substance satisfactory to Lender and Lender's counsel.

**Borrower's Authorization.** Borrower shall have provided in form and substance satisfactory to Lender properly certified resolutions, duly authorizing the execution and delivery of this Agreement, the Note and the Related Documents. In addition, Borrower shall have provided such other resolutions, authorizations, documents and instruments as Lender or its counsel, may require.

**Payment of Fees and Expenses.** Borrower shall have paid to Lender all fees, charges, and other expenses which are then due and payable as specified in this Agreement or any Related Document.

**Representations and Warranties.** The representations and warranties set forth in this Agreement, in the Related Documents, and in any document or certificate delivered to Lender under this Agreement are true and correct.

**No Event of Default.** There shall not exist at the time of any Advance a condition which would constitute an Event of Default under this Agreement or under any Related Document.

**REPRESENTATIONS AND WARRANTIES.** Borrower represents and warrants to Lender, as of the date of this Agreement, as of the date of each disbursement of loan proceeds, as of the date of any renewal, extension or modification of any Loan, and at all times any Indebtedness exists:

**Organization.** Borrower is a limited partnership which is, and at all times shall be, duly organized, validly existing, and in good standing under and by virtue of the laws of the State of Texas. Borrower is duly authorized to transact business in all other states in which Borrower is doing business, having obtained all necessary filings, governmental licenses and approvals for each state in which Borrower is doing business. Specifically, Borrower is, and at all times shall be, duly qualified as a foreign limited partnership in all states in which the failure to so qualify would have a material adverse effect on its business or financial condition. Borrower has the full power and authority to own its properties and to transact the business in which it is presently engaged or presently proposes to engage. Borrower maintains an office at 1215 Ave J, Lubbock, TX 79401. Unless Borrower has designated otherwise in writing, the principal office is the office at which Borrower keeps its books and records including its records concerning the Collateral. Borrower will notify Lender prior to any change in the location of Borrower's principal office address or any change in Borrower's name. Borrower shall do all things necessary to preserve and to keep in full force and effect its existence, rights and privileges, and shall comply with all regulations, rules, ordinances, statutes, orders and decrees of any governmental or quasi-governmental authority or court applicable to Borrower and Borrower's business activities.

**Assumed Business Names.** Borrower has filed or recorded all documents or filings required by law relating to all assumed business names used by Borrower. Excluding the name of Borrower, the following is a complete list of all assumed business names under which Borrower does business: None.

**Authorization.** Borrower's execution, delivery, and performance of this Agreement and all the Related Documents have been duly authorized by all necessary action by Borrower and do not conflict with, result in a violation of, or constitute a default under (1) any provision of (a) Borrower's articles or agreements of partnership, or (b) any agreement or other instrument binding upon Borrower or (2) any law, governmental regulation, court decree, or order applicable to Borrower or to Borrower's properties.

**Financial Information.** Each of Borrower's financial statements supplied to Lender truly and completely disclosed Borrower's financial condition as of the date of the statement, and there has been no material adverse change in Borrower's financial condition subsequent to the date of the most recent financial statement supplied to Lender. Borrower has no material contingent obligations except as disclosed in such financial statements.

**Legal Effect.** This Agreement constitutes, and any instrument or agreement Borrower is required to give under this Agreement when delivered will constitute legal, valid, and binding obligations of Borrower enforceable against Borrower in accordance with their respective terms.

**Properties.** Except as contemplated by this Agreement or as previously disclosed in Borrower's financial statements or in writing to Lender and as accepted by Lender, and except for property tax liens for taxes not presently due and payable, Borrower owns and has good title to all of Borrower's properties free and clear of all Security Interests, and has not executed any security documents or financing statements relating to such properties. All of Borrower's properties are titled in Borrower's legal name, and Borrower has not used or filed a financing statement under any other name for at least the last five (5) years.

**Hazardous Substances.** Except as disclosed to and acknowledged by Lender in writing, Borrower represents and warrants that: (1) During the period of Borrower's ownership of the Collateral, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance by any person on, under, about or from any of the Collateral. (2) Borrower has no knowledge of, or reason to believe that there has been (a) any breach or violation of any Environmental Laws; (b) any use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance on, under, about or from the Collateral by any prior owners or occupants of any of the Collateral; or (c) any actual or threatened litigation or claims of any kind by any person relating to such matters. (3) Neither Borrower nor any tenant, contractor, agent or other authorized user of any of the Collateral shall use, generate, manufacture, store, treat, dispose of or release any Hazardous Substance on, under, about or from any of the Collateral; and any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations, and ordinances, including without limitation all Environmental Laws. Borrower authorizes Lender and its agents to enter upon the Collateral to make such inspections and tests as Lender may deem appropriate to determine compliance of the Collateral with this section of the Agreement. Any inspections or tests made by Lender shall be at Borrower's expense and for Lender's purposes only and shall not be construed to create any responsibility or liability on the part of Lender to Borrower or to any other person. The representations and warranties contained herein are based on Borrower's due diligence in investigating the Collateral for hazardous waste and Hazardous Substances. Borrower hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Borrower becomes liable for cleanup or other costs under any such laws, and (2) agrees to indemnify, defend, and hold harmless Lender against any and all claims, losses, liabilities, damages, penalties, and expenses which Lender may directly or indirectly sustain or suffer resulting from a breach of this section of the Agreement or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release of a hazardous waste or substance on the Collateral. The provisions of this section of the Agreement,

## BUSINESS LOAN AGREEMENT
### (Continued)

including the obligation to indemnify and defend, shall survive the payment of the Indebtedness and the termination, expiration or satisfaction of this Agreement and shall not be affected by Lender's acquisition of any interest in any of the Collateral, whether by foreclosure or otherwise.

**Litigation and Claims.** No litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Borrower is pending or threatened, and no other event has occurred which may materially adversely affect Borrower's financial condition or properties, other than litigation, claims, or other events, if any, that have been disclosed to and acknowledged by Lender in writing.

**Taxes.** To the best of Borrower's knowledge, all of Borrower's tax returns and reports that are or were required to be filed, have been filed, and all taxes, assessments and other governmental charges have been paid in full, except those presently being or to be contested by Borrower in good faith in the ordinary course of business and for which adequate reserves have been provided.

**Lien Priority.** Unless otherwise previously disclosed to Lender in writing, Borrower has not entered into or granted any Security Agreements, or permitted the filing or attachment of any Security Interests on or affecting any of the Collateral directly or indirectly securing repayment of Borrower's Loan and Note, that would be prior or that may in any way be superior to Lender's Security Interests and rights in and to such Collateral.

**Binding Effect.** This Agreement, the Note, all Security Agreements (if any), and all Related Documents are binding upon the signors thereof, as well as upon their successors, representatives and assigns, and are legally enforceable in accordance with their respective terms.

**AFFIRMATIVE COVENANTS.** Borrower covenants and agrees with Lender that, so long as this Agreement remains in effect, Borrower will:

**Notices of Claims and Litigation.** Promptly inform Lender in writing of (1) all material adverse changes in Borrower's financial condition, and (2) all existing and all threatened litigation, claims, investigations, administrative proceedings or similar actions affecting Borrower or any Guarantor which could materially affect the financial condition of Borrower or the financial condition of any Guarantor.

**Financial Records.** Maintain its books and records in accordance with GAAP, applied on a consistent basis, and permit Lender to examine and audit Borrower's books and records at all reasonable times.

**Financial Statements.** Furnish Lender with the following:

**Interim Statements.** As soon as available, but in no event later than thirty (30) days after the end of each fiscal quarter, Borrower's balance sheet and profit and loss statement for the period ended, prepared by Borrower in form satisfactory to Lender.

**Tax Returns.** As soon as available after the applicable filing date for the tax reporting period ended, Borrower's Federal and other governmental tax returns, prepared by a tax professional satisfactory to Lender.

**Additional Requirements.**

**Annual Statements.** As soon as available or by September 30th of each fiscal year, Borrower's balance sheet and income statement for the year ended, audited by a certified public accountant satisfactory to Lender

**Inventory Listing.** As soon as available after the end of each fiscal month, company prepared in form satisfactory to Lender

**Guarantor(s)** agrees to furnish Lender with the following:

**Annual Statements.** As soon as available after the end of each fiscal year, Guarantor's balance sheet and income statement for the year ended, prepared by Guarantor in form satisfactory to Lender

**Tax Returns.** As soon as available after the applicable filing date for the tax reporting period ended, Federal and other governmental tax returns, prepared by a tax professional satisfactory to Lender .

All financial reports required to be provided under this Agreement shall be prepared in accordance with GAAP, applied on a consistent basis, and certified by Borrower as being true and correct.

**Additional Information.** Furnish such additional information and statements, as Lender may request from time to time.

**Additional Requirements.**
Minimum Annual DSCR: 1.00X after-distribution debt service coverage ratio required for the companies on a consolidated basis measured quarterly. Failure to meet requirement will result in all related debt increasing to a rate of F&T Base + 3.00%.

The DSCR will be calculated as:
Earnings before interest, depreciation, and amortization (EBIDA):
-Partner draws from equity
+Partner contributions to equity
= Cash flow to service debt
Divided by annual debt service
= Debt Service Coverage Ratio

**Maximum Current Ratio:** Current ration required at or above 1.00:1 including re-categorization of owner receivables to long-term assets

**Curtailments:** 10% due at 90 days; 10% due every 30 days thereafter until paid in full

**Flooring Fees:** $25.00 fee per floored item

**Monthly Inspection:** Monthly inspections of all units.

**Insurance.** Maintain fire and other risk insurance, public liability insurance, and such other insurance as Lender may require with respect to Borrower's properties and operations, in form, amounts, and coverage reasonably acceptable to Lender and by insurance companies authorized to transact business in Texas. BORROWER MAY FURNISH THE INSURANCE REQUIRED BY THIS AGREEMENT WHETHER THROUGH EXISTING POLICIES OWNED OR CONTROLLED BY BORROWER OR THROUGH EQUIVALENT COVERAGE FROM ANY INSURANCE COMPANY AUTHORIZED TO TRANSACT BUSINESS IN TEXAS. Borrower, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least thirty (30) days prior written notice to Lender. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Borrower or any other person. In connection with all policies covering assets in which Lender holds or is offered a security interest for the Loans, Borrower will provide Lender with such lender's loss payable or other endorsements as Lender may require.

**Insurance Reports.** Furnish to Lender, upon request of Lender, reports on each existing insurance policy showing such information as Lender may reasonably request, including without limitation the following: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the properties insured; (5) the then current property value on the basis of which insurance has been obtained, and the manner of determining those values; and (6) the expiration date of the policy. In addition, upon request of Lender (however not more often than annually), Borrower will have an independent appraiser satisfactory to Lender determine, as applicable, the actual cash value or replacement cost of any Collateral. The cost of such appraisal shall be paid by Borrower.

**Guaranties.** Prior to disbursement of any Loan proceeds, furnish executed guaranties of the Loans in favor of Lender, executed by the guarantors named below, on Lender's forms, and in the amounts and under the conditions set forth in those guaranties.

| Names of Guarantors | Amounts |
|---|---|
| Bart Reagor | Unlimited |
| Rick Dykes | Unlimited |

**Other Agreements.** Comply with all terms and conditions of all other agreements, whether now or hereafter existing, between Borrower and any other party and notify Lender immediately in writing of any default in connection with any other such agreements.

**Loan Proceeds.** Use all Loan proceeds solely for Borrower's business operations, unless specifically consented to the contrary by Lender in writing.

**Taxes, Charges and Liens.** Pay and discharge when due all of its indebtedness and obligations, including without limitation all assessments, taxes, governmental charges, levies and liens, of every kind and nature, imposed upon Borrower or its properties, income, or profits, prior to the date on which penalties would attach, and all lawful claims that, if unpaid, might become a lien or charge upon any of Borrower's properties, income, or profits. Provided however, Borrower will not be required to pay and discharge any such assessment, tax, charge, levy, lien or claim so long as (1) the legality of the same shall be contested in good faith by appropriate proceedings, and (2) Borrower shall have established on Borrower's books adequate reserves with respect to such contested assessment, tax, charge, levy, lien, or claim in accordance with GAAP.

## BUSINESS LOAN AGREEMENT
### (Continued)

**Performance.** Perform and comply, in a timely manner, with all terms, conditions, and provisions set forth in this Agreement, in the Related Documents, and in all other instruments and agreements between Borrower and Lender. Borrower shall notify Lender immediately in writing of any default in connection with any agreement.

**Operations.** Maintain executive and management personnel with substantially the same qualifications and experience as the present executive and management personnel; provide written notice to Lender of any change in executive and management personnel; conduct its business affairs in a reasonable and prudent manner.

**Environmental Studies.** Promptly conduct and complete, at Borrower's expense, all such investigations, studies, samplings and testings as may be requested by Lender or any governmental authority relative to any substance, or any waste or by-product of any substance defined as toxic or a hazardous substance under applicable federal, state, or local law, rule, regulation, order or directive, at or affecting any property or any facility owned, leased or used by Borrower.

**Compliance with Governmental Requirements.** Comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the conduct of Borrower's properties, businesses and operations, and to the use or occupancy of the Collateral, including without limitation, the Americans With Disabilities Act. Borrower may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Borrower has notified Lender in writing prior to doing so and so long as, in Lender's sole opinion, Lender's interests in the Collateral are not jeopardized. Lender may require Borrower to post adequate security or a surety bond, reasonably satisfactory to Lender, to protect Lender's interest.

**Inspection.** Permit employees or agents of Lender at any reasonable time to inspect any and all Collateral for the Loan or Loans and Borrower's other properties and to examine or audit Borrower's books, accounts, and records and to make copies and memoranda of Borrower's books, accounts, and records. If Borrower now or at any time hereafter maintains any records (including without limitation computer generated records and computer software programs for the generation of such records) in the possession of a third party, Borrower, upon request of Lender, shall notify such party to permit Lender free access to such records at all reasonable times and to provide Lender with copies of any records it may request, all at Borrower's expense.

**Compliance Certificates.** Unless waived in writing by Lender, provide Lender at least annually, with a certificate executed by Borrower's chief financial officer, or other officer or person acceptable to Lender, certifying that the representations and warranties set forth in this Agreement are true and correct as of the date of the certificate and further certifying that, as of the date of the certificate, no Event of Default exists under this Agreement.

**Environmental Compliance and Reports.** Borrower shall comply in all respects with any and all Environmental Laws; not cause or permit to exist, as a result of an intentional or unintentional action or omission on Borrower's part or on the part of any third party, on property owned and/or occupied by Borrower, any environmental activity where damage may result to the environment, unless such environmental activity is pursuant to and in compliance with the conditions of a permit issued by the appropriate federal, state or local governmental authorities; shall furnish to Lender promptly and in any event within thirty (30) days after receipt thereof a copy of any notice, summons, lien, citation, directive, letter or other communication from any governmental agency or instrumentality concerning any intentional or unintentional action or omission on Borrower's part in connection with any environmental activity whether or not there is damage to the environment and/or other natural resources.

**Additional Assurances.** Make, execute and deliver to Lender such promissory notes, mortgages, deeds of trust, security agreements, assignments, financing statements, instruments, documents and other agreements as Lender or its attorneys may reasonably request to evidence and secure the Loans and to perfect all Security Interests.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Borrower fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Borrower's failure to discharge or pay when due any amounts Borrower is required to discharge or pay under this Agreement or any Related Documents, Lender on Borrower's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on any Collateral and paying all costs for insuring, maintaining and preserving any Collateral. All such expenditures paid by Lender for such purposes will then bear interest at the Note rate from the date paid by Lender to the date of repayment by Borrower. To the extent permitted by applicable law, all such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity.

**NEGATIVE COVENANTS.** Borrower covenants and agrees with Lender that while this Agreement is in effect, Borrower shall not, without the prior written consent of Lender:

**Indebtedness and Liens.** (1) Except for trade debt incurred in the normal course of business and indebtedness to Lender contemplated by this Agreement, create, incur or assume indebtedness for borrowed money, including capital leases, (2) sell, transfer, mortgage, assign, pledge, lease, grant a security interest in, or encumber any of Borrower's assets (except as allowed as Permitted Liens), or (3) sell with recourse any of Borrower's accounts, except to Lender.

**Continuity of Operations.** (1) Engage in any business activities substantially different than those in which Borrower is presently engaged, (2) cease operations, liquidate, merge, transfer, acquire or consolidate with any other entity, change its name, dissolve or transfer or sell Collateral out of the ordinary course of business, or (3) make any distribution with respect to any capital account, whether by reduction of capital or otherwise.

**Loans, Acquisitions and Guaranties.** (1) Loan, invest in or advance money or assets to any other person, enterprise or entity, (2) purchase, create or acquire any interest in any other enterprise or entity, or (3) incur any obligation as surety or guarantor other than in the ordinary course of business.

**Agreements.** Enter into any agreement containing any provisions which would be violated or breached by the performance of Borrower's obligations under this Agreement or in connection herewith.

**CESSATION OF ADVANCES.** If Lender has made any commitment to make any Loan to Borrower, whether under this Agreement or under any other agreement, Lender shall have no obligation to make Loan Advances or to disburse Loan proceeds if: (A) Borrower or any Guarantor is in default under the terms of this Agreement or any of the Related Documents or any other agreement that Borrower or any Guarantor has with Lender; (B) Borrower or any Guarantor dies, becomes incompetent or becomes insolvent, files a petition in bankruptcy or similar proceedings, or is adjudged a bankrupt; (C) there occurs a material adverse change in Borrower's financial condition, in the financial condition of any Guarantor, or in the value of any Collateral securing any Loan; or (D) any Guarantor seeks, claims or otherwise attempts to limit, modify or revoke such Guarantor's guaranty of the Loan or any other loan with Lender; or (E) Lender in good faith deems itself insecure, even though no Event of Default shall have occurred.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the Indebtedness against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

**DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement:

**Payment Default.** Borrower fails to make any payment when due under the Loan.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant, or condition contained in any other agreement between Lender and Borrower.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Death or Insolvency.** The dissolution or termination of Borrower's existence as a going business or the death of any partner, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Defective Collateralization.** This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the Loan.

**BUSINESS LOAN AGREEMENT**
**(Continued)**

Loan No: 4009622988                                                                 Page 4

---

This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Events Affecting General Partner of Borrower.** Any of the preceding events occurs with respect to any general partner of Borrower or any general partner dies or becomes incompetent.

**Change in Ownership.** The resignation or expulsion of any general partner with an ownership interest of twenty-five percent (25%) or more in Borrower.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of the Loan is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**Right to Cure.** If any default, other than a default on Indebtedness, is curable and if Borrower or Grantor, as the case may be, has not been given a notice of a similar default within the preceding twelve (12) months, it may be cured if Borrower or Grantor, as the case may be, after Lender sends written notice to Borrower or Grantor, as the case may be, demanding cure of such default: (1) cure the default within thirty (30) days; or (2) if the cure requires more than thirty (30) days, immediately initiate steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continue and complete all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**EFFECT OF AN EVENT OF DEFAULT.** If any Event of Default shall occur, except where otherwise provided in this Agreement or the Related Documents, all commitments and obligations of Lender under this Agreement or the Related Documents or any other agreement immediately will terminate (including any obligation to make further Loan Advances or disbursements), and, at Lender's option, all Indebtedness immediately will become due and payable, all without notice of any kind to Borrower, except that in the case of an Event of Default of the type described in the "Insolvency" subsection above, such acceleration shall be automatic and not optional. In addition, Lender shall have all the rights and remedies provided in the Related Documents or available at law, in equity, or otherwise. Except as may be prohibited by applicable law, all of Lender's rights and remedies shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Borrower or of any Grantor shall not affect Lender's right to declare a default and to exercise its rights and remedies.

**ORIGINAL DOCUMENT.** "The parties whose signatures appear below agree that a photographic, photostatic, facsimile, electronic, copy or similar reproduction of this document shall be valid as the original.".

**CANCELLATION PROVISION.** "Notwithstanding anything to the contrary contained in this Loan Agreement or the Related Documents this Loan may be cancelled at any time and for any reason in the sole discretion of Lender and Lender shall have no obligation to make any additional Advances thereafter. Lender shall so notify Borrower of Lender's decision to cancel the loan, which notification shall be immediately effective or effective at the time stated therein if another effective time is stated in the notice. All Advances made prior to the cancellation of the Loan shall remain payable pursuant to the terms of the Loan Agreement and the Related Documents.".

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement:

**Amendments.** This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.** Borrower agrees to pay upon demand all of Lender's costs and expenses, including Lender's reasonable attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement. Lender may hire or pay someone else to help enforce this Agreement, and Borrower shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's reasonable attorneys' fees and legal expenses whether or not there is a lawsuit, including Lender's reasonable attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Borrower also shall pay all court costs and such additional fees as may be directed by the court.

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Consent to Loan Participation.** Borrower agrees and consents to Lender's sale or transfer, whether now or later, of one or more participation interests in the Loan to one or more purchasers, whether related or unrelated to Lender. Lender may provide, without any limitation whatsoever, to any one or more purchasers, or potential purchasers, any information or knowledge Lender may have about Borrower or about any other matter relating to the Loan, and Borrower hereby waives any rights to privacy Borrower may have with respect to such matters. Borrower additionally waives any and all notices of sale of participation interests, as well as all notices of any repurchase of such participation interests. Borrower also agrees that the purchasers of any such participation interests will be considered as the absolute owners of such interests in the Loan and will have all the rights granted under the participation agreement or agreements governing the sale of such participation interests. Borrower further waives all rights of offset or counterclaim that it may have now or later against Lender or against any purchaser of such a participation interest and unconditionally agrees that either Lender or such purchaser may enforce Borrower's obligation under the Loan irrespective of the failure or insolvency of any holder of any interest in the Loan. Borrower further agrees that the purchaser of any such participation interests may enforce its interests irrespective of any personal claims or defenses that Borrower may have against Lender.

**Governing Law.** This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Texas without regard to its conflicts of law provisions. This Agreement has been accepted by Lender in the State of Texas.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Borrower, or between Lender and any Grantor, shall constitute a waiver of any of Lender's rights or of any of Borrower's or any Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Notices.** Any notice required to be given under this Agreement shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Agreement. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Borrower agrees to keep Lender informed at all times of Borrower's current address. Unless otherwise provided or required by law, if there is more than one Borrower, any notice given by Lender to any Borrower is deemed to be notice given to all Borrowers.

**Payment of Interest and Fees.** Notwithstanding any other provision of this Agreement or any provision of any Related Document, Borrower does not agree or intend to pay, and Lender does not agree or intend to charge, collect, take, reserve or receive (collectively referred to herein as "charge or collect"), any amount in the nature of interest or in the nature of a fee for the Loan which would in any way or event (including demand, prepayment, or acceleration) cause Lender to contract for, charge or collect more for the Loan than the maximum Lender would be permitted to charge or collect by any applicable federal or Texas state law. Any such excess interest or unauthorized fee will, instead of anything stated to the contrary, be applied first to reduce the unpaid principal balance of the Loan, and when the principal has been paid in full, be refunded to Borrower.

**Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

**Subsidiaries and Affiliates of Borrower.** To the extent the context of any provisions of this Agreement makes it appropriate, including

## BUSINESS LOAN AGREEMENT
### (Continued)

without limitation any representation, warranty or covenant, the word "Borrower" as used in this Agreement shall include all of Borrower's subsidiaries and affiliates. Notwithstanding the foregoing however, under no circumstances shall this Agreement be construed to require Lender to make any Loan or other financial accommodation to any of Borrower's subsidiaries or affiliates.

**Successors and Assigns.** All covenants and agreements by or on behalf of Borrower contained in this Agreement or any Related Documents shall bind Borrower's successors and assigns and shall inure to the benefit of Lender and its successors and assigns. Borrower shall not, however, have the right to assign Borrower's rights under this Agreement or any interest therein, without the prior written consent of Lender.

**Survival of Representations and Warranties.** Borrower understands and agrees that in extending Loan Advances, Lender is relying on all representations, warranties, and covenants made by Borrower in this Agreement or in any certificate or other instrument delivered by Borrower to Lender under this Agreement or the Related Documents. Borrower further agrees that regardless of any investigation made by Lender, all such representations, warranties and covenants will survive the extension of Loan Advances and delivery to Lender of the Related Documents, shall be continuing in nature, shall be deemed made and redated by Borrower at the time each Loan Advance is made, and shall remain in full force and effect until such time as Borrower's Indebtedness shall be paid in full, or until this Agreement shall be terminated in the manner provided above, whichever is the last to occur.

**Time is of the Essence.** Time is of the essence in the performance of this Agreement.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code. Accounting words and terms not otherwise defined in this Agreement shall have the meanings assigned to them in accordance with generally accepted accounting principles as in effect on the date of this Agreement:

**Advance.** The word "Advance" means a disbursement of Loan funds made, or to be made, to Borrower or on Borrower's behalf on a line of credit or multiple advance basis under the terms and conditions of this Agreement.

**Agreement.** The word "Agreement" means this Business Loan Agreement, as this Business Loan Agreement may be amended or modified from time to time, together with all exhibits and schedules attached to this Business Loan Agreement from time to time.

**Borrower.** The word "Borrower" means Reagor Auto Mall, Ltd. dba Reagor-Dykes Imports and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Collateral.** The word "Collateral" means all property and assets granted as collateral security for a Loan, whether real or personal property, whether granted directly or indirectly, whether granted now or in the future, and whether granted in the form of a security interest, mortgage, collateral mortgage, deed of trust, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien, charge, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever, whether created by law, contract, or otherwise.

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Agreement in the default section of this Agreement.

**GAAP.** The word "GAAP" means generally accepted accounting principles.

**Grantor.** The word "Grantor" means each and all of the persons or entities granting a Security Interest in any Collateral for the Loan, including without limitation all Borrowers granting such a Security Interest.

**Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Loan.

**Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Indebtedness.** The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Borrower is responsible under this Agreement or under any of the Related Documents.

**Lender.** The word "Lender" means First Bank & Trust, its successors and assigns.

**Loan.** The word "Loan" means any and all loans and financial accommodations from Lender to Borrower whether now or hereafter existing, and however evidenced, including without limitation those loans and financial accommodations described herein or described on any exhibit or schedule attached to this Agreement from time to time.

**Note.** The word "Note" means the Note dated September 29, 2017 and executed by Reagor Auto Mall, Ltd. dba Reagor-Dykes Imports in the principal amount of $2,500,000.00, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the note or credit agreement.

**Permitted Liens.** The words "Permitted Liens" mean (1) liens and security interests securing indebtedness owed by Borrower to Lender; (2) liens for taxes, assessments, or similar charges either not yet due or being contested in good faith; (3) liens of materialmen, mechanics, warehousemen, or carriers, or other like liens arising in the ordinary course of business and securing obligations which are not yet delinquent; (4) purchase money liens or purchase money security interests upon or in any property acquired or held by Borrower in the ordinary course of business to secure indebtedness outstanding on the date of this Agreement or permitted to be incurred under the paragraph of this Agreement titled "Indebtedness and Liens"; (5) liens and security interests which, as of the date of this Agreement, have been disclosed to and approved by the Lender in writing; and (6) those liens and security interests in the aggregate constitute an immaterial and insignificant monetary amount with respect to the net value of Borrower's assets.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Loan.

**Security Agreement.** The words "Security Agreement" mean and include without limitation any agreements, promises, covenants, arrangements, understandings or other agreements, whether created by law, contract, or otherwise, evidencing, governing, representing, or creating a Security Interest.

**Security Interest.** The words "Security Interest" mean, without limitation, any and all types of collateral security, present and future, whether in the form of a lien, charge, encumbrance, mortgage, deed of trust, security deed, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever whether created by law, contract, or otherwise.

**BUSINESS LOAN AGREEMENT**
**(Continued)**

Loan No: 400982298B                                                                Page 6

BORROWER ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS BUSINESS LOAN AGREEMENT AND BORROWER AGREES TO ITS TERMS. THIS BUSINESS LOAN AGREEMENT IS DATED SEPTEMBER 29, 2017.

BORROWER:

REAGOR AUTO MALL, LTD. DBA REAGOR-DYKES IMPORTS

REAGOR AUTO MALL I, L.L.C., General Partner of Reagor Auto Mall, Ltd. dba Reagor-Dykes Imports

By: _____          By: _____
    Bart Reagor, Manager of Reagor Auto Mall I, L.L.C.          Rick Dykes, Manager of Reagor Auto Mall I, L.L.C.

LENDER:

FIRST BANK & TRUST

By: _____
    Jared Edward Townsend, Senior Vice President

LaserPro, Ver. 17.3.0.010 Copr. D   A USA Corporation 1997, 2017.  All Rights Reserved.    TX  J:\HARLAND\LASERPRO\CFILP\LC40.FC  TR 40271  PR-4

APP 0037

# EXHIBIT A-6

APP 0038



*00000000400982298B%0955%09292017%00000000RAA2564*

# PROMISSORY NOTE

| Principal | Loan Date | Maturity | Loan No. | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $2,500,000.00 | 09-29-2017 | 10-01-2018 | 4009822988 | 4A / 46 | RAA2564 | JET | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "****" has been omitted due to text length limitations.

Borrower: Reagor Auto Mall, Ltd. dba Reagor-Dykes Imports
(TIN): 20-0275022)
1215 Ave J
Lubbock, TX 79401

Lender: First Bank & Trust
First Bank Centre
9816 Slide Road
Lubbock, TX 79424
(806) 788-0800

---

Principal Amount: $2,500,000.00                    Date of Note: September 29, 2017

**PROMISE TO PAY.** Reagor Auto Mall, Ltd. dba Reagor-Dykes Imports ("Borrower") promises to pay to First Bank & Trust ("Lender"), or order, in lawful money of the United States of America, the principal amount of Two Million Five Hundred Thousand & 00/100 Dollars ($2,500,000.00) or so much as may be outstanding, together with interest on the unpaid outstanding principal balance of each advance. Interest shall be calculated from the date of each advance until repayment of each advance or maturity, whichever occurs first.

**CHOICE OF USURY CEILING AND INTEREST RATE.** The interest rate on this Note has been implemented under the "Weekly Ceiling" as referred to in Sections 303.002 and 303 003 of the Texas Finance Code.

**PAYMENT.** Borrower will pay this loan in full immediately upon Lender's demand. If no demand is made, Borrower will pay this loan in one payment of all outstanding principal plus all accrued unpaid interest on October 1, 2018. In addition, Borrower will pay regular monthly payments of all accrued unpaid interest due as of each payment date, beginning November 1, 2017, with all subsequent interest payments to be due on the same day of each month after that. Unless otherwise agreed or required by applicable law, payments will be applied first to any accrued unpaid interest; then to principal; then to any unpaid collection costs; and then to any late charges. Borrower will pay Lender at Lender's address shown above or at such other place as Lender may designate in writing. Notwithstanding any other provision of this Note, Lender will not charge interest on any undisbursed loan proceeds. No scheduled payment, whether of principal or interest or both, will be due unless sufficient loan funds have been disbursed by the scheduled payment date to justify the payment.

**VARIABLE INTEREST RATE.** The interest rate on this Note is subject to change from time to time based on changes in an index which is the the First Bank & Trust Base Rate (the "Index"). The Index is not necessarily the lowest rate charged by Lender on its loans and is set by Lender in its sole discretion. If the Index becomes unavailable during the term of this loan, Lender may designate a substitute index after notifying Borrower. Lender will tell Borrower the current Index rate upon Borrower's request. The interest rate change will not occur more often than each day. Borrower understands that Lender may make loans based on other rates as well. The Index currently is 5.760% per annum. Interest prior to maturity on the unpaid principal balance of this Note will be calculated as described in the "INTEREST CALCULATION METHOD" paragraph using a rate equal to the Index, adjusted if necessary for any minimum and maximum rate limitations described below, resulting in an initial rate of 8.125% per annum based on a year of 360 days. NOTICE: Under no circumstances will the interest rate on this Note be less than 6 125% per annum or more than (except for any higher default rate or Post Maturity Rate shown below) the lesser of 18.000% per annum or the maximum rate allowed by applicable law. For purposes of this Note, the "maximum rate allowed by applicable law" means the greater of (A) the maximum rate of interest permitted under federal or state law or (B) the rate of interest evidenced by this Note, or (B) the "Weekly Ceiling" as referred to in Sections 303.002 and 303.003 of the Texas Finance Code.

**INTEREST CALCULATION METHOD.** Interest on this Note is computed on a 365/360 basis; that is, by applying the ratio of the interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding, unless such calculation would result in a usurious rate, in which case interest shall be calculated on a per diem basis of a year of 365 or 366 days, as the case may be. All interest payable under this Note is computed using this method.

**PREPAYMENT.** Borrower agrees that all loan fees and other prepaid finance charges are earned fully as of the date of this loan and will not be subject to refund upon early payment (whether voluntary or as a result of default), except as otherwise required by law. Except for the foregoing, Borrower may pay without penalty all or a portion of the amount owed earlier than it is due. Prepayment in full shall consist of payment of the remaining unpaid principal balance together with all accrued and unpaid interest and all other amounts, costs and expenses for which Borrower is responsible under this Note or any other agreement with Lender pertaining to this loan, and in no event will Borrower ever be required to pay any unearned interest. Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments of accrued unpaid interest. Rather, early payments will reduce the principal balance due. Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language. If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Note, and Borrower will remain obligated to pay any further amount owed to Lender. All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to: First Bank & Trust, 9816 Slide Road Lubbock, TX 79424.

**LATE CHARGE.** If a payment is 10 days or more late, Borrower will be charged 5.000% of the regularly scheduled payment.

**POST MATURITY RATE.** The Post Maturity Rate on this Note is the lesser of (A) the maximum rate allowed by law or (B) 18.000% per annum based on a year of 360 days. Borrower will pay interest on all sums due after final maturity, whether by acceleration or otherwise, at that rate.

**DEFAULT.** Each of the following shall constitute an event of default ("Event of Default") under this Note:

**Payment Default.** Borrower fails to make any payment when due under this Note.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Note or in any of the related documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Note or the related documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Death or Insolvency.** The dissolution or termination of Borrower's existence as a going business or the death of any partner, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any guaranty of the indebtedness evidenced by this Note.

**Events Affecting General Partner of Borrower.** Any of the preceding events occurs with respect to any general partner of Borrower or any general partner dies or becomes incompetent.

**Change in Ownership.** The resignation or expulsion of any general partner with an ownership interest of twenty-five percent (25%) or more in Borrower.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of this Note is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

APP 0039

## PROMISSORY NOTE
### (Continued)

Loan No: 4009822988        Page 2

Cure Provisions. If any default, other than a default in payment, is curable and if Borrower has not been given a notice of a breach of the same provision of this Note within the preceding twelve (12) months, it may be cured if Borrower, after Lender sends written notice to Borrower demanding cure of such default: (1) cures the default within thirty (30) days; or (2) if the cure requires more than thirty (30) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

LENDER'S RIGHTS. Upon default, Lender may declare the entire indebtedness, including the unpaid principal balance under this Note, all accrued unpaid interest, and all other amounts, costs and expenses for which Borrower is responsible under this Note or any other agreement with Lender pertaining to this loan, immediately due, without notice, and then Borrower will pay that amount.

ATTORNEYS' FEES; EXPENSES. Lender may hire an attorney to help collect this Note if Borrower does not pay, and Borrower will pay Lender's reasonable attorneys' fees. Borrower also will pay Lender all other amounts Lender actually incurs as court costs, lawful fees for filing, recording, releasing to any public office any instrument securing this Note; the reasonable cost actually expended for repossessing, storing, preparing for sale, and selling any security; and fees for noting a lien on or transferring a certificate of title to any motor vehicle offered as security for this Note, or premiums or identifiable charges received in connection with the sale of authorized insurance.

GOVERNING LAW. This Note will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Texas without regard to its conflicts of law provisions. This Note has been accepted by Lender in the State of Texas.

DISHONORED CHECK CHARGE. Borrower will pay a processing fee of $30.00 if any check given by Borrower to Lender as a payment on this loan is dishonored.

RIGHT OF SETOFF. To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the indebtedness against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

COLLATERAL. Borrower acknowledges this Note is secured by a Commercial Security Agreement from Reagor Auto Mall, Ltd. dba Reagor-Dykes Imports to First Bank & Trust, dated September 29, 2017, secured by All Inventory, together with the following specifically described property: all debtor's inventory of property of every description (specifically including by not limited to) all debtor's inventory of property of every description (specifically including by not limited to) all new and used motor vehicles, which includes but is not limited to automobiles, motorcycles, mobile homes, motor homes, travel trailers, boats, vans, pickups, together with all accessories, attachments, or accessions related to any of the foregoing collateral hereafter acquired and wherever located, whether held for rental, lease, sale or use, of whatever nature and wheresoever located and all debtor's accounts, accounts receivable, notes receivable, checks, drafts, contract rights and general intangibles of every nature evidencing debtor's right to the payment of monies arising from the sale, leasing, or rental of such inventory items and/or from the performance of debtor of services in connection therewith or related thereto all the foregoing whether now owned or hereafter acquired by debtor and the proceeds and products thereof.

LINE OF CREDIT. This Note evidences a revolving line of credit. Advances under this Note, as well as directions for payment from Borrower's accounts, may be requested orally or in writing by Borrower or by an authorized person. Lender may, but need not, require that all oral requests be confirmed in writing. Borrower agrees to be liable for all sums either: (A) advanced in accordance with the instructions of an authorized person or (B) credited to any of Borrower's accounts with Lender. The unpaid principal balance owing on this Note at any time may be evidenced by endorsements on this Note or by Lender's internal records, including daily computer print-outs. This revolving line of credit shall not be subject to Ch. 346 of the Texas Finance Code.

ORIGINAL DOCUMENT. "The parties whose signatures appear below agree that a photographic, photostatic, facsimile, electronic, copy or similar reproduction of this document shall be valid as the original.".

CHOICE OF VENUE. If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the Courts of Lubbock County, Texas. The parties agree that Lubbock County, Texas is the sole and exclusive venue for any lawsuit arising out of this transaction.

CANCELLATION PROVISION. "Notwithstanding any language to the contrary contained herein, the loan represented by this Note may be cancelled at any time and for any reason in the sole discretion of Lender and Lender shall have no obligation to make any additional advances thereafter. Lender shall so notify Borrower of Lender's decision to cancel this loan, which notification shall be immediately effective or effective at the time stated therein if another effective time is stated in the notice. All principal advanced prior to the cancellation of this loan shall continue to accrue interest and shall remain payable pursuant to the terms of this Note ".

RENEWAL AND EXTENSION. This Note is given in renewal and extension and not in novation of the following described indebtedness: a Promissory Note #4009822988 from Reagor Auto Mall, Ltd. dba Reagor-Dykes Imports to First Bank & Trust, dated August 23, 2016, in the original commitment amount of $2,500,000.00, with a current principal balance of $2,494,475.00.

SUCCESSOR INTERESTS. The terms of this Note shall be binding upon Borrower, and upon Borrower's heirs, personal representatives, successors and assigns, and shall inure to the benefit of Lender and its successors and assigns

GENERAL PROVISIONS. This Note is payable on demand. The inclusion of specific default provisions or rights of Lender shall not preclude Lender's right to declare payment of this Note on its demand. If any part of this Note cannot be enforced, this fact will not affect the rest of the Note. Borrower does not agree or intend to pay, and Lender does not agree or intend to contract for, charge, collect, take, reserve or receive (collectively referred to herein as "charge or collect"), any amount in the nature of interest or in the nature of a fee for this loan, which would in any way or event (including demand, prepayment, or acceleration) cause Lender to charge or collect more for this loan than the maximum Lender would be permitted to charge or collect by federal law or the law of the State of Texas (as applicable). Any such excess interest or unauthorized fee shall, instead of anything stated to the contrary, be applied first to reduce the principal balance of this loan, and when the principal has been paid in full, be refunded to Borrower. The right to accelerate maturity of sums due under this Note does not include the right to accelerate any interest which has not otherwise accrued on the date of such acceleration, and Lender does not intend to charge or collect any unearned interest in the event of acceleration. All sums paid or agreed to be paid to Lender for the use, forbearance or detention of sums due hereunder shall, to the extent permitted by applicable law, be amortized, prorated, allocated and spread throughout the full term of the loan evidenced by this Note until payment in full so that the rate or amount of interest on account of the loan evidenced hereby does not exceed the applicable usury ceiling. Lender may delay or forgo enforcing any of its rights or remedies under this Note without losing them. Borrower and any other person who signs, guarantees or endorses this Note, to the extent allowed by law, waive presentment, demand for payment, notice of dishonor, notice of intent to accelerate the maturity of this Note, and notice of acceleration of the maturity of this Note. Upon any change in the terms of this Note, and unless otherwise expressly stated in writing, no party who signs this Note, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability. All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan or release any party, partner, or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral without the consent of or notice to anyone. All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made. The obligations under this Note are joint and several.

PRIOR TO SIGNING THIS NOTE, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE, INCLUDING THE VARIABLE INTEREST RATE PROVISIONS. BORROWER AGREES TO THE TERMS OF THE NOTE.

BORROWER ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS PROMISSORY NOTE.

BORROWER:

REAGOR AUTO MALL, LTD. DBA REAGOR-DYKES IMPORTS

REAGOR AUTO MALL I, L.L.C., General Partner of Reagor Auto Mall, Ltd. dba Reagor-Dykes Imports

By: _____      By: _____
Bart Reagor, Manager of Reagor Auto Mall I, L.L.C.      Rick Dykes, Manager of Reagor Auto Mall I, L.L.C.

LaserPro, Ver. 17.3.0.010 Copr. D+H USA Corporation 1997, 2017. All Rights Reserved. - TX  J:\HALL\CFI\LPL\APPS\CFI\LPL\D20.FC TR-4027 PR-4

# EXHIBIT A-7

APP 0041

*00000004009822980%0220%09292017%00000000RAA2564*

## COMMERCIAL GUARANTY

| Borrower: | Reagor Auto Mall, Ltd. dba Reagor-Dykes Imports | Lender: | First Bank & Trust |
|---|---|---|---|
| | (TIN: 20-0275022) | | First Bank Centre |
| | 1215 Ave J | | 9816 Slide Road |
| | Lubbock, TX 79401 | | Lubbock, TX 79424 |
| | | | (806) 788-0800 |

| Guarantor: | Bart Reagor (SSN: 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) |
|---|---|
| | 8504 Oxford Ave |
| | Lubbock, TX 79423 |

**CONTINUING GUARANTEE OF PAYMENT AND PERFORMANCE.** For good and valuable consideration, Guarantor absolutely and unconditionally guarantees full and punctual payment and satisfaction of the Indebtedness of Borrower to Lender, and the performance and discharge of all Borrower's obligations under the Note and the Related Documents. This is a guaranty of payment and performance and not of collection, so Lender can enforce this Guaranty against Guarantor even when Lender has not exhausted Lender's remedies against anyone else obligated to pay the Indebtedness or against any collateral securing the Indebtedness, this Guaranty or any other guaranty of the Indebtedness. Guarantor will make any payments to Lender or its order, on demand, in legal tender of the United States of America, in same-day funds, without set-off or deduction or counterclaim, and will otherwise perform Borrower's obligations under the Note and Related Documents. Under this Guaranty, Guarantor's liability is unlimited and Guarantor's obligations are continuing.

**INDEBTEDNESS.** The word "Indebtedness" as used in this Guaranty means all of the principal amount outstanding from time to time and at any one or more times, accrued unpaid interest thereon and all collection costs and legal expenses related thereto permitted by law, Lender's reasonable attorneys' fees, arising from any and all debts, liabilities and obligations of every nature or form, now existing or hereafter arising or acquired, that Borrower individually or collectively or interchangeably with others, owes or will owe Lender. "Indebtedness" includes, without limitation, loans, advances, debts, overdraft indebtedness, credit card indebtedness, lease obligations, liabilities and obligations under any interest rate protection agreements or foreign currency exchange agreements or commodity price protection agreements, other obligations, and liabilities of Borrower, and any present or future judgments against Borrower, future advances, loans or transactions that renew, extend, modify, refinance, consolidate or substitute these debts, liabilities and obligations whether: voluntarily or involuntarily incurred; due or to become due by their terms or acceleration; absolute or contingent; liquidated or unliquidated; determined or undetermined; direct or indirect; primary or secondary in nature or arising from a guaranty or surety; secured or unsecured; joint or several or joint and several; evidenced by a negotiable or non-negotiable instrument or writing; originated by Lender or another or others; barred or unenforceable against Borrower for any reason whatsoever; for any transactions that may be voidable for any reason (such as infancy, insanity, ultra vires or otherwise); and originated then reduced or extinguished and then afterwards increased or reinstated.

If Lender presently holds one or more guaranties, or hereafter receives additional guaranties from Guarantor, Lender's rights under all guaranties shall be cumulative. This Guaranty shall not (unless specifically provided below to the contrary) affect or invalidate any such other guaranties. Guarantor's liability will be Guarantor's aggregate liability under the terms of this Guaranty and any such other unterminated guaranties.

**CONTINUING GUARANTY.** THIS IS A "CONTINUING GUARANTY" UNDER WHICH GUARANTOR AGREES TO GUARANTEE THE FULL AND PUNCTUAL PAYMENT, PERFORMANCE AND SATISFACTION OF THE INDEBTEDNESS OF BORROWER TO LENDER, NOW EXISTING OR HEREAFTER ARISING OR ACQUIRED, ON AN OPEN AND CONTINUING BASIS. ACCORDINGLY, ANY PAYMENTS MADE ON THE INDEBTEDNESS WILL NOT DISCHARGE OR DIMINISH GUARANTOR'S OBLIGATIONS AND LIABILITY UNDER THIS GUARANTY FOR ANY REMAINING AND SUCCEEDING INDEBTEDNESS EVEN WHEN ALL OR PART OF THE OUTSTANDING INDEBTEDNESS MAY BE A ZERO BALANCE FROM TIME TO TIME.

**DURATION OF GUARANTY.** This Guaranty will take effect when received by Lender without the necessity of any acceptance by Lender, or any notice to Guarantor or to Borrower, and will continue in full force until all the Indebtedness incurred or contracted before revocation by Lender of any notice of revocation shall have been fully and finally paid and satisfied and all of Guarantor's other obligations under this Guaranty shall have been performed in full. If Guarantor elects to revoke this Guaranty, Guarantor may only do so in writing. Guarantor's written notice of revocation must be mailed to Lender, by certified mail, at Lender's address listed above or such other place as Lender may designate in writing. Written revocation of this Guaranty will apply only to new Indebtedness created after actual receipt by Lender of Guarantor's written revocation and Lender's written acknowledgment of receipt. For this purpose and without limitation, the term "new Indebtedness" does not include the Indebtedness which at the time of notice of revocation is contingent, unliquidated, undetermined or not due and which later becomes absolute, liquidated, determined or due. For this purpose and without limitation, "new Indebtedness" does not include all or part of the Indebtedness that is: incurred by Borrower prior to revocation; incurred under a commitment that became binding before revocation; any renewals, extensions, substitutions, and modifications of the Indebtedness. This Guaranty shall bind Guarantor's estate as to the Indebtedness created both before and after Guarantor's death or incapacity, regardless of Lender's actual notice of Guarantor's death. Subject to the foregoing, Guarantor's executor or administrator or other legal representative may terminate this Guaranty in the same manner in which Guarantor might have terminated it and with the same effect. Release of any other guarantor or termination of any other guaranty of the Indebtedness shall not affect the liability of Guarantor under this Guaranty. A revocation Lender receives from any one or more Guarantors shall not affect the liability of any remaining Guarantors under this Guaranty. It is anticipated that fluctuations may occur in the aggregate amount of the Indebtedness covered by this Guaranty, and Guarantor specifically acknowledges and agrees that reductions in the amount of the Indebtedness, even to zero dollars ($0.00), shall not constitute a termination of this Guaranty. This Guaranty is binding upon Guarantor and Guarantor's heirs, successors and assigns so long as any of the Indebtedness remains unpaid and even though the Indebtedness may from time to time be zero dollars ($0.00).

**GUARANTOR'S AUTHORIZATION TO LENDER.** Guarantor authorizes Lender, either before or after any revocation hereof, without notice or demand and without lessening or otherwise affecting Guarantor's liability under this Guaranty, from time to time: (A) prior to revocation as set forth above, to make one or more additional secured or unsecured loans to Borrower, to lease equipment or other goods to Borrower, or otherwise to extend additional credit to Borrower; (B) to alter, compromise, renew, extend, accelerate, or otherwise change one or more times the time for payment or other terms of the Indebtedness or any part of the Indebtedness, including increases and decreases of the rate of interest on the Indebtedness; extensions may be repeated and may be for longer than the original loan term; (C) to take and hold security for the payment of this Guaranty or the Indebtedness, and exchange, enforce, waive, subordinate, fail or decide not to perfect, and release any such security, with or without the substitution of new collateral; (D) to release, substitute, agree not to sue, or deal with any one or more of Borrower's sureties, endorsers, or other guarantors on any terms or in any manner Lender may choose, (E) to determine how, when and what application of payments and credits shall be made on the Indebtedness; (F) to apply such security and direct the order or manner of sale thereof, including without limitation, any nonjudicial sale permitted by the terms of the controlling security agreement or deed of trust, as Lender in its discretion may determine; (G) to sell, transfer, assign or grant participations in all or any part of the Indebtedness; and (H) to assign or transfer this Guaranty in whole or in part.

**GUARANTOR'S REPRESENTATIONS AND WARRANTIES.** Guarantor represents and warrants to Lender that (A) no representations or agreements of any kind have been made to Guarantor which would limit or qualify in any way the terms of this Guaranty; (B) this Guaranty is executed at Borrower's request and not at the request of Lender; (C) Guarantor has full power, right and authority to enter into this Guaranty; (D) the provisions of this Guaranty do not conflict with or result in a default under any agreement or other instrument binding upon Guarantor and do not result in a violation of any law, regulation, court decree or order applicable to Guarantor; (E) Guarantor has not and will not, without the prior written consent of Lender, sell, lease, assign, encumber, hypothecate, transfer, or otherwise dispose of all or substantially all of Guarantor's assets, or any interest therein; (F) upon Lender's request, Guarantor will provide to Lender financial and credit information in form acceptable to Lender, and all such financial information which currently has been, and all future financial information which will be provided to Lender is and will be true and correct in all material respects and fairly present Guarantor's financial condition as of the dates the financial information is provided; (G) no material adverse change has occurred in Guarantor's financial condition since the date of the most recent financial statements provided to Lender and no event has occurred which may materially adversely affect Guarantor's financial condition; (H) no litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Guarantor is pending or threatened; (I) Lender has made no representation to Guarantor as to the creditworthiness of Borrower; and (J) Guarantor has established adequate means of obtaining from Borrower on a continuing basis information regarding Borrower's financial condition. Guarantor agrees to keep adequately informed from such means of any facts, events, or circumstances which might in any way affect Guarantor's risks under this Guaranty, and Guarantor further agrees that, absent a request for information, Lender shall have no obligation to disclose to Guarantor any information or documents acquired by Lender in the course of its relationship with Borrower.

**GUARANTOR'S WAIVERS.** Except as prohibited by applicable law, Guarantor waives any right to require Lender (A) to continue lending money or to extend other credit to Borrower; (B) to make any presentment, protest, demand, or notice of any kind, including notice of any nonpayment of the Indebtedness or of any nonpayment related to any collateral, or notice of any action or nonaction on the part of Borrower, Lender, any surety, endorser, or other guarantor in connection with the Indebtedness or in connection with the creation of new or additional

APP 0042

**COMMERCIAL GUARANTY**
**(Continued)**

Loan No: 4009822988                                                                                           Page 2

loans or obligations; (C) to resort for payment or to proceed directly or at once against any person, including Borrower or any other guarantor; (D) to proceed directly against or exhaust any collateral held by Lender from Borrower, any other guarantor, or any other person; (E) to give notice of the terms, time, and place of any public or private sale of personal property security held by Lender from Borrower or to comply with any other applicable provisions of the Uniform Commercial Code; (F) to pursue any other remedy within Lender's power; or (G) to commit any act or omission of any kind, or at any time, with respect to any matter whatsoever.

Guarantor waives all rights of Guarantor under Chapter 43 of the Texas Civil Practice and Remedies Code. Guarantor also waives any and all rights or defenses based on suretyship or impairment of collateral including, but not limited to, any rights or defenses arising by reason of (A) any "one action" or "anti-deficiency" law or any other law which may prevent Lender from bringing any action, including a claim for deficiency, against Guarantor, before or after Lender's commencement or completion of any foreclosure action, either judicially or by exercise of a power of sale; (B) any election of remedies by Lender which destroys or otherwise adversely affects Guarantor's subrogation rights or Guarantor's rights to proceed against Borrower for reimbursement, including without limitation, any loss of rights Guarantor may suffer by reason of any law limiting, qualifying, or discharging the Indebtedness; (C) any disability or other defense of Borrower, of any other guarantor, or of any other person, or by reason of the cessation of Borrower's liability from any cause whatsoever, other than payment in full in legal tender, of the Indebtedness; (D) any right to claim discharge of the Indebtedness on the basis of unjustified impairment of any collateral for the Indebtedness; (E) any statute of limitations, if at any time any action or suit brought by Lender against Guarantor is commenced, there is outstanding Indebtedness which is not barred by any applicable statute of limitations; or (F) any defenses given to guarantors at law or in equity other than actual payment and performance of the Indebtedness. If payment is made by Borrower, whether voluntarily or otherwise, or by any third party, on the Indebtedness and thereafter Lender is forced to remit the amount of that payment to Borrower's trustee in bankruptcy or to any similar person under any federal or state bankruptcy law or law for the relief of debtors, the Indebtedness shall be considered unpaid for the purpose of the enforcement of this Guaranty.

Guarantor further waives and agrees not to assert or claim at any time any deductions to the amount guaranteed under this Guaranty for any claim of setoff, counterclaim, counter demand, recoupment or similar right, whether such claim, demand or right may be asserted by the Borrower, the Guarantor, or both.

**GUARANTOR'S UNDERSTANDING WITH RESPECT TO WAIVERS.** Guarantor warrants and agrees that each of the waivers set forth above is made with Guarantor's full knowledge of its significance and consequences and that, under the circumstances, the waivers are reasonable and not contrary to public policy or law. If any such waiver is determined to be contrary to any applicable law or public policy, such waiver shall be effective only to the extent permitted by law or public policy.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Guarantor's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Guarantor holds jointly with someone else and all accounts Guarantor may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Guarantor authorizes Lender, to the extent permitted by applicable law, to hold these funds if there is a default, and Lender may apply the funds in these accounts to pay what Guarantor owes under the terms of this Guaranty.

**SUBORDINATION OF BORROWER'S DEBTS TO GUARANTOR.** Guarantor agrees that the Indebtedness, whether now existing or hereafter created, shall be superior to any claim that Guarantor may now have or hereafter acquire against Borrower, whether or not Borrower becomes insolvent. Guarantor hereby expressly subordinates any claim Guarantor may have against Borrower, upon any account whatsoever, to any claim that Lender may now or hereafter have against Borrower. In the event of insolvency and consequent liquidation of the assets of Borrower, through bankruptcy, by an assignment for the benefit of creditors, by voluntary liquidation, or otherwise, the assets of Borrower applicable to the payment of the claims of both Lender and Guarantor shall be paid to Lender and shall be first applied by Lender to the Indebtedness. Guarantor does hereby assign to Lender all claims which it may have or acquire against Borrower or against any assignee or trustee in bankruptcy of Borrower; provided however, that such assignment shall be effective only for the purpose of assuring to Lender full payment in legal tender of the Indebtedness. If Lender so requests, any notes or credit agreements now or hereafter evidencing any debts or obligations of Borrower to Guarantor shall be marked with a legend that the same are subject to this Guaranty and shall be delivered to Lender. Guarantor agrees, and Lender is hereby authorized, in the name of Guarantor, from time to time to file financing statements and continuation statements and to execute documents and to take such other actions as Lender deems necessary or appropriate to perfect, preserve and enforce its rights under this Guaranty.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Guaranty:

**Amendments.** This Guaranty, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Guaranty. No alteration of or amendment to this Guaranty shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.** Guarantor agrees to pay upon demand all of Lender's costs and expenses, including Lender's reasonable attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Guaranty. Lender may hire or pay someone else to help enforce this Guaranty, and Guarantor shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's reasonable attorneys' fees and legal expenses whether or not there is a lawsuit, including Lender's reasonable attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Guarantor also shall pay all court costs and such additional fees as may be directed by the court.

**Caption Headings.** Caption headings in this Guaranty are for convenience purposes only and are not to be used to interpret or define the provisions of this Guaranty.

**Governing Law.** This Guaranty will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Texas without regard to its conflicts of law provisions.

**Integration.** Guarantor further agrees that Guarantor has read and fully understands the terms of this Guaranty; Guarantor has had the opportunity to be advised by Guarantor's attorney with respect to this Guaranty; Guaranty fully reflects Guarantor's intentions and parol evidence is not required to interpret the terms of this Guaranty. Guarantor hereby indemnifies and holds Lender harmless from all losses, claims, damages, and costs (including Lender's attorneys' fees) suffered or incurred by Lender as a result of any breach by Guarantor of the warranties, representations and agreements of this paragraph.

**Interpretation.** In all cases where there is more than one Borrower or Guarantor, then all words used in this Guaranty in the singular shall be deemed to have been used in the plural where the context and construction so require; and where there is more than one Borrower named in this Guaranty or when this Guaranty is executed by more than one Guarantor, the words "Borrower" and "Guarantor" respectively shall mean all and any one or more of them. The words "Guarantor," "Borrower," and "Lender" include the heirs, successors, assigns, and transferees of each of them. If a court finds that any provision of this Guaranty is not valid or should not be enforced, that fact by itself will not mean that the rest of this Guaranty will not be valid or enforced. Therefore, a court will enforce the rest of the provisions of this Guaranty even if a provision of this Guaranty may be found to be invalid or unenforceable. If any one or more of Borrower or Guarantor are corporations, partnerships, limited liability companies, or similar entities, it is not necessary for Lender to inquire into the powers of Borrower or Guarantor or of the officers, directors, partners, managers, or other agents acting or purporting to act on their behalf, and any indebtedness made or created in reliance upon the professed exercise of such powers shall be guaranteed under this Guaranty.

**Notices.** Any notice required to be given under this Guaranty shall be given in writing, and, except for revocation notices by Guarantor, shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Guaranty. All revocation notices by Guarantor shall be in writing and shall be effective upon delivery to Lender as provided in the section of this Guaranty entitled "DURATION OF GUARANTY." Any party may change its address for notices under this Guaranty by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Guarantor agrees to keep Lender informed at all times of Guarantor's current address. Unless otherwise provided or required by law, if there is more than one Guarantor, any notice given by Lender to any Guarantor is deemed to be notice given to all Guarantors.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Guaranty unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Guaranty shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Guaranty. No prior waiver by Lender, nor any course of dealing between Lender and Guarantor, shall constitute a waiver of any of Lender's rights or of any of Guarantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Guaranty, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Successors and Assigns.** Subject to any limitations stated in this Guaranty on transfer of Guarantor's interest, this Guaranty shall be binding upon and inure to the benefit of the parties, their successors and assigns.

APP 0043

**COMMERCIAL GUARANTY**
**(Continued)**

Loan No: 4009822988                                                                                                           Page 3

Waive Jury.   Lender and Guarantor hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by either Lender or Guarantor against the other.

Original Document.  "The parties whose signatures appear below agree that a photographic, photostatic, facsimile, electronic, copy or similar reproduction of this document shall be valid as the original.".

Choice of Venue.  If there is a lawsuit, Guarantor agrees upon Lender's request to submit to the jurisdiction of the Courts of Lubbock County, Texas.  The parties agree that Lubbock County, Texas is the sole and exclusive venue for any lawsuit arising out of this Guaranty.

DEFINITIONS.  The following capitalized words and terms shall have the following meanings when used in this Guaranty.  Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America.  Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require.  Words and terms not otherwise defined in this Guaranty shall have the meanings attributed to such terms in the Uniform Commercial Code:

Borrower.  The word "Borrower" means Reagor Auto Mall, Ltd. dba Reagor-Dykes Imports and includes all co-signers and co-makers signing the Note and all their successors and assigns.

Guarantor.  The word "Guarantor" means everyone signing this Guaranty, including without limitation Bart Reagor, and in each case, any signer's successors and assigns.

Guaranty.  The word "Guaranty" means this guaranty from Guarantor to Lender.

Indebtedness.  The word "Indebtedness" means Borrower's indebtedness to Lender as more particularly described in this Guaranty.

Lender.  The word "Lender" means First Bank & Trust, its successors and assigns.

Note.  The word "Note" means and includes without limitation all of Borrower's promissory notes and/or credit agreements evidencing Borrower's loan obligations in favor of Lender, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of and substitutions for promissory notes or credit agreements.

Related Documents.  The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

EACH UNDERSIGNED GUARANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS GUARANTY AND AGREES TO ITS TERMS.  IN ADDITION, EACH GUARANTOR UNDERSTANDS THAT THIS GUARANTY IS EFFECTIVE UPON GUARANTOR'S EXECUTION AND DELIVERY OF THIS GUARANTY TO LENDER AND THAT THE GUARANTY WILL CONTINUE UNTIL TERMINATED IN THE MANNER SET FORTH IN THE SECTION TITLED "DURATION OF GUARANTY".  NO FORMAL ACCEPTANCE BY LENDER IS NECESSARY TO MAKE THIS GUARANTY EFFECTIVE.  THIS GUARANTY IS DATED SEPTEMBER 29, 2017.

GUARANTOR:

X _____
  Bart Reagor

---

**INDIVIDUAL ACKNOWLEDGMENT**

STATE OF ___Texas___                                          )
                                                               ) SS
COUNTY OF ___Lubbock___                                        )

This instrument was acknowledged before me on ___September 29___, 20_17_ by Bart Reagor.

LYNETTE BONHAM
Notary Public, State of Texas
Comm. Expires 05-22-2019
Notary ID 125682733

_____
Notary Public, State of Texas

# EXHIBIT A-8

APP 0045

*00000004009822986%0220%09292017%00000000RAA2564*

## COMMERCIAL GUARANTY

| Borrower: | Reagor Auto Mall, Ltd. dba Reagor-Dykes Imports (TIN: 20-0275022) 1215 Ave J Lubbock, TX 79401 | Lender: | First Bank & Trust First Bank Centre 9816 Slide Road Lubbock, TX 79424 (806) 788-0800 |
|---|---|---|---|
| Guarantor: | Rick Dykes (SSN: 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) 4705 21st Street Lubbock, TX 79407 | | |

**CONTINUING GUARANTEE OF PAYMENT AND PERFORMANCE.** For good and valuable consideration, Guarantor absolutely and unconditionally guarantees full and punctual payment and satisfaction of the Indebtedness of Borrower to Lender, and the performance and discharge of all Borrower's obligations under the Note and the Related Documents. This is a guaranty of payment and performance and not of collection, so Lender can enforce this Guaranty against Guarantor even when Lender has not exhausted Lender's remedies against anyone else obligated to pay the Indebtedness or against any collateral securing the Indebtedness, this Guaranty or any other guaranty of the Indebtedness. Guarantor will make any payments to Lender or its order, on demand, in legal tender of the United States of America, in same-day funds, without set-off or deduction or counterclaim, and will otherwise perform Borrower's obligations under the Note and Related Documents. Under this Guaranty, Guarantor's liability is unlimited and Guarantor's obligations are continuing.

**INDEBTEDNESS.** The word "Indebtedness" as used in this Guaranty means all of the principal amount outstanding from time to time and at any one or more times, accrued unpaid interest thereon and all collection costs and legal expenses related thereto permitted by law, Lender's reasonable attorneys' fees, arising from any and all debts, liabilities and obligations of every nature or form, now existing or hereafter arising or acquired, that Borrower individually or collectively or interchangeably with others, owes or will owe Lender. "Indebtedness" includes, without limitation, loans, advances, debts, overdraft indebtedness, credit card indebtedness, lease obligations, liabilities and obligations under any interest rate protection agreements or foreign currency exchange agreements or commodity price protection agreements, other obligations, and liabilities of Borrower, and any present or future judgments against Borrower, future advances, loans or transactions that renew, extend, modify, refinance, consolidate or substitute these debts, liabilities and obligations whether: voluntarily or involuntarily incurred; due or to become due by their terms or acceleration; absolute or contingent; liquidated or unliquidated; determined or undetermined; direct or indirect; primary or secondary in nature or arising from a guaranty or surety; secured or unsecured; joint or several or joint and several; evidenced by a negotiable or non-negotiable instrument or writing; originated by Lender or another or others; barred or unenforceable against Borrower for any reason whatsoever; for any transactions that may be voidable for any reason (such as infancy, insanity, ultra vires or otherwise); and originated then reduced or extinguished and then afterwards increased or reinstated.

If Lender presently holds one or more guaranties, or hereafter receives additional guaranties from Guarantor, Lender's rights under all guaranties shall be cumulative. This Guaranty shall not (unless specifically provided below to the contrary) affect or invalidate any such other guaranties. Guarantor's liability will be Guarantor's aggregate liability under the terms of this Guaranty and any such other unterminated guaranties.

**CONTINUING GUARANTY. THIS IS A "CONTINUING GUARANTY" UNDER WHICH GUARANTOR AGREES TO GUARANTEE THE FULL AND PUNCTUAL PAYMENT, PERFORMANCE AND SATISFACTION OF THE INDEBTEDNESS OF BORROWER TO LENDER, NOW EXISTING OR HEREAFTER ARISING OR ACQUIRED, ON AN OPEN AND CONTINUING BASIS. ACCORDINGLY, ANY PAYMENTS MADE ON THE INDEBTEDNESS WILL NOT DISCHARGE OR DIMINISH GUARANTOR'S OBLIGATIONS AND LIABILITY UNDER THIS GUARANTY FOR ANY REMAINING AND SUCCEEDING INDEBTEDNESS EVEN WHEN ALL OR PART OF THE OUTSTANDING INDEBTEDNESS MAY BE A ZERO BALANCE FROM TIME TO TIME.**

**DURATION OF GUARANTY.** This Guaranty will take effect when received by Lender without the necessity of any acceptance by Lender, or any notice to Guarantor or to Borrower, and will continue in full force until all the Indebtedness incurred or contracted before receipt by Lender of any notice of revocation shall have been fully and finally paid and satisfied and all of Guarantor's other obligations under this Guaranty shall have been performed in full. If Guarantor elects to revoke this Guaranty, Guarantor may only do so in writing. Guarantor's written notice of revocation must be mailed to Lender, by certified mail, at Lender's address listed above or such other place as Lender may designate in writing. Written revocation of this Guaranty will apply only to new Indebtedness created after actual receipt by Lender of Guarantor's written revocation and Lender's written acknowledgment of receipt. For this purpose and without limitation, the term "new Indebtedness" does not include the Indebtedness which at the time of notice of revocation is contingent, unliquidated, undetermined or not due and which later becomes absolute, liquidated, determined or due. For this purpose and without limitation, "new Indebtedness" does not include all or part of the Indebtedness that is: incurred by Borrower prior to revocation; incurred under a commitment that became binding before revocation; any renewals, extensions, substitutions, and modifications of the Indebtedness. This Guaranty shall bind Guarantor's estate as to the Indebtedness created both before and after Guarantor's death or incapacity, regardless of Lender's actual notice of Guarantor's death. Subject to the foregoing, Guarantor's executor or administrator or other legal representative may terminate this Guaranty in the same manner in which Guarantor might have terminated it and with the same effect. Release of any other guarantor or termination of any other guaranty of the Indebtedness shall not affect the liability of Guarantor under this Guaranty. A revocation Lender receives from any one or more Guarantors shall not affect the liability of any remaining Guarantors under this Guaranty. It is anticipated that fluctuations may occur in the aggregate amount of the Indebtedness covered by this Guaranty, and Guarantor specifically acknowledges and agrees that reductions in the amount of the Indebtedness, even to zero dollars ($0.00), shall not constitute a termination of this Guaranty. This Guaranty is binding upon Guarantor and Guarantor's heirs, successors and assigns so long as any of the Indebtedness remains unpaid and even though the Indebtedness may from time to time be zero dollars ($0.00).

**GUARANTOR'S AUTHORIZATION TO LENDER.** Guarantor authorizes Lender, either before or after any revocation hereof, without notice or demand and without lessening or otherwise affecting Guarantor's liability under this Guaranty, from time to time: (A) prior to revocation as set forth above, to make one or more additional secured or unsecured loans to Borrower, to lease equipment or other goods to Borrower, or otherwise to extend additional credit to Borrower; (B) to alter, compromise, renew, extend, accelerate, or otherwise change one or more times the time for payment or other terms of the Indebtedness or any part of the Indebtedness, including increases and decreases of the rate of interest on the Indebtedness; extensions may be repeated and may be for longer than the original loan term; (C) to take and hold security for the payment of this Guaranty or the Indebtedness, and exchange, enforce, waive, subordinate, fail or decide not to perfect, and release any such security, with or without the substitution of new collateral; (D) to release, substitute, agree not to sue, or deal with any one or more of Borrower's sureties, endorsers, or other guarantors on any terms or in any manner Lender may choose; (E) to determine how, when and what application of payments and credits shall be made on the Indebtedness; (F) to apply such security and direct the order or manner of sale thereof, including without limitation, any nonjudicial sale permitted by the terms of the controlling security agreement or deed of trust, as Lender in its discretion may determine; (G) to sell, transfer, assign or grant participations in all or any part of the Indebtedness; and (H) to assign or transfer this Guaranty in whole or in part.

**GUARANTOR'S REPRESENTATIONS AND WARRANTIES.** Guarantor represents and warrants to Lender that (A) no representations or agreements of any kind have been made to Guarantor which would limit or qualify in any way the terms of this Guaranty; (B) this Guaranty is executed at Borrower's request and not at the request of Lender; (C) Guarantor has full power, right and authority to enter into this Guaranty; (D) the provisions of this Guaranty do not conflict with or result in a default under any agreement or other instrument binding upon Guarantor and do not result in a violation of any law, regulation, court decree or order applicable to Guarantor; (E) Guarantor has not and will not, without the prior written consent of Lender, sell, lease, assign, encumber, hypothecate, transfer, or otherwise dispose of all or substantially all of Guarantor's assets, or any interest therein; (F) upon Lender's request, Guarantor will provide to Lender financial and credit information in form acceptable to Lender, and all such financial information which currently has been, and all future financial information which will be provided to Lender is and will be true and correct in all material respects and fairly present Guarantor's financial condition as of the dates the financial information is provided; (G) no material adverse change has occurred in Guarantor's financial condition since the date of the most recent financial statements provided to Lender and no event has occurred which may materially adversely affect Guarantor's financial condition; (H) no litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Guarantor is pending or threatened; (I) Lender has made no representation to Guarantor as to the creditworthiness of Borrower; and (J) Guarantor has established adequate means of obtaining from Borrower on a continuing basis information regarding Borrower's financial condition. Guarantor agrees to keep adequately informed from such means of any facts, events, or circumstances which might in any way affect Guarantor's risks under this Guaranty, and Guarantor further agrees that, absent a request for information, Lender shall have no obligation to disclose to Guarantor any information or documents acquired by Lender in the course of its relationship with Borrower.

**GUARANTOR'S WAIVERS.** Except as prohibited by applicable law, Guarantor waives any right to require Lender to (A) to continue lending money or to extend other credit to Borrower; (B) to make any presentment, protest, demand, or notice of any kind, including notice of any nonpayment of the Indebtedness or of any nonpayment related to any collateral, or notice of any action or nonaction on the part of Borrower, Lender, any surety, endorser, or other guarantor in connection with the Indebtedness or in connection with the creation of new or additional

**COMMERCIAL GUARANTY**
**(Continued)**

Loan No: 4009822988                                                                                          Page 2

loans or obligations; (C) to resort for payment or to proceed directly or at once against any person, including Borrower or any other guarantor, (D) to proceed directly against or exhaust any collateral held by Lender from Borrower, any other guarantor, or any other person; (E) to give notice of the terms, time, and place of any public or private sale of personal property security held by Lender from Borrower or to comply with any other applicable provisions of the Uniform Commercial Code; (F) to pursue any other remedy within Lender's power; or (G) to commit any act or omission of any kind, or at any time, with respect to any matter whatsoever.

Guarantor waives all rights of Guarantor under Chapter 43 of the Texas Civil Practice and Remedies Code. Guarantor also waives any and all rights or defenses based on suretyship or impairment of collateral including, but not limited to, any rights or defenses arising by reason of (A) any "one action" or "anti-deficiency" law or any other law which may prevent Lender from bringing any action, including a claim for deficiency, against Guarantor, before or after Lender's commencement or completion of any foreclosure action, either judicially or by exercise of a power of sale; (B) any election of remedies by Lender which destroys or otherwise adversely affects Guarantor's subrogation rights or Guarantor's rights to proceed against Borrower for reimbursement, including without limitation, any loss of rights Guarantor may suffer by reason of any law limiting, qualifying, or discharging the Indebtedness; (C) any disability or other defense of Borrower, of any other guarantor, or of any other person, or by reason of the cessation of Borrower's liability from any cause whatsoever, other than payment in full in legal tender, of the Indebtedness; (D) any right to claim discharge of the Indebtedness on the basis of unjustified impairment of any collateral for the Indebtedness; (E) any statute of limitations, if at any time any action or suit brought by Lender against Guarantor is commenced, there is outstanding Indebtedness which is not barred by any applicable statute of limitations; or (F) any defenses given to guarantors at law or in equity other than actual payment and performance of the Indebtedness. If payment is made by Borrower, whether voluntarily or otherwise, or by any third party, on the Indebtedness and thereafter Lender is forced to remit the amount of that payment to Borrower's trustee in bankruptcy or to any similar person under any federal or state bankruptcy law or law for the relief of debtors, the Indebtedness shall be considered unpaid for the purpose of the enforcement of this Guaranty.

Guarantor further waives and agrees not to assert or claim at any time any deductions to the amount guaranteed under this Guaranty for any claim of setoff, counterclaim, counter demand, recoupment or similar right, whether such claim, demand or right may be asserted by the Borrower, the Guarantor, or both.

**GUARANTOR'S UNDERSTANDING WITH RESPECT TO WAIVERS.** Guarantor warrants and agrees that each of the waivers set forth above is made with Guarantor's full knowledge of its significance and consequences and that, under the circumstances, the waivers are reasonable and not contrary to public policy or law. If any such waiver is determined to be contrary to any applicable law or public policy, such waiver shall be effective only to the extent permitted by law or public policy.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Guarantor's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Guarantor holds jointly with someone else and all accounts Guarantor may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Guarantor authorizes Lender, to the extent permitted by applicable law, to hold these funds if there is a default, and Lender may apply the funds in these accounts to pay what Guarantor owes under the terms of this Guaranty.

**SUBORDINATION OF BORROWER'S DEBTS TO GUARANTOR.** Guarantor agrees that the Indebtedness, whether now existing or hereafter created, shall be superior to any claim that Guarantor may now have or hereafter acquire against Borrower, whether or not Borrower becomes insolvent. Guarantor hereby expressly subordinates any claim Guarantor may have against Borrower, upon any account whatsoever, to any claim that Lender may now or hereafter have against Borrower. In the event of insolvency and consequent liquidation of the assets of Borrower, through bankruptcy, by an assignment for the benefit of creditors, by voluntary liquidation, or otherwise, the assets of Borrower applicable to the payment of the claims of both Lender and Guarantor shall be paid to Lender and shall be first applied by Lender to the Indebtedness. Guarantor does hereby assign to Lender all claims which it may have or acquire against Borrower or against any assignee or trustee in bankruptcy of Borrower; provided however, that such assignment shall be effective only for the purpose of assuring to Lender full payment in legal tender of the Indebtedness. If Lender so requests, any notes or credit agreements now or hereafter evidencing any debts or obligations of Borrower to Guarantor shall be marked with a legend that the same are subject to this Guaranty and shall be delivered to Lender. Guarantor agrees, and Lender is hereby authorized, in the name of Guarantor, from time to time to file financing statements and continuation statements and to execute documents and to take such other actions as Lender deems necessary or appropriate to perfect, preserve and enforce its rights under this Guaranty.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Guaranty:

   **Amendments.** This Guaranty, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Guaranty. No alteration of or amendment to this Guaranty shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

   **Attorneys' Fees; Expenses.** Guarantor agrees to pay upon demand all of Lender's costs and expenses, including Lender's reasonable attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Guaranty. Lender may hire or pay someone else to help enforce this Guaranty, and Guarantor shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's reasonable attorneys' fees and legal expenses whether or not there is a lawsuit, including Lender's reasonable attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Guarantor also shall pay all court costs and such additional fees as may be directed by the court.

   **Caption Headings.** Caption headings in this Guaranty are for convenience purposes only and are not to be used to interpret or define the provisions of this Guaranty.

   **Governing Law.** This Guaranty will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Texas without regard to its conflicts of law provisions.

   **Integration.** Guarantor further agrees that Guarantor has read and fully understands the terms of this Guaranty; Guarantor has had the opportunity to be advised by Guarantor's attorney with respect to this Guaranty; the Guaranty fully reflects Guarantor's intentions and parol evidence is not required to interpret the terms of this Guaranty. Guarantor hereby indemnifies and holds Lender harmless from all losses, claims, damages, and costs (including Lender's attorneys' fees) suffered or incurred by Lender as a result of any breach by Guarantor of the warranties, representations and agreements of this paragraph.

   **Interpretation.** In all cases where there is more than one Borrower or Guarantor, then all words used in this Guaranty in the singular shall be deemed to have been used in the plural where the context and construction so require; and where there is more than one Borrower named in this Guaranty or when this Guaranty is executed by more than one Guarantor, the words "Borrower" and "Guarantor" respectively shall mean all and any one or more of them. The words "Guarantor," "Borrower," and "Lender" include the heirs, successors, assigns, and transferees of each of them. If a court finds that any provision of this Guaranty is not valid or should not be enforced, that fact by itself will not mean that the rest of this Guaranty will not be valid or enforced. Therefore, a court will enforce the rest of the provisions of this Guaranty even if a provision of this Guaranty may be found to be invalid or unenforceable. If any one or more of Borrower or Guarantor are corporations, partnerships, limited liability companies, or similar entities, it is not necessary for Lender to inquire into the powers of Borrower or Guarantor or of the officers, directors, partners, managers, or other agents acting or purporting to act on their behalf, and any indebtedness made or created in reliance upon the professed exercise of such powers shall be guaranteed under this Guaranty.

   **Notices.** Any notice required to be given under this Guaranty shall be given in writing, and, except for revocation notices by Guarantor, shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Guaranty. All revocation notices by Guarantor shall be in writing and shall be effective upon delivery to Lender as provided in the section of this Guaranty entitled "DURATION OF GUARANTY." Any party may change its address for notices under this Guaranty by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Guarantor agrees to keep Lender informed at all times of Guarantor's current address. Unless otherwise provided or required by law, if there is more than one Guarantor, any notice given by Lender to any Guarantor is deemed to be notice given to all Guarantors.

   **No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Guaranty unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Guaranty shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Guaranty. No prior waiver by Lender, nor any course of dealing between Lender and Guarantor, shall constitute a waiver of any of Lender's rights or of any of Guarantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Guaranty, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

   **Successors and Assigns.** Subject to any limitations stated in this Guaranty on transfer of Guarantor's interest, this Guaranty shall be binding upon and inure to the benefit of the parties, their successors and assigns.

**COMMERCIAL GUARANTY**
**(Continued)**

Loan No: 4009822988                                                                                Page 3

---

Waive Jury. Lender and Guarantor hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by either Lender or Guarantor against the other.

Original Document. "The parties whose signatures appear below agree that a photographic, photostatic, facsimile, electronic, copy or similar reproduction of this document shall be valid as the original.".

Choice of Venue. If there is a lawsuit, Guarantor agrees upon Lender's request to submit to the jurisdiction of the Courts of Lubbock County, Texas. The parties agree that Lubbock County, Texas is the sole and exclusive venue for any lawsuit arising out of this Guaranty.

DEFINITIONS. The following capitalized words and terms shall have the following meanings when used in this Guaranty. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Guaranty shall have the meanings attributed to such terms in the Uniform Commercial Code:

Borrower. The word "Borrower" means Reagor Auto Mall, Ltd, dba Reagor-Dykes Imports and includes all co-signers and co-makers signing the Note and all their successors and assigns.

Guarantor. The word "Guarantor" means everyone signing this Guaranty, including without limitation Rick Dykes, and in each case, any signer's successors and assigns.

Guaranty. The word "Guaranty" means this guaranty from Guarantor to Lender.

Indebtedness. The word "Indebtedness" means Borrower's indebtedness to Lender as more particularly described in this Guaranty.

Lender. The word "Lender" means First Bank & Trust, its successors and assigns.

Note. The word "Note" means and includes without limitation all of Borrower's promissory notes and/or credit agreements evidencing Borrower's loan obligations in favor of Lender, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of and substitutions for promissory notes or credit agreements.

Related Documents. The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

EACH UNDERSIGNED GUARANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS GUARANTY AND AGREES TO ITS TERMS. IN ADDITION, EACH GUARANTOR UNDERSTANDS THAT THIS GUARANTY IS EFFECTIVE UPON GUARANTOR'S EXECUTION AND DELIVERY OF THIS GUARANTY TO LENDER, AND THAT THE GUARANTY WILL CONTINUE UNTIL TERMINATED IN THE MANNER SET FORTH IN THE SECTION TITLED "DURATION OF GUARANTY". NO FORMAL ACCEPTANCE BY LENDER IS NECESSARY TO MAKE THIS GUARANTY EFFECTIVE. THIS GUARANTY IS DATED SEPTEMBER 29, 2017.

GUARANTOR:

X _____
Rick Dykes

---

## INDIVIDUAL ACKNOWLEDGMENT

STATE OF ___Texas___ )
                              ) SS
COUNTY OF ___Lubbock___ )

This instrument was acknowledged before me on ___September 29___, 20_17_ by Rick Dykes.

_____
Notary Public, State of Texas

LYNETTE BONHAM
Notary Public, State of Texas
Comm Expires 05-22-2019
Notary ID 125582733

---

# EXHIBIT A-9

APP 0049



**fiserv.**

Signature from Fiserv

**Compute Payoff**

Favorites

Information

Help

Logoff

| | | | | |
|---|---|---|---|---|
| Note number | **1009818597** | | | |
| Short name | **REAGOR AUTO MALL L** | Payoff year base | **ACT/360** | |
| | | Payoff good thru | 11-02-2018 | |
| | | **Payoff Data** | | |
| | Payoff date | | **11-02-18** | |
| | Net payoff | | **987,825.49** | |
| | Principal amount | | **966,825.00** | |
| | Interest due | | **20,486.12** | |
| | Late fees due | | **514.37** | |
| | Unpaid insurance | | **.00** | |
| | Escrow balance | | **.00** | |
| | Payoff interest per day | | **164.494531** | |
| | Unapplied funds | | **.00** | |
| | Unpaid loan fees | | **.00** | |
| | Total of other rebates | | **.00** | |

APP 0050

# EXHIBIT A-10

APP 0051

**fiserv.**

Signature from Fiserv

Favorites

Information

Help

Logoff

**Compute Payoff**

| Note number | 4009822988 | | |
|---|---|---|---|
| Short name | **REAGOR AUTO MALL L** | Payoff year base | **ACT/360** |
| | Payoff good thru | 11-02-2018 | |

**Payoff Data**

| | |
|---|---|
| Payoff date | 11-02-18 |
| Net payoff | 2,137,671.06 |
| Principal amount | 2,090,220.47 |
| Interest due | 46,249.09 |
| Late fees due | 1,201.50 |
| Unpaid insurance | .00 |
| Escrow balance | .00 |
| Payoff interest per day | 355.627788 |
| Unapplied funds | .00 |
| Unpaid loan fees | .00 |
| Total of other rebates | .00 |

APP 0052

# EXHIBIT A-11

APP 0053



fiserv.                                                      Signature from Fiserv

Checking Account Inquiry - Prior Statement                                3-26-201

Favorites                                          12-Trend analysis (Analysis plans) ∨

Information    Account Number
               REAQOR AUTO MALL LTD              Bal as of      8-31-18    1,595,395.83-
               1215 AVE J                        +Dep/CR        1         1,595,395.83
Help           LUBBOCK TX 79401                  -Chks/DR                        .00
                                                 -Service charge                .00
Logoff                                           +Interest paid                 .00
                                                 Current balance                .00

               Opt    Pst Dt   Serial Number   TC Description    Amount Sub    Balance
                      Eff Dt                                    Str/Run/Bat/Seq#
                      092818                   012 BANK DEP TO CLO              00

1,595,395.83   overdraft-

(602,280)   FED Credit late
            returns-
────────────
993,115.83  total overdraft charge
            off-

APP 0054

# EXHIBIT A-12

APP 0055

**FAX TO 1-866-333-6633**
RCVR: 061000146

F E D E R A L

R E S E R V E



F I N A N C I A L

S E R V I C E S

## FRB - FEDLINE CHECK ADJUSTMENTS

| | |
|---|---|
| ABA #: | 111319347 |
| AMOUNT: | $59,064.00 |
| SREF: | JLB080518-01 |
| ITYP: | LC |
| DATE: | 08/02/2018 |
| RREF: | |

APP 0056

FIRSTBANK & TRUST - 11131934?



**Federal Reserve Bank**
**Bank's Claim of Late Return**

FRBservices.org

Reference the returned check described below:

| Amount (*must be $100 or more*) | 59064.00 |
|---|---|
| Dated | 07/22/2018 |
| Paying Bank | FIRST CAPITAL BANK OF TEXAS |
| Paying Bank 9 Digit Routing Number | 116324201 |
| Paying Bank Location | LUBBOCK, TEXAS |
| Drawn By (drawer) | REAGOR AUTO MALL, LTD |
| Payable To (payee) | REAGOR AUTO MALL, LTD |
| Check Number | 190998 |

We sent this item to:

| Bank Name | FRB ATLANTA | | |
|---|---|---|---|
| Cash Letter Date | 07/27/2018 | | |
| Cash Letter Total | 6939351.54 | | |
| Tape total | 682743.97 | | |
| Listed between items | 48246.00 | and | 43444.00 |

We received the check from:

| Bank Name | FRB ATLANTA | | |
|---|---|---|---|
| Received Date | 08/02/2018 | | |
| Return Letter / Advice Date[1] | 08/02/2018 | | |
| Return Letter / Advice Total | 1207676.51 | | |
| Tape total | 1207676.51 | | |
| Listed between items | 57246.00 | and | 59517.00 |
| Sequence number (if applicable) | 3996372136 | | |

---

[1] If the Reserve Bank does not receive all of the information requested w ithin tw o(2) calendar months after the date listed, the Reserve Bank w ill not accept the claim and the requester will have to deal directly w ith the paying bank. In addition, the item must have been collected and/or returned through the Federal Reserve check collection system. Know ingly making false statements to influence the action of a Federal Reserve Bank may subject the signing party to criminal penalties under federal and/or state law .

ARB 0057

## Federal Reserve Bank
## Bank's Claim of Late Return

We claim that, according to our records and the data associated with the check, the paying bank did not take all action necessary to recover its payment within the deadline in Regulations J and CC, and we verify that, as to notice of non-payment of the check we received:   (CHECK ONE)

| ☑ Advice by | Method: FAX | Date: 08/02/2018 |
|---|---|---|
| ☐ No advice other than the returned check | | |

Please provisionally credit our account and advise.

| Bank Name | FIRSTBANK & TRUST |
|---|---|
| 9 Digit Routing Number | 111319347 |
| Name of Bank Contact[2] | JONATHAN L BLOXOM |
| Phone Number of Bank Contact[2] | 806.776.6843 |
| Authorized Signature | |
| Date | 08/06/2018 |

---

[2] For Payor Bank to request original form and/or original check or original photocopy of check if needed.

APP 0058

# Check21 Fed Lookup Information



| Type | Outgoing Check | Incoming Return |
|------|----------------|-----------------|
| **Item Reference** | BankersBank | Fed Returns |
| **HostImageNumber** | 678310770000616 | 678310770000616 |
| **Posting Date** | 07/27/2018 | 07/27/2018 |
| **Run Sequence** | 1012 | 1012 |
| **Batch Sequence** | 18 | 18 |
| **Amount** | $59,064.00 | $59,064.00 |
| **Created Time** | 07/27/2018 21:01 | 08/02/2018 08:52 |
| **Bank of First Deposit** | 111319347 | 111319347 |
| **Cash Letter Total** | $6,939,351.54 | $1,207,676.51 |
| **Cash Letter Date** | 07/27/2018 | 08/02/2018 |
| **Cash Letter TR** | 111319347 | 111319347 |
| **Bundle Total** | $682,743.97 | $1,207,676.51 |
| **Sequence** | 678310770000616 | 3996372136 |
| **Previous Item Amount** | $48,246.00 | $57,246.00 |
| **Next Item Amount** | $43,444.00 | $59,517.00 |

Case 5:18-cv-00234-C   Document 134   Filed 08/30/19   Page 60 of 379   PageID 2613

**CA1000 - Case Open**

**Information**

| | |
|---|---|
| **Status:** | SENT |
| **DTS:** | 8/5/18 9:34:40 PM ET |
| **SNDR:** | 111319347 - FIRST BANK & TRUST |
| **RCVR:** | 061000146 - FRB Atlanta |
| **RESP:** | |

**Case Information**

| | | | | | |
|---|---|---|---|---|---|
| **ITYP:** | LC - late claim | | | | |
| **MTYP:** | OPEN - open | | | | |
| **AMT:** | 59,064.00 | **ETYP:** | CR - credit | | |
| **SREF:** | JLB080518-01 | **RREF:** | | **AID:** | |
| **CNTC:** | JONATHAN BLOXOM | **TELE:** | 806-776-6843 Ext. 6843 | | |
| **FCL:** | 061000146 - FRB Atlanta | | | | |
| **TCL:** | 111319347 - FIRST BANK & TRUST | | | | |
| **PROD:** | RTN | **DTF:** | F | | |
| **CLD1:** | | **FCL1:** | | | |
| **TCL1:** | | **SEQ1:** | | | |
| **COM:** | | | | | |

**Item Identification**

| | | | | | |
|---|---|---|---|---|---|
| **CLED:** | 8/2/18 | **CLT:** | .00 | **TT:** | .00 |
| **GID:** | | **SEQ:** | | | |
| **IBEF:** | .00 | **IAFT:** | .00 | | |
| **LAS:** | .00 | **SBE:** | .00 | **CURR:** | USA |

**Item Details**

| | | | |
|---|---|---|---|
| **DRBK:** | - | | |
| **DPBK:** | - | | |
| **MKR:** | | **PYE:** | |
| **CKNO:** | | **ANO:** | |

**For Treasury Items Only**

| | | | |
|---|---|---|---|
| **TSYM:** | | **TSER:** | **TRCL:** |

**DTF(s)**

None

APP 0060

**FAX TO 1-866-333-6633**
RCVR: 061000146

F E D E R A L

R E S E R V E



F I N A N C I A L

S E R V I C E S

## FRB - FEDLINE CHECK ADJUSTMENTS

| | |
|---|---|
| ABA #: | 111319347 |
| AMOUNT: | $48,246.00 |
| SREF: | JLB080518-02 |
| ITYP: | LC |
| DATE: | 08/02/2018 |
| RREF: | |

APP 0061

FIRSTBANK & TRUST - 111319347



**Federal Reserve Bank**
**Bank's Claim of Late Return**

FRBservices.org

Reference the returned check described below:

| Amount (*must be $100 or more*) | 48246.00 |
|---|---|
| Dated | 07/22/2018 |
| Paying Bank | FIRST CAPITAL BANK OF TEXAS |
| Paying Bank 9 Digit Routing Number | 116324201 |
| Paying Bank Location | LUBBOCK, TEXAS |
| Drawn By (drawer) | REAGOR AUTO MALL, LTD |
| Payable To (payee) | REAGOR AUTO MALL, LTD |
| Check Number | 191002 |

We sent this item to:

| Bank Name | FRB ATLANTA | | |
|---|---|---|---|
| Cash Letter Date | 07/27/2018 | | |
| Cash Letter Total | 6939351.54 | | |
| Tape total | 682743.97 | | |
| Listed between items | 164.26 | and | 59064.00 |

We received the check from:

| Bank Name | FRB ATLANTA | | |
|---|---|---|---|
| Received Date | 08/02/2018 | | |
| Return Letter / Advice Date[1] | 08/02/2018 | | |
| Return Letter / Advice Total | 1207676.51 | | |
| Tape total | 1207676.51 | | |
| Listed between items | 43444.00 | and | 53027.00 |
| Sequence number (if applicable) | 3996372120 | | |

---

[1] If the Reserve Bank does not receive all of the information requested within two (2) calendar months after the date listed, the Reserve Bank will not accept the claim and the requester will have to deal directly with the paying bank. In addition, the item must have been collected and/or returned through the Federal Reserve check collection system. Knowingly making false statements to influence the action of a Federal Reserve Bank may subject the signing party to criminal penalties under federal and/or state law.

RP 0062

# Federal Reserve Bank
## Bank's Claim of Late Return

We claim that, according to our records and the data associated with the check, the paying bank did not take all action necessary to recover its payment within the deadline in Regulations J and CC, and we verify that, as to notice of non-payment of the check we received:   (CHECK ONE)

| ☒ Advice by | Method: FAX | Date:  08/02/2018 |
|---|---|---|
| ☐ No advice other than the returned check | | |

Please provisionally credit our account and advise.

| Bank Name | FIRSTBANK & TRUST |
|---|---|
| 9 Digit Routing Number | 111319347 |
| Name of Bank Contact[2] | JONATHAN L BLOXOM |
| Phone Number of Bank Contact [2] | 806.776.6843 |
| Authorized Signature | *[signature]* |
| Date | 08/06/2018 |

---

[2] For Payor Bank to request original form and/or original check or original photocopy of check if needed.

# Check21 Fed Lookup Information



| Type | Outgoing Check | Incoming Return |
|---|---|---|
| Item Reference | BankersBank | Fed Returns |
| HostImageNumber | 678310770000615 | 678310770000615 |
| Posting Date | 07/27/2018 | 07/27/2018 |
| Run Sequence | 1012 | 1012 |
| Batch Sequence | 18 | 18 |
| Amount | $48,246.00 | $48,246.00 |
| Created Time | 07/27/2018 21:01 | 08/02/2018 08:52 |
| Bank of First Deposit | 111319347 | 111319347 |
| Cash Letter Total | $6,939,351.54 | $1,207,676.51 |
| Cash Letter Date | 07/27/2018 | 08/02/2018 |
| Cash Letter TR | 111319347 | 111319347 |
| Bundle Total | $682,743.97 | $1,207,676.51 |
| Sequence | 678310770000615 | 3996372120 |
| Previous Item Amount | $164.26 | $43,444.00 |
| Next Item Amount | $59,064.00 | $53,027.00 |

APP 0064

**CA1000 - Case Open**

### Information

| | |
|---|---|
| **Status:** | SENT |
| **DTS:** | 8/5/18 9:36:28 PM ET |
| **SNDR:** | 111319347 - FIRST BANK & TRUST |
| **RCVR:** | 061000146 - FRB Atlanta |
| **RESP:** | |

### Case Information

| | | | | | |
|---|---|---|---|---|---|
| **ITYP:** | LC - late claim | | | | |
| **MTYP:** | OPEN - open | | | | |
| **AMT:** | 48,246.00 | **ETYP:** | CR - credit | | |
| **SREF:** | JLB080518-02 | **RREF:** | | **AID:** | |
| **CNTC:** | JONATHAN BLOXOM | **TELE:** | 806-776-6843 Ext. 6843 | | |
| **FCL:** | 061000146 - FRB Atlanta | | | | |
| **TCL:** | 111319347 - FIRST BANK & TRUST | | | | |
| **PROD:** | RTN | **DTF:** | F | | |
| **CLD1:** | | **FCL1:** | | | |
| **TCL1:** | | **SEQ1:** | | | |
| **COM:** | | | | | |

### Item Identification

| | | | | | |
|---|---|---|---|---|---|
| **CLED:** | 8/2/18 | **CLT:** | .00 | **TT:** | .00 |
| **GID:** | | **SEQ:** | | | |
| **IBEF:** | .00 | **IAFT:** | .00 | | |
| **LAS:** | .00 | **SBE:** | .00 | **CURR:** | USA |

### Item Details

| | | | |
|---|---|---|---|
| **DRBK:** | - | | |
| **DPBK:** | - | | |
| **MKR:** | | **PYE:** | |
| **CKNO:** | | **ANO:** | |

### For Treasury Items Only

| | | | |
|---|---|---|---|
| **TSYM:** | | **TSER:** | **TRCL:** |

### DTF(s)

None

APP 0065

**FAX TO 1-866-333-6633**
RCVR: 061000146

F E D E R A L

R E S E R V E



F I N A N C I A L

S E R V I C E S

## FRB - FEDLINE CHECK ADJUSTMENTS

| | |
|---|---|
| ABA #: | 111319347 |
| AMOUNT: | $43,444.00 |
| SREF: | JLB080518-03 |
| ITYP: | LC |
| DATE: | 08/02/2018 |
| RREF: | |

APP 0066

FIRSTBANK & TRUST - 111319347



**Federal Reserve Bank**
**Bank's Claim of Late Return**

FRBservices.org

Reference the returned check described below:

| Amount (must be $100 or more) | 43444.00 |
|---|---|
| Dated | 07/22/2018 |
| Paying Bank | FIRST CAPITAL BANK OF TEXAS |
| Paying Bank 9 Digit Routing Number | 116324201 |
| Paying Bank Location | LUBBOCK, TEXAS |
| Drawn By (drawer) | REAGOR AUTO MALL, LTD |
| Payable To (payee) | REAGOR AUTO MALL, LTD |
| Check Number | 191003 |

We sent this item to:

| Bank Name | FRB ATLANTA | | |
|---|---|---|---|
| Cash Letter Date | 07/27/2018 | | |
| Cash Letter Total | 6939351.54 | | |
| Tape total | 682743.97 | | |
| Listed between items | 59064.00 | and | 39997.00 |

We received the check from:

| Bank Name | FRB ATLANTA | | |
|---|---|---|---|
| Received Date | 08/02/2018 | | |
| Return Letter / Advice Date[1] | 08/02/2018 | | |
| Return Letter / Advice Total | 1207676.51 | | |
| Tape total | 1207676.51 | | |
| Listed between items | 39997.00 | and | 48246.00 |
| Sequence number (if applicable) | 3996372109 | | |

[1] If the Reserve Bank does not receive all of the information requested within two (2) calendar months after the date listed, the Reserve Bank will not accept the claim and the requester will have to deal directly with the paying bank. In addition, the item must have been collected and/or returned through the Federal Reserve check collection system. Knowingly making false statements to influence the action of a Federal Reserve Bank may subject the signing party to criminal penalties under federal and/or state law.

APFE 0067

## Federal Reserve Bank
## Bank's Claim of Late Return

We claim that, according to our records and the data associated with the check, the paying bank did not take all action necessary to recover its payment within the deadline in Regulations J and CC, and we verify that, as to notice of non-payment of the check we received:   (CHECK ONE)

| ☑ Advice by | Method: FAX | Date: 08/02/2018 |
|---|---|---|
| ☐ No advice other than the returned check | | |

Please provisionally credit our account and advise.

| Bank Name | FIRSTBANK & TRUST |
|---|---|
| 9 Digit Routing Number | 111319347 |
| Name of Bank Contact² | JONATHAN L BLOXOM |
| Phone Number of Bank Contact² | 806.776.6843 |
| Authorized Signature | |
| Date | 08/06/2018 |

² For Payor Bank to request original form and/or original check or original photocopy of check if needed.

Last Updated: April 2014

APP 0068

Page 2 of 2

# Check21 Fed Lookup Information



| Type | Outgoing Check | Incoming Return |
|---|---|---|
| Item Reference | BankersBank | Fed Returns |
| HostImageNumber | 678310770000617 | 678310770000617 |
| Posting Date | 07/27/2018 | 07/27/2018 |
| Run Sequence | 1012 | 1012 |
| Batch Sequence | 18 | 18 |
| Amount | $43,444.00 | $43,444.00 |
| Created Time | 07/27/2018 21:01 | 08/02/2018 08:52 |
| Bank of First Deposit | 111319347 | 111319347 |
| Cash Letter Total | $6,939,351.54 | $1,207,676.51 |
| Cash Letter Date | 07/27/2018 | 08/02/2018 |
| Cash Letter TR | 111319347 | 111319347 |
| Bundle Total | $682,743.97 | $1,207,676.51 |
| Sequence | 678310770000617 | 3996372109 |
| Previous Item Amount | $59,064.00 | $39,997.00 |
| Next Item Amount | $39,997.00 | $48,246.00 |

APP 0069

**CA1000 - Case Open**

**Information**

| | |
|---|---|
| **Status:** | SENT |
| **DTS:** | 8/5/18 9:40:41 PM ET |
| **SNDR:** | 111319347 - FIRST BANK & TRUST |
| **RCVR:** | 061000146 - FRB Atlanta |
| **RESP:** | |

**Case Information**

| | | | | | |
|---|---|---|---|---|---|
| **ITYP:** | LC - late claim | | | | |
| **MTYP:** | OPEN - open | | | | |
| **AMT:** | 43,444.00 | **ETYP:** | CR - credit | | |
| **SREF:** | JLB080518-03 | **RREF:** | | **AID:** | |
| **CNTC:** | JONATHAN BLOXOM | **TELE:** | 806-776-6843 Ext. 6843 | | |
| **FCL:** | 061000146 - FRB Atlanta | | | | |
| **TCL:** | 111319347 - FIRST BANK & TRUST | | | | |
| **PROD:** | RTN | **DTF:** | F | | |
| **CLD1:** | | **FCL1:** | | | |
| **TCL1:** | | **SEQ1:** | | | |
| **COM:** | | | | | |

**Item Identification**

| | | | | | |
|---|---|---|---|---|---|
| **CLED:** | 8/2/18 | **CLT:** | .00 | **TT:** | .00 |
| **GID:** | | **SEQ:** | | | |
| **IBEF:** | .00 | **IAFT:** | .00 | | |
| **LAS:** | .00 | **SBE:** | .00 | **CURR:** | USA |

**Item Details**

| | | | |
|---|---|---|---|
| **DRBK:** | - | | |
| **DPBK:** | - | | |
| **MKR:** | | **PYE:** | |
| **CKNO:** | | **ANO:** | |

**For Treasury Items Only**

| | | | |
|---|---|---|---|
| **TSYM:** | | **TSER:** | **TRCL:** |

**DTF(s)**

None

APP 0070

**FAX TO 1-866-333-6633**
RCVR: 061000146

F E D E R A L

R E S E R V E



F I N A N C I A L

S E R V I C E S

## FRB - FEDLINE CHECK ADJUSTMENTS

| | |
|---|---|
| ABA #: | 111319347 |
| AMOUNT: | $63,762.00 |
| SREF: | JLB080518-04 |
| ITYP: | LC |
| DATE: | 08/02/2018 |
| RREF: | |

APP 0071

FIRSTBANK & TRUST - 111319347



**Federal Reserve Bank**
**Bank's Claim of Late Return**



FRBservices.org

Reference the returned check described below:

| | |
|---|---|
| Amount (*must be $100 or more*) | 63762.00 |
| Dated | 07/22/2018 |
| Paying Bank | ~~REAGOR AUTO MALL LTD~~ First Capital Bank of Texas |
| Paying Bank 9 Digit Routing Number | 116324201 |
| Paying Bank Location | LUBBOCK, TEXAS |
| Drawn By (drawer) | REAGOR AUTO MALL, LTD |
| Payable To (payee) | REAGOR AUTO MALL, LTD |
| Check Number | 190449 |

We sent this item to:

| | | | |
|---|---|---|---|
| Bank Name | FRD ATLANTA | | |
| Cash Letter Date | 07/27/2018 | | |
| Cash Letter Total | 6939351.54 | | |
| Tape total | 682743.97 | | |
| Listed between items | 62391.00 | and | 500.00 |

We received the check from:

| | | | |
|---|---|---|---|
| Bank Name | FRB ATLANTA | | |
| Received Date | 08/02/2018 | | |
| Return Letter / Advice Date[1] | 08/02/2018 | | |
| Return Letter / Advice Total | 1207676.51 | | |
| Tape total | 1207676.51 | | |
| Listed between items | 27.00 | and | 1639.18 |
| Sequence number (if applicable) | 3996368075 | | |

---

[1] If the Reserve Bank does not receive all of the information requested within two (2) calendar months after the date listed, the Reserve Bank will not accept the claim and the requester will have to deal directly with the paying bank. In addition, the item must have been collected and/or returned through the Federal Reserve check collection system. Knowingly making false statements to influence the action of a Federal Reserve Bank may subject the signing party to criminal penalties under federal and/or state law.

ARB 0072

# Federal Reserve Bank
## Bank's Claim of Late Return

We claim that, according to our records and the data associated with the check, the paying bank did not take all action necessary to recover its payment within the deadline in Regulations J and CC, and we verify that, as to notice of non-payment of the check we received:   (CHECK ONE)

| ☑ Advice by | Method: FAX | Date: 08/02/2018 |
|---|---|---|
| ☐ No advice other than the returned check | | |

Please provisionally credit our account and advise.

| Bank Name | FIRSTBANK & TRUST |
|---|---|
| 9 Digit Routing Number | 111319347 |
| Name of Bank Contact[2] | JONATHAN L BLOXOM |
| Phone Number of Bank Contact [2] | 806.776.6843 |
| Authorized Signature | |
| Date | 08/06/2018 |

APP 0073

[2] For Payor Bank to request original form and/or original check or original photocopy of check if needed

# Check21 Fed Lookup Information







| Type | Outgoing Check | Incoming Return |
|---|---|---|
| Item Reference | BankersBank | Fed Returns |
| HostImageNumber | 678310770000626 | 678310770000626 |
| Posting Date | 07/27/2018 | 07/27/2018 |
| Run Sequence | 1012 | 1012 |
| Batch Sequence | 18 | 18 |
| Amount | $63,762.00 | $63,762.00 |
| Created Time | 07/27/2018 21:01 | 08/02/2018 08:35 |
| Bank of First Deposit | 111319347 | 111319347 |
| Cash Letter Total | $6,939,351.54 | $1,207,676.51 |
| Cash Letter Date | 07/27/2018 | 08/02/2018 |
| Cash Letter TR | 111319347 | 111319347 |
| Bundle Total | $682,743.97 | $1,207,676.51 |
| Sequence | 678310770000626 | 3996368075 |
| Previous Item Amount | $62,391.00 | $27.00 |
| Next Item Amount | $500.00 | $1,639.18 |

Case 5:18-cv-00234-C   Document 134   Filed 08/30/19   Page 75 of 379   PageID 2628

**CA1000 - Case Open**

<b>Information</b>

| | |
|---|---|
| **Status:** | SENT |
| **DTS:** | 8/5/18 9:42:47 PM ET |
| **SNDR:** | 111319347 - FIRST BANK & TRUST |
| **RCVR:** | 061000146 - FRB Atlanta |
| **RESP:** | |

<b>Case Information</b>

| | | | | | |
|---|---|---|---|---|---|
| **ITYP:** | LC - late claim | | | | |
| **MTYP:** | OPEN - open | | | | |
| **AMT:** | 63,762.00 | **ETYP:** | CR - credit | | |
| **SREF:** | JLB080518-04 | **RREF:** | | **AID:** | |
| **CNTC:** | JONATHAN BLOXOM | **TELE:** | 806-776-6843 Ext. 6843 | | |
| **FCL:** | 061000146 - FRB Atlanta | | | | |
| **TCL:** | 111319347 - FIRST BANK & TRUST | | | | |
| **PROD:** | RTN | **DTF:** | F | | |
| **CLD1:** | | **FCL1:** | | | |
| **TCL1:** | | **SEQ1:** | | | |
| **COM:** | | | | | |

<b>Item Identification</b>

| | | | | | |
|---|---|---|---|---|---|
| **CLED:** | 8/2/18 | **CLT:** | .00 | **TT:** | .00 |
| **GID:** | | **SEQ:** | | | |
| **IBEF:** | .00 | **IAFT:** | .00 | | |
| **LAS:** | .00 | **SBE:** | .00 | **CURR:** | USA |

<b>Item Details</b>

| | | | |
|---|---|---|---|
| **DRBK:** | - | | |
| **DPBK:** | - | | |
| **MKR:** | | **PYE:** | |
| **CKNO:** | | **ANO:** | |

<b>For Treasury Items Only</b>

| | | | |
|---|---|---|---|
| **TSYM:** | | **TSER:** | **TRCL:** |

<b>DTF(s)</b>

None

APP 0075

**FAX TO 1-866-333-6633**
RCVR: 061000146

F E D E R A L

R E S E R V E



F I N A N C I A L

S E R V I C E S

## FRB - FEDLINE CHECK ADJUSTMENTS

ABA #:        111319347

AMOUNT:      $62,391.00

SREF:        JLB080518-05

ITYP:        LC

DATE:        08/02/2018

RREF:

APP 0076



**Federal Reserve Bank**
**Bank's Claim of Late Return**

5

FRBservices.org

Reference the returned check described below:

| Amount (*must be $100 or more*) | 62391.00 |
|---|---|
| Dated | 07/22/2018 |
| Paying Bank | ~~REAGOR AUTO MALL LTD~~ *First Capital Bank of Texas* |
| Paying Bank 9 Digit Routing Number | 116324201 |
| Paying Bank Location | LUBBOCK, TEXAS |
| Drawn By (drawer) | REAGOR AUTO MALL, LTD |
| Payable To (payee) | REAGOR AUTO MALL, LTD |
| Check Number | 190448 |

We sent this item to:

| Bank Name | FRB ATLANTA | | |
|---|---|---|---|
| Cash Letter Date | 07/27/2018 | | |
| Cash Letter Total | 6939351.54 | | |
| Tape total | 682743.97 | | |
| Listed between items | 59517.00 | and | 63762.00 |

We received the check from:

| Bank Name | FRB ATLANTA | | |
|---|---|---|---|
| Received Date | 08/02/2018 | | |
| Return Letter / Advice Date[1] | 08/02/2018 | | |
| Return Letter / Advice Total | 1207676.51 | | |
| Tape total | 1207676.51 | | |
| Listed between items | 59517.00 | and | 7290.91 |
| Sequence number (if applicable) | 3996372148 | | |

---

[1] If the Reserve Bank does not receive all of the information requested within two (2) calendar months after the date listed, the Reserve Bank will not accept the claim and the requester will have to deal directly with the paying bank. In addition, the item must have been collected and/or returned through the Federal Reserve check collection system. Knowingly making false statements to influence the action of a Federal Reserve Bank may subject the signing party to criminal penalties under federal and/or state law.

EXP 0077

FIRSTBANK & TRUST - 111319347

# Federal Reserve Bank
## Bank's Claim of Late Return

We claim that, according to our records and the data associated with the check, the paying bank did not take all action necessary to recover its payment within the deadline in Regulations J and CC, and we verify that, as to notice of non-payment of the check we received:   (CHECK ONE)

| ☑ Advice by | Method: FAX | Date:   08/02/2018 |
|---|---|---|
| ☐ No advice other than the returned check | | |

Please provisionally credit our account and advise.

| Bank Name | FIRSTBANK & TRUST |
|---|---|
| 9 Digit Routing Number | 111319347 |
| Name of Bank Contact[2] | JONATHAN L BLOXOM |
| Phone Number of Bank Contact[2] | 806.776.6843 |
| Authorized Signature | *signature* |
| Date | 08/06/2018 |

---

[2] For Payor Bank to request original form and/or original check or original photocopy of check if needed

APP 0078



# Check21 Fed Lookup Information



| Type | Outgoing Check | Incoming Return |
|---|---|---|
| Item Reference | BankersBank | Fed Returns |
| HostImageNumber | 678310770000625 | 678310770000625 |
| Posting Date | 07/27/2018 | 07/27/2018 |
| Run Sequence | 1012 | 1012 |
| Batch Sequence | 18 | 18 |
| Amount | $62,391.00 | $62,391.00 |
| Created Time | 07/27/2018 21:01 | 08/02/2018 08:35 |
| Bank of First Deposit | 111319347 | 111319347 |
| Cash Letter Total | $6,939,351.54 | $1,207,676.51 |
| Cash Letter Date | 07/27/2018 | 08/02/2018 |
| Cash Letter TR | 111319347 | 111319347 |
| Bundle Total | $682,743.97 | $1,207,676.51 |
| Sequence | 678310770000625 | 3996372148 |
| Previous Item Amount | $59,517.00 | $59,517.00 |
| Next Item Amount | $63,762.00 | $7,290.91 |

APP 0079

**CA1000 - Case Open**

### Information

| | |
|---|---|
| **Status:** | SENT |
| **DTS:** | 8/5/18 9:48:10 PM ET |
| **SNDR:** | 111319347 - FIRST BANK & TRUST |
| **RCVR:** | 061000146 - FRB Atlanta |
| **RESP:** | |

### Case Information

| | | | | | |
|---|---|---|---|---|---|
| **ITYP:** | LC - late claim | | | | |
| **MTYP:** | OPEN - open | | | | |
| **AMT:** | 62,391.00 | **ETYP:** | CR - credit | | |
| **SREF:** | JLB080518-05 | **RREF:** | | **AID:** | |
| **CNTC:** | JONATHAN BLOXOM | **TELE:** | 806-776-6843 Ext. 6843 | | |
| **FCL:** | 061000146 - FRB Atlanta | | | | |
| **TCL:** | 111319347 - FIRST BANK & TRUST | | | | |
| **PROD:** | RTN | **DTF:** | F | | |
| **CLD1:** | | **FCL1:** | | | |
| **TCL1:** | | **SEQ1:** | | | |
| **COM:** | | | | | |

### Item Identification

| | | | | | |
|---|---|---|---|---|---|
| **CLED:** | 8/2/18 | **CLT:** | .00 | **TT:** | .00 |
| **GID:** | | **SEQ:** | | | |
| **IBEF:** | .00 | **IAFT:** | .00 | | |
| **LAS:** | .00 | **SBE:** | .00 | **CURR:** | USA |

### Item Details

| | | | |
|---|---|---|---|
| **DRBK:** | - | | |
| **DPBK:** | - | | |
| **MKR:** | | **PYE:** | |
| **CKNO:** | | **ANO:** | |

### For Treasury Items Only

| | | | |
|---|---|---|---|
| **TSYM:** | | **TSER:** | **TRCL:** |

### DTF(s)

None

APP 0080

**FAX TO 1-866-333-6633**
RCVR: 061000146

F E D E R A L

R E S E R V E



F I N A N C I A L

S E R V I C E S

## FRB - FEDLINE CHECK ADJUSTMENTS

ABA #:        111319347

AMOUNT:       $59,517.00

SREF:         JLB080518-06

ITYP:         LC

DATE:         08/02/2018

RREF:

APP 0081

FIRSTBANK & TRUST - 111319347



**Federal Reserve Bank**
**Bank's Claim of Late Return**



FRBservices.org

Reference the returned check described below:

| Amount (*must be $100 or more*) | 59517.00 |
|---|---|
| Dated | 07/22/2018 |
| Paying Bank | ~~REAGOR AUTO MALL LTD~~ First Copital Bank of Texas |
| Paying Bank 9 Digit Routing Number | 116324201 |
| Paying Bank Location | LUBBOCK, TEXAS |
| Drawn By (drawer) | REAGOR AUTO MALL, LTD |
| Payable To (payee) | REAGOR AUTO MALL, LTD |
| Check Number | 190446 |

We sent this item to:

| Bank Name | FRB ATLANTA | | |
|---|---|---|---|
| Cash Letter Date | 07/27/2018 | | |
| Cash Letter Total | 6939351.54 | | |
| Tape total | 682743.97 | | |
| Listed between items | 57246.00 | and | 62391.00 |

We received the check from:

| Bank Name | FRB ATLANTA | | |
|---|---|---|---|
| Received Date | 08/02/2018 | | |
| Return Letter / Advice Date[1] | 08/02/2018 | | |
| Return Letter / Advice Total | 1207676.51 | | |
| Tape total | 1207676.51 | | |
| Listed between items | 59064.00 | and | 62391.00 |
| Sequence number (if applicable) | 3996372140 | | |

---

[1] If the Reserve Bank does not receive all of the information requested within two (2) calendar months after the date listed, the Reserve Bank will not accept the claim and the requester will have to deal directly with the paying bank. In addition, the item must have been collected and/or returned through the Federal Reserve check collection system. Knowingly making false statements to influence the action of a Federal Reserve Bank may subject the signing party to criminal penalties under federal and/or state law.

ALPS 0082

## Federal Reserve Bank
## Bank's Claim of Late Return

We claim that, according to our records and the data associated with the check, the paying bank did not take all action necessary to recover its payment within the deadline in Regulations J and CC, and we verify that, as to notice of non-payment of the check we received:  (CHECK ONE)

| ☑ Advice by | Method: FAX | Date: 08/02/2018 |
|---|---|---|
| ☐ No advice other than the returned check | | |

Please provisionally credit our account and advise.

| Bank Name | FIRSTBANK & TRUST |
|---|---|
| 9 Digit Routing Number | 111319347 |
| Name of Bank Contact[2] | JONATHAN L BLOXOM |
| Phone Number of Bank Contact[2] | 806.776.6843 |
| Authorized Signature | |
| Date | 08/06/2018 |

[2] For Payor Bank to request original form and/or original check or original photocopy of check if needed.

# Check21 Fed Lookup Information



| Type | Outgoing Check | Incoming Return |
|---|---|---|
| Item Reference | BankersBank | Fed Returns |
| HostImageNumber | 678310770000624 | 678310770000624 |
| Posting Date | 07/27/2018 | 07/27/2018 |
| Run Sequence | 1012 | 1012 |
| Batch Sequence | 18 | 18 |
| Amount | $59,517.00 | $59,517.00 |
| Created Time | 07/27/2018 21:01 | 08/02/2018 08:35 |
| Bank of First Deposit | 111319347 | 111319347 |
| Cash Letter Total | $6,939,351.54 | $1,207,676.51 |
| Cash Letter Date | 07/27/2018 | 08/02/2018 |
| Cash Letter TR | 111319347 | 111319347 |
| Bundle Total | $682,743.97 | $1,207,676.51 |
| Sequence | 678310770000624 | 3996372140 |
| Previous Item Amount | $57,246.00 | $59,064.00 |
| Next Item Amount | $62,391.00 | $62,391.00 |

**CA1000 - Case Open**

### Information

| | |
|---|---|
| **Status:** | SENT |
| **DTS:** | 8/5/18 9:49:08 PM ET |
| **SNDR:** | 111319347 - FIRST BANK & TRUST |
| **RCVR:** | 061000146 - FRB Atlanta |
| **RESP:** | |

### Case Information

| | | | | | |
|---|---|---|---|---|---|
| **ITYP:** | LC - late claim | | | | |
| **MTYP:** | OPEN - open | | | | |
| **AMT:** | 59,517.00 | **ETYP:** | CR - credit | | |
| **SREF:** | JLB080518-06 | **RREF:** | | **AID:** | |
| **CNTC:** | JONATHAN BLOXOM | **TELE:** | 806-776-6843 Ext. 6843 | | |
| **FCL:** | 061000146 - FRB Atlanta | | | | |
| **TCL:** | 111319347 - FIRST BANK & TRUST | | | | |
| **PROD:** | RTN | **DTF:** | F | | |
| **CLD1:** | | **FCL1:** | | | |
| **TCL1:** | | **SEQ1:** | | | |
| **COM:** | | | | | |

### Item Identification

| | | | | | |
|---|---|---|---|---|---|
| **CLED:** | 8/2/18 | **CLT:** | .00 | **TT:** | .00 |
| **GID:** | | **SEQ:** | | | |
| **IBEF:** | .00 | **IAFT:** | .00 | | |
| **LAS:** | .00 | **SBE:** | .00 | **CURR:** | USA |

### Item Details

| | | | |
|---|---|---|---|
| **DRBK:** | - | | |
| **DPBK:** | - | | |
| **MKR:** | | **PYE:** | |
| **CKNO:** | | **ANO:** | |

### For Treasury Items Only

| | | | |
|---|---|---|---|
| **TSYM:** | | **TSER:** | **TRCL:** |

### DTF(s)

None

APP 0085

**FAX TO 1-866-333-6633**
**RCVR: 061000146**

F E D E R A L

R E S E R V E



F I N A N C I A L

S E R V I C E S

## FRB - FEDLINE CHECK ADJUSTMENTS

ABA #:       111319347

AMOUNT:     $57,246.00

SREF:       JLB080518-07

ITYP:       LC

DATE:       08/02/2018

RREF:

APP 0086



FEDERAL
RESERVE

FINANCIAL
SERVICES

FRBservices.org

**Federal Reserve Bank**
**Bank's Claim of Late Return**

Reference the returned check described below:

| Amount (*must be $100 or more*) | 57246.00 |
|---|---|
| Dated | 07/22/2018 |
| Paying Bank | REAGOR AUTO MALL LTD First Capital Bank of Texas |
| Paying Bank 9 Digit Routing Number | 116324201 |
| Paying Bank Location | LUBBOCK, TEXAS |
| Drawn By (drawer) | REAGOR AUTO MALL, LTD |
| Payable To (payee) | REAGOR AUTO MALL, LTD |
| Check Number | 190444 |

We sent this item to:

| Bank Name | FRB ATLANTA | | |
|---|---|---|---|
| Cash Letter Date | 07/27/2018 | | |
| Cash Letter Total | 6939351.54 | | |
| Tape total | 682743.97 | | |
| Listed between items | 39562.00 | and | 59517.00 |

We received the check from:

| Bank Name | FRB ATLANTA | | |
|---|---|---|---|
| Received Date | 08/02/2018 | | |
| Return Letter / Advice Date[1] | 08/02/2018 | | |
| Return Letter / Advice Total | 1207676.51 | | |
| Tape total | 1207676.51 | | |
| Listed between items | 53027.00 | and | 59064.00 |
| Sequence number (if applicable) | 6996372132 | | |

---

[1] If the Reserve Bank does not receive all of the information requested within two (2) calendar months after the date listed, the Reserve Bank will not accept the claim and the requester will have to deal directly with the paying bank. In addition, the item must have been collected and/or returned through the Federal Reserve check collection system. Knowingly making false statements to influence the action of a Federal Reserve Bank may subject the signing party to criminal penalties under federal and/or state law.

EP 0087

# Federal Reserve Bank
## Bank's Claim of Late Return

We claim that, according to our records and the data associated with the check, the paying bank did not take all action necessary to recover its payment within the deadline in Regulations J and CC, and we verify that, as to notice of non-payment of the check we received:  (CHECK ONE)

| ☑ Advice by | Method: FAX | Date: 08/02/2018 |
|---|---|---|
| ☐ No advice other than the returned check | | |

Please provisionally credit our account and advise.

| Bank Name | FIRSTBANK & TRUST |
|---|---|
| 9 Digit Routing Number | 111319347 |
| Name of Bank Contact[2] | JONATHAN L BLOXOM |
| Phone Number of Bank Contact [2] | 806.776.6843 |
| Authorized Signature | |
| Date | 08/06/2018 |

[2] For Payor Bank to request original form and/or original check or original photocopy of check if needed.

APP 0088

# Check21 Fed Lookup Information



| Type | Outgoing Check | Incoming Return |
|---|---|---|
| Item Reference | BankersBank | Fed Returns |
| HostImageNumber | 678310770000623 | 678310770000623 |
| Posting Date | 07/27/2018 | 07/27/2018 |
| Run Sequence | 1012 | 1012 |
| Batch Sequence | 18 | 18 |
| Amount | $57,246.00 | $57,246.00 |
| Created Time | 07/27/2018 21:01 | 08/02/2018 08:52 |
| Bank of First Deposit | 111319347 | 111319347 |
| Cash Letter Total | $6,939,351.54 | $1,207,676.51 |
| Cash Letter Date | 07/27/2018 | 08/02/2018 |
| Cash Letter TR | 111319347 | 111319347 |
| Bundle Total | $682,743.97 | $1,207,676.51 |
| Sequence | 678310770000623 | 3996372132 |
| Previous Item Amount | $39,862.00 | $53,027.00 |
| Next Item Amount | $59,517.00 | $59,064.00 |

APP 0089

Case 5:18-cv-00234-C  Document 134  Filed 08/30/19  Page 90 of 379  PageID 2643

**CA1000 - Case Open**

## Information

| | |
|---|---|
| **Status:** | SENT |
| **DTS:** | 8/5/18 9:50:10 PM ET |
| **SNDR:** | 111319347 - FIRST BANK & TRUST |
| **RCVR:** | 061000146 - FRB Atlanta |
| **RESP:** | |

## Case Information

| | | | | | |
|---|---|---|---|---|---|
| **ITYP:** | LC - late claim | | | | |
| **MTYP:** | OPEN - open | | | | |
| **AMT:** | 57,246.00 | **ETYP:** | CR - credit | | |
| **SREF:** | JLB080518-07 | **RREF:** | | **AID:** | |
| **CNTC:** | JONATHAN BLOXOM | **TELE:** | 806-776-6843 Ext. 6843 | | |
| **FCL:** | 061000146 - FRB Atlanta | | | | |
| **TCL:** | 111319347 - FIRST BANK & TRUST | | | | |
| **PROD:** | RTN | **DTF:** | F | | |
| **CLD1:** | | **FCL1:** | | | |
| **TCL1:** | | **SEQ1:** | | | |
| **COM:** | | | | | |

## Item Identification

| | | | | | |
|---|---|---|---|---|---|
| **CLED:** | 8/2/18 | **CLT:** | .00 | **TT:** | .00 |
| **GID:** | | **SEQ:** | | | |
| **IBEF:** | .00 | **IAFT:** | .00 | | |
| **LAS:** | .00 | **SBE:** | .00 | **CURR:** | USA |

## Item Details

| | | | |
|---|---|---|---|
| **DRBK:** | – | | |
| **DPBK:** | – | | |
| **MKR:** | | **PYE:** | |
| **CKNO:** | | **ANO:** | |

## For Treasury Items Only

| | | | |
|---|---|---|---|
| **TSYM:** | | **TSER:** | **TRCL:** |

### DTF(s)

None

APP 0090

**FAX TO 1-866-333-6633**
RCVR: 061000146

F E D E R A L

R E S E R V E



F I N A N C I A L

S E R V I C E S

## FRB - FEDLINE CHECK ADJUSTMENTS

| | |
|---|---|
| ABA #: | 111319347 |
| AMOUNT: | $39,862.00 |
| SREF: | JLB080518-08 |
| ITYP: | LC |
| DATE: | 08/02/2018 |
| RREF: | |

APP 0091

FIRSTBANK & TRUST - 111319347

8



**Federal Reserve Bank**
**Bank's Claim of Late Return**

FRBservices.org

Reference the returned check described below:

| | |
|---|---|
| Amount (*must be $100 or more*) | 39862.00 |
| Dated | 07/22/2018 |
| Paying Bank | ~~REAGOR AUTO MALL LTD~~ First Capital Bank of Texas |
| Paying Bank 9 Digit Routing Number | 116324201 |
| Paying Bank Location | LUBBOCK, TEXAS |
| Drawn By (drawer) | REAGOR AUTO MALL, LTD |
| Payable To (payee) | REAGOR AUTO MALL, LTD |
| Check Number | 191011 |

We sent this item to:

| | | | |
|---|---|---|---|
| Bank Name | FRB ATLANTA | | |
| Cash Letter Date | 07/27/2018 | | |
| Cash Letter Total | 6939351.54 | | |
| Tape total | 682743.97 | | |
| Listed between items | 37601.00 | and | 57246.00 |

We received the check from:

| | | | |
|---|---|---|---|
| Bank Name | FRB ATLANTA | | |
| Received Date | 08/02/2018 | | |
| Return Letter / Advice Date[1] | 08/02/2018 | | |
| Return Letter / Advice Total | 1207676.51 | | |
| Tape total | 1207676.51 | | |
| Listed between items | 38123.00 | and | 39997.00 |
| Sequence number (if applicable) | 3996372101 | | |

---

[1] If the Reserve Bank does not receive all of the information requested within two (2) calendar months after the date listed, the Reserve Bank will not accept the claim and the requester will have to deal directly with the paying bank. In addition, the item must have been collected and/or returned through the Federal Reserve check collection system. Knowingly making false statements to influence the action of a Federal Reserve Bank may subject the signing party to criminal penalties under federal and/or state law.

APP 0092

## Federal Reserve Bank
## Bank's Claim of Late Return

We claim that, according to our records and the data associated with the check, the paying bank did not take all action necessary to recover its payment within the deadline in Regulations J and CC, and we verify that, as to notice of non-payment of the check we received:  (CHECK ONE)

| ☒ Advice by | Method: FAX | Date: 08/02/2018 |
|---|---|---|
| ☐ No advice other than the returned check | | |

Please provisionally credit our account and advise.

| Bank Name | FIRSTBANK & TRUST |
|---|---|
| 9 Digit Routing Number | 111319347 |
| Name of Bank Contact[2] | JONATHAN L BLOXOM |
| Phone Number of Bank Contact[2] | 806.776.6843 |
| Authorized Signature | |
| Date | 08/06/2018 |

---

[2] For Payor Bank to request original form and/or original check or original photocopy of check if needed.

Last Updated: April 2014

APP 0093

# Check21 Fed Lookup Information



| Type | Outgoing Check | Incoming Return |
|------|----------------|-----------------|
| Item Reference | BankersBank | Fed Returns |
| HostImageNumber | 678310770000622 | 678310770000622 |
| Posting Date | 07/27/2018 | 07/27/2018 |
| Run Sequence | 1012 | 1012 |
| Batch Sequence | 18 | 18 |
| Amount | $39,862.00 | $39,862.00 |
| Created Time | 07/27/2018 21:01 | 08/02/2018 08:52 |
| Bank of First Deposit | 111319347 | 111319347 |
| Cash Letter Total | $6,939,351.54 | $1,207,676.51 |
| Cash Letter Date | 07/27/2018 | 08/02/2018 |
| Cash Letter TR | 111319347 | 111319347 |
| Bundle Total | $682,743.97 | $1,207,676.51 |
| Sequence | 678310770000622 | 3996372101 |
| Previous Item Amount | $37,601.00 | $38,123.00 |
| Next Item Amount | $57,246.00 | $39,997.00 |

**CA1000 - Case Open**

### Information

| | |
|---|---|
| **Status:** | SENT |
| **DTS:** | 8/5/18 9:51:12 PM ET |
| **SNDR:** | 111319347 - FIRST BANK & TRUST |
| **RCVR:** | 061000146 - FRB Atlanta |
| **RESP:** | |

### Case Information

| | | | | | |
|---|---|---|---|---|---|
| **ITYP:** | LC - late claim | | | | |
| **MTYP:** | OPEN - open | | | | |
| **AMT:** | 39,862.00 | **ETYP:** | CR - credit | | |
| **SREF:** | JLB080518-08 | **RREF:** | | **AID:** | |
| **CNTC:** | JONATHAN BLOXOM | **TELE:** | 806-776-6843 Ext. 6843 | | |
| **FCL:** | 061000146 - FRB Atlanta | | | | |
| **TCL:** | 111319347 - FIRST BANK & TRUST | | | | |
| **PROD:** | RTN | **DTF:** | F | | |
| **CLD1:** | | **FCL1:** | | | |
| **TCL1:** | | **SEQ1:** | | | |
| **COM:** | | | | | |

### Item Identification

| | | | | | |
|---|---|---|---|---|---|
| **CLED:** | 8/2/18 | **CLT:** | .00 | **TT:** | .00 |
| **GID:** | | **SEQ:** | | | |
| **IBEF:** | .00 | **IAFT:** | .00 | | |
| **LAS:** | .00 | **SBE:** | .00 | **CURR:** | USA |

### Item Details

| | | | |
|---|---|---|---|
| **DRBK:** | – | | |
| **DPBK:** | – | | |
| **MKR:** | | **PYE:** | |
| **CKNO:** | | **ANO:** | |

### For Treasury Items Only

| | | | |
|---|---|---|---|
| **TSYM:** | | **TSER:** | **TRCL:** |

### DTF(s)

None

APP 0095

**FAX TO 1-866-333-6633**
RCVR: 061000146

F E D E R A L

R E S E R V E



F I N A N C I A L

S E R V I C E S

## FRB - FEDLINE CHECK ADJUSTMENTS

ABA #:        111319347

AMOUNT:    $37,601.00

SREF:         JLB080518-09

ITYP:          LC

DATE:         08/02/2018

RREF:

APP 0096

FIRSTBANK & TRUST - 111319347



**Federal Reserve Bank**
**Bank's Claim of Late Return**

9

FRBservices.org

Reference the returned check described below:

| | |
|---|---|
| Amount (*must be $100 or more*) | 37601.00 |
| Dated | 07/22/2018 |
| Paying Bank | ~~REAGOR AUTO MALL LTD~~ First Capital Bank of Texas |
| Paying Bank 9 Digit Routing Number | 116324201 |
| Paying Bank Location | LUBBOCK, TEXAS |
| Drawn By (drawer) | REAGOR AUTO MALL, LTD |
| Payable To (payee) | REAGOR AUTO MALL, LTD |
| Check Number | 191010 |

We sent this item to:

| | | | |
|---|---|---|---|
| Bank Name | FRB ATLANTA | | |
| Cash Letter Date | 07/27/2018 | | |
| Cash Letter Total | 6939351.54 | | |
| Tape total | 682743.97 | | |
| Listed between items | 38123.00 | and | 39862.00 |

We received the check from:

| | | | |
|---|---|---|---|
| Bank Name | FRB ATLANTA | | |
| Received Date | 08/02/2018 | | |
| Return Letter / Advice Date[1] | 08/02/2018 | | |
| Return Letter / Advice Total | 1207676.51 | | |
| Tape total | 1207676.51 | | |
| Listed between items | 237.60 | and | 38123.00 |
| Sequence number (if applicable) | 3996372095 | | |

---

[1] If the Reserve Bank does not receive all of the information requested within two (2) calendar months after the date listed, the Reserve Bank will not accept the claim and the requester will have to deal directly with the paying bank. In addition, the item must have been collected and/or returned through the Federal Reserve check collection system. Knowingly making false statements to influence the action of a Federal Reserve Bank may subject the signing party to criminal penalties under federal and/or state law.

# Federal Reserve Bank
## Bank's Claim of Late Return

We claim that, according to our records and the data associated with the check, the paying bank did not take all action necessary to recover its payment within the deadline in Regulations J and CC, and we verify that, as to notice of non-payment of the check we received:   (CHECK ONE)

| ☑ Advice by | Method: FAX | Date: 08/02/2018 |
|---|---|---|
| ☐ No advice other than the returned check | | |

Please provisionally credit our account and advise.

| Bank Name | FIRSTBANK & TRUST |
|---|---|
| 9 Digit Routing Number | 111319347 |
| Name of Bank Contact[2] | JONATHAN L BLOXOM |
| Phone Number of Bank Contact[2] | 806.776.6843 |
| Authorized Signature | |
| Date | 08/06/2018 |

---

[2] For Payor Bank to request original form and/or original check or original photocopy of check if needed

Last Updated: April 2014

APP 0098

# Check21 Fed Lookup Information



| Type | Outgoing Check | Incoming Return |
|---|---|---|
| Item Reference | BankersBank | Fed Returns |
| HostImageNumber | 678310770000621 | 678310770000621 |
| Posting Date | 07/27/2018 | 07/27/2018 |
| Run Sequence | 1012 | 1012 |
| Batch Sequence | 18 | 18 |
| Amount | $37,601.00 | $37,601.00 |
| Created Time | 07/27/2018 21:01 | 08/02/2018 08:52 |
| Bank of First Deposit | 111319347 | 111319347 |
| Cash Letter Total | $6,939,351.54 | $1,207,676.51 |
| Cash Letter Date | 07/27/2018 | 08/02/2018 |
| Cash Letter TR | 111319347 | 111319347 |
| Bundle Total | $682,743.97 | $1,207,676.51 |
| Sequence | 678310770000621 | 3996372095 |
| Previous Item Amount | $38,123.00 | $237.60 |
| Next Item Amount | $39,862.00 | $38,123.00 |

APP 0099

**CA1000 - Case Open**

## Information

| | |
|---|---|
| **Status:** | SENT |
| **DTS:** | 8/5/18 9:52:19 PM ET |
| **SNDR:** | 111319347 - FIRST BANK & TRUST |
| **RCVR:** | 061000146 - FRB Atlanta |
| **RESP:** | |

## Case Information

| | | | | | |
|---|---|---|---|---|---|
| **ITYP:** | LC - late claim | | | | |
| **MTYP:** | OPEN - open | | | | |
| **AMT:** | 37,601.00 | **ETYP:** | DB - debit | | |
| **SREF:** | JLB080518-09 | **RREF:** | | **AID:** | |
| **CNTC:** | JONATHAN BLOXOM | **TELE:** | 806-776-6843 Ext. 6843 | | |
| **FCL:** | 061000146 - FRB Atlanta | | | | |
| **TCL:** | 111319347 - FIRST BANK & TRUST | | | | |
| **PROD:** | RTN | **DTF:** | F | | |
| **CLD1:** | | **FCL1:** | | | |
| **TCL1:** | | **SEQ1:** | | | |
| **COM:** | | | | | |

## Item Identification

| | | | | | |
|---|---|---|---|---|---|
| **CLED:** | 8/2/18 | **CLT:** | .00 | **TT:** | .00 |
| **GID:** | | **SEQ:** | | | |
| **IBEF:** | .00 | **IAFT:** | .00 | | |
| **LAS:** | .00 | **SBE:** | .00 | **CURR:** | USA |

## Item Details

| | | | |
|---|---|---|---|
| **DRBK:** | - | | |
| **DPBK:** | - | | |
| **MKR:** | | **PYE:** | |
| **CKNO:** | | **ANO:** | |

## For Treasury Items Only

| | | | |
|---|---|---|---|
| **TSYM:** | | **TSER:** | **TRCL:** |

**DTF(s)**

None

APP 0100

**FAX TO 1-866-333-6633**
RCVR: 061000146

FEDERAL

RESERVE



FINANCIAL

SERVICES

## FRB - FEDLINE CHECK ADJUSTMENTS

| | |
|---|---|
| ABA #: | 111319347 |
| AMOUNT: | $38,123.00 |
| SREF: | JLB080518-10 |
| ITYP: | LC |
| DATE: | 08/02/2018 |
| RREF: | |

APP 0101

FIRSTBANK & TRUST - 111131347



## Federal Reserve Bank
## Bank's Claim of Late Return

10

FRBservices.org

Reference the returned check described below:

| Amount (*must be $100 or more*) | 38123.00 |
|---|---|
| Dated | 07/22/2018 |
| Paying Bank | ~~REAGOR AUTO MALL LTD~~ First Capital Bank of Texas |
| Paying Bank 9 Digit Routing Number | 116324201 |
| Paying Bank Location | LUBBOCK, TEXAS |
| Drawn By (drawer) | REAGOR AUTO MALL, LTD |
| Payable To (payee) | REAGOR AUTO MALL, LTD |
| Check Number | 191005 |

We sent this item to:

| Bank Name | FRB ATLANTA | | |
|---|---|---|---|
| Cash Letter Date | 07/27/2018 | | |
| Cash Letter Total | 6939351.54 | | |
| Tape total | 682743.97 | | |
| Listed between items | 53027.00 | and | 37601.00 |

We received the check from:

| Bank Name | FRB ATLANTA | | |
|---|---|---|---|
| Received Date | 08/02/2018 | | |
| Return Letter / Advice Date[1] | 08/02/2018 | | |
| Return Letter / Advice Total | 1207676.51 | | |
| Tape total | 1207676.51 | | |
| Listed between items | 37601.00 | and | 39862.00 |
| Sequence number (if applicable) | 3996372099 | | |

---

[1] If the Reserve Bank does not receive all of the information requested within two (2) calendar months after the date listed, the Reserve Bank will not accept the claim and the requester will have to deal directly with the paying bank. In addition, the item must have been collected and/or returned through the Federal Reserve check collection system. Knowingly making false statements to influence the action of a Federal Reserve Bank may subject the signing party to criminal penalties under federal and/or state law.

ARP 0102

## Federal Reserve Bank
## Bank's Claim of Late Return

We claim that, according to our records and the data associated with the check, the paying bank did not take all action necessary to recover its payment within the deadline in Regulations J and CC, and we verify that, as to notice of non-payment of the check we received:   (CHECK ONE)

| ☑ Advice by | Method: FAX | Date: 08/02/2018 |
|---|---|---|
| ☐ No advice other than the returned check | | |

Please provisionally credit our account and advise.

| Bank Name | FIRSTBANK & TRUST |
|---|---|
| 9 Digit Routing Number | 111319347 |
| Name of Bank Contact[2] | JONATHAN L BLOXOM |
| Phone Number of Bank Contact[2] | 806.776.6843 |
| Authorized Signature | *(signature)* |
| Date | 08/06/2018 |

[2] For Payor Bank to request original form and/or original check or original photocopy of check if needed.

# Check21 Fed Lookup Information



| Type | Outgoing Check | Incoming Return |
|---|---|---|
| Item Reference | BankersBank | Fed Returns |
| HostImageNumber | 678310770000620 | 678310770000620 |
| Posting Date | 07/27/2018 | 07/27/2018 |
| Run Sequence | 1012 | 1012 |
| Batch Sequence | 18 | 18 |
| Amount | $38,123.00 | $38,123.00 |
| Created Time | 07/27/2018 21:01 | 08/02/2018 08:52 |
| Bank of First Deposit | 111319347 | 111319347 |
| Cash Letter Total | $6,939,351.54 | $1,207,676.51 |
| Cash Letter Date | 07/27/2018 | 08/02/2018 |
| Cash Letter TR | 111319347 | 111319347 |
| Bundle Total | $682,743.97 | $1,207,676.51 |
| Sequence | 678310770000620 | 3996372099 |
| Previous Item Amount | $53,027.00 | $37,601.00 |
| Next Item Amount | $37,601.00 | $39,862.00 |

APP 0104

**CA1000 - Case Open**

### Information

| | |
|---|---|
| **Status:** | SENT |
| **DTS:** | 8/5/18 10:02:55 PM ET |
| **SNDR:** | 111319347 - FIRST BANK & TRUST |
| **RCVR:** | 061000146 - FRB Atlanta |
| **RESP:** | |

### Case Information

| | | | | | |
|---|---|---|---|---|---|
| **ITYP:** | LC - late claim | | | | |
| **MTYP:** | OPEN - open | | | | |
| **AMT:** | 38,123.00 | **ETYP:** | CR - credit | | |
| **SREF:** | JLB080518-10 | **RREF:** | | **AID:** | |
| **CNTC:** | JONATHAN BLOXOM | **TELE:** | 806-776-6843 Ext. 6843 | | |
| **FCL:** | 061000146 - FRB Atlanta | | | | |
| **TCL:** | 111319347 - FIRST BANK & TRUST | | | | |
| **PROD:** | RTN | **DTF:** | F | | |
| **CLD1:** | | **FCL1:** | | | |
| **TCL1:** | | **SEQ1:** | | | |
| **COM:** | | | | | |

### Item Identification

| | | | | | |
|---|---|---|---|---|---|
| **CLED:** | 8/2/18 | **CLT:** | .00 | **TT:** | .00 |
| **GID:** | | **SEQ:** | | | |
| **IBEF:** | .00 | **IAFT:** | .00 | | |
| **LAS:** | .00 | **SBE:** | .00 | **CURR:** | USA |

### Item Details

| | | | |
|---|---|---|---|
| **DRBK:** | - | | |
| **DPBK:** | - | | |
| **MKR:** | | **PYE:** | |
| **CKNO:** | | **ANO:** | |

### For Treasury Items Only

| | | | |
|---|---|---|---|
| **TSYM:** | | **TSER:** | **TRCL:** |

### DTF(s)

None

APP 0105

**FAX TO 1-866-333-6633**
RCVR: 061000146

F E D E R A L

R E S E R V E



F I N A N C I A L

S E R V I C E S

## FRB - FEDLINE CHECK ADJUSTMENTS

ABA #:        111319347

AMOUNT:    $53,027.00

SREF:         JLB080518-11

ITYP:         LC

DATE:        08/02/2018

RREF:

APP 0106

FIRSTBANK & TRUST - 11951934?



FRBservices.org

## Federal Reserve Bank
## Bank's Claim of Late Return

11

Reference the returned check described below:

| Amount (*must be $100 or more*) | 53027.00 |
|---|---|
| Dated | 07/22/2018 |
| Paying Bank | ~~REAGOR AUTO MALL LTD~~ *First Capital Bank of Texas* |
| Paying Bank 9 Digit Routing Number | 116324201 |
| Paying Bank Location | LUBBOCK, TEXAS |
| Drawn By (drawer) | REAGOR AUTO MALL, LTD |
| Payable To (payee) | REAGOR AUTO MALL, LTD |
| Check Number | 191001 |

We sent this item to:

| Bank Name | FRB ATLANTA | | |
|---|---|---|---|
| Cash Letter Date | 07/27/2018 | | |
| Cash Letter Total | 6939351.54 | | |
| Tape total | 682743.97 | | |
| Listed between items | 39997.00 | and | 38123.00 |

We received the check from:

| Bank Name | FRB ATLANTA | | |
|---|---|---|---|
| Received Date | 08/02/2018 | | |
| Return Letter / Advice Date[1] | 08/02/2018 | | |
| Return Letter / Advice Total | 1207676.51 | | |
| Tape total | 1207676.51 | | |
| Listed between items | 48246.00 | and | 57246.00 |
| Sequence number (if applicable) | 3996372126 | | |

---

[1] If the Reserve Bank does not receive all of the information requested within two (2) calendar months after the date listed, the Reserve Bank will not accept the claim and the requester will have to deal directly with the paying bank. In addition, the item must have been collected and/or returned through the Federal Reserve check collection system. Knowingly making false statements to influence the action of a Federal Reserve Bank may subject the signing party to criminal penalties under federal and/or state law.

ARR 0107

# Federal Reserve Bank
## Bank's Claim of Late Return

We claim that, according to our records and the data associated with the check, the paying bank did not take all action necessary to recover its payment within the deadline in Regulations J and CC, and we verify that, as to notice of non-payment of the check we received:   (CHECK ONE)

| ☑ Advice by | Method:  FAX | Date:   08/02/2018 |
| --- | --- | --- |
| ☐ No advice other than the returned check | | |

Please provisionally credit our account and advise.

| Bank Name | FIRSTBANK & TRUST |
| --- | --- |
| 9 Digit Routing Number | 111319347 |
| Name of Bank Contact[2] | JONATHAN L BLOXOM |
| Phone Number of Bank Contact [2] | 806.776.6843 |
| Authorized Signature | *Hana Robertson* |
| Date | 08/06/2018 |

---

[2] For Payor Bank to request original form and/or original check or original photocopy of check if needed.

APP 0108

# Check21 Fed Lookup Information



| Type | | |
|---|---|---|
| Item Reference | Outgoing Check | Incoming Return |
| | BankersBank | Fed Returns |
| HostImageNumber | 678310770000619 | 678310770000619 |
| Posting Date | 07/27/2018 | 07/27/2018 |
| Run Sequence | 1012 | 1012 |
| Batch Sequence | 18 | 18 |
| Amount | $53,027.00 | $53,027.00 |
| Created Time | 07/27/2018 21:01 | 08/02/2018 08:52 |
| Bank of First Deposit | 111319347 | 111319347 |
| Cash Letter Total | $6,939,351.54 | $1,207,676.51 |
| Cash Letter Date | 07/27/2018 | 08/02/2018 |
| Cash Letter TR | 111319347 | 111319347 |
| Bundle Total | $682,743.97 | $1,207,676.51 |
| Sequence | 678310770000619 | 3996372126 |
| Previous Item Amount | $39,997.00 | $48,246.00 |
| Next Item Amount | $38,123.00 | $57,246.00 |

**CA1000 - Case Open**

### Information

| | |
|---|---|
| **Status:** | SENT |
| **DTS:** | 8/5/18 10:04:12 PM ET |
| **SNDR:** | 111319347 - FIRST BANK & TRUST |
| **RCVR:** | 061000146 - FRB Atlanta |
| **RESP:** | |

### Case Information

| | | | | | |
|---|---|---|---|---|---|
| **ITYP:** | LC - late claim | | | | |
| **MTYP:** | OPEN - open | | | | |
| **AMT:** | 53,027.00 | **ETYP:** | CR - credit | | |
| **SREF:** | JLB080518-11 | **RREF:** | | **AID:** | |
| **CNTC:** | JONATHAN BLOXOM | **TELE:** | 806-776-6843 Ext. 6843 | | |
| **FCL:** | 061000146 - FRB Atlanta | | | | |
| **TCL:** | 111319347 - FIRST BANK & TRUST | | | | |
| **PROD:** | RTN | **DTF:** | F | | |
| **CLD1:** | | **FCL1:** | | | |
| **TCL1:** | | **SEQ1:** | | | |
| **COM:** | | | | | |

### Item Identification

| | | | | | |
|---|---|---|---|---|---|
| **CLED:** | 8/2/18 | **CLT:** | .00 | **TT:** | .00 |
| **GID:** | | **SEQ:** | | | |
| **IBEF:** | .00 | **IAFT:** | .00 | | |
| **LAS:** | .00 | **SBE:** | .00 | **CURR:** | USA |

### Item Details

| | | | |
|---|---|---|---|
| **DRBK:** | - | | |
| **DPBK:** | - | | |
| **MKR:** | | **PYE:** | |
| **CKNO:** | | **ANO:** | |

### For Treasury Items Only

| | | | |
|---|---|---|---|
| **TSYM:** | | **TSER:** | **TRCL:** |

### DTF(s)

None

APP 0110

**FAX TO 1-866-333-6633**
RCVR: 061000146

F E D E R A L

R E S E R V E



F I N A N C I A L

S E R V I C E S

## FRB - FEDLINE CHECK ADJUSTMENTS

ABA #:        111319347

AMOUNT:     $39,997.00

SREF:        JLB080518-11

ITYP:        LC

DATE:        08/02/2018

RREF:

APP 0111



**FEDERAL RESERVE**

**FINANCIAL SERVICES**

FRBservices.org

## Federal Reserve Bank
## Bank's Claim of Late Return

*12*

Reference the returned check described below:

| Amount (*must be $100 or more*) | 39997.00 |
|---|---|
| Dated | 07/22/2018 |
| Paying Bank | ~~REAGOR AUTO MALL LTD~~ *First Capital Bank of Texas* |
| Paying Bank 9 Digit Routing Number | 116324201 |
| Paying Bank Location | LUBBOCK, TEXAS |
| Drawn By (drawer) | REAGOR AUTO MALL, LTD |
| Payable To (payee) | REAGOR AUTO MALL, LTD |
| Check Number | 191004 |

We sent this item to:

| Bank Name | FRB ATLANTA | | |
|---|---|---|---|
| Cash Letter Date | 07/27/2018 | | |
| Cash Letter Total | 6939351.54 | | |
| Tape total | 682743.97 | | |
| Listed between items | 43444.00 | and | 53027.00 |

We received the check from:

| Bank Name | FRB ATLANTA | | |
|---|---|---|---|
| Received Date | 08/02/2018 | | |
| Return Letter / Advice Date[1] | 08/02/2018 | | |
| Return Letter / Advice Total | 1207676.51 | | |
| Tape total | 1207676.51 | | |
| Listed between items | 39862.00 | and | 43444.00 |
| Sequence number (if applicable) | 3996372106 | | |

---

[1] If the Reserve Bank does not receive all of the information requested within two (2) calendar months after the date listed, the Reserve Bank will not accept the claim and the requester will have to deal directly with the paying bank. In addition, the item must have been collected and/or returned through the Federal Reserve check collection system. Knowingly making false statements to influence the action of a Federal Reserve Bank may subject the signing party to criminal penalties under federal and/or state law.

APP 0112

Last Updated: April 2014

## Federal Reserve Bank
## Bank's Claim of Late Return

We claim that, according to our records and the data associated with the check, the paying bank did not take all action necessary to recover its payment within the deadline in Regulations J and CC, and we verify that, as to notice of non-payment of the check we received:   (CHECK ONE)

| ☑ Advice by | Method: FAX | Date: 08/02/2018 |
|---|---|---|
| ☐ No advice other than the returned check | | |

Please provisionally credit our account and advise.

| Bank Name | FIRSTBANK & TRUST |
|---|---|
| 9 Digit Routing Number | 111319347 |
| Name of Bank Contact[2] | JONATHAN L BLOXOM |
| Phone Number of Bank Contact[2] | 806.776.6843 |
| Authorized Signature | |
| Date | 08/06/2018 |

---

[2] For Payor Bank to request original form and/or original check or original photocopy of check if needed.

# Check21 Fed Lookup Information



| Type | Outgoing Check | Incoming Return |
|---|---|---|
| Item Reference | BankersBank | Fed Returns |
| HostImageNumber | 678310770000618 | 678310770000618 |
| Posting Date | 07/27/2018 | 07/27/2018 |
| Run Sequence | 1012 | 1012 |
| Batch Sequence | 18 | 18 |
| Amount | $39,997.00 | $39,997.00 |
| Created Time | 07/27/2018 21:01 | 08/02/2018 08:52 |
| Bank of First Deposit | 111319347 | 111319347 |
| Cash Letter Total | $6,939,351.54 | $1,207,676.51 |
| Cash Letter Date | 07/27/2018 | 08/02/2018 |
| Cash Letter TR | 111319347 | 111319347 |
| Bundle Total | $682,743.97 | $1,207,676.51 |
| Sequence | 678310770000618 | 3996372106 |
| Previous Item Amount | $43,444.00 | $39,862.00 |
| Next Item Amount | $53,027.00 | $43,444.00 |

APP 0114

**CA1000 - Case Open**

**Information**

| | |
|---|---|
| **Status:** | SENT |
| **DTS:** | 8/5/18 10:05:04 PM ET |
| **SNDR:** | 111319347 - FIRST BANK & TRUST |
| **RCVR:** | 061000146 - FRB Atlanta |
| **RESP:** | |

**Case Information**

| | | | | | |
|---|---|---|---|---|---|
| **ITYP:** | LC - late claim | | | | |
| **MTYP:** | OPEN - open | | | | |
| **AMT:** | 39,997.00 | **ETYP:** | CR - credit | | |
| **SREF:** | JLB080518-11 | **RREF:** | | **AID:** | |
| **CNTC:** | JONATHAN BLOXOM | **TELE:** | 806-776-6843 Ext. 6843 | | |
| **FCL:** | 061000146 - FRB Atlanta | | | | |
| **TCL:** | 111319347 - FIRST BANK & TRUST | | | | |
| **PROD:** | RTN | **DTF:** | F | | |
| **CLD1:** | | **FCL1:** | | | |
| **TCL1:** | | **SEQ1:** | | | |
| **COM:** | | | | | |

**Item Identification**

| | | | | | |
|---|---|---|---|---|---|
| **CLED:** | 8/2/18 | **CLT:** | .00 | **TT:** | .00 |
| **GID:** | | **SEQ:** | | | |
| **IBEF:** | .00 | **IAFT:** | .00 | | |
| **LAS:** | .00 | **SBE:** | .00 | **CURR:** | USA |

**Item Details**

| | | | |
|---|---|---|---|
| **DRBK:** | - | | |
| **DPBK:** | - | | |
| **MKR:** | | **PYE:** | |
| **CKNO:** | | **ANO:** | |

**For Treasury Items Only**

| | | | |
|---|---|---|---|
| **TSYM:** | | **TSER:** | **TRCL:** |

**DTF(s)**

None

APP 0115

# EXHIBIT A-13



# Statutory Warning
# Demand Letter

**Friday, August 03, 2018**

**REAGOR AUTO MALL, LTD.**
**ATTN: MR. BART REAGOR**
**1215 AVE J**
**LUBBOCK, TX 79401**

Dear Sir,

The below check(s) were returned for the following reason:

☐ Insufficient Funds     ☐ Account Closed     ☒ Uncollected Funds

| Check Number | Amount | Dated | Bank Drawn Off of | Payable to |
|---|---|---|---|---|
| 191010 | $37,601.00 | 7/26/2018 | First Capital Bank of Lubbock | Reagor Auto Mall LTD. |
| 191005 | $38,123.00 | 7/26/2018 | First Capital Bank of Lubbock | Reagor Auto Mall LTD. |
| 191011 | $39,862.00 | 7/26/2018 | First Capital Bank of Lubbock | Reagor Auto Mall LTD. |
| 191004 | $39,997.00 | 7/26/2018 | First Capital Bank of Lubbock | Reagor Auto Mall LTD. |
| 191003 | $43,444.00 | 7/26/2018 | First Capital Bank of Lubbock | Reagor Auto Mall LTD. |
| 191002 | $48,246.00 | 7/26/2018 | First Capital Bank of Lubbock | Reagor Auto Mall LTD. |
| 191001 | $53,027.00 | 7/26/2018 | First Capital Bank of Lubbock | Reagor Auto Mall LTD. |
| 190444 | $57,246.00 | 7/22/2018 | First Capital Bank of Lubbock | Reagor Auto Mall LTD. |
| 190998 | $59,064.00 | 7/26/2018 | First Capital Bank of Lubbock | Reagor Auto Mall LTD. |
| 190446 | $59,517.00 | 7/22/2018 | First Capital Bank of Lubbock | Reagor Auto Mall LTD. |
| 190448 | $62,391.00 | 7/22/2018 | First Capital Bank of Lubbock | Reagor Auto Mall LTD. |
| 190449 | $63,762.00 | 7/22/2018 | First Capital Bank of Lubbock | Reagor Auto Mall LTD. |
| 191230 | $38,750.00 | 7/28/2018 | First Capital Bank of Lubbock | Reagor Auto Mall LTD. |
| 191231 | $39,125.00 | 7/28/2018 | First Capital Bank of Lubbock | Reagor Auto Mall LTD. |
| 191232 | $40,217.00 | 7/28/2018 | First Capital Bank of Lubbock | Reagor Auto Mall LTD. |
| 191235 | $43,044.00 | 7/28/2018 | First Capital Bank of Lubbock | Reagor Auto Mall LTD. |
| 191238 | $44,227.00 | 7/28/2017 | First Capital Bank of Lubbock | Reagor Auto Mall LTD. |
| 191237 | $45,668.00 | 7/28/2018 | First Capital Bank of Lubbock | Reagor Auto Mall LTD. |
| 191338 | $50,992.00 | 7/30/2018 | First Capital Bank of Lubbock | Reagor Auto Mall LTD. |
| 191331 | $51,456.00 | 7/30/2018 | First Capital Bank of Lubbock | Reagor Auto Mall LTD. |
| 191328 | $53,998.00 | 7/30/2018 | First Capital Bank of Lubbock | Reagor Auto Mall LTD. |
| 191325 | $58,064.00 | 7/30/2018 | First Capital Bank of Lubbock | Reagor Auto Mall LTD. |
| 191335 | $60,097.00 | 7/30/2018 | First Capital Bank of Lubbock | Reagor Auto Mall LTD. |
| 191334 | $62,998.00 | 7/30/2018 | First Capital Bank of Lubbock | Reagor Auto Mall LTD. |
| 191372 | $37,097.00 | 7/30/2018 | First Capital Bank of Lubbock | Reagor Auto Mall LTD. |
| 191375 | $60,189.00 | 7/30/2018 | First Capital Bank of Lubbock | Reagor Auto Mall LTD. |
| 191374 | $36,332.00 | 7/30/2018 | First Capital Bank of Lubbock | Reagor Auto Mall LTD. |
| 191370 | $53,201.00 | 7/30/2018 | First Capital Bank of Lubbock | Reagor Auto Mall LTD. |
| 191337 | $49,077.00 | 7/30/2018 | First Capital Bank of Lubbock | Reagor Auto Mall LTD. |
| 191326 | $53,972.00 | 7/30/2018 | First Capital Bank of Lubbock | Reagor Auto Mall LTD. |

APP 0117

*Continued on next page*

| | | | | |
|---|---|---|---|---|
| 191329 | $57,024.00 | 7/30/2018 | First Capital Bank of Lubbock | Reagor Auto Mall LTD. |
| 191330 | $59,964.00 | 7/30/2018 | First Capital Bank of Lubbock | Reagor Auto Mall LTD. |
| 191234 | $42,027.00 | 7/28/2018 | First Capital Bank of Lubbock | Reagor Auto Mall LTD. |

**Total:**        **$1,639,799.00**

This is a demand for payment in full for the check(s) or order(s) not paid because the reason listed above. If you fail to make payment in full within 10 days after the date of this notice, the failure to pay created a presumption for committing an offense, and this matter will be referred to the Lubbock County District Attorney's Hot Check Office for criminal prosecution.

Sincerely,

*Jonathan Bloxom*

**FirstBank & Trust Co.**
**Deposit Operations Team Leader/Banking Officer**
**806.776.6804  direct line**
**jonathan.bloxom@firstbanktexas.com**
**9826 Slide Rd Ste 100**
**Lubbock, TX 79424**

**CC via email:     Mr. Jared Townsend, VP, FirstBank & Trust**
**                          Mr. Tim White, EVP/Chief Credit Officer, FirstBank & Trust**
**                          Mr. Greg Garland, President, FirstBank & Trust**

# Check21 Fed Lookup Information



| Type | Outgoing Check | Incoming Return |
|---|---|---|
| **Item Reference** | BankersBank | Fed Returns |
| **HostImageNumber** | 678310770000626 | 678310770000626 |
| **Posting Date** | 07/27/2018 | 07/27/2018 |
| **Run Sequence** | 1012 | 1012 |
| **Batch Sequence** | 18 | 18 |
| **Amount** | $63,762.00 | $63,762.00 |
| **Created Time** | 07/27/2018 21:01 | 08/02/2018 08:35 |
| **Bank of First Deposit** | 111319347 | 111319347 |
| **Cash Letter Total** | $6,939,351.54 | $1,207,676.51 |
| **Cash Letter Date** | 07/27/2018 | 08/02/2018 |
| **Cash Letter TR** | 111319347 | 111319347 |
| **Bundle Total** | $682,743.97 | $1,207,676.51 |
| **Sequence** | 678310770000626 | 3996368075 |
| **Previous Item Amount** | $62,391.00 | $27.00 |
| **Next Item Amount** | $500.00 | $1,639.18 |

APP 0119

# Check21 Fed Lookup Information



| Type | Outgoing Check | Incoming Return |
|---|---|---|
| Item Reference | BankersBank | Fed Returns |
| HostImageNumber | 678310770000625 | 678310770000625 |
| Posting Date | 07/27/2018 | 07/27/2018 |
| Run Sequence | 1012 | 1012 |
| Batch Sequence | 18 | 18 |
| Amount | $62,391.00 | $62,391.00 |
| Created Time | 07/27/2018 21:01 | 08/02/2018 08:35 |
| Bank of First Deposit | 111319347 | 111319347 |
| Cash Letter Total | $6,939,351.54 | $1,207,676.51 |
| Cash Letter Date | 07/27/2018 | 08/02/2018 |
| Cash Letter TR | 111319347 | 111319347 |
| Bundle Total | $682,743.97 | $1,207,676.51 |
| Sequence | 678310770000625 | 3996372148 |
| Previous Item Amount | $59,517.00 | $59,517.00 |
| Next Item Amount | $63,762.00 | $7,290.91 |

APP 0120

# Check21 Fed Lookup Information




| Type | Outgoing Check | Incoming Return |
|---|---|---|
| Item Reference | BankersBank | Fed Returns |
| HostImageNumber | 678310770000624 | 678310770000624 |
| Posting Date | 07/27/2018 | 07/27/2018 |
| Run Sequence | 1012 | 1012 |
| Batch Sequence | 18 | 18 |
| Amount | $59,517.00 | $59,517.00 |
| Created Time | 07/27/2018 21:01 | 08/02/2018 08:35 |
| Bank of First Deposit | 111319347 | 111319347 |
| Cash Letter Total | $6,939,351.54 | $1,207,676.51 |
| Cash Letter Date | 07/27/2018 | 08/02/2018 |
| Cash Letter TR | 111319347 | 111319347 |
| Bundle Total | $682,743.97 | $1,207,676.51 |
| Sequence | 678310770000624 | 3996372140 |
| Previous Item Amount | $57,246.00 | $59,064.00 |
| Next Item Amount | $62,391.00 | $62,391.00 |

# Check21 Fed Lookup Information



| Type | Outgoing Check | Incoming Return |
|---|---|---|
| Item Reference | BankersBank | Fed Returns |
| HostImageNumber | 678310770000623 | 678310770000623 |
| Posting Date | 07/27/2018 | 07/27/2018 |
| Run Sequence | 1012 | 1012 |
| Batch Sequence | 18 | 18 |
| Amount | $57,246.00 | $57,246.00 |
| Created Time | 07/27/2018 21:01 | 08/02/2018 08:52 |
| Bank of First Deposit | 111319347 | 111319347 |
| Cash Letter Total | $6,939,351.54 | $1,207,676.51 |
| Cash Letter Date | 07/27/2018 | 08/02/2018 |
| Cash Letter TR | 111319347 | 111319347 |
| Bundle Total | $682,743.97 | $1,207,676.51 |
| Sequence | 678310770000623 | 3996372132 |
| Previous Item Amount | $39,862.00 | $53,027.00 |
| Next Item Amount | $59,517.00 | $59,064.00 |

APP 0122

# Check21 Fed Lookup Information



| Type | Outgoing Check | Incoming Return |
|---|---|---|
| Item Reference | BankersBank | Fed Returns |
| HostImageNumber | 678310770000622 | 678310770000622 |
| Posting Date | 07/27/2018 | 07/27/2018 |
| Run Sequence | 1012 | 1012 |
| Batch Sequence | 18 | 18 |
| Amount | $39,862.00 | $39,862.00 |
| Created Time | 07/27/2018 21:01 | 08/02/2018 08:52 |
| Bank of First Deposit | 111319347 | 111319347 |
| Cash Letter Total | $6,939,351.54 | $1,207,676.51 |
| Cash Letter Date | 07/27/2018 | 08/02/2018 |
| Cash Letter TR | 111319347 | 111319347 |
| Bundle Total | $682,743.97 | $1,207,676.51 |
| Sequence | 678310770000622 | 3996372101 |
| Previous Item Amount | $37,601.00 | $38,123.00 |
| Next Item Amount | $57,246.00 | $39,997.00 |

APP 0123

# Check21 Fed Lookup Information





| Type | Outgoing Check | Incoming Return |
|---|---|---|
| Item Reference | BankersBank | Fed Returns |
| HostImageNumber | 678310770000621 | 678310770000621 |
| Posting Date | 07/27/2018 | 07/27/2018 |
| Run Sequence | 1012 | 1012 |
| Batch Sequence | 18 | 18 |
| Amount | $37,601.00 | $37,601.00 |
| Created Time | 07/27/2018 21:01 | 08/02/2018 08:52 |
| Bank of First Deposit | 111319347 | 111319347 |
| Cash Letter Total | $6,939,351.54 | $1,207,676.51 |
| Cash Letter Date | 07/27/2018 | 08/02/2018 |
| Cash Letter TR | 111319347 | 111319347 |
| Bundle Total | $682,743.97 | $1,207,676.51 |
| Sequence | 678310770000621 | 3996372095 |
| Previous Item Amount | $38,123.00 | $237.60 |
| Next Item Amount | $39,862.00 | $38,123.00 |

APP 0124

# Check21 Fed Lookup Information





| Type | Outgoing Check | Incoming Return |
|---|---|---|
| Item Reference | BankersBank | Fed Returns |
| HostImageNumber | 678310770000620 | 678310770000620 |
| Posting Date | 07/27/2018 | 07/27/2018 |
| Run Sequence | 1012 | 1012 |
| Batch Sequence | 18 | 18 |
| Amount | $38,123.00 | $38,123.00 |
| Created Time | 07/27/2018 21:01 | 08/02/2018 08:52 |
| Bank of First Deposit | 111319347 | 111319347 |
| Cash Letter Total | $6,939,351.54 | $1,207,676.51 |
| Cash Letter Date | 07/27/2018 | 08/02/2018 |
| Cash Letter TR | 111319347 | 111319347 |
| Bundle Total | $682,743.97 | $1,207,676.51 |
| Sequence | 678310770000620 | 3996372099 |
| Previous Item Amount | $53,027.00 | $37,601.00 |
| Next Item Amount | $37,601.00 | $39,862.00 |

APP 0125

# Check21 Fed Lookup Information





| Type | Outgoing Check | Incoming Return |
|---|---|---|
| Item Reference | BankersBank | Fed Returns |
| HostImageNumber | 678310770000619 | 678310770000619 |
| Posting Date | 07/27/2018 | 07/27/2018 |
| Run Sequence | 1012 | 1012 |
| Batch Sequence | 18 | 18 |
| Amount | $53,027.00 | $53,027.00 |
| Created Time | 07/27/2018 21:01 | 08/02/2018 08:52 |
| Bank of First Deposit | 111319347 | 111319347 |
| Cash Letter Total | $6,939,351.54 | $1,207,676.51 |
| Cash Letter Date | 07/27/2018 | 08/02/2018 |
| Cash Letter TR | 111319347 | 111319347 |
| Bundle Total | $682,743.97 | $1,207,676.51 |
| Sequence | 678310770000619 | 3996372126 |
| Previous Item Amount | $39,997.00 | $48,246.00 |
| Next Item Amount | $38,123.00 | $57,246.00 |

# Check21 Fed Lookup Information



| Type | Outgoing Check | Incoming Return |
|---|---|---|
| Item Reference | BankersBank | Fed Returns |
| HostImageNumber | 678310770000618 | 678310770000618 |
| Posting Date | 07/27/2018 | 07/27/2018 |
| Run Sequence | 1012 | 1012 |
| Batch Sequence | 18 | 18 |
| Amount | $39,997.00 | $39,997.00 |
| Created Time | 07/27/2018 21:01 | 08/02/2018 08:52 |
| Bank of First Deposit | 111319347 | 111319347 |
| Cash Letter Total | $6,939,351.54 | $1,207,676.51 |
| Cash Letter Date | 07/27/2018 | 08/02/2018 |
| Cash Letter TR | 111319347 | 111319347 |
| Bundle Total | $682,743.97 | $1,207,676.51 |
| Sequence | 678310770000618 | 3996372106 |
| Previous Item Amount | $43,444.00 | $39,862.00 |
| Next Item Amount | $53,027.00 | $43,444.00 |

APP 0127

# Check21 Fed Lookup Information



| Type | Outgoing Check | Incoming Return |
|---|---|---|
| Item Reference | BankersBank | Fed Returns |
| HostImageNumber | 678310770000617 | 678310770000617 |
| Posting Date | 07/27/2018 | 07/27/2018 |
| Run Sequence | 1012 | 1012 |
| Batch Sequence | 18 | 18 |
| Amount | $43,444.00 | $43,444.00 |
| Created Time | 07/27/2018 21:01 | 08/02/2018 08:52 |
| Bank of First Deposit | 111319347 | 111319347 |
| Cash Letter Total | $6,939,351.54 | $1,207,676.51 |
| Cash Letter Date | 07/27/2018 | 08/02/2018 |
| Cash Letter TR | 111319347 | 111319347 |
| Bundle Total | $682,743.97 | $1,207,676.51 |
| Sequence | 678310770000617 | 3996372109 |
| Previous Item Amount | $59,064.00 | $39,997.00 |
| Next Item Amount | $39,997.00 | $48,246.00 |

# Check21 Fed Lookup Information



| Type | Outgoing Check | Incoming Return |
|---|---|---|
| Item Reference | BankersBank | Fed Returns |
| HostImageNumber | 678310770000616 | 678310770000616 |
| Posting Date | 07/27/2018 | 07/27/2018 |
| Run Sequence | 1012 | 1012 |
| Batch Sequence | 18 | 18 |
| Amount | $59,064.00 | $59,064.00 |
| Created Time | 07/27/2018 21:01 | 08/02/2018 08:52 |
| Bank of First Deposit | 111319347 | 111319347 |
| Cash Letter Total | $6,939,351.54 | $1,207,676.51 |
| Cash Letter Date | 07/27/2018 | 08/02/2018 |
| Cash Letter TR | 111319347 | 111319347 |
| Bundle Total | $682,743.97 | $1,207,676.51 |
| Sequence | 678310770000616 | 3996372136 |
| Previous Item Amount | $48,246.00 | $57,246.00 |
| Next Item Amount | $43,444.00 | $59,517.00 |

APP 0129

# Check21 Fed Lookup Information



| Type | Outgoing Check | Incoming Return |
|---|---|---|
| Item Reference | BankersBank | Fed Returns |
| HostImageNumber | 678310770000615 | 678310770000615 |
| Posting Date | 07/27/2018 | 07/27/2018 |
| Run Sequence | 1012 | 1012 |
| Batch Sequence | 18 | 18 |
| Amount | $48,246.00 | $48,246.00 |
| Created Time | 07/27/2018 21:01 | 08/02/2018 08:52 |
| Bank of First Deposit | 111319347 | 111319347 |
| Cash Letter Total | $6,939,351.54 | $1,207,676.51 |
| Cash Letter Date | 07/27/2018 | 08/02/2018 |
| Cash Letter TR | 111319347 | 111319347 |
| Bundle Total | $682,743.97 | $1,207,676.51 |
| Sequence | 678310770000615 | 3996372120 |
| Previous Item Amount | $164.26 | $43,444.00 |
| Next Item Amount | $59,064.00 | $53,027.00 |

APP 0130

# Check21 Fed Lookup Information



| Type | Outgoing Check | Incoming Return |
|---|---|---|
| **Item Reference** | BankersBank | Fed Returns |
| **HostImageNumber** | 678610770000234 | 678610770000234 |
| **Posting Date** | 07/30/2018 | 07/30/2018 |
| **Run Sequence** | 1007 | 1007 |
| **Batch Sequence** | 6 | 6 |
| **Amount** | $38,750.00 | $38,750.00 |
| **Created Time** | 07/30/2018 20:42 | 08/02/2018 08:52 |
| **Bank of First Deposit** | 111319347 | 111319347 |
| **Cash Letter Total** | $9,595,914.13 | $1,207,676.51 |
| **Cash Letter Date** | 07/30/2018 | 08/02/2018 |
| **Cash Letter TR** | 111319347 | 111319347 |
| **Bundle Total** | $1,167,452.08 | $1,207,676.51 |
| **Sequence** | 678610770000234 | 3996370319 |
| **Previous Item Amount** | $62,998.00 | $1,639.18 |
| **Next Item Amount** | $126.21 | $39,125.00 |

APP 0131

# Check21 Fed Lookup Information



| Type | Outgoing Check | Incoming Return |
|---|---|---|
| Item Reference | BankersBank | Fed Returns |
| HostImageNumber | 678610770000233 | 678610770000233 |
| Posting Date | 07/30/2018 | 07/30/2018 |
| Run Sequence | 1007 | 1007 |
| Batch Sequence | 6 | 6 |
| Amount | $62,998.00 | $62,998.00 |
| Created Time | 07/30/2018 20:42 | 08/02/2018 08:35 |
| Bank of First Deposit | 111319347 | 111319347 |
| Cash Letter Total | $9,595,914.13 | $1,207,676.51 |
| Cash Letter Date | 07/30/2018 | 08/02/2018 |
| Cash Letter TR | 111319347 | 111319347 |
| Bundle Total | $1,167,452.08 | $1,207,676.51 |
| Sequence | 678610770000233 | 3996370397 |
| Previous Item Amount | $44,227.00 | $60,097.00 |
| Next Item Amount | $38,750.00 | $237.60 |

# Check21 Fed Lookup Information





| Type | Outgoing Check | Incoming Return |
|---|---|---|
| Item Reference | BankersBank | Fed Returns |
| HostImageNumber | 678610770000232 | 678610770000232 |
| Posting Date | 07/30/2018 | 07/30/2018 |
| Run Sequence | 1007 | 1007 |
| Batch Sequence | 6 | 6 |
| Amount | $44,227.00 | $44,227.00 |
| Created Time | 07/30/2018 20:42 | 08/02/2018 08:52 |
| Bank of First Deposit | 111319347 | 111319347 |
| Cash Letter Total | $9,595,914.13 | $1,207,676.51 |
| Cash Letter Date | 07/30/2018 | 08/02/2018 |
| Cash Letter TR | 111319347 | 111319347 |
| Bundle Total | $1,167,452.08 | $1,207,676.51 |
| Sequence | 678610770000232 | 3996370335 |
| Previous Item Amount | $50,992.00 | $43,044.00 |
| Next Item Amount | $62,998.00 | $45,668.00 |

APP 0133

# Check21 Fed Lookup Information



| Type | Outgoing Check | Incoming Return |
|---|---|---|
| Item Reference | BankersBank | Fed Returns |
| HostImageNumber | 678610770000231 | 678610770000231 |
| Posting Date | 07/30/2018 | 07/30/2018 |
| Run Sequence | 1007 | 1007 |
| Batch Sequence | 6 | 6 |
| Amount | $50,992.00 | $50,992.00 |
| Created Time | 07/30/2018 20:42 | 08/02/2018 08:52 |
| Bank of First Deposit | 111319347 | 111319347 |
| Cash Letter Total | $9,595,914.13 | $1,207,676.51 |
| Cash Letter Date | 07/30/2018 | 08/02/2018 |
| Cash Letter TR | 111319347 | 111319347 |
| Bundle Total | $1,167,452.08 | $1,207,676.51 |
| Sequence | 678610770000231 | 3996370345 |
| Previous Item Amount | $39,125.00 | $45,668.00 |
| Next Item Amount | $44,227.00 | $51,456.00 |

APP 0134

# Check21 Fed Lookup Information




| Type | Outgoing Check | Incoming Return |
|---|---|---|
| Item Reference | BankersBank | Fed Returns |
| HostImageNumber | 678610770000230 | 678610770000230 |
| Posting Date | 07/30/2018 | 07/30/2018 |
| Run Sequence | 1007 | 1007 |
| Batch Sequence | 6 | 6 |
| Amount | $39,125.00 | $39,125.00 |
| Created Time | 07/30/2018 20:42 | 08/02/2018 08:52 |
| Bank of First Deposit | 111319347 | 111319347 |
| Cash Letter Total | $9,595,914.13 | $1,207,676.51 |
| Cash Letter Date | 07/30/2018 | 08/02/2018 |
| Cash Letter TR | 111319347 | 111319347 |
| Bundle Total | $1,167,452.08 | $1,207,676.51 |
| Sequence | 678610770000230 | 3996370322 |
| Previous Item Amount | $53,998.00 | $38,750.00 |
| Next Item Amount | $50,992.00 | $40,217.00 |

# Check21 Fed Lookup Information



| Type | Outgoing Check | Incoming Return |
|---|---|---|
| Item Reference | BankersBank | Fed Returns |
| HostImageNumber | 678610770000229 | 678610770000229 |
| Posting Date | 07/30/2018 | 07/30/2018 |
| Run Sequence | 1007 | 1007 |
| Batch Sequence | 6 | 6 |
| Amount | $53,998.00 | $53,998.00 |
| Created Time | 07/30/2018 20:42 | 08/02/2018 08:52 |
| Bank of First Deposit | 111319347 | 111319347 |
| Cash Letter Total | $9,595,914.13 | $1,207,676.51 |
| Cash Letter Date | 07/30/2018 | 08/02/2018 |
| Cash Letter TR | 111319347 | 111319347 |
| Bundle Total | $1,167,452.08 | $1,207,676.51 |
| Sequence | 678610770000229 | 3996370354 |
| Previous Item Amount | $60,097.00 | $51,456.00 |
| Next Item Amount | $39,125.00 | $58,064.00 |

# Check21 Fed Lookup Information





| Type | Outgoing Check | Incoming Return |
|---|---|---|
| Item Reference | BankersBank | Fed Returns |
| HostImageNumber | 678610770000228 | 678610770000228 |
| Posting Date | 07/30/2018 | 07/30/2018 |
| Run Sequence | 1007 | 1007 |
| Batch Sequence | 6 | 6 |
| Amount | $60,097.00 | $60,097.00 |
| Created Time | 07/30/2018 20:42 | 08/02/2018 08:35 |
| Bank of First Deposit | 111319347 | 111319347 |
| Cash Letter Total | $9,595,914.13 | $1,207,676.51 |
| Cash Letter Date | 07/30/2018 | 08/02/2018 |
| Cash Letter TR | 111319347 | 111319347 |
| Bundle Total | $1,167,452.08 | $1,207,676.51 |
| Sequence | 678610770000228 | 3996370367 |
| Previous Item Amount | $45,668.00 | $58,064.00 |
| Next Item Amount | $53,998.00 | $62,998.00 |

# Check21 Fed Lookup Information



| Type | Outgoing Check | Incoming Return |
|---|---|---|
| **Item Reference** | BankersBank | Fed Returns |
| **HostImageNumber** | 678610770000227 | 678610770000227 |
| **Posting Date** | 07/30/2018 | 07/30/2018 |
| **Run Sequence** | 1007 | 1007 |
| **Batch Sequence** | 6 | 6 |
| **Amount** | $45,668.00 | $45,668.00 |
| **Created Time** | 07/30/2018 20:42 | 08/02/2018 08:52 |
| **Bank of First Deposit** | 111319347 | 111319347 |
| **Cash Letter Total** | $9,595,914.13 | $1,207,676.51 |
| **Cash Letter Date** | 07/30/2018 | 08/02/2018 |
| **Cash Letter TR** | 111319347 | 111319347 |
| **Bundle Total** | $1,167,452.08 | $1,207,676.51 |
| **Sequence** | 678610770000227 | 3996370337 |
| **Previous Item Amount** | $51,456.00 | $44,227.00 |
| **Next Item Amount** | $60,097.00 | $50,992.00 |

# Check21 Fed Lookup Information



| Type | Outgoing Check | Incoming Return |
|---|---|---|
| **Item Reference** | BankersBank | Fed Returns |
| **HostImageNumber** | 678610770000226 | 678610770000226 |
| **Posting Date** | 07/30/2018 | 07/30/2018 |
| **Run Sequence** | 1007 | 1007 |
| **Batch Sequence** | 6 | 6 |
| **Amount** | $51,456.00 | $51,456.00 |
| **Created Time** | 07/30/2018 20:42 | 08/02/2018 08:52 |
| **Bank of First Deposit** | 111319347 | 111319347 |
| **Cash Letter Total** | $9,595,914.13 | $1,207,676.51 |
| **Cash Letter Date** | 07/30/2018 | 08/02/2018 |
| **Cash Letter TR** | 111319347 | 111319347 |
| **Bundle Total** | $1,167,452.08 | $1,207,676.51 |
| **Sequence** | 678610770000226 | 3996370348 |
| **Previous Item Amount** | $43,044.00 | $50,992.00 |
| **Next Item Amount** | $45,668.00 | $53,998.00 |

APP 0139

# Check21 Fed Lookup Information



| Type | Outgoing Check | Incoming Return |
|---|---|---|
| **Item Reference** | BankersBank | Fed Returns |
| **HostImageNumber** | 678610770000225 | 678610770000225 |
| **Posting Date** | 07/30/2018 | 07/30/2018 |
| **Run Sequence** | 1007 | 1007 |
| **Batch Sequence** | 6 | 6 |
| **Amount** | $43,044.00 | $43,044.00 |
| **Created Time** | 07/30/2018 20:42 | 08/02/2018 08:52 |
| **Bank of First Deposit** | 111319347 | 111319347 |
| **Cash Letter Total** | $9,595,914.13 | $1,207,676.51 |
| **Cash Letter Date** | 07/30/2018 | 08/02/2018 |
| **Cash Letter TR** | 111319347 | 111319347 |
| **Bundle Total** | $1,167,452.08 | $1,207,676.51 |
| **Sequence** | 678610770000225 | 3996370329 |
| **Previous Item Amount** | $58,064.00 | $40,217.00 |
| **Next Item Amount** | $51,456.00 | $44,227.00 |

# Check21 Fed Lookup Information



| Type | Outgoing Check | Incoming Return |
|---|---|---|
| Item Reference | BankersBank | Fed Returns |
| HostImageNumber | 678610770000224 | 678610770000224 |
| Posting Date | 07/30/2018 | 07/30/2018 |
| Run Sequence | 1007 | 1007 |
| Batch Sequence | 6 | 6 |
| Amount | $58,064.00 | $58,064.00 |
| Created Time | 07/30/2018 20:42 | 08/02/2018 08:52 |
| Bank of First Deposit | 111319347 | 111319347 |
| Cash Letter Total | $9,595,914.13 | $1,207,676.51 |
| Cash Letter Date | 07/30/2018 | 08/02/2018 |
| Cash Letter TR | 111319347 | 111319347 |
| Bundle Total | $1,167,452.08 | $1,207,676.51 |
| Sequence | 678610770000224 | 3996370358 |
| Previous Item Amount | $40,217.00 | $53,998.00 |
| Next Item Amount | $43,044.00 | $60,097.00 |

APP 0141

# Check21 Fed Lookup Information



| Type | Outgoing Check | Incoming Return |
|---|---|---|
| Item Reference | BankersBank | Fed Returns |
| HostImageNumber | 678610770000223 | 678610770000223 |
| Posting Date | 07/30/2018 | 07/30/2018 |
| Run Sequence | 1007 | 1007 |
| Batch Sequence | 6 | 6 |
| Amount | $40,217.00 | $40,217.00 |
| Created Time | 07/30/2018 20:42 | 08/02/2018 08:52 |
| Bank of First Deposit | 111319347 | 111319347 |
| Cash Letter Total | $9,595,914.13 | $1,207,676.51 |
| Cash Letter Date | 07/30/2018 | 08/02/2018 |
| Cash Letter TR | 111319347 | 111319347 |
| Bundle Total | $1,167,452.08 | $1,207,676.51 |
| Sequence | 678610770000223 | 3996370327 |
| Previous Item Amount | $85.00 | $39,125.00 |
| Next Item Amount | $58,064.00 | $43,044.00 |

# Check21 Fed Lookup Information



| Type | Outgoing Check | Incoming Return |
|---|---|---|
| Item Reference | BankersBank | Fed Returns |
| HostImageNumber | 678710770000404 | 678710770000404 |
| Posting Date | 07/31/2018 | 07/31/2018 |
| Run Sequence | 1010 | 1010 |
| Batch Sequence | 11 | 11 |
| Amount | $37,097.00 | $37,097.00 |
| Created Time | 07/31/2018 20:54 | 08/03/2018 08:25 |
| Bank of First Deposit | 111319347 | 111319347 |
| Cash Letter Total | $7,412,239.83 | $519,812.59 |
| Cash Letter Date | 07/31/2018 | 08/03/2018 |
| Cash Letter TR | 111319347 | 111319347 |
| Bundle Total | $768,858.77 | $519,812.59 |
| Sequence | 678710770000404 | 4010293123 |
| Previous Item Amount | $60,189.00 | $60,189.00 |
| Next Item Amount | $1,121.84 | $920.00 |

APP 0143

# Check21 Fed Lookup Information



| Type | Outgoing Check | Incoming Return |
|---|---|---|
| Item Reference | BankersBank | Fed Returns |
| HostImageNumber | 678710770000403 | 678710770000403 |
| Posting Date | 07/31/2018 | 07/31/2018 |
| Run Sequence | 1010 | 1010 |
| Batch Sequence | 11 | 11 |
| Amount | $60,189.00 | $60,189.00 |
| Created Time | 07/31/2018 20:54 | 08/03/2018 08:25 |
| Bank of First Deposit | 111319347 | 111319347 |
| Cash Letter Total | $7,412,239.83 | $519,812.59 |
| Cash Letter Date | 07/31/2018 | 08/03/2018 |
| Cash Letter TR | 111319347 | 111319347 |
| Bundle Total | $768,858.77 | $519,812.59 |
| Sequence | 678710770000403 | 4010293119 |
| Previous Item Amount | $36,332.00 | $36,332.00 |
| Next Item Amount | $37,097.00 | $37,097.00 |

# Check21 Fed Lookup Information



| Type | Outgoing Check | Incoming Return |
|---|---|---|
| Item Reference | BankersBank | Fed Returns |
| HostImageNumber | 678710770000402 | 678710770000402 |
| Posting Date | 07/31/2018 | 07/31/2018 |
| Run Sequence | 1010 | 1010 |
| Batch Sequence | 11 | 11 |
| Amount | $36,332.00 | $36,332.00 |
| Created Time | 07/31/2018 20:54 | 08/03/2018 08:25 |
| Bank of First Deposit | 111319347 | 111319347 |
| Cash Letter Total | $7,412,239.83 | $519,812.59 |
| Cash Letter Date | 07/31/2018 | 08/03/2018 |
| Cash Letter TR | 111319347 | 111319347 |
| Bundle Total | $768,858.77 | $519,812.59 |
| Sequence | 678710770000402 | 4010293113 |
| Previous Item Amount | $53,201.00 | $53,201.00 |
| Next Item Amount | $60,189.00 | $60,189.00 |

# Check21 Fed Lookup Information





| Type | Outgoing Check | Incoming Return |
| --- | --- | --- |
| Item Reference | BankersBank | Fed Returns |
| HostImageNumber | 678710770000401 | 678710770000401 |
| Posting Date | 07/31/2018 | 07/31/2018 |
| Run Sequence | 1010 | 1010 |
| Batch Sequence | 11 | 11 |
| Amount | $53,201.00 | $53,201.00 |
| Created Time | 07/31/2018 20:54 | 08/03/2018 08:25 |
| Bank of First Deposit | 111319347 | 111319347 |
| Cash Letter Total | $7,412,239.83 | $519,812.59 |
| Cash Letter Date | 07/31/2018 | 08/03/2018 |
| Cash Letter TR | 111319347 | 111319347 |
| Bundle Total | $768,858.77 | $519,812.59 |
| Sequence | 678710770000401 | 4010293106 |
| Previous Item Amount | $49,077.00 | $49,077.00 |
| Next Item Amount | $36,332.00 | $36,332.00 |

# Check21 Fed Lookup Information



| Type | Outgoing Check | Incoming Return |
|---|---|---|
| **Item Reference** | BankersBank | Fed Returns |
| **HostImageNumber** | 678710770000400 | 678710770000400 |
| **Posting Date** | 07/31/2018 | 07/31/2018 |
| **Run Sequence** | 1010 | 1010 |
| **Batch Sequence** | 11 | 11 |
| **Amount** | $49,077.00 | $49,077.00 |
| **Created Time** | 07/31/2018 20:54 | 08/03/2018 08:25 |
| **Bank of First Deposit** | 111319347 | 111319347 |
| **Cash Letter Total** | $7,412,239.83 | $519,812.59 |
| **Cash Letter Date** | 07/31/2018 | 08/03/2018 |
| **Cash Letter TR** | 111319347 | 111319347 |
| **Bundle Total** | $768,858.77 | $519,812.59 |
| **Sequence** | 678710770000400 | 4010293105 |
| **Previous Item Amount** | $53,972.00 | $53,972.00 |
| **Next Item Amount** | $53,201.00 | $53,201.00 |

APP 0147

# Check21 Fed Lookup Information





| Type | Outgoing Check | Incoming Return |
|---|---|---|
| Item Reference | BankersBank | Fed Returns |
| HostImageNumber | 678710770000399 | 678710770000399 |
| Posting Date | 07/31/2018 | 07/31/2018 |
| Run Sequence | 1010 | 1010 |
| Batch Sequence | 11 | 11 |
| Amount | $53,972.00 | $53,972.00 |
| Created Time | 07/31/2018 20:54 | 08/03/2018 08:25 |
| Bank of First Deposit | 111319347 | 111319347 |
| Cash Letter Total | $7,412,239.83 | $519,812.59 |
| Cash Letter Date | 07/31/2018 | 08/03/2018 |
| Cash Letter TR | 111319347 | 111319347 |
| Bundle Total | $768,858.77 | $519,812.59 |
| Sequence | 678710770000399 | 4010293095 |
| Previous Item Amount | $57,024.00 | $57,024.00 |
| Next Item Amount | $49,077.00 | $49,077.00 |

APP 0148

# Check21 Fed Lookup Information



| Type | Outgoing Check | Incoming Return |
|---|---|---|
| **Item Reference** | BankersBank | Fed Returns |
| **HostImageNumber** | 678710770000398 | 678710770000398 |
| **Posting Date** | 07/31/2018 | 07/31/2018 |
| **Run Sequence** | 1010 | 1010 |
| **Batch Sequence** | 11 | 11 |
| **Amount** | $57,024.00 | $57,024.00 |
| **Created Time** | 07/31/2018 20:54 | 08/03/2018 08:25 |
| **Bank of First Deposit** | 111319347 | 111319347 |
| **Cash Letter Total** | $7,412,239.83 | $519,812.59 |
| **Cash Letter Date** | 07/31/2018 | 08/03/2018 |
| **Cash Letter TR** | 111319347 | 111319347 |
| **Bundle Total** | $768,858.77 | $519,812.59 |
| **Sequence** | 678710770000398 | 4010293088 |
| **Previous Item Amount** | $59,964.00 | $59,964.00 |
| **Next Item Amount** | $53,972.00 | $53,972.00 |

APP 0149

# Check21 Fed Lookup Information




| Type | Outgoing Check | Incoming Return |
|---|---|---|
| Item Reference | BankersBank | Fed Returns |
| HostImageNumber | 678710770000397 | 678710770000397 |
| Posting Date | 07/31/2018 | 07/31/2018 |
| Run Sequence | 1010 | 1010 |
| Batch Sequence | 11 | 11 |
| Amount | $59,964.00 | $59,964.00 |
| Created Time | 07/31/2018 20:54 | 08/03/2018 08:25 |
| Bank of First Deposit | 111319347 | 111319347 |
| Cash Letter Total | $7,412,239.83 | $519,812.59 |
| Cash Letter Date | 07/31/2018 | 08/03/2018 |
| Cash Letter TR | 111319347 | 111319347 |
| Bundle Total | $768,858.77 | $519,812.59 |
| Sequence | 678710770000397 | 4010293085 |
| Previous Item Amount | $42,027.00 | $42,027.00 |
| Next Item Amount | $57,024.00 | $57,024.00 |

APP 0150

# Check21 Fed Lookup Information



| Type | Outgoing Check | Incoming Return |
|---|---|---|
| Item Reference | BankersBank | Fed Returns |
| HostImageNumber | 678710770000396 | 678710770000396 |
| Posting Date | 07/31/2018 | 07/31/2018 |
| Run Sequence | 1010 | 1010 |
| Batch Sequence | 11 | 11 |
| Amount | $42,027.00 | $42,027.00 |
| Created Time | 07/31/2018 20:54 | 08/03/2018 08:25 |
| Bank of First Deposit | 111319347 | 111319347 |
| Cash Letter Total | $7,412,239.83 | $519,812.59 |
| Cash Letter Date | 07/31/2018 | 08/03/2018 |
| Cash Letter TR | 111319347 | 111319347 |
| Bundle Total | $768,858.77 | $519,812.59 |
| Sequence | 678710770000396 | 4010293076 |
| Previous Item Amount | $54,025.00 | $54,025.00 |
| Next Item Amount | $59,964.00 | $59,964.00 |

# Check21 Fed Lookup Information





| Type | Outgoing Check | Incoming Return |
|---|---|---|
| Item Reference | BankersBank | Fed Returns |
| HostImageNumber | 678710770000395 | 678710770000395 |
| Posting Date | 07/31/2018 | 07/31/2018 |
| Run Sequence | 1010 | 1010 |
| Batch Sequence | 11 | 11 |
| Amount | $54,025.00 | $54,025.00 |
| Created Time | 07/31/2018 20:54 | 08/03/2018 08:25 |
| Bank of First Deposit | 111319347 | 111319347 |
| Cash Letter Total | $7,412,239.83 | $519,812.59 |
| Cash Letter Date | 07/31/2018 | 08/03/2018 |
| Cash Letter TR | 111319347 | 111319347 |
| Bundle Total | $768,858.77 | $519,812.59 |
| Sequence | 678710770000395 | 4010293072 |
| Previous Item Amount | $150.00 | $430.20 |
| Next Item Amount | $42,027.00 | $42,027.00 |

# EXHIBIT A-14

APP 0153



# Statutory Warning Demand Letter

**Friday, August 03, 2018**

**REAGOR AUTO MALL, LTD.**
**ATTN: MR. RICK DYKES**
**1215 AVE J**
**LUBBOCK, TX 79401**

Dear Sir,

The below check(s) were returned for the following reason:

☐  Insufficient Funds      ☐  Account Closed      ☒  Uncollected Funds

| Check Number | Amount | Dated | Bank Drawn Off of | Payable to |
|---|---|---|---|---|
| 191010 | $37,601.00 | 7/26/2018 | First Capital Bank of Lubbock | Reagor Auto Mall LTD. |
| 191005 | $38,123.00 | 7/26/2018 | First Capital Bank of Lubbock | Reagor Auto Mall LTD. |
| 191011 | $39,862.00 | 7/26/2018 | First Capital Bank of Lubbock | Reagor Auto Mall LTD. |
| 191004 | $39,997.00 | 7/26/2018 | First Capital Bank of Lubbock | Reagor Auto Mall LTD. |
| 191003 | $43,444.00 | 7/26/2018 | First Capital Bank of Lubbock | Reagor Auto Mall LTD. |
| 191002 | $48,246.00 | 7/26/2018 | First Capital Bank of Lubbock | Reagor Auto Mall LTD. |
| 191001 | $53,027.00 | 7/26/2018 | First Capital Bank of Lubbock | Reagor Auto Mall LTD. |
| 190444 | $57,246.00 | 7/22/2018 | First Capital Bank of Lubbock | Reagor Auto Mall LTD. |
| 190998 | $59,064.00 | 7/26/2018 | First Capital Bank of Lubbock | Reagor Auto Mall LTD. |
| 190446 | $59,517.00 | 7/22/2018 | First Capital Bank of Lubbock | Reagor Auto Mall LTD. |
| 190448 | $62,391.00 | 7/22/2018 | First Capital Bank of Lubbock | Reagor Auto Mall LTD. |
| 190449 | $63,762.00 | 7/22/2018 | First Capital Bank of Lubbock | Reagor Auto Mall LTD. |
| 191230 | $38,750.00 | 7/28/2018 | First Capital Bank of Lubbock | Reagor Auto Mall LTD. |
| 191231 | $39,125.00 | 7/28/2018 | First Capital Bank of Lubbock | Reagor Auto Mall LTD. |
| 191232 | $40,217.00 | 7/28/2018 | First Capital Bank of Lubbock | Reagor Auto Mall LTD. |
| 191235 | $43,044.00 | 7/28/2018 | First Capital Bank of Lubbock | Reagor Auto Mall LTD. |
| 191238 | $44,227.00 | 7/28/2017 | First Capital Bank of Lubbock | Reagor Auto Mall LTD. |
| 191237 | $45,668.00 | 7/28/2018 | First Capital Bank of Lubbock | Reagor Auto Mall LTD. |
| 191338 | $50,992.00 | 7/30/2018 | First Capital Bank of Lubbock | Reagor Auto Mall LTD. |
| 191331 | $51,456.00 | 7/30/2018 | First Capital Bank of Lubbock | Reagor Auto Mall LTD. |
| 191328 | $53,998.00 | 7/30/2018 | First Capital Bank of Lubbock | Reagor Auto Mall LTD. |
| 191325 | $58,064.00 | 7/30/2018 | First Capital Bank of Lubbock | Reagor Auto Mall LTD. |
| 191335 | $60,097.00 | 7/30/2018 | First Capital Bank of Lubbock | Reagor Auto Mall LTD. |
| 191334 | $62,998.00 | 7/30/2018 | First Capital Bank of Lubbock | Reagor Auto Mall LTD. |
| 191372 | $37,097.00 | 7/30/2018 | First Capital Bank of Lubbock | Reagor Auto Mall LTD. |
| 191375 | $60,189.00 | 7/30/2018 | First Capital Bank of Lubbock | Reagor Auto Mall LTD. |
| 191374 | $36,332.00 | 7/30/2018 | First Capital Bank of Lubbock | Reagor Auto Mall LTD. |
| 191370 | $53,201.00 | 7/30/2018 | First Capital Bank of Lubbock | Reagor Auto Mall LTD. |
| 191337 | $49,077.00 | 7/30/2018 | First Capital Bank of Lubbock | Reagor Auto Mall LTD. |
| 191326 | $53,972.00 | 7/30/2018 | First Capital Bank of Lubbock | Reagor Auto Mall LTD. |

APP 0154

*Continued on next page*

| 191329 | $57,024.00 | 7/30/2018 | First Capital Bank of Lubbock | Reagor Auto Mall LTD. |
|--------|-----------|-----------|-------------------------------|----------------------|
| 191330 | $59,964.00 | 7/30/2018 | First Capital Bank of Lubbock | Reagor Auto Mall LTD. |
| 191234 | $42,027.00 | 7/28/2018 | First Capital Bank of Lubbock | Reagor Auto Mall LTD. |

**Total:**     **$1,639,799.00**

This is a demand for payment in full for the check(s) or order(s) not paid because the reason listed above. If you fail to make payment in full within 10 days after the date of this notice, the failure to pay created a presumption for committing an offense, and this matter will be referred to the Lubbock County District Attorney's Hot Check Office for criminal prosecution.

Sincerely,

*Jonathan Bloxom*

**FirstBank & Trust Co.**
**Deposit Operations Team Leader/Banking Officer**
**806.776.6804  direct line**
**jonathan.bloxom@firstbanktexas.com**
**9826 Slide Rd Ste 100**
**Lubbock, TX 79424**

**CC via email:**     **Mr. Jared Townsend, VP, FirstBank & Trust**
                   **Mr. Tim White, EVP/Chief Credit Officer, FirstBank & Trust**
                   **Mr. Greg Garland, President, FirstBank & Trust**

APP 0155

# Check21 Fed Lookup Information



| Type | Outgoing Check | Incoming Return |
|---|---|---|
| **Item Reference** | BankersBank | Fed Returns |
| **HostImageNumber** | 678310770000626 | 678310770000626 |
| **Posting Date** | 07/27/2018 | 07/27/2018 |
| **Run Sequence** | 1012 | 1012 |
| **Batch Sequence** | 18 | 18 |
| **Amount** | $63,762.00 | $63,762.00 |
| **Created Time** | 07/27/2018 21:01 | 08/02/2018 08:35 |
| **Bank of First Deposit** | 111319347 | 111319347 |
| **Cash Letter Total** | $6,939,351.54 | $1,207,676.51 |
| **Cash Letter Date** | 07/27/2018 | 08/02/2018 |
| **Cash Letter TR** | 111319347 | 111319347 |
| **Bundle Total** | $682,743.97 | $1,207,676.51 |
| **Sequence** | 678310770000626 | 3996368075 |
| **Previous Item Amount** | $62,391.00 | $27.00 |
| **Next Item Amount** | $500.00 | $1,639.18 |

APP 0156

# Check21 Fed Lookup Information



| Type | Outgoing Check | Incoming Return |
|------|----------------|-----------------|
| Item Reference | BankersBank | Fed Returns |
| HostImageNumber | 678310770000625 | 678310770000625 |
| Posting Date | 07/27/2018 | 07/27/2018 |
| Run Sequence | 1012 | 1012 |
| Batch Sequence | 18 | 18 |
| Amount | $62,391.00 | $62,391.00 |
| Created Time | 07/27/2018 21:01 | 08/02/2018 08:35 |
| Bank of First Deposit | 111319347 | 111319347 |
| Cash Letter Total | $6,939,351.54 | $1,207,676.51 |
| Cash Letter Date | 07/27/2018 | 08/02/2018 |
| Cash Letter TR | 111319347 | 111319347 |
| Bundle Total | $682,743.97 | $1,207,676.51 |
| Sequence | 678310770000625 | 3996372148 |
| Previous Item Amount | $59,517.00 | $59,517.00 |
| Next Item Amount | $63,762.00 | $7,290.91 |

# Check21 Fed Lookup Information





| Type | Outgoing Check | Incoming Return |
|---|---|---|
| Item Reference | BankersBank | Fed Returns |
| HostImageNumber | 678310770000624 | 678310770000624 |
| Posting Date | 07/27/2018 | 07/27/2018 |
| Run Sequence | 1012 | 1012 |
| Batch Sequence | 18 | 18 |
| Amount | $59,517.00 | $59,517.00 |
| Created Time | 07/27/2018 21:01 | 08/02/2018 08:35 |
| Bank of First Deposit | 111319347 | 111319347 |
| Cash Letter Total | $6,939,351.54 | $1,207,676.51 |
| Cash Letter Date | 07/27/2018 | 08/02/2018 |
| Cash Letter TR | 111319347 | 111319347 |
| Bundle Total | $682,743.97 | $1,207,676.51 |
| Sequence | 678310770000624 | 3996372140 |
| Previous Item Amount | $57,246.00 | $59,064.00 |
| Next Item Amount | $62,391.00 | $62,391.00 |

APP 0158

# Check21 Fed Lookup Information



| Type | Outgoing Check | Incoming Return |
|---|---|---|
| **Item Reference** | BankersBank | Fed Returns |
| **HostImageNumber** | 678310770000623 | 678310770000623 |
| **Posting Date** | 07/27/2018 | 07/27/2018 |
| **Run Sequence** | 1012 | 1012 |
| **Batch Sequence** | 18 | 18 |
| **Amount** | $57,246.00 | $57,246.00 |
| **Created Time** | 07/27/2018 21:01 | 08/02/2018 08:52 |
| **Bank of First Deposit** | 111319347 | 111319347 |
| **Cash Letter Total** | $6,939,351.54 | $1,207,676.51 |
| **Cash Letter Date** | 07/27/2018 | 08/02/2018 |
| **Cash Letter TR** | 111319347 | 111319347 |
| **Bundle Total** | $682,743.97 | $1,207,676.51 |
| **Sequence** | 678310770000623 | 3996372132 |
| **Previous Item Amount** | $39,862.00 | $53,027.00 |
| **Next Item Amount** | $59,517.00 | $59,064.00 |

APP 0159

# Check21 Fed Lookup Information



| Type | Outgoing Check | Incoming Return |
|---|---|---|
| Item Reference | BankersBank | Fed Returns |
| HostImageNumber | 678310770000622 | 678310770000622 |
| Posting Date | 07/27/2018 | 07/27/2018 |
| Run Sequence | 1012 | 1012 |
| Batch Sequence | 18 | 18 |
| Amount | $39,862.00 | $39,862.00 |
| Created Time | 07/27/2018 21:01 | 08/02/2018 08:52 |
| Bank of First Deposit | 111319347 | 111319347 |
| Cash Letter Total | $6,939,351.54 | $1,207,676.51 |
| Cash Letter Date | 07/27/2018 | 08/02/2018 |
| Cash Letter TR | 111319347 | 111319347 |
| Bundle Total | $682,743.97 | $1,207,676.51 |
| Sequence | 678310770000622 | 3996372101 |
| Previous Item Amount | $37,601.00 | $38,123.00 |
| Next Item Amount | $57,246.00 | $39,997.00 |

APP 0160

# Check21 Fed Lookup Information




| Type | Outgoing Check | Incoming Return |
|---|---|---|
| Item Reference | BankersBank | Fed Returns |
| HostImageNumber | 678310770000621 | 678310770000621 |
| Posting Date | 07/27/2018 | 07/27/2018 |
| Run Sequence | 1012 | 1012 |
| Batch Sequence | 18 | 18 |
| Amount | $37,601.00 | $37,601.00 |
| Created Time | 07/27/2018 21:01 | 08/02/2018 08:52 |
| Bank of First Deposit | 111319347 | 111319347 |
| Cash Letter Total | $6,939,351.54 | $1,207,676.51 |
| Cash Letter Date | 07/27/2018 | 08/02/2018 |
| Cash Letter TR | 111319347 | 111319347 |
| Bundle Total | $682,743.97 | $1,207,676.51 |
| Sequence | 678310770000621 | 3996372095 |
| Previous Item Amount | $38,123.00 | $237.60 |
| Next Item Amount | $39,862.00 | $38,123.00 |

APP 0161

# Check21 Fed Lookup Information





| Type | Outgoing Check | Incoming Return |
|---|---|---|
| Item Reference | BankersBank | Fed Returns |
| HostImageNumber | 678310770000620 | 678310770000620 |
| Posting Date | 07/27/2018 | 07/27/2018 |
| Run Sequence | 1012 | 1012 |
| Batch Sequence | 18 | 18 |
| Amount | $38,123.00 | $38,123.00 |
| Created Time | 07/27/2018 21:01 | 08/02/2018 08:52 |
| Bank of First Deposit | 111319347 | 111319347 |
| Cash Letter Total | $6,939,351.54 | $1,207,676.51 |
| Cash Letter Date | 07/27/2018 | 08/02/2018 |
| Cash Letter TR | 111319347 | 111319347 |
| Bundle Total | $682,743.97 | $1,207,676.51 |
| Sequence | 678310770000620 | 3996372099 |
| Previous Item Amount | $53,027.00 | $37,601.00 |
| Next Item Amount | $37,601.00 | $39,862.00 |

APP 0162

# Check21 Fed Lookup Information





| Type | Outgoing Check | Incoming Return |
|---|---|---|
| Item Reference | BankersBank | Fed Returns |
| HostImageNumber | 678310770000619 | 678310770000619 |
| Posting Date | 07/27/2018 | 07/27/2018 |
| Run Sequence | 1012 | 1012 |
| Batch Sequence | 18 | 18 |
| Amount | $53,027.00 | $53,027.00 |
| Created Time | 07/27/2018 21:01 | 08/02/2018 08:52 |
| Bank of First Deposit | 111319347 | 111319347 |
| Cash Letter Total | $6,939,351.54 | $1,207,676.51 |
| Cash Letter Date | 07/27/2018 | 08/02/2018 |
| Cash Letter TR | 111319347 | 111319347 |
| Bundle Total | $682,743.97 | $1,207,676.51 |
| Sequence | 678310770000619 | 3996372126 |
| Previous Item Amount | $39,997.00 | $48,246.00 |
| Next Item Amount | $38,123.00 | $57,246.00 |

# Check21 Fed Lookup Information



| Type | Outgoing Check | Incoming Return |
|---|---|---|
| Item Reference | BankersBank | Fed Returns |
| HostImageNumber | 678310770000618 | 678310770000618 |
| Posting Date | 07/27/2018 | 07/27/2018 |
| Run Sequence | 1012 | 1012 |
| Batch Sequence | 18 | 18 |
| Amount | $39,997.00 | $39,997.00 |
| Created Time | 07/27/2018 21:01 | 08/02/2018 08:52 |
| Bank of First Deposit | 111319347 | 111319347 |
| Cash Letter Total | $6,939,351.54 | $1,207,676.51 |
| Cash Letter Date | 07/27/2018 | 08/02/2018 |
| Cash Letter TR | 111319347 | 111319347 |
| Bundle Total | $682,743.97 | $1,207,676.51 |
| Sequence | 678310770000618 | 3996372106 |
| Previous Item Amount | $43,444.00 | $39,862.00 |
| Next Item Amount | $53,027.00 | $43,444.00 |

# Check21 Fed Lookup Information



| Type | Outgoing Check | Incoming Return |
|---|---|---|
| Item Reference | BankersBank | Fed Returns |
| HostImageNumber | 678310770000617 | 678310770000617 |
| Posting Date | 07/27/2018 | 07/27/2018 |
| Run Sequence | 1012 | 1012 |
| Batch Sequence | 18 | 18 |
| Amount | $43,444.00 | $43,444.00 |
| Created Time | 07/27/2018 21:01 | 08/02/2018 08:52 |
| Bank of First Deposit | 111319347 | 111319347 |
| Cash Letter Total | $6,939,351.54 | $1,207,676.51 |
| Cash Letter Date | 07/27/2018 | 08/02/2018 |
| Cash Letter TR | 111319347 | 111319347 |
| Bundle Total | $682,743.97 | $1,207,676.51 |
| Sequence | 678310770000617 | 3996372109 |
| Previous Item Amount | $59,064.00 | $39,997.00 |
| Next Item Amount | $39,997.00 | $48,246.00 |

APP 0165

# Check21 Fed Lookup Information



| Type | Outgoing Check | Incoming Return |
|---|---|---|
| Item Reference | BankersBank | Fed Returns |
| HostImageNumber | 678310770000616 | 678310770000616 |
| Posting Date | 07/27/2018 | 07/27/2018 |
| Run Sequence | 1012 | 1012 |
| Batch Sequence | 18 | 18 |
| Amount | $59,064.00 | $59,064.00 |
| Created Time | 07/27/2018 21:01 | 08/02/2018 08:52 |
| Bank of First Deposit | 111319347 | 111319347 |
| Cash Letter Total | $6,939,351.54 | $1,207,676.51 |
| Cash Letter Date | 07/27/2018 | 08/02/2018 |
| Cash Letter TR | 111319347 | 111319347 |
| Bundle Total | $682,743.97 | $1,207,676.51 |
| Sequence | 678310770000616 | 3996372136 |
| Previous Item Amount | $48,246.00 | $57,246.00 |
| Next Item Amount | $43,444.00 | $59,517.00 |

# Check21 Fed Lookup Information



| Type | Outgoing Check | Incoming Return |
|---|---|---|
| Item Reference | BankersBank | Fed Returns |
| HostImageNumber | 678310770000615 | 678310770000615 |
| Posting Date | 07/27/2018 | 07/27/2018 |
| Run Sequence | 1012 | 1012 |
| Batch Sequence | 18 | 18 |
| Amount | $48,246.00 | $48,246.00 |
| Created Time | 07/27/2018 21:01 | 08/02/2018 08:52 |
| Bank of First Deposit | 111319347 | 111319347 |
| Cash Letter Total | $6,939,351.54 | $1,207,676.51 |
| Cash Letter Date | 07/27/2018 | 08/02/2018 |
| Cash Letter TR | 111319347 | 111319347 |
| Bundle Total | $682,743.97 | $1,207,676.51 |
| Sequence | 678310770000615 | 3996372120 |
| Previous Item Amount | $164.26 | $43,444.00 |
| Next Item Amount | $59,064.00 | $53,027.00 |

# Check21 Fed Lookup Information



| Type | Outgoing Check | Incoming Return |
|---|---|---|
| Item Reference | BankersBank | Fed Returns |
| HostImageNumber | 678610770000234 | 678610770000234 |
| Posting Date | 07/30/2018 | 07/30/2018 |
| Run Sequence | 1007 | 1007 |
| Batch Sequence | 6 | 6 |
| Amount | $38,750.00 | $38,750.00 |
| Created Time | 07/30/2018 20:42 | 08/02/2018 08:52 |
| Bank of First Deposit | 111319347 | 111319347 |
| Cash Letter Total | $9,595,914.13 | $1,207,676.51 |
| Cash Letter Date | 07/30/2018 | 08/02/2018 |
| Cash Letter TR | 111319347 | 111319347 |
| Bundle Total | $1,167,452.08 | $1,207,676.51 |
| Sequence | 678610770000234 | 3996370319 |
| Previous Item Amount | $62,998.00 | $1,639.18 |
| Next Item Amount | $126.21 | $39,125.00 |

# Check21 Fed Lookup Information



| Type | Outgoing Check | Incoming Return |
|------|----------------|-----------------|
| Item Reference | BankersBank | Fed Returns |
| HostImageNumber | 678610770000233 | 678610770000233 |
| Posting Date | 07/30/2018 | 07/30/2018 |
| Run Sequence | 1007 | 1007 |
| Batch Sequence | 6 | 6 |
| Amount | $62,998.00 | $62,998.00 |
| Created Time | 07/30/2018 20:42 | 08/02/2018 08:35 |
| Bank of First Deposit | 111319347 | 111319347 |
| Cash Letter Total | $9,595,914.13 | $1,207,676.51 |
| Cash Letter Date | 07/30/2018 | 08/02/2018 |
| Cash Letter TR | 111319347 | 111319347 |
| Bundle Total | $1,167,452.08 | $1,207,676.51 |
| Sequence | 678610770000233 | 3996370397 |
| Previous Item Amount | $44,227.00 | $60,097.00 |
| Next Item Amount | $38,750.00 | $237.60 |

APP 0169

# Check21 Fed Lookup Information



| Type | Outgoing Check | Incoming Return |
|------|----------------|------------------|
| Item Reference | BankersBank | Fed Returns |
| HostImageNumber | 678610770000232 | 678610770000232 |
| Posting Date | 07/30/2018 | 07/30/2018 |
| Run Sequence | 1007 | 1007 |
| Batch Sequence | 6 | 6 |
| Amount | $44,227.00 | $44,227.00 |
| Created Time | 07/30/2018 20:42 | 08/02/2018 08:52 |
| Bank of First Deposit | 111319347 | 111319347 |
| Cash Letter Total | $9,595,914.13 | $1,207,676.51 |
| Cash Letter Date | 07/30/2018 | 08/02/2018 |
| Cash Letter TR | 111319347 | 111319347 |
| Bundle Total | $1,167,452.08 | $1,207,676.51 |
| Sequence | 678610770000232 | 3996370335 |
| Previous Item Amount | $50,992.00 | $43,044.00 |
| Next Item Amount | $62,998.00 | $45,668.00 |

APP 0170

# Check21 Fed Lookup Information



| Type | Outgoing Check | Incoming Return |
|---|---|---|
| **Item Reference** | BankersBank | Fed Returns |
| **HostImageNumber** | 678610770000231 | 678610770000231 |
| **Posting Date** | 07/30/2018 | 07/30/2018 |
| **Run Sequence** | 1007 | 1007 |
| **Batch Sequence** | 6 | 6 |
| **Amount** | $50,992.00 | $50,992.00 |
| **Created Time** | 07/30/2018 20:42 | 08/02/2018 08:52 |
| **Bank of First Deposit** | 111319347 | 111319347 |
| **Cash Letter Total** | $9,595,914.13 | $1,207,676.51 |
| **Cash Letter Date** | 07/30/2018 | 08/02/2018 |
| **Cash Letter TR** | 111319347 | 111319347 |
| **Bundle Total** | $1,167,452.08 | $1,207,676.51 |
| **Sequence** | 678610770000231 | 3996370345 |
| **Previous Item Amount** | $39,125.00 | $45,668.00 |
| **Next Item Amount** | $44,227.00 | $51,456.00 |

APP 0171

# Check21 Fed Lookup Information




| Type | Outgoing Check | Incoming Return |
|---|---|---|
| Item Reference | BankersBank | Fed Returns |
| HostImageNumber | 678610770000230 | 678610770000230 |
| Posting Date | 07/30/2018 | 07/30/2018 |
| Run Sequence | 1007 | 1007 |
| Batch Sequence | 6 | 6 |
| Amount | $39,125.00 | $39,125.00 |
| Created Time | 07/30/2018 20:42 | 08/02/2018 08:52 |
| Bank of First Deposit | 111319347 | 111319347 |
| Cash Letter Total | $9,595,914.13 | $1,207,676.51 |
| Cash Letter Date | 07/30/2018 | 08/02/2018 |
| Cash Letter TR | 111319347 | 111319347 |
| Bundle Total | $1,167,452.08 | $1,207,676.51 |
| Sequence | 678610770000230 | 3996370322 |
| Previous Item Amount | $53,998.00 | $38,750.00 |
| Next Item Amount | $50,992.00 | $40,217.00 |

APP 0172

# Check21 Fed Lookup Information



| Type | Outgoing Check | Incoming Return |
|---|---|---|
| Item Reference | BankersBank | Fed Returns |
| HostImageNumber | 678610770000229 | 678610770000229 |
| Posting Date | 07/30/2018 | 07/30/2018 |
| Run Sequence | 1007 | 1007 |
| Batch Sequence | 6 | 6 |
| Amount | $53,998.00 | $53,998.00 |
| Created Time | 07/30/2018 20:42 | 08/02/2018 08:52 |
| Bank of First Deposit | 111319347 | 111319347 |
| Cash Letter Total | $9,595,914.13 | $1,207,676.51 |
| Cash Letter Date | 07/30/2018 | 08/02/2018 |
| Cash Letter TR | 111319347 | 111319347 |
| Bundle Total | $1,167,452.08 | $1,207,676.51 |
| Sequence | 678610770000229 | 3996370354 |
| Previous Item Amount | $60,097.00 | $51,456.00 |
| Next Item Amount | $39,125.00 | $58,064.00 |

APP 0173

# Check21 Fed Lookup Information





| Type | Outgoing Check | Incoming Return |
|---|---|---|
| Item Reference | BankersBank | Fed Returns |
| HostImageNumber | 678610770000228 | 678610770000228 |
| Posting Date | 07/30/2018 | 07/30/2018 |
| Run Sequence | 1007 | 1007 |
| Batch Sequence | 6 | 6 |
| Amount | $60,097.00 | $60,097.00 |
| Created Time | 07/30/2018 20:42 | 08/02/2018 08:35 |
| Bank of First Deposit | 111319347 | 111319347 |
| Cash Letter Total | $9,595,914.13 | $1,207,676.51 |
| Cash Letter Date | 07/30/2018 | 08/02/2018 |
| Cash Letter TR | 111319347 | 111319347 |
| Bundle Total | $1,167,452.08 | $1,207,676.51 |
| Sequence | 678610770000228 | 3996370367 |
| Previous Item Amount | $45,668.00 | $58,064.00 |
| Next Item Amount | $53,998.00 | $62,998.00 |

APP 0174

# Check21 Fed Lookup Information



| Type | Outgoing Check | Incoming Return |
|---|---|---|
| **Item Reference** | BankersBank | Fed Returns |
| **HostImageNumber** | 678610770000227 | 678610770000227 |
| **Posting Date** | 07/30/2018 | 07/30/2018 |
| **Run Sequence** | 1007 | 1007 |
| **Batch Sequence** | 6 | 6 |
| **Amount** | $45,668.00 | $45,668.00 |
| **Created Time** | 07/30/2018 20:42 | 08/02/2018 08:52 |
| **Bank of First Deposit** | 111319347 | 111319347 |
| **Cash Letter Total** | $9,595,914.13 | $1,207,676.51 |
| **Cash Letter Date** | 07/30/2018 | 08/02/2018 |
| **Cash Letter TR** | 111319347 | 111319347 |
| **Bundle Total** | $1,167,452.08 | $1,207,676.51 |
| **Sequence** | 678610770000227 | 3996370337 |
| **Previous Item Amount** | $51,456.00 | $44,227.00 |
| **Next Item Amount** | $60,097.00 | $50,992.00 |

APP 0175

# Check21 Fed Lookup Information




| Type | Outgoing Check | Incoming Return |
|---|---|---|
| Item Reference | BankersBank | Fed Returns |
| HostImageNumber | 678610770000226 | 678610770000226 |
| Posting Date | 07/30/2018 | 07/30/2018 |
| Run Sequence | 1007 | 1007 |
| Batch Sequence | 6 | 6 |
| Amount | $51,456.00 | $51,456.00 |
| Created Time | 07/30/2018 20:42 | 08/02/2018 08:52 |
| Bank of First Deposit | 111319347 | 111319347 |
| Cash Letter Total | $9,595,914.13 | $1,207,676.51 |
| Cash Letter Date | 07/30/2018 | 08/02/2018 |
| Cash Letter TR | 111319347 | 111319347 |
| Bundle Total | $1,167,452.08 | $1,207,676.51 |
| Sequence | 678610770000226 | 3996370348 |
| Previous Item Amount | $43,044.00 | $50,992.00 |
| Next Item Amount | $45,668.00 | $53,998.00 |

APP 0176

# Check21 Fed Lookup Information



| Type | Outgoing Check | Incoming Return |
|---|---|---|
| Item Reference | BankersBank | Fed Returns |
| HostImageNumber | 678610770000225 | 678610770000225 |
| Posting Date | 07/30/2018 | 07/30/2018 |
| Run Sequence | 1007 | 1007 |
| Batch Sequence | 6 | 6 |
| Amount | $43,044.00 | $43,044.00 |
| Created Time | 07/30/2018 20:42 | 08/02/2018 08:52 |
| Bank of First Deposit | 111319347 | 111319347 |
| Cash Letter Total | $9,595,914.13 | $1,207,676.51 |
| Cash Letter Date | 07/30/2018 | 08/02/2018 |
| Cash Letter TR | 111319347 | 111319347 |
| Bundle Total | $1,167,452.08 | $1,207,676.51 |
| Sequence | 678610770000225 | 3996370329 |
| Previous Item Amount | $58,064.00 | $40,217.00 |
| Next Item Amount | $51,456.00 | $44,227.00 |

# Check21 Fed Lookup Information



| Type | Outgoing Check | Incoming Return |
|---|---|---|
| Item Reference | BankersBank | Fed Returns |
| HostImageNumber | 678610770000224 | 678610770000224 |
| Posting Date | 07/30/2018 | 07/30/2018 |
| Run Sequence | 1007 | 1007 |
| Batch Sequence | 6 | 6 |
| Amount | $58,064.00 | $58,064.00 |
| Created Time | 07/30/2018 20:42 | 08/02/2018 08:52 |
| Bank of First Deposit | 111319347 | 111319347 |
| Cash Letter Total | $9,595,914.13 | $1,207,676.51 |
| Cash Letter Date | 07/30/2018 | 08/02/2018 |
| Cash Letter TR | 111319347 | 111319347 |
| Bundle Total | $1,167,452.08 | $1,207,676.51 |
| Sequence | 678610770000224 | 3996370358 |
| Previous Item Amount | $40,217.00 | $53,998.00 |
| Next Item Amount | $43,044.00 | $60,097.00 |

APP 0178

# Check21 Fed Lookup Information



| Type | Outgoing Check | Incoming Return |
| --- | --- | --- |
| **Item Reference** | BankersBank | Fed Returns |
| **HostImageNumber** | 678610770000223 | 678610770000223 |
| **Posting Date** | 07/30/2018 | 07/30/2018 |
| **Run Sequence** | 1007 | 1007 |
| **Batch Sequence** | 6 | 6 |
| **Amount** | $40,217.00 | $40,217.00 |
| **Created Time** | 07/30/2018 20:42 | 08/02/2018 08:52 |
| **Bank of First Deposit** | 111319347 | 111319347 |
| **Cash Letter Total** | $9,595,914.13 | $1,207,676.51 |
| **Cash Letter Date** | 07/30/2018 | 08/02/2018 |
| **Cash Letter TR** | 111319347 | 111319347 |
| **Bundle Total** | $1,167,452.08 | $1,207,676.51 |
| **Sequence** | 678610770000223 | 3996370327 |
| **Previous Item Amount** | $85.00 | $39,125.00 |
| **Next Item Amount** | $58,064.00 | $43,044.00 |

APP 0179

# Check21 Fed Lookup Information



| Type | Outgoing Check | Incoming Return |
|---|---|---|
| Item Reference | BankersBank | Fed Returns |
| HostImageNumber | 678710770000404 | 678710770000404 |
| Posting Date | 07/31/2018 | 07/31/2018 |
| Run Sequence | 1010 | 1010 |
| Batch Sequence | 11 | 11 |
| Amount | $37,097.00 | $37,097.00 |
| Created Time | 07/31/2018 20:54 | 08/03/2018 08:25 |
| Bank of First Deposit | 111319347 | 111319347 |
| Cash Letter Total | $7,412,239.83 | $519,812.59 |
| Cash Letter Date | 07/31/2018 | 08/03/2018 |
| Cash Letter TR | 111319347 | 111319347 |
| Bundle Total | $768,858.77 | $519,812.59 |
| Sequence | 678710770000404 | 4010293123 |
| Previous Item Amount | $60,189.00 | $60,189.00 |
| Next Item Amount | $1,121.84 | $920.00 |

# Check21 Fed Lookup Information



| Type | Outgoing Check | Incoming Return |
|---|---|---|
| Item Reference | BankersBank | Fed Returns |
| HostImageNumber | 678710770000403 | 678710770000403 |
| Posting Date | 07/31/2018 | 07/31/2018 |
| Run Sequence | 1010 | 1010 |
| Batch Sequence | 11 | 11 |
| Amount | $60,189.00 | $60,189.00 |
| Created Time | 07/31/2018 20:54 | 08/03/2018 08:25 |
| Bank of First Deposit | 111319347 | 111319347 |
| Cash Letter Total | $7,412,239.83 | $519,812.59 |
| Cash Letter Date | 07/31/2018 | 08/03/2018 |
| Cash Letter TR | 111319347 | 111319347 |
| Bundle Total | $768,858.77 | $519,812.59 |
| Sequence | 678710770000403 | 4010293119 |
| Previous Item Amount | $36,332.00 | $36,332.00 |
| Next Item Amount | $37,097.00 | $37,097.00 |

APP 0181

# Check21 Fed Lookup Information




| Type | Outgoing Check | Incoming Return |
|---|---|---|
| Item Reference | BankersBank | Fed Returns |
| HostImageNumber | 678710770000402 | 678710770000402 |
| Posting Date | 07/31/2018 | 07/31/2018 |
| Run Sequence | 1010 | 1010 |
| Batch Sequence | 11 | 11 |
| Amount | $36,332.00 | $36,332.00 |
| Created Time | 07/31/2018 20:54 | 08/03/2018 08:25 |
| Bank of First Deposit | 111319347 | 111319347 |
| Cash Letter Total | $7,412,239.83 | $519,812.59 |
| Cash Letter Date | 07/31/2018 | 08/03/2018 |
| Cash Letter TR | 111319347 | 111319347 |
| Bundle Total | $768,858.77 | $519,812.59 |
| Sequence | 678710770000402 | 4010293113 |
| Previous Item Amount | $53,201.00 | $53,201.00 |
| Next Item Amount | $60,189.00 | $60,189.00 |

APP 0182

# Check21 Fed Lookup Information





| Type | Outgoing Check | Incoming Return |
|---|---|---|
| Item Reference | BankersBank | Fed Returns |
| HostImageNumber | 678710770000401 | 678710770000401 |
| Posting Date | 07/31/2018 | 07/31/2018 |
| Run Sequence | 1010 | 1010 |
| Batch Sequence | 11 | 11 |
| Amount | $53,201.00 | $53,201.00 |
| Created Time | 07/31/2018 20:54 | 08/03/2018 08:25 |
| Bank of First Deposit | 111319347 | 111319347 |
| Cash Letter Total | $7,412,239.83 | $519,812.59 |
| Cash Letter Date | 07/31/2018 | 08/03/2018 |
| Cash Letter TR | 111319347 | 111319347 |
| Bundle Total | $768,858.77 | $519,812.59 |
| Sequence | 678710770000401 | 4010293106 |
| Previous Item Amount | $49,077.00 | $49,077.00 |
| Next Item Amount | $36,332.00 | $36,332.00 |

# Check21 Fed Lookup Information





| Type | Outgoing Check | Incoming Return |
|---|---|---|
| Item Reference | BankersBank | Fed Returns |
| HostImageNumber | 678710770000400 | 678710770000400 |
| Posting Date | 07/31/2018 | 07/31/2018 |
| Run Sequence | 1010 | 1010 |
| Batch Sequence | 11 | 11 |
| Amount | $49,077.00 | $49,077.00 |
| Created Time | 07/31/2018 20:54 | 08/03/2018 08:25 |
| Bank of First Deposit | 111319347 | 111319347 |
| Cash Letter Total | $7,412,239.83 | $519,812.59 |
| Cash Letter Date | 07/31/2018 | 08/03/2018 |
| Cash Letter TR | 111319347 | 111319347 |
| Bundle Total | $768,858.77 | $519,812.59 |
| Sequence | 678710770000400 | 4010293105 |
| Previous Item Amount | $53,972.00 | $53,972.00 |
| Next Item Amount | $53,201.00 | $53,201.00 |

APP 0184

# Check21 Fed Lookup Information




| Type | Outgoing Check | Incoming Return |
|---|---|---|
| Item Reference | BankersBank | Fed Returns |
| HostImageNumber | 678710770000399 | 678710770000399 |
| Posting Date | 07/31/2018 | 07/31/2018 |
| Run Sequence | 1010 | 1010 |
| Batch Sequence | 11 | 11 |
| Amount | $53,972.00 | $53,972.00 |
| Created Time | 07/31/2018 20:54 | 08/03/2018 08:25 |
| Bank of First Deposit | 111319347 | 111319347 |
| Cash Letter Total | $7,412,239.83 | $519,812.59 |
| Cash Letter Date | 07/31/2018 | 08/03/2018 |
| Cash Letter TR | 111319347 | 111319347 |
| Bundle Total | $768,858.77 | $519,812.59 |
| Sequence | 678710770000399 | 4010293095 |
| Previous Item Amount | $57,024.00 | $57,024.00 |
| Next Item Amount | $49,077.00 | $49,077.00 |

APP 0185

# Check21 Fed Lookup Information



| Type | Outgoing Check | Incoming Return |
|---|---|---|
| **Item Reference** | BankersBank | Fed Returns |
| **HostImageNumber** | 678710770000398 | 678710770000398 |
| **Posting Date** | 07/31/2018 | 07/31/2018 |
| **Run Sequence** | 1010 | 1010 |
| **Batch Sequence** | 11 | 11 |
| **Amount** | $57,024.00 | $57,024.00 |
| **Created Time** | 07/31/2018 20:54 | 08/03/2018 08:25 |
| **Bank of First Deposit** | 111319347 | 111319347 |
| **Cash Letter Total** | $7,412,239.83 | $519,812.59 |
| **Cash Letter Date** | 07/31/2018 | 08/03/2018 |
| **Cash Letter TR** | 111319347 | 111319347 |
| **Bundle Total** | $768,858.77 | $519,812.59 |
| **Sequence** | 678710770000398 | 4010293088 |
| **Previous Item Amount** | $59,964.00 | $59,964.00 |
| **Next Item Amount** | $53,972.00 | $53,972.00 |

APP 0186

# Check21 Fed Lookup Information




| Type | Outgoing Check | Incoming Return |
|---|---|---|
| Item Reference | BankersBank | Fed Returns |
| HostImageNumber | 678710770000397 | 678710770000397 |
| Posting Date | 07/31/2018 | 07/31/2018 |
| Run Sequence | 1010 | 1010 |
| Batch Sequence | 11 | 11 |
| Amount | $59,964.00 | $59,964.00 |
| Created Time | 07/31/2018 20:54 | 08/03/2018 08:25 |
| Bank of First Deposit | 111319347 | 111319347 |
| Cash Letter Total | $7,412,239.83 | $519,812.59 |
| Cash Letter Date | 07/31/2018 | 08/03/2018 |
| Cash Letter TR | 111319347 | 111319347 |
| Bundle Total | $768,858.77 | $519,812.59 |
| Sequence | 678710770000397 | 4010293085 |
| Previous Item Amount | $42,027.00 | $42,027.00 |
| Next Item Amount | $57,024.00 | $57,024.00 |

# Check21 Fed Lookup Information



| Type | Outgoing Check | Incoming Return |
|---|---|---|
| Item Reference | BankersBank | Fed Returns |
| HostImageNumber | 678710770000396 | 678710770000396 |
| Posting Date | 07/31/2018 | 07/31/2018 |
| Run Sequence | 1010 | 1010 |
| Batch Sequence | 11 | 11 |
| Amount | $42,027.00 | $42,027.00 |
| Created Time | 07/31/2018 20:54 | 08/03/2018 08:25 |
| Bank of First Deposit | 111319347 | 111319347 |
| Cash Letter Total | $7,412,239.83 | $519,812.59 |
| Cash Letter Date | 07/31/2018 | 08/03/2018 |
| Cash Letter TR | 111319347 | 111319347 |
| Bundle Total | $768,858.77 | $519,812.59 |
| Sequence | 678710770000396 | 4010293076 |
| Previous Item Amount | $54,025.00 | $54,025.00 |
| Next Item Amount | $59,964.00 | $59,964.00 |

APP 0188

# Check21 Fed Lookup Information




| Type | Outgoing Check | Incoming Return |
|---|---|---|
| Item Reference | BankersBank | Fed Returns |
| HostImageNumber | 678710770000395 | 678710770000395 |
| Posting Date | 07/31/2018 | 07/31/2018 |
| Run Sequence | 1010 | 1010 |
| Batch Sequence | 11 | 11 |
| Amount | $54,025.00 | $54,025.00 |
| Created Time | 07/31/2018 20:54 | 08/03/2018 08:25 |
| Bank of First Deposit | 111319347 | 111319347 |
| Cash Letter Total | $7,412,239.83 | $519,812.59 |
| Cash Letter Date | 07/31/2018 | 08/03/2018 |
| Cash Letter TR | 111319347 | 111319347 |
| Bundle Total | $768,858.77 | $519,812.59 |
| Sequence | 678710770000395 | 4010293072 |
| Previous Item Amount | $150.00 | $430.20 |
| Next Item Amount | $42,027.00 | $42,027.00 |

APP 0189

# EXHIBIT B

APP 0190

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | | |
|---|---|---|
| FIRST BANK & TRUST, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| vs. | § | |
| | § | **Cause No.5:18-cv-00234-C** |
| REAGOR AUTO MALL, LTD. d/b/a | § | |
| REAGOR-DYKES OF LEVELLAND and | § | |
| d/b/a REAGOR-DYKES IMPORTS, | § | |
| FIRSTCAPITAL BANK OF TEXAS, N.A., | § | |
| BART REAGOR, RICK DYKES, SHANE | § | |
| SMITH, SHEILA MILLER, BRAD D. | § | |
| BURGESS, and KENNETH L. BURGESS, | § | |
| | § | |
| *Defendant.* | § | |

**AFFIDAVIT OF MATTHEW R. MILLER**

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF DALLAS | § |

1.      My name is Matthew R. Miller. I am over the age of 21, and am fully competent and authorized to execute this Affidavit in support of Plaintiff's Motion for Summary Judgment.

2.      I am of counsel for the law firm of Stinson LLP ("Stinson"). I, along with other attorneys at Stinson, represent Plaintiff First Bank & Trust ("First Bank") in this lawsuit. The matters stated herein are true and correct and within my personal knowledge.

3.      A true and correct copy of the Answer of Defendant Rick Dykes to First Bank & Trust's First Set of Requests for Admission, served in this lawsuit on or about February 9, 2018, is attached as Ex. B-1.

APP 0191

4.     A true and correct copy of Defendant Bart Reagor's Responses to Plaintiff First Bank & Trust's First Set of Requests for Admissions, served in this lawsuit on or about February 8, 2019, is attached as Exhibit B-2.

5.     A true and correct copy of the Oral and Videotaped Deposition of Tim Connor, dated August 13, 2018, and taken in *In re Reagor-Dykes Motors, L.P., et al.*, pending before the United States Bankruptcy Court for the Northern District of Texas, and bearing the Cause No. 18-50214-rlj11, is attached as Exhibit B-3.

6.     A true and correct copy of the Oral and Videotaped Deposition of Rick Dykes, dated August 13, 2018, and taken in *In re Reagor-Dykes Motors, L.P., et al.*, pending before the United States Bankruptcy Court for the Northern District of Texas, and bearing the Cause No. 18-50214-rlj11, is attached as Exhibit B-4.

7.     A true and correct copy of the Answers of Defendant Rick Dykes to First Bank & Trust's First Set of Interrogatories, served in this lawsuit by Defendant Rick Dykes on or about February 8, 2019, is attached as Exhibit B-5.

8.     A true and correct copy of Defendant Bart Reagor's Responses and Objections to Plaintiff First Bank & Trust's First Set of Interrogatories, served in this lawsuit by Defendant Rick Dykes on or about February 8, 2019, is attached as Exhibit B-6.

Further the affiant sayeth not.

DATED:  August 2019

By: _____
Matthew R. Miller

Sworn to and subscribed before me by Matthew R. Miller on August 2019.

_____
Notary Public in and for the State of Texas

PATRICIA TOMASKY
Notary Public, State of Texas
Comm. Expires 05-03-2023
Notary ID 12599464-6

APP 0193

# EXHIBIT B-1

APP 0194

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## LUBBOCK DIVISION

| | | |
|---|---|---|
| FIRST BANK & TRUST, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 5:18-cv-00234-C |
| | § | |
| FIRSTCAPITAL BANK OF TEXAS, N.A.,, | § | |
| BART REAGOR, RICK DYKES, SHANE | § | |
| SMITH, SHEILA MILLER, BRAD D. | § | |
| BURGESS and KENNETH L. BURGESS, | § | |
| | § | |
| *Defendants.* | § | |

## ANSWERS OF DEFENDANT RICK DYKES TO
## FIRST BANK & TRUST'S FIRST SET OF REQUESTS FOR ADMISSION

Rick Dykes, defendant in the above-captioned proceeding, provides these Answers to

the First Bank & Trust's ("First Bank") First Set of Requests for Admission in this civil action.

Respectfully submitted,

*/s/ Tom Kirkendall*
Tom Kirkendall
State Bar No. 11517300
Law Office of Tom Kirkendall
2 Violetta Ct
The Woodlands, Texas 77381-4550
281.364.9946
888.582.0646 (fax)
bigtkirk@kir.com (email)

**ATTORNEY-IN-CHARGE FOR RICK DYKES,
DEFENDANT**

<u>C<small>ERTIFICATE OF</small> S<small>ERVICE</small></u>

I hereby certify that a true and correct copy of the foregoing instrument, was served on respective counsel for the other parties to this civil action via electronic transmission on the 8th day of February, 2019:

Paul B. Lackey
paul.lackey@stinson.com
Michael P. Aigen
michael.aigen@stinson.com
Katy L. Hart
katy.hart@stinson.com
Matt Miller
matt.miller@stinson.com
Stinson Leonard Street LLP
102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219-4259

**A<small>TTORNEYS FOR</small> P<small>LAINTIFF</small> F<small>IRST</small> B<small>ANK</small> & T<small>RUST</small>**

Robert A. Aycock
aaycock@lubbocklawfirm.com
Joshua D. Frost
jfrost@lubbocklawfirm.com
Field, Manning, Stone, Hawthorne & Aycock, PC
2112 Indiana Avenue
Lubbock, Texas 79410-1499

**A<small>TTORNEYS FOR</small> D<small>EFENDANT</small> S<small>HANE</small> S<small>MITH</small>**

Joel R. Hogue
joel.hogue@sprouselaw.com
John F. Massouh
john.massouh@sprouselaw.com
Sprouse Shrader Smith PC
701 S. Taylor, Suite 500
Amarillo, Texas 79101

**A<small>TTORNEYS FOR</small> D<small>EFENDANT</small> F<small>IRSTCAPITAL</small> B<small>ANK OF</small> T<small>EXAS</small>, <small>NA</small>**

APP 0196

Robert N. Nebb
rnebb@carperlaw.com
Law Office of Michael H. Carper
1102 Main Street
Lubbock, Texas 79401

**ATTORNEYS FOR DEFENDANT SHEILA MILLER**

Marshall M. Searcy
marshall.searcy@kellyhart.com
Scott R. Wiehle
scott.wiehle@kellyhart.com
Kelly Hart & Hallman
201 Main Street, Suite 2500
Fort Worth, Texas 76102-3194

**ATTORNEYS FOR DEFENDANT BART REAGOR**

Jared Michael Slade
Jared.Slade@alston.com
Alston & Bird, LLP
2200 Ross Avenue, Suite 2300
Dallas, Texas 75201

**ATTORNEYS FOR DEFENDANTS
BRAD D. BURGESS AND KENNETH L. BURGESS**

_/s/ Tom Kirkendall_
Tom Kirkendall

APP 0197

## ANSWERS TO REQUESTS FOR ADMISSION

**Request for Admission No. 1**: Admit that RAM entered into the RD-Imports Business Loan Agreement on or about September 29, 2017.

   **Answer:** Admitted

**Request for Admission No. 2**: Admit that you executed the RD-Imports Business Loan Agreement on or about September 29, 2017 on behalf of RAM.

   **Answer**: Admitted, in my representative capacity.

**Request for Admission No. 3**: Admit that you were authorized to execute the RD-Imports Business Loan Agreement on behalf of RAM.

   **Answer**: Admitted

**Request for Admission No. 4**: Admit that RAM entered into the RD-Imports Commercial Security Agreement on or about September 29, 2017.

   **Answer**: Admitted

**Request for Admission No. 5**: Admit that you executed the RD-Imports Commercial Security Agreement on or about September 29, 2017.

   **Answer**: Admitted, in my representative capacity.

**Request for Admission No. 6**: Admit that you were authorized to execute the RD-Imports Commercial Security Agreement on behalf of RAM.

   **Answer**: Admitted

**Request for Admission No. 7**: Admit that RAM entered into the RD-Imports Promissory Note on or about September 29, 2017.

   **Answer:** Admitted

**Request for Admission No. 8**: Admit that you executed the RD-Imports Promissory Note on or about September 29, 2017.

   **Answer**: Admitted, in my representative capacity.

APP 0198

**Request for Admission No. 9**: Admit that you were authorized to execute the RD-Imports Promissory Note on behalf of RAM.

    **Answer**: Admitted

**Request for Admission No. 10**: Admit that you executed the RD-Imports Dykes Commercial Guaranty on or about September 29, 2017.

    **Answer**: Admitted

**Request for Admission No. 11**: Admit that the RD-Imports Promissory Note required RAM to pay all outstanding principal and all accrued unpaid interest on October 1, 2018.

    **Answer**: Admitted

**Request for Admission No. 12**: Admit that RAM did not pay all outstanding principal and all accrued unpaid interest on the RD-Imports Promissory Note by October 1, 2018.

    **Answer**: Admitted

**Request for Admission No. 13**: Admit that there remains a balance outstanding on the RD-Imports Promissory Note.

    **Answer**: Admitted, subject to setoffs in an unknown amount for unauthorized charges paid by RAM to First Bank.

**Request for Admission No. 14**: Admit that an Event of Default has occurred on the RD-Imports Promissory Note.

    **Answer**: Admitted

**Request for Admission No. 15**: Admit that an Event of Default has occurred on the RD-Imports Commercial Security Agreement.

    **Answer**: Admitted

**Request for Admission No. 16**: Admit that an Event of Default has occurred on the RD-Imports Business Loan Agreement.

    **Answer**: Admitted

**Request for Admission No. 17**: Admit that an Event of Default has occurred on the RD-Imports Dykes Commercial Guaranty.

    **Answer**: Admitted

**Request for Admission No. 18**: Admit that RAM entered into the RD-Levelland Business Loan Agreement on or about September 29, 2017.

    **Answer**: Admitted

**Request for Admission No. 19**: Admit that you executed the RD-Levelland Business Loan Agreement on or about September 29, 2017 on behalf of RAM.

    **Answer**: Admitted, in my representative capacity.

**Request for Admission No. 20**: Admit that you were authorized to execute the RD-Levelland Business Loan Agreement on behalf of RAM.

    **Answer**: Admitted

**Request for Admission No. 21**: Admit that RAM entered into the RD-Levelland Commercial Security Agreement on or about September 29, 2017.

    **Answer**: Admitted

**Request for Admission No. 22**: Admit that you executed the RD-Levelland Commercial Security Agreement on or about September 29, 2017.

    **Answer**: Admitted, in my representative capacity.

**Request for Admission No. 23**: Admit that you were authorized to execute the RD-Levelland Commercial Security Agreement on behalf of RAM.

    **Answer**: Admitted

**Request for Admission No. 24**: Admit that RAM entered into the RD-Levelland Promissory Note on or about September 29, 2017.

    **Answer**: Admitted

**Request for Admission No. 25**: Admit that you executed the RD-Levelland Promissory Note on or about September 29, 2017.

    **Answer**: Admitted, in my representative capacity.

**Request for Admission No. 26**: Admit that you were authorized to execute the RD-Levelland Promissory Note on behalf of RAM.

    **Answer**: Admitted

**Request for Admission No. 27**: Admit that you executed the RD-Levelland Dykes Commercial Guaranty on or about September 29, 2017.

> **Answer**: Admitted

**Request for Admission No. 28**: Admit that the RD-Levelland Promissory Note required RAM to pay all outstanding principal and all accrued unpaid interest on October 1, 2018.

> **Answer**: Admitted.

**Request for Admission No. 29**: Admit that RAM did not pay all outstanding principal and all accrued unpaid interest on the RD-Levelland Promissory Note by October 1, 2018.

> **Answer**: Admitted.

**Request for Admission No. 30**: Admit that there remains a balance outstanding on the RD-Levelland Promissory Note.

> **Answer**: Admitted, subject to setoffs in an unknown amount for unauthorized charges paid by RAM to First Bank.

**Request for Admission No. 31**: Admit that an Event of Default has occurred on the RD-Levelland Promissory Note.

> **Answer**: Admitted

**Request for Admission No. 32**: Admit that an Event of Default has occurred on the RD-Levelland Commercial Security Agreement.

> **Answer**: Admitted

**Request for Admission No. 33**: Admit that an Event of Default has occurred on the RD-Levelland Business Loan Agreement.

> **Answer**: Admitted

**Request for Admission No. 34**: Admit that an Event of Default has occurred on the RD-Levelland Dykes Commercial Guaranty.

> **Answer**: Admitted

**Request for Admission No. 35**: Admit that RAM pledged at least one vehicle as collateral to First Bank and pledged that same vehicle as collateral to another lender.

> **Answer:** Admitted, although Mr. Dykes had no knowledge of such multiple pledges until he learned about such pledges after August 1, 2018.

**Request for Admission No. 36:** Admit that RAM sold at least one vehicle pledged as collateral to First Bank without remitting payment to First Bank.

> **Answer**: Admitted, although Mr. Dykes had no knowledge of such non-payment until he learned about it after August 1, 2018.

**Request for Admission No. 37**: Admit that RAM removed at least one vehicle pledged as collateral to First Bank from its existing location without first obtaining written consent from First Bank.

> **Answer**: Admitted, although Mr. Dykes had no knowledge of such movement until after August 1, 2018.

**Request for Admission No. 38**: Admit that you executed the Account Agreement.

> **Answer**: Admitted

**Request for Admission No. 39**: Admit that RAM's First Bank Account is overdrawn.

> **Answer**: Admitted.

**Request for Admission No. 40**: Admit that you have not paid First Bank any portion of the amount RAM's First Bank Account is overdrawn.

> **Answer**: Admitted.

**Request for Admission No. 41**: Admit that RAM maintained a deposit account with FirstCapital.

> **Answer**: Admitted

**Request for Admission No. 42**: Admit that RAM maintained more than one deposit account with FirstCapital.

> **Answer**: After making reasonable inquiry, Mr. Dykes does not have sufficient information to admit or deny this request.

**Request for Admission No. 43**: Admit that RAM engaged in "float credit."

> **Answer:** Admitted, although Mr. Dykes did not learn of RAM's use of "float credit" until after August 1, 2018.

**Request for Admission No. 44:** Admit that RAM engaged in check kiting during the Relevant Time Period.

> **Answer**: Admitted, although Mr. Dykes had no knowledge of check-kiting relating to RAM accounts until after August 3, 2018.

**Request for Admission No. 45**: Admit that you knew RAM engaged in check kiting during the Relevant Time Period.

> **Answer**: Admitted, although Mr. Dykes had no knowledge of check-kiting relating to RAM accounts until after August 3, 2018.

**Request for Admission No. 46**: Admit that you knew RAM was involved in check kiting prior to the filing of Case No. 5:18-cv-00186 in the United States District Court for the Northern District of Texas, entitled Ford Motor Credit Company LLC v. Reagor-Dykes Amarillo, L.P., et al.

> **Answer**: Denied.

**Request for Admission No. 47**: Admit that you knew RAM was involved in check kiting prior to Reagor-Dykes Motors, LP filing for bankruptcy protection.

> **Answer**: Denied.

**Request for Admission No. 48**: Admit that you knew RAM was involved in check kiting prior to Reagor-Dykes Imports, LP filing for bankruptcy protection.

> **Answer**: Denied.

**Request for Admission No. 49**: Admit that you knew RAM was involved in check kiting prior to Reagor-Dykes Amarillo, LP filing for bankruptcy protection.

> **Answer**: Denied.

**Request for Admission No. 50**: Admit that you knew RAM was involved in check kiting prior to Reagor-Dykes Auto Company, LP filing for bankruptcy protection.

> **Answer**: Denied.

**Request for Admission No. 51**: Admit that you knew RAM was involved in check kiting prior to Reagor-Dykes Plainview, LP filing for bankruptcy protection.

    **Answer**: Denied

**Request for Admission No. 52**: Admit that you knew RAM was involved in check kiting prior to Reagor-Dykes Floydada, LP filing for bankruptcy protection.

    **Answer**: Denied

**Request for Admission No. 53:** Admit that you knew RAM was involved in check kiting prior to July 31, 2018.

    **Answer**: Denied

**Request for Admission No. 54**: Admit that you knew RAM was involved in check kiting prior to July 30, 2018.

    **Answer**: Denied

**Request for Admission No. 55**: Admit that you knew RAM was involved in check kiting prior to July 29, 2018.

    **Answer**: Denied

**Request for Admission No. 56**: Admit that you knew RAM was involved in check kiting prior to July 28, 2018.

    **Answer**: Denied

**Request for Admission No. 57**: Admit that you knew RAM was involved in check kiting prior to July 27, 2018.

    **Answer**: Denied

**Request for Admission No. 58**: Admit that before July 27, 2018, you had reason to believe that RAM was involved in check kiting.

    **Answer**: Denied

**Request for Admission No. 59**: Admit that RAM provided FirstCapital with floor plan lists on a daily basis.

    **Answer**: After making reasonable inquiry, Mr. Dykes has insufficient information to admit or deny this request.

APP 0204

**Request for Admission No. 60**: Admit that RAM made deposits into accounts at FirstCapital on a daily basis.

    **Answer**: Admitted, although Mr. Dykes did not learn this until the spring of 2018.

**Request for Admission No. 61**: Admit that FirstCapital loaned money to you after the bankruptcy filings referenced in Requests Nos. 47-52, above.

    **Answer**: Admitted, although none of such loans related to any of the Reagor-Dykes Auto Group entities.

**Request for Admission No. 62**: Admit that you were previously a board member for FirstCapital.

    **Answer**: Admitted

**Request for Admission No. 63**: Admit that you are no longer a board member for FirstCapital.

    **Answer**: Admitted

**Request for Admission No. 64**: Admit that you are a shareholder in FirstCapital's parent company.

    **Answer**: Admitted

# EXHIBIT B-2

APP 0206

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | | |
|---|---|---|
| **FIRST BANK & TRUST,** | § | |
| **Plaintiff,** | § | |
| | § | |
| | § | |
| **v.** | § | **Civil Action No.: 5:18-cv-00234-C** |
| | § | |
| **REAGOR AUTO MALL, LTD. d/b/a** | § | |
| **REAGOR-DYKES OF LEVELLAND, AND** | § | |
| **d/b/a REAGOR-DYKES IMPORTS,** | § | |
| **FIRSTCAPITAL BANK OF TEXAS, N.A.,** | § | |
| **BART REAGOR, RICK DYKES, SHANE** | § | |
| **SMITH, SHEILA MILLER, BRAD D.** | § | |
| **BURGESS, and KENNETH L. BURGESS** | § | |
| **Defendants.** | § | |

### DEFENDANT BART REAGOR'S RESPONSES TO PLAINTIFF FIRST BANK & TRUST'S FIRST SET OF REQUESTS FOR ADMISSIONS

TO:   Plaintiff, First Bank & Trust, by and through its attorney of record, Paul B. Lackey, Michael P. Aigen and Katy L. Hart, STINSON LEONARD STREET LLP, 3102 Oak Lawn Avenue, Suite 777, Dallas, Texas 75219-4259.

Pursuant to Rules 36 of the Federal Rules of Civil Procedure, Defendant, Bart Reagor ("Reagor"), responds to Plaintiff's First Set of Requests for Admissions ("Admissions") as follows:

### RESERVATION OF RIGHTS

Reagor's objections and responses are not admissions that any discovery request made is relevant, admissible, or proportional to the needs of the case. Reagor's responses are made without prejudice to his right to change or supplement his responses and objections, and to introduce at trial additional evidence as warranted by the development of facts through ongoing investigation. In providing these Responses, Reagor preserves all objections as to competency, relevancy, materiality, authenticity and admissibility of any information or documents, including but not limited to all documents and/or information identified herein; all rights to object on any ground to the use of any documents and/or information identified herein in any subsequent proceedings. APP 0207

Bart Reagor's Responses to FBT's
First Set of Requests for Admissions
2822399

Moreover, the allegations in the Complaint concern parties that are (i) entities that may be filing chapter 11 petitions and have been involved in the chapter 11 cases of related entities (the "Debtors") (Case Nos. 18-50214;18-50214, 18-50215, 18- 50216, 18-50217, 18-50218 and 18-50219, collectively the "Bankruptcy Cases") in the United States Bankruptcy Court for the Northern District of Texas, Lubbock (the "Bankruptcy Court"), and (ii) are individual owners integrally involved in the reorganization efforts of the Debtors and have been able to spend insufficient time aggregating information relating to this answer and affirmative defenses and if available counterclaims.  The financial situation of the Debtors and Reagor is most complicated.  Reagor has been working with the Debtors to aid in unraveling the financial difficulties that befell the Debtors. The Debtors have employed an independent Chief Restructuring Officer, BlackBriar Advisors, LLC ("BlackBriar" or "CRO").   Reagor has been unable to undertake the necessary analysis of information that has to be obtained through and with approval of the CRO, who has been solely focused upon the reorganization efforts of the Debtors.  In effect, Reagor is in the position of not having access to much of the companies he owns, as they cannot distract the CRO from the duties Reagor voluntarily referred to the CRO through pleadings filed with the Bankruptcy Court

**SUBJECT TO AND WITHOUT WAIVING THE FOREGOING RESERVATION OF RIGHTS, REAGOR FURTHER OBJECTS AND RESPONDS TO THE REQUESTS FOR ADMISSIONS AS FOLLOWS:**

Bart Reagor's Responses to FBT's
First Set of Requests for Admissions
2822399

## I.

### OBJECTIONS AND RESPONSES TO DEFINITIONS AND INSTRUCTIONS

Reagor objects to Definitions 3-5, 11-12, 15, 17-18, 20, and 36 on the following grounds: 1) the definitions are vague and ambiguous because Reagor has no way of knowing who might constitute an agent, employee, representative, etc. for persons or entities with whom he is not involved or related; 2) the definitions are not reasonably calculated to lead to the discovery of admissible evidence because they necessarily include persons acting on the behalf of those persons and entities specifically identified that have absolutely no involvement in the subject matter of this dispute; and 3) the definitions are unduly burdensome for the reasons set forth above and would needlessly require Reagor to investigate who might fall within the purview of the definitions and search for documents from persons who almost certainly do not possess discoverable material.

Reagor objects to Definition 9 on the following grounds: 1) the definition is overly broad and includes not only Defendant Bart Reagor individually, but a laundry list of potential persons and entities; and 2) the definitions necessarily encompass attorneys and accountants for Reagor and would impermissibly require the inclusion of obviously privileged materials, much of which is exempt from production or logging pursuant to the Federal Rules of Civil Procedure.

## II.

### OBJECTIONS AND RESPONSES TO REQUESTS FOR ADMISSIONS

**Request for Admission No.1:**     Admit that RAM entered into the RD-Imports Business Loan Agreement on or about September 29, 2017.

**Response: Admit.**

Bart Reagor's Responses to FBT's
First Set of Requests for Admissions
2822399

**Request for Admission No.2:**   Admit that you executed the RD-Imports Business Loan Agreement on or about September 29, 2017 on behalf of RAM.

**Response:** **Reagor admits that he signed the RD-Imports Business Loan Agreement in his representative capacity.**

**Request for Admission No.3:**   Admit that you were authorized to execute the RD-Imports Business Loan Agreement on behalf of RAM.

**Response: Admit.**

**Request for Admission No.4:**   Admit that RAM entered into the RD-Imports Commercial Security Agreement on or about September 29, 2017.

**Response: Admit.**

**Request for Admission No.5:**   Admit that you executed the RD-Imports Commercial Security Agreement on or about September 29, 2017.

**Response:** **Reagor admits that he signed the RD-Imports Commercial Security Agreement in his representative capacity.**

**Request for Admission No.6:**   Admit that you were authorized to execute the RD-Imports Commercial Security Agreement on behalf of RAM.

**Response: Admit.**

**Request for Admission No.7:**   Admit that RAM entered into the RD-Imports Promissory Note on or about September 29, 2017.

APP 0210

Bart Reagor's Responses to FBT's
First Set of Requests for Admissions
2822399

**Response:** **Admit.**

**Request for Admission No.8:**    Admit that you executed the RD-Imports Promissory Note on or about September 29, 2017.

**Response:** **Reagor admits that he signed the RD-Imports Promissory Note in his representative capacity.**

**Request for Admission No.9:**    Admit that you were authorized to execute the RD-Imports Promissory Note on behalf of RAM.

**Response:** **Admit.**

**Request for Admission No.10:**    Admit that you executed the RD-Imports Reagor Commercial Guaranty on or about September 29, 2017.

**Response:** **Admit.**

**Request for Admission No.11:**    Admit that the RD-Imports Promissory Note required RAM to pay all outstanding principal and all accrued unpaid interest on October 1, 2018.

**Response:** **Reagor submits that the RD-Imports Promissory Note is the best evidence of its contents and denies all allegations and/or characterizations of such agreement which differ and/or deviate from those terms.**

**Request for Admission No.12:**    Admit that RAM did not pay all outstanding principal and all accrued unpaid interest on the RD-Imports Promissory Note by October 1, 2018.

APP 0211

Bart Reagor's Responses to FBT's
First Set of Requests for Admissions
2822399

**Response:** **Reagor responds that he lacks knowledge or information sufficient to respond to this request.**

**Request for Admission No.13:**   Admit that there is a balance outstanding on the RD-Imports Promissory Note.

**Response:** **Reagor responds that he lacks knowledge or information sufficient to respond to this request.**

**Request for Admission No.14:**   Admit that an Event of Default has occurred on the RD-Imports Promissory Note.

**Response:** **Reagor responds that he lacks knowledge or information sufficient to respond to this request.**

**Request for Admission No.15:**   Admit that an Event of Default has occurred on the RD-Imports Commercial Security Agreement.

**Response:** **Reagor responds that he lacks knowledge or information sufficient to respond to this request.**

**Request for Admission No.16:**   Admit that an Event of Default has occurred on the RD-Imports Business Loan Agreement.

**Response:** **Reagor responds that he lacks knowledge or information sufficient to respond to this request.**

Bart Reagor's Responses to FBT's
First Set of Requests for Admissions
2822399

**Request for Admission No.17:**   Admit that an Event of Default has occurred on the RD-Imports Reagor Commercial Guaranty.

**Response: Reagor responds that he lacks knowledge or information sufficient to respond to this request.**

**Request for Admission No.18:**   Admit that RAM entered into the RD-Levelland Business Loan Agreement on or about September 29, 2017.

**Response: Admit.**

**Request for Admission No.19:**   Admit that you executed the RD-Levelland Business Loan Agreement on or about September 29, 2017 on behalf of RAM.

**Response: Reagor admits that he signed the RD-Levelland Business Loan Agreement in his representative capacity.**

**Request for Admission No.20:**   Admit that you were authorized to execute the RD-Levelland Business Loan Agreement on behalf of RAM.

**Response: Admit.**

**Request for Admission No.21:**   Admit that RAM entered into the RD-Levelland Commercial Security Agreement on or about September 29, 2017.

**Response: Admit.**

**Request for Admission No.22:**   Admit that you executed the RD-Levelland Commercial Security Agreement on or about September 29, 2017.

APP 0213

Bart Reagor's Responses to FBT's
First Set of Requests for Admissions
2822399

**Response:** **Reagor admits that he signed the RD-Levelland Commercial Security Agreement in his representative capacity.**

**Request for Admission No.23:**   Admit that you were authorized to execute the RD-Levelland Commercial Security Agreement on behalf of RAM.

**Response: Admit.**

**Request for Admission No.24:**   Admit that RAM entered into the RD-Levelland Promissory Note on or about September 29, 2017.

**Response: Admit.**

**Request for Admission No.25:**   Admit that you executed the RD-Levelland Promissory Note on or about September 29, 2017.

**Response:** **Reagor admits that he signed the RD-Levelland Promissory Note in his representative capacity.**

**Request for Admission No.26:**   Admit that you were authorized to execute the RD-Levelland Promissory Note on behalf of RAM.

**Response: Admit.**

**Request for Admission No.27:**   Admit that you executed the RD-Levelland Reagor Commercial Guaranty on or about September 29, 2017.

**Response: Admit.**

Bart Reagor's Responses to FBT's
First Set of Requests for Admissions
2822399

**Request for Admission No.28:**    Admit that the RD-Levelland Promissory Note required RAM to pay all outstanding principal and all accrued unpaid interest on October 1, 2018.

**Response: . Reagor submits that the RD-Levelland Promissory Note is the best evidence of its contents and denies all allegations and/or characterizations of such agreement which differ and/or deviate from those terms.**

**Request for Admission No.29:**    Admit that RAM did not pay all outstanding principal and all accrued unpaid interest on the RD-Levelland Promissory Note by October 1, 2018.

**Response: Reagor responds that he lacks knowledge or information sufficient to respond to this request.**

**Request for Admission No.30:**    Admit that there remains a balance outstanding on the RD-Levelland Promissory Note.

**Response: Reagor responds that he lacks knowledge or information sufficient to respond to this request.**

**Request for Admission No.31:**    Admit that an Event of Default has occurred on the RD-Levelland Promissory Note.

**Response: Reagor responds that he lacks knowledge or information sufficient to respond to this request, which also calls for a legal conclusion and on that basis, denies it.**

**Request for Admission No.32:**    Admit that Event of Default has occurred on the RD-Levelland Commercial Security Agreement.

Bart Reagor's Responses to FBT's
First Set of Requests for Admissions
2822399

**Response:** **Reagor responds that he lacks knowledge or information sufficient to respond to this request.**

**Request for Admission No.33:**   Admit that an Event of Default has occurred on the RD-Levelland Business Loan Agreement.

**Response:** **Reagor responds that he lacks knowledge or information sufficient to respond to this request.**

**Request for Admission No.34:**   Admit that an Event of Default has occurred on the RD-Levelland Reagor Commercial Guaranty.

**Response:** **Reagor responds that he lacks knowledge or information sufficient to respond to this request.**

**Request for Admission No.35:**   Admit that RAM pledged at least one vehicle as collateral to First Bank and pledged that same vehicle as collateral to another lender.

**Response:** **Reagor objects to this request on the following grounds: 1) it provides only an incomplete hypothetical and does not identify any specific "vehicle" or "lender"; 2) the use of the phrases "pledged at least one vehicle" and "pledged that same vehicle" makes the request compound and useless as a request to admit; 3) the phrase "another lender" is not limited or defined and thus is vague and ambiguous to such an extent that Reagor cannot attach any meaning to it; and 4) any response would necessarily be misleading.  Subject to and without waiving his objections, Reagor responds that he lacks knowledge or information sufficient to respond to this request, which also calls for a legal conclusion based on compound facts and on that basis, denies it.**

Bart Reagor's Responses to FBT's
First Set of Requests for Admissions
2822399

**Request for Admission No.36:**   Admit that RAM sold at least one vehicle pledged as collateral to First Bank without remitting payment to First Bank.

**Response: Reagor objects to this request on the following grounds: 1) it provides only an incomplete hypothetical and does not identify any specific "vehicle"; and 2) any response would necessarily be misleading.  Subject to and without waiving his objections, Reagor responds that he lacks knowledge or information sufficient to respond to this request, which also calls for a legal conclusion based on compound facts and on that basis, denies it.**

**Request for Admission No.37:**   Admit that RAM removed at least one vehicle pledged as collateral to First Bank from its existing location without first obtaining written consent from First Bank.

**Response: Reagor objects to this request on the following grounds: 1) it provides only an incomplete hypothetical and does not identify any specific "vehicle"; and 2) any response would necessarily be misleading.  Subject to and without waiving his objections, Reagor responds that he lacks knowledge or information sufficient to respond to this request, which also calls for a legal conclusion based on compound facts and on that basis, denies it.**

**Request for Admission No.38:**   Admit that you executed the Account Agreement.

**Response: Reagor admits that he signed the Account Agreement in his representative capacity.**

APP 0217

Bart Reagor's Responses to FBT's
First Set of Requests for Admissions
2822399

**Request for Admission No.39:**  Admit that RAM's First Bank Account is overdrawn.

**Response:** **Reagor lacks knowledge or information sufficient to respond to this request.**

**Request for Admission No.40:**  Admit that you have not paid First Bank any portion of the amount RAM's First Bank Account is overdrawn.

**Response:** **Reagor objects to this request on the following grounds: 1) the phrase "any portion of the amount" is not limited or defined and thus is vague and ambiguous to such an extent that Reagor cannot attach any meaning to it; and 2) any response would necessarily be misleading.  Subject to and without waiving his objections, Reagor responds that he lacks knowledge or information sufficient to respond to this request.**

**Request for Admission No.41:**  Admit that RAM maintained a deposit account with FirstCapital.

**Response:** **Reagor responds that he lacks knowledge or information sufficient to respond to this request**

**Request for Admission No.42:**  Admit that RAM maintained more than one deposit account with FirstCapital.

**Response:**  **Reagor responds that he lacks knowledge or information sufficient to respond to this request.**

**Request for Admission No.43:**  Admit that RAM engaged in "float credit".

**Response:** **Reagor objects to this request on the following grounds: 1) the phrase "float credit" is not limited or defined and thus is vague and ambiguous to such an extent that**

APP 0218

Bart Reagor's Responses to FBT's
First Set of Requests for Admissions
2822399

Reagor cannot attach any meaning to it; and 2) any response would necessarily be misleading.  Subject to and without waiving his objections, Reagor responds that this request calls for a legal conclusion and on that basis, denies it.


**Request for Admission No.44:**   Admit that RAM engaged in check kiting during the Relevant Time Period.

**Response:**  Reagor objects to this request on the following grounds: 1) the phrases "check kiting" is not limited or defined and thus is vague and ambiguous to such an extent that Reagor cannot attach any meaning to it; and 2) any response would necessarily be misleading.  Subject to and without waiving his objections, Reagor responds that he lacks knowledge or information sufficient to respond to this request.


**Request for Admission No.45:**   Admit that you knew RAM engaged in check kiting during the Relevant Time Period.

**Response: Deny.**


**Request for Admission No.46:**   Admit that you knew RAM was involved in check kiting prior to the filing of Case No. 5:18-cv-00186 in the United States District Court for the Norther District of Texas, entitled *Ford Motor Credit Company LLC v. Reagor-Dykes Amarillo, L.P., et al.*

**Response: Deny.**


**Request for Admission No.47:**   Admit that you knew RAM was involved in check kiting prior to Reagor-Dykes Motors, LP filing for bankruptcy protection.

APP 0219

Bart Reagor's Responses to FBT's
First Set of Requests for Admissions
2822399

**Response: Deny.**

**Request for Admission No.48:**   Admit that you knew RAM was involved in check kiting prior to Reagor-Dykes Imports, LP filing for bankruptcy protection.

**Response: Deny.**

**Request for Admission No.49:**   Admit that you knew RAM was involved in check kiting prior to Reagor-Dykes Amarillo, LP filing for bankruptcy protection.

**Response: Deny.**

**Request for Admission No.50:**   Admit that you knew RAM was involved in check kiting prior to Reagor-Dykes Auto Company, LP filing for bankruptcy protection.

**Response: Deny.**

**Request for Admission No.51:**   Admit that you knew RAM was involved in check kiting prior to Reagor-Dykes Plainview, LP filing for bankruptcy protection.

**Response: Deny.**

**Request for Admission No.52:**   Admit that you knew RAM was involved in check kiting prior to Reagor-Dykes Floydada, LP filing for bankruptcy protection.

**Response: Deny.**

**Request for Admission No.53:**   Admit that you knew RAM was involved in check kiting prior to July 31, 2018.

APP 0220

Bart Reagor's Responses to FBT's
First Set of Requests for Admissions
2822399

**Response: Deny.**

**Request for Admission No.54:**   Admit that you knew RAM was involved in check kiting prior to July 30, 2018.

**Response: Deny.**

**Request for Admission No.55:**   Admit that you knew RAM was involved in check kiting prior to July 29, 2018.

**Response: Deny.**

**Request for Admission No.56:**   Admit that you knew RAM was involved in check kiting prior to July 28, 2018.

**Response: Deny.**

**Request for Admission No.57:**   Admit that you knew RAM was involved in check kiting prior to July 27, 2018.

**Response: Deny.**

**Request for Admission No.58:**   Admit that before July 27, 2018, you had reason to believe that RAM was involved in check kiting.

**Response: Deny.**

**Request for Admission No.59:**   Admit that RAM provided FirstCapital with floor plan lists on a daily basis.

Bart Reagor's Responses to FBT's
First Set of Requests for Admissions
2822399

**Response:** **Reagor objects to this request on the following grounds: 1) it provides only an incomplete hypothetical and does not identify any specific location for which floor plan lists were supplied. Subject to and without waiving his objections, Reagor responds that he lacks knowledge or information sufficient to respond to this request.**

**Request for Admission No.60:**   Admit that RAM made deposits into accounts at FirstCapital on a daily basis.

**Response:** **Reagor objects to this request on the following grounds: 1) it provides only an incomplete hypothetical and does not identify any specific location for which floor plan lists were supplied. Subject to and without waiving his objections, Reagor responds that he lacks knowledge or information sufficient to respond to this request.**

**Request for Admission No.61:**   Admit that FirstCapital loaned money to you after the bankruptcy filing referenced in Requests Nos. 47-52, above.

**Response: Denied as written.**

**Request for Admission No.62:**   Admit that you are a shareholder in FirstCapital's parent company.

**Response:** **Reagor objects to this request because "FirstCapital's parent company" is not defined and is vague. Subject to and without waiving his objections, Reagor denies this request as written.**

APP 0222

Bart Reagor's Responses to FBT's
First Set of Requests for Admissions
2822399

Respectfully submitted,


  /s/ Marshall M. Searcy, Jr.
Marshall M. Searcy, Jr.
State Bar No. 17955500
marshall.searcy@kellyhart.com
Scott R. Wiehle
State Bar No. 24043991
scott.wiehle@kellyhart.com
KELLY HART & HALLMAN, LLP
201 Main Street, Suite 2500
Fort Worth, Texas  76102
Telephone:  (817) 332-2500
Telecopy:  (817) 878-9280

**ATTORNEYS FOR DEFENDANT BART
REAGOR**

Bart Reagor's Responses to FBT's
First Set of Requests for Admissions
2822399

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing to be delivered to the following parties in accordance with the Federal Rules of Civil Procedure on the February 8, 2019.

Roel R. Hogue
John F. Massouh
Sprouse Shrader Smith PC
701 S. Taylor, Suite 500
Amarillo, Texas 79101
ATTORNEYS FOR DEFENDANT FIRSTCAPITAL BANK OF TEXAS, NA

Thomas Murray Kirkendall
Law Office of Tom Kirkendall
2 Violetta Court
The Woodlands, Texas 77381-4550
ATTORNEYS FOR DEFENDANT RICK DYKES

Robert N. Nebb
Law Office of Michael H. Carper
1102 Main Street
Lubbock, Texas 79401
ATTORNEYS FOR DEFENDANT SHEILA MILLER

Jared Michael Slade
Alston & Bird, LLP
2200 Ross Avenue, Suite 2300
Dallas, Texas 75201
ATTORNEYS FOR DEFENDANTS BRAD D. BURGESS AND KENNETH L. BURGESS

Robert A. Aycock
Joshua D. Frost
Field, Manning, Stone, Hawthorne, & Aycock, PC
2112 Indiana Avenue
Lubbock, Teas 79410-1449
ATTORNEYS FOR DEFENDANT SHANE SMITH

Paul B. Lackey
Michael B. Aigen
Katy L. Hart
Stinson Leonard Street LLP
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219-4259
ATTORNEYS FOR PLAINTIFF FIRST BANK & TRUST

    /s/ Marshall M. Searcy, Jr.    
Marshall M. Searcy, Jr.

APP 0224

Bart Reagor's Responses to FBT's
First Set of Requests for Admissions
2822399

# EXHIBIT B-3

APP 0225

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| REAGOR-DYKES MOTORS, LP, | ) | Case No. 18-50214-rlj11 |
| | ) | |
| Debtor. | ) | |

_____

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| REAGOR-DYKES IMPORTS, LP, | ) | Case No. 18-50215-rlj11 |
| | ) | |
| Debtor. | ) | |

_____

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| REAGOR-DYKES AMARILLO, LP, | ) | Case No. 18-50216-rlj11 |
| | ) | |
| Debtor. | ) | |

_____

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| REAGOR-DYKES AUTO COMPANY, | ) | |
| LP, | ) | Case No. 18-50217-rlj11 |
| | ) | |
| Debtor. | ) | |

_____

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| REAGOR-DYKES PLAINVIEW, LP, | ) | Case No. 18-50218-rlj11 |
| | ) | |
| Debtor. | ) | |

_____

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| REAGOR-DYKES FLOYDADA, LP, | ) | Case No. 18-50219-rlj11 |
| | ) | |
| Debtor. | ) | |

_____

-------------------------------------

ORAL AND VIDEOTAPED DEPOSITION OF
TIM CONNER
AUGUST 13, 2018

-------------------------------------

1          ORAL DEPOSITION OF TIM CONNER, produced as a

2     witness at the instance of FORD MOTOR CREDIT COMPANY,

3     L.L.C., and duly sworn, was taken in the above-styled

4     and numbered cause on August 13, 2018, from 9:16 a.m. to

5     10:46 a.m., before Cindy Wiley, CSR in and for the State

6     of Texas, reported by machine shorthand, at the

7     Reagor-Dykes Auto Group, 1215 Avenue J, Lubbock, Texas,

8     pursuant to the Federal Rules and the provisions stated

9     on the record or attached hereto.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

1                        INDEX

2                                                      PAGE

3    Appearances........................................ 4

4    Instructions to the Witness........................ 7

5    TIM CONNER
           Examination by Mr. Langley......................8
6          Examination by Mr. Bustos.....................45
           Examination by Mr. Carder.....................47
7          Examination by Mr. Strohschein................47
           Examination by Mr. Lashaway...................48
8          Examination by Mr. Massouh....................50

9    Deposition Concluded.............................52

10   Signature and Changes............................53

11   Reporter's Certificate...........................55

12

13

14                       EXHIBITS

15   NO.  DESCRIPTION                           PAGE

16   1    Vehicle Receivables Spreadsheet......    37
     2    Spreadsheet of Vehicles with No
17        Corresponding Floor Plan.............    37

18

19

20

21

22

23

24

25

APP 0228

```
 1              A P P E A R A N C E S

 2

 3   FOR THE DEBTORS:
          MR. DAVID MULLIN
 4        -AND-
          MR. DAVID R. LANGSTON
 5        MULLIN, HOARD & BROWN, L.L.P.
          WELLS FARGO CENTER
 6        1500 BROADWAY
          SUITE 700
 7        LUBBOCK, TEXAS 79401
          (806)765.7491
 8

 9   FOR FORD MOTOR CREDIT COMPANY, L.L.C.:
          MR. KEITH A. LANGLEY
10        LANGLEY ATTORNEYS & COUNSELORS, L.L.P.
          1301 SOLANA BOULEVARD
11        BUILDING 1, SUITE 1545
          WESTLAKE, TEXAS 76262
12        (214)722.7162

13        MR. DONALD H. CRAM, III
          SEVERSON & WERSON, P.C.
14        ONE EMBARCADERO CENTER
          26TH FLOOR
15        SAN FRANCISCO, CALIFORNIA 94111
          (415)398.3344
16

17   FOR GM, L.L.C.:
          MR. MARK ANDREWS
18        DYKEMA, COX, SMITH
          1717 MAIN STREET
19        SUITE 4200
          DALLAS, TEXAS 75201
20        (214)698.7819

21
     FOR GM FINANCIAL:
22        MR. STEPHEN P. STROHSCHEIN
          MCGLINCHEY STAFFORD, P.L.L.C.
23        301 MAIN STREET
          FOURTEENTH FLOOR
24        BATON ROUGE, LOUISIANA 70801
          (225)383.9000
25
```

APP 0229

APP409

```
 1   FOR AIM BANK:
          MR. JEFF R. LASHAWAY
 2        BOERNER, DENNIS & FRANKLIN, P.L.L.C.
          920 AVENUE Q
 3        LUBBOCK, TEXAS 79401
          (806)763.0044
 4

 5   FOR FIRST CAPITAL BANK:
          MR. JOHN F. MASSOUH
 6        SPROUSE, SHRADER, SMITH, P.L.L.C.
          701 SOUTH TAYLOR
 7        SUITE 500
          AMARILLO, TEXAS 79105
 8        (806)468.3337

 9
     FOR TIM CONNER:
10        JOHNNY K. MERRITT
          HAJJAR, PETERS, L.L.P.
11        3144 BEE CARES ROAD
          AUSTIN, TEXAS 78746
12        (512)637.4956

13
     FOR VISTA BANK:
14        MR. FERNANDO BUSTOS
          BUSTOS LAW FIRM, P.C.
15        1001 MAIN STREET
          SUITE 501
16        LUBBOCK, TEXAS 79401
          (806)780.3976
17

18   FOR FIRST BANK & TRUST:
          MR. MARK S. CARDER
19        STINSON, LEONARD, STREET, L.L.P.
          1201 WALNUT
20        SUITE 2900
          KANSAS CITY, MISSOURI 64106
21        (816)691.3415

22
     FOR BART REAGOR:
23        MR. SCOTT R. WIEHLE
          KELLY, HART & HALLMAN, L.L.P.
24        201 MAIN STREET
          SUITE 2500
25        FORT WORTH, TEXAS 76102
```

APP 0230

```
 1   FOR IBC BANK:
          MR. MARK D.G. SANDERS
 2        GABLE GOTWALS
          1100 ONEOK PLAZA
 3        100 WEST FIFTH STREET
          TULSA, OKLAHOMA 74103
 4        (918)595.4828

 5

 6
     Also Present:
 7        Mr. Audin Herrera
          Mr. Toby Cecil
 8        Mr. Craig Leslie
          Mr. Bart Reagor
 9        Mr. Rick Dykes
          Mr. Johnathan Hill
10        Mr. Howie Ravitz
          Mr. Brad Burgess
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1            INSTRUCTIONS FOR SIGNING A DEPOSITION

2    Rules of Civil Procedure under which this deposition was
     taken provide that the deposition transcript shall be
3    made available to the witness or his attorney of record
     for examination and signature by the witness.
4
     This deposition condensed transcript is provided for
5    your review.  It is yours to keep.  Read it carefully
     before making any changes or corrections on the Witness
6    Signature Page.

7    Changes and/or corrections must be made in the following
     manner:
8
                 (1)   Indicate by number the page and line you
9                      wish to alter;
                 (2)   Indicate your change or correction;
10               (3)   Give the reason for making the change.

11   When you have followed the instructions above, sign the
     Witness Signature Page before a Notary Public and return
12   it as soon as possible.

13   When we have received the signed and notarized
     transcript, we will forward all attorneys of record a
14   copy of the completed Witness Signature Page and deliver
     the original transcript to Mr. Keith A. Langley for
15   safekeeping and use at trial.

16   If you have any questions about this procedure, please
     call my office at (806)795.4202.

17

18                           Cindy Wiley, Cert No. 8667
                             Caprock Court Reporting, Inc.
19                           Firm No. 374
                             1112 Texas, Suite 200
20                           Lubbock, Texas 79401
                             (806)795.4202
21

22

23

24

25

1                    TIM CONNER,

2    having been first duly sworn by the court reporter,

3    testified as follows:

4                    EXAMINATION

5    BY MR. LANGLEY:

6        Q.  Mr. Conner, we are going to have the same

7    stipulations all day, and we are going to try to work

8    through some cash issues as quickly and as effectively

9    as we can?

10       A.  Okay.

11       Q.  We are going to need your help, okay?  My name

12   is Keith Langley, and I represent Ford Credit, and we

13   have had appearances by all the attorneys previously.

14                   MR. LANGLEY:  Is there anyone who has not

15   appeared?

16                   MR. MERRITT:  Johnny Merritt with Austin

17   law firm of Hajjar/Peters, H-A-J-J-A-R Peters.  I

18   represent Timothy Conner.

19       Q.  (BY MR. LANGLEY)  Mr. Conner, would you state

20   your full name for the record?

21       A.  Timothy Don Conner.

22       Q.  Can you give us a little bit of background on

23   you relative to your education?  Let's start with high

24   school.

25       A.  I went to high school in Muleshoe, Texas.  I APP 0233

1    went to college at Wayland Baptist University, where I

2    received my -- my undergrad was in accounting, and I

3    have a master's in business administration from there,

4    also.  I -- do you want my work history?

5         Q.  Yeah.  Go ahead.

6         A.  I went and worked for Robinson, Burdette,

7    Martin & Seright here in Lubbock right out of college

8    where I received my CPA license in 2013.  From there, I

9    started a trucking company with some friends, and it

10   took off and ended up moving to San Antonio, where we

11   later sold out.

12              I moved back to Plainview, Texas, took a

13   job at a CPA firm for a year until coming to work for

14   Reagor-Dykes in January.

15        Q.  Let's talk just a little bit about your CPA.

16   You took the exam in 2013 and passed?

17        A.  Yes.

18        Q.  And the CPA firm that you worked for for one

19   year, what firm was that?

20        A.  The one in Plainview would be Rogers, Cross,

21   Hanby.

22        Q.  And what were your principal responsibilities

23   at that time?

24        A.  Just to help people with their bookkeeping, tax

25   returns.

1    Q.  The trucking firm that you mentioned starting,

2  can you tell us a little bit about what type of business

3  that was?

4    A.  We were over-the-road, coast-to-coast trucking.

5  We started with one truck and one trailer and grew it to

6  about 60 trucks and 100 trailers within a three-year

7  period, and I sold out.

8    Q.  At any time prior to working at Reagor-Dykes,

9  were you in the retail business?  And what I mean by

10  that is:  Were you involved in selling vehicles?

11    A.  No, sir.

12    Q.  When you were in private practice at Rogers,

13  Cross, Hanby, did you represent anyone involved in

14  retailing vehicles?

15    A.  No, sir.

16    Q.  Talk to us just briefly, if you will, about

17  coming on board in January at Reagor-Dykes.

18    A.  Well, I came here because I discussed with Ryan

19  Reagor -- he had brought up to me coming to work over

20  here.  He knew they needed help, and so I -- he gave my

21  resumé to Bart Reagor and Shane Smith, and they gave me

22  a call.

23    Q.  And prior to that time, I take it you had an

24  acquaintance with Mr. Ryan Reagor.

25    A.  I do.  We developed a friendship while I was in

1    Plainview, and we actually owned a small restaurant

2    together.

3        Q.  Let's talk about coming on board at

4    Reagor-Dykes in January.  Tell us, if you will, your job

5    title and responsibilities at that time.

6        A.  When I originally came on, I was hired to be

7    the office manager at the Lubbock Mitsubishi location.

8    That lasted all of four days before I was brought up to

9    the corporate location.

10       Q.  Okay.  What happened then?

11       A.  I began getting some responsibilities of

12   reconciling bank accounts, going through schedules that

13   just needed to be worked over such as overages and

14   shortages on payments and just going through and helping

15   people understand why that was happening and kind of

16   training the accounting staff on how to review the

17   accounting side of what they were doing.

18       Q.  Help us understand, if you will, how you

19   reported upwards.  Who did you report to?

20       A.  All of my reporting was done to Shane Smith.

21   Pretty much everything I did, he would want a daily

22   report, depending on which store I was at or what I was

23   up to.  He just wanted to know daily what was going on.

24       Q.  Okay.  So the bankruptcy was filed on or about

25   August 1st.  Do you recall that?

1      A.  Yes, sir.

2      Q.  I should say "bankruptcies."  And is it about

3  right that Mr. Smith was terminated on his employment on

4  or about August 3rd?

5      A.  I am not aware of his -- I don't know the

6  actual date.  Yeah.  That would be somewhere in there.

7      Q.  And how, if at all, did your responsibilities

8  on reporting change after August 3rd?

9      A.  Everything changed.  We began having to report

10  to -- David Langston was giving us things that needed to

11  be done for the Court, and of course, we were reporting

12  to Bart and Rick daily, depending on what we were

13  working on.  Cash in bank, money going out was being

14  reported directly to Mr. Langston and Bart and Rick.

15      Q.  Let's talk about your staff or the accounting

16  staff as of January up through August the 3rd.  What

17  staff was involved that you were knowledgeable about or

18  supervising on the accounting?

19      A.  I didn't supervise anybody.  I was kind of my

20  own person.  I would go help the stores individually,

21  and I didn't really have anybody that I supervised.  I

22  just went person to person.

23      Q.  And during this time frame, Mr. Smith is still

24  the CFO, correct?

25      A.  Yes, sir.

APP 0237

1    Q.  And who was on the accounting staff at that

2  point?

3    A.  Which accounting staff?  We had an accounting

4  office at every store.  So which accounting staff?

5    Q.  Let's go to the corporate headquarters then,

6  specifically with respect to issues of available cash

7  and payment for sold vehicles.  Was there a staff?  Was

8  that an issue that went to particular stores or was that

9  an issue that went into the corporate accounting group?

10    A.  All of that flowed through Shane.  The payment

11  of vehicles all flowed through him.  I -- from what I am

12  aware of, nobody upstairs had any -- they had no

13  authority to say, "We need to pay that off."

14         Even at the store level, they would have

15  the checks prepared, but could not release them until

16  Mr. Smith said it was okay to pay that check.

17    Q.  You started at the Lubbock Mitsubishi store; is

18  that correct?

19    A.  Yes, sir.

20    Q.  And were there accountants who were responsible

21  for that store during this time frame of basically

22  January 1st through August 1st?

23    A.  There was one lady that had been responsible up

24  to that point that was going part-time, and that's why I

25  was brought in there originally, but they decided to

 1   bring me to headquarters.

 2       Q.  And payoffs relative to that store, would that

 3   be a decision at that time that Mr. Shane Smith would

 4   make as to whether a payoff was or was not to be made on

 5   that store?

 6       A.  That's my understanding.  I had no knowledge

 7   of -- I had no knowledge of how those payoffs were made.

 8   That was all done on a store-by-store basis, and being

 9   at headquarters, I would only know what the office

10   managers were telling me.

11       Q.  Okay.  Let's jump ahead to the August 4th or so

12   time frame.  I take it that your world changed slightly.

13       A.  Since then, I have been managing the bank

14   accounts, making sure we stay on track with all -- with

15   the budget that was submitted to the Court and trying to

16   manage the day-to-day office needs of the company.

17       Q.  Is it fair to say that's kind of difficult to

18   do?

19       A.  Yes, sir.

20       Q.  And there were certain assumptions made

21   relative to the use of cash and available cash relative

22   to the cash collateral budget.  Was it about 70 percent

23   of July sales that were initially being assumed for

24   August?

25       A.  The initial assumption on the budget was about

1    70 percent.

2         Q.  And that got changed to about 30 percent?

3         A.  Correct.

4         Q.  And can you talk to us about actual

5    performance?  Has there been actual sales at some

6    percentage level?

7         A.  There have been actual sales.  I am not sure on

8    the percentage level.  As of current, just through the

9    first week, it has been less than the 30 percent.

10        Q.  Mr. Conner, you have been involved, I believe,

11   in putting together some spreadsheets dealing with

12   different types of vehicles such as vehicles that have

13   not specifically been named as being floored.  Are you

14   familiar with that?

15        A.  Yes, sir.

16        Q.  And I believe you have identified or your team

17   has identified about 9.5 to 15 million in unfloored, and

18   I use that term colloquially of vehicles.  Is that about

19   right?

20        A.  Yes, sir.

21        Q.  Where are those vehicles located?  Are they

22   across the dealerships?

23        A.  Yes.  They are just across the group.

24        Q.  Are any of those vehicles, if you know, at any

25   of the used vehicle locations, the Auto Mall in Lubbock

1    or the Auto Mall in Dallas?

2        A.  I am not sure.

3        Q.  With respect to these unfloored units where

4    specific amounts have not been advanced on those units,

5    if you know, what has happened to those units?  Have

6    they been sold or sequestered or identified further?

7        A.  We are still in the process of identifying them

8    further.  We have hard inventory accounts that happened

9    yesterday and more that are happening today to identify

10   every vehicle that does not have a flooring encumbrance.

11       Q.  Do you think that's still about the right

12   range, 9.5 to 15 million?

13       A.  Yes, sir.

14       Q.  And you are using, basically, a dealer cost?

15       A.  Yes, sir.

16       Q.  Let's talk a little bit about cash uses.  Since

17   the bankruptcy on August the 1st, how have the uses of

18   cash by the Debtors progressed?

19       A.  Since the bankruptcy, we have paid payroll, and

20   we have written four checks for parts.  Other than that,

21   there has been no cash usage.

22       Q.  Let's talk about the next payroll.  When is the

23   next payroll due?

24       A.  The next ordinary cycle would be due on this

25   Thursday.

1     Q.  So that would be two weeks in arrears due on

2  Thursday, August 16th; is that correct?

3     A.  Yes, sir.

4     Q.  If you look at two weeks -- I take it your

5  payroll is every two weeks; is that fair?

6     A.  Yes, sir.

7     Q.  If you look at two weeks out to August 30th,

8  what's the order of magnitude of the payroll amount?

9     A.  A lot of that will depend on sales commissions,

10  how much is sold.  That will be a big variance,

11  depending on actual sales.  On the office staff that are

12  fixed salaries and we know what they are going to be, it

13  will be in the realm of 110,000.

14     Q.  If you gave an order of magnitude on the sales

15  commission variance, recognizing it is difficult to do,

16  can you give us some order of magnitude?

17     A.  The sales commission will be as was set up in

18  the original budget, 30 percent of the gross profit of

19  the sale.

20     Q.  Again, can you give us an order of magnitude

21  of -- are we talking 10,000, 100,000, 1 million, some

22  other number?

23     A.  I am not sure at this time what that's going to

24  be.  Like I said, that will all depend on sales, and I

25  don't feel comfortable giving a number on what I don't

1    know.

2        Q.  Sales that have actually occurred since August

3    1st have been tracking at less than 30 percent, correct?

4        A.  Yes, sir.

5        Q.  Have they been tracking more closely to 10

6    percent of the July sales?

7        A.  Yes, sir.

8        Q.  Is it fair to say that it's a cash-rich

9    business, meaning you need -- the Debtors need cash to

10   pay taxes and trade ins and things of that nature in

11   order to close the financial transactions?

12       A.  Yes, sir.

13       Q.  One of the spreadsheets you have worked on

14   previously, Mr. Conner, indicates payoffs of

15   $2.8 million.  Do you recall that?

16       A.  Yes, sir.

17       Q.  And to what extent, if you know, has that

18   amount changed since the petition date?  Is it a higher

19   amount than 2.8 million now?

20       A.  No, sir, it is not higher.  That number has

21   stayed pretty steadily just under 2.8 million.

22       Q.  So we are talking used cars relative to the

23   payoffs, correct?

24       A.  Yes, sir.

25       Q.  And some of these vehicles, is it fair to say

1    they have been resold to retail purchasers prior to the

2    payoffs being paid?

3         A.  Yes, sir, some of them have.

4         Q.  Do you have any estimate of whether that is one

5    car or 10 cars or 100 cars?

6         A.  No, sir.

7         Q.  You have become aware of some complaints from

8    consumers that they need to get the vehicle paid off

9    that they are driving, correct?

10        A.  Yes.

11        Q.  And do you have an approximate value of these

12   number of cars representing $2.8 million in payoffs?

13        A.  I guess I don't understand the question.

14        Q.  If the payoffs are 2.8 million, are the cars

15   worth 5 million or 3 million or some other number?

16        A.  I have not ran that analysis.  I don't know.

17        Q.  And if you know, Mr. Conner, where are those

18   vehicles located?  Are they at the location where each

19   vehicle was traded in?

20        A.  I would assume that's correct, but I don't know

21   until we get our hard inventory counts done.

22        Q.  And if you know, who would know that?

23        A.  It would be -- Ryan Reagor is currently

24   handling tracking inventory.

25        Q.  Mr. Conner, you were involved with respect to

APP 0244

1    creating a spreadsheet on receivables and specifically

2    contracts in transit; is that correct?

3         A.  Yes, sir.

4         Q.  And specifically you had identified, as of the

5    petition date, about $8.2 million in vehicle

6    receivables?

7         A.  Yes, sir.

8         Q.  Now, talk to us, if you will:  What if anything

9    has happened since August 1st with respect to those

10   receivables?

11        A.  We are not quite sure what has happened.  We

12   lost a lot of our bank access as the bank accounts were

13   shut down.  We were not able to see any money received,

14   and we have not received an accounting from Ford, if any

15   of that money was paid directly to them based off their

16   letter of assignment.  So that is information we are

17   still working on.

18        Q.  And who is the person in charge of working on

19   that issue?

20        A.  Kyle Fields.

21        Q.  What is Mr. Fields's position?

22        A.  He is a financial analyst.

23        Q.  For Reagor-Dykes?

24        A.  Yes, sir.

25        Q.  Does he report to you?

1      A.  Currently, yes, sir.

2      Q.  And these sources of retail installment

3  contracts, that's what we are talking about, correct?

4      A.  Yes, sir.

5      Q.  Who were your main finance sources?  You might

6  finance the retail paper with Ford Credit or others,

7  correct?

8      A.  Yes, sir.

9      Q.  Who are those sources?

10     A.  There is a lot of banks.  We do a lot of

11  business with Ford Motor Credit, Santander.  Those were

12  some of the main ones, but it's -- the list is quite

13  lengthy, and it just depends which bank comes back with

14  the best rate for the customer.

15     Q.  Prior to the bankruptcy, what was the normal

16  course of dealing on those issues?  What I am trying to

17  get to is:  If you will, describe for us Santander.  If

18  they bought the retail installment contract, would there

19  be a week or two weeks or some time would pass by, and

20  then you would get funding on that retail paper?

21     A.  Once we provided them with all the information

22  they need, what we call their stips -- their

23  stipulations, whether they need proof of income or bank

24  statements, it would typically be within seven days.

25     Q.  Have the Debtors received funding on contracts

APP 0246

1  in transit since the date of the bankruptcy?

2    A.  We have received some paper checks that have

3  come in.  There have not been many compared to the

4  overall list of receivables, though.

5    Q.  Do you have belief as to some reasons that the

6  checks have slowed down since the bankruptcy?

7    A.  Well, we have been contacted by -- Santander,

8  for instance, didn't know who to pay, and they put the

9  money into a suspense account.  They did contact us.

10  This is how we found that out, but other than that, we

11  have to go bank by bank and find out why they have

12  slowed down.

13         We don't -- we are not aware.  Without the

14  bank access to know, we have no idea if they have

15  already been funded.

16    Q.  Okay.  I am looking at Walter Miller financed

17  with Cabot Credit Union.  Do you recognize Cabot?

18    A.  I don't.  I am not familiar with that bank.

19    Q.  Okay.  It's $47,000.  If we are wanting to

20  identify the gross profits relative to that transaction,

21  do we need to wait until Cabot has funded on the retail

22  installment contract to make that determination?

23    A.  Yes, sir.

24    Q.  Okay.  And have any of those determinations

25  been made with respect to retail installment paper that

1   has funded?

2      A.  No, sir.  We have not determined the gross

3   profit on anything that has been received.

4      Q.  Who will do that?

5      A.  I will.

6      Q.  Okay.  Santander was previously referred to as

7   Drive Financial?

8      A.  Maybe.  I don't know.

9      Q.  Okay.  Mr. Conner, let's talk a little bit

10  about cash sources and uses, and we have been talking

11  about uses of cash by the Debtors relative to payroll

12  and to gross profits.

13          You have indicated that you have issued

14  payroll checks and four checks for parts.  I take it

15  those checks have probably gone to local suppliers; is

16  that fair?

17     A.  Yes, sir.

18     Q.  And has the Debtor received any payment on

19  account of parts accounts with respect to the

20  manufacturers, to your knowledge?

21     A.  Not that I am aware of.

22     Q.  What other critical uses of cash do you

23  identify basically from August 1st through August 30th

24  other than the ones you have identified so far being the

25  payroll and the gross profits?

1     A.  I guess -- say that again for me.

2     Q.  Yeah.  It wasn't a very good question.  Talk to

3   me about insurance.  Let go with insurance on the

4   vehicles.

5          How, to your knowledge, if you know, is

6   insurance handled with respect to the new car inventory?

7     A.  I have had to get with Steve Rinehart on that.

8   He manages our facilities and our insurance policies,

9   and he is getting me that information, but I don't know

10  any of that at this time.

11    Q.  If you know, have you received any notices of

12  cancellation of insurance?

13    A.  I am not aware of any.

14    Q.  Okay.  What about property damage, if you had a

15  hailstorm or something like that relative to just the

16  new vehicles?  Do you know how that issue is protected

17  against?

18    A.  I am not aware of any of that stuff.

19    Q.  Okay.  With respect to the physical locations,

20  I take it that currently there are not payments being

21  made for rent or passed through items to the physical

22  facilities.

23    A.  That's correct.

24    Q.  Talk to me, if you will, about other cash use.

25  Let's talk about retainers.  Has the Debtor, to your

1   knowledge, paid retainers to Mr. Langston or others?

2       A.  I am not aware of any checks cut from the

3   entities that are in bankruptcy that have cut checks to

4   any professional fees or services.

5       Q.  Let's move to cash sources.  At this point,

6   along with what we have discussed being the vehicles

7   in -- I'm sorry -- the contracts in transit, are there

8   any other sources of cash that you have identified as

9   incoming?

10      A.  Say that again for me.

11      Q.  Yes, sir.  We have talked about cash out.

12  Let's talk about cash in.  Have you identified any money

13  coming into these dealerships, these Debtors from any

14  sources?

15      A.  We have had some service income, people coming

16  in and getting their cars worked on, but other than

17  that, I am not aware of any other sources of income.

18      Q.  Does the service income flow through,

19  basically, the parts statement, as far as you know?

20      A.  Yes, sir.

21      Q.  Talk to me about any sales of vehicles other

22  than to a retail consumer.  Have you wholesaled any

23  vehicles?

24      A.  Not that I am aware of.

25      Q.  What about dealer transfers?  Have you made any

1    dealer transfers of any new or used vehicles?

2         A.  Not that I am aware of, not since August 1st.

3         Q.  Mr. Conner, with respect to any management

4    agreements or sales of one or more dealerships, do you

5    have, personally, any involvement in those issues?

6         A.  No.  Other than providing some financial

7    information that's historical that's needed, I have had

8    no involvement in those issues.

9         Q.  You came on around January 1st of 2018,

10   correct?

11        A.  It was the end of January.  January 27th.

12        Q.  Were you involved in any potential sale

13   transactions of any dealerships prior to August 1st in

14   terms of providing information?

15        A.  No, sir.

16        Q.  And to your knowledge, who is the person who --

17   or persons who would be responsible for discussing any

18   of those type transactions?

19        A.  Shane Smith.

20        Q.  And since August 3rd, who would be responsible?

21        A.  It's -- to my knowledge, Bart and Rick and John

22   Thompson have handled all that.

23        Q.  Mr. Conner, you have been working hard to

24   assist Mr. Ryan Reagor to reconcile vehicle collateral

25   since the bankruptcy, correct?

1      A.  Yes, sir.

2      Q.  And tell us a little bit as far as you know as

3  to what he is trying to do to reconcile -- vehicle

4  collateral such as between dealerships or between new

5  car dealerships and used car dealerships.

6      A.  Can I -- say that again.

7      Q.  Sure.  Let's go to the Auto Mall in Lubbock.

8  There are some vehicles, and there is a question as to

9  whose collateral those vehicles at the Auto Mall are and

10  whether they constitute trades from one of the other

11  dealerships.  Is that, to your knowledge, something

12  Mr. Reagor -- Ryan Reagor is working on?

13      A.  I am not real sure what Ryan is working on

14  right now.

15      Q.  And what, if anything, has been your

16  involvement with that issue?

17      A.  My involvement has become that I have everyone

18  doing the hard inventory counts now that we are

19  comparing by VIN number with the floor plans associated

20  so that every vehicle -- we will know which company it

21  is floor planned with, whether it's double floor

22  planned, whatever it may be.  We have built that by VIN

23  number so we are able to properly sort between all the

24  banks.

25      Q.  If at all, have you come to any beliefs as to

1   how some vehicle came to be double floor planned?

2      A. I don't know.

3      Q. If you know, Mr. Conner, let's talk a little

4   bit about the taxes and titles. Have you become aware

5   of some of the counties' county prosecutors indicating

6   that there are retail consumers that need to have taxes

7   paid or to obtain registration or tax?

8      A. Yes, sir.

9      Q. And if there has been a response to that, what

10  has the response been?

11     A. We haven't had a response to that so far. On

12  all sales that have happened since August 1st, we have

13  been able to register those, but prior to the August 1st

14  order, we have not -- we have not had a response to

15  those.

16     Q. Okay. Let's talk about the ones sold since

17  August 1st. What have you done, if you know, to

18  register those vehicles?

19     A. Well, we have had, in some instances we have

20  had the customers go directly to the county people and

21  pay with cash or check personally, and that's how we

22  have had to register so far.

23     Q. Since that time, August 1st, have you stopped

24  accepting trade ins with payoffs?

25     A. Yes, sir.

1     Q.  Okay.  Let's talk about the double floored

2  units.  Have you tried to -- or someone tried to

3  identify by a spreadsheet or otherwise what units have

4  been double floor planned?

5     A.  Yes, sir.

6     Q.  And tell us generally what that process has

7  involved.

8     A.  The process has been getting the information

9  from every floor planning bank that we have and getting

10  what we can, such as VIN number, some sort of searchable

11  item and building comparisons showing which vehicles

12  with what VIN numbers show to be floored with multiple

13  banks.

14     Q.  Do you have an approximate order of magnitude?

15  Are we talking 10 cars, or 100 cars, 500 cars?

16     A.  The last count, to my recollection, was 185.

17     Q.  As of today, you haven't filed -- "you,"

18  meaning the Debtors -- haven't filed something with the

19  bankruptcy court to try to unwind that issue, correct?

20     A.  Not that I am aware of.

21     Q.  Do you have -- if you do, Mr. Conner, do you

22  have an approach as to how you try to resolve that

23  issue?

24     A.  I don't have an approach.

25     Q.  Now, as to those double floored units, do those

1    units exist physically at one of the locations?

2        A.  Yes, sir.

3        Q.  What, if any, approach are you using with

4    respect to those 185 cars?  Are you treating them in the

5    normal course?  Are you sequestering those cars?  What

6    are you doing, if you know?

7        A.  We are treating them in normal course.  We have

8    mainly just identified.

9        Q.  Since you have been aboard in late August of

10   this year, what has been the record that has been

11   maintained of the dealership with respect to the

12   movement of a car?

13            Let's say you had an F-150, and it moved

14   from one location to another location.  If you know, is

15   there some history that identifies that transfer from

16   one location to another location?

17       A.  Well, since August 1st, we have stopped moving

18   cars between lots unless instructed by Ford that it

19   needed to get to the lot that it was floor planned with.

20       Q.  Okay.  Let's talk about prior to August 1st.

21   Is there a record, if you know, indicating the movement

22   of a particular vehicle from one physical location or

23   dealer to a different physical location or dealer?

24       A.  The only record would be by reviewing the

25   titles and seeing if it was transferred on the title

APP 0255

1  from -- whether it be Reagor Auto Mall to Spike Dykes

2  Ford, just for an example.  That would be probably the

3  only way to tell if it -- how it -- if it did move

4  around between the dealerships.

5      Q.  And if it was a new car, it wouldn't have a

6  title.  It would have a manufacturer's statement of

7  origin, correct?

8      A.  The new cars could not move around that way

9  because -- I mean, you couldn't move a new car to a

10  different lot.  It had to be sold on that lot that it

11  was entitled to.

12      Q.  With respect to this 185 double floored units,

13  are they new cars, used cars or both?

14      A.  Both.

15      Q.  Did that involve any new cars moving between

16  locations?

17      A.  I am not aware of any.

18      Q.  Have you actually seen where titles were

19  executed between dealerships or is that unusual?

20      A.  I have seen it.  I have seen it.  It's not

21  unusual.

22      Q.  We were talking about cash sources, and we have

23  identified a few.  Are there any other cash sources to

24  these Debtors that you know of?

25      A.  No, sir.

1      Q.  And any issues related to management or

2   operating agreements, that would be an issue we would

3   need to talk with someone else about?

4      A.  Yes, sir.

5      Q.  After you came aboard in late January, were you

6   involved at all in the physical vehicle audit process?

7      A.  No.  I had no involvement or anything to do the

8   with that.

9      Q.  Sometime on or about July 28th, 29th, 30th, did

10  you become aware of Ford Credit requesting payment for

11  certain units --

12     A.  Yes.

13     Q.  -- that had been sold?

14     A.  Yes.

15     Q.  Okay.  And is it your understanding that dealer

16  electronic funds transfers were initiated by the

17  dealerships on or about late July, early August?

18     A.  I am not sure who initiated them, but I know

19  they were initiated.

20     Q.  Did you come to learn that each of -- well,

21  primarily all of these electronic funds transfers were

22  rejected?

23     A.  Yes.

24     Q.  And did you become aware that this amounted to

25  about $42 million?

1       A.  Yes.

2       Q.  Mr. Conner, if some issues developed relative

3   to the date of sale of a particular vehicle, did you

4   become involved with respect to the date of sale of a

5   vehicle?

6       A.  No.  I had no involvement in sales or dates or

7   anything like that.

8       Q.  Prior to coming to work for Reagor-Dykes, did

9   you know Mr. Shane Smith?

10      A.  No.

11      Q.  Do you have an understanding as the -- as to

12  the entire indebtedness owed by these dealerships to

13  Ford Credit?

14      A.  Yes.

15      Q.  And is that amount approximately $116 million?

16      A.  Yes.

17      Q.  That's going to be give or take depending upon

18  the total interest and other charges, correct?

19      A.  Yes, sir.

20      Q.  And to your knowledge, have the dealerships

21  received certain notices relative to manufacturers such

22  as Toyota or GM or Ford Motor Company relative to the

23  sales and service agreements?

24      A.  I am aware that some stuff has been received,

25  but I really don't know what it amounts to.

```
 1        Q.  Is the inventory -- and by "inventory," I mean

 2   vehicles.  Are the vehicles -- is it fair to say that

 3   those are ageing in value each day they sit on the lots

 4   post-petition?

 5        A.  Yes, sir.  That's correct.

 6        Q.  When does the new model year come out for,

 7   let's say, Ford vehicles, if you know?

 8        A.  They are already coming out.

 9        Q.  Do the dealerships have some 2017 model

10   vehicles?

11        A.  Yes.

12        Q.  And so you have 2017s, 2018s, and you are

13   receiving some 2019s, correct?

14        A.  Yes.

15        Q.  Mr. Conner, I think you provided some

16   spreadsheets with maybe some new information.  Is there

17   anything particularly remarkable on some of these new

18   spreadsheets?

19        A.  No.  It's just an update on where we show the

20   payoffs are.

21        Q.  Okay.  So this payoffs is basically showing

22   2.8 million.  That's about the same as the prior

23   spreadsheet, correct?

24        A.  Yes, sir.

25                MR. LANGLEY:  Let's take a break for just
```

1    about ten minutes.

2              (Break was taken.)

3        Q.  (BY MR. LANGLEY)  Mr. Conner, I have a few more

4    questions, and then I will finish up with you.  I

5    appreciate you helping me understand some of these

6    numbers.

7              Let me understand -- to the extent you know

8    the data entry process, when a car is sold in the

9    ordinary course to a retail consumer -- let's say at the

10   Mitsubishi store that you were employed at -- who, if

11   you know, enters the data to get that information either

12   to that store or to the corporate headquarters that that

13   vehicle has been sold?

14       A.  Well, for Mitsubishi, we used a software called

15   Reynolds and Reynolds.  That software would allow the

16   salesman and the finance managers to input all of the

17   information from the sale, and it would automatically

18   flow onto the accounting side, and they bring the deals

19   over when they were done, and we would send them to the

20   bank, but they would go to the accounting system that we

21   also had access to at headquarters.

22             So as things were getting entered and

23   update it was realtime updates for us at headquarters,

24   also.

25       Q.  Okay.  So Reynolds and Reynolds, I take it, is

 1   some form of an accounting software; is that about

 2   right?

 3        A.   It's account -- it's a car sale as a whole.  It

 4   does the operational side and the car side.

 5        Q.   Help me understand:  At corporate headquarters,

 6   are you translating that data or are you using Reynolds

 7   and Reynolds data at that point to reconcile what has

 8   occurred at the Mitsubishi store?

 9        A.   As far as I know, we just use Reynolds and

10   Reynolds.

11        Q.   Okay.  And at other locations, you are going to

12   have other software packages, either Reynolds and

13   Reynolds or something else; is that correct?

14        A.   Yes.

15        Q.   To your knowledge, was there a master ability

16   to reconcile the sold units?  I am trying to understand.

17   If the dealerships have reported that 500 vehicles have

18   been sold in a particular time frame and if those 500

19   vehicles were floored, financed, if you will, by a

20   particular finance source, does the corporate

21   headquarters then have the ability to say, "Okay.  We

22   have got 500.  We need to get those 500 paid off"?

23        A.   They would have had the ability to see because

24   it would have left our inventory schedule, which also

25   had the floor plan amount for the specific vehicle.

1           So as the vehicle was sold, it would leave

2  our inventory schedule and still leave a corresponding

3  floor plan liability if it's owed.

4      Q.  Okay.  And the date of sale which triggers the

5  length of time that the dealership has to pay that floor

6  source, that was an issue that you did not deal with,

7  but rather Mr. Smith, to your knowledge, dealt with?

8      A.  Yes, sir.

9      Q.  Since your time at corporate headquarters, have

10  you come to learn that there have been discrepancies

11  relative to the date of sale reporting?

12      A.  I have become aware recently of that.

13      Q.  And have you come to any conclusions on how

14  that happened or why that happened?

15      A.  I don't have any knowledge of how it happened.

16      Q.  All right.  So a new vehicle, what we talked

17  about -- and I just have two exhibits for you here.

18           (Tim Conner Deposition Exhibit Number 1,

19  Vehicle Receivables Spreadsheet, was marked for

20  identification and attached hereto.)

21           (Tim Conner Deposition Exhibit Number 2,

22  Spreadsheet of Vehicles with No Corresponding Floor

23  Plan, was marked for identification and attached

24  hereto.)

25      Q.  (BY MR. LANGLEY)  I have got one that I marked

1    as Conner Exhibit 2, and I think that's a spreadsheet

2    that you prepared and provided to us, and I wrote on the

3    top that it's unfloored of 9.5 to 15 million.  Do you

4    recognize, Conner Exhibit 2?

5         A.  Yes, sir.

6         Q.  What is it?

7         A.  It is a listing of vehicles that we show to be

8    in our inventory that have no corresponding floor plan

9    liability.

10        Q.  All right.  I need your help in understanding

11   that.  A new unit comes in -- so let's go with the first

12   vehicle.  It's a '18 Ford Expedition.  It's got the VIN

13   number on Conner Exhibit 2, and it indicates $66,000

14   inventory value, correct?

15        A.  Yes, sir.

16        Q.  That vehicle comes in.  In looking at Conner

17   Exhibit 2, can you tell where it went?

18        A.  No, sir.

19        Q.  All right.  So you have got a Ford Expedition.

20   It's not floored specifically with any floor plan

21   finance source.  What, if anything, happened relative to

22   that vehicle, if you can tell us?

23             I am wondering when it came in, where it

24   came in and what would normally have happened to get it

25   on some floor plan.

APP443

1          A.  Well, normally, with these new vehicles like

2    this, they would have come in from the manufacturer.

3    They would have been taken to the lot that they would be

4    sold on and floor planned under the corresponding -- we

5    would submit that to the floor plan to advance the

6    funds.

7          Q.  Okay.  So with this Ford Expedition that comes

8    in, you have got a control number?

9          A.  Yes, sir.

10         Q.  All right.  And so that control number is a

11   number that's assigned by the dealerships that says, "We

12   are going to refer to that vehicle as that number,"

13   correct?

14         A.  Yes, sir.

15         Q.  That vehicle comes in, and in the ordinary

16   course, you would expect that at some point in time,

17   Mr. Conner, that unit would be reported and then added

18   to a floor plan somewhere, correct?

19         A.  Yes, sir.

20         Q.  And that unit -- is it fair to say the only

21   source for that unit would come from the Ford

22   manufacturer?

23         A.  Yes, sir.

24         Q.  So in all probability, that vehicle was headed

25   to one of the two Ford stores, correct?

1      A.  Yes, sir.

2      Q.  All right.  Let me see if I can't -- now, I

3  quickly went through your spreadsheet and added up these

4  subtotals, and if you add the 3.648 million and these

5  other subtotals, you come up somewhere in the range that

6  you are talking about, 9.5 to 15 million, correct?

7      A.  Yes, sir.

8      Q.  And these are your assumptions on the value,

9  depending upon whether they are new or used vehicles,

10  correct?

11      A.  Yes, sir.

12      Q.  What, if anything, would have happened with

13  respect to the used vehicles?  Can you look at this?

14  And look down here at the bottom, and you see this '13

15  Chevy Corvette, three from the bottom.  What, if

16  anything, can you tell us about that vehicle?

17      A.  That's a vehicle that was either received by

18  trade in or we bought it from another dealership, and

19  that 51,000 number is what we purchased it for.

20      Q.  Does the exhibit Conner 2 indicate to you

21  whether there is a payoff associated with that vehicle?

22      A.  No, sir.

23      Q.  All right.  I am going to hand you Conner

24  Exhibit 1, and I think this is another spreadsheet that

25  you were involved in preparing that shows the contracts

1    in transit of about $8.2 million; is that correct?

2         A.  Yes, sir.

3         Q.  And we talked about these contracts already.

4    Basically, a few of these have been financed, meaning

5    that you have seen checks, but in general, it's fair to

6    say that these checks have been put into suspense

7    accounts?

8         A.  We have been made aware of that in one

9    situation, but I don't know for all of them.

10        Q.  Okay.  Is it fair to say you don't really know

11   what has happened with the other finance sources?

12        A.  Yes, sir.

13        Q.  All right.  Now, this Corvette that was on

14   Conner Exhibit 2, third from the bottom, first page,

15   that vehicle, looking at Conner Exhibit 2, we don't know

16   which dealership that ended up at, and we also don't

17   know whether that vehicle ended up getting moved from

18   one location to another, correct?

19        A.  No, sir.  That spreadsheet is giving -- it is

20   the assumption on which dealership it's on the books at.

21        Q.  All right.  And which dealership is at the --

22   on the books?

23        A.  That is Reagor Dykes Motor, Spike Dykes Ford.

24        Q.  Is that the Auto Mall?

25        A.  No.  That is our Ford store in Lamesa.

1      Q.  Okay.  All right.  So if you go through each of

2  these, how do you identify which dealership it's located

3  at?

4      A.  It's on the top page.

5      Q.  Okay.

6      A.  It says, "Reagor-Dykes Motors," and then a

7  subtotal for that one.  The next one is Reagor-Dykes

8  Imports, which is Lubbock Mitsubishi, Reagor-Dykes

9  Amarillo, Reagor-Dykes Auto Company, which is Ford

10  Plainview, Reagor-Dykes Plainview, which is Toyota, and

11  our Floydada Chevy store, and that's how you identify

12  them.

13      Q.  What about the used car Auto Mall in Lubbock?

14  That's not on Conner Exhibit 2.

15      A.  No, sir.

16      Q.  Would there be vehicles potentially at the

17  Lubbock Auto Mall that fit within this category where

18  they -- you are not sure whether they have been listed

19  on a floor plan finance source?

20      A.  Potentially.

21      Q.  Since on or about August 1st to the current, I

22  believe you said that there is not any of the accounting

23  personnel who actually reports to you or that you

24  supervise; is that correct?

25      A.  Rephrase that for me.

1      Q.  Do you supervise any of the accounting

2   personnel at corporate headquarters?

3      A.  Yes.

4      Q.  Who do you supervise?

5      A.  Kyle Fields, Lindsey Williams and Brad Fansler.

6      Q.  Just generally tell us the responsibilities of

7   Mr. Fields.

8      A.  Kyle Fields is a financial analyst.  He is

9   very, very talented in Excel, and he helps us take the

10  raw data and make it more useful.

11     Q.  Who was the next person?

12     A.  Lindsey Williams.  She is very knowledgeable at

13  the store level as well as accounting, and she helps the

14  stores day to day.

15     Q.  And Brad Fansler?

16     A.  He is our systems operational guy that can

17  train people on how things should work from Reynolds and

18  Reynolds, CDK, as well as being a good source for

19  accounting work.

20     Q.  What is CDK?

21     A.  It's another software we use that's like

22  Reynolds and Reynolds.

23     Q.  And Mr. Conner, have you or Mr. Fields or

24  Ms. Williams or Mr. Fansler or anyone to your knowledge

25  reached out to the finance -- retail finance sources to

1    inquire about the funding of the accounts on Conner

2    Exhibit 1?

3         A.   Lindsey and Brad have reached out on a few, and

4    we keep getting referred to their legal department, and

5    it hasn't really gotten us anywhere.

6         Q.   When you look at Conner Exhibit 1, that

7    document doesn't really tell us the amount of the payoff

8    for the trade in on the particular installment sale?

9         A.   No, sir.

10        Q.   Okay.  And it doesn't also tell us -- we would

11   have to go to the deal jacket to determine the taxes and

12   the title and whether there is an extended warranty or

13   any other payable associated with that deal?

14        A.   Correct.

15        Q.   Have you developed any -- and by "you," I mean

16   the Debtors.  Have you developed any means of

17   reconciling the back end of the transactions?  And

18   specifically, I am talking about the finance spread or

19   extended warranties or other items that are added on the

20   in the finance department.

21        A.   I guess rephrase that for me.

22        Q.   Well, let's say your source of funding costs

23   you 5 percent, and you charge the consumer 7 percent.

24   Do you have a mechanism to be able to determine your

25   gross profit that includes the cost of your warranties

1    or other add on devices such as the interest rate?

2       A.  Our software will do that for us.

3       Q.  Have you produced any type of calculation

4    relative to that?

5       A.  No, sir.

6       Q.  Okay.

7                MR. LANGLEY:  I pass the witness.

8                        EXAMINATION

9    BY MR. BUSTOS:

10      Q.  Mr. Conner, I represent Vista Bank.

11      A.  Yes, sir.

12      Q.  I have a few questions for you.  You produced

13   some financial statements to Vista Bank last week; is

14   that correct?

15      A.  Yes, sir.

16      Q.  When did those financial statements become

17   available to you?

18      A.  Are we referring to the audited financials that

19   were provided?

20      Q.  Yes, the 2016 audited financials.

21      A.  They became available to me after August 1st.

22      Q.  So you were not aware of their existence before

23   that date?

24      A.  I had never seen them before that date.

25      Q.  Who gave those to you to produce to Vista Bank?

Page 46

1      A.   I was made aware that they were in what we call

2   our admin share folder that's shared on a drive, and I

3   was made aware that they were located in there and I

4   could go get them and send them to you.

5      Q.   Who directed you to send those to Vista Bank?

6      A.   Bart Reagor.

7      Q.   To your knowledge, who was responsible for

8   working with the auditors to provide information to the

9   auditors on financials?

10      A.   Shane Smith and Brad Fansler headed up getting

11   the information to the auditors, but all the information

12   had to flow through Shane.

13      Q.   Let me ask you some follow-up questions from

14   earlier questioning.  In terms of the payroll

15   liabilities for the bankrupt company, has all payroll

16   obligations been satisfied to date to your knowledge?

17      A.   Yes, sir.

18      Q.   So there is no unpaid payroll for the

19   employees, correct?

20      A.   We sent all the remaining payroll due to

21   employees this morning.

22      Q.   Okay.  So some was paid late, as late as this

23   morning?

24      A.   We did pay it as of this morning.

25      Q.   Okay.  In terms of these double floor planned

1    cars -- and there is approximately 185 of them

2    currently, right?

3         A.  Yes.

4         Q.  Who are the lenders involved in that double

5    flooring on those cars, to your knowledge?

6         A.  To my knowledge, it's Ford Motor Credit, GM

7    Financial, First Capital Bank and Liberty Capital, and

8    First Bank & Trust is the other one.

9         Q.  Do you still have an active CPA license?

10        A.  Yes, sir.

11             MR. BUSTOS:  I will pass the witness.

12                      EXAMINATION

13   BY MR. CARDER:

14        Q.  Is there a document on the 185 cars that you

15   mentioned were double floor planned?

16        A.  Yes, sir.  We have a spreadsheet.

17        Q.  What's the title or way to identify that

18   document?

19        A.  We call it -- in our folder, it's saved as

20   "Duped Flooring Spreadsheet."

21        Q.  Thank you.

22             MR. CARDER:  That's all my questions.

23                      EXAMINATION

24   BY MR. STROHSCHEIN:

25        Q.  Mr. Conner, I am Steve Strohschein.  I

APP 0272

1    represent GM Financial.  Conner Number 2 is the

2    inventory list of automobiles which are not on a floor

3    plan; is that correct?

4        A.  Yes, sir.

5        Q.  And what is the status -- you may have answered

6    this.  If I am repeating a question, I am sorry.  What

7    is the status of actually trying to see which of those

8    cars are on the ground?

9        A.  We have conducted hard counts on most of the

10   lots yesterday and are finishing at the others today.

11   So we will be able to actually know where each one of

12   these individual cars is very, very soon.

13              MR. STROHSCHEIN:  No further questions.

14                        EXAMINATION

15   BY MR. LASHAWAY:

16       Q.  I am Jeff Lashaway.  I represent Aim Bank.  Are

17   you aware that financials -- financial statements were

18   provided to Aim Bank through the end of March of this

19   year, 2018?

20       A.  I wasn't aware who received financials.

21       Q.  Would you have been involved in preparing those

22   financials in March -- through March of 2018?

23       A.  The only thing I had to do with financials is

24   Shane would tell me when they were finished, and I would

25   plug the numbers into our consolidated financial report

APP 0273

APP453

Page 49

1    that put it all just in one big spreadsheet.

2              So I would take the financials that were

3    prepared and place those numbers into a spreadsheet for

4    him.

5         Q.   Who else with the Reagor-Dykes organization

6    would be involved in providing the data for those

7    financials?

8         A.   The data would come from the individual stores,

9    and they would finish what they call the month end

10   close, and then all that data will be sent to Shane, and

11   he would have it from there.

12        Q.   Earlier, you had testified, I think, in

13   response to a question about the 42 million in ACH

14   payments that were made or originated prior -- at the

15   end of July or in July.  Do you recall -- do you know

16   what I am speaking of with the 42 million?

17        A.   Yes, sir.

18        Q.   Who -- do you know who originated that ACH?

19        A.   I do not.

20        Q.   Would Ford have originated -- Ford Motor Credit

21   originated those ACHs?

22        A.   You would have to ask them.  I don't know.

23        Q.   And do you know who those ACHs were presented

24   to or what banks -- bank accounts?

25        A.   Yes, sir.  I do know which banks they were

1    presented to.

2         Q.  Who would be those banks?

3         A.  For Amarillo Mitsubishi, it would have been

4    IBC.  For the two Plainview stores, which would be

5    Reagor-Dykes Auto Company and Reagor-Dykes Plainview, it

6    would have been to Vista Bank.  I am not sure on

7    Floydada, which -- because they had a few accounts.

8              For Spike Dykes Ford, I am not sure, and

9    Lubbock Mitsubishi would have been to IBC.

10             MR. LASHAWAY:  That is all the questions I

11   have.  Pass the witness.

12                        EXAMINATION

13   BY MR. MASSOUH:

14        Q.  I am John Massouh.  I am represent First

15   Capital Bank of Texas.  You had mentioned that prior to

16   August 1st there were no vehicles transferred -- or I'm

17   sorry -- after August 1st there were no vehicles

18   transferred from car lot to car lot except for some

19   vehicles that you were instructed to transfer by Ford

20   Motor Company; is that correct?

21        A.  Yes.  That's what I have been told.

22        Q.  Okay.  Is there a list of these vehicles after

23   August 1st that were transferred from one car lot to

24   another car lot?

25        A.  I am not aware of one.  Ryan Reagor has handled

Page 51

1    all of the cars.

2        Q.  To your knowledge, were the cars that were

3    transferred after August 1st from one car lot to another

4    car lot, were they new or used cars or a combination of

5    both?

6        A.  I am only aware of used, but I don't know.

7        Q.  Do you know the scope of how many vehicles we

8    are talking about that were transferred from one car lot

9    to another car lot after August 1st?

10       A.  No, sir.

11       Q.  Is there a process or a mechanism in place to

12   keep track of transfers as between car lots prior to

13   August 1st or any point in time?

14       A.  Prior to August 1st, there wasn't really a

15   mechanism for that, and since August 1st, we have told

16   all GMs, "No moving between the stores."

17       Q.  So prior to August 1st, there would be vehicles

18   that would have been transferred from car lot to car

19   lot.  And how would Reagor-Dykes keep up with where the

20   vehicle is located and which car lot it was at?

21       A.  The office staff would get the receipts for the

22   vehicle turned into them.  We sold it between lot to

23   lot, and so we would pay the different entities for the

24   car, and that would be turned into the office for them

25   to post in inventory.

```
 1        Q.  If it was a used vehicle, would that be --

 2   would there be a transfer of ownership reflected on the

 3   title, as well?

 4        A.  Yes, sir.

 5        Q.  Would that always be the case or was it just

 6   sometimes?

 7        A.  I have seen it.  I can't speak to always, but I

 8   have seen it on the title that it does get transferred.

 9             MR. MASSOUH:  I pass the witness.

10             MR. MULLIN:  We will reserve our questions.

11             MR. LANGLEY:  Anyone else?  Okay.  Nothing

12   further.  Thank you very much, Mr. Conner.

13             THE WITNESS:  Thank you.

14             (Deposition concluded at 10:46 a.m.)

15

16

17

18

19

20

21

22

23

24

25
```

Page 53

1                      CHANGES AND SIGNATURE

2    WITNESS NAME: TIM CONNER    DATE: AUGUST 13, 2018

3    PAGE LINE        CHANGE              REASON

4    _____

5    _____

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   _____

APP 0278

APP458

 1          I, TIM CONNER, have read the foregoing
   deposition and hereby affix my signature that same is
 2 true and correct, except as noted above.

 3

 4                    _____

 5                    TIM CONNER

 6

 7 THE STATE OF _____)

 8 COUNTY OF _____)

 9

10      Before me, _____, on this day

11 personally appeared TIM CONNER, known to me (or proved

12 to me under oath or through _____)

13 (description of identity card or other document)) to be

14 the person whose name is subscribed to the foregoing

15 instrument and acknowledged to me that they executed the

16 same for the purposes and consideration therein

17 expressed.

18      Given under my hand and seal of office this

19 _____ day of _____, _____.

20

21

22                    _____

23                    NOTARY PUBLIC IN AND FOR
                    THE STATE OF _____
24                  COMMISSION EXPIRES: _____

25

```
 1              IN THE UNITED STATES BANKRUPTCY COURT
             FOR THE NORTHERN DISTRICT OF TEXAS
 2                    LUBBOCK DIVISION

 3   IN RE:                     )
                                )
 4   REAGOR-DYKES MOTORS, LP,   )Case No. 18-50214-rlj11
                                )
 5           Debtor.            )
     _____
 6   IN RE:                     )
                                )
 7   REAGOR-DYKES IMPORTS, LP,  )Case No. 18-50215-rlj11
                                )
 8           Debtor.            )
     _____
 9   IN RE:                     )
                                )
10   REAGOR-DYKES AMARILLO, LP, )Case No. 18-50216-rlj11
                                )
11           Debtor.            )
     _____
12   IN RE:                     )
                                )
13   REAGOR-DYKES AUTO COMPANY, )
     LP,                        )Case No. 18-50217-rlj11
14                              )
             Debtor.            )
15   _____
     IN RE:                     )
16                              )
     REAGOR-DYKES PLAINVIEW, LP,)Case No. 18-50218-rlj11
17                              )
             Debtor.            )
18   _____
     IN RE:                     )
19                              )
     REAGOR-DYKES FLOYDADA, LP, )Case No. 18-50219-rlj11
20                              )
             Debtor.            )
21   _____

22              REPORTER'S CERTIFICATION
               DEPOSITION OF TIM CONNER
23                  AUGUST 13, 2018

24       I, Cindy Wiley, Certified Shorthand Reporter in and

25   for the State of Texas, hereby certify to the following:
```

1          That the witness, TIM CONNER, was duly sworn by the

2     officer and that the transcript of the oral deposition

3     is a true record of the testimony given by the witness;

4          That the deposition transcript was submitted on

5     _____ to the witness or to the attorney

6     for the witness for examination, signature and return to

7     me by _____;

8          That the amount of time used by each party at the

9     deposition is as follows:

10          MR. DAVID MULLIN - 00 HOURS:00 MINUTES
            MR. DAVID M. LANGSTON - 00 HOURS:00 MINUTES
11          MR. KEITH A. LANGLEY - 01 HOUR:05 MINUTES
            MR. DONALD H. CRAM - 00 HOURS:00 MINUTES
12          MR. MARK ANDREWS - 00 HOURS:00 MINUTES
            MR. STEPHEN P. STROHSCHEIN - 00 HOURS:01 MINUTE
13          MR. JEFF R. LASHAWAY - 00 HOURS:03 MINUTES
            MR. JOHN F. MASSOUH - 00 HOURS:02 MINUTES
14          MR. JOHNNY K. MERRITT - 00 HOURS:00 MINUTES
            MR. FERNANDO BUSTOS - 00 HOURS:03 MINUTES
15          MR. MARK S. CARDER - 00 HOURS:01 MINUTE
            MR. SCOTT R. WIEHLE - 00 HOURS:00 MINUTES
16          MR. MARK D.G. SANDERS - 00 HOURS:00 MINUTES

17          That pursuant to information given to the

18     Deposition officer at the time said testimony was taken,

19     the following includes counsel for all parties of

20     record:

21          MR. DAVID MULLIN and MR. DAVID M. LANGSTON,
            Attorneys for Debtors,
22          MR. KEITH A. LANGLEY and MR. DONALD H. CRAM,
            Attorneys for FORD MOTOR CREDIT COMPANY, L.L.P.,
23          MR. MARK ANDREWS, Attorney for GM, L.L.C,
            MR. STEPHEN P. STROHSCHEIN, Attorney for GM
24          FINANCIAL,
            MR. JEFF R. LASHAWAY, Attorney for Aim Bank,
25          MR. JOHN F. MASSOUH, Attorney for First Capital

1      MR. JOHNNY K. MERRITT, Attorney for Tim Conner,
       MR. FERNANDO BUSTOS, Attorney for Vista Bank,
2      MR. MARK S. CARDER, Attorney for First Bank &
       Trust,
3      MR. SCOTT R. WIEHLE, Attorney for Bart Reagor,
       MR. MARK D.G. SANDERS, Attorney for IBC Bank

4

5          I further certify that I am neither counsel for,

6      related to, nor employed by any of the parties or

7      attorneys in the action in which this proceeding was

8      taken, and further that I am not financially or

9      otherwise interested in the outcome of the action.

10         Further certification requirements pursuant to Rule

11     203 of TRCP will be certified to after they have

12     occurred.

13         Certified to by me this 14th day of August, 2018.

14

15

16

17
                    _____
18                  Cindy Wiley, Texas CSR 8667
                    Expiration Date:  12/31/18
19                  Caprock Court Reporting, Inc.
                    Firm Registration No. 374
20                  1112 Texas, Suite 200
                    Lubbock, Texas 79401
21                  (806)795.4202

22

23

24

25

APP 0282

APP462

 1              FURTHER CERTIFICATION UNDER RULE 203 TRCP

 2        The original deposition was/was not returned to the

 3   deposition officer on _____;

 4        If returned, the attached Changes and Signature

 5   page contains any changes and the reasons therefor;

 6        If returned, the original deposition was delivered

 7   to Mr. Keith A. Langley, Custodial Attorney;

 8        That $_____ is the deposition officer's

 9   charges to Ford Motor Credit Company, L.L.C., for

10   preparing the original deposition transcript and any

11   copies of exhibits;

12        That the deposition was delivered in accordance

13   with Rule 203.3, and that a copy of this certificate was

14   served on all parties shown herein on and filed with the

15   Clerk.

16        Certified to by me this _____ day of

17   _____, 2018.

18

19

20                    _____
                      Cindy Wiley, Texas CSR 8667
21                    Expiration Date:  12/31/18
                      Caprock Court Reporting, Inc.
22                    Firm Registration No. 374
                      1112 Texas, Suite 200
23                    Lubbock, Texas 79401
                      (806)795.4202
24

25

**A**

**a.m** 2:4,5 52:14
**ability** 36:15,21
  36:23
**able** 20:13 27:23
  28:13 44:24
  48:11
**aboard** 30:9
  32:5
**above-styled** 2:3
**accepting** 28:24
**access** 20:12
  22:14 35:21
**account** 22:9
  23:19 36:3
**accountants**
  13:20
**accounting** 9:2
  11:16,17 12:15
  12:18 13:1,3,3
  13:4,9 20:14
  35:18,20 36:1
  42:22 43:1,13
  43:19
**accounts** 11:12
  14:14 16:8
  20:12 23:19
  41:7 44:1
  49:24 50:7
**ACH** 49:13,18
**ACHs** 49:21,23
**acknowledged**
  54:15
**acquaintance**
  10:24
**action** 57:7,9
**active** 47:9
**actual** 12:6 15:4
  15:5,7 17:11
**add** 40:4 45:1
**added** 39:17
  40:3 44:19
**admin** 46:2
**administration**
  9:3
**advance** 39:5
**advanced** 16:4
**affix** 54:1
**ageing** 34:3

**agreements** 26:4
  32:2 33:23
**ahead** 9:5 14:11
**Aim** 5:1 48:16
  48:18 56:24
**allow** 35:15
**alter** 7:9
**Amarillo** 1:10
  5:7 42:9 50:3
  55:10
**amount** 17:8
  18:18,19 33:15
  36:25 44:7
  56:8
**amounted** 32:24
**amounts** 16:4
  33:25
**analysis** 19:16
**analyst** 20:22
  43:8
**AND-** 4:4
**and/or** 7:7
**ANDREWS**
  4:17 56:12,23
**answered** 48:5
**Antonio** 9:10
**anybody** 12:19
  12:21
**appearances** 3:3
  8:13
**appeared** 8:15
  54:11
**appreciate** 35:5
**approach** 29:22
  29:24 30:3
**approximate**
  19:11 29:14
**approximately**
  33:15 47:1
**arrears** 17:1
**assigned** 39:11
**assignment**
  20:16
**assist** 26:24
**associated** 27:19
  40:21 44:13
**assume** 19:20
**assumed** 14:23
**assumption**

  14:25 41:20
**assumptions**
  14:20 40:8
**attached** 2:9
  37:20,23 58:4
**attorney** 7:3
  56:5,23,23,24
  56:25 57:1,1,2
  57:3,3 58:7
**attorneys** 4:10
  7:13 8:13
  56:21,22 57:7
**Audin** 6:7
**audit** 32:6
**audited** 45:18
  45:20
**auditors** 46:8,9
  46:11
**August** 1:24 2:4
  11:25 12:4,8
  12:16 13:22
  14:11,24 16:17
  17:2,7 18:2
  20:9 23:23,23
  26:2,13,20
  28:12,13,17,23
  30:9,17,20
  32:17 42:21
  45:21 50:16,17
  50:23 51:3,9
  51:13,14,15,17
  53:2 55:23
  57:13
**Austin** 5:11 8:16
**authority** 13:13
**Auto** 1:13 2:7
  15:25 16:1
  27:7,9 31:1
  41:24 42:9,13
  42:17 50:5
  55:13
**automatically**
  35:17
**automobiles**
  48:2
**available** 7:3
  13:6 14:21
  45:17,21
**Avenue** 2:7 5:2

**aware** 12:5
  13:12 19:7
  22:13 23:21
  24:13,18 25:2
  25:17,24 26:2
  28:4 29:20
  31:17 32:10,24
  33:24 37:12
  41:8 45:22
  46:1,3 48:17
  48:20 50:25
  51:6

**B**

**back** 9:12 21:13
  44:17
**background**
  8:22
**bank** 5:1,5,13,18
  6:1 11:12
  12:13 14:13
  20:12,12 21:13
  21:23 22:11,11
  22:14,18 29:9
  35:20 45:10,13
  45:25 46:5
  47:7,8 48:16
  48:18 49:24
  50:6,15 56:24
  57:1,2,3
**bankrupt** 46:15
**bankruptcies**
  12:2
**bankruptcy** 1:1
  11:24 16:17,19
  21:15 22:1,6
  25:3 26:25
  29:19 55:1
**banks** 21:10
  27:24 29:13
  49:24,25 50:2
**Baptist** 9:1
**Bart** 5:22 6:8
  10:21 12:12,14
  26:21 46:6
  57:3
**based** 20:15
**basically** 13:21
  16:14 23:23

  25:19 34:21
  41:4
**basis** 14:8
**BATON** 4:24
**BEE** 5:11
**began** 11:11
  12:9
**belief** 22:5
**beliefs** 27:25
**believe** 15:10,16
  42:22
**best** 21:14
**big** 17:10 49:1
**bit** 8:22 9:15
  10:2 16:16
  23:9 27:2 28:4
**board** 10:17
  11:3
**BOERNER** 5:2
**bookkeeping**
  9:24
**books** 41:20,22
**bottom** 40:14,15
  41:14
**bought** 21:18
  40:18
**BOULEVARD**
  4:10
**Brad** 6:10 43:5
  43:15 44:3
  46:10
**break** 34:25
  35:2
**briefly** 10:16
**bring** 14:1 35:18
**BROADWAY**
  4:6
**brought** 10:19
  11:8 13:25
**BROWN** 4:5
**budget** 14:15,22
  14:25 17:18
**building** 4:11
  29:11
**built** 27:22
**Burdette** 9:6
**Burgess** 6:10
**business** 9:3
  10:2,9 18:9

21:11
**Bustos** 3:6 5:14
5:14 45:9
47:11 56:14
57:1

**C**

**C** 4:1
**Cabot** 22:17,17
22:21
**calculation** 45:3
**CALIFORNIA**
4:15
**call** 7:16 10:22
21:22 46:1
47:19 49:9
**called** 35:14
**cancellation**
24:12
**Capital** 5:5 47:7
47:7 50:15
56:25
**Caprock** 7:18
57:19 58:21
**car** 19:5 24:6
27:5,5 30:12
31:5,9 35:8
36:3,4 42:13
50:18,18,23,24
51:3,4,8,9,12
51:18,18,20,24
**card** 54:13
**Carder** 3:6 5:18
47:13,22 56:15
57:2
**carefully** 7:5
**CARES** 5:11
**cars** 18:22 19:5
19:5,12,14
25:16 29:15,15
29:15 30:4,5
30:18 31:8,13
31:13,15 47:1
47:5,14 48:8
48:12 51:1,2,4
**case** 1:4,7,10,13
1:16,19 52:5
55:4,7,10,13
55:16,19

**cash** 8:8 12:13
13:6 14:21,21
14:22 16:16,18
16:21 18:9
23:10,11,22
24:24 25:5,8
25:11,12 28:21
31:22,23
**cash-rich** 18:8
**category** 42:17
**cause** 2:4
**CDK** 43:18,20
**Cecil** 6:7
**CENTER** 4:5,14
**Cert** 7:18
**certain** 14:20
32:11 33:21
**certificate** 3:11
58:13
**certification**
55:22 57:10
58:1
**certified** 55:24
57:11,13 58:16
**certify** 55:25
57:5
**CFO** 12:24
**change** 7:9,10
12:8 53:3
**changed** 12:9
14:12 15:2
18:18
**changes** 3:10 7:5
7:7 53:1 58:4,5
**charge** 20:18
44:23
**charges** 33:18
58:9
**check** 13:16
28:21
**checks** 13:15
16:20 22:2,6
23:14,14,15
25:2,3 41:5,6
**Chevy** 40:15
42:11
**Cindy** 2:5 7:18
55:24 57:18
58:20

**CITY** 5:20
**Civil** 7:2
**Clerk** 58:15
**close** 18:11
49:10
**closely** 18:5
**coast-to-coast**
10:4
**collateral** 14:22
26:24 27:4,9
**college** 9:1,7
**colloquially**
15:18
**combination**
51:4
**come** 22:3 27:25
32:20 34:6
37:10,13 39:2
39:21 40:5
49:8
**comes** 21:13
38:11,16 39:7
39:15
**comfortable**
17:25
**coming** 9:13
10:17,19 11:3
25:13,15 33:8
34:8
**commission**
17:15,17 54:23
**commissions**
17:9
**company** 1:13
2:2 4:9 9:9
14:16 27:20
33:22 42:9
46:15 50:5,20
55:13 56:22
58:9
**compared** 22:3
**comparing**
27:19
**comparisons**
29:11
**complaints** 19:7
**completed** 7:14
**concluded** 3:9
52:14

**conclusions**
37:13
**condensed** 7:4
**conducted** 48:9
**Conner** 1:23 2:1
3:5 5:9 8:1,6
8:18,19,21
15:10 18:14
19:17,25 23:9
26:3,23 28:3
29:21 33:2
34:15 35:3
37:18,21 38:1
38:4,13,16
39:17 40:20,23
41:14,15 42:14
43:23 44:1,6
45:10 47:25
48:1 52:12
53:2 54:1,5,11
55:22 56:1
57:1
**consideration**
54:16
**consolidated**
48:25
**constitute** 27:10
**consumer** 25:22
35:9 44:23
**consumers** 19:8
28:6
**contact** 22:9
**contacted** 22:7
**contains** 58:5
**contract** 21:18
22:22
**contracts** 20:2
21:3,25 25:7
40:25 41:3
**control** 39:8,10
**copies** 58:11
**copy** 7:14 58:13
**corporate** 11:9
13:5,9 35:12
36:5,20 37:9
43:2
**correct** 12:24
13:18 15:3
17:2 18:3,23

19:9,20 20:2
21:3,7 24:23
26:10,25 29:19
31:7 33:18
34:5,13,23
36:13 38:14
39:13,18,25
40:6,10 41:1
41:18 42:24
44:14 45:14
46:19 48:3
50:20 54:2
**correction** 7:9
**corrections** 7:5
7:7
**corresponding**
3:17 37:2,22
38:8 39:4
**Corvette** 40:15
41:13
**cost** 16:14 44:25
**costs** 44:22
**counsel** 56:19
57:5
**COUNSELORS**
4:10
**count** 29:16
**counties'** 28:5
**counts** 19:21
27:18 48:9
**county** 28:5,20
54:8
**course** 12:11
21:16 30:5,7
35:9 39:16
**court** 1:1 7:18
8:2 12:11
14:15 29:19
55:1 57:19
58:21
**COX** 4:18
**CPA** 9:8,13,15
9:18 47:9
**Craig** 6:8
**CRAM** 4:13
56:11,22
**creating** 20:1
**Credit** 2:2 4:9
8:12 21:6,1

APP 0285

22:17 32:10
33:13 47:6
49:20 56:22
58:9
**critical** 23:22
**Cross** 9:20 10:13
**CSR** 2:5 57:18
58:20
**current** 15:8
42:21
**currently** 19:23
21:1 24:20
47:2
**Custodial** 58:7
**customer** 21:14
**customers** 28:20
**cut** 25:2,3
**cycle** 16:24

**D**

**D.G** 6:1 56:16
57:3
**daily** 11:21,23
12:12
**Dallas** 4:19 16:1
**damage** 24:14
**data** 35:8,11
36:6,7 43:10
49:6,8,10
**date** 12:6 18:18
20:5 22:1 33:3
33:4 37:4,11
45:23,24 46:16
53:2 57:18
58:21
**dates** 33:6
**David** 4:3,4
12:10 56:10,10
56:21,21
**day** 8:7 34:3
43:14,14 54:10
54:19 57:13
58:16
**day-to-day**
14:16
**days** 11:8 21:24
**deal** 37:6 44:11
44:13
**dealer** 16:14

25:25 26:1
30:23,23 32:15
**dealership** 30:11
37:5 40:18
41:16,20,21
42:2
**dealerships**
15:22 25:13
26:4,13 27:4,5
27:5,11 31:4
31:19 32:17
33:12,20 34:9
36:17 39:11
**dealing** 15:11
21:16
**deals** 35:18
**dealt** 37:7
**Debtor** 1:5,8,11
1:14,17,20
23:18 24:25
55:5,8,11,14
55:17,20
**Debtors** 4:3
16:18 18:9
21:25 23:11
25:13 29:18
31:24 44:16
56:21
**decided** 13:25
**decision** 14:3
**deliver** 7:14
**delivered** 58:6
58:12
**DENNIS** 5:2
**department**
44:4,20
**depend** 17:9,24
**depending** 11:22
12:12 17:11
33:17 40:9
**depends** 21:13
**deposition** 1:23
2:1 3:9 7:1,2,2
7:4 37:18,21
52:14 54:1
55:22 56:2,4,9
56:18 58:2,3,6
58:8,10,12
**describe** 21:17

**description** 3:15
54:13
**determination**
22:22
**determinations**
22:24
**determine** 44:11
44:24
**determined** 23:2
**developed** 10:25
33:2 44:15,16
**devices** 45:1
**different** 15:12
30:23 31:10
51:23
**difficult** 14:17
17:15
**directed** 46:5
**directly** 12:14
20:15 28:20
**discrepancies**
37:10
**discussed** 10:18
25:6
**discussing** 26:17
**DISTRICT** 1:1
55:1
**DIVISION** 1:2
55:2
**document** 44:7
47:14,18 54:13
**doing** 11:17
27:18 30:6
**Don** 8:21
**DONALD** 4:13
56:11,22
**double** 27:21
28:1 29:1,4,25
31:12 46:25
47:4,15
**drive** 23:7 46:2
**driving** 19:9
**due** 16:23,24
17:1 46:20
**duly** 2:3 8:2 56:1
**Duped** 47:20
**DYKEMA** 4:18
**Dykes** 6:9 31:1
41:23,23 50:8

**E**

**E** 4:1,1
**earlier** 46:14
49:12
**early** 32:17
**education** 8:23
**effectively** 8:8
**either** 35:11
36:12 40:17
**electronic** 32:16
32:21
**EMBARCAD...**
4:14
**employed** 35:10
57:6
**employees** 46:19
46:21
**employment**
12:3
**encumbrance**
16:10
**ended** 9:10
41:16,17
**entered** 35:22
**enters** 35:11
**entire** 33:12
**entities** 25:3
51:23
**entitled** 31:11
**entry** 35:8
**estimate** 19:4
**exam** 9:16
**examination** 3:5
3:6,6,7,8 7:3
8:4 45:8 47:12
47:23 48:14
50:12 56:6
**example** 31:2
**Excel** 43:9
**executed** 31:19
54:15
**exhibit** 37:18,21
38:1,4,13,17
40:20,24 41:14
41:15 42:14
44:2,6
**exhibits** 3:14
37:17 58:11
**exist** 30:1

**existence** 45:22
**expect** 39:16
**Expedition**
38:12,19 39:7
**Expiration**
57:18 58:21
**EXPIRES** 54:23
**expressed** 54:17
**extended** 44:12
44:19
**extent** 18:17
35:7

**F**

**F** 5:5 56:13,25
**F-150** 30:13
**facilities** 24:8,22
**fair** 14:17 17:5
18:8,25 23:16
34:2 39:20
41:5,10
**familiar** 15:14
22:18
**Fansler** 43:5,15
43:24 46:10
**far** 23:24 25:19
27:2 28:11,22
36:9
**FARGO** 4:5
**Federal** 2:8
**feel** 17:25
**fees** 25:4
**FERNANDO**
5:14 56:14
57:1
**Fields** 20:20
43:5,7,8,23
**Fields's** 20:21
**FIFTH** 6:3
**filed** 11:24 29:17
29:18 58:14
**finance** 21:5,6
35:16 36:20
38:21 41:11
42:19 43:25,25
44:18,20
**financed** 22:16
36:19 41:4
**financial** 4:2

18:11 20:22
23:7 26:6 43:8
45:13,16 47:7
48:1,17,25
56:24
**financially** 57:8
**financials** 45:18
45:20 46:9
48:17,20,22,23
49:2,7
**find** 22:11
**finish** 35:4 49:9
**finished** 48:24
**finishing** 48:10
**firm** 5:14 7:19
8:17 9:13,18
9:19 10:1
57:19 58:22
**first** 5:5,18 8:2
15:9 38:11
41:14 47:7,8
50:14 56:25
57:2
**fit** 42:17
**fixed** 17:12
**floor** 3:17 4:14
4:23 27:19,21
27:21 28:1
29:4,9 30:19
36:25 37:3,5
37:22 38:8,20
38:25 39:4,5
39:18 42:19
46:25 47:15
48:2
**floored** 15:13
29:1,12,25
31:12 36:19
38:20
**flooring** 16:10
47:5,20
**flow** 25:18 35:18
46:12
**flowed** 13:10,11
**Floydada** 1:19
42:11 50:7
55:19
**folder** 46:2
47:19

**follow-up** 46:13
**followed** 7:11
**following** 7:7
55:25 56:19
**follows** 8:3 56:9
**Ford** 2:2 4:9
8:12 20:14
21:6,11 30:18
31:2 32:10
33:13,22 34:7
38:12,19 39:7
39:21,25 41:23
41:25 42:9
47:6 49:20,20
50:8,19 56:22
58:9
**foregoing** 54:1
54:14
**form** 36:1
**FORT** 5:25
**forward** 7:13
**found** 22:10
**four** 11:8 16:20
23:14
**FOURTEEN...**
4:23
**frame** 12:23
13:21 14:12
36:18
**FRANCISCO**
4:15
**FRANKLIN** 5:2
**friends** 9:9
**friendship** 10:25
**full** 8:20
**funded** 22:15,21
23:1
**funding** 21:20
21:25 44:1,22
**funds** 32:16,21
39:6
**further** 16:6,8
48:13 52:12
57:5,8,10 58:1

**G**

**GABLE** 6:2
**general** 41:5
**generally** 29:6

43:6
**getting** 11:11
24:9 25:16
29:8,9 35:22
41:17 44:4
46:10
**give** 7:10 8:22
17:16,20 33:17
**given** 54:18 56:3
56:17
**giving** 12:10
17:25 41:19
**GM** 4:17,21
33:22 47:6
48:1 56:23,23
**GMs** 51:16
**go** 9:5 12:20
13:5 22:11
24:3 27:7
28:20 35:20
38:11 42:1
44:11 46:4
**going** 8:6,7,11
11:12,14,23
12:13 13:24
17:12,23 33:17
36:11 39:12
40:23
**good** 24:2 43:18
**gotten** 44:5
**GOTWALS** 6:2
**grew** 10:5
**gross** 17:18
22:20 23:2,12
23:25 44:25
**ground** 48:8
**group** 2:7 13:9
15:23
**guess** 19:13 24:1
44:21
**guy** 43:16

**H**

**H** 4:13 56:11,22
**H-A-J-J-A-R**
8:17
**hailstorm** 24:15
**HAJJAR** 5:10
**Hajjar/Peters**

8:17
**HALLMAN**
5:23
**Hanby** 9:21
10:13
**hand** 40:23
54:18
**handled** 24:6
26:22 50:25
**handling** 19:24
**happened** 11:10
16:5,8 20:9,11
28:12 37:14,14
37:15 38:21,24
40:12 41:11
**happening**
11:15 16:9
**hard** 16:8 19:21
26:23 27:18
48:9
**HART** 5:23
**headed** 39:24
46:10
**headquarters**
13:5 14:1,9
35:12,21,23
36:5,21 37:9
43:2
**help** 8:11 9:24
10:20 11:18
12:20 36:5
38:10
**helping** 11:14
35:5
**helps** 43:9,13
**hereto** 2:9 37:20
37:24
**Herrera** 6:7
**high** 8:23,25
**higher** 18:18,20
**Hill** 6:9
**hired** 11:6
**historical** 26:7
**history** 9:4
30:15
**HOARD** 4:5
**HOUR:05** 56:11
**HOURS:00**
56:10,10,11,12

8:17
56:14,15,16
**HOURS:01**
56:12,15
**HOURS:02**
56:13
**HOURS:03**
56:13,14
**Howie** 6:10

**I**

**IBC** 6:1 50:4,9
57:3
**idea** 22:14
**identification**
37:20,23
**identified** 15:16
15:17 16:6
20:4 23:24
25:8,12 30:8
31:23
**identifies** 30:15
**identify** 16:9
22:20 23:23
29:3 42:2,11
47:17
**identifying** 16:7
**identity** 54:13
**III** 4:13
**Imports** 1:7 42:8
55:7
**includes** 44:25
56:19
**income** 21:23
25:15,17,18
**incoming** 25:9
**indebtedness**
33:12
**INDEX** 3:1
**indicate** 7:8,9
40:20
**indicated** 23:13
**indicates** 18:14
38:13
**indicating** 28:5
30:21
**individual** 48:12
49:8
**individually**
12:20

information
  20:16 21:21
  24:9 26:7,14
  29:8 34:16
  35:11,17 46:8
  46:11,11 56:17
initial 14:25
initially 14:23
initiated 32:16
  32:18,19
input 35:16
inquire 44:1
ins 18:10 28:24
installment 21:2
  21:18 22:22,25
  44:8
instance 2:2
  22:8
instances 28:19
instructed 30:18
  50:19
instructions 3:4
  7:1,11
instrument
  54:15
insurance 24:3,3
  24:6,8,12
interest 33:18
  45:1
interested 57:9
inventory 16:8
  19:21,24 24:6
  27:18 34:1,1
  36:24 37:2
  38:8,14 48:2
  51:25
involve 31:15
involved 10:10
  10:13 12:17
  15:10 19:25
  26:12 29:7
  32:6 33:4
  40:25 47:4
  48:21 49:6
involvement
  26:5,8 27:16
  27:17 32:7
  33:6
issue 13:8,9

20:19 24:16
  27:16 29:19,23
  32:2 37:6
issued 23:13
issues 8:8 13:6
  21:16 26:5,8
  32:1 33:2
item 29:11
items 24:21
  44:19

J

J 2:7
jacket 44:11
January 9:14
  10:17 11:4
  12:16 13:22
  26:9,11,11
  32:5
Jeff 5:1 48:16
  56:13,24
job 9:13 11:4
John 5:5 26:21
  50:14 56:13,25
Johnathan 6:9
Johnny 5:10
  8:16 56:14
  57:1
July 14:23 18:6
  32:9,17 49:15
  49:15
jump 14:11

K

K 5:10 56:14
  57:1
KANSAS 5:20
keep 7:5 44:4
  51:12,19
Keith 4:9 7:14
  8:12 56:11,22
  58:7
KELLY 5:23
kind 11:15
  12:19 14:17
knew 10:20
know 11:23 12:5
  14:9 15:24
  16:5 17:12
  18:1,17 19:16

19:17,20,22,22
  22:8,14 23:8
  24:5,9,11,16
  25:19 27:2,20
  28:2,3,17 30:6
  30:14,21 31:24
  32:18 33:9,25
  34:7 35:7,11
  36:9 41:9,10
  41:15,17 48:11
  49:15,18,22,23
  49:25 51:6,7
knowledge 14:6
  14:7 23:20
  24:5 25:1
  26:16,21 27:11
  33:20 36:15
  37:7,15 43:24
  46:7,16 47:5,6
  51:2
knowledgeable
  12:17 43:12
known 54:11
Kyle 20:20 43:5
  43:8

L

L.L.C 2:3 4:9,17
  56:23 58:9
L.L.P 4:5,10
  5:10,19,23
  56:22
lady 13:23
Lamesa 41:25
Langley 3:5 4:9
  4:10 7:14 8:5
  8:12,14,19
  34:25 35:3
  37:25 45:7
  52:11 56:11,22
  58:7
Langston 4:4
  12:10,14 25:1
  56:10,21
Lashaway 3:7
  5:1 48:15,16
  50:10 56:13,24
lasted 11:8
late 30:9 32:5,17

46:22,22
law 5:14 8:17
learn 32:20
  37:10
leave 37:1,2
left 36:24
legal 44:4
lenders 47:4
length 37:5
lengthy 21:13
LEONARD
  5:19
Leslie 6:8
let's 8:23 9:15
  11:3 12:15
  13:5 14:11
  16:16,22 23:9
  24:25 25:5,12
  27:7 28:3,16
  29:1 30:13,20
  34:7,25 35:9
  38:11 44:22
letter 20:16
level 13:14 15:6
  15:8 43:13
liabilities 46:15
liability 37:3
  38:9
Liberty 47:7
license 9:8 47:9
Lindsey 43:5,12
  44:3
line 7:8 53:3
list 21:12 22:4
  48:2 50:22
listed 42:18
listing 38:7
little 8:22 9:15
  10:2 16:16
  23:9 27:2 28:3
local 23:15
located 15:21
  19:18 42:2
  46:3 51:20
location 11:7,9
  19:18 30:14,14
  30:16,16,22,23
  41:18
locations 15:25

24:19 30:1
  31:16 36:11
look 17:4,7
  40:13,14 44:6
looking 22:16
  38:16 41:15
lost 20:12
lot 17:9 20:12
  21:10,10 30:19
  31:10,10 39:3
  50:18,18,23,24
  51:3,4,8,9,18
  51:19,20,22,23
lots 30:18 34:3
  48:10 51:12
LOUISIANA
  4:24
LP 1:4,7,10,13
  1:16,19 55:4,7
  55:10,13,16,19
Lubbock 1:2 2:7
  4:7 5:3,16 7:20
  9:7 11:7 13:17
  15:25 27:7
  42:8,13,17
  50:9 55:2
  57:20 58:23

M

M 56:10,21
machine 2:6
magnitude 17:8
  17:14,16,20
  29:14
main 4:18,23
  5:15,24 21:5
  21:12
maintained
  30:11
making 7:5,10
  14:14
Mall 15:25 16:1
  27:7,9 31:1
  41:24 42:13,17
manage 14:16
management
  26:3 32:1
manager 11:7
managers 14:16

35:16
**manages** 24:8
**managing** 14:13
**manner** 7:7
**manufacturer** 39:2,22
**manufacturer's** 31:6
**manufacturers** 23:20 33:21
**March** 48:18,22 48:22
**MARK** 4:17 5:18 6:1 56:12 56:15,16,23 57:2,3
**marked** 37:19 37:23,25
**Martin** 9:7
**Massouh** 3:8 5:5 50:13,14 52:9 56:13,25
**master** 36:15
**master's** 9:3
**MCGLINCH...** 4:22
**mean** 10:9 31:9 34:1 44:15
**meaning** 18:9 29:18 41:4
**means** 44:16
**mechanism** 44:24 51:11,15
**mentioned** 10:1 47:15 50:15
**Merritt** 5:10 8:16,16 56:14 57:1
**Miller** 22:16
**million** 15:17 16:12 17:21 18:15,19,21 19:12,14,15,15 20:5 32:25 33:15 34:22 38:3 40:4,6 41:1 49:13,16
**MINUTE** 56:12 56:15

**minutes** 35:1 56:10,10,11,11 56:12,13,13,14 56:14,15,16
**MISSOURI** 5:20
**Mitsubishi** 11:7 13:17 35:10,14 36:8 42:8 50:3 50:9
**model** 34:6,9
**money** 12:13 20:13,15 22:9 25:12
**month** 49:9
**morning** 46:21 46:23,24
**Motor** 2:2 4:9 21:11 33:22 41:23 47:6 49:20 50:20 56:22 58:9
**Motors** 1:4 42:6 55:4
**move** 25:5 31:3 31:8,9
**moved** 9:12 30:13 41:17
**movement** 30:12 30:21
**moving** 9:10 30:17 31:15 51:16
**Muleshoe** 8:25
**MULLIN** 4:3,5 52:10 56:10,21
**multiple** 29:12

**N**

N 4:1
**name** 8:11,20 53:2 54:14
**named** 15:13
**nature** 18:10
**need** 8:11 13:13 18:9,9 19:8 21:22,23 22:21 28:6 32:3 36:22 38:10

**needed** 10:20 11:13 12:10 26:7 30:19
**needs** 14:16
**neither** 57:5
**never** 45:24
**new** 24:6,16 26:1 27:4 31:5 31:8,9,13,15 34:6,16,17 37:16 38:11 39:1 40:9 51:4
**normal** 21:15 30:5,7
**normally** 38:24 39:1
**NORTHERN** 1:1 55:1
**notarized** 7:13
**Notary** 7:11 54:22
**noted** 54:2
**notices** 24:11 33:21
**number** 7:8 17:22,25 18:20 19:12,15 27:19 27:23 29:10 37:18,21 38:13 39:8,10,11,12 40:19 48:1
**numbered** 2:4
**numbers** 29:12 35:6 48:25 49:3

**O**

**oath** 54:12
**obligations** 46:16
**obtain** 28:7
**occurred** 18:2 36:8 57:12
**office** 7:16 11:7 13:4 14:9,16 17:11 51:21,24 54:18
**officer** 56:2,18 58:3

**officer's** 58:8
**okay** 8:10,11 11:10,24 13:16 14:11 22:16,19 22:24 23:6,9 24:14,19 28:16 29:1 30:20 32:15 34:21 35:25 36:11,21 37:4 39:7 41:10 42:1,5 44:10 45:6 46:22,25 50:22 52:11
**OKLAHOMA** 6:3
**Once** 21:21
**ONEOK** 6:2
**ones** 21:12 23:24 28:16
**operating** 32:2
**operational** 36:4 43:16
**oral** 1:23 2:1 56:2
**order** 17:8,14,16 17:20 18:11 28:14 29:14
**ordinary** 16:24 35:9 39:15
**organization** 49:5
**origin** 31:7
**original** 7:14 17:18 58:2,6 58:10
**originally** 11:6 13:25
**originated** 49:14 49:18,20,21
**outcome** 57:9
**over-the-road** 10:4
**overages** 11:13
**overall** 22:4
**owed** 33:12 37:3
**owned** 11:1
**ownership** 52:2

**P**

P 4:1,1,22 56:12 56:23
**P.C** 4:13 5:14
**P.L.L.C** 4:22 5:2 5:6
**packages** 36:12
**page** 3:2,15 7:6 7:8,11,14 41:14 42:4 53:3 58:5
**paid** 16:19 19:2 19:8 20:15 25:1 28:7 36:22 46:22
**paper** 21:6,20 22:2,25
**part-time** 13:24
**particular** 13:8 30:22 33:3 36:18,20 44:8
**particularly** 34:17
**parties** 56:19 57:6 58:14
**parts** 16:20 23:14,19 25:19
**party** 56:8
**pass** 21:19 45:7 47:11 50:11 52:9
**passed** 9:16 24:21
**pay** 13:13,16 18:10 22:8 28:21 37:5 46:24 51:23
**payable** 44:13
**payment** 13:7 13:10 23:18 32:10
**payments** 11:14 24:20 49:14
**payoff** 14:4 40:21 44:7
**payoffs** 14:2,7 18:14,23 19:2 19:12,14 28:24 34:20,21

payroll 16:19,22
  16:23 17:5,8
  23:11,14,25
  46:14,15,18,20
people 9:24
  11:15 25:15
  28:20 43:17
percent 14:22
  15:1,2,9 17:18
  18:3,6 44:23
  44:23
percentage 15:6
  15:8
performance
  15:5
period 10:7
person 12:20,22
  12:22 20:18
  26:16 43:11
  54:14
personally 26:5
  28:21 54:11
personnel 42:23
  43:2
persons 26:17
Peters 5:10 8:17
petition 18:18
  20:5
physical 24:19
  24:21 30:22,23
  32:6
physically 30:1
place 49:3 51:11
Plainview 1:16
  9:12,20 11:1
  42:10,10 50:4
  50:5 55:16
plan 3:17 36:25
  37:3,23 38:8
  38:20,25 39:5
  39:18 42:19
  48:3
planned 27:21
  27:22 28:1
  29:4 30:19
  39:4 46:25
  47:15
planning 29:9
plans 27:19

PLAZA 6:2
please 7:16
plug 48:25
point 13:2,24
  25:5 36:7
  39:16 51:13
policies 24:8
position 20:21
possible 7:12
post 51:25
post-petition
  34:4
potential 26:12
potentially
  42:16,20
practice 10:12
prepared 13:15
  38:2 49:3
preparing 40:25
  48:21 58:10
Present 6:6
presented 49:23
  50:1
pretty 11:21
  18:21
previously 8:13
  18:14 23:6
primarily 32:21
principal 9:22
prior 10:8,23
  19:1 21:15
  26:13 28:13
  30:20 33:8
  34:22 49:14
  50:15 51:12,14
  51:17
private 10:12
probability
  39:24
probably 23:15
  31:2
procedure 7:2
  7:16
proceeding 57:7
process 16:7
  29:6,8 32:6
  35:8 51:11
produce 45:25
produced 2:1

45:3,12
professional
  25:4
profit 17:18 23:3
  44:25
profits 22:20
  23:12,25
progressed
  16:18
proof 21:23
properly 27:23
property 24:14
prosecutors 28:5
protected 24:16
proved 54:11
provide 7:2 46:8
provided 7:4
  21:21 34:15
  38:2 45:19
  48:18
providing 26:6
  26:14 49:6
provisions 2:8
Public 7:11
  54:22
purchased 40:19
purchasers 19:1
purposes 54:16
pursuant 2:8
  56:17 57:10
put 22:8 41:6
  49:1
putting 15:11

——————
          Q
——————
question 19:13
  24:2 27:8 48:6
  49:13
questioning
  46:14
questions 7:16
  35:4 45:12
  46:13 47:22
  48:13 50:10
  52:10
quickly 8:8 40:3
quite 20:11
  21:12

——————
          R
——————

R 4:1,4 5:1,23
  56:13,15,24
  57:3
ran 19:16
range 16:12 40:5
rate 21:14 45:1
Ravitz 6:10
raw 43:10
reached 43:25
  44:3
read 7:5 54:1
Reagor 5:22 6:8
  10:19,21,24
  19:23 26:24
  27:12,12 31:1
  41:23 46:6
  50:25 57:3
Reagor-Dykes
  1:4,7,10,13,16
  1:19 2:7 9:4
  10:8,17 11:4
  20:23 33:8
  42:6,7,8,9,10
  49:5 50:5,5
  51:19 55:4,7
  55:10,13,16,19
real 27:13
really 12:21
  33:25 41:10
  44:5,7 51:14
realm 17:13
realtime 35:23
reason 7:10 53:3
reasons 22:5
  58:5
recall 11:25
  18:15 49:15
receipts 51:21
receivables 3:16
  20:1,6,10 22:4
  37:19
received 7:13
  9:2,8 20:13,14
  21:25 22:2
  23:3,18 24:11
  33:21,24 40:17
  48:20
receiving 34:13
recognize 22:17

38:4
recognizing
  17:15
recollection
  29:16
reconcile 26:24
  27:3 36:7,16
reconciling
  11:12 44:17
record 2:9 7:3
  7:13 8:20
  30:10,21,24
  56:3,20
refer 39:12
referred 23:6
  44:4
referring 45:18
reflected 52:2
register 28:13
  28:18,22
registration 28:7
  57:19 58:22
rejected 32:22
related 32:1
  57:6
relative 8:23
  14:2,21,21
  18:22 22:20
  23:11 24:15
  33:2,21,22
  37:11 38:21
  45:4
release 13:15
remaining 46:20
remarkable
  34:17
rent 24:21
repeating 48:6
rephrase 42:25
  44:21
report 11:19,22
  12:9 20:25
  48:25
reported 2:6
  11:19 12:14
  36:17 39:17
reporter 8:2
  55:24
Reporter's 3:4

55:22
**reporting** 7:18
 11:20 12:8,11
 37:11 57:19
 58:21
**reports** 42:23
**represent** 8:12
 8:18 10:13
 45:10 48:1,16
 50:14
**representing**
 19:12
**requesting**
 32:10
**requirements**
 57:10
**reserve** 52:10
**resold** 19:1
**resolve** 29:22
**respect** 13:6
 16:3 19:25
 20:9 22:25
 23:19 24:6,19
 26:3 30:4,11
 31:12 33:4
 40:13
**response** 28:9,10
 28:11,14 49:13
**responsibilities**
 9:22 11:5,11
 12:7 43:6
**responsible**
 13:20,23 26:17
 26:20 46:7
**restaurant** 11:1
**resumé** 10:21
**retail** 10:9 19:1
 21:2,6,18,20
 22:21,25 25:22
 28:6 35:9
 43:25
**retailing** 10:14
**retainers** 24:25
 25:1
**return** 7:11 56:6
**returned** 58:2,4
 58:6
**returns** 9:25
**review** 7:5 11:16

reviewing 30:24
**Reynolds** 35:15
 35:15,25,25
 36:6,7,9,10,12
 36:13 43:17,18
 43:22,22
**Rick** 6:9 12:12
 12:14 26:21
**right** 9:7 12:3
 15:19 16:11
 27:14 36:2
 37:16 38:10,19
 39:10 40:2,23
 41:13,21 42:1
 47:2
**Rinehart** 24:7
**ROAD** 5:11
**Robinson** 9:6
**Rogers** 9:20
 10:12
**ROUGE** 4:24
**Rule** 57:10 58:1
 58:13
**Rules** 2:8 7:2
**Ryan** 10:18,24
 19:23 26:24
 27:12,13 50:25

**S**

S 4:1 5:18 56:15
 57:2
**safekeeping** 7:15
**salaries** 17:12
**sale** 17:19 26:12
 33:3,4 35:17
 36:3 37:4,11
 44:8
**sales** 14:23 15:5
 15:7 17:9,11
 17:14,17,24
 18:2,6 25:21
 26:4 28:12
 33:6,23
**salesman** 35:16
**San** 4:15 9:10
**SANDERS** 6:1
 56:16 57:3
**Santander** 21:11
 21:17 22:7

23:6
**satisfied** 46:16
**saved** 47:19
**says** 39:11 42:6
**schedule** 36:24
 37:2
**schedules** 11:12
**school** 8:24,25
**scope** 51:7
**SCOTT** 5:23
 56:15 57:3
**seal** 54:18
**searchable**
 29:10
**see** 20:13 36:23
 40:2,14 48:7
**seeing** 30:25
**seen** 31:18,20,20
 41:5 45:24
 52:7,8
**selling** 10:10
**send** 35:19 46:4
 46:5
**sent** 46:20 49:10
**sequestered** 16:6
**sequestering**
 30:5
**Seright** 9:7
**served** 58:14
**service** 25:15,18
 33:23
**services** 25:4
**set** 17:17
**seven** 21:24
**SEVERSON**
 4:13
**Shane** 10:21
 11:20 13:10
 14:3 26:19
 33:9 46:10,12
 48:24 49:10
**share** 46:2
**shared** 46:2
**shortages** 11:14
**shorthand** 2:6
 55:24
**show** 29:12
 34:19 38:7
**showing** 29:11

34:21
**shown** 58:14
**shows** 40:25
**SHRADER** 5:6
**shut** 20:13
**side** 11:17 35:18
 36:4,4
**sign** 7:11
**signature** 3:10
 7:3,6,11,14
 53:1 54:1 56:6
 58:4
**signed** 7:13
**SIGNING** 7:1
**sir** 10:11,15 12:1
 12:25 13:19
 14:19 15:15,20
 16:13,15 17:3
 17:6 18:4,7,12
 18:16,20,24
 19:3,6 20:3,7
 20:24 21:1,4,8
 22:23 23:2,17
 25:11,20 26:15
 27:1 28:8,25
 29:5 30:2
 31:25 32:4
 33:19 34:5,24
 37:8 38:5,15
 38:18 39:9,14
 39:19,23 40:1
 40:7,11,22
 41:2,12,19
 42:15 44:9
 45:5,11,15
 46:17 47:10,16
 48:4 49:17,25
 51:10 52:4
**sit** 34:3
**situation** 41:9
**slightly** 14:12
**slowed** 22:6,12
**small** 11:1
**Smith** 4:18 5:6
 10:21 11:20
 12:3,23 13:16
 14:3 26:19
 33:9 37:7
 46:10

**software** 35:14
 35:15 36:1,12
 43:21 45:2
**SOLANA** 4:10
**sold** 9:11 10:7
 13:7 16:6
 17:10 28:16
 31:10 32:13
 35:8,13 36:16
 36:18 37:1
 39:4 51:22
**soon** 7:12 48:12
**sorry** 25:7 48:6
 50:17
**sort** 27:23 29:10
**source** 36:20
 37:6 38:21
 39:21 42:19
 43:18 44:22
**sources** 21:2,5,9
 23:10 25:5,8
 25:14,17 31:22
 31:23 41:11
 43:25
**SOUTH** 5:6
**speak** 52:7
**speaking** 49:16
**specific** 16:4
 36:25
**specifically** 13:6
 15:13 20:1,4
 38:20 44:18
**Spike** 31:1 41:23
 50:8
**spread** 44:18
**spreadsheet**
 3:16,16 20:1
 29:3 34:23
 37:19,22 38:1
 40:3,24 41:19
 47:16,20 49:1
 49:3
**spreadsheets**
 15:11 18:13
 34:16,18
**SPROUSE** 5:6
**staff** 11:16 12:15
 12:16,17 13:1
 13:3,4,7 17:4

51:21
**STAFFORD**
4:22
**start** 8:23
**started** 9:9 10:5
13:17
**starting** 10:1
**state** 2:5 8:19
54:7,23 55:25
**stated** 2:8
**statement** 25:19
31:6
**statements**
21:24 45:13,16
48:17
**STATES** 1:1
55:1
**status** 48:5,7
**stay** 14:14
**stayed** 18:21
**steadily** 18:21
**STEPHEN** 4:22
56:12,23
**Steve** 24:7 47:25
**STINSON** 5:19
**stips** 21:22
**stipulations** 8:7
21:23
**stopped** 28:23
30:17
**store** 11:22 13:4
13:14,17,21
14:2,5 35:10
35:12 36:8
41:25 42:11
43:13
**store-by-store**
14:8
**stores** 12:20
13:8 39:25
43:14 49:8
50:4 51:16
**STREET** 4:18
4:23 5:15,19
5:24 6:3
**Strohschein** 3:7
4:22 47:24,25
48:13 56:12,23
**stuff** 24:18 33:24

**submit** 39:5
**submitted** 14:15
56:4
**subscribed**
54:14
**subtotal** 42:7
**subtotals** 40:4,5
**Suite** 4:6,11,19
5:7,15,20,24
7:19 57:20
58:22
**supervise** 12:19
42:24 43:1,4
**supervised**
12:21
**supervising**
12:18
**suppliers** 23:15
**sure** 14:14 15:7
16:2 17:23
20:11 27:7,13
32:18 42:18
50:6,8
**suspense** 22:9
41:6
**sworn** 2:3 8:2
56:1
**system** 35:20
**systems** 43:16

───────
**T**
**take** 10:23 14:12
17:4 23:14
24:20 33:17
34:25 35:25
43:9 49:2
**taken** 2:3 7:2
35:2 39:3
56:18 57:8
**talented** 43:9
**talk** 9:15 10:16
11:3 12:15
15:4 16:16,22
20:8 23:9 24:2
24:24,25 25:12
25:21 28:3,16
29:1 30:20
32:3
**talked** 25:11

37:16 41:3
**talking** 17:21
18:22 21:3
23:10 29:15
31:22 40:6
44:18 51:8
**tax** 9:24 28:7
**taxes** 18:10 28:4
28:6 44:11
**TAYLOR** 5:6
**team** 15:16
**tell** 10:2 11:4
27:2 29:6 31:3
38:17,22 40:16
43:6 44:7,10
48:24
**telling** 14:10
**ten** 35:1
**term** 15:18
**terminated** 12:3
**terms** 26:14
46:14,25
**testified** 8:3
49:12
**testimony** 56:3
56:18
**Texas** 1:1 2:6,7
4:7,11,19 5:3,7
5:11,16,25
7:19,20 8:25
9:12 50:15
55:1,25 57:18
57:20,20 58:20
58:22,23
**Thank** 47:21
52:12,13
**therefor** 58:5
**thing** 48:23
**things** 12:10
18:10 35:22
43:17
**think** 16:11
34:15 38:1
40:24 49:12
**third** 41:14
**Thompson**
26:22
**three** 40:15
**three-year** 10:6

**Thursday** 16:25
17:2
**Tim** 1:23 2:1 3:5
5:9 8:1 37:18
37:21 53:2
54:1,5,11
55:22 56:1
57:1
**time** 9:23 10:8
10:23 11:5
12:23 13:21
14:3,12 17:23
21:19 24:10
28:23 36:18
37:5,9 39:16
51:13 56:8,18
**Timothy** 8:18,21
**title** 11:5 30:25
31:6 44:12
47:17 52:3,8
**titles** 28:4 30:25
31:18
**Toby** 6:7
**today** 16:9 29:17
48:10
**told** 50:21 51:15
**top** 38:3 42:4
**total** 33:18
**Toyota** 33:22
42:10
**track** 14:14
51:12
**tracking** 18:3,5
19:24
**trade** 18:10
28:24 40:18
44:8
**traded** 19:19
**trades** 27:10
**trailer** 10:5
**trailers** 10:6
**train** 43:17
**training** 11:16
**transaction**
22:20
**transactions**
18:11 26:13,18
44:17
**transcript** 7:2,4

7:13,14 56:2,4
58:10
**transfer** 30:15
50:19 52:2
**transferred**
30:25 50:16,18
50:23 51:3,8
51:18 52:8
**transfers** 25:25
26:1 32:16,21
51:12
**transit** 20:2 22:1
25:7 41:1
**translating** 36:6
**TRCP** 57:11
58:1
**treating** 30:4,7
**trial** 7:15
**tried** 29:2,2
**triggers** 37:4
**truck** 10:5
**trucking** 9:9
10:1,4
**trucks** 10:6
**true** 54:2 56:3
**Trust** 5:18 47:8
57:2
**try** 8:7 29:19,22
**trying** 14:15
21:16 27:3
36:16 48:7
**TULSA** 6:3
**turned** 51:22,24
**two** 17:1,4,5,7
21:19 37:17
39:25 50:4
**type** 10:2 26:18
45:3
**types** 15:12
**typically** 21:24

───────
**U**
**undergrad** 9:2
**understand**
11:15,18 19:13
35:5,7 36:5,16
**understanding**
14:6 32:15
33:11 38:10

APP 0292

**unfloored** 15:17
  16:3 38:3
**Union** 22:17
**unit** 38:11 39:17
  39:20,21
**UNITED** 1:1
  55:1
**units** 16:3,4,5
  29:2,3,25 30:1
  31:12 32:11
  36:16
**University** 9:1
**unpaid** 46:18
**unusual** 31:19
  31:21
**unwind** 29:19
**update** 34:19
  35:23
**updates** 35:23
**upstairs** 13:12
**upwards** 11:19
**usage** 16:21
**use** 7:15 14:21
  15:18 24:24
  36:9 43:21
**useful** 43:10
**uses** 16:16,17
  23:10,11,22

**V**

**value** 19:11 34:3
  38:14 40:8
**variance** 17:10
  17:15
**vehicle** 3:16
  15:25 16:10
  19:8,19 20:5
  26:24 27:3,20
  28:1 30:22
  32:6 33:3,5
  35:13 36:25
  37:1,16,19
  38:12,16,22
  39:12,15,24
  40:16,17,21
  41:15,17 51:20
  51:22 52:1
**vehicles** 3:16
  10:10,14 13:7

13:11 15:12,12
  15:18,21,24
  18:25 19:18
  24:4,16 25:6
  25:21,23 26:1
  27:8,9 28:18
  29:11 34:2,2,7
  34:10 36:17,19
  37:22 38:7
  39:1 40:9,13
  42:16 50:16,17
  50:19,22 51:7
  51:17
**VIDEOTAPED**
  1:23
**VIN** 27:19,22
  29:10,12 38:12
**Vista** 5:13 45:10
  45:13,25 46:5
  50:6 57:1

**W**

**wait** 22:21
**WALNUT** 5:19
**Walter** 22:16
**want** 9:4 11:21
**wanted** 11:23
**wanting** 22:19
**warranties**
  44:19,25
**warranty** 44:12
**was/was** 58:2
**wasn't** 24:2
  48:20 51:14
**way** 31:3,8
  47:17
**Wayland** 9:1
**week** 15:9 21:19
  45:13
**weeks** 17:1,4,5,7
  21:19
**WELLS** 4:5
**went** 8:25 9:1,6
  12:22 13:8,9
  38:17 40:3
**WERSON** 4:13
**WEST** 6:3
**WESTLAKE**
  4:11

**wholesaled**
  25:22
**WIEHLE** 5:23
  56:15 57:3
**Wiley** 2:5 7:18
  55:24 57:18
  58:20
**Williams** 43:5
  43:12,24
**wish** 7:9
**witness** 2:2 3:4
  7:3,3,5,11,14
  45:7 47:11
  50:11 52:9,13
  53:2 56:1,3,5,6
**wondering**
  38:23
**work** 8:7 9:4,13
  10:19 33:8
  43:17,19
**worked** 9:6,18
  11:13 18:13
  25:16
**working** 10:8
  12:13 20:17,18
  26:23 27:12,13
  46:8
**world** 14:12
**worth** 5:25
  19:15
**wouldn't** 31:5
**written** 16:20
**wrote** 38:2

**X**

**Y**

**Yeah** 9:5 12:6
  24:2
**year** 9:13,19
  30:10 34:6
  48:19
**yesterday** 16:9
  48:10

**Z**

**0**

**00** 56:10,10,11
  56:12,12,13,13

56:14,14,15,15
  56:16
**01** 56:11

**1**

**1** 3:16 4:11 7:8
  17:21 37:18
  40:24 44:2,6
**10** 18:5 19:5
  29:15
**10,000** 17:21
**10:46** 2:5 52:14
**100** 6:3 10:6
  19:5 29:15
**100,000** 17:21
**1001** 5:15
**110,000** 17:13
**1100** 6:2
**1112** 7:19 57:20
  58:22
**116** 33:15
**12/31/18** 57:18
  58:21
**1201** 5:19
**1215** 2:7
**13** 1:24 2:4
  40:14 53:2
  55:23
**1301** 4:10
**14th** 57:13
**15** 15:17 16:12
  38:3 40:6
**1500** 4:6
**1545** 4:11
**16th** 17:2
**1717** 4:18
**18** 38:12
**18-50214-rlj11**
  1:4 55:4
**18-50215-rlj11**
  1:7 55:7
**18-50216-rlj11**
  1:10 55:10
**18-50217-rlj11**
  1:13 55:13
**18-50218-rlj11**
  1:16 55:16
**18-50219-rlj11**
  1:19 55:19

**185** 29:16 30:4
  31:12 47:1,14
**1st** 11:25 13:22
  13:22 16:17
  18:3 20:9
  23:23 26:2,9
  26:13 28:12,13
  28:17,23 30:17
  30:20 42:21
  45:21 50:16,17
  50:23 51:3,9
  51:13,14,15,17

**2**

**2** 3:16 7:9 37:21
  38:1,4,13,17
  40:20 41:14,15
  42:14 48:1
**2.8** 18:15,19,21
  19:12,14 34:22
**200** 7:19 57:20
  58:22
**201** 5:24
**2013** 9:8,16
**2016** 45:20
**2017** 34:9
**2017s** 34:12
**2018** 1:24 2:4
  26:9 48:19,22
  53:2 55:23
  57:13 58:17
**2018s** 34:12
**2019s** 34:13
**203** 57:11 58:1
**203.3** 58:13
**214)698.7819**
  4:20
**214)722.7162**
  4:12
**225)383.9000**
  4:24
**2500** 5:24
**26TH** 4:14
**27th** 26:11
**28th** 32:9
**2900** 5:20
**29th** 32:9

**3**

**3** 7:10 19:15

**3.648** 40:4
**30** 15:2,9 17:18
  18:3
**301** 4:23
**30th** 17:7 23:23
  32:9
**3144** 5:11
**37** 3:16,17
**374** 7:19 57:19
  58:22
**3rd** 12:4,8,16
  26:20

### 4

**4** 3:3
**415)398.3344**
  4:15
**42** 32:25 49:13
  49:16
**4200** 4:19
**45** 3:6
**47** 3:6,7
**47,000** 22:19
**48** 3:7
**4th** 14:11

### 5

**5** 19:15 44:23
**50** 3:8
**500** 5:7 29:15
  36:17,18,22,22
**501** 5:15
**51,000** 40:19
**512)637.4956**
  5:12
**52** 3:9
**53** 3:10
**55** 3:11

### 6

**60** 10:6
**64106** 5:20
**66,000** 38:13

### 7

**7** 3:4 44:23
**70** 14:22 15:1
**700** 4:6
**701** 5:6
**70801** 4:24

**74103** 6:3
**75201** 4:19
**76102** 5:25
**76262** 4:11
**78746** 5:11
**79105** 5:7
**79401** 4:7 5:3,16
  7:20 57:20
  58:23

### 8

**8** 3:5
**8.2** 20:5 41:1
**806)468.3337**
  5:8
**806)763.0044**
  5:3
**806)765.7491**
  4:7
**806)780.3976**
  5:16
**806)795.4202**
  7:16,20 57:21
  58:23
**816)691.3415**
  5:21
**8667** 7:18 57:18
  58:20

### 9

**9.5** 15:17 16:12
  38:3 40:6
**9:16** 2:4
**918)595.4828**
  6:4
**920** 5:2
**94111** 4:15

# EXHIBIT B-4

APP 0295

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| REAGOR-DYKES MOTORS, LP, | ) | Case No. 18-50214-rlj11 |
| | ) | |
| Debtor. | ) | |

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| REAGOR-DYKES IMPORTS, LP, | ) | Case No. 18-50215-rlj11 |
| | ) | |
| Debtor. | ) | |

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| REAGOR-DYKES AMARILLO, LP, | ) | Case No. 18-50216-rlj11 |
| | ) | |
| Debtor. | ) | |

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| REAGOR-DYKES AUTO COMPANY, | ) | |
| LP, | ) | Case No. 18-50217-rlj11 |
| | ) | |
| Debtor. | ) | |

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| REAGOR-DYKES PLAINVIEW, LP, | ) | Case No. 18-50218-rlj11 |
| | ) | |
| Debtor. | ) | |

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| REAGOR-DYKES FLOYDADA, LP, | ) | Case No. 18-50219-rlj11 |
| | ) | |
| Debtor. | ) | |

-----------------------------------

ORAL AND VIDEOTAPED DEPOSITION OF
RICK DYKES
AUGUST 13, 2018

-----------------------------------

APP 0296

1      ORAL DEPOSITION OF RICK DYKES, produced as a

2   witness at the instance of FORD MOTOR CREDIT COMPANY,

3   L.L.C., and duly sworn, was taken in the above-styled

4   and numbered cause on August 13, 2018, from 1:18 p.m. to

5   2:25 p.m., before Cindy Wiley, CSR in and for the State

6   of Texas, reported by machine shorthand, at the

7   Reagor-Dykes Auto Group, 1215 Avenue J, Lubbock, Texas,

8   pursuant to the Federal Rules and the provisions stated

9   on the record or attached hereto.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

APP 0297

Page 3

1                        INDEX

2                                              PAGE

3    Appearances.......................................... 4

4    Instructions to the Witness....................... 7

5    RICK DYKES
          Examination by Mr. Langley......................8
6         Examination by Mr. Bustos.....................26
          Examination by Mr. Strohschein................34
7         Examination by Mr. Mullin.....................39
          Examination by Mr. Langley....................40
8         Examination by Mr. Bustos.....................42

9    Deposition Concluded.............................43

10   Signature and Changes............................44

11   Reporter's Certificate...........................46

12

13

14

15

16

17

18

19

20

21

22

23

24

25

APP 0298

```
 1                    A P P E A R A N C E S
 2
 3
     FOR THE DEBTORS:
 4        MR. DAVID MULLIN
          -AND-
 5        MR. DAVID R. LANGSTON
          MULLIN, HOARD & BROWN, L.L.P.
 6        WELLS FARGO CENTER
          1500 BROADWAY
 7        SUITE 700
          LUBBOCK, TEXAS 79401
 8        (806)765.7491
 9
     FOR FORD MOTOR CREDIT COMPANY, L.L.C.:
10        MR. KEITH A. LANGLEY
          LANGLEY ATTORNEYS & COUNSELORS, L.L.P.
11        1301 SOLANA BOULEVARD
          BUILDING 1, SUITE 1545
12        WESTLAKE, TEXAS 76262
          (214)722.7162
13
          MR. DONALD H. CRAM, III
14        SEVERSON & WERSON, P.C.
          ONE EMBARCADERO CENTER
15        26TH FLOOR
          SAN FRANCISCO, CALIFORNIA 94111
16        (415)398.3344
17
     FOR GM, L.L.C.:
18        MR. MARK ANDREWS
          DYKEMA, COX, SMITH
19        1717 MAIN STREET
          SUITE 4200
20        DALLAS, TEXAS 75201
          (214)698.7819
21
22   FOR GM FINANCIAL:
          MR. STEPHEN P. STROHSCHEIN
23        MCGLINCHEY STAFFORD, P.L.L.C.
          301 MAIN STREET
24        FOURTEENTH FLOOR
          BATON ROUGE, LOUISIANA 70801
25        (225)383.9000
```

Page 5

```
 1   FOR AIM BANK:
          MR. JEFF R. LASHAWAY
 2        BOERNER, DENNIS & FRANKLIN, P.L.L.C.
          920 AVENUE Q
 3        LUBBOCK, TEXAS 79401
          (806)763.0044
 4

 5   FOR FIRST CAPITAL BANK:
          MR. JOHN F. MASSOUH
 6        SPROUSE, SHRADER, SMITH, P.L.L.C.
          701 SOUTH TAYLOR
 7        SUITE 500
          AMARILLO, TEXAS 79105
 8        (806)468.3337

 9
     FOR VISTA BANK:
10        MR. FERNANDO BUSTOS
          BUSTOS LAW FIRM, P.C.
11        1001 MAIN STREET
          SUITE 501
12        LUBBOCK, TEXAS 79401
          (806)780.3976

13

14   FOR FIRST BANK & TRUST:
          MR. MARK S. CARDER
15        STINSON, LEONARD, STREET, L.L.P.
          1201 WALNUT
16        SUITE 2900
          KANSAS CITY, MISSOURI 64106
17        (816)691.3415

18
     FOR BART REAGOR:
19        MR. SCOTT R. WIEHLE
          KELLY, HART & HALLMAN, L.L.P.
20        201 MAIN STREET
          SUITE 2500
21        FORT WORTH, TEXAS 76102
          (817)332.2500

22
     FOR IBC BANK:
23        MR. MARK D.G. SANDERS
          GABLE GOTWALS
24        1100 ONEOK PLAZA
          100 WEST FIFTH STREET
25        TULSA, OKLAHOMA 74103
```

APP 0300

```
 1    FOR RICK DYKES:
           MR. TOM KIRKENDALL
 2         LAW OFFICE OF TOM KIRKENDALL
           2 VIOLETTA COURT
 3         THE WOODLANDS, TEXAS 77381
           (281)364.9946
 4
           MR. DAVID M. GUINN, JR.
 5         LAW OFFICE OF HURLEY & GUINN
           1805 13TH STREET
 6         LUBBOCK, TEXAS 79401
           (806)771.0700
 7

 8

 9    Also Present:
           MR. Audin Herrera
10         MR. Toby Cecil
           MR. Craig Leslie
11         MR. Bart Reagor
           MR. Johnathan Hill
12         MR. Howie Ravitz
           MR. Brad Burgess
13

14

15

16

17

18

19

20

21

22

23

24

25
```

APP 0301

1    INSTRUCTIONS FOR SIGNING A DEPOSITION

2    Rules of Civil Procedure under which this deposition was
     taken provide that the deposition transcript shall be
3    made available to the witness or his attorney of record
     for examination and signature by the witness.

4
     This deposition condensed transcript is provided for
5    your review.  It is yours to keep.  Read it carefully
     before making any changes or corrections on the Witness
6    Signature Page.

7    Changes and/or corrections must be made in the following
     manner:
8
              (1)   Indicate by number the page and line you
9                   wish to alter;
              (2)   Indicate your change or correction;
10            (3)   Give the reason for making the change.

11   When you have followed the instructions above, sign the
     Witness Signature Page before a Notary Public and return
12   it as soon as possible.

13   When we have received the signed and notarized
     transcript, we will forward all attorneys of record a
14   copy of the completed Witness Signature Page and deliver
     the original transcript to Mr. Keith A. Langley for
15   safekeeping and use at trial.

16   If you have any questions about this procedure, please
     call my office at (806)795.4202.

17

18                        Cindy Wiley, Cert No. 8667
                          Caprock Court Reporting, Inc.
19                        Firm No. 374
                          1112 Texas, Suite 200
20                        Lubbock, Texas 79401
                          (806)795.4202
21

22

23

24

25

APP 0302

Page 8

1                    RICK DYKES,

2    having been first duly sworn by the court reporter,

3    testified as follows:

4                    EXAMINATION

5    BY MR. LANGLEY:

6         Q.   Would you state your full name?

7         A.   Yes.  Franklin Andrew Dykes.  I am better known

8    as Rick.

9         Q.   All right.  Mr. Dykes, I am going to continue

10   some stipulations and state some new ones, probably not

11   a lot of difference, but there have been some changes,

12   which is not all that unusual for a fast moving Chapter

13   11 or series of Chapter 11s, especially when alphabet

14   agencies have taken an interest in the case.

15              What has been requested of me as counsel

16   for Ford Credit is to restrict your deposition and the

17   deposition of Mr. Reagor to the time frame from and

18   after the bankruptcy filing, to focus upon the

19   bankruptcies and to focus upon what is set before the

20   bankruptcy judge on Thursday, which is the use of cash

21   collateral and any other attendant matters.

22              We are agreed for purposes of today's

23   depositions and any depositions that occur on Wednesday

24   to that procedure that we are going to focus moving

25   forward.

APP 0303

1          Obviously, you are free to volunteer

2    anything you choose to volunteer on pre-petition issues.

3    Is that acceptable?

4        A.  Yes, sir.

5          MR. KIRKENDALL:  Mr. Langley, has that

6    request been made by Debtor's counsel?

7          MR. LANGLEY:  That request has been made by

8    both Mr. Reagor's counsel and by Mr. Langston.

9          MR. KIRKENDALL:  Okay.  I just wanted to

10   make clear for the record that was not requested by

11   Mr. Dykes.

12         MR. LANGLEY:  Understood.

13         MR. KIRKENDALL:  Okay.

14       Q.  (BY MR. LANGLEY)  Which is why I am happy to

15   hear anything more that you want to address.

16         MR. LANGLEY:  Is there anyone who wants --

17   you probably need -- have you made appearance already

18   today?

19         MR. KIRKENDALL:  I have haven't made an

20   appearance, but I have provided my information to the

21   court reporter.  She has got it.  Tom Kirkendall on

22   behalf of Rick Dykes.

23         MR. LANGLEY:  Okay.

24       Q.  (BY MR. LANGLEY)  Mr. Dykes, I am going to

25   start by primarily focusing upon the time frame from and

1    after August 1st forward, and we are going to talk a

2    little bit about cash sources and uses and capital and

3    use of cash collateral and prospects for reorganization,

4    potential for sale, and then we will back into a few

5    other potential issues, okay?

6        A.  Yes, sir.

7        Q.  If you will -- first of all, have you been

8    deposed before?

9        A.  I have, yes, sir.

10       Q.  All right.  So you understand the court

11   reporter is going to be taking doing my questions and

12   your responses.  If you don't understand anything I say,

13   you will ask me to clarify, and I will do my best, okay?

14       A.  Yes, sir.

15       Q.  You will have an opportunity to review the

16   transcript after today and to make any corrections to

17   that transcript.  As we have discussed, the intent, as

18   of right now, is to keep this open and to go for a short

19   period of time today and to see what information we can

20   elicit.

21           Would you start by taking us from August

22   1st forward over the last 12 days or so and talk about,

23   if you will, what you have done and what you have

24   learned in terms of the ability of Reagor-Dykes Auto

25   Group?  And by that, I am talking about the six entities

1    that have filed bankruptcy.  And you understand which

2    six those are?

3         A.  Yes, sir.

4         Q.  I want you to talk to us a little bit and tell

5    us what has happened since the bankruptcy filing and

6    what are the current prospects for those entities.

7         A.  Well, since the bankruptcy filing, we have

8    worked diligently to set up the cash funds at the banks.

9    So we have been able to pay our employees from those

10   funds.

11        Q.  All right.  And those are debtor in possession

12   accounts; is that your understanding?

13        A.  Yes, sir.

14        Q.  And do you have a balance in those DIP

15   accounts?

16        A.  Yes, sir, we do.  I am not sure what that is.

17        Q.  Do you have any range or order of magnitude

18   approximately?

19        A.  I believe it's in the $350,000 range.  All

20   total 900.

21        Q.  All right.  So prior to the bankruptcy, it's my

22   understanding there was a clearing account or a

23   commingled account where all of the funds would go into

24   a central clearing account.  Is that correct?

25        A.  Can you say that again?

APP 0306

1     Q.  Yes, sir.

2     A.  I am not sure.

3     Q.  I am wondering whether the funds generated by

4  each of the Debtors prior to the bankruptcy were

5  segregated and maintained on a segregated basis for each

6  dealership location, if you know.

7     A.  I am not sure.

8     Q.  Post-petition, are there separate debtor in

9  possession accounts for each dealership?

10    A.  Yes, sir.

11    Q.  So there is going to be six accounts?

12    A.  Yes, sir.

13    Q.  And the cumulative total approximately, what do

14  you think that total is?

15    A.  It's 900 -- I don't know for sure.  950,000,

16  somewhere in that range.

17    Q.  Okay.  And what types of sources of money do

18  the Debtor entities have such as contracts in transit or

19  payments on accounts or other sources of funding?

20    A.  Right now, we are pretty limited on sources of

21  funding.  I do know that we have picked up some money

22  from our ops -- operations in the back where we have

23  done some service work.

24    Q.  And I believe there was some amount of money

25  generated by transfer from some brokerage accounts; is

APP 0307

1    that correct?

2         A.  Yes, sir, that is.

3         Q.  Are there any other sources of money that you

4    are aware of?

5         A.  No, sir.

6         Q.  And who primarily is in charge of managing the

7    money?  And by that, I mean obtaining the money,

8    receiving the money and putting the money into the DIP

9    accounts.

10        A.  David Langston, at the end of the day, has that

11   control.

12        Q.  And who, if anyone, for RDAG?

13        A.  He has been working directly with Tim Conner.

14        Q.  Let's talk about uses of cash.  It's my

15   understanding -- is it also your understanding that all

16   payroll has been paid through today?

17        A.  Yes, sir, it has.  We finished -- we cut

18   checks, I believe, this morning to finish that.

19        Q.  And do you have a sense of how much money is

20   required through the end of August, say August 30th, for

21   payroll?

22        A.  Through the end of August, it's going to be

23   about 572,000, 573,000 total.

24        Q.  Okay.  If you will, give me what that consists

25   of.

Page 14

1        A.  That's our administration salaries, and then

2   it's commission based off of the sales projections that

3   we set.

4        Q.  How much is commissions?

5        A.  I don't know for sure.  It's not broken out

6   exactly.  Administration salaries and commissions are

7   $286,693.

8        Q.  Okay.  And what else do you have besides

9   administration and sales commissions?

10       A.  We have tools and supplies.

11       Q.  How much?

12       A.  $15,721.

13       Q.  What else?

14       A.  We have freight, $207.

15       Q.  Let's focus only on some larger items.

16       A.  Okay.  The next largest would be payroll taxes.

17       Q.  Okay.  How much is that?

18       A.  That's $30,909.

19       Q.  Okay.

20       A.  Then it would go down to utilities, $28,895.

21       Q.  All right.

22       A.  And the largest expenditure would be rent,

23   $334,384.

24       Q.  Okay.  So if you add all those numbers up, are

25   these the numbers that are going to make up -- they are

1    larger than the payroll?

2        A.  Yes, sir.  There are several others that we

3    didn't include that are much smaller.

4        Q.  Okay.  So what's the grand total number through

5    August 30th?

6        A.  Total operating expenses is $909,551, and I do

7    need to -- this is a two-week budget that we have set.

8        Q.  Okay.

9        A.  So I just wanted to clarify that to make sure

10   that we are on the same page.

11       Q.  Okay.  That takes us through August 30th?

12       A.  Yes, sir.

13       Q.  All right.  So we have talked about cash

14   uses --

15       A.  Actually, let me go back, Keith, if that's

16   okay.  This budget would take us through the 16th, as I

17   understand it, and then this was set up on a two-week

18   basis.

19       Q.  Sixteenth of August?

20       A.  Yes, sir.  This was the initial budget that we

21   set.

22       Q.  Okay.  For Judge Jones on Thursday, what I am

23   trying to understand is a request that's being made to

24   Judge Jones through the end of the month for whatever

25   time frame, if you have an understanding of that.

1    A.   Yes, sir.

2    Q.   What amount of money?

3    A.   It would be this operating budget for the next

4 two weeks.

5    Q.   Currently, do you anticipate receipt of cash

6 from any sources to fund that use of cash?

7    A.   I am not sure.

8    Q.   And as of right now as we sit here

9 post-petition, the Reagor Auto Mall in Lubbock and the

10 GM store in Snyder have not filed Chapter 11s; is that

11 correct?

12    A.   Yes, sir.  That's correct.

13    Q.   On the six debtor stores, is it fair to say

14 that none of those stores currently have the ability to

15 obtain new inventory?

16    A.   At the present time, that's correct.

17    Q.   And you -- are you generally aware that the

18 manufacturers, be that GM or Ford, at least some of them

19 have provided notices as to the sales and service

20 agreements relating to performance concerns that they

21 have with Reagor-Dykes?

22    A.   Yes, sir.

23    Q.   You are not aware of any orders having been

24 entered on any of those issues yet?

25    A.   No, sir.

1      Q.  All right.  Mr. Dykes, help me understand:

2  What's the plan of action?  Do you have an understanding

3  and appreciation of what is going to happen, whether

4  that's for the next two days, two weeks, next two months

5  to try to deal with these situations?

6      A.  Yes, sir, I think I do.

7      Q.  Help us understand that.

8      A.  Well, we are going to continue to operate as we

9  have under the guidelines and restrictions of the Court.

10      Q.  Okay.  Anything else?

11      A.  No, sir.

12      Q.  What about the potential for either a sale or

13  an operations agreement or a management agreement?  Is

14  that an issue that you have explored?

15      A.  Yes, sir.  We have several different interested

16  parties.

17      Q.  There has been a motion filed with the Court

18  relative to a chief restructuring officer.  Are you

19  generally familiar with that?

20      A.  Yes, sir.

21      Q.  And what is your understanding of the need or a

22  request for a CRO?

23      A.  He would come in and be in charge of the

24  day-to-day operations of the dealerships.

25      Q.  Do you have, Mr. Dykes, any information as to

1    what the current plan is to pay trade ins or taxes or

2    registration fees?

3         A.  No, sir.

4         Q.  You may have been here for a prior deposition

5    of Mr. Conner, but do you generally agree that the new

6    model vehicles have been hitting the stores as we speak?

7         A.  Yes, sir.

8         Q.  So '18 model vehicles would be one year prior;

9    is that fair to say?

10        A.  Yes, sir.

11        Q.  '17 model vehicles that are new with less than

12   an amount of mileage -- say 5,000 miles -- would be two

13   years, but still new?

14        A.  Yes, sir.

15        Q.  There was an effort of the Debtors to ground

16   all of the demonstrators.  Has that been primarily

17   successful with most of the demos?

18        A.  Yes, sir.

19        Q.  I think at last count there were maybe two

20   still out.  Is that still the case?

21        A.  Yes, sir.  That's still the case as I know it.

22        Q.  Upon the, perhaps, sudden -- definitely sudden

23   and unfortunate filing of the Chapter 11s, there was a

24   projection of 70 percent of the sales that occurred in

25   July.  Are you generally familiar with that?

1      A.   Yes, sir.

2      Q.   And it was modified to about 30 percent, and

3   the budget was modified accordingly.   Are you familiar

4   with that?

5      A.   Yes, sir.

6      Q.   And based upon the information you currently

7   have, what percentage of July sales, which I recognize

8   that may be a complicated question -- but what level of

9   sales would you plan on for the month of the next 30

10  days starting Thursday?

11     A.   I am not sure I can answer that.

12     Q.   Okay.

13     A.   I am not --

14     Q.   Has anyone with RDAG made a projection based

15  upon a number of sales that would be projected for the

16  two weeks or 30 days commencing on Thursday?

17     A.   Yes, sir.

18     Q.   And who is that?

19     A.   Tim Conner and his group.

20     Q.   Do you know the basis for his assumptions?

21     A.   No, sir, I don't.

22     Q.   At this point, have you reviewed those

23  assumptions?

24     A.   I have looked at them, yes, sir.

25     Q.   Do you believe that they are achievable?

```
 1        A.  Yes, sir.  If certain things happen going

 2   forward, I do.

 3        Q.  Let's talk about those certain things.  What do

 4   you think needs to happen going forward to allow this to

 5   keep going?

 6        A.  We need to -- we need to pay people's trade

 7   ins, trading them out.  We need to get cars that have

 8   not been registered and the tax, title and license taken

 9   care of.

10        Q.  When you speak to the issue of paying trade in

11   amounts, is that an issue that also exists at the Snyder

12   GM store?

13        A.  Yes, sir.  I would assume it does.

14        Q.  And is that an issue that also exists at the

15   Auto Mall?

16        A.  Yes, sir.

17        Q.  Is Mr. Conner the person that has been

18   primarily charged with trying to deal with and reconcile

19   the trade in amounts?

20        A.  Yes, sir.

21        Q.  On the issue of registering cars, paying tax

22   title and license, is that an issue, as far as you know,

23   that also exists at Snyder in the Auto Mall?

24        A.  Yes, sir.

25        Q.  And again, is Mr. Conner the person who has
```

1    been primarily charged with that issue?

2        A.  Yes, sir.  That's correct.

3        Q.  There has been some discussion of contracts in

4    transit, which we are speaking of retail installment

5    contracts.  To your knowledge, has someone been

6    appointed to be in charge of speaking with those finance

7    sources about suspense accounts or the status of their

8    money?

9        A.  Yes, sir.  We have talked about that, but I am

10   not sure that I know who is in charge of that.

11       Q.  Mr. Dykes, we have spoken about cash sources

12   and uses.  Are there any other cash sources that the

13   bankruptcy court should be aware of the potential for

14   capital infusion or other sources of money?

15       A.  No, sir, not that I know.  The one thing -- if

16   I can rephrase that a little bit, the one thing that is

17   a potential is a possibility for getting DIP lending.

18   So that would be the one thing that I would say would be

19   a source for that.

20       Q.  As of now, have you identified any potential

21   DIP lenders?

22       A.  Yes, sir, we have.

23       Q.  Who is that?

24       A.  We had a local bank that reached out to us last

25   week that said they would like to help us out.

1    Q.   Anyone else?

2    A.   I don't know about -- I can't speak to the

3  other banks involved, but I know for sure that the one

4  bank did.

5    Q.   And that culminated in a potential line of

6  credit to pay off trade ins; is that your understanding?

7    A.   Yes, sir, potentially.

8    Q.   Okay.  Mr. Dykes, what would you like to see

9  the bankruptcy court do on Thursday?

10    A.   I would like to see them appoint a CRO.

11    Q.   And from your perspective, what do you believe

12  would be the benefit of that?

13    A.   I believe it gives us a chance to retain as

14  much value as we can for the company and save as many

15  local jobs as we can.

16    Q.   Yes, sir.  Do you have a belief as to the value

17  that can be retained?

18    A.   No, sir, I don't.

19    Q.   Through the years, to your knowledge, did

20  Reagor-Dykes pay a premium -- a blue sky premium

21  relative to any of the dealerships?

22    A.   We paid very little blue sky.

23    Q.   In terms of the potential for the sale of one

24  or more of the dealerships, who is the person at

25  Reagor-Dykes Auto Group or counsel who would be most

APP 0317

1    familiar with that issue?

2         A.   John Thompson.

3         Q.   Can we take a break for about ten minutes?

4         A.   Yes, sir.

5         Q.   All right.

6              (Break was taken.)

7         Q.   (BY MR. LANGLEY)  Mr. Dykes, let me ask you a

8    couple of questions.  You mentioned blue sky value.  Do

9    you have any current belief as to the blue sky value of

10   the any of the Debtors?

11        A.   No, sir, I don't.

12        Q.   In terms of total indebtedness to Ford Motor

13   Credit company, do you have a belief as to what the

14   quantum is?

15        A.   No, sir.  I know it's been a moving target, but

16   I am not sure where it's at right now.

17        Q.   Okay.  As of the SOT, or sold out of trust

18   amount, have you been involved in reconciliation of that

19   amount?

20        A.   No, sir.

21        Q.   Do you have any belief as to what that amount

22   is?

23        A.   No, sir.

24        Q.   There was some testimony by Mr. Conner earlier

25   about double flooring.  Do you have any personal

APP 0318

1   knowledge as to an amount of double flooring of

2   vehicles?

3       A.  No, sir.  I just -- I knew that -- I was told

4   that it was -- involved around 175 vehicles, but I have

5   never heard an amount.

6       Q.  In terms of reconciliation of inventory since

7   August the 1st, let's focus on that.  Are you familiar

8   with what efforts have been undertaken to reconcile

9   inventory collateral at any location?

10      A.  Yes, sir.  I know they are making -- they are

11  working to physically touch every vehicle.

12      Q.  And is that under the direction of Mr. Ryan

13  Reagor and Mr. Tim Conner?

14      A.  Yes, sir.

15      Q.  Okay.  We started the deposition with some

16  stipulations as to what we wanted to talk about, but you

17  have indicated that you wanted to talk about a little

18  bit broader topic, which I think is kind of where we

19  got -- how we got to where we are now.  What would you

20  like to tell us about that?

21      A.  That I will be -- I will answer any question

22  that you ask.

23      Q.  Okay.  Do you -- do you know -- do you have a

24  personal belief as to how this situation developed?

25      A.  Yes, sir, I do.

1    Q.  Okay.  And what do you think happened?

2    A.  I think Shane Smith was obviously -- he

3  misappropriated funds in several different ways.

4    Q.  Okay.  And that's a big area and that's a broad

5  topic.  And so if you know at the current time or have

6  reason to believe, do you believe that there was

7  personal benefit by Mr. Shane Smith financially out of

8  this misappropriation?

9    A.  I don't know that.

10    Q.  Did you suspect that any of that had occurred

11  prior to, let's say, July 28th, which was a Saturday?

12  Did you have any reason to believe that any of that had

13  occurred -- that your belief had developed prior to July

14  28th?

15    A.  No, sir.  In fact, I thought we were operating

16  at our highest level ever.

17    Q.  Okay.  So it's fair to say that since July

18  28th -- sometime from July 28th until today, which is

19  August 13th, there have been some rather significant

20  revelations that have occurred to you?

21    A.  Yes, sir.

22    Q.  And I take it it's fair to say that you have a

23  lot of questions about that.

24    A.  I do.

25        MR. LANGLEY:  I will pass the witness.

```
 1                        EXAMINATION

 2   BY MR. BUSTOS:

 3        Q.  Mr. Dykes, I am Fernando Bustos, representing

 4   Vista Bank.  What were some of the ways in which you

 5   thought that Mr. Smith was misappropriating funds to

 6   your knowledge today?

 7        A.  It's my understanding today that floors had --

 8   or cars had been double floored and that there were also

 9   cars that had been paid off that were floored again.

10        Q.  Any other ways that you have become aware of?

11        A.  Can you ask the question one more time?

12        Q.  Sure.  In what ways was Mr. Smith

13   misappropriating funds?

14        A.  There was also check kiting.

15        Q.  Any other ways generally that you know of?

16        A.  No, sir, not that I know of.

17        Q.  Do you have an understanding of how much was

18   kited in terms of the check kiting?

19        A.  No, sir, I don't.

20        Q.  Let me ask you about -- what have been your

21   day-to-day duties with the Reagor-Dykes Auto Group in

22   the last year?

23        A.  I am a co-owner.  You know, I am not in the

24   management of the day-to-day operations.  I am obviously

25   partners with Bart, but I typically come down to the
```

1    dealership between two and three times a week, depending

2    on the week.

3        Q.  And in terms of a division of labor between you

4    and Mr. Reagor, in terms of who is kind of in charge of

5    what parts of business, can you describe the division of

6    labor between you and Mr. Reagor as co-owners?

7        A.  Bart managed the -- he took care of the

8    day-to-day with our sales people.  He was the motivator.

9    He was the guy that instructed our sales teams.

10       Q.  And your job duties were more what?

11       A.  I was available for -- if anything came up

12   outside of that that he felt like I needed to know

13   about.  I reported typically to check in with Shane

14   Smith to find out if there were any documents that

15   needed to be signed.

16       Q.  Did you have your finger on a day-to-day pulse

17   on some issues that you felt like you were kind of in

18   charge of for the operations or is that delegated out?

19       A.  No, sir.

20       Q.  Okay.  So the answer is no, no day-to-day pulse

21   issues for you?

22       A.  Yes.

23       Q.  Okay.  Let me ask you about some 2016 audited

24   financials that Vista Bank received from Tim Conner last

25   week.  Are you aware of those audited financial reports?

1      A.   I am.

2      Q.   And did you instruct Mr. Conner to send those

3 to Vista Bank?

4      A.   No, sir.

5      Q.   Do you know who did?

6      A.   I am not sure who did.

7      Q.   Those audited financials were completed back in

8 November of 2017.  Are you aware of that?

9      A.   Yes, sir.

10      Q.   Do you know why they were not provided to Vista

11 Bank until last week?

12      A.   I have no idea.

13      Q.   Was that something that Shane Smith would have

14 been in charge of?

15      A.   Yes, sir.

16      Q.   Are you aware of any differences between the

17 audited and unaudited financials for 2017?

18      A.   No, sir.

19      Q.   Have you seen the audited financial reports for

20 2016?

21      A.   No, sir.

22      Q.   Have you seen any audited financial reports

23 from the year 2017?

24      A.   I have not.

25      Q.   Have you seen any unaudited financial reports

1    for either of those years, 2016 or 2017?

2         A.   No, sir.

3         Q.   Is the best person who could have answered

4    questions about these financials Shane Smith?

5         A.   Yes, sir.

6         Q.   Is there anybody who can speak intelligently to

7    those issues now that he is gone?

8         A.   Tim Conner would probably be your best bet.

9    Yes, sir.

10        Q.   All right.   Let me ask you some questions about

11   First Capital Bank.   Are you on their board of

12   directors?

13        A.   In an advisory position.

14        Q.   So you are still an advisory board member?

15        A.   No, sir.

16        Q.   You are not?

17        A.   I am not.

18        Q.   At what time did you cease being an advisory

19   member?

20        A.   The day of the filing.

21        Q.   August 1, 2018; is that about right?

22        A.   I am not certain, but I think that's right,

23   yes, sir.

24        Q.   Okay.   Have you ever been a full board member

25   of the bank?

1      A.   I have.

2      Q.   When were you a full board member?

3      A.   I don't know the years for sure, but for

4   several years I was.

5      Q.   So were you a full board member first and then

6   converted into an advisory board member?

7      A.   Yes, sir.

8      Q.   What was the reason for converting to advisory

9   board member status?

10     A.   Because of the size of our account there, it

11  became so cumbersome to -- as I understand it, to get

12  things passed.  Everything we did had to be approved by

13  the board because of the size of our account there.  So

14  I moved to an advisory role.

15     Q.   And then the bank would have a higher lending

16  limit if you were just an advisory board member?

17     A.   I am not sure about that.  I don't know if that

18  affected the lending limit or not.

19     Q.   Did you ever have discussions with either the

20  CEO or chairman of the board about regulations owed when

21  it came to your board member status?  Does that mean

22  anything to you?

23     A.   No, sir.

24     Q.   All right.  Have your auditors sent a

25  management letter to Reagor-Dykes saying that they

1    indicate that they need to revise any of their audited

2    financial reports?

3         A.   Can you repeat that, please?

4         Q.   Sure.  Have your auditors sent y'all a

5    management letter or any correspondence saying, "Hey, we

6    need to go ahead and look into revising the audited

7    financial report for 2016," for example?

8         A.   No, sir.  I don't know.

9         Q.   How many shares do you own First Capital Bank?

10        A.   Approximate?  I don't know precisely.

11        Q.   Just approximately.

12        A.   375,000.

13        Q.   And about what percentage of the whole is that,

14   as far as you understand?

15        A.   Percentage of the whole company?

16        Q.   Yes.

17        A.   You know, I don't know that.

18        Q.   Under 10 percent?

19        A.   Oh, yes.  Yes.

20        Q.   And First Capital provided floor plan financing

21   for Reagor-Dykes Auto Group; is that right?

22        A.   Yes, sir, it did.

23        Q.   How much is owed to First Capital Bank on the

24   floor plan financing?  Do you know?

25        A.   It's kind of a moving target, but I think it's

1    about 7.5 million.

2        Q.  On the floor plan financing?

3        A.  Yes, sir.

4        Q.  And then what other liabilities does

5    Reagor-Dykes Auto Group companies have with First

6    Capital Bank aside from floor plan financing, to your

7    knowledge?

8        A.  I can't speak to that directly.  I am not sure

9    exactly.

10       Q.  Okay.

11       A.  I do know there are other accounts there and

12    other holdings.

13       Q.  Okay.  Have you ever raised capital for First

14    Capital Bank?  Have you assisted in capital raises for

15    the bank?

16       A.  No, sir -- well, potentially through friends,

17    but not an organized effort.

18       Q.  Have you engaged in any of those efforts

19    recently for the bank?

20       A.  No, sir.

21       Q.  Are you aware whether you are the only advisory

22    director?

23       A.  No, sir.  I think there are several others.

24       Q.  Do Reagor-Dykes Auto Group companies have any

25    preferential lending terms at First Capital?

APP 0327

1      A.   No, sir, not that I know of.

2      Q.   Do you know what the account balances were for

3   the Reagor-Dykes bankrupt entities as of the day they

4   filed for bankruptcy protection?

5      A.   No, sir, I don't.

6      Q.   Do you know when you anticipate schedules to be

7   filed for your bankrupt entities?

8      A.   I am not sure.

9      Q.   Okay.  All right.  What was the longest amount

10   of time that Shane Smith ever took for vacation, to your

11   knowledge?

12      A.   I don't know.  He was at work a lot.  Maybe a

13   week in the summer.

14      Q.   What was his most recent absence of about a

15   week, to your knowledge?

16      A.   I can't answer that.  I don't remember him

17   being gone this summer.  I think he missed two or three

18   days at one time when they went to -- I know he did.

19   They went to New York City for a baseball game, but I

20   think it was over a long weekend.

21      Q.   Okay.  And are you social friends with the

22   chairman and CEO of First Capital Bank?

23      A.   Yes, sir.

24      Q.   Did you go on vacation with them?

25      A.   No, sir.

APP 0328

1        Q.   Entertain each other in each other's homes?

2        A.   Yes, sir.

3                 MR. BUSTOS:   I will pass the witness.

4                        EXAMINATION

5   BY MR. STROHSCHEIN:

6        Q.   Mr. Dykes, I am Steve Strohschein.   I am

7   representing GM Financial.   You mentioned that you had

8   not reviewed the audited financial --

9        A.   Yes, sir.

10       Q.   -- statement of your bank?

11       A.   Yes, sir.

12       Q.   What level of financial review would you

13  undertake in your role as a co-owner of Reagor-Dykes

14  Auto Group?   Would you ever look at any bank statements?

15       A.   No, sir.

16       Q.   Were there internally-generated financials you

17  reviewed?

18       A.   Let me go back to that.   Every Friday we

19  received a list from Shane Smith that had a -- all of

20  our bank accounts on there and the dollar amounts in

21  those accounts.

22                 So every Friday, I got an updated account,

23  myself and Bart did.   We got an updated account of what

24  was in our account.

25       Q.   So that would just be strictly deposits, a

1    snapshot as of that day, how much money was in each bank

2    account?

3        A.  Yes, sir.

4        Q.  And do you remember roughly the number of bank

5    accounts that would be reflected on that schedule?

6        A.  No, sir.  It was a lot.

7        Q.  Pages?

8        A.  Yes, sir.

9        Q.  How many pages?

10       A.  Typically two to three.

11       Q.  And this would be generated routinely on

12   Fridays by Shane?

13       A.  Every Friday, yes, sir.

14       Q.  Would copies of those reports that were given

15   to you still exist?

16       A.  Yes, sir.

17       Q.  And who -- where would they be within the

18   Reagor-Dykes Auto Group?  Would you have those copies or

19   would they be --

20       A.  I don't have those copies, but Bart had the

21   copies every Friday.

22       Q.  And they would have been maintained in some

23   kind of way?

24       A.  Yes, sir.

25       Q.  What other routine financial information would

1  you receive and review?  Would you receive a report on

2  sales?

3        A.  At the end of each month, yes, sir.

4        Q.  And what would that report look like?

5        A.  It wasn't as much a report as it was just a

6  reporting.

7        Q.  So it would be oral?

8        A.  Yes, sir.

9        Q.  By whom?

10       A.  Typically, me and Bart met on that.

11       Q.  Together?

12       A.  Yes, sir.

13       Q.  Where would the information come from?

14       A.  It would have come from the information

15  provided by Shane Smith.

16       Q.  To Bart first?

17       A.  Yes, sir.

18       Q.  And then you would meet with Bart?

19       A.  Yes, sir.

20       Q.  And that would not be in writing.  That would

21  just be a conversation?

22       A.  Yes, sir.

23       Q.  And that conversation, would it be about the

24  month's sales?

25       A.  About the success of our -- yes, sir, the month

1    before.

2        Q.  In addition to sales, what else would you

3    discuss at that monthly meeting?

4        A.  Typically just sales.

5        Q.  What other type of financial review did you

6    undertake?  So you had the weekly bank deposits and the

7    monthly sales.  Any other?

8        A.  Well, we had our -- we had our yearly audit.

9    We had just finished a refinance of our real estate in

10   March with IBC Bank, and they had spent six months of

11   due diligence.  So that was something that we felt very

12   comfortable with.

13               We had our Ford audit reports that came out

14   every quarter, and then we had -- we also had our bank

15   statements that came in on Friday.

16       Q.  The IBC due diligence that was performed,

17   did -- was that a due diligence only for the real estate

18   or was it due diligence for the total business

19   operation?

20       A.  I assume it was total business operation.  It

21   was -- it was several months long, months and months

22   long.

23       Q.  The loan was strictly a real estate loan with

24   IBC?

25       A.  It was a refinance, yes, sir.  But it also

APP 0332

1    freed money up for working capital.

2        Q.  How?

3        A.  Eighty percent of our real estate -- we

4    received the value of 80 percent of our real estate,

5    which freed up -- we had some equity in that, which

6    freed up money that we were able to use for working

7    capital.

8        Q.  And where was that working capital employed?

9        A.  It was at -- I assume it was employed in our

10   general dealerships.

11       Q.  Was there a distribution to the owners at that

12   time?

13       A.  I don't know that, no.  I can't remember.

14       Q.  How much money was freed up by the refinancing

15   with IBC?

16       A.  Ten million dollars.

17       Q.  And you don't recall whether you received any

18   portion of that 10 million?

19       A.  I don't remember, no, sir.

20       Q.  It's possible that you did?

21       A.  It's possible.

22       Q.  So this other financial reporting or review --

23   overview that you would have undertaken as a co-owner of

24   the enterprise, anything else come mind?

25       A.  No, sir.  Those four sources were what we had.

1      Q.  In what ways would you become involved in, say,

2   the debt side of the enterprise, the floor plans, the

3   borrowings of Reagor-Dykes Auto Group?  Were you ever

4   involved in that?

5      A.  No, sir.

6      Q.  Were you ever involved in the inventory

7   analysis in any way?

8      A.  No, sir.

9      Q.  Did you visit the stores, the actual locations

10   of the dealerships?

11      A.  Yes, sir.  We visited them on occasion.  Most

12   of the time, it was because of -- we received the

13   President's Awards just three weeks ago at both stores.

14            So we were in Lamesa and Plainview, and we

15   were down in Snyder at that GM store, as we received two

16   awards there.  So I have been to those stores recently,

17   yes, sir.

18            MR. STROHSCHEIN:  I have no further

19   questions.  Thank you.

20            THE WITNESS:  Yes, sir.

21            MR. LASHAWAY:  I will reserve.

22            MR. MULLIN:  One question just to clarify a

23   prior answer.

24                    EXAMINATION

25   BY MR. MULLIN:

1     Q.  On the Layne, Gormon, the auditors --

2     A.  Yes, sir.

3     Q.  -- did Mr. Reagor report to you that they were

4 providing and had provided clean opinions on the

5 company's financials?

6     A.  No, sir.  Mr. Smith did.

7     Q.  Mr. Smith told you that Layne, Gormon had

8 provided clean opinions on the company's financials --

9     A.  Yes, sir.

10    Q.  -- each year when the reports came out?

11    A.  Yes, sir.

12    Q.  Okay.  And did you review the report yourself?

13    A.  No, sir.

14    Q.  Okay.

15         MR. MULLIN:  That's all I have.

16                EXAMINATION

17 BY MR. LANGLEY:

18    Q.  On the Layne, Gormon audits, if you have an

19 understanding, why were the dealership financial

20 statements being audited by a third-party CPA firm?

21    A.  Because we had plans potentially to go public

22 at a later date.  We knew that that would be a

23 requirement.

24    Q.  In connection with that plan, you needed five

25 years of audited financial statements with clean audit

APP 0335

1   opinions, correct?

2       A.  Yes, sir.  I am not sure it was five years as I

3   understood it, but yes, sir.

4       Q.  And there were some creditors that those

5   financial statements were provided to and specifically

6   those audits, correct?

7       A.  I'm sorry.  Could you repeat that, please?

8       Q.  Do you know which creditors the audited

9   financial statements were provided to?

10      A.  No, sir.

11      Q.  And that's something that Mr. Smith would know?

12      A.  Yes, sir.

13      Q.  With respect to the stock that you have in FCB,

14  you mentioned 375,000 shares.  Is that pledged to

15  somewhere, to your knowledge?

16      A.  A lot of it is pledged, yes, sir.

17      Q.  Where is it pledged?

18      A.  Right now, it's at FCB.  So it's --

19      Q.  So in other words, that stock doesn't supply

20  any liquidity for you to capitalize any of these

21  Debtors, correct?

22      A.  Not at the present time.

23      Q.  And who was in charge at RDAG of the

24  refinancing in March of 2018?

25      A.  Shane Smith.

1      Q.   What was your understanding of the business

2   purpose of refinancing in March of 2018?

3      A.   We knew we had equity in the real estate, and

4   we wanted to get that equity out and put in a working

5   capital.

6             MR. LANGLEY:   I pass the witness.

7             MR. BUSTOS:   Just a few more follow-up

8   questions.

9                       EXAMINATION

10  BY MR. BUSTOS:

11     Q.   About how many hours a week would you say you

12  typically spent working at Reagor-Dykes on average?  And

13  it can be a range.

14     A.   I always came after lunch.  Typically three --

15  two to three, maybe occasionally four days a week.

16     Q.   So two to four half days a week?

17     A.   Yes, sir.

18     Q.   Okay.  Based on your preliminary investigation,

19  how long do you think this fraud was going on being

20  perpetrated by your former CFO?

21     A.   I have no idea.

22     Q.   Regarding audited financials, did any of

23  Reagor-Dykes Auto Group's lenders request or suggest

24  that y'all get in the practice of getting audited

25  financials?

1        A.  No, sir, not initially.  That was -- we are the

2   ones that initiated it.

3                MR. BUSTOS:  I will pass the witness.

4                MR. STROHSCHEIN:  Reserve.

5                MR. MULLIN:  Reserve.

6                MR. KIRKENDALL:  Do you have anything

7   further?

8                MR. LANGLEY:  Anything further?  Thank you

9   very much.

10                THE WITNESS:  Yes, sir.

11                (Deposition concluded at 2:25 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 44

1                          CHANGES AND SIGNATURE

2    WITNESS NAME: RICK DYKES     DATE: AUGUST 13, 2018

3    PAGE LINE      CHANGE              REASON

4    _____

5    _____

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   _____

APP 0339

1      I, RICK DYKES, have read the foregoing
deposition and hereby affix my signature that same is
2  true and correct, except as noted above.

3

4

5                         _____
                          RICK DYKES

6

7  THE STATE OF _____)

8  COUNTY OF _____)

9

10     Before me, _____, on this day

11  personally appeared RICK DYKES, known to me (or proved

12  to me under oath or through _____)

13  (description of identity card or other document)) to be

14  the person whose name is subscribed to the foregoing

15  instrument and acknowledged to me that they executed the

16  same for the purposes and consideration therein

17  expressed.

18     Given under my hand and seal of office this

19  _____ day of _____, _____.

20

21

22                         _____
                          NOTARY PUBLIC IN AND FOR
23                        THE STATE OF _____
                          COMMISSION EXPIRES: _____
24

25

```
1              IN THE UNITED STATES BANKRUPTCY COURT
              FOR THE NORTHERN DISTRICT OF TEXAS
2                       LUBBOCK DIVISION

3    IN RE:                        )
                                   )
4    REAGOR-DYKES MOTORS, LP,      )Case No. 18-50214-rlj11
                                   )
5         Debtor.                  )
     _____
6    IN RE:                        )
                                   )
7    REAGOR-DYKES IMPORTS, LP,     )Case No. 18-50215-rlj11
                                   )
8         Debtor.                  )
     _____
9    IN RE:                        )
                                   )
10   REAGOR-DYKES AMARILLO, LP,    )Case No. 18-50216-rlj11
                                   )
11        Debtor.                  )
     _____
12   IN RE:                        )
                                   )
13   REAGOR-DYKES AUTO COMPANY,    )
     LP,                           )Case No. 18-50217-rlj11
14                                 )
          Debtor.                  )
15   _____
     IN RE:                        )
16                                 )
     REAGOR-DYKES PLAINVIEW, LP,   )Case No. 18-50218-rlj11
17                                 )
          Debtor.                  )
18   _____
     IN RE:                        )
19                                 )
     REAGOR-DYKES FLOYDADA, LP,    )Case No. 18-50219-rlj11
20                                 )
          Debtor.                  )
21   _____

22                  REPORTER'S CERTIFICATION
                   DEPOSITION OF RICK DYKES
23                     AUGUST 13, 2018

24       I, Cindy Wiley, Certified Shorthand Reporter in and

25   for the State of Texas, hereby certify to the following:
```

1    That the witness, RICK DYKES, was duly sworn by the

2  officer and that the transcript of the oral deposition

3  is a true record of the testimony given by the witness;

4    That the deposition transcript was submitted on

5  _____ to the witness or to the attorney

6  for the witness for examination, signature and return to

7  me by _____;

8    That the amount of time used by each party at the

9  deposition is as follows:

10   MR. DAVID MULLIN - 00 HOURS:01 MINUTE
     MR. DAVID M. LANGSTON - 00 HOURS:00 MINUTES
11   MR. KEITH A. LANGLEY - 00 HOURS:36 MINUTES
     MR. DONALD H. CRAM - 00 HOURS:00 MINUTES
12   MR. MARK ANDREWS - 00 HOURS:00 MINUTES
     MR. STEPHEN P. STROHSCHEIN - 00 HOURS:07 MINUTES
13   MR. JEFF R. LASHAWAY - 00 HOURS:00 MINUTES
     MR. JOHN F. MASSOUH - 00 HOURS:00 MINUTES
14   MR. FERNANDO BUSTOS - 00 HOURS:12 MINUTES
     MR. MARK S. CARDER - 00 HOURS:00 MINUTE
15   MR. SCOTT R. WIEHLE - 00 HOURS:00 MINUTES
     MR. MARK D.G. SANDERS - 00 HOURS:00 MINUTES
16   MR. TOM KIRKENDALL - 00 HOURS:00 MINUTES
     MR. DAVID M. GUINN, JR. - 00 HOURS:00 MINUTES

17

18   That pursuant to information given to the

19 Deposition officer at the time said testimony was taken,

20 the following includes counsel for all parties of

21 record:

22   MR. DAVID MULLIN and MR. DAVID M. LANGSTON,
     Attorneys for Debtors,
23   MR. KEITH A. LANGLEY and MR. DONALD H. CRAM,
     Attorneys for FORD MOTOR CREDIT COMPANY, L.L.P.,
24   MR. MARK ANDREWS, Attorney for GM, L.L.C.,
     MR. STEPHEN P. STROHSCHEIN, Attorney for GM
25   FINANCIAL,

Page 48

```
 1       MR. JEFF R. LASHAWAY, Attorney for Aim Bank,
         MR. JOHN F. MASSOUH, Attorney for First Capital
 2       Bank,
         MR. FERNANDO BUSTOS, Attorney for Vista Bank,
 3       MR. MARK S. CARDER, Attorney for First Bank &
         Trust,
 4       MR. SCOTT R. WIEHLE, Attorney for Bart Reagor,
         MR. MARK D.G. SANDERS, Attorney for IBC Bank,
 5       MR. TOM KIRKENDALL and MR. DAVID M. GUINN, JR.,
         Attorneys for Rick Dykes
 6

 7       I further certify that I am neither counsel for,

 8  related to, nor employed by any of the parties or

 9  attorneys in the action in which this proceeding was

10  taken, and further that I am not financially or

11  otherwise interested in the outcome of the action.

12       Further certification requirements pursuant to Rule

13  203 of TRCP will be certified to after they have

14  occurred.

15       Certified to by me this 14th day of August, 2018.

16

17

18

19
                              _____
20                            Cindy Wiley, Texas CSR 8667
                              Expiration Date:  12/31/18
21                            Caprock Court Reporting, Inc.
                              Firm Registration No. 374
22                            1112 Texas, Suite 200
                              Lubbock, Texas 79401
23                            (806)795.4202

24

25
```

Page 49

1          FURTHER CERTIFICATION UNDER RULE 203 TRCP

2          The original deposition was/was not returned to the

3     deposition officer on _____;

4          If returned, the attached Changes and Signature

5     page contains any changes and the reasons therefor;

6          If returned, the original deposition was delivered

7     to Mr. Keith A. Langley, Custodial Attorney;

8          That $_____ is the deposition officer's

9     charges to Ford Motor Credit Company, L.L.C., for

10    preparing the original deposition transcript and any

11    copies of exhibits;

12         That the deposition was delivered in accordance

13    with Rule 203.3, and that a copy of this certificate was

14    served on all parties shown herein on and filed with the

15    Clerk.

16         Certified to by me this _____ day of

17    _____, 2018.

18

19

20                              _____
                                Cindy Wiley, Texas CSR 8667
21                              Expiration Date:  12/31/18
                                Caprock Court Reporting, Inc.
22                              Firm Registration No. 374
                                1112 Texas, Suite 200
23                              Lubbock, Texas 79401
                                (806)795.4202
24

25

APP 0344

# EXHIBIT B-5

APP 0345

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## LUBBOCK DIVISION

| | | |
|---|---|---|
| FIRST BANK & TRUST, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 5:18-cv-00234-C |
| | § | |
| FIRSTCAPITAL BANK OF TEXAS, N.A.,, | § | |
| BART REAGOR, RICK DYKES, SHANE | § | |
| SMITH, SHEILA MILLER, BRAD D. | § | |
| BURGESS and KENNETH L. BURGESS, | § | |
| | § | |
| *Defendants.* | § | |

### ANSWERS OF DEFENDANT RICK DYKES TO
### FIRST BANK & TRUST'S FIRST SET OF INTERROGATORIES

Rick Dykes, defendant in the above-captioned proceeding, provides these Answers to the First Bank & Trust's ("First Bank") First Set of Interrogatories in this civil action.

Respectfully submitted,

*/s/ Tom Kirkendall*

Tom Kirkendall
State Bar No. 11517300
**LAW OFFICE OF TOM KIRKENDALL**
2 Violetta Ct
The Woodlands, Texas 77381-4550
281.364.9946
888.582.0646 (fax)
bigtkirk@kir.com (email)

**ATTORNEY-IN-CHARGE FOR RICK DYKES,
DEFENDANT**

APP 0346

<u>C</u><small>ERTIFICATE OF</small> <u>S</u><small>ERVICE</small>

I hereby certify that a true and correct copy of the foregoing instrument, was served on respective counsel for the other parties to this civil action via electronic transmission on the 8th day of February, 2019:

Paul B. Lackey
paul.lackey@stinson.com
Michael P. Aigen
michael.aigen@stinson.com
Katy L. Hart
katy.hart@stinson.com
Matt Miller
matt.miller@stinson.com
Stinson Leonard Street LLP
102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219-4259

**A**TTORNEYS FOR **P**LAINTIFF **F**IRST **B**ANK **& T**RUST

Robert A. Aycock
aaycock@lubbocklawfirm.com
Joshua D. Frost
jfrost@lubbocklawfirm.com
Field, Manning, Stone, Hawthorne & Aycock, PC
2112 Indiana Avenue
Lubbock, Texas 79410-1499

**A**TTORNEYS FOR **D**EFENDANT **S**HANE **S**MITH

Joel R. Hogue
joel.hogue@sprouselaw.com
John F. Massouh
john.massouh@sprouselaw.com
Sprouse Shrader Smith PC
701 S. Taylor, Suite 500
Amarillo, Texas 79101

**A**TTORNEYS FOR **D**EFENDANT **F**IRSTCAPITAL **B**ANK OF **T**EXAS, NA

Robert N. Nebb
rnebb@carperlaw.com
Law Office of Michael H. Carper
1102 Main Street
Lubbock, Texas 79401

**ATTORNEYS FOR DEFENDANT SHEILA MILLER**

Marshall M. Searcy
marshall.searcy@kellyhart.com
Scott R. Wiehle
scott.wiehle@kellyhart.com
Kelly Hart & Hallman
201 Main Street, Suite 2500
Fort Worth, Texas 76102-3194

**ATTORNEYS FOR DEFENDANT BART REAGOR**

Jared Michael Slade
Jared.Slade@alston.com
Alston & Bird, LLP
2200 Ross Avenue, Suite 2300
Dallas, Texas 75201

**ATTORNEYS FOR DEFENDANTS
BRAD D. BURGESS AND KENNETH L. BURGESS**

  _/s/ Tom Kirkendall_
Tom Kirkendall

## ANSWERS TO INTERROGATORIES

1.      Identify and describe in detail the factual basis for denying that you breached the RD-Levelland Dykes Commercial Guaranty as alleged in the Complaint.

**Answer:** Based upon preliminary information derived from the Reagor-Dykes Auto Group ("RDAG") entities in their pending chapter 11 cases, Mr. Dykes believes that First Bank knew or should have known that Shane Smith, RDAG's former chief financial officer, was using RDAG accounts at First Bank in an illegal check-kiting scheme.

First Bank did not notify Mr. Dykes that Mr. Smith was regularly maintaining negative balances in RDAG accounts at First Bank. First Bank had a duty to notify Mr. Dykes and other RDAG representatives that Mr. Smith was regularly maintaining negative balances in RDAG accounts at First Bank so that Mr. Dykes and Reagor-Dykes representatives could take actions to stop Mr. Smith's scheme. Mr. Dykes did not learn about Mr. Smith's check-kiting scheme until after the Reagor-Dykes entities ("RDAG Ford Stores") with floor-plan financing from Ford Motor Credit Company ("Ford Credit") filed their bankruptcy cases on August 1, 2018, which triggered the collapse of Mr. Smith's check-kiting scheme.

Although forensic examination of Reagor-Dykes accounts has not yet been undertaken in connection with the pending RDAG bankruptcy cases, Mr. Dykes has reviewed preliminary information that indicates that First Bank and several other banks charged Reagor-Dykes an unusually high amount of bank charges relating to Mr. Smith's maintenance of negative balances in RDAG accounts.

For example, for the seven months from January 1, 2018 through July 31, 2018, First Bank charged RDAG entities a total of $35,378.00 in overdraft fees alone, which is almost as much as First Bank charged RDAG in interest over the same period ($42,530.94). Moreover, during the same period, First Bank charged RDAG $340,519.63 in unexplained "analysis fees."

Consequently, during the seven months of RDAG operations in 2018, RDAG paid First Bank a total of $375,897.00 (an average of $53,699.66 per month) in overdraft fees and analysis fees, an amount that dwarfs the interest ($42,530.94 or an average of $6,075.85 per month) that RDAG paid First Bank during the same time period.

First Bank did not notify Mr. Dykes and other RDAG representatives that Mr. Smith was causing RDAG to pay First Bank large overdraft and analysis fees on negative balances that Mr. Smith was maintaining in RDAG accounts at First Bank. First Bank had a duty to notify Mr. Dykes that Mr. Smith was causing RDAG to pay such exorbitant fees so that Mr. Dykes could take actions to halt such payments and expose Mr. Smith's scheme. Failure to fulfill that duty is grounds to suspend

Mr. Dykes' performance under the RD-Levelland Dykes Commercial Guaranty and to deny enforcement of the guaranty.

Likewise, if First Bank participated in Mr. Smith's scheme by profiting through the charging of exorbitant bank fees on negative balances in RDAG accounts that Mr. Smith regularly maintained at First Bank in carrying out his scheme, then such participation is grounds to suspend Mr. Dykes' performance under the RD-Levelland Dykes Commerical Guranty, to deny enforcement of the guaranty, and to setoff such amounts on any amounts due under the the RD-Levelland Dykes Commercial Guaranty.

2.  Identify and describe in detail the factual basis for denying that you breached the RD-Imports Dykes Commercial Guaranty as alleged in the Complaint.

**Answer**: See answer to Interrogatory 1, which applies to the RD-Imports Dykes Commercial Guaranty as well.

3.  Identify and describe in detail the factual basis for your affirmative defense that "First Bank's actions breached the agreements with RAM and [you] that have been modified through the course of conduct between First Bank, RAM, and [you]."

**Answer**: Based upon preliminary information derived from the RDAG chapter 11 cases, Mr. Dykes believes that First Bank knew or should have known that Shane Smith, RDAG's former chief financial officer, was using Reagor-Dykes accounts at First Bank in an illegal check-kiting scheme.

First Bank had a duty to notify Mr. Dykes that Mr. Smith was regularly maintaining negative balances in RDAG at First Bank so that Mr. Dykes could take corrective actions. First Bank did not notify Mr. Dykes that Mr. Smith was regularly maintaining negative balances in RDAG accounts at First Bank.

Mr. Smith's regular maintenance of negative balances in RAM accounts at First Bank was a breach of the loan agreements between First Bank and RAM. First Bank's allowance of such negative balances – as well as the charging of large overdraft and analysis fees – constituted a modification of the loan agreements between First Bank and RAM. Mr. Dykes did not consent to such material modification of the loan agreements. Such modification of the loan agreements without Mr. Dykes' consent constitutes grounds to suspend Mr. Dykes' performance under his guaranties to First Bank relating to such loan agreements and to deny enforcement of such guaranties.

4.     Identify and describe in detail the factual basis for your affirmative defense that "First Bank's actions improperly impaired the value of the security for the claims upon which it seeks recovery from RAM and [you]. As a result, RAM and [you] are entitled to setoff the amount of any such impairment against any of First Bank's claims against them," and state the amount of setoff to which you contend you are entitled.

**Answer**: Part of the security for First Bank's claims were the sales proceeds generated by RAM's sale of inventory that was collateral for First Bank's loan agreements with RAM. RAM used such proceeds of inventory sales to pay interest, principal and other charges to First Bank under the loan agreements.

Although forensic examination of RDAG accounts has not yet been undertaken in connection with the pending chapter 11 cases of the RDAG entities, Mr. Dykes has reviewed preliminary information that indicates that First Bank and several other banks charged Reagor-Dykes an unusually high amount of bank charges relating to Mr. Smith's maintenance of negative balances in RAM accounts.

For example, for the seven months from January 1, 2018 through July 31, 2018, First Bank charged RAM entities a total of $35,378.00 in overdraft fees alone, which is almost as much as First Bank charged RDAG in interest over the same period ($42,530.94). Moreover, during the same period, First Bank charged RDAG $340,519.63 in unexplained "analysis fees."

Consequently, during the seven months of RDAG operations in 2018, RDAG paid First Bank a total of $375,897.00 (an average of $53,699.66 per month) in overdraft fees and analysis fees, an amount that dwarfs the interest ($42,530.94 or an average of $6,075.85 per month) that RDAG paid First Bank during the same time period.

First Bank did not notify Mr. Dykes and other Reagor-Dykes representatives that Mr. Smith was causing RAM or RDAG to pay First Bank large overdraft and analysis fees on negative balances that Mr. Smith was maintaining in RDAG accounts at First Bank. First Bank had a duty to notify Mr. Dykes that Mr. Smith was causing RAM or RDAG to pay such exorbitant fees so that Mr. Dykes could take actions to halt such payments and expose Mr. Smith's scheme. Failure to fulfill that duty impaired RAM's security for its loans with First Bank by reducing the funds available to RAM and RDAG to pay principal and interest on such loans.

Due to limitations on access to financial information of RAM and RDAG during the pendency of their chapter 11 cases to date, Mr. Dykes does not have complete information regarding the amount of the setoff that he is entitled to from the above-described impairment of First Bank's security. However, based on the information from 2018 set forth above, Mr. Dykes is entitled to a credit in the

amount of at least $350,000.00 based on excessive First Bank charges resulting from Mr. Smith's maintenance of negative balances in RDAG accounts at First Bank. Mr. Dykes believes that forensic examination of bank records for previous years will reveal similar impairment to First Bank's security for which Mr. Dykes is entitled to setoff against amounts owing under his guaranties.

5.    Identify and describe in detail the factual basis for your affirmative defense that "First Bank engaged in a course of conduct with Defendant Shane Smith that damaged RAM's ability to pay its debt to First Bank, which damaged [you]," and state the amount of damages that you contend you have suffered.

**Answer**: See answers to interrogatories 1 and 4 above.

6.    Identify and describe in detail the factual basis for your affirmative defense that "First Bank has failed to mitigate the damages that it asserts against Mr. Dykes."

**Answer**: See answers to interrogatories 1 and 4 above. Moreover, First Bank has refused to allow RAM to sell inventory that is subject to First Bank's security interests. The proceeds of such inventory sales would have been applied to reduce First Bank's claims that it asserts against RAM and Mr. Dykes.

7.    Identify each and every occasion between July 1, 2018 and the present that a communication occurred between You (or any employee, representative, or agent of You) and FirstCapital (or any Affiliate, employee, representative, or agent of FirstCapital) wherein RAM's financial condition (or that of any of its Affiliates), the FirstCapital Account or any checks related thereto, the First Bank Account or any checks related thereto, potential bankruptcy, Ford Motor Credit's intention to file a lawsuit, or potential financial assistance from FirstCapital to RAM (or any of its Affiliates) was discussed. Include in Your answer the date, time and location the communication was made, the form of the communication, the total verbatim communication (if that is not possible, the state the detailed substance of the communication), and the identity of all persons present when such communication was made.

**Answer**: Mr. Dykes objects to this interrogatory to the extent that it requests information regarding confidential and privileged settlement negotiations between Mr. Dykes and FirstCapital during the pendency of the RDAG reorganization cases, including RAM. Subject to the foregoing objection, Mr. Dykes provides the following answer.

On Monday, July 30, 2018, as a result of Ford Motor Credit Cmopany's rejection of a settlement proposal that Mr. Dykes made that morning regarding Ford Credit's decision to terminate its floor-plan financing facility with the RDAG Ford Stores, Mr. Dykes met with David Langston at Mr. Langston's law office in Lubbock to start preparing the bankruptcy cases for each of the RDAG Ford Stores. Mr. Langston, Tim Pridmore, Brad Odell (Mr. Langston's partner), Bart Reagor, and Mr. Dykes were present at the meeting.

Among numerous other topics, the participants discussed that it would not be necessary to place RAM into bankruptcy at that time because Ford Credit did not provide floor-plan financing for RAM. FirstCapital and First Bank provided most of the floor-plan financing for RAM.

Messrs. Dykes and Reagor believed that this was important because RAM was profitable and its profits could be used to defray some of the administrative expenses of the bankruptcy cases of RDAG's Ford Stores. The participants in the meeting all agreed that it would be a good idea for Mr. Langston to call Brad Burgess, FirstCapital's chief executive officer, to set up a meeting later that evening for the purpose of confirming that FirstCapital would continue to provide floor-plan financing for RAM. Mr. Langston called Mr. Burgess and arranged a meeting at FirstCapital's offices for that evening.

That evening, Mr. Langston, Mr. Pridmore and Mr. Dykes met with FirstCapital representatives Brad Burgess, Tracy Bacon and Mike Cannon (by telephone) at FirstCapital's offices. Mr. Langston disclosed that the RDAG Ford Stores were probably going to have to file bankruptcy in the next day or two because of Ford Credit's termination of floor-plan financing. Mr. Langston emphasized that continuation of FirstCaptial's floor-plan financing to RAM was key to RDAG because RAM's continued operations would allow RDAG to retain key personnel and generate profits that could be used in the bankruptcy cases of RDAG's Ford Stores.The FirstCapital representatives replied that they would review the situation, discuss it internally, and would provide an answer to Mr. Langston and Mr. Dykes at a meeting on Tuesday morning.

First thing in the morning on Tuesday, July 31, 2018, Mr. Dykes returned to FirstCapital for the meeting. Mr. Dykes believes the participants in the meeting were the same as the meeting the evening before, except Mr. Cannon did not participate. There may have been other FirstCapital representatives involved in this meeting.

Upon arriving at the meeting, Mr. Dykes learned that FirstCapital had frozen all of his personal bank accounts and seized shares of FirstCapital stock that Mr. Dykes owned and had left in the safe-keeping of FirstCapital. Mr. Dykes immediately turned in his letter of resignation as an advisory board member of FirstCapital. The FirstCapital representatives advised Mr. Dykes and the others that the bank had not yet decided whether it would provide floor-plan financing to RAM going forward. The meeting lasted about 30 minutes.

After Mr. Langston's firm commenced the chapter 11 cases of the RDAG Ford Stores on August 1, 2018, Mr. Dykes entered into a series of three pledge agreements with FirstCapital from August 2-7, 2018 in which he pledged an additional $7.5 million in additional collateral to FirstCapital, comprised of approximately $2.75 million in cash and $4.7 million in FirstCapital stock

APP 0353

(260,302 shares). In return, FirstCapital agreed to provide an additional $2.1 million in floor-plan financing for RAM in addition to the approximate $9.5 million that it had advanced under its existing floor-plan financing facility with RAM.

FirstCapital has not advanced RAM any of that additional $2.1 million in floor-plan financing since making the foregoing commitment. FirstCapital has also not released any of the $7.5 million in additional collateral that Mr. Dykes pledged to First Capital.

8.      Identify the date upon which you first became aware that any Reagor-Dykes entity was in violation of any agreement with Ford Credit.  Include in your answer how you were made aware, by whom, where you were when you were made aware, and describe any related communications.

**Answer**: Mr. Dykes was primarily an investor in RDAG beginning in 2006 (the dealerships started in 2003) and did not have a day-to-day management role. Accordingly, Mr. Dykes did not have access generally to information relating to violations by any RDAG entity of its agreements with Ford Credit.

In March, 2017, Mr. Dykes became aware of problems that arose in connection with Ford Credit's quarterly audit of RDAG. Mr. Dykes presumes, but is not certain, that such problems related primarily to out-of-trust sales of inventory in violation of RDAG's loan agreements with Ford Credit. Those problems led to Mr. Dykes and RDAG's other co-owner, Bart Reagor, injecting substantial capital into the company to pay Ford Credit what Mr. Dykes understood to be approximately $25 million in out-of-trust sales.

A substantial portion of the foregoing $25 million deficit at the time was paid by simply having the various units of RDAG catch up on funding of inventory sales. However, Mr. Dykes and Mr. Reagor invested the following amounts in RDAG:

- $3 million that had been set aside in money market accounts from proceeds of reinsurance (Zurich);

- $2 million from a loan from Zurich Insurance that Messrs. Dykes and Reagor guaranteed;

- $5 million from a capital loan from Ford Credit that Messrs. Dykes and Reagor guaranteed;

- $1 million from a life insurance policy on Mr. Reagor;

- $1.5 million from a Ford Credit CMA (savings) accounts, and

- $1-2 million from personal savings accounts of Messrs. Dykes and Reagor.

After investing and helping arrange the foregoing additional capital for RDAG in March, 2017, Mr. Dykes assisted management in implementing a plan to obtain additional capital to meet RDAG's long-term capital requirements.

In that regard, Messrs. Dykes and Reagor arranged a consolidation and refinancing loan with IBC Bank secured by the real estate on which the RDAG dealerships and offices were located.

The IBC financing was comprised of two loans -- (i) a $25 million loan that consolidated the debt secured by the real estate on which the RDAG dealerships and offices were located, and (ii) a $10 million loan.

Messrs. Dykes and Reagor personally guaranteed both of the IBC loans. The IBC loans were made to D&R Acquisitions, LLC, an entity owned by Messrs. Dykes and Reagor that owns the real estate on which the Reagor-Dykes dealerships and offices are located.

The $10 million IBC loan was borrowed in two $5 million components. The first $5 million was borrowed on July 14, 2017 and the second $5 million was borrowed on February 27, 2018. The $25 million consolidation loan also closed and was funded on February 27, 2018.

From the proceeds of the first $5 million component borrowed on July 14, 2017, $3 million was immediately invested in Reagor-Dykes as working capital and $2 million was paid to Messrs. Dykes and Reagor ($1 million each). Mr. Dykes deposited the $1 million he received in a money market account to use for possible future capital needs of RDAG.

From the proceeds of the second $5 million component borrowed on February 27, 2018, all $5 million was immediately invested in RDAG.

At the time of the closing of the second $5 million loan and the $25 million loan on February 27, 2018, Shane Smith, chief financial officer of RDAG, assured Messrs. Dykes and Reagor that RDAG's capital requirements were resolved at least through 2018 and likely much longer.

Moreover, Mr. Smith assured Mr. Dykes and Mr. Reagor at the same time and at various times afterward that he was holding the $5 million from the second component of the $10 million IBC loan in a "rainy day" money market account at IBC Bank for future RDAG capital needs.

After Ford Credit terminated its floor-plan financing for the RDAG Ford Stores on July 28, 2018, Mr. Dykes learned for the first time that Mr. Smith's representations regarding the $5 million rainy day account were false. Mr. Smith used the $5 million as working capital for RDAG in March 2018 immediately after the February 27, 2018 closing of the second component of the IBC Bank $10 million loan.

After the above-described capitalization of RDAG, Mr. Dykes did not know of any other problems with regard to Ford Credit until Thursday July 26, 2018. That day, Mr. Dykes and his wife were at their lake house about an hour from Lubbock. Mr. Smith contacted Mr. Dykes by telephone in the mid-afternoon to inform him that Ford Credit had undertaken a surprise audit of the RDAG Ford Stores and that the audit was not going well. As RDAG's chief financial officer, Mr. Smith was responsible for all aspects of assisting Ford Credit in connection with its periodic audits of the RDAG Ford Stores.

Mr. Dykes did not know about the surprise audit until receiving the above-described telephone call from Mr. Smith. Mr. Dykes was surprised by the audit because Ford Credit had recently completed one of its quarterly audits on the RDAG Ford Stores less than a month before at the end of June, 2018. Mr. Dykes' understanding was that Ford Credit found no problems with that audit and had been complimentary of RDAG's cooperation with the audit.

In the phone call on Thursday, Mr. Smith indicated to Mr. Dykes that the main problem was that many of the people on his financial staff were on vacation and unavailable to help with the audit. He did not indicate any other problems with the audit at that time. Mr. Dykes told Mr. Smith that he would return to Lubbock the next morning.

On Friday July 27, 2018, Mr. Dykes returned to Lubbock and went directly to RDAG's downtown office. It was obvious to Mr. Dykes that the audit was going poorly, but Mr. Dykes still had not received any details from Mr. Smith on the nature of the problems with the audit.

Gary Byrd of Ford Credit was directing Ford Credit's audit in RDAG's offices when Mr. Dykes arrived at the offices. Mr. Byrd was working out of Mr. Smith's office. Mr. Dykes spoke briefly to Mr. Byrd on Friday in greeting him, but did not talk to him about the problems with the audit. Mr. Smith reiterated to Mr. Dykes on Friday that the main problems with the audit were resulting from his inability to respond because of the number of his financial staff that were on vacation.

After several hours at the office, Mr. Dykes left the RDAG offices and tended to his other business interests before returning home that evening.

On Saturday July 28, 2018, Mr. Dykes returned to RDAG's downtown office in the morning. Mr. Byrd was still working out of Mr. Smith's office and Mr. Dykes offered him the use of his RDAG office, which Mr. Byrd accepted. He began working at the conference table in Mr. Dykes' office. At this time, Mr. Smith had still not advised Mr. Dykes of the nature of the problems with the audit.

While Mr. Byrd was working in Mr. Dykes' office, Mr. Byrd stated to Mr. Dykes: "Y'all have some big problems." Mr. Byrd did not go into specifics initially, but indicated to Mr. Dykes for the first time that the RDAG Ford Stores were seriously out of trust with regard to sales of inventory that secured Ford Credit's floor-plan financing.

Later that morning, Mr. Byrd informed Mr. Dykes that one of the "red flags" that alerted Ford Credit that there were problems at RDAG was that RDAG was "loading" (i.e., reporting) a disproportionately large number of inventory sales in the week immediately preceding each Ford Credit quarterly audit of RDAG's Ford stores.

Mr. Dykes was surprised by Mr. Byrd's statement and asked: "How long has this (i.e., the reporting of disproportionately large inventory sales) going on?"

"For quite awhile," replied Mr. Byrd.

"Why weren't Bart (Reagor) and I notified about this?" Mr. Dykes asked.

Mr. Byrd looked at Mr. Dykes with a blank expression and did not immediately respond to the question. After a pause, Mr. Byrd replied: "Well, I did tell Shane."

Mr. Dykes shook his head and did not say anything in response to the futility of Mr. Byrd notifying the person at RDAG who was responsible for creating the red flags that alerted Ford Credit of problems at RDAG.

Late that afternoon (Saturday, July 28th), Mr. Dykes was in Mr. Smith's office while he was the phone with Mr. Reagor, who was returning to Lubbock from a vacation. Mr. Smith was explaining the bad audit to Mr. Reagor, but Mr. Smith still was not taking any responsibility for the problems that were arising in the audit.

At this time, Pepper Martin, one of Mr. Smith's assistants on the RDAG financial staff, came into the office.

"Pepper, what is going on?" Mr. Dykes asked Ms. Martin while Mr. Smith was still on the phone.

Ms. Martin then informed Mr. Dykes for the first time that certain vehicles in RDAG's inventory had been – as she put it – "double-floored" –  that is, the same vehicle had been pledged as collateral more than once in order to receive multiple advances under Ford Credit's floor-plan financing facility.

Mr. Dykes was shocked. "Why would anybody do that?" he asked Ms. Martin.

"I knew you didn't know about this," Ms. Martin replied as she began to cry and become quite emotional.

At that point, Mr. Dykes left the room.

That evening, Mr. Byrd called Mr. Dykes after a telephone call between Mr. Byrd and Mr. Reagor. Mr. Byrd was upset and told Mr. Dykes that Mr. Reagor had threatened him physically. Mr. Dykes tried to calm Mr. Byrd down by assuring him that Mr. Reagor did not mean what he had said and that he was simply upset over the reports of an ongoing bad audit that he knew little about. Mr. Byrd replied: "No one threatens me."

Mr. Reagor returned to Lubbock that night and he immediately came to RDAG's office to meet with Mr. Smith and Mr. Dykes at 11:30 p.m.

During that meeting, for the first time, Mr. Smith became extremely apologetic and said "I am sorry" multiple times to Messrs. Dykes and Reagor. However, he still did not elaborate at that time as to the nature of the problems in the audit. He then left for the night.

After Mr. Smith left, Messrs. Dykes and Reagor met with Pepper Martin and she reiterated what she had told Mr. Dykes earlier – i.e., that RDAG had pledged vehicles multiple times to obtain multiple advances on the same vehicles under the Ford Credit floor-plan financing facility.

On Sunday, July 29, 2018, Mr. Dykes worked overnight on a proposed settlement agreement with Ford Credit. The proposal called for a large immediate cash payment ($5 million) followed by substantial cash payments in the near term.

On Monday morning, July 30, 2018, Tim Pridmore, RDAG's lawyer, presented Mr. Dykes' settlement proposal to Ford Credit, which rejected it and refused to make a counter-offer. As a result of Ford Credit's rejection of Mr. Dykes' settlement proposal, Mr. Dykes met at David Langston's office to start preparing the bankruptcy cases. Mr. Langston, Mr. Pridmore, Brad Odell (Mr. Langston's partner), and Mr. Reagor were present at the meeting.

On the afternoon of Monday, July 30, 2018, Mr. Smith and a group of about a dozen RDAG employees met in RDAG's 5th floor conference room. Messrs. Dykes and Reagor attended. Mr. Smith emotionally admitted to the group that he was responsible for the problems that Ford Credit had uncovered in the audit of the RDAG Ford Stores and that neither Messrs. Dykes nor Reagor knew anything about the nature of the problems. Mr. Smith later signed and delivered an affidavit to one of RDAG's lawyers, Dan Hurley, that affirmed the statements that he made during the meeting. Mr. Dykes does not have a copy of Mr. Smith's affidavit, but Mr. Dykes has reviewed the affidavit at Mr. Hurley's office.

On Tuesday, July 31, 2018, Mr. Dykes learned that Ford Credit had filed a lawsuit in federal district court against the RDAG Ford Stores, Mr. Reagor, and Mr. Dykes seeking recovery of over $40 million in alleged damages and a court order to obtain possession of Ford Credit's collateral.

The following day (August 1, 2018), Mr. Langston and his firm filed the bankruptcy cases for RDAG's Ford Stores. RDAG also formally terminated Mr. Smith's employment on that date.

On August 3, 2018, Mr. Dykes met with Tim Conner, one of RDAG's accountants, who explained to Mr. Dykes for the first time that Mr. Smith had been rotating negative balances at various banks – sometimes dozens of times a month – to generate short term credit for RDAG. Mr. Conner informed Mr. Dykes that Mr. Smith's actions amounted to check-kiting, which is a concept that Mr. Dykes did not understand prior to his meeting with Mr. Conner.

Finally, during the RDAG reorganization cases, Ford Credit interfered with RAM's commitment from First Capital to provide an additional $2.1 million in floor plan financing that proximately caused damages to RAM, RDAG, and Mr. Dykes by depriving them of a source of funds to use in the reorganization cases of the RDAG entities.

9.       Identify the date upon which you first became aware that any Reagor-Dykes entity was in violation of any agreement with any of its lenders.  Include in your answer how you were made aware, by whom, where you were when you were made aware, and describe any related communications.

**Answer**: See answer to interrogatories 8 above. At various times in August, 2018 after the commencement of the reorganization cases of the RDAG Stores, Mr. Dykes became aware that all RDAG entities were in violation of loan agreements with their lenders.

10.     Identify the date upon which you first became aware that any Reagor-Dykes entity was kiting checks.  Include in your answer how you were made aware, by whom, where you were when you were made aware, and describe any related communications.

**Answer**: On August 3, 2018, Mr. Dykes met with Tim Conner, one of RDAG's accountants, who explained to Mr. Dykes for the first time that Mr. Smith had been rotating negative balances at various banks – sometimes dozens of times a month – to generate short term credit for RDAG. Mr. Conner informed Mr. Dykes that Mr. Smith's actions amounted to check-kiting, which is a concept that Mr. Dykes did not understand prior to his meeting with Mr. Conner.

11.     Identify and describe any wrongful acts you allege were taken by First Bank. Include in your answer the identity of any persons involved in such acts, when and where such acts were taken, identify any witnesses to such acts, and describe any related communications.

**Answer**: See answers to interrogatories 1 and 4 above. Moreover, First Bank has also refused to allow RAM to sell inventory that is subject to First Bank's security interests. The net proceeds of such inventory sales would have been applied to reduce First Bank's claims that it asserts against RAM and Mr. Dykes. Forensic examination of RDAG accounting records may reveal additional wrongful acts.

12.     Identify and describe any wrongful acts you allege were taken by FirstCapital. Include in your answer the identity of any persons involved in such acts, when and where such acts were taken, identify any witnesses to such acts, and describe any related communications.

**Answer**: See answer to interrogatory 7 above. Moreover, FirstCapital has refused to allow RAM to sell inventory that is subject to FirstCapital's security interests. The net proceeds of such inventory sales would have been applied to reduce FirstCapital's claims that it asserts against RAM and Mr. Dykes. Moreover, FirstCapital has disclosed to Ford Credit without Mr. Dyke's authorization confidential personal banking information in violation of applicable bank privacy laws. Finally, forensic examination of RDAG accounting records may reveal additional wrongful acts.

13.     Identify and describe any wrongful acts you allege were taken by any lender to any Reagor-Dykes entity.  Include in your answer the identity of any persons involved in such acts, when and where such acts were taken, identify any witnesses to such acts, and describe any related communications.

**Answer**: See answers to interrogatories 1,4, 7 and 8 above. Forensic examination of RDAG accounting records may reveal additional wrongful acts.

THE STATE OF TEXAS      §
                        §
COUNTY OF LUBBOCK  §

## **VERIFICATION**

BEFORE ME, the undersigned notary, on this day personally appeared Franklin Andrew "Rick" Dykes, the affiant, a person whose identity is known to me. After I administered an oath, affiant testified as follows:

"My name is Franklin Andrew "Rick" Dykes. I have read the foregoing Answers to First Bank's First Set of Interrogatories. The facts stated in it are within my personal knowledge and are true and correct."

_____
Franklin Andrew "Rick" Dykes

SWORN TO and SUBSCRIBED before me by Franklin Andrew "Rick" Dykes on February ⧸, 2019.

CALLIE ROCHA
Notary Public, State of Texas
Comm. Expires 06-20-2021
Notary ID 126462068

_____
Notary Public in and for
the State of Texas

# EXHIBIT B-6

APP 0362

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | | |
|---|---|---|
| **FIRST BANK & TRUST,** | § | |
| **Plaintiff,** | § | |
| | § | |
| | § | |
| **v.** | § | **Civil Action No.: 5:18-cv-00234-C** |
| | § | |
| **REAGOR AUTO MALL, LTD. d/b/a** | § | |
| **REAGOR-DYKES OF LEVELLAND, AND** | § | |
| **d/b/a REAGOR-DYKES IMPORTS,** | § | |
| **FIRSTCAPITAL BANK OF TEXAS, N.A.,** | § | |
| **BART REAGOR, RICK DYKES, SHANE** | § | |
| **SMITH, SHEILA MILLER, BRAD D.** | § | |
| **BURGESS, and KENNETH L. BURGESS** | § | |
| **Defendants.** | § | |

### DEFENDANT BART REAGOR'S RESPONSES AND OBJECTIONS TO PLAINTIFF FIRSTBANK & TRUST'S FIRST SET OF INTERROGATORIES

TO:    Plaintiff, First Bank & Trust, by and through its attorney of record, Paul B. Lackey, Michael P. Aigen and Katy L. Hart, STINSON LEONARD STREET LLP, 3102 Oak Lawn Avenue, Suite 777, Dallas, Texas 75219-4259.

Pursuant to Rules 33 of the Federal Rules of Civil Procedure, Defendant, Bart Reagor ("Reagor"), responds to Plaintiff's First Set of Interrogatories ("Interrogatories") as follows:

### RESERVATION OF RIGHTS

Reagor's objections and responses are not admissions that any discovery request made is relevant, admissible, or proportional to the needs of the case. Reagor's responses are made without prejudice to his right to change or supplement his responses and objections, and to introduce at trial additional evidence as warranted by the development of facts through ongoing investigation. In providing these Responses, Reagor preserves all objections as to competency, relevancy, materiality, authenticity and admissibility of any information or documents, including but not limited to all documents and/or information identified herein; all rights to object on any ground to the use of any documents and/or information identified herein in any subsequent proceedings. APP 0363

Bart Reagor's Responses and Objections
to FBT's First Set of Interrogatories
2828143

Moreover, the allegations in the Complaint concern parties that are (i) entities that may be filing chapter 11 petitions and have been involved in the chapter 11 cases of related entities (the "Debtors") (Case Nos. 18-50214;18-50214, 18-50215, 18- 50216, 18-50217, 18-50218 and 18-50219, collectively the "Bankruptcy Cases") in the United States Bankruptcy Court for the Northern District of Texas, Lubbock (the "Bankruptcy Court"), and (ii) are individual owners integrally involved in the reorganization efforts of the Debtors and have been able to spend insufficient time aggregating information relating to this answer and affirmative defenses and if available counterclaims.  The financial situation of the Debtors and Reagor is most complicated.  Reagor has been working with the Debtors to aid in unraveling the financial difficulties that befell the Debtors. The Debtors have employed an independent Chief Restructuring Officer, BlackBriar Advisors, LLC ("BlackBriar" or "CRO").   Reagor has been unable to undertake the necessary analysis of information that has to be obtained through and with approval of the CRO, who has been solely focused upon the reorganization efforts of the Debtors.  In effect, Reagor is in the position of not having access to much of the companies he owns, as they cannot distract the CRO from the duties Reagor voluntarily referred to the CRO through pleadings filed with the Bankruptcy Court

**SUBJECT TO AND WITHOUT WAIVING THE FOREGOING RESERVATION OF RIGHTS, REAGOR FURTHER OBJECTS AND RESPONDS TO THE INTERROGATORIES AS FOLLOWS:**

APP 0364

Bart Reagor's Responses and Objections
to FBT's First Set of Interrogatories
2828143

# I.

## <u>OBJECTIONS AND RESPONSES TO DEFINITIONS AND INSTRUCTIONS</u>

Reagor objects to Definitions 3-5, 11-12, 15, 17-18, 20, and 36 on the following grounds: 1) the definitions are vague and ambiguous because Reagor has no way of knowing who might constitute an agent, employee, representative, etc. for persons or entities with whom he is not involved or related; 2) the definitions are not reasonably calculated to lead to the discovery of admissible evidence because they necessarily include persons acting on the behalf of those persons and entities specifically identified that have absolutely no involvement in the subject matter of this dispute; and 3) the definitions are unduly burdensome for the reasons set forth above and would needlessly require Reagor to investigate who might fall within the purview of the definitions and search for documents from persons who almost certainly do not possess discoverable material.

Reagor objects to Definition 9 on the following grounds: 1) the definition is overly broad and includes not only Defendant Bart Reagor individually, but a laundry list of potential persons and entities; and 2) the definitions necessarily encompass attorneys and accountants for Reagor and would impermissibly require the inclusion of obviously privileged materials, much of which is exempt from production or logging pursuant to the Federal Rules of Civil Procedure.

# II.

## <u>OBJECTIONS AND ANSWERS TO INTERROGATORIES</u>

**<u>Interrogatory No.1:</u>**     Identify and describe in detail the factual basis for denying that you breached the RD-Levelland Reagor Commercial Guaranty as alleged in the Complaint.

**<u>Answer:</u> Reagor objects to this integratory as premature.  Discovery has only just commenced in this action.  As such, it is impossible for Reagor to provide, or even have complete knowledge of, the requested information.  Reagor additionally objects to the extent**

APP 0365

Bart Reagor's Responses and Objections
to FBT's First Set of Interrogatories
2828143

the interrogatory seeks the disclosure of information or communications protected by the attorney-client privilege, the work product doctrine, and/or any other applicable constitutional, statutory, or common law privilege.

Subject to these objections, Reagor states that he will supplement his answer as discovery progresses.

**Interrogatory No.2:**        Identify and describe in detail the factual basis for denying that you breached the RD-Imports Reagor Commercial Guaranty as alleged in the Complaint.

**Answer: Reagor objects to this integratory as premature.  Discovery has only just commenced in this action.  As such, it is impossible for Reagor to provide, or even have complete knowledge of, the requested information.  Reagor additionally objects to the extent the interrogatory seeks the disclosure of information or communications protected by the attorney-client privilege, the work product doctrine, and/or any other applicable constitutional, statutory, or common law privilege.**

Subject to these objections, Reagor states that he will supplement his answer as discovery progresses.

**Interrogatory No.3:**        Identify and describe in detail the factual basis for your affirmative defense that "Plaintiff's actions breached the agreements with RAM and [you] that have been modified through the course of conduct between First Bank, RAM and [you].

**Answer: Reagor objects to this integratory as premature.  Discovery has only just commenced in this action.  As such, it is impossible for Reagor to provide, or even have complete knowledge of, the requested information.  Reagor is in the process of continuing to evaluate his affirmative defenses.  Subject to the forgoing objection, Reagor's affirmative**

Bart Reagor's Responses and Objections
to FBT's First Set of Interrogatories
2828143

defense concerns Plaintiff's responsibility for its own lack of good faith or failure to exercise ordinary care, or limit the measure of damages for such a lack or failure. Tex. Bus. & Com. Code Ann. § 4.103(a) (West).   The factual bases for the affirmative defenses will be supplemented as the factual investigation continues and consistent with the Federal Rules of Civil Procedure.

**Interrogatory No.4:**        Identify and describe in detail the factual basis for your affirmative defense that "Plaintiff's actions improperly impaired the value of the security for the claims upon which it seeks recovery from RAM and [you].  As a result, RAM and [you] are entitled to setoff the amount of any such impairment against any of First Bank's claims against them," and state the amount of setoff to which you contend you are entitled.

**Answer: Reagor objects to this integratory as premature.   Discovery has only just commenced in this action.   As such, it is impossible for Reagor to provide, or even have complete knowledge of, the requested information.   Reagor is in the process of continuing to evaluate his affirmative defenses.   Subject to the forgoing objection, Reagor's affirmative defense concerns Plaintiff's responsibility for its own lack of good faith or failure to exercise ordinary care, or limit the measure of damages for such a lack or failure. Tex. Bus. & Com. Code Ann. § 4.103(a) (West).   The factual bases for the affirmative defenses will be supplemented as the factual investigation continues and consistent with the Federal Rules of Civil Procedure.**

**Interrogatory No.5:**        Identify and describe in detail the factual basis for your affirmative defense that "Plaintiff engaged in a course of conduct with Defendant Shane Smith that

APP 0367

Bart Reagor's Responses and Objections
to FBT's First Set of Interrogatories
2828143

damaged RAM's ability to pay its debt to First Bank, which damaged [you]," and state the amount of damages that you contend you have suffered.

**Answer: Reagor objects to this integratory as premature.   Discovery has only just commenced in this action.   As such, it is impossible for Reagor to provide, or even have complete knowledge of, the requested information.   Reagor is in the process of continuing to evaluate his affirmative defenses.   Subject to the forgoing objection, Reagor's affirmative defense concerns Plaintiff's responsibility for its own lack of good faith or failure to exercise ordinary care, or limit the measure of damages for such a lack or failure. Tex. Bus. & Com. Code Ann. § 4.103(a) (West).   The factual bases for the affirmative defenses will be supplemented as the factual investigation continues and consistent with the Federal Rules of Civil Procedure.**

**Interrogatory No.6:**        Identify and describe in detail the factual basis for your affirmative defense that "Plaintiff has failed to mitigate the damages that it asserts against the Defendant."

**Answer: Reagor objects to this integratory as premature.   Discovery has only just commenced in this action.   As such, it is impossible for Reagor to provide, or even have complete knowledge of, the requested information.   Reagor is in the process of continuing to evaluate his affirmative defenses.   Subject to the forgoing objection, Reagor's affirmative defense concerns Plaintiff's responsibility for its own lack of good faith or failure to exercise ordinary care, or limit the measure of damages for such a lack or failure. Tex. Bus. & Com. Code Ann. § 4.103(a) (West).   The factual bases for the affirmative defenses will be supplemented as the factual investigation continues and consistent with the Federal Rules of Civil Procedure.**

Bart Reagor's Responses and Objections
to FBT's First Set of Interrogatories
2828143

**Interrogatory No.7:**   Identify and describe in detail the factual basis for your affirmative defense that "Plaintiff's claims are barred by the doctrine of unclean hands."

**Answer: Reagor objects to this integratory as premature.   Discovery has only just commenced in this action.   As such, it is impossible for Reagor to provide, or even have complete knowledge of, the requested information.   Reagor is in the process of continuing to evaluate his affirmative defenses.   Subject to the forgoing objection, Reagor's affirmative defense concerns Plaintiff's responsibility for its own lack of good faith or failure to exercise ordinary care, or limit the measure of damages for such a lack or failure. Tex. Bus. & Com. Code Ann. § 4.103(a) (West).   The factual bases for the affirmative defenses will be supplemented as the factual investigation continues and consistent with the Federal Rules of Civil Procedure.**

**Interrogatory No.8:**   Identify and describe in detail the factual basis for your affirmative defense that "Plaintiff's claims are barred in whole or in part by the doctrines of res judicata, collateral estoppel, equitable estoppel, waiver and laches."

**Answer: Reagor objects to this integratory as premature.   Discovery has only just commenced in this action.   As such, it is impossible for Reagor to provide, or even have complete knowledge of, the requested information.   Reagor is in the process of continuing to evaluate his affirmative defenses.   Subject to the forgoing objection, Reagor's affirmative defense concerns Plaintiff's responsibility for its own lack of good faith or failure to exercise ordinary care, or limit the measure of damages for such a lack or failure. Tex. Bus. & Com. Code Ann. § 4.103(a) (West).   The factual bases for the affirmative defenses will be supplemented as the factual investigation continues and consistent with the Federal Rules of Civil Procedure.**

APP 0369

Bart Reagor's Responses and Objections
to FBT's First Set of Interrogatories
2828143

**Interrogatory No.9:**      Identify and describe in detail the factual basis for your affirmative defense that "Plaintiff's claims are barred in whole or in part by the doctrines of setoff and/or recoupment," and state the amount of setoff and/or recoupment to which you contend to be entitled.

**Answer: Reagor objects to this integratory as premature.  Discovery has only just commenced in this action.  As such, it is impossible for Reagor to provide, or even have complete knowledge of, the requested information.  Reagor is in the process of continuing to evaluate his affirmative defenses.  Subject to the forgoing objection, Reagor's affirmative defense concerns Plaintiff's responsibility for its own lack of good faith or failure to exercise ordinary care, or limit the measure of damages for such a lack or failure. Tex. Bus. & Com. Code Ann. § 4.103(a) (West).   The factual bases for the affirmative defenses will be supplemented as the factual investigation continues and consistent with the Federal Rules of Civil Procedure.**

**Interrogatory No.10:**      Identify and describe in detail the factual basis for your affirmative defense that "Plaintiff's claims are barred, in whole or in party, by the applicable statute of limitations and/or contractual agreement between the parties."

**Answer: Reagor objects to this integratory as premature.  Discovery has only just commenced in this action.  As such, it is impossible for Reagor to provide, or even have complete knowledge of, the requested information.  Reagor additionally objects to the extent the interrogatory seeks the disclosure of information or communications protected by the attorney-client privilege, the work product doctrine, and/or any other applicable constitutional, statutory, or common law privilege.**

APP 0370

Bart Reagor's Responses and Objections
to FBT's First Set of Interrogatories
2828143

**Subject to these objections, Reagor states that he will supplement his answer as discovery progresses.**

**Interrogatory No.11:**     Identify and describe in detail the factual basis for your affirmative defense that "Plaintiff's claims are barred by the doctrine of accord and satisfaction."

**Answer: Reagor objects to this integratory as premature.   Discovery has only just commenced in this action.   As such, it is impossible for Reagor to provide, or even have complete knowledge of, the requested information.   Reagor additionally objects to the extent the interrogatory seeks the disclosure of information or communications protected by the attorney-client privilege, the work product doctrine, and/or any other applicable constitutional, statutory, or common law privilege.**

**Subject to these objections, Reagor states that he will supplement his answer as discovery progresses. The factual bases for the affirmative defenses will be supplemented as the factual investigation continues and consistent with the Federal Rules of Civil Procedure.**

**Interrogatory No.12:**     Admit that RAM did not pay all outstanding principal and all accrued unpaid interest on the RD-Imports Promissory Note by October 1, 2018.

**Answer: Reagor objects to this interrogatory as duplicative of Plaintiff's First Set of Requests for Admission No. 12.   Reagor incorporates his response and objections to Request for Admission No. 12 herein.**

**Interrogatory No.13:**     Identify the date upon which you first became aware that any Reagor-Dykes entity was in violation of any agreement with Ford Credit.   Include in your

APP 0371

Bart Reagor's Responses and Objections
to FBT's First Set of Interrogatories
2828143

answer how you were made aware, by whom, where you were when you were made aware, and describe any related communications.

**Answer:**   **Reagor objects to this interrogatory as seeking a legal conclusion.   Reagor additionally objects to the extent this interrogatory seeks the disclosure of information or communications protected by the attorney-client privilege, the work product doctrine, and/or any other applicable constitutional, statutory, or common law privilege.**

**Subject to and without waiving these objections, on or about July 26, 2018, Ford Credit conducted an emergency on-site review and reported irregularities in the financial records of the Reagor-Dykes dealerships.   On the same day, Shane Smith, former chief financial officer of the Reagor-Dykes dealerships, notified Reagor and Dykes that problems had emerged in regard to Ford Credit's emergency review.   On July 27, 2018, Ford Credit declared defaults under its agreements with the Reagor-Dykes dealerships, Reagor and Dykes, terminated providing any further financing to the Reagor-Dykes Auto Group, and—on July 31—filed a civil action against Reagor-Dykes Amarillo, L.P., Reagor-Dykes Auto Company, L.P., Reagor-Dykes II, L.L.C., Reagor-Dykes Floydada, L.P., Reagor-Dykes Imports, L.P., Reagor Auto Mall I, L.L.C., Reagor-Dykes Motors, L.P., Reagor-Dykes Plainview, L.P., Reagor-Dykes III, L.L.C., and Reagor and Dykes.**

**Interrogatory No.14:**      Identify the date upon which you first became aware that any Reagor-Dykes entity was in violation of any agreement with any of its lenders.   Include in your answer how you were made aware, by whom, where you were when you were made aware, and describe any related communications.

**Answer: Reagor objects to this interrogatory as seeking a legal conclusion.   Reagor additionally objects to the extent the interrogatory seeks the disclosure of information or**

APP 0372

Bart Reagor's Responses and Objections
to FBT's First Set of Interrogatories
2828143

communications protected by the attorney-client privilege, the work product doctrine, and/or any other applicable constitutional, statutory, or common law privilege.

Subject to and without waiving these objections, Reagor became aware of First Bank's position when First Bank made demand for payment upon RAM, Reagor and Dykes to pay the amounts owing on the promissory notes.

**Interrogatory No.15:**    Identify the date upon which you first became aware that any Reagor-Dykes entity was kiting checks.  Include in your answer how you were made aware, by whom, where you were when you were made aware, and describe any related communications.

**Answer: Reagor objects to this interrogatory as seeking a legal conclusion.  Reagor additionally objects to the extent the interrogatory seeks the disclosure of information or communications protected by the attorney-client privilege, the work product doctrine, and/or any other applicable constitutional, statutory, or common law privilege.**

**Subject to and without waiving these objections, Reagor became aware of First Bank's check kiting allegations when First Bank filed its Original Petition and Application for Writ of Sequestration on September 18, 2018.**

**Interrogatory No.16:**    Identify and describe any wrongful acts you allege were taken by First Bank.  Include in your answer the identity of any persons involved in such acts, when and where such acts were taken, identify any witnesses to such acts, and describe any related communications.

**Answer: Reagor objects to this integratory as premature.  Discovery has only just commenced in this action.  As such, it is impossible for Reagor to provide, or even have complete knowledge of, the requested information.  Reagor is in the process of continuing to**

Bart Reagor's Responses and Objections
to FBT's First Set of Interrogatories
2828143

APP 0373

evaluate his affirmative defenses.  Subject to the forgoing objection, Reagor's affirmative defense concerns Plaintiff's responsibility for its own lack of good faith or failure to exercise ordinary care, or limit the measure of damages for such a lack or failure. Tex. Bus. & Com. Code Ann. § 4.103(a) (West).  The factual bases for the affirmative defenses will be supplemented as the factual investigation continues and consistent with the Federal Rules of Civil Procedure.

**Interrogatory No.17:**      Identify and describe any wrongful acts you allege were taken by FirstCapital.  Include in your answer the identity of any persons involved in such acts, when and where such acts were taken, identify any witnesses to such acts, and describe any related communications.

**Answer: Reagor objects to this integratory as premature.  Discovery has only just commenced in this action.  As such, it is impossible for Reagor to provide, or even have complete knowledge of, the requested information.  Reagor additionally objects to the extent the interrogatory seeks the disclosure of information or communications protected by the attorney-client privilege, the work product doctrine, and/or any other applicable constitutional, statutory, or common law privilege.**

**Subject to these objections, Reagor states that he will supplement his answer as discovery progresses. The factual bases for the affirmative defenses will be supplemented as the factual investigation continues and consistent with the Federal Rules of Civil Procedure.**

**Interrogatory No.18:**      Identify and describe any wrongful acts you allege were taken by any lender to any Reagor-Dykes entity.  Include in your answer the identity of any persons involved

APP 0374

Bart Reagor's Responses and Objections
to FBT's First Set of Interrogatories
2828143

in such acts, when and where such acts were taken, identify any witnesses to such acts, and describe any related communications.

**Answer:** **Reagor objects to this integratory as premature.  Discovery has only just commenced in this action.  As such, it is impossible for Reagor to provide, or even have complete knowledge of, the requested information.  Reagor additionally objects to the extent the interrogatory seeks the disclosure of information or communications protected by the attorney-client privilege, the work product doctrine, and/or any other applicable constitutional, statutory, or common law privilege.**

**Subject to these objections, Reagor states that he will supplement his answer as discovery progresses. The factual bases for the affirmative defenses will be supplemented as the factual investigation continues and consistent with the Federal Rules of Civil Procedure.**

Bart Reagor's Responses and Objections
to FBT's First Set of Interrogatories
2828143

Respectfully submitted,


 _/s/ Marshall M. Searcy, Jr._____
Marshall M. Searcy, Jr.
State Bar No. 17955500
marshall.searcy@kellyhart.com
Scott R. Wiehle
State Bar No. 24043991
scott.wiehle@kellyhart.com
KELLY HART & HALLMAN, LLP
201 Main Street, Suite 2500
Fort Worth, Texas  76102
Telephone:  (817) 332-2500
Telecopy:  (817) 878-9280

**ATTORNEYS FOR DEFENDANT BART
REAGOR**

Bart Reagor's Responses and Objections
to FBT's First Set of Interrogatories
2828143

## <u>CERTIFICATE OF SERVICE</u>

I certify that a true and correct copy of the foregoing to be delivered to the following parties in accordance with the Federal Rules of Civil Procedure on the February 8, 2019.

| | |
|---|---|
| Roel R. Hogue | Thomas Murray Kirkendall |
| John F. Massouh | Law Office of Tom Kirkendall |
| Sprouse Shrader Smith PC | 2 Violetta Court |
| 701 S. Taylor, Suite 500 | The Woodlands, Texas 77381-4550 |
| Amarillo, Texas 79101 | ATTORNEYS FOR DEFENDANT RICK DYKES |
| ATTORNEYS FOR DEFENDANT FIRSTCAPITAL BANK OF TEXAS, NA | |
| Robert N. Nebb | Jared Michael Slade |
| Law Office of Michael H. Carper | Alston & Bird, LLP |
| 1102 Main Street | 2200 Ross Avenue, Suite 2300 |
| Lubbock, Texas 79401 | Dallas, Texas 75201 |
| ATTORNEYS FOR DEFENDANT SHEILA MILLER | ATTORNEYS FOR DEFENDANTS BRAD D. BURGESS AND KENNETH L. BURGESS |
| | |
| Robert A. Aycock | Paul B. Lackey |
| Joshua D. Frost | Michael B. Aigen |
| Field, Manning, Stone, Hawthorne, & Aycock, PC | Katy L. Hart |
| | Stinson Leonard Street LLP |
| 2112 Indiana Avenue | 3102 Oak Lawn Avenue, Suite 777 |
| Lubbock, Teas 79410-1449 | Dallas, Texas 75219-4259 |
| ATTORNEYS FOR DEFENDANT SHANE SMITH | ATTORNEYS FOR PLAINTIFF FIRST BANK & TRUST |

_/s/ Marshall M. Searcy, Jr._
Marshall M. Searcy, Jr.

APP 0377

Bart Reagor's Responses and Objections
to FBT's First Set of Interrogatories
2828143

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**LUBBOCK DIVISION**

| | | |
|---|---|---|
| FIRST BANK & TRUST,<br>     Plaintiff, | §<br>§<br>§<br>§ | |
| v. | §<br>§ | Civil Action No.: 5:18-cv-00234-C |
| REAGOR AUTO MALL, LTD. d/b/a<br>REAGOR-DYKES OF LEVELLAND, AND<br>d/b/a REAGOR-DYKES IMPORTS,<br>FIRSTCAPITAL BANK OF TEXAS, N.A.,<br>BART REAGOR, RICK DYKES, SHANE<br>SMITH, SHEILA MILLER, BRAD D.<br>BURGESS, and KENNETH L. BURGESS<br>     Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | |

## VERIFICATION

STATE OF TEXAS       §
                                   §
COUNTY OF _____  §

BEFORE ME, the undersigned Notary Public, on this day personally appeared Bart Reagor, who, being by me duly sworn on oath, deposed and said that he is the Defendant in the above-entitled and numbered cause; that he has read the above answers to interrogatories; and that every statement contained in the answers to interrogatories is within his personal knowledge and is true and correct.

_____
Bart Reagor

SUBSCRIBED AND SWORN TO BEFORE ME on this the 8th day of February, 2019, to certify which witness my hand and official seal.

APP 0378

(Seal)

_____

Signature of Notary Public

Jessica Palacios

_____

Typed/Printed Name of Notary Public

Notary Public in and for the State of Texas

My Commission Expires:____6/29/2021____

Jessica Ann Palacios
My Commission Expires
06/29/2021
ID No. 131190897

APP 0379